# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ACADIA PHARMACEUTICALS INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) C.A. No. 22-1387-GBW |
| v. | ) |
| | ) **CONSOLIDATED** |
| AUROBINDO PHARMA LIMITED, *et al.* | ) ▮▮▮▮▮▮▮▮▮▮ |
| | ) |
| Defendants. | ) PUBLIC VERSION FILED |
| | OCTOBER 3, 2024 |

**PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANT
MSN'S *DAUBERT* MOTION REGARDING CERTAIN
<u>OPINIONS OF DR. PAMELA SMITH</u>**

## TABLE OF CONTENTS
(continued)

Page

I. INTRODUCTION ........................................................................................................... 1

II. FACTUAL BACKGROUND ......................................................................................... 1

III. MSN'S *DAUBERT* MOTION SHOULD BE DENIED ................................................. 3

    A. Dr. Smith's Opinions and Testimony Concerning the Particle Size Distribution Testing of MSN's ANDA Product Are Not Improper ...................... 4

        1. Dr. Smith Is Sufficiently Qualified to Opine on MSN's Infringement of Claim 3 of the '721 Patent and Her Opinions Properly Rely Upon Dr. Byrn's Testing ..................................................... 4

        2. Dr. Smith's Opinions and Testimony Meet the "Fit" Requirement ......... 10

IV. CONCLUSION ............................................................................................................ 12

# **TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993) ........................................................................................................3, 11

*Dura Automotive Sys. of Ind., Inc. v. CTS Corp.*,
    285 F.3d 609 (7th Cir. 2002) ..............................................................................................6, 9

*IpLearn LLC v. Blackboard Inc.*,
    C.A. No. 11-876, 2014 WL 4954462 (D. Del. Sept. 29, 2014) ..............................................10

*Kyocera Senco Indus. Tools Inc. v. Int'l Trade Comm'n*,
    22 F.4th 1369 (Fed. Cir. 2022) ..................................................................................................5

*LG Display Co. v. AU Optronics Corp.*,
    265 F.R.D. 199 (D. Del. 2010) ..................................................................................................3

*Monsanto Co. v. David*,
    516 F.3d 1009 (Fed. Cir. 2008) ................................................................................................6

*Shire ViroPharma Inc. v. CSL Behring LLC*,
    C.A. No. 17-414, 2021 WL 1227097 (D. Del. Mar. 31, 2021) ............................................4, 6

*Shure Inc. v. Clearone, Inc.*,
    C.A. No. 19-1343, 2021 WL 7209740 (D. Del. 2021) ..........................................................11

*Summit 6, LLC v. Samsung Elecs. Co.*,
    802 F.3d 1283 (Fed. Cir. 2015) ................................................................................................5

*United States v. Ford*,
    481 F.3d 215 (3d Cir. 2007) ......................................................................................................3

**Other Authorities**

Fed. R. Evid. 702 ................................................................................................................................4

Fed. R. Evid. 702(a) ........................................................................................................................11

Fed. R. Evid. 704(a) ..........................................................................................................................3

Fed. R. Evid. 703 ....................................................................................................................6, 7, 8

I.      **INTRODUCTION**

Plaintiff ACADIA Pharmaceuticals Inc. ("ACADIA") hereby opposes Defendants' MSN Laboratories Private Limited and MSN Pharmaceuticals, Inc. (collectively "MSN") *Daubert* motion seeking to exclude the expert opinions provided by Dr. Pamela A. Smith (Chief Operating Officer of Improved Pharma, a research, consulting, and information company in the pharmaceutical field) regarding the D90 particle size distribution limitation of Claim 3 of U.S. Patent No. 11,452,721 (the "'721 Patent").  Dr. Smith is sufficiently qualified to opine on MSN's infringement of Claim 3 of the '721 Patent, and her reliance on the testing of MSN's ANDA Product supervised and witnessed by her colleague, Dr. Stephen Byrn, was reasonable and permissible.  Dr. Byrn is the Chief Science Officer of Improved Pharma and a Professor of Medicinal Chemistry at Purdue University.

II.     **FACTUAL BACKGROUND**

ACADIA filed this patent infringement case under the Hatch-Waxman Act in response to MSN's filing of its Abbreviated New Drug Application seeking approval to market a generic version ("MSN's ANDA Product") of ACADIA's Nuplazid® product.  The only patent at issue in this case is U.S. Patent No. 11,452,721 ("the '721 Patent").  The '721 Patent has two independent claims, both of which cover small-sized capsule formulations that contain a blended pimavanserin composition and granules comprising 40 mg pimavanserin tartrate and excipients.  (*See* '721 Patent at Claims 1 and 4.)  Relevant to this *Daubert* motion is Claim 3, which depends from independent Claim 1.  These claims read as follows:

> 1. A pharmaceutically acceptable capsule for orally delivering 34 mg of pimavanserin to a patient, wherein the capsule has a size 3 or 4 capsule shell that contains a blended pimavanserin composition comprising:
> granules comprising 40 mg pimavanserin tartrate and optionally one or more pharmaceutically acceptable excipients;
> and one or more blending excipients; wherein the bulk

1

> density of the granules is >0.4 g/ml as determined by USP<616>, method 1.
>
> 3. The pharmaceutically acceptable capsule of claim 1, ***wherein the blended pimavanserin composition has a D90 particle size distribution of 60-450 μm as measured using laser scattering particle size analysis***.

('721 Patent at Claims 1 and 3 (emphasis added).)

As part of ACADIA's infringement case against MSN, Dr. Smith submitted an expert report ("Opening Expert Report") in which she provided the facts and data supporting her opinions that MSN's ANDA Product infringes Claim 3 of the '721 Patent. Dr. Smith explained that she worked with her close colleague at Improved Pharma, Dr. Byrn, who arranged for, supervised, and witnessed the particle size distribution analysis performed on MSN's ANDA Product.[1] (*See* D.I. 95, Exhibit A ("Smith Tr.") at 92:10–93:2.) The analysis was conducted at Purdue University's Particle, Powder and Compact Characterization Lab, located in the Center for Particulate Products and Processes ("CP3"). (*Id.* at 91:22–25.) The full details of the particle size distribution testing were included in Dr. Smith's Opening Expert Report at ¶¶ 80–89, (*see* D.I. 95, Exhibit B), and Appendix D of the Opening Expert Report, titled ▬▬▬▬▬▬▬ (Ex. 1 "Appendix D to Opening Expert Report".) ▬▬▬▬▬▬▬

▬▬▬▬▬▬▬

▬▬▬▬▬▬▬ (Smith Tr. at 95:20–23, 96:16–19.)

At her deposition, MSN repeatedly asked Dr. Smith why she did not personally witness the particle size testing. Dr. Smith explained that she relied on Dr. Byrn ▬▬▬▬▬▬▬

---

[1] Drs. Smith and Byrn are executives at Improved Pharma and conducted the particle size distribution testing on MSN's ANDA Product on September 29, 2021. (D.I. 95, Exhibit B at ¶ 81.)

2

Case 1:22-cv-01387-GBW   Document 99   Filed 10/03/24   Page 6 of 16 PageID #: 1045

████████████████████████████ and his experience as a professor in industrial physical pharmacy, making him the better suited person from Improved Pharma to supervise and witness the testing. (Smith Tr. at 92:14–93:2; 105:21–21.) While she did not witness the testing, Dr. Smith explained that she thereafter discussed the particle size testing results with Dr. Byrn and that the content of those conversations was disclosed in her report. (*Id.* at 93:17–24.) Dr. Smith explained that given her knowledge of the expertise of Dr. Byrn ███████████, she has no reason to question the propriety of the analysis and relied on it in connection with forming her opinions on Claim 3 of the '721 Patent.[2] (*See, e.g.*, *id.* at 96:9–15, 105:16–23, 115:16–22.)

### III.  MSN'S *DAUBERT* MOTION SHOULD BE DENIED

District court judges are to perform a screening function with respect to expert testimony before it reaches the trier of fact. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). *Daubert* requires courts to conduct an inquiry into the reliability and relevance of the proposed expert testimony. *See, e.g.*, *United States v. Ford*, 481 F.3d 215, 218 (3d Cir. 2007). An otherwise qualified and proper expert technical opinion is not excludable "just because it embraces an ultimate issue." Fed. R. Evid. 704(a). Moreover, "Daubert considerations are less pressing in the context of a bench trial" such as the bench trial in the present case. *LG Display Co. v. AU Optronics Corp.*, 265 F.R.D. 199, 202 (D. Del. 2010).

---

[2]  In response to Dr. Smith's Opening Expert report, MSN had Dr. Fernando Muzzio submitted a Rebuttal Report on infringement. In his report, Dr. Muzzio not once addresses the substance of Dr. Smith's opinions as to whether MSN's ANDA Product meets the limitations provided in Claim 3 of the '721 Patent.

3

      **A.**      **Dr. Smith's Opinions and Testimony Concerning the Particle Size Distribution Testing of MSN's ANDA Product Are Not Improper**

           **1.**      **Dr. Smith Is Sufficiently Qualified to Opine on MSN's Infringement of Claim 3 of the '721 Patent and Her Opinions Properly Rely Upon Dr. Byrn's Testing**

Dr. Smith possesses sufficient skill and specialized knowledge to qualify as an expert to opine on MSN's infringement of Claim 3 of the '721 Patent and her opinions properly relied on testing by her colleague, Dr. Byrn.

                **a.**      **Dr. Smith Is a Qualified Analytical Chemist**

A witness qualified "as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise" if it is more likely than not that the expert's "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," "is based on sufficient facts or data," and is "the product of reliable principles and methods," and the witness "reliably appli[ed] . . . the principles and methods to the facts of the case." Fed. R. Evid. 702. "An expert's qualifications should be assessed liberally, recognizing that a broad range of knowledge, skills, and training qualify an expert as such." *Shire ViroPharma Inc. v. CSL Behring LLC*, C.A. No. 17-414, 2021 WL 1227097 at *3 (D. Del. Mar. 31, 2021). The Third Circuit "has eschewed imposing overly rigorous requirements of expertise and has been satisfied with more generalized qualifications." (*Id.*)

    As provided in her Opening Expert Report, Dr. Smith has led numerous pharmaceutical solid-state research projects and has supervised work in Improved Pharma's chemistry research laboratory on analytical methods including microspectroscopy, polarized light microscopy, hot stage optical microscopy, high-performance liquid chromatography, dissolution, differential scanning calorimetry, and ultraviolet-visible spectrophotometry. (Ex. 2, Opening Expert Report Excerpt, at ¶ 2.) In the past five years, she has provided consulting and analytical services to

4

countless pharmaceutical companies on a variety of solid-state chemistry and analytical projects. (*Id.* at ¶ 3.) Before that, she led over 100 research projects, in which her responsibilities included the evaluation of data generated by a range of analytical techniques and preparation of technical reports for a variety of pharmaceutical clients. (*Id.* at ¶ 5.) Altogether, Dr. Smith's scientific, technical, and specialized knowledge would be helpful to the trier of fact.

Notably, MSN has not challenged Dr. Smith's qualifications as lacking the requisite ordinary skill in the art in this case. "To offer expert testimony from the perspective of a skilled artisan in a patent case—like for validity or infringement—a witness must at least have ordinary skill in the art." *Kyocera Senco Indus. Tools Inc. v. Int'l Trade Comm'n*, 22 F.4th 1369, 1377 (Fed. Cir. 2022).[3] Dr. Smith stated that person of ordinary skill in the art ("POSA") "would have had at least a bachelor's degree in the relevant scientific field (e.g., pharmaceutical sciences, chemistry, chemical engineering, or materials science, or related fields), and several years of real-world experience with the preparation of pharmaceutical formulations, that a POSA with a bachelor's degree would have more real-world experience, while a POSA with a more advanced degree would have correspondingly less real-world experience, and that ***a POSA would also have experience working as part of a multi-disciplinary team and would have access to, and draw upon the knowledge of, individuals with comparable levels of education and experience in relevant disciplines that lie outside his or her primary training***." (Ex. 3, Reply Expert Report Excerpt, at ¶ 5 (emphasis added).) Indeed, Dr. Smith's standard for a POSA expressly includes the ability to draw upon the knowledge of others in disciplines that lie outside of her primary training (such as Dr. Byrn) as part of a multidisciplinary team. MSN has not challenged whether

---

[3] The Federal Circuit "applies the law of the otherwise applicable regional circuit to issues not unique to patent law, including the admissibility of expert testimony." *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1294 (Fed. Cir. 2015).

Dr. Smith meets this definition of POSA. Nor does MSN contend that Dr. Smith is not a POSA under the definition provided by its expert Dr. Muzzio. (*See id.* at ¶ 6.) For this reason, too, MSN's *Daubert* challenge on the grounds that Dr. Smith lacks the requisite qualifications is misguided.

### b. Dr. Smith Properly Relied on Testing by Dr. Byrn

In challenging Dr. Smith, MSN relies on her testimony that her "experience with particle size analysis is not very extensive," that she could not answer some of counsel's questions about the testing, and that she "relied *entirely* upon her colleague, Dr. Byrn," for the particle size testing. (*See* D.I. 95 ("Def's Br.") at 4–5.)" However, an expert will not be excluded simply because the expert is not "the best qualified" or lacks the most appropriate specialization. *See Shire*, 2021 WL 1227097 at *3. Here, while Dr. Byrn may have more experience with particle size distribution analysis than Dr. Smith, her opinions cannot be excluded for that reason alone. Indeed, Dr. Smith was justified in relying on Dr. Byrn's testing due to their close working relationship and her knowledge of his and the CP3 lab's expertise in testing, and because their respective areas of expertise are closely related, if not overlap.

If anything, MSN ignores the well-settled proposition that an expert witness can rely on admissible expert testimony from another expert as the factual support for his or her opinion testimony. *See, e.g., Dura Automotive Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 609-613 (7th Cir. 2002) ("[I]t is common in technical fields for an expert to base an opinion in part on what a different expert believes on the basis of expert knowledge not possessed by the first expert."); *Monsanto Co. v. David*, 516 F.3d 1009, 1015 (Fed. Cir. 2008) ("Numerous courts have held that reliance on scientific test results prepared by others may constitute the type of evidence that is reasonably relied upon by experts for purposes of Rule of Evidence 703.").

Here, Dr. Smith felt it was proper to rely on Dr. Byrn at least because ████████████

██████████████████████████████████████████████

████████████████████████████████████ (Smith Tr. at 91:20–25, 92:14–93:24.) Dr. Smith did not blindly accept the results of the particle size testing supervised by Dr. Byrn. Indeed, she testified that she discussed the results with Dr. Byrn and subsequently included the discussion in her report. (*Id.* at 10:20–24; *see also* Ex. 1, Appendix D to Opening Expert Report.) Moreover, she did not delegate the laser light particle size analysis to some unknown third party; rather, Dr. Byrn and Dr. Smith are both executives at Improved Pharma and have worked together for many years, giving her a basis to assess his competency to supervise this testing. Dr. Smith considered it appropriate to rely on Dr. Byrn for the analysis. (Smith Tr. at 108:20–110:15.) MSN offers no evidence to the contrary.[4] Thus, MSN has not shown that Dr. Smith lacks the expertise necessary to opine on MSN's infringement of Claim 3 of the '721 Patent.

MSN's arguments to the contrary largely fixate on the fact that Dr. Smith did not "personally witness" the testing. But "[a]n expert may base an opinion on facts or data in the case that the expert ***has been made aware of*** or personally observed." Fed. R. Evid. 703 (emphasis added). Furthermore, "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted." (*Id.*) Here, MSN does not (and cannot) dispute the fact that Dr. Smith was made aware of the particle size distribution testing conducted by her close colleague, Dr. Byrn. It is not unusual for experts such as these, who have worked together for many years, to collaborate on a project where one of the experts may have more experience than the other in a specific area. As previously explained, Dr. Byrn provided Dr. Smith with ***all*** of the results of testing, and they had

---

[4] Notably, MSN's non-infringement expert (Dr. Muzzio) did not include any arguments of non-infringement with respect to the D90 particle size distribution limitations of claim 3, and did not raise any concerns about the particle size testing.

7

discussed the results of the testing performed at CP3. While MSN seems to suggest that "[p]ersonal knowledge is an important factor in analyzing trustworthiness of testing results," (Def's Br. at 3), it is not a requirement for purposes of satisfying Rule 703. Thus, MSN's contention that Dr. Smith's opinion should be excluded because it "is not based on personal knowledge" is misguided.

MSN argues that Dr. Smith's "testimony is further inadmissible because it relies on hearsay testimony as to Dr. Byrn's work, and there is no evidence that Dr. Byrn's work contained the sort of facts or data that an expert in the field would reasonably rely upon." (*Id.* at 5.) Other than allege that Dr. Smith's reliance fails this test "because she is merely acting as a mouthpiece for Dr. Byrn's opinions," MSN provides no additional support for their contention that Dr. Byrn's testimony would be inadmissible. (*See id.* at 5–8.) Contrary to MSN's contention, as noted above, Dr. Smith had conversations with Dr. Byrn regarding the laser light scattering experiments that he performed and the particle size distribution test results. (Smith Tr. at 93:17-22 ("Q: Did you have a conversation with him about particle size testing? A: Yes. Q: Okay. What did he tell you in that conversation? A: Exactly what you see in the report.") Because Dr. Smith discussed the results of the particle size testing with Dr. Byrn and reviewed them without turning a blind eye, Dr. Smith is **not** "merely acting as a mouthpiece for Dr. Byrn's opinions" as MSN contends. Dr. Smith, in fact, was able to answer some of MSN's questions during her deposition about the particle size distribution testing ███████████████. (*See, e.g.*, Smith Tr. at 95:20–96:22, 97:8–98:6, 99:24–101:3, 101:5–102:25, 104:24–105:23, 106:21–108:12, 108:16–109:21, 111:10–112:18.) Accordingly, Defendant's motion should be denied because it is predicated on the incorrect notion that Dr. Smith's reliance on the work of a close colleague cannot confer with said colleague under any circumstances.

8

Relying on a case from a different circuit, MSN next argues that "Dr. Smith's lack of expertise robs her of any basis to opine on what a qualified expert in laser light scattering particle size analysis would consider appropriate to rely on in forming their opinion, including Dr. Byrn's experiments." (Def's Br. at 5–6.) But MSN overstates the holding from *Dura Auto Systems*. There, the court did not allow an expert hydrologist to rely upon the work of other experts who performed very complicated computer modeling that the expert hydrologist was unfamiliar with. *Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 614–615 (7th Cir. 2002). The court emphasized the complexity of the work, namely, that the modeling was not "cut and dried" but instead was "inherently not the most precise," and that "the process of constructing a valid and useful groundwater model is an iterative process that requires the exercise of sound technical judgment." (*Id.* at 614.) The court also noted that the opinions on which the expert relied would be considered "controversial in the relevant community of experts," and where experts may differ in justifying the discretionary choices that they made. (*Id.* at 615.)

Here, in contrast, the degree of subjective analysis is not as drastic as that described in *Dura Auto Systems*. For instance, Exhibit 9 from Dr. Smith's Opening Expert Report provides that for laser light diffraction, it is a preferred method for determination of PSD, where "[a]nalysis time is short, robust methods can be developed with a minimum of material, results are reproducible, calibration is not required, and a wide range of measurement is possible." (D.I. 95, Exhibit B at Exhibit 9, page 274.) Likewise, "[f]or dry dispersion LD, initial conditions such as pressure and lens size are determined by microscopy, with **a short series** of trial runs to assess correct pressure for dispersing particles without fracturing them and to confirm lens size." *Id.* The article also states that "[d]ry dispersion techniques tend to be used when there is plenty of material available, since developing a method is straightforward with sufficient trial runs." (*Id.* at Exhibit

9

9, page 275.) MSN has not pointed to any references or testimony to support the notion that laser light scattering analysis would be as subjective or complicated as the type of expert opinion provided in *Dura Auto Systems*. Thus, for at least this reason too, Dr. Smith's reliance on the work supervised by Dr. Byrn is not improper.[5]

MSN also appears to suggest that because Dr. Smith relied too heavily on her written report, that she is therefore too unfamiliar with the particle size distribution testing and too unreliable to appear before a jury. However, this court has held that heavy reliance on the information in the report does not raise a *Daubert* issue. *See, e.g.*, *IpLearn LLC v. Blackboard Inc.*, C.A. No. 11-876, 2014 WL 4954462, at *2 (D. Del. Sept. 29, 2014). Dr. Smith's expert opinion is based on the work performed by her close colleague, Dr. Byrn, which in turn is based on sufficient facts and reliable methods. Whether or not Dr. Smith should have done more to become familiar with the work performed by Dr. Byrn is an issue for cross-examination, not *Daubert*.

### 2. Dr. Smith's Opinions and Testimony Meet the "Fit" Requirement

In a last ditch attempt to exclude Dr. Smith's testimony, MSN improperly contends that "[a] final basis for excluding Dr. Smith's opinion on particle size distribution is that she has not 'fit' it to the question of infringement." (Def's Br. at 8.) MSN contends that Dr. Smith's testimony "does not fit this case as it is not helpful in assisting the trier of fact" and solely relies on the fact that Dr. Smith ███████████████████

---

[5] MSN contends that ███████████████████ ███████████████████ (Def's Br. at 6-7.) Even so, however, Dr. Smith's reliance on Dr. Byrn is not unreasonable. Dr. Smith's expert opinion and report contain all the information provided by Dr. Byrn, and which Dr. Smith had discussed with Dr. Byrn prior to signing her expert report.

10

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

To be admissible, expert testimony must be connected to the inquiry at hand. *See Daubert*, 509 U.S. at 591-92. The relevant inquiry is whether "expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Id*. The Rule requires that expert testimony "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Fit "goes primarily to relevance as the testimony must assist the trier of fact to understand the evidence or to determine a fact in issue and have a valid connection to the pertinent inquiry as a precondition to admissibility." *Shure Inc. v. Clearone, Inc.*, C.A. No. 19-1343, 2021 WL 7209740 at *1 (D. Del. Oct. 5, 2021). "The standard for fit . . . is not high; it is met when there is a clear 'fit' connecting the issue in the case with the expert's opinion that will aid the jury in determining an issue in the case." (*Id.* at *4.)

The "fit" requirement is met here because Dr. Smith's particle size distribution testing squarely addresses the infringement inquiry with respect to Claim 3 (*i.e.*, whether the particle size limitation is met). ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Because there can be no question that the particle size distribution testing conducted by Drs. Smith and Byrn was obtained using laser light scattering particle size (LLS PS) methods, MSN cannot in good faith argue that "fit" is missing. Indeed, Claim 3 of the '721 Patent expressly only requires that D90 particle size distribution be measured "using laser scattering particle size analysis," nothing more. Dr. Smith's report includes such analysis.

MSN contends that "the patent mandates that the D90 value must be measured by laser light scattering particle size analyses, and such analysis should be 'conducted on a Malvern Mastersizer 2000 LLS PS system using a Scirocco 2000 dry dispersion unit using standard non-

11

GMP conditions, and in a sample size of about 2 -10 g.'" (Def's Br. at 8.) MSN mischaracterizes the scope of claim 3 and is attempting to import additional limitations into the claim requiring a specific piece of equipment for testing. Indeed, MSN is really making claim construction arguments (never previously raised) requiring that a specific, outdated models of instruments (*i.e.*, "Malvern Mastersizer 2000 LLS PS system using a Scirocco 2000 dry dispersion unit") ***must be used***. But Claim 3 does not name any model.

MSN contends that Dr. Smith did not explain why the Mastersizer 2000 LLS PS laser scattering equipment was not used. She did not need to explain it, as there is no requirement in the claims for using such equipment. Regardless, Dr. Smith did provide such explanation, noting that the Malvern Mastersizer 2000 LLS PS system is "an older unit. And we could not find a functioning older unit of that make and model." (*Id.*) As such, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ But again, "fit" is not an issue here because there is no requirement to use a specific instrument for testing and the trier of fact can determine whether the testing was appropriate.

## IV. <u>CONCLUSION</u>

For at least these reasons, ACADIA respectfully requests that the Court deny MSN's *Daubert* motion regarding the opinions of Dr. Pamela Smith concerning MSN's infringement of Claim 3 of the '721 Patent.

<table>
<tr><td>Date: September 26, 2024</td><td><b>SAUL EWING LLP</b></td></tr>
<tr><td></td><td><i>/s/ Michelle C. Streifthau-Livizos</i><br>James D. Taylor, Jr. (#4009)<br>Jessica M. Jones (#6246)</td></tr>
<tr><td>OF COUNSEL:</td><td>Michelle C. Streifthau-Livizos (#6584)<br>1201 N. Market Street, Suite 2300</td></tr>
<tr><td><i>Of Counsel</i>:</td><td>P.O. Box 1266<br>Wilmington, Delaware 19899</td></tr>
<tr><td>Chad J. Peterman<br>Bruce M. Wexler<br>Scott F. Peachman<br>Peter E. Conway<br>PAUL HASTINGS LLP<br>200 Park Avenue<br>New York, New York 10166<br>(212) 318-6000</td><td>(302) 421-6800<br>james.taylor@saul.com<br>jessica.jones@saul.com<br>michelle.streifthau-livizos@saul.com<br><br><i>Attorneys for Plaintiff ACADIA Pharmaceuticals Inc.</i></td></tr>
<tr><td>Felix A. Eyzaguirre<br>PAUL HASTINGS LLP<br>600 Travis Street, 58th Floor<br>Houston, TX 77002<br>(713) 860-7300</td><td></td></tr>
</table>

13