# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ACADIA PHARMACEUTICALS INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 22-1387-GBW |
| | ) |
| AUROBINDO PHARMA LIMITED *et al*., | ) CONSOLIDATED |
| | ) **PUBLIC VERSION FILED** |
| Defendants. | ) **NOVEMBER 14, 2024** |
| | ) |

## ACADIA'S MOTION *IN LIMINE* TO PRECLUDE
## DEFENDANTS FROM REARGUING CLAIM CONSTRUCTION

ACADIA moves to preclude Defendants' expert, Dr. Fernando J. Muzzio, from resurrecting Defendants' specification disavowal argument, which the Court already rejected during claim construction, or from seeking to contravene the Court's finding that the construed terms are not explicitly limited or redefined by the specification. Defendants should be precluded from arguing a plain and ordinary meaning of the claims that is inconsistent with the *Markman* decision.

During *Markman*, Defendants argued that ACADIA disavowed formulations where pimavanserin was granulated with other excipients and that Defendants' "proposed constructions … are … fully supported by the consistent description of the claimed invention and its manufacturing process in the '721 patent specification." (D.I. 39 at 17). Defendants asserted that the embodiment "describ[ing] processes to manufacture capsules," (Ex. 1 ('721 patent) at 15:3-5), provides "comparative experiments resulting in *unacceptable* products," and thus, "discloses the invention, which would presumably generate acceptable products, as involving a wet granulation process with 'a small quantity of water' conducted on pimavanserin API alone." (D.I. 39 at 19 (citing Ex. 1 ('721 patent) at cols. 13-15 ("manufacturing embodiment")) (emphasis in original)). In short, Defendants argued "that the foundation of the claimed subject matter is 40 mg pimavanserin tartrate granulated alone [and] that foundation is a limitation of all issued claims of the '721 patent." (*Id.* at 42).

The Court rejected Defendants' specification disavowal argument and found that the disputed terms have their "plain and ordinary meaning," "granule" is not limited to pimavanserin granulated alone, and "blended pimavanserin composition" need not possess an extra-granular component. (D.I. 43 at 3-6). On specification disavowal, the Court found that "Acadia did not clearly disavow granules containing both pimavanserin and excipients," (*id.* at 9), and that "[w]hile

the specification also describes a mixing process that occurs after granulation, nowhere does the specification explicitly state that extra-granular excipients are mandatory," (D.I. 43 at 11). Dr. Muzzio "attempt[s] to resurrect a claim construction that the district court already rejected," however, "[r]estating a previously settled argument does not create an 'actual dispute regarding the proper scope of the claims.'" *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1207 (Fed. Cir. 2010); *TEK Glob., S.R.L. v. Sealant Sys. Int'l, Inc.*, 920 F.3d 777, 787 (Fed. Cir. 2019) (rejecting attempt to "toe[] a fine line" around claim construction by arguing support in 'the *plain language* of [the] claim").

Specifically, Dr. Muzzio tries to resuscitate the rejected specification disavowal by arguing that, *inter alia*, "the issued claims recite granules, granules must be made by granulation processes, and the comparative experiments define granulation processes that resulted in ... unacceptable granules, and thus would be unacceptable for use in a 'pharmaceutically acceptable capsule' that is to contain granules." (Ex. 2 (Muzzio Reply) at ¶ 101). Dr. Muzzio attempted to obfuscate that this is the exact same, rejected disavowal argument by stating:

> **the claims encompass subject matter the inventors expressly disclaimed** … unless the 'pharmaceutically acceptable capsule' language operates to somehow exclude the unacceptable granulations from the scope of claims 1 and 4 (and thus the remaining claims), then claims 1 and 4 read on the unacceptable granules as well as the **acceptable granules of pimavanserin alone**.

(*Id.* at ¶ 102 (emphasis altered)). But Dr. Muzzio's basis for this position is that "[a] [POSA]… would generally understand what 'pharmaceutically acceptable' means, except in the case of the '721 patent where the specification manages to confuse the meaning of that term," (Ex. 3 (Muzzio Tr.) at 93:4-8), because "the whole point of the specification … and the most clear thing being described as inventive … is granulating without excipients," (*id.* at 148:9-14), which "would inform the POSA, when reading the claim, that there has to be the claim element that actually

distinguishes the acceptable versus the not acceptable ways of making granules," (*id.* at 131:3-7), so "[y]eah, just because the court construed some terms doesn't mean that the POSA wouldn't have questions and try to understand the claims some other way," (*id.* at 132:1-8).

The Court already found that the specification "did not clearly disavow granules containing both pimavanserin and excipients." (D.I. 43 at 9). At its core, Dr. Muzzio's opinion is that the Court should have found that "the claims encompass subject matter the inventors expressly disclaimed," and because it did not, a POSA would now "try to understand the claims some other way" to render its constructions illusory. It is of no moment whether he improperly interprets the term's plain and ordinary meaning (i) by importing different limitations from the same manufacturing embodiment while excluding those explicitly rejected,[1] or (ii) by defining an "unconstrued" term to thereby limit the claimed "granules" in a previously rejected manner.[2] "Parties, their experts, and their attorneys are not permitted at trial to reargue claim construction or to take positions that are inconsistent with the Court's construction." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 763 F.Supp.2d 671, 695 (D. Del. 2010). Because the Court expressly rejected Dr. Muzzio's purported disclaimer, the Court may prevent Defendants' expert from rearguing this previously settled issue under the guise of § 112 contentions simply to obtain a second stab at reconstruing the terms at trial. *See, e.g.*, *Finjan*, 626 F.3d at 1206-07.

---

[1] *See, e.g.*, *Finjan*, 626 F.3d at 1206-07 ("district court construed [term] as having 'its plain and ordinary meaning,'" because "defendant's proposed construction would unjustifiably narrow the term's broad scope, which was not explicitly limited or redefined by the specification," therefore, "the district court [had] rejected Defendants' construction"); *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1325-26 (Fed. Cir. 2012); *TEK Glob.*, 920 F.3d at 787.

[2] *See, e.g.*, *InTouch Technologies, Inc. v. VGo Communications, Inc.*, 751 F.3d 1327, 1342 (Fed. Cir. 2014) ("By asking that we define 'determines' as it proposes, InTouch seeks to back into a construction of the claim limitation 'arbitrator' which we have already rejected.").

*Of Counsel*:

Chad J. Peterman
Bruce M. Wexler
Scott F. Peachman
Peter E. Conway
PAUL HASTINGS LLP
200 Park Avenue
New York, New York 10166
(212) 318-6000

Felix A. Eyzaguirre
PAUL HASTINGS LLP
600 Travis Street, 58th Floor
Houston, TX 77002
(713) 860-7300

SAUL EWING LLP

*/s/ Michelle C. Streifthau-Livizos*

James D. Taylor (#4009)
Jessica M. Jones (#6246)
Michelle C. Streifthau-Livizos (#6584)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
james.taylor@saul.com
jessica.jones@saul.com
michelle.streifthau-livizos@saul.com

*Attorneys for Plaintiff*
*ACADIA Pharmaceuticals Inc.*

Dated:  October 25, 2024

# EXHIBIT 1

US011452721B2

(12) **United States Patent**     (10) **Patent No.:**     **US 11,452,721 B2**

Tejwani et al.     (45) **Date of Patent:**     *Sep. 27, 2022

(54) **FORMULATIONS OF PIMAVANSERIN**

(71) Applicant: **ACADIA Pharmaceuticals Inc.**, San Diego, CA (US)

(72) Inventors: **Ravindra Tejwani**, Monmouth Junction, NJ (US); **Stephen Edward Abele**, White Plains, NY (US); **Emanuel Joseph Vizzotti**, Millburn, NJ (US)

(73) Assignee: **ACADIA Pharmaceuticals Inc.**, San Diego, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **17/693,830**

(22) Filed: **Mar. 14, 2022**

(65) **Prior Publication Data**

US 2022/0193057 A1     Jun. 23, 2022

**Related U.S. Application Data**

(63) Continuation of application No. 17/080,731, filed on Oct. 26, 2020, which is a continuation of application No. 16/836,086, filed on Mar. 31, 2020, now Pat. No. 10,849,891, which is a continuation of application No. 16/571,554, filed on Sep. 16, 2019, now Pat. No. 10,646,480, which is a continuation of application No. 16/363,378, filed on Mar. 25, 2019, now Pat. No. 10,449,185, which is a continuation of application No. PCT/US2018/048096, filed on Aug. 27, 2018.

(60) Provisional application No. 62/552,300, filed on Aug. 30, 2017.

(30) **Foreign Application Priority Data**

Sep. 1, 2017     (SE) .................................... 1730232-4

(51) **Int. Cl.**
*A61K 9/48* (2006.01)
*A61K 31/4468* (2006.01)
*A61K 9/16* (2006.01)
*A61K 9/20* (2006.01)
*A61K 47/38* (2006.01)

(52) **U.S. Cl.**
CPC ........ *A61K 31/4468* (2013.01); *A61K 9/1652* (2013.01); *A61K 9/1688* (2013.01); *A61K 9/1694* (2013.01); *A61K 9/2009* (2013.01); *A61K 9/2013* (2013.01); *A61K 9/2054* (2013.01); *A61K 9/485* (2013.01); *A61K 9/4808* (2013.01); *A61K 9/4833* (2013.01); *A61K 9/4858* (2013.01); *A61K 9/4866* (2013.01); *A61K 47/38* (2013.01); *C07B 2200/13* (2013.01)

(58) **Field of Classification Search**
CPC .. A61K 9/4833; A61K 9/4841; A61K 9/4883; A61K 9/4891
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,983,234 A | 9/1976 | Sayers | |
| 4,138,492 A | 2/1979 | Noverola et al. | |
| 4,255,432 A | 3/1981 | Kluge et al. | |
| 4,332,804 A | 6/1982 | Clark | |
| 4,353,900 A | 10/1982 | Clark | |
| 4,353,901 A | 10/1982 | Clark | |
| 4,367,232 A | 1/1983 | Boix-Iglesias et al. | |
| 4,795,646 A | 1/1989 | Schlunken | |
| 4,853,394 A | 8/1989 | King | |
| 5,025,013 A | 6/1991 | Barreau | |
| 5,214,055 A | 5/1993 | Peglion et al. | |
| 5,216,165 A | 6/1993 | Mobilio et al. | |
| 5,461,066 A | 10/1995 | Gericke et al. | |
| 5,595,872 A | 1/1997 | Wetterau, II et al. | |
| 5,621,010 A | 4/1997 | Sueda et al. | |
| 5,707,798 A | 1/1998 | Brann | |
| 5,795,894 A | 8/1998 | Shue | |
| 5,837,730 A | 11/1998 | Javitt | |
| 5,869,488 A | 2/1999 | Shue | |
| 5,877,173 A | 3/1999 | Olney et al. | |
| 5,912,132 A | 6/1999 | Brann | |
| 5,955,281 A | 9/1999 | Brann | |
| 6,107,324 A | 8/2000 | Behan | |
| 6,140,509 A | 10/2000 | Behan | |
| 6,150,393 A | 11/2000 | Behan | |
| 6,358,698 B1 | 3/2002 | Weiner et al. | |
| 6,451,343 B1 | 9/2002 | Glinecke et al. | |
| 6,479,480 B1 | 11/2002 | Moyes | |
| 6,486,153 B1 | 11/2002 | Castro Pineiro | |
| 6,670,137 B2 | 12/2003 | VanMechelen et al. | |
| 6,756,393 B2 | 6/2004 | Andersson et al. | |
| 6,815,458 B2 | 11/2004 | Andersson et al. | |
| 6,911,452 B2 | 6/2005 | Schlienger | |
| 7,022,698 B2 | 4/2006 | Hamied et al. | |
| 7,041,667 B1 | 5/2006 | Armour et al. | |
| 7,087,593 B2 | 8/2006 | Kelly et al. | |
| 7,115,634 B2 | 10/2006 | Thurieau et al. | |
| 7,217,719 B2 | 5/2007 | Schlienger | |
| 7,253,186 B2 | 8/2007 | Andersson et al. | |
| 7,351,707 B2 | 4/2008 | Schlienger | |
| 7,393,861 B2 | 7/2008 | Thurieau et al. | |
| 7,476,682 B2 | 1/2009 | Andersson et al. | |
| 7,538,222 B2 | 5/2009 | Andersson et al. | |
| 7,601,740 B2 | 10/2009 | Weiner et al. | |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| CA | 984843 A | 3/1976 | |
| CN | 104844502 A | 8/2015 | |

(Continued)

OTHER PUBLICATIONS

U.S. Appl. No. 09/800,096, Azacyclic compounds, filed Mar. 6, 2001, U.S. Pat. No. 6,815,458.

(Continued)

*Primary Examiner* — Micah Paul Young

(74) *Attorney, Agent, or Firm* — Goodwin Procter LLP

(57) **ABSTRACT**

Provided herein are capsules containing pimavanserin, processes for manufacturing said capsule, and pharmaceutical compositions containing pimavanserin.

**13 Claims, 4 Drawing Sheets**

## US 11,452,721 B2

Page 2

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 7,659,285 B2 | 2/2010 | Weiner et al. |
| 7,713,995 B2 | 5/2010 | Weiner et al. |
| 7,732,462 B2 | 6/2010 | Weiner et al. |
| 7,732,615 B2 | 6/2010 | Thygesen et al. |
| 7,790,899 B2 | 9/2010 | Tolf et al. |
| 7,816,383 B1 | 10/2010 | Bradford et al. |
| 7,820,695 B2 | 10/2010 | Weiner et al. |
| 7,858,789 B2 | 12/2010 | Thurieau et al. |
| 7,863,296 B2 | 1/2011 | Weiner et al. |
| 7,868,176 B2 | 1/2011 | Thygesen et al. |
| 7,875,632 B2 | 1/2011 | Weiner et al. |
| 7,923,564 B2 | 4/2011 | Thygesen et al. |
| 7,994,193 B2 | 8/2011 | Weiner et al. |
| 8,008,323 B2 | 8/2011 | Weiner et al. |
| 8,110,574 B2 | 2/2012 | Thurieau et al. |
| 8,227,487 B2 | 7/2012 | Weiner et al. |
| 8,236,960 B2 | 8/2012 | Thygesen et al. |
| 8,377,959 B2 | 2/2013 | Weiner et al. |
| 8,618,130 B2 | 12/2013 | Weiner et al. |
| 8,921,393 B2 | 12/2014 | Weiner et al. |
| 9,050,343 B2 | 6/2015 | Peters et al. |
| 9,211,289 B2 | 12/2015 | Weiner et al. |
| 9,296,694 B2 | 3/2016 | Andersson et al. |
| 9,446,037 B2 | 9/2016 | Mills et al. |
| 9,486,453 B2 | 11/2016 | Javitt |
| 9,566,271 B2 | 2/2017 | Weiner et al. |
| 9,757,366 B2 | 9/2017 | Mills et al. |
| 9,765,053 B2 | 9/2017 | Andersson et al. |
| 10,028,944 B2 | 7/2018 | Weiner et al. |
| 10,449,185 B2 * | 10/2019 | Tejwani ............... A61K 9/485 |
| 10,517,860 B2 | 12/2019 | Parkinson |
| 10,525,046 B2 | 1/2020 | Weiner et al. |
| 10,597,363 B2 | 3/2020 | Carlos et al. |
| 10,646,480 B2 * | 5/2020 | Tejwani ............. A61K 9/4833 |
| 10,849,891 B2 * | 12/2020 | Tejwani ............. A61K 9/2054 |
| 10,953,000 B2 | 3/2021 | Parkinson |
| 10,981,870 B2 | 4/2021 | Carlos et al. |
| 10,981,871 B2 | 4/2021 | Carlos et al. |
| 11,135,211 B2 | 10/2021 | Burstein |
| 11,191,757 B2 | 12/2021 | Parkinson |
| 2002/0004513 A1 | 1/2002 | Andersson et al. |
| 2002/0156068 A1 | 10/2002 | Behan |
| 2002/0165225 A1 | 11/2002 | Kankan et al. |
| 2004/0006081 A1 | 1/2004 | Burrows |
| 2004/0106600 A1 | 6/2004 | Andersson et al. |
| 2004/0213816 A1 | 10/2004 | Weiner et al. |
| 2004/0229908 A1 | 11/2004 | Nelson |
| 2005/0014757 A1 | 1/2005 | Andersson et al. |
| 2005/0148018 A1 | 7/2005 | Weiner et al. |
| 2005/0244862 A1 | 11/2005 | Brann |
| 2005/0256108 A1 | 11/2005 | Schlienger |
| 2005/0261278 A1 | 11/2005 | Weiner et al. |
| 2005/0261340 A1 | 11/2005 | Weiner et al. |
| 2005/0288328 A1 | 12/2005 | Weiner et al. |
| 2006/0094758 A1 | 5/2006 | Andersson et al. |
| 2006/0106063 A1 | 5/2006 | Thhygesen et al. |
| 2006/0111399 A1 | 5/2006 | Thhygesen et al. |
| 2006/0194778 A1 | 8/2006 | Andersson et al. |
| 2006/0194834 A1 | 8/2006 | Andersson et al. |
| 2006/0199794 A1 | 9/2006 | Schlienger |
| 2006/0199818 A1 | 9/2006 | Andersson et al. |
| 2006/0199842 A1 | 9/2006 | Weiner et al. |
| 2006/0204486 A1 | 9/2006 | Pyke et al. |
| 2006/0205710 A1 | 9/2006 | Schlienger |
| 2006/0205722 A1 | 9/2006 | Andersson et al. |
| 2006/0205780 A1 | 9/2006 | Thygesen et al. |
| 2006/0205781 A1 | 9/2006 | Thygesen et al. |
| 2006/0264465 A1 | 11/2006 | Weiner et al. |
| 2006/0264466 A1 | 11/2006 | Weiner et al. |
| 2006/0286610 A1 | 12/2006 | Brann |
| 2006/0292606 A1 | 12/2006 | Brann |
| 2007/0260064 A1 | 11/2007 | Tolf et al. |
| 2007/0264330 A1 * | 11/2007 | Ragnar-Tolf ......... A61K 9/2059 424/464 |
| 2008/0051429 A1 | 2/2008 | Van Kammen et al. |

| | | |
|---|---|---|
| 2008/0280886 A1 | 11/2008 | Gant et al. |
| 2009/0053329 A1 | 2/2009 | Peters et al. |
| 2009/0082342 A1 | 3/2009 | Uldam et al. |
| 2009/0082388 A1 | 3/2009 | Hacksell |
| 2009/0186921 A1 | 7/2009 | Andersson et al. |
| 2014/0018348 A1 | 1/2014 | Javitt |
| 2014/0162942 A1 | 6/2014 | Ghosal et al. |
| 2014/0221395 A1 | 8/2014 | Dhanoa |
| 2014/0329903 A1 | 11/2014 | Burstein et al. |
| 2014/0349976 A1 | 11/2014 | Hacksell et al. |
| 2015/0231126 A1 | 8/2015 | Peters |
| 2015/0313888 A1 | 11/2015 | Mills et al. |
| 2016/0237036 A1 | 8/2016 | Andersson et al. |
| 2018/0037549 A1 | 2/2018 | Biljan |
| 2019/0030015 A1 | 1/2019 | Weiner et al. |
| 2019/0047955 A1 | 2/2019 | Carlos et al. |
| 2019/0117636 A1 | 4/2019 | Burstein |
| 2019/0216791 A1 | 7/2019 | Tejwani et al. |
| 2019/0231767 A1 | 8/2019 | Parkinson |
| 2019/0240211 A1 | 8/2019 | Parkinson |
| 2020/0009122 A1 | 1/2020 | Tejwani et al. |
| 2020/0061045 A1 | 2/2020 | Burstein |
| 2020/0078346 A1 | 3/2020 | Parkinson |
| 2020/0165202 A1 | 5/2020 | Carlos et al. |
| 2020/0181087 A1 | 6/2020 | Carlos et al. |
| 2020/0222381 A1 | 7/2020 | Tejwani et al. |
| 2020/0237739 A1 | 7/2020 | Coate et al. |
| 2020/0323836 A1 | 10/2020 | Weiner et al. |
| 2021/0077479 A1 | 3/2021 | Tejwani et al. |
| 2021/0161880 A1 | 6/2021 | Foff |
| 2021/0283118 A1 | 9/2021 | Tejwani et al. |
| 2022/0000852 A1 | 1/2022 | Burstein |
| 2022/0016101 A1 | 1/2022 | Burstein et al. |
| 2022/0024871 A1 | 1/2022 | Carlos et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 104961672 A | 10/2015 |
| CN | 105111135 A | 12/2015 |
| CN | 105153016 A | 12/2015 |
| CN | 105418460 A | 3/2016 |
| CN | 105481757 A | 4/2016 |
| CN | 105820110 A | 8/2016 |
| CN | 106543072 A | 3/2017 |
| EP | 0005318 B1 | 11/1979 |
| EP | 0061333 B1 | 9/1982 |
| EP | 0260070 B1 | 3/1988 |
| EP | 0379441 A1 | 7/1990 |
| EP | 0548015 B1 | 6/1993 |
| EP | 0625507 B1 | 11/1994 |
| EP | 1576985 A1 | 9/2005 |
| HU | 157325 | 3/1998 |
| JP | 51052176 | 5/1976 |
| JP | 52085174 A | 7/1977 |
| WO | WO-9427967 A1 | 12/1994 |
| WO | WO-9708166 A1 | 3/1997 |
| WO | WO-9711940 A1 | 4/1997 |
| WO | WO-9738665 A2 | 10/1997 |
| WO | WO-9738984 A1 | 10/1997 |
| WO | WO-9811128 A1 | 3/1998 |
| WO | WO-9817646 A1 | 4/1998 |
| WO | WO-98/44921 A1 | 10/1998 |
| WO | WO-98/50534 A1 | 11/1998 |
| WO | WO-9952927 A1 | 10/1999 |
| WO | WO-2000/020636 A1 | 4/2000 |
| WO | WO-0023076 A1 | 4/2000 |
| WO | WO-0056335 A1 | 9/2000 |
| WO | WO-0059497 A1 | 10/2000 |
| WO | WO-0069810 A1 | 11/2000 |
| WO | WO-2001/029008 A1 | 4/2001 |
| WO | WO-0144191 A1 | 6/2001 |
| WO | WO-0166521 A1 | 9/2001 |
| WO | WO-0187839 A1 | 11/2001 |
| WO | WO-2001089498 A2 | 11/2001 |
| WO | WO-02246449 A1 | 3/2002 |
| WO | WO-2002038142 A2 | 5/2002 |
| WO | WO-02076464 A1 | 10/2002 |
| WO | WO-02079186 A2 | 10/2002 |
| WO | WO-03057698 A2 | 7/2003 |

## US 11,452,721 B2

Page 3

(56)            **References Cited**

FOREIGN PATENT DOCUMENTS

| WO | WO-03062206 A2 | 7/2003 |
| WO | WO-03070246 A1 | 8/2003 |
| WO | WO-03086400 A1 | 10/2003 |
| WO | WO-04000808 A2 | 12/2003 |
| WO | WO-04039322 A2 | 5/2004 |
| WO | WO-04064753 A2 | 8/2004 |
| WO | WO-2004064738 A2 | 8/2004 |
| WO | WO-05053796 A1 | 6/2005 |
| WO | WO-05063254 A2 | 7/2005 |
| WO | WO-05112927 A1 | 12/2005 |
| WO | WO-2006036874 A1 | 4/2006 |
| WO | WO-2006037043 A1 | 4/2006 |
| WO | WO-06104826 A1 | 10/2006 |
| WO | WO-2007124136 A1 | 11/2007 |
| WO | WO-2007133802 A2 | 11/2007 |
| WO | WO-2008116024 A2 | 9/2008 |
| WO | WO-2008141057 A1 | 11/2008 |
| WO | WO-2008144326 A2 | 11/2008 |
| WO | WO-2008144665 A1 | 11/2008 |
| WO | WO-2009035473 A2 | 3/2009 |
| WO | WO-2009039460 A2 | 3/2009 |
| WO | WO-2009039461 A2 | 3/2009 |
| WO | WO-2010111353 A1 | 9/2010 |
| WO | WO-2011047341 A2 | 4/2011 |
| WO | WO-2011085216 A2 | 7/2011 |
| WO | WO-2014085362 A1 | 6/2014 |
| WO | WO-2015/087283 A1 | 6/2015 |
| WO | WO-2016201373 A1 | 12/2016 |
| WO | WO-2017011767 A2 | 1/2017 |
| WO | WO-2017015272 A1 | 1/2017 |
| WO | WO-2017165635 A1 | 9/2017 |
| WO | WO-2017172757 A1 | 10/2017 |
| WO | WO-2018118626 A1 | 6/2018 |
| WO | WO-2018200977 A1 | 11/2018 |
| WO | WO-2019046167 A1 | 3/2019 |
| WO | WO-2019177973 A1 | 9/2019 |
| WO | WO-2020092618 A1 | 5/2020 |
| WO | WO-2021016369 A1 | 1/2021 |
| WO | WO-2021030607 A1 | 2/2021 |

OTHER PUBLICATIONS

U.S. Appl. No. 10/409,782, Azacyclic compounds, filed Apr. 7, 2003, U.S. Pat. No. 6,756,393.
U.S. Appl. No. 13/053,079, Methods of treatment using selective 5-HT2A inverse agonists, filed Mar. 21, 2011, U.S. Pat. No. 9,765,053.
U.S. Appl. No. 14/628,156, Azacyclic compounds, filed Feb. 20, 2015, U.S. Pat. No. 9,296,694.
U.S. Appl. No. 10/759,564, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed Jan. 15, 2004, U.S. Pat. No. 7,601,740.
U.S. Appl. No. 11/416,527, Selective Serotonin 2A/2C Receptor Inverse Agonists as Therapeutics for Neurodegenerative Diseases, filed May 3, 2006 2006, U.S. Pat. No. 7,732,462.
U.S. Appl. No. 11/416,855, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed May 3, 2006, U.S. Pat. No. 7,659,285.
U.S. Appl. No. 11/416,594, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed May 3, 2006, U.S. Pat. No. 7,713,995.
U.S. Appl. No. 12/759,662, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed Apr. 13, 2010, U.S. Pat. No. 7,994,193.
U.S. Appl. No. 12/759,664, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed Apr. 13, 2010, U.S. Pat. No. 8,008,323.
U.S. Appl. No. 13/169,893, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed Jun. 27, 2011, U.S. Pat. No. 8,227,487.
U.S. Appl. No. 13/539,011, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed Jun. 29, 2012, U.S. Pat. No. 8,377,959.

U.S. Appl. No. 13/750,778, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed Jan. 25, 2013, U.S. Pat. No. 8,618,130.
U.S. Appl. No. 14/086,838, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed Nov. 21, 2013, U.S. Pat. No. 8,921,393.
U.S. Appl. No. 14/537,793, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed Nov. 10, 2014, U.S. Pat. No. 9,211,289.
U.S. Appl. No. 14/935,246, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed Nov. 6, 2015, U.S. Pat. No. 9,566,271.
U.S. Appl. No. 15/397,582, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed Jan. 3, 2017, U.S. Pat. No. 10,028,944.
U.S. Appl. No. 16/019,485, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed Jun. 26, 2018, U.S. Pat. No. 10,525,046.
U.S. Appl. No. 17/474,816, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed Sep. 14, 2021, Pending.
U.S. Appl. No. 10/850,819, Selective serotonin receptor inverse agonists as therapeutics for disease, filed May 21, 2004, U.S. Pat. No. 7,820,695.
U.S. Appl. No. 11/134,769, Selective serotonin receptor inverse agonists as therapeutics for disease, filed May 20, 2005, U.S. Pat. No. 7,863,296.
U.S. Appl. No. 12,378,385, Selective serotonin receptor inverse agonists as therapeutics for disease, filed Feb. 11, 2009, U.S. Pat. No. 7,875,632.
U.S. Appl. No. 11/235,558, N-(4-fluorobenzyl)-N-(1-methylpiperidin-4-yl)-N'-(4-(2-methylpropyloxy)phenylmethyl)carbamide and its tartrate salt and crystalline forms, filed Sep. 26, 2005, U.S. Pat. No. 7,732,615.
U.S. Appl. No. 11/235,381, Salts of N-(4-fluorobenzyl)-N-(1-methylpiperidin-4-yl)-N'-(4-(2-methylprop-yloxy)phenylmethyl)carbamide and their preparation, filed Sep. 26, 2005, U.S. Pat. No. 7,868,176.
U.S. Appl. No. 12/795,547, Synthesis of N-(4-fluorobenzyl)-N-(1-methylpiperidin-4-yl)-N'-(4-(2-methylpropyloxy)phenylmethyl)carbamide and its tartrate salt and crystalline forms, filed Jun. 7, 2010, U.S. Pat. No. 7,923,564.
U.S. Appl. No. 13/081,427, Synthesis of N-(4-fluorobenzyl)-N-(1-methylpiperidin-4-yl)-N'-(4-(2-methylpropyloxy)phenylmethyl)carbamide and its tartrate salt and crystalline forms, filed Apr. 6, 2011, U.S. Pat. No. 8,236,960.
U.S. Appl. No. Synthesis of N-(4-fluorobenzyl)-N-(1-methylpropyloxy)-N'-(4-(2-methylpropyloxy)phenylmethyl)carbamide and its tartrate salt and crystalline forms, filed May 15, 2007, U.S. Pat. No. 7,790,899.
U.S. Appl. No. 13/754,769, Combination of pimavanserin and risperidone for the treatment of psychosis, filed Jan. 30, 2013, U.S. Pat. No. 9,050,343.
U.S. Appl. No. 14/647,438, Methods for the treatment of Parkinson's disease psychosis using pimavanserin, filed May 26, 2015, U.S. Pat. No. 9,446,037.
U.S. Appl. No. 15/246,412, Methods for the treatment of Parkinson's disease psychosis using pimavanserin, filed Aug. 24, 2016, U.S. Pat. No. 9,757,366.
U.S. Appl. No. 15/744,636, Methods for preparing N-(4-fluorobenzyl)-N-(1-methylpiperidin-4-yl)-N'-(4-(2-methylpropyloxy)phenylmethyl)carbamide and its tartrate salt and polymorphic form, filed Jan. 12, 2018, U.S. Pat. No. 10,597,363.
U.S. Appl. No. 16/743,607, Methods for preparing N-(4-fluorobenzyl)-N-(1-methylpiperidin-4-yl)-N'-(4-(2-methylpropyloxy)phenylmethyl)carbamide and its tartrate salt and polymorphic form, filed Jan. 15, 2020, U.S. Pat. No. 10,981,870.
U.S. Appl. No. 16/686,809, Methods for preparing N-(4-fluorobenzyl)-N-(1-methylpiperidin-4-yl)-N'-(4-(2-methylpropyloxy)phenylmethyl)carbamide and its tartrate salt and polymorphic form, filed Feb. 10, 2020, U.S. Pat. No. 10,981,871.
U.S. Appl. No. 17/203,266, Methods for preparing N-(4-fluorobenzyl)-N-(1-methylpiperidin-4-yl)-N'-(4-(2-

## US 11,452,721 B2

Page 4

(56)          **References Cited**

OTHER PUBLICATIONS

methylpropyloxy)phenylmethyl)carbamide and its tartrate salt and polymorphic form, filed Mar. 16, 2021, Pending, 20220024871.

U.S. Appl. No. 17/176,723, 5-HT2A serotonin receptor inverse agonists or antagonists for use in reducing amyloid-beta peptides and accumulation of amyloid plaques, filed Feb. 16, 2021, Pending, 20220000852.

U.S. Appl. No. 16/087,604, Combination of pimavanserin and cytochrome p450 modulators, filed Sep. 21, 2018, U.S. Pat. No. 10,953,000.

U.S. Appl. No. 16/379,169, Combination of pimavanserin and cytochrome p450 modulators, filed Apr. 9, 2019, U.S. Pat. No. 10,517,860.

U.S. Appl. No. 16/684,883, Combination of pimavanserin and cytochrome p450 modulators, filed Nov. 19, 2019, U.S. Pat. No. 11,191,757.

U.S. Appl. No. 17/518,776, Combination of pimavanserin and cytochrome p450 modulators, filed Nov. 4, 2021, Pending.

U.S. Appl. No. 16/607,234, Pimavanserin for Treating Impulse Control Disorder, filed Oct. 22, 2019, U.S. Pat. No. 11,135,211.

U.S. Appl. No. 17/412,659, Pimavanserin for Treating Impulse Control Disorder, filed Aug. 26, 2021, Pending.

U.S. Appl. No. 16/471,543, Methods for the Treatment of Alzheimer's Disease Psychosis Using Pimavanserin, filed Jun. 19, 2019, Pending, 20200237739.

U.S. Appl. No. 16/363,378, Formulations of Pimavanserin, filed Mar. 25, 2019, U.S. Pat. No. 10,449,185.

U.S. Appl. No. 16/571,554, Formulations of Pimavanserin, filed Sep. 16, 2019, U.S. Pat. No. 10,646,480.

U.S. Appl. No. 16/836,086, Formulations of Pimavanserin, filed Mar. 31, 2020, U.S. Pat. No. 10,849,891.

U.S. Appl. No. 17/080,731, Formulations of Pimavanserin, filed Oct. 26, 2020, Pending, 20210283118.

U.S. Appl. No. 17/290,479, Methods of Treating Depression, Anxiety and Sexual Dysfunction Using the Compound Primavanserin, filed Apr. 30, 2021, Pending, 20220016101.

U.S. Appl. No. 17/108,623, Methods for Treating Dementia Related Psychosis, filed Dec. 1, 2020, Pending, 20210161880.

U.S. Appl. No. 17/635,459, Pimavanserin for Treating Neurodegenerative Diseases, filed Feb. 15, 2022, Pending.

U.S. Appl. No. 17/629,098, Pimavanserin for Treating Schizophrenia for Treating Psychosis Secondary to Neurodegenerative Disorders or Depressive Disorder, filed Jan. 21, 2022, Pending.

"ACP-103," *Drugs of the Future, Prous Science* (2006) vol. 31, No. 11, pp. 939-943.

"NUPLAZID™ (pimavanserin) Sponsor Background Information for a Meeting of the Psychopharmacologic Drugs Advisory Committee on Mar. 29, 2016," Acadia Pharmaceuticals, Inc. 2016. Retrieved from the Internet (URL): <https://www.fda.gov/downloads/advisorycommittees/committeesmeetingmaterials/drugs/psychopharmacologicdrugsadvisorycommittee/ucm492453.pdf> (173 pages).

"Pimavanserin (Nuplazid) for parkinson's disease psychosis," Medical Letter on Drugs and Therapeutics, New Rochelle, NY, US (Jun. 2016) vol. 58, pp. 74-75.

Aarsland et al., "Decreased burden among caregivers of patients with Parkinson's disease psychosis (PDP) treated with pimavanserin, a selective 5-HT2A inverse agonist," (Meeting Abstract) *Neurology* (2015) vol. 84, No. 14, Suppl P6.044.

Abbas et al., "Pimavanserin tartrate: a 5-HT2A inverse agonist with potential for treating various neuropsychiatric disorders," *Expert Opinion on Pharmacotherapy* (2008) vol. 9, No. 18, pp. 3251-3259.

Acadia Pharmaceuticals, "Acadia Pharmaceuticals Announces FDA approval of New Dosing Formulation and Strength for NUPLAZID (Pimavanserin)," Press Release, San Diego (CA) Jun. 29, 2018. Retrieved from the internet (URL): http://ir.acadia-pharm.com/phoenix.zhtml?c=125180&p-irol-newsArticle&ID=2356605 (3 pages).

Adam, et al., "Effects of repeated ritanserin on middle-aged poor sleepers," *Psychopharmacology* (1989) 99:219-221.

Aizenstein et al., "Frequent Amyloid Deposition Without Significant Cognitive Impairment Among the Elderly," Arch. Neurol. 65(11):1509-1517 (2008).

Akin, et al., "Decreased serotonin 5-HT 2A receptor-stimulated phosphoinositide signaling in fibroblasts from melancholic depressed patients," *Neuropsychopharmacology* (2004) 29:2081-2087.

Anonymous, "Use of Liquids and/or Soft Foods as Vehicles for Drug Administration: General Considerations for Selection and In Vitro Methods for Product Quality Assessments Guidance for Industry," Jul. 13, 2018 (Jul. 13, 2018), XP055676101, Retrieved from the Internet: URL:https://www.fda.gov/media/114872/downl <http://www.fda.gov/media/114872/downl> oad [retrieved on Mar. 12, 2020].

Antunes, et al., "The novel object recognition memory: neurobiology, test procedure, and its modifications," *Cogn. Process* (2012) 13:93-110.

Bakshi, et al., "Clozapine antagonizes phencyclidine-induced deficits in sensorimotor gating of the startle response," *The Journal of Pharmacology and Experimental Therapeutics* (1994) 271(2)787-794.

Basha, A., "Synthesis of N, N'-disubstituted Ureas from Carbamates," Tetrahedron Letters 29(21):2525-2526 (1988).

Bekris et al. "Cerebrospinal Fluid Ab42 Levels and APP processing pathway genes in Parkinson's disease," Movement Disorders, 2015, vol. 30, No. 7, pp. 936-944, 2015.

Bennett, et al., "Suppression of dyskinesias in advanced Parkinson's disease. II. Increasing daily clozapine doses suppress dyskinesias and improve parkinsonism symptoms," *Neurology* (1993) 43:1551-1554.

Bhana et al., "A Review of its Use in the Management of the Behavioural and Psychological Symptoms of Dementia," Drugs & Aging 16(6):451-471 (2000).

Biagi, et al., "1,2,3-Triazoles: Structural changes on two effective inhibitors of the prostaglandin synthesis in vitro," *Farmaco Ed. Sci.* (1988) 43:597-611.

Bibbiani, et al., "Serotonin 5-HT1A agonist improves motor complications in rodent and primate parkinsonian models," *Neurology* (2001) 57:1829-1834.

Blakley, et al., "Bidirectional changes in ethanol consumption in rats with site-specific antisense down-regulation of 5-hydroxytryptamine2A receptors in brain," *The Journal of Pharmacology and Experimental Therapeutics* (2001) 299(1):277-289.

Blier, et al., "Potential mechanisms of action of atypical antipsychotic medications in treatment-resistant depression and anxiety," *J. Clin. Psychiatry* (2005) 66(suppl 8):30-40.

Blier, et al., "Putative mechanisms of action of antidepressant drugs in affective and anxiety disorders and pain," *Journal of Psychiatry & Neuroscience* (2001) 26(1):37-43.

Bogolubsky et al., "Bis(2,2,2-trifluoroethyl) carbonate as a condensing agent in one-pot parallel synthesis of unsymmetrical aliphatic ureas," (2014), pages S1-S67. Retrieved from URL: http://pubs.acs.org/doi/suppl/10.102 l/co500025f/supl_file co500025f_si_001.pdf, Table S2, pp. S9, entry 47.

Bogolubsky et al., "Bis(2,2,2-trifluoroethyl) carbonate as a condensing agent in one-pot parallel synthesis of unsymmetrical aliphatic ureas," *ACS Combinatorial Science* (2014) vol. 16, Issue 6, pp. 303-308.

Bond et al., "Physiological effects of inverse agonists in transgenic mice with myocardial overexpression of the beta-adrenoceptor," *Nature* (1995) 374:272-276.

Borman et al., "5-HT2B receptors play a key role in mediating the excitatory effects of 5-HT in human colon in vitro," *Br. J. Pharmacol.* (2002) vol. 135, No. 5, pp. 1144-1151.

Brann, M. R. "Identification of ligands by selective amplification of cells transfected with receptors and marker enzymes," *Chemical Abstracts* (1998) 128: 111548.

Buddhala et al. "Correlation between decreased CSF a-synuclein and Ab1-42 in Parkinson disease," Neurobiology of Aging, 2015, vol. 36, pp. 476-484, 2015.

Chaturvedi, D., "Perspectives on the Synthesis of Organic Carbamates," Tetrahedron 68:15-45 (2012).

Chaturvedi, D., "Recent Developments on the Carbamation of Amines," Curr. Org. Chem. 15:1593-1624 (2011).

## US 11,452,721 B2

Page 5

(56)    **References Cited**

OTHER PUBLICATIONS

Choi et al., "5HT2B receptor-mediated serotonin morphogenic functions in mouse cranial neural crest and myocardiac cells," *Development* (1997) vol. 124, pp. 1745-1755.

Cirrito et al., "Serotonin signaling is associated with lower amyloid-p levels and plaques in transgenic mice and humans," *PNAS* (2011) vol. 108, No. 36, pp. 14968-14973.

Colovic et al., "Acetylcholinesterase Inhibitors: Pharmacology and Toxicology," Current Neuropharmacology 11:315-335 (2013).

Cummings et al., "Pimavanserin for patients with Parkinson's disease psychosis: a randomised, placebo-controlled phase 3 trial," *Lancet* (2014) vol. 383, pp. 533-540.

Cummings et al., "Pimavanserin: Potential Treatment for Dementia-Related Psychosis." J. Prev. Alzheimers Dis. 5(4): 253-258 (2018).

Cunningham et al., "Serotonin at the Nexus of Impulsivity and Cue Reactivity in Cocaine Addiction," *Neuropharmacology* 76(0 0): 460-478.

Database CA [online] Chemical Abstracts Service, Columbus, Ohio, US; 2016, Wang et al., "Intermediate of pimavanserin and its analog, preparation method thereof and preparation method of pimavanserin and its analog," XP002761533, retrieved from STN Database accession No. 2016:451070 (reference date: Mar. 23, 2016).

Database CA [online] Chemical Abstracts Service, Columbus, Ohio, US; 2016, Zheng, Xuchun et al: "A process for preparing pimavanserin tartrate," XP002761538, retrieved from STN Database accession No. 2016:1261850 (reference date: Aug. 3, 2016).

Database WPI Week 201622, Derwent Publications Ltd., London, GB; AN 2016-17318M, XP002761536 (reference date: Aug. 19, 2015).

Database WPI Week 201623, Derwent Publications Ltd., London, GB; AN 2015-708058, XP002761532 (reference date: Oct. 7, 2015).

Database WPI Week 201635, Derwent Publications Ltd., London, GB; AN 2016-02257F, XP002761534 (reference date: Dec. 2, 2015).

Database WPI Week 201640, Derwent Publications Ltd., London, GB; AN 2016-01442V, XP002761535 (reference date: Dec. 16, 2015).

Database WPI Week 201641, Derwent Publications Ltd., London, GB; AN 2016-24419S, XP002761537 (reference date: Apr. 13, 2016).

DeClerck, et al., "Increase in slow-wave sleep in humans with the serotonin-S2 antagonist ritanserin," *Current Therapeutic Research* (1987) 41(4):427-432.

Delecluse, et al., "A case of tardive tremor successfully treated with clozapine," *Movement Disorders* (1998) 13(5):846-847.

Dine et al., "One-Pot, Solvent-Free Access to Unsymmetrical Ureas by Palladium-Catalysed Reductive Alkylation Using Molecular Hydrogen," Eur. J. Chem., 5445-5454 (2013).

Dube et al., "Carbonyldiimidazole-Mediated Lossen Rearrangement." Org. Lett. 11(24):5622-5625 (2009).

Dunn, et al., "Analgetic and antiinflammatory 7-aroylbenzofuran-5-ylacetic acids and 7-aroylbenzothiophene-5-ylacetic acids," *J. Med. Chem.* (1986) 29:2326-2329.

Durif, et al., "Low-dose clozapine improves dyskinesias in Parkinson's disease," *Neurology* (1997) 48:658-662.

Eichelbaum, et al., "Influence of pharmacogenetics on drug disposition and response," *Clinical and Experimental Pharmacology and Physiology* (1996) 23:983-985.

Everett, et al., "L-Dopa: Effect on concentrations of dopamine, norepinephrine, and serotonin in brains of mice," *Science* (1970) 168:849-850.

Factor, et al. "Clozapine for the treatment of drug-induced psychosis in Parkinson's disease: Results of the 12 week open label extension in the PSYCLOPS trial," *Movement Disorders* (2001) 16(1):135-139.

Factor, et al., "Clozapine prevents recurrence of psychosis in Parkinson's disease," *Movement Disorders* (1992) 7(2):125-131.

Fava, M. et al. "A Phase 2, Randomized, Double-Blind, Placebo-Controlled Study of Adjunctive Pimavanserin in Patients with Major Depressive Disorder and an Inadequate Response to Therapy (CLARITY)." J Clin Psychiatry. Sep. 24, 2019;80(6) (13 pages).

Fitzgerald et al., "Possible Role of Valvular Serotonin 5-HT2B Receptors in the Cardiopathy Associated with Fenfluramine," *Molecular Pharmacol.* (1999) vol. 57, pp. 75-81.

Friedman et al., "A Multi-Center, Placebo-Controlled, Double-Blind Trial to Examine the Safety and Efficacy of Pimavanserin in the Treatment of Psychosis in Parkinson's Disease," *Neurology* (2010) vol. 74, No. 9, Suppl. 2, pp. A299.

Friedman, et al., "Atypical antipsychotics in the treatment of drug-induced psychosis in Parkinson's disease," *Movement Disorders* (2000) 15(2):201-211.

Friedman, et al., "Low-dose clozapine for the treatment of drug-induced psychosis in Parkinson's disease," N. *Engl. J. Med.* (1999) 340(10):757-763.

Friedman, J. H. "Clozapine treatment of psychosis in patients with tardive dystonia: Report of three cases," *Movement Disorders* (1994) 9(3):321-324.

Gillman, P. K. "Monoamine oxidase inhibitors, opioid analgesics and serotonin toxicity," *British Journal of Anaesthesia* (2005) 95(4):434-441.

Goldman et al., "Genetic counseling and testing for Alzheimer disease: Joint practice guidelines of the American College of Medical Genetics and the National Society of Genetic Counselors," *Genetics in Medicine* (2011) vol. 13, No. 6, pp. 597-605.

Hacksell et al., 2014, "On the Discovery and Development of Pimavanserin: A Novel Drug Candidate for Parkinson's Psychosis," Neurochem. Res., vol. 39, pp. 2008-2017.

Han et al., "Synthesis of Carbamates and Ureas Using Zr(IV)-Catalyzed Exchange Processes," Organic Letters 9(8): 1517-1520 (2007).

Hatoum, H. T. et al., "The Use of the Occupational Disruptiveness Scale of the Neuropsychiatric Inventory-Nusing Home Version to Measure the Impact of Rivastigmine on the Disruptive Behavior of Nursing Home Residents with Alzheimer's Disease," *Journal of the American Medical Directors Association* (2005) vol. 6, No. 4, pp. 238-245.

Highlights of Prescribing Information Nuplazid™ (pimavanserin), Revised Apr. 2016. Retrieved from the Internet (URL): https://www.accessdata.fda.gov/drugsatfda_docs/label/2016/207318lbl.pdf (14 pages).

Highlights of Prescribing Information Nuplazid® (pimavanserin), Revised Jun. 2018. Retrieved from the Internet (URL): https://www.accessdata.fda.gov/drugsatfda_docs/label/2018/207318s005lbl.pdf (15 pages).

Highlights of Prescribing Information Nuplazid® (pimavanserin), Revised Mar. 2018. Retrieved from the Internet (URL): https://www.accessdata.fda.gov/drugsatfda_docs/label/2018/207318s002s004lbl.pdf (15 pages).

Idzikowski, et al. 1991. A dose response study examining the effects of ritanserin on human slow wave sleep. Br. J. Clin. Pharmac., 31:193-196.Idzikowski, et al., "A dose response study examining the effects of ritanserin on human slow wave sleep," *Br. J. Clin. Pharmac.* (1991) 31:193-196.

International Search Report and Written Opinion for International Application No. PCT/US2013/071792, dated, Jan. 1, 2014 (9 pages).

International Search Report and Written Opinion in corresponding PCT Application PCT/US2016/042933 dated Oct. 14, 2016 (13 pages).

International Search Report and Written Opinion in corresponding PCT Patent Application No. PCT/US08/057557 dated Oct. 24, 2008 (10 pages).

International Search Report and Written Opinion in corresponding PCT Patent Application No. PCT/US2017/023795 dated May 29, 2017 (11 pages).

International Search Report and Written Opinion in corresponding PCT Patent Application No. PCT/US2017/024526 dated Jul. 5, 2017 (18 pages).

International Search Report and Written Opinion in corresponding PCT Patent Application No. PCT/US2017/066340 dted Mar. 5, 2018 (13 pages).

**US 11,452,721 B2**

Page 6

(56)         **References Cited**

OTHER PUBLICATIONS

International Search Report and Written Opinion in corresponding PCT Patent Application No. PCT/US2018/029831 dated Jul. 11, 2018 (10 pages).

International Search Report and Written Opinion in corresponding PCT Patent Application No. PCT/US2018/048096 dated Oct. 30, 2018 (12 pages).

International Search Report and Written Opinion of the International Searching Authority for International Application No. PCT/US2019/021618 dated Jun. 12, 2019 (10 pages).

International Search Report and Written Opinion of the International Searching Authority for International Application No. PCT/US2019/058927 dated Jan. 23, 2020 (16 pages).

International Search Report and Written Opinion of the International Searching Authority for International Application No. PCT/US2020/043103 dated Dec. 18, 2020 (12 pages).

International Search Report and Written Opinion of the International Searching Authority for International Application No. PCT/US2020/46212 dated Oct. 23, 2020 (10 pages).

International-type Search Report by International Searching Authority for SE1630067-5 dated Sep. 23, 2016 (18 pages).

Ito et al., "Prediction of Human Drug Clearance from in Vitro and Preclinical Data Using Physiologically Based and Empirical Approaches," Pharm. Res., (2005) vol. 22, No. 1, pp. 103-112.

Kalgutkar, et al., "Selective inhibitors of monoamine oxidase (MAO-A and MAO-B) as probes of its catalytic site and mechanism," Medicinal Research Reviews (1995) 15(4)325-388.

Katritzky et al., Chapter V. "Reaction of Amines with Carbamic Acid Esters," Comprehensive Organic Functional Group Transmformations, pp. 501-502 (1995).

Kennedy et al., "The BACE1 inhibitor verubecestat (MK-8931) reduces CNS β-amyloid in animal models and in Alzheimer's disease patients," Sci. Transl. Med. 8, 363ra150 13 pages (2016).

Kondo et al., "Novel Ruthenium-Complex Catalyzed Synthesis of Ureas from Formamides and Amines," Organometallics 16:2562-2570 (1997).

Kotachi et al., "Ruthenium catalysed N.N'-Diarylurea Synthesis from N-Aryl Substituted Formamides and Aminoarenes," J. Chem. Soc., Chem. Comm., 7:549-550 (1990).

Lane et al., "Alzheimer's Disease," Eur. J. Neurol. 25:59-70 (2018).

Lashley et al. "Cortical a-synuclein load is associated with amyloid-b plaque burden in subset of Parkinson disease patients," Acta Neuropathol. 2008, 115, 417-425.

Leysen, et al. "Serotonergic component of neuroleptic receptors," Nature (1978) 272:168-171.

Liechti, et al., "Effects of MDMA (ecstasy) on prepulse inhibition and habituation of startle in humans after pretreatment with Citalopram, Haloperidol, or Ketanserin," Neuropsychopharmacology (2001) 24(3):240-252.

Linder, et al. "Pharmacogenetics: A laboratory tool for optimizing therapeutic efficiency," Clinical Chemistry (1997) 43(2):254-266.

Loudon et al., "Conversion of Aliphatic Amides into Amines with [I,1-Bis(trifluoroacetoxy)iodo]benzene. 1. Scope of Reaction," J. Org. Chem. 49:4272-4276 (1984).

Marek et al., "The Selective 5-HT2A receptor Antagonist MI00907 Enhances Antidepressant-Like Behavioral Effects of the SSRI Fluoxetine," Neuropsychopharmacology (2005) vol. 30, No. 12, pp. 2205-2215.

Marek, et al., "Synergistic action of 5-HT2A antagonists and selective serotonin reuptake inhibitors in neuropsychiatric disorders," Neuropsychopharmacology (2003) 28:402-412.

Matsumura et al., "A New Method for Synthesis of Unsymmetrical Ureas Using Electochemically Prepared Trifluoroethyl Carbamates," J. Org. Chem. 65:1549-1551 (2000).

Medical Review(s), Application No. 207318Orig1s000, Center for Drug Evaluation and Research, Submission Date Sep. 1, 2015 [available online Jun. 3, 2016]. Retrieved from the Internet (URL): <https://www.accessdata.fda.gov/drugsatfda_docs/nda/2016/207318Orig1s000MedR.pdf> (173 pages).

Meltzer et al., "Co-therapy with pimavanserin and risperidone 2 mg provides an improved clinical profile," Schizophrenia Research (2008) vol. 98, pp. 16.

Meltzer et al., "Pimavanserin, a Serotonin(2A) Receptor Inverse Agonist, for the Treatment of Parkinson's Disease Psychosis," Neuropsychopharmacology (2010) vol. 35, No. 4, pp. 881-892.

Meltzer et al., "Serotonin Receptors: Their Key Role in Drugs to Treat Schizophrenia," Progress in Neuro-Pyschopharmacology & Biol. Psych. (2003) vol. 27, pp. 1159-1172.

Meltzer, et al., "Plasma clozapine levels and the treatment of L-DOPA-induced psychosis in Parkinson's disease," Neuropsychopharmacology (1995) 12(1):39-45.

Meltzer, H. Y. "The role of serotonin in antipsychotic drug action," Neuropsychopharmacology (1999) 21(2S): 106S-115S.

Morley et al., "Antibody to Amyloid p Protein Alleviates Imparied Acquisition, Retention, and Memory Processing in SAMP8 Mice," Neurobiology of Learning and Memory (2002), 78(1):125-138.

Naritomi et al., "Prediction of human hepatic clearance from in vivo animal experiments and in vitro metabolic studies with liver microsomes from animals and humans," Drug Metab. Dispos. (2001) vol. 29, No. 10, pp. 1316-1324.

NDA Approval/Supplement Approval, NDA 210793 NDA 207318/S-003, Letter Signed Jun. 28, 2018. Retrieved from the Internet (URL): https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2018/210793Orig1s000,207318Orig1s003ltr.pdf (5 pages).

Nebigil et al., "Serotonin is a novel survival factor of cardiomyocytes: mitochondria as a tarqet of 5-HT2B-receptor signaling," FASEB J. (2003) vol. 27, No. 10, pp. 1373-1375.

Ng, et al., "L-dopa-induced release of cerebral monoamines," Science (1970) 170:76-77.

Nordstrom, et al., "High 5-HT2 receptor occupancy in clozapine treated patients demonstrated by PET," Psychopharmacology (1993) 110:365-367.

Norton et al., "Caregivers of PDP patients have an increased risk of developing emotional and social distress that is decreased when PDP is treated with pimavanserin," (Meeting Abstract) Journal of Parkinson's Disease (Sep. 2016) vol. 6, No. S1, pp. 257, Abstract No. P42.11.

Norton et al., "Decreased burden among caregivers of patients with Parkinson's disease psychosis (PDP) treated with pimavanserin, a selective 5-HT2A inverse agonist," (Meeting Abstract) Journal of Parkinson's Disease (Sep. 2016) vol. 6, No. S1, p. 88, Abstract No. P12.08.

Obach et al., "The Prediction of Human Pharmacokinetic Parameters from Preclinical and In Vitro Metabolism Data," J. Pharm. Exp. Therap. (1997) vol. 283, No. 1, pp. 46-58.

Ogawa, et al., "Effects of R-102444 and its active metabolite R-96544, selective 5-HT2A receptor antagonists, on experimental acute and chronic pancreatitis: Additional evidence for possible involvement of 5-HT2A receptors in the development of experimental pancreatitis," European Journal of Pharmacology (2005) 521:156-163.

Paiva, et al., "Effects of ritanserin on sleep disturbances of dysthymic patients," Psychopharmacology (1988) 96:395-399.

Patel, et al., "The highly selective 5-hydroxytryptamine (5-HT)2A receptor antagonist, EMO 281014, significantly increases swimming and decreases immobility in male congenital learned helpless rats in the forced swim test," Synapse (2004) 52:73-75.

Pierce, et al., "5-hydroxytryptamine-induced synovial plasma extravasation is mediated via 5-hydroxytryptamine2A receptors on sympathetic efferent terminals," The Journal of Pharmacology and Experimental Therapeutics (1995) 275(1):502-508.

Poewe, W. "Psychosis in Parkinson's Disease," Movement Disorders (2006) vol. 18, Suppl. 6, pp. S80-S87.

Pollak, et al., "Clozapine in drug-induced psychosis in Parkinson's disease," Lancet (1999) 353:2041-2042.

Price et al., "Pimavanserin, a 5-HT2A receptor inverse agonist, reverses psychosis-like behaviors in a rodent model of Alzheimer's disease," Behavioural Pharmacology (2002), 23:426-433.

R&D Focus Drug News (Jan. 24, 2000). Pimvaserin ACADIA lead compounds identified.

R&D Focus Drug News (Nov. 12, 2001). Pimvaserin ACADIA preclinical data.

## US 11,452,721 B2
Page 7

(56)    **References Cited**

OTHER PUBLICATIONS

Sadzot, et al., "Hallucinogenic drug interactions at human brain 5-HT2 receptors: Implications for treating LSD-induced hallucinogenesis," *Psychopharmacology* (1989) 98:495-499.

Saltzman, et al., "Cloning of the human serotonin 5-HT2 and 5-HT1C receptor subtypes," *Biochemical and Biophysical Research Communications* (1991) 181(3):1469-1478.

Sandler and Karo, Chapter E., "Reaction of Amines with Urethanes and Carbamates," Organic Functional Group Preparations, Academic Press pp. 161-162 (1986).

Satori and Maggi, "Acyclic and Cyclic Ureas," Science of Synthesis 18: 695-699 (2005).

Saxena, et al., "Cardiovascular effects of serotonin agonists and antagonists," *Journal of Cardiovascular Pharmacology* (1990) 15(Supp. 7):S17-S34.

Shanmugam, S. "Granulation Techniques and Technologies: Recent Progresses," *BioImpacts* (2015) vol. 5, No. 1, pp. 55-63.

Shigemori et al., "The factoral structure of the mini mental state examination (MMSE) in Japanese dementia patients," BMC Geriatrics 10(36): 7 pages (2010).

Stoner et al., "Integrated oral bioavailability projection using in vitro screening data as a selection tool in drug discovery," *Int. J. Pharm.* (2004) vol. 269, No. 1, pp. 241-249.

Swedish Search Report for Patent Application No. 1730232-4 dated Mar. 28, 2018 (10 pages).

Thavonekham, "A Practical Synthesis of Ureas from Phenyl Carbamates," Synthesis 11:1189-1194 (1997).

Vanover et al., "Pharmacological Characterization of AC-90179 [2-( 4-Methoxy-phenyl)-N-( 4-methyl-benzyl)-N-( 1-methyl-piperidiny-4-yl)-acetamide Hydrochloride]: A Selective Serotonin 2A Receptor Inverse Agonist," *J. Pharmacology & Experimental Therapeutics* (2004) vol. 310, No. 3, pp. 943-951.

Vanover, Kimberly E. et al., "Pharmacokinetics, tolerability, and safety of ACP-103 following single or multiple oral dose administration in healthy volunteers," *Journal of Clinical Phamacol.* (2007) vol. 47, No. 6, pp. 704-714.

Vanover, Kimberly E. et al., "Pharmacological and Behavioral Profile of N-(4-Fluorophenylmethyl)-N-(1-methylpiperidin-4-yl)-N'-(4-(2-methylpropyloxy)phenylmethyl) Carbamide (2R,3R)-Dihydroxybutanedioate (2:1) (ACP-103), a Novel 5-Hydroxytryptamine$_{2A}$ Receptor Inverse Agonist," *The Journal of Pharmacology and Experimental Therapeutics* (2006) 317(2):910-918.

Vinogradova et al., Palladium Catalyzed Cross-Coupling of Aryl Chlorides and Triflates with Sodium Cyanate: A Practical Synthesis of Unsymmetrical Ureas, J. Am. Chem. Soc. 134:11132-11135 (2012).

Volk et al., "Synthesis of methyl ethyl and phenyl 4 2 methylpropoxy benzyl carbamates," The IP.com Prior Art Database, Disclosure No. IPCOM000244271D, (Nov. 27, 2015).

Weintraub et al., "Association of Dopamine Agonist Use With Impulse Control Disorders in Parkinson Disease," *Arch Neurol.* 2006 63(7):969-973.

Weintraub et al., "Clinical Spectrum of Impulse Control Disorders in Parkinson's Disease," *Movement Disorders 2015* 30(2):121-127.

Wood et al., "The Use of the Neuropsychiatric Inventory in Nursing Home Residents: Characterization and Measurement," Am. J. Geriatr. Psychiatr. 8(1):75-83 (2000).

Ye et al. "Improving response inhibition in Parkinson's disease with Atomoxetine." Biological Psychiatry, Apr. 15, 2015, 77, 740-748.

Yoshimura et al., "Hypervalent Iodine Catalyzed Hofmann Rearrangement of Carboxamides Using Oxone as Terminal Oxidant," JOC 77:11399-11404 (2012).

Yoshimura et al., (Tosylimino)phenyl-λ3-iodane as a Reagent for the Synthesis of Metyl Carbamates via Hofmann Rearrangement of Aromatic and Aliphatic Carboxamides, Journal of Organic Chemistry 77:2087-2091 (2012).

*Acadia Pharmaceuticals Inc. v. Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Declaration of R. Christian Moreton, Ph.D in Support of Defendants' Reply Claim Construction Brief, dated Jan. 19, 2022 (11 pages).

*Acadia Pharmaceuticals Inc. v. Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Defendants' Sur-Reply Claim Construction Brief, dated Jan. 21, 2022 (23 pages).

*Acadia Pharmaceuticals Inc. v. Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Acadia's Opening Claim Construction Brief, dated Oct. 8, 2021 (24 pages).

Acadia's NUPLAZID® product information, Retrieved from the Internet (URL): https://www.acadia-pharm.com/product/ (dated Oct. 4, 2021, 2 pages) (Exhibit 1 of *Acadia Pharmaceuticals Inc. v. Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Acadia's Opening Claim Construction Brief, dated Oct. 8, 2021).

Highlights of Prescribing Information NUPLAZID™ (pimavanserin), Revised Apr. 2016. Retrieved from the Internet (URL): https://www.accessdata.fda.gov/drugsatfda_docs/label/2016/207318lbl.pdf (14 pages) (Exhibit 2 of *Acadia Pharmaceuticals Inc. v. Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Acadia's Opening Claim Construction Brief, dated Oct. 8, 2021).

Highlights of Prescribing Information NUPLAZID® (pimavanserin), Revised Jun. 2018. Retrieved from the Internet (URL): https://www.accessdata.fda.gov/drugsatfda_docs/label/2018/207318s005lbl.pdf (15 pages) (Exhibit 3 of *Acadia Pharmaceuticals Inc. v. Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Acadia's Opening Claim Construction Brief, dated Oct. 8, 2021).

2017 U.S. Pharmacopeia National Formulary, vol. 1 (7 pages) (Exhibit 4 of *Acadia Pharmaceuticals Inc. v. Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Acadia's Opening Claim Construction Brief, dated Oct. 8, 2021).

*Acadia Pharmaceuticals Inc. v. Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Declaration of R. Christian Moreton, Ph.D in Support of Defendants' Answering Claim Construction Brief, dated Nov. 12, 2021 (28 pages).

*Acadia Pharmaceuticals Inc. v. Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Declaration of R. Christian Moreton, Ph.D in Support of Defendants' Answering Claim Construction Brief, dated Nov. 12, 2021 (64 pages).

*Acadia Pharmaceuticals Inc. v. Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Defendants' Responsive Claim Construction Brief, dated Nov. 12, 2021 (30 pages).

USP 40 Phase-solubility analysis-general information, Retrieved from the Internet (URL): www.getintopharma.com <http://www.getintopharma.com> (5 pages) (Exhibit 1 of *Acadia Pharmaceuticals Inc. v. Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Declaration of R. Christian Moreton, Ph.D in Support of Defendants' Answering Claim Construction Brief, dated Nov. 12, 2021).

Curriculum Vitae of Richard Christian Moreton (29 pages) (Exhibit A of *Acadia Pharmaceuticals Inc. v. Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Declaration of R. Christian Moreton, Ph.D in Support of Defendants' Answering Claim Construction Brief, dated Nov. 12, 2021).

*Acadia Pharmaceuticals Inc. v. Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Acadia's Reply Claim Construction Brief, dated Dec. 17, 2021 (28 pages).

*Acadia Pharmaceuticals Inc. v. Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Declaration of Alexander M. Klibanov, Ph.D., in Support of Plaintiff's Reply Claim Construction Brief, dated Dec. 16, 2021 (61 pages).

Curriculum vitae of Alexander M. Klibanov (43 pages) (Exhibit A of *Acadia Pharmaceuticals Inc. v. Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Declaration of Alexander M. Klibanov, Ph.D., in Support of Plaintiff's Reply Claim Construction Brief, dated Dec. 16, 2021).

Notice Letter of Paragraph IV Certification Regarding U.S. Pat. Nos. 10,449,185 and 10,646,480 from Aurobindo Pharma Ltd. to Acadia Pharmaceuticals, Inc. dated Jun. 10, 2020 (179 pages).

Notice Letter of Paragraph IV Certification Regarding U.S. Pat. No. 10,449,185 from Teva Pharmaceuticals USA, Inc. to Acadia Pharmaceuticals, Inc. dated Jun. 10, 2020 (83 pages).

**US 11,452,721 B2**

Page 8

(56)        **References Cited**

OTHER PUBLICATIONS

Notice Letter of Paragraph IV Certification Regarding U.S. Pat. Nos. 7,732,615; 7,923,564; and 10,449,185 from MSN Laboratories Private Ltd. to Acadia Pharmaceuticals, Inc. dated Jun. 15, 2020 (18 pages).

Notice Letter of Paragraph IV Certification Regarding U.S. Pat. No. 10,646,480 from MSN Laboratories Private Ltd. to Acadia Pharmaceuticals, Inc. dated Jun. 18, 2020 (28 pages).

Notice Letter of Paragraph IV Certification Regarding U.S. Pat. Nos. 10,449,185, and 10,646,480 from Zydus Pharmaceuticals (USA) Inc. to Acadia Pharmaceuticals, Inc. dated Jun. 22, 2020 (67 pages).

Notice Letter of Paragraph IV Certification Regarding U.S. Pat. No. 10,646,480 from Teva Pharmaceuticals USA, Inc. to Acadia Pharmaceuticals, Inc. dated Jun. 23, 2020 (18 pages).

Notice Letter of Paragraph IV Certification Regarding U.S. Pat. No. 10,849,891 from Teva Pharmaceuticals USA, Inc. to Acadia Pharmaceuticals, Inc. received Dec. 23, 2020 (16 pages).

Notice Letter of Paragraph IV Certification Regarding U.S. Pat. No. 10,849,891 from Aurobindo Pharma Ltd. to Acadia Pharmaceuticals, Inc. dated Jan. 13, 2021 (26 pages).

Notice Letter of Paragraph IV Certification Regarding U.S. Pat. No. 10,849,891 from Zydus Pharmaceuticals (USA) Inc. to Acadia Pharmaceuticals, Inc. received Feb. 17, 2021 (22 pages).

Notice Letter of Paragraph IV Certification Regarding U.S. Pat. No. 10,849,891 from MSN Laboratories Private Ltd. to Acadia Pharmaceuticals, Inc. received Apr. 16, 2021 (38 pages).

*Acadia Pharmaceuticals Inc.* v. *Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Defendants' Initial Invalidity Contentions, dated Apr. 26, 2021 (241 pages) (redacted).

*Acadia Pharmaceuticals Inc.* v. *Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Joint Claim Construction Brief, filed Jan. 28, 2022 (93 pages).

*Acadia Pharmaceuticals Inc.* v. *Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Joint Claim Construction Appendix, filed Jan. 28, 2022 (225 pages).

*Acadia Pharmaceuticals Inc.* v. *Aurobindo Pharma Ltd., et al.* Civil Action No. 20-985-RGA, Memorandum Opinion, filed Apr. 6, 2022 (13 pages).

*Acadia Pharmaceuticals Inc.* v. *Aurobindo Pharma Limited and Aurobindo Pharma USA, Inc.*, D.Del. Civil Action No. 1-20-cv-00985: Complaint against Aurobindo Pharma Limited and Aurobindo Pharma USA, Inc. filed by Acadia Pharmaceuticals Inc., Jul. 24, 2020 (127 pages).

*Acadia Pharmaceuticals Inc.* v. *Hetero Labs Limited, Hetero Labs Limited Unit-V, and Hetero USA Inc.*, D.Del. Civil Action No. 1-20-cv-01022: Complaint against Hetero Labs Limited, Hetero Labs Limited Unit-V, and Hetero USA Inc. filed by Acadia Pharmaceuticals Inc., Jul. 30, 2020 (90 pages).

*Acadia Pharmaceuticals Inc.* v. *MSN Laboratories Private Ltd. and MSN Pharmaceuticals, Inc.*, D.Del. Civil Action No. 1-20-cv-01029: Complaint against MSN Laboratories Private Ltd. and MSN Pharmaceuticals, Inc. filed by Acadia Pharmaceuticals Inc., Jul. 30, 2020 (71 pages).

*Acadia Pharmaceuticals Inc.* v. *Teva Pharmaceuticals USA, Inc. and Teva Pharmaceutical Industries Ltd.*, D.Del. Civil Action No. 1-20-cv-00986: Complaint against Teva Pharmaceuticals USA, Inc. and Teva Pharmaceutical Industries Ltd. filed by Acadia Pharmaceuticals Inc., Jul. 24, 2020(126 pages).

*Acadia Pharmaceuticals Inc.* v. *Zydus Pharmaceuticals (USA) Inc. and Cadila Healthcare Limited*, D.Del. Civil Action No. 1-20-cv-01021: Complaint against Zydus Pharmaceuticals (USA) Inc. and Cadila Healthcare Limited filed by Acadia Pharmaceuticals Inc., Jul. 30, 2020 (153 pages).

\* cited by examiner

U.S. Patent

Sep. 27, 2022

Sheet 1 of 4

US 11,452,721 B2

| EMPTY HARD CAPSULE SPECIFICATIONS | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| APPROXIMATE COMPARATIVE SIZE | CAPSULE SIZE | CONVENTIONAL FILL WEIGHT (mg) | | | VOLUME (Theoretical) | LENGTH | EXTERNAL DIAMETER | WEIGHT |
| | | TYPICAL POWDER DENSITY | | | (ml) | ±0.8(mm) | (mm) | ±10% |
| | | 0.45 (light) | 0.7 (standard) | 1.0 (heavy) | | | | |
| | 000 | 615 | 960 | 1370 | 1.37 | 26.1 | 9.9 | 163 |
| | 00 | 430 | 665 | 950 | 0.95 | 23.3 | 8.5 | 118 |
| | 0 | 305 | 475 | 680 | 0.68 | 21.7 | 7.65 | 96 |
| | 1 | 225 | 350 | 500 | 0.5 | 19.4 | 6.91 | 76 |
| | 2 | 165 | 260 | 370 | 0.37 | 18.0 | 6.35 | 61 |
| | 3 | 135 | 210 | 300 | 0.3 | 15.9 | 5.82 | 48 |
| | 4 | 95 | 145 | 210 | 0.21 | 14.3 | 5.31 | 38 |
| | 5 | 60 | 90 | 130 | 0.13 | 11.1 | 4.91 | 28 |

FIG. 1



FIG. 2



FIG. 3



FIG. 4



FIG. 5

US 11,452,721 B2

1

# FORMULATIONS OF PIMAVANSERIN

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 17/080,731, filed on Oct. 26, 2020, which is a continuation of U.S. patent application Ser. No. 16/836,086, filed on Mar. 31, 2020, which is a continuation of U.S. patent application Ser. No. 16/571,554, filed on Sep. 16, 2019, which is a continuation of U.S. patent application Ser. No. 16/363,378, filed on Mar. 25, 2019, which is a continuation of International Patent Application No. PCT/US2018/048096, filed on Aug. 27, 2018, which claims priority to and the benefit of U.S. Provisional Patent Application No. 62/552,300, filed Aug. 30, 2017, and Swedish Patent Application No. 1730232-4, filed Sep. 1, 2017.

## BACKGROUND

Pimavanserin, the active component in Nuplazid®, is approved for treatment of hallucinations and delusions associated with Parkinson's disease psychosis at a dose of 34 mg, taken as two 17 mg tablets once a day. The tablets are immediate release, film-coated tablet containing 20 mg of pimavanserin tartrate, which is equivalent to 17 mg of pimavanserin free base. Inactive ingredients include pregelatinized starch, magnesium stearate, and microcrystalline cellulose. Additionally, the following inactive ingredients are present as components of the film coat: hypromellose, talc, titanium dioxide, polyethylene glycol, and saccharin sodium.

Patients suffering from neurodegenerative diseases, such as Parkinson's disease are at a risk of non-compliance when administered a drug of too large size, or if taken as more than one tablet per day as said patients often have difficulty swallowing. Formulations of pimavanserin are described in WO 2007/133802. Pimavanserin is currently approved and administered as tablets containing 20 mg pimavanserin tartrate (equivalent to 17 mg pimavanserin), taken as two tablets once a day. Each with a total 150 mg tablet weight before film coating, i.e. total weight per dose is 300 mg (equivalent to 34 mg pimavanserin). In order to simplify administration and patient compliance of pimavanserin it would be advantageous to administer pimavanserin as a single dose.

Improved manufacturing processes for single unit dose forms, particularly for smaller sized single unit dosage forms, for oral administration of a therapeutic quantity of pimavanserin are critical. The physical properties of pimavanserin, e.g. bulk density and flow, when prepared in a tablet form requires, e.g. binders and other agents that increase the finished dosage size. Pimavanserin manufactured following conventional techniques has low bulk density and poor flowability and a tendency to clump, which will adversely impact reproducibility and quantitative accurate filling of capsules during the manufacturing process.

Consequently there is a need to improve the properties of pimavanserin allowing dosing of the daily therapeutic dose as a single administration.

## SUMMARY

Provided herein are capsules comprising 5-34 mg pimavanserin (equivalent to 6-40 mg pimavanserin tartrate), or a pharmaceutically acceptable salt thereof

2

Provided herein are also pharmaceutical compositions consisting of 5-34 mg pimavanserin or a pharmaceutically acceptable salt thereof, a filler and a lubricant .

Provided herein are also processes for manufacturing a capsule comprising 5-34 mg pimavanserin or a pharmaceutically acceptable salt thereof comprising: adding water to pimavanserin or a pharmaceutically acceptable salt thereof, and granulating pimavanserin or a pharmaceutically acceptable salt thereof with the water; controlling the impeller speed and/or amperage; drying the granulated pimavanserin or a pharmaceutically acceptable salt thereof; sizing the dried granulated pimavanserin or a pharmaceutically acceptable salt thereof; blending the dried and granulated pimavanserin or a pharmaceutically acceptable salt thereof and one or more filler; encapsulating the blended pimavanserin composition in a capsule of size 3 or 4.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 shows a table disclosing specifications of capsule sizes, commercially available.

FIG. 2 schematically discloses a process flow chart for pimavanserin granulation.

FIG. 3 schematically discloses a process flow chart for encapsulating pimavanserin granulation

FIG. 4 shows a particle size distribution diagram of pimavanserin tartrate.

FIG. 5 shows a particle size distribution diagram of granulated pimavanserin.

## DETAILED DESCRIPTION

Definitions

Unless defined otherwise, all technical and scientific terms used herein have the same meaning as is commonly understood by one of ordinary skill in the art. All patents, applications, published applications and other publications referenced herein are incorporated by reference in their entirety. In the event that there are a plurality of definitions for a term herein, those in this section prevail unless stated otherwise.

As used herein, "pharmaceutical composition" refers to a composition of one or more active pharmaceutical ingredient(s) alone, or administered with other chemical components, such as diluents, binders, lubricants, pharmaceutical flow agents, and/or or excipients, e.g. for forming a unit dose, such as a tablet, a capsule etc.

As used herein, "physiologically acceptable" defines a diluent, binder, or excipient that does not abrogate the biological activity and properties of the pharmaceutically active compound.

As used herein, "pharmaceutically acceptable salt" refers to a salt of a compound that does not abrogate the biological activity and properties of the compound. Pharmaceutical salts can be obtained by reaction of a compound disclosed herein with an acid or base. Base-formed salts include, without limitation, ammonium salt ($NH_4^+$); alkali metal, such as, without limitation, sodium or potassium, salts; alkaline earth, such as, without limitation, calcium or magnesium, salts; salts of organic bases such as, without limitation, dicyclohexylamine, piperidine, piperazine, methylpiperazine, N-methyl-D-glucamine, diethylamine, ethylenediamine, tris(hydroxymethyl)methylamine; and salts with the amino group of amino acids such as, without limitation, arginine and lysine. Useful acid-based salts include, without limitation, acetates, adipates, aspartates, ascorbates, benzoates, butyrates, caparate, caproate, capry-

US 11,452,721 B2

3

late, camsylates, citrates, decanoates, formates, fumarates, gluconates, glutarate, glycolates, hexanoates, laurates, lactates, maleates, nitrates, oleates, oxalates, octanoates, propanoates, palmitates, phosphates, sebacates, succinates, stearates, sulfates, sulfonates, such as methanesulfonates, ethanesulfonates, p-toluenesulfonates, salicylates, tartrates, and tosylates.

Pharmaceutically acceptable solvates and hydrates are complexes of a compound with one or more solvent of water molecules, or 0.5 to about 100, or 1 to about 100, or 1 to about 10, or one to about 2, 3 or 4, solvent or water molecules.

As used herein, to "modulate" the activity of a receptor means either to activate it, i.e., to increase its cellular function over the base level measured in the particular environment in which it is found, or deactivate it, i.e., decrease its cellular function to less than the measured base level in the environment in which it is found and/or render it unable to perform its cellular function at all, even in the presence of a natural binding partner. A natural binding partner is an endogenous molecule that is an agonist for the receptor.

An "agonist" is defined as a compound that increases the basal activity of a receptor (e.g. signal transduction mediated by the receptor).

As used herein, "partial agonist" refers to a compound that has an affinity for a receptor but, unlike an agonist, when bound to the receptor it elicits only a fractional degree of the pharmacological response normally associated with the receptor even if a large number of receptors are occupied by the compound.

An "inverse agonist" is defined as a compound, which reduces, or suppresses the basal activity of a receptor, such that the compound is not technically an antagonist but, rather, is an agonist with negative intrinsic activity.

As used herein, "antagonist" refers to a compound that binds to a receptor to form a complex that does not give rise to any response, as if the receptor was unoccupied. An antagonist attenuates the action of an agonist on a receptor. An antagonist may bind reversibly or irreversibly, effectively eliminating the activity of the receptor permanently or at least until the antagonist is metabolized or dissociates or is otherwise removed by a physical or biological process.

As used herein, a "subject" refers to an animal that is the object of treatment, observation or experiment. "Animal" includes cold- and warm-blooded vertebrates and invertebrates such as birds, fish, shellfish, reptiles and, in particular, mammals. "Mammal" includes, without limitation, mice; rats; rabbits; guinea pigs; dogs; cats; sheep; goats; cows; horses; primates, such as monkeys, chimpanzees, and apes, and, in particular, humans.

As used herein, an "excipient" refers to an inactive ingredient that is added to a pharmaceutical composition to provide, without limitation, bulk, consistency, stability, binding ability, lubrication, disintegrating ability, etc., to the composition. A "diluent" is a type of excipient.

As used herein, a "diluent", "bulking agent" and "filler" refer to an ingredient (excipient) in a pharmaceutical composition that lacks pharmacological activity but may be pharmaceutically necessary or desirable, e.g. to enhance or improve the properties of the pharmaceutical blend for manufacturing or physiological purposes. For example, a diluent or filler may be used to increase the bulk of a potent drug whose mass is too small for manufacture or administration.

As used herein, a "binder" is an excipient holding the ingredients together, and forming granules or tablets with required mechanical strength, and may give volume to the formulation. Specific examples of binders are mono-, di-, and poly-saccharides and derivatives thereof; sugar alcohols

4

such as xylitol, sorbitol or maltitol; protein, such as; synthetic polymers, such as polyvinylpyrrolidone (PVP), polyethylene glycol (PEG). Binders are classified according to their application, e.g. solution binders are dissolved in a solvent (for example water or alcohol may be used in wet granulation processes). Examples include gelatin, cellulose, cellulose derivatives, polyvinylpyrrolidone, starch, sucrose and polyethylene glycol. Dry binders are added to the powder blend, either after a wet granulation step, or as part of a direct powder compression (DC) formula. Examples include cellulose, methyl cellulose, polyvinylpyrrolidone and polyethylene glycol.

As used herein a "lubricant" refers to an excipient which for example prevents ingredients and excipients to lump together, and/or sticking to the capsule filling machine. A lubricant may also ensure that the formation, filing and ejection of the capsule can occur, for example by lowering friction. Examples of lubricants are talc, silicon dioxide (silica), fatty acids or fatty acid salts, such as magnesium stearate, sodium stearate fumarate, stearic acid, etc.

As used herein a "disintegrant" refers to an excipient which disintegrate a pharmaceutical preparation on contact with an aqueous fluid.

As used herein, "coadministration" of pharmacologically active compounds refers to the delivery of two or more separate chemical entities, whether in vitro or in vivo. Coadministration means the simultaneous delivery of separate agents; the simultaneous delivery of a mixture of agents; as well as the delivery of one agent followed by delivery of a second agent or additional agents. Agents that are coadministered are typically intended to work in conjunction with each other.

The term "an effective amount" as used herein means an amount of active compound or pharmaceutical agent that elicits the biological or medicinal response in a tissue, system, animal or human that is being sought by a researcher, veterinarian, medical doctor or other clinician, which includes alleviation or palliation of the symptoms of the disease being treated.

The terms screen, screening, delump, delumping, dry milling, and sizing are used interchangeably herein. These terms refer to separation according to size.

The term "granulation" as used herein, and as conventionally used in the pharmaceutical industry, refers to the act or process in which primary powder particles are made to adhere to form larger, multiparticle entities called granules. Granules may for example be formed collecting particles together by creating mechanical bonds between them, e.g. by compression or by using a binder. Granulation is extensively used in the manufacturing of tablets and capsules.

The terms "granulated pimavanserin" and "pimavanserin granulation" are used interchangeably herein.

Generally a granulation process combines one or more particles and forms a granule that will allow tableting or the encapsulation process to be within required limits. The granulation process can be made predictable and repeatable. The granulation can be performed in a variety of equipment such as, but not limited to, low shear, high shear granulators, fluid bed granulator, roller compactor, and slugger.

The term "blending" refers to the mixing of pharmaceutical ingredients to form a mixture of the ingredients, e.g. active pharmaceutical ingredient (API) and diluent, as defined by pharmaceutical specifications in the compendial references using a variety of equipment such as, but not limited to, "V"-blenders, bin-blenders, cone-blenders.

The term "encapsulation" refers to a range of techniques used to enclose medicines in a shell, e.g. a two-piece capsule, such as a two-piece hard shell capsule. The capsule

US 11,452,721 B2

**5**

referred to herein may be taken orally. Capsules may be designed with a telescoping cap and body manufactured from e.g. gelatin or cellulose.

Compounds

Pimavanserin, which is also known as N-(1-methylpiperidin-4-yl)-N-(4-fluorophenylmethyl)-N'-(4-(2-methylpro-

**6**

pyloxy)phenylmethyl)carbamide,    N-[(4-fluorophenyl)
methyl]-N-(1-methyl-4-piperidinyl)-N'-[4-(2-
methylpropoxy)phenyl]methyl -urea, 1-(4-fluorobenzyl)-1-
(1-methylpiperidin-4-yl)-3-[4-(2-methylpropoxy)benzyl]
urea, or ACP-103. Pimavanserin commonly is administered
as pimavanserin tartrate and has the structure of Formula (I):

(I)



Pimavanserin has previously been synthesized according
to the method disclosed in Scheme I.

SCHEME I: SYNTHESIS OF PIMAVANSERIN

US 11,452,721 B2

7 8

-continued



Alternative methods for preparing pimavanserin are disclosed in WO2017/015272, which is incorporated herein by reference in its entirety.

Pimavanserin and methods for its use are described in U.S. Pat. Nos. 7,601,740; 7,659,285; 7,713,995; 7,732,462; 7,994,193 and 8,008,323, the entirety of each of which is hereby incorporated by reference. Pimavanserin can be obtained in a number of salt and crystalline forms. Exemplary pharmaceutically acceptable salts include the tartrate, hemi-tartrate, citrate, fumarate, maleate, malate, phosphate, succinate, sulphate, and edisylate (ethanedisulfonate) salts. Pimavanserin salts including the aforementioned ions, among others, are described in U.S. Patent Publication No. 2006-0111399, filed Sep. 26, 2005, the entirety of which is incorporated herein by reference. In an embodiment provided herein, pimavanserin is the tartrate salt of pimavanserin. Several crystalline forms of the tartrate salt of pimavanserin have been described in U.S. Patent Publication No. 2006-0106063, filed Sep. 26, 2006, the entirety of which is incorporated herein by reference. See also U.S. Pat. Nos. 7,732,615; 7,795,547; 7,790,899; 7,868,176, the entirety of each of which is incorporated herein by reference. In an embodiment provided herein, pimavanserin is the crystalline form of the tartrate salt of pimavanserin Form A. In another embodiment, pimavanserin is the crystalline form of the tartrate salt of pimavanserin Form C. Pimavanserin (including, for example, the tartrate salt) may be formulated into tablets, such as is described in U.S. Patent Publication Nos. 2007-0260064, filed May 15, 2007 and 2007-0264330, filed May 15, 2007, each of which are incorporated herein by reference in their entireties.

The pharmacological activity of pimavanserin has been previously reported. See U.S. Patent Publication Nos. 2004/0213816 and 2009/0053329, the entirety of each of which is hereby incorporated by reference. Pimavanserin is active in a number of models thought to be predictive of antipsychotic activity such as DOI ((±)-2,5-dimethoxy-4-iodoamphetamine, a serotonin agonist) induced head twitches in the rat and attenuation of hyperactivity in mice induced by the N-methyl-D-aspartate antagonist MK-801. The compound was effective in these models at oral doses of 3 and 10 mg/kg.

Suitable routes of administration of pimavanserin may, for example, include oral, rectal, transmucosal, topical, or intestinal administration; parenteral delivery, including intramuscular, subcutaneous, intravenous, intramedullary injections, as well as intrathecal, direct intraventricular, intraperitoneal, intranasal, or intraocular injections. The compounds can also be administered in sustained or controlled release dosage forms, including depot injections, osmotic pumps, pills, transdermal (including electrotransport) patches, and the like, for prolonged and/or timed, pulsed administration at a predetermined rate. Embodiments provided herein relate to oral administration of a capsule comprising pimavanserin granulation.

The pharmaceutical compositions described herein comprised in a capsule refer to compositions prepared by methodologies not conventionally used in granulation, such as high and low shear granulation, e.g. using low amounts of water.

For oral administration, the compositions can be formulated readily by combining the active pharmaceutical ingredient (API) (e.g., pimavanserin or pimavanserin tartrate) with pharmaceutically acceptable binders or diluents well known in the art. Such binders or diluents enable the API disclosed herein to be formulated as tablets, pills, dragees, capsules, liquids, gels, syrups, slurries, suspensions and the like, for oral ingestion by a patient to be treated.

Provided herein is pimavanserin and pharmaceutically acceptable salts thereof having altered properties, such as increased bulk density, improved flow, and compressibility allowing the pharmaceutical manufacturing of a capsule

US 11,452,721 B2

9                                                    10

comprising about 5-34 mg pimavanserin, such as about 34 mg, which for example may be filled in a size 3 or 4 capsule, such as a capsule of size 4.

It has herein been demonstrated that altering the flow and bulk density of pimavanserin, and compositions comprising pimavanserin using methods described herein results in a reproducible and quantitatively accurate filling of small sized capsules (e.g. size 3 or 4 capsules) in a scaled up pharmaceutical manufacturing processes, e.g. for manufacturing of about 1,000,000 capsules or more, for example at a speed of 40-90,000 capsules per hour.

Pharmaceutical manufacturing as used herein implies certain requirement being met such as manufacturing efficiency and economical requirements. Although also product quality and performance are ensured through the design of effective and efficient manufacturing processes, product and process specifications are based on a mechanistic understanding of how formulation and process factors affect product performance, e.g. variability between batches, assuring continuous real-time quality of the product and the materials, e.g. excipients. Additionally, regulatory policies and procedures used to meet official requirements such as those set out by health authorities, such as EMA (European Medicine agency) and FDA (U.S. Food and Drug Administration) and similar agencies in order to obtain the required quality of a drug product has an impact on the pharmaceutical manufacturing. For example, risk-based regulatory approaches recognize the level of scientific understanding of how formulation and manufacturing process factors affect product quality and performance and the capability of process control strategies to prevent or mitigate the risk of producing a poor quality product. For example, manual filling of capsules would not be considered relevant by those skilled in the art as manual filling of capsules cannot provide high reproducibility at the filling speed required to manufacture batches containing more than 100,000 capsules. Consequently those skilled in the art setting out to improve the formulation of an existing active pharmaceutical ingredient (API) for example to improve patient compliance, are working with tools used within the field of pharmaceutical manufacturing of small molecules.

Generally when improving the flow of an API (active pharmaceutical ingredient) the fill weight is increased. Increasing the fill weight is counterproductive to filling a small volume, such as a size 3 or even a size 4 capsule, at the production speeds required, such as 40-90,000 capsules per hour.

Disclosed herein are pharmaceutical manufacturing processes for obtaining suitable strength capsules of pimavanserin or a pharmaceutically acceptable salt thereof, said process comprises spraying water to pimavanserin, followed by a granulation process, wherein pimavanserin is granulated without addition of a binder, and blending followed by encapsulation. The particle size distribution, and/or bulk density of the granulated pimavanserin is controlled and matched to other excipient(s) to improve flow of the composition and assure content uniformity and low variability of the product. Additionally matching of excipient(s) allows reproducibility during encapsulation of pimavanserin. The matching of physical properties of API and other excipients used herein enables pharmaceutical manufacturing, in particular capsule filling (encapsulating the dried pimavanserin granulation in capsules of size 3 or 4) at sufficient speed such as more than 40,000 capsules per hour. Matching of API may for example be done by matching the particle size distribu-

tion of the API and one or more excipient. The bulk density of the API and the one or more excipients may also be matched.

For example, as shown in table 1, pimavanserin granulation, as obtained by the pharmaceutical manufacturing described herein vs the native API (active pharmaceutical ingredient (e.g., pimavanserin tartrate), obtained for example as decribed in W02017/015272), the bulk density and the Carr's Index (Carr's Compressibility Index) have been substantially altered which enables the filling of the above mentioned small capsule. Carr's Index compares the difference between the bulk density and tapped density of a substance to determine its compressibility. The bulk density and the Carr's Index may be determined in accordance with USP<616> (method for performing Bulk and Tapped Densities, method 1) and USP<1174> (definition of powder flow) respectively.

TABLE 1

|  | Pimavanserin granulation* | Native API |
|---|---|---|
| Bulk density (g/ml) according to USP <616> | 0.508  (n = 4) | 0.294  (n = 2) |
| Carr's Index | 24  (n = 4) | 36  (n = 2) |

*final blend as disclosed in the example herein below and in table 2

Table 1 visualizes that filling of a capsule, in particular a capsule of size 3 or 4 (capsule volumes of 0.30 and 0.21 ml respectively, approximately 120 mg and 85 mg respectively at a bulk density of 0.5 g/ml). As evident from Table 1, native pimavanserin (API) would be challenging for a size 3 capsule and not possible for a capsule of size 4 without improving the bulk density (as comparison 85 mg of pimavanserin granulation would require about 0.17 ml compared to 0.29 ml for the native API) and flowability (Carr index is frequently used in pharmaceutical manufacturing as an indication of the flowability of a powder, e.g. 2016 U.S. Pharmacopoeias-National Formulary [USP 35 NF 30]).

In particular, disclosed herein are formulation, granulation, dry milling, blending, and encapsulation of pimavanserin containing novel elements. Salient features are that the known granulation technology uses atypical parameters to achieve the desired results. Spray rate, atomization and quantity of water are examples of atypical parameters used in combination with wet granulation to obtain the targeted properties of pimavanserin formulation disclosed herein. For example, pimavanserin has been successfully granulated without the use of binder by spraying, at a controlled rate and under controlled atomization conditions, a controlled amount of water to pimavanserin during the wet granulation to provide granulated pimavanserin suitable for further processing (e.g. drying, blending, etc.) in the pharmaceutical manufacturing of capsules containing 5-34 mg pimavanserin, such as 10-34 mg capsules of size 3 or 4. Prior to the surprising finding that pimavanserin could be successfully wet granulated achieving the targeted improved physical properties (e.g. bulk density) without the addition of a binder, and by adding a small, such as 2-15% w/w, e.g. 3-10% w/w, 3-8% w/w amount of water to pimavanserin by spraying, many different granulation methods were contemplated and tested, and some discussed more in detail hereinbelow.

In one embodiment, High Shear Granulation (HSG) utilizing a small quantity of water, such as approximately 3-8% w/w of the dry ingredients, under appropriate HSG parameters for atomization, spray rate, impeller speed, and chopper speed was found to provide the required improvements

US 11,452,721 B2

11

to the pimavanserin (API) physical properties, such as increased bulk density, improved flow, and compressibility. The small quantity of water, its application using appropriate water atomization and/or water application rate are important reasons for the improved properties of pimavanserin. It has herein been demonstrated that the atomized spraying of a small amount of water during the granulation of pimavanserin achieves a wetting of pimavanserin that provides a granulated pimavanserin suitable for pharmaceutical manufacturing of a capsule, such as a capsule of size 4 comprising 10-34 mg pimavanserin. The actual amount of water to be sprayed at the granulation of pimavanserin may vary from batch to batch (depending on surrounding factors such as humidity, temperature, exact properties of the API batch, etc) but is still consider to be a small amount, e.g. 3-10% w/w based on the dry ingredients. The amount of water and the granulation process disclosed herein is controlled by controlling the impeller energy to achieve the targeted impeller speed. The appropriate impeller speed ensures sufficient mixing and controls the growth of granules. The specific small amount of water needed for each batch is controlled by the power consumption (amperage) of the granulator, i.e., if the amperage is too high, additional amounts of water could be sprayed to the granulate in order to obtain pimavanserin having the properties desired in order to pharmaceutically manufacture capsules comprising 5-34 mg pimavanserin. Adding too much water may alter other properties of the API, such as its crystallinity. The properties are achieved via a manufacturing process that includes granulation, using a suitable granulator, e.g. a high shear granulator, simultaneously spraying the adequate amount of water while mixing, followed by screening, and blending appropriate quantities of excipients. In some embodiments the lack of a binder, and using pimavanserin, properly wetted and not over-wetted are believed to be reasons for the fill uniformity observed using the herein described manufacturing process. Over-wetted granulation could seriously affect the further processing. In some embodiments particle size distribution of the granulated pimavanserin is controlled and matched to the particle size distribution of the diluents and other excipients to minimize segregation and improve flow and capsule filling reproducibility. The particle size distribution is also considered a factor involved in the successful filing of capsules of size 3 or 4, as a too aggressive milling would cause a wider particle size distribution and hamper the encapsulation. Examples of suitable particles size distribution of the granulated pimavanserin is a particle size distribution (D90) of 60-450 µm, such as 100-420 µm, such as above 250 µm. Particle size distribution referred to herein is obtained using Laser light scattering particle size (LLS PS) analyses of granulated pimavanserin conducted on a Malvern Mastersizer 2000 LLS PS system using a Scirocco 2000 dry dispersion unit using standard non-GMP conditions, and in a sample size of about 2 -10 g. Suitable diluents such as microcrystalline cellulose, silicified microcrystalline cellulose, low substituted hydroxylpropyl cellulose or similar materials to a concentration approximately one-half of the granulation and lubricated with magnesium stearate, sodium stearyl fumarate or other suitable lubricants to prevent sticking to the encapsulation tooling. In some embodiments the particle size distribution of the diluent is matched to the above mentioned particle size distribution of granulated pimavanserin, for example microcrystalline cellulose having a particle size distribution (D90) is 180-420 µm, such as above 250 µm. In some embodiments the lubricant, such as magnesium stearate is also matched to the API. In some embodiments the matching

12

of the particle size distribution of the lubricant, compared to the diluent, is less important in view of the lower amounts used in some embodiments. Optionally suitable binders and/or disintegrants may be included in the blending of the pimavanserin granulation. In some embodiments pimavanserin is blended with a diluent, e.g. microcrystalline cellulose and lubricant, magnesium stearate only, whereas amounts of water were added by spraying during the granulation process

In some embodiments the particle size distribution (D90) of the composition is 60-380 µm, such as 75-350 µm, such as 100-300 µm.

FIG. 4 discloses the particle size distribution of pimavanserin tartrate, prior to the herein disclosed granulation process.

FIG. 5 discloses the particle size distribution of the granulated pimavanserin. The arrow in FIG. 5 indicates the area of particles size distribution of the API. A substantial change in the particle size distribution can be seen, e.g. the D90 has increased from about 30 µm for the API to above 279 µm.

The matching of particles size distribution of the API and diluent is considered one factor influencing the herein disclosed robust process and reproducible encapsulation of pimavanserin, e.g. 10-34 mg pimavanserin in size 4 capsules, e.g. two-piece capsules.

In some embodiment bulk density between the API and the diluent and optionally the lubricant are matched, for example granulated pimavanserin having a bulk density above >0.40 g/ml, such as about 0.5 g/ml, and the diluent 0.35-0.46 g/ml.

In some embodiments both the bulk density and the particle size distribution is used in combination in order to adequately match at least the pimavanserin granulate and the diluent in order to obtain capsules of size 4 comprising 10-34 mg pimavanserin.

In some particular embodiments the granulation of pimavanserin may be completed and the obtained pimavanserin granulation having suitable properties for the herein disclosed manufacturing process, in the absence of a binder. It is however possible to include a binder in the granulation but for various reasons not necessarily preferred.

In some embodiments disclosed herein the blended pimavanserin composition, as described herein, comprised in a capsule (e.g a size 4 capsule) have an average Specific Energy (SE) of less than 5 mJ/g, such as less than 4.5 mJ/g, such as less than 4 mJ/g, as obtained by FT4 measurement.

In some embodiments disclosed herein the blended pimavanserin composition, as described herein, comprised in a capsule (e.g a size 4 capsule) have an average Flow Rate Index (FRI) of 0.9-1.2, such as 1.0-1.1, as obtained by FT4 measurement.

In some embodiments disclosed herein the blended pimavanserin composition, as described herein, comprised in a capsule (e.g a size 4 capsule) have an average Specific Energy (SE) of less than 4.5 mJ/g, and an average Flow Rate Index (FRI) of 0.9-1.2.

Pharmaceutical Formulations

Some embodiments include a pharmaceutical composition comprising granulated pimavanserin tartrate, Form C which may include a small percentage of Form A, including a pharmaceutically acceptable diluent, binder or excipient, or combination thereof.

The pharmaceutical compositions disclosed herein, are in some embodiments, provided as a two-piece hard shell capsules made of gelatin (fish, mammalian, or vegetable sourced) or other combinations. The two-piece hard shell

US 11,452,721 B2

13

capsules may contain the pimavanserin granules with a filler/diluent and/or lubricants.

The finished dosage forms may be presented in packaging containing metal or plastic foil such as a blister pack. The pack may also be accompanied with a notice associated with the container in form prescribed by a governmental agency regulating the manufacture, use, or sale of pharmaceuticals, which notice is reflective of approval by the agency of the form of the drug for human or veterinary administration. Such notice, for example, may be the labeling approved by the U.S. Food and Drug Administration for prescription of drugs, or the approved package insert.

WO 2007/133802 discloses that only certain components are compatible with pimavanserin, and although certain components are compatible their use in the herein disclosed capsule may not be preferred. A particular example is lactose as it may have implications to the administration to subject being lactose intolerant.

Some requirements of the pharmaceutical manufacturing for pimavanserin are commercial operational speed, as well as stringent regulatory requirements. For example, the encapsulation equipment used is capable of ~100,000 capsules per hour, such as 40,000-90,000 capsules per hour, such as 60,000-86,000 capsules per hour, such as 60,000-70,000 capsules per hour. The manufacturing must be reproducible and robust to be capable of this output while producing quality product.

Prior to the surprising finding, i.e. the herein disclosed processes and compositions resulting in a robust and reliable filling of 5-34 mg pimavanserin in capsules of size 3 or 4, such as size 4 capsules, many experiments were done.

Comparative experiments resulting in unacceptable products

For example, the pharmaceutical industry has used fluid-bed layering extensively for several decades to produce small spherical particles with improved properties (e.g. flowability and compressibility) for further downstream processing, such as capsule filling. During this two-phase process that includes simultaneous spraying and drying, the addition of a binder causes primary particles to increase the diameter of the substrate by the addition of a dense layer of the drug and a binder, one such technique evaluated was top spray layering (use of conventional top-spray fluidized bed granulation equipment to apply the drug layer to a small substrate particle), e.g. using the following compostion about 63% w/w microcrystalline cellulose (the spherical particle (bead) around which the API is layered or applied), about 28% w/w of pimavanserin tartrate (API), about 6% w/w povidone (binder), such as povidone K30, and about 2% w/w HPMC E5 (Methocel™ E5) (hydroxypropylmethyl cellulose). The top spray fluid-bed layering resulted in particles having an acceptable flow and bulk density but unacceptable stability and particle size distribution as well an unacceptable amount of impurities. These unacceptable disadvantages, such as unacceptable stability, less favourable dissolution, resulted in deeming this process option unsuitable for the current purpose.

Wurster Layering (a similar and more common process to the Top Spray Layering described above) was tested and found to produce particles having an acceptable flow and bulk density but unacceptable stability and particle size distribution as well an unacceptable amount of impurities. These unacceptable disadvantages, such as unacceptable stability, less favourable dissolution, resulted in deeming this process option unsuitable for the current purpose. One compostion tested was the same as in the top spray layering.

14

Extrusion/spheronization is especially useful in producing semi-spherical, dense granules. The physical advantages of extrusion/spheronization vs. other multiparticulate approaches can include relatively high drug loading, improved flow properties, narrow particle size distribution, smooth and a coatable surface, low friability, and uniform packing characteristics. The process consists of five operations, i.e. wet granulating the formulation, followed by screening to form cylindrical extrudates, adding the extrudate to a spheronizer forming spheres from the extrudate, and drying the spheres. Optionally coatings may be applied to the spheres. A composition containing about 27% w/w pimavanserin tartrate as a 32% w/w slurry in water, about 68% w/w microcrystalline cellulose (e.g. Avicel PH 101), about 4% hydroxypropylmethyl cellulose (e.g. Methocel™ A15LV), and about 1% w/w povidone (e.g. povidone K30) resulted in particles having an acceptable flow and bulk density but unacceptable stability and particle size distribution as well an unacceptable amount of impurities. The particles were milled in order to achieve a uniform particle size, yet the amount of impurities and stability were found to be unacceptable.

Twin-Screw Melt Granulation has increased in popularity in pharmaceutical manufacturing due to the numerous advantages of this continuous manufacturing technique over traditional batch wet granulation. Twin-Screw Melt Granulation does not require the use of organic or aqueous solvents, making the entire process less consuming in terms of time and energy as compared to wet granulation, and in view of other tests disclosed hereinabove the use of solvent was deemed as a potential source for the impurities and may have been a factor for the stability issues observed. Consequently Twin-Screw Melt Granulation was evaluated using a binder/disintegrant, heat and agitation. As binder/disintegrant a low substituted hydroxypropyl cellulose (e.g. LH-B1 marketed by Shin Etsu), and Kollidon® VA64 marketed by BASF were used in separate compositions using about 50% w/w pimavanserin tartrate and LH-B1 and Kollidon VA64 respectively. In either case the resulting particles were screened and evaluated resulting in particles having an acceptable flow and bulk density but unacceptable finding of impurities as well as unacceptable dissolution.

Conventionally wet granulation (both high shear and low shear) have been used for a long time in pharmaceutical manufacturing, an example of a conventional wet granulation process is described in WO2009/061909 wherein table 7 discloses 40-50% w/w of water being used in the wet granulation, i.e. conventionally a wet granulation uses a liquid, e.g. water in order to prepare a wet mass with sufficient plasticity which can be subsequently wet-milled and dried produce granules with improved flow and density properties. High shear granulation was chosen for evaluation due to the higher energy it is capable of imparting to the particles, which was known to improve the particle density, spherocity, and consequently the capsule filling capability and particle flow, respectively. The quantity of water used in conventional or traditional wet granulation proved to be problematic resulting in very large, wet, adhesive pimavanserin granules that would not be easily dried in a fluid bed dryer. Additionally, large quantity of water would also result in high impurities and changes in the crystallinity of pimavanserin.

Several embodiments were evaluated using excipients commonly used to mitigate the impact of high water content while providing excellent granule properties. These did not improve the resulting over-wetting of the pimavanserin

US 11,452,721 B2

15

blend and resulted in an adhesive wet mass that would not would not be easily dried in a fluid bed dryer.

Contrary to the above disclosed comparative experiments the present application describes processes to manufacture capsules of size 4 comprising 5-34 mg pimavanserin. As additionally disclosed above it was surprisingly found that a 100% pimavanserin high-shear granulation was possible by using only small water quantities, often large quantities of water and a binder conventionally used in high-shear granulation. In order for a small quantity of water to be effective, the distribution of the water should be finely divided providing small points of localized wetting of pimavanserin. Localized wetting is considered wetting of an immediate area around the water droplets. Examples of suitable size of the water droplets to be sprayed are about 0.05-0.15 mm The granulation of pimavanserin, for example without the presence of a binder, was achieved using a small amount of water and a nozzle, such as an atomizing nozzle, capable of producing a spray pattern that covered a large area of pimavanserin and preventing over-wetting of large areas of the batch. Suitable nozzles are commercially available, e.g. from Spraying Systems Co. Spraying of low amounts of water and appropriate impeller speed and chopper speed of the high shear granulator achieved pimavanserin granulation having altered properties and improved the flow, e.g. bulk density compared to the native API. The total quantity of water added to the pimavanserin granulation should be limited to a global value the would not result in a global state of over-wetting (global refers to a large area of the batch being over-wetted), which as described above would occur during conventional wet granulation of pimavanserin, causing an adhesive wet mass that would not be easily dried in a fluid bed dryer, i.e. not resulting in a sufficiently dried product, or too long drying times, and increasing the risk of changing the crystalline form of pimavanserin (e.g. changing pimavanserin into amorphous forms), which could result in slow dissolution when administered to a patient. As disclosed above conventionally high shear granulation utilizes amounts of water that would lead to over wetting of an API, such as pimavanserin, and the present inventors have demonstrated that an appropriate water application, e.g. using a nozzle, capable of spraying water over a large area of the API, combined with a chopper/impeller speed (e.g. by controlling amperage), results in granulated pimavanserin having improved bulk density suitable for filling amounts disclosed herein into capsules of size 4.

In addition to the global, or batch, over-wetting a local over-wetting may also impair the properties of the API. One solution presented herein relates to applying a spray of water having a droplet size such as 0.05-0.15 mm, e.g. using a nozzle spraying the water and resulting in adequate wetting, locally and globally.

Suitable drying times of the wet granulation described herein is 120 min, such as 100 min, such as 80 min, such as 60 min. A drying time of 60 min is preferred, e.g. in view of process efficiency etc. The global quantity of water will vary depending on many factors such as the capacity of the high shear granulator, loading of the high shear granulator, the batch of pimavanserin to be granulated, surrounding environment, and may be controlled by impeller speed and chopper speed as well as the spray rate and spray pattern parameters (e.g. using a atomization nozzle), and the amperage (energy consumption) of the granulator. As the high shear granulator is an "open" system and energy from the impeller actually incorporates into the product causing the product temperature to increase favorably limiting the global impact of the added water when applied at a low rate.

16

However, the range of water was found to be approximately 3-15% w/w, such as 3-10% w/w, such as 3-8% w/w (based on the mass of the pimavanserin in the granulator at the start of the granulation process). As disclosed herein it has been demonstrated that pimavanserin can be granulated without the use of a binder, i.e. utilizing water only. It is however contemplated that in some embodiments suitable binders, such as cellulose, methyl cellulose, polyvinylpyrrolidone and polyethylene glycol may be used, although not a necessity. The present high shear granulation of pimavanserin utilizing e.g. 3-8% w/w water, applied by an nozzle, which can generate an atomized spray pattern, provides benefits.

Embodiments disclosed herein relate to pimavanserin tartrate as crystalline Form C, Form A or a combination thereof.

The doses referred to herein, i.e. 5-34 mg refers to pimavanserin free base (equivalent to about 6 mg-40 mg pimavanserin tartrate).

Some embodiments relates to pimavanserin tartrate Form C (40 mg of pimavanserin tartrate, equivalent to 34 mg pimavanserin free base) being encapsulated in capsules of size 3 or 4, such as capsules of size 4.

One embodiment of the compositions described herein includes pimavanserin tartrate granulation without binder, dried, and thereafter blended with less than 60% w/w microcrystalline cellulose such as Avicel PH302 or equivalent microcrystalline cellulose, and about 1% w/w magnesium stearate.

In some embodiments the compositions described herein comprises granulated pimavanserin and microcrystalline cellulose is at least 20% w/w microcrystalline cellulose, such as 30% w/w microcrystalline cellulose, such as 40% w/w microcrystalline cellulose, such as 50% w/w microcrystalline cellulose, such as 50-89% w/w microcrystalline cellulose, such as 20-94% w/w, such as 50-94% w/w, such as 57-94% w/w, such as 57-89% w/w microcrystalline cellulose, such as 57-79% w/w microcrystalline cellulose, or 57-60% w/w microcrystalline cellulose, or 57-59.5% w/w microcrystalline cellulose, or 58.5-59.5% w/w microcrystalline cellulose, or 59% w/w microcrystalline cellulose.

In some embodiments the compositions described herein comprises granulated pimavanserin and microcrystalline cellulose and magnesium stearate, such as 0.1-3% w/w, such as 0.5-2% w/w magnesium stearate, or 0.5-1.5% w/w magnesium stearate, or 1% w/w magnesium stearate.

In some embodiments the compositions described herein comprises granulated pimavanserin (5, 10, 20 or 34 mg) and microcrystalline cellulose is at least 20% w/w microcrystalline cellulose, such as 30% w/w microcrystalline cellulose, such as 40% w/w microcrystalline cellulose, such as 50% w/w microcrystalline cellulose, such as 50-89% w/w microcrystalline cellulose, such as 20-94% w/w, such as 50-94% w/w, such as 57-94% w/w, such as 57-89% w/w microcrystalline cellulose, such as 57-79% w/w microcrystalline cellulose, or 57-60% w/w microcrystalline cellulose, or 57-59.5% w/w microcrystalline cellulose, or 58.5-59.5% w/w microcrystalline cellulose, or 59% w/w microcrystalline cellulose and magnesium stearate, such as 0.1-3% w/w, such as 0.5-2% w/w magnesium stearate, or 0.5-1.5% w/w magnesium stearate, or 1% w/w magnesium stearate.

The compositions disclosed herein comprise pimavanserin and additional compatible excipients, e.g. sugars, sucrose, mannitol, sorbitol, polysaccharides (e.g. from corn, wheat, rice, potato), as well as pregelatinized or partially pregelatinized starches (e.g. STARCH 1500®), cellulose preparations such as microcrystalline cellulose (MCC) (e.g. AVICEL® PH 302, AVICEL® PH 102, VIVAPUR® 302,

17

VIVAPUR® 102, EMCOCEL® HD 90), silicified microc-rystalline cellulose (e.g. PROSOLV® 50, PROSOLV® 90, PROSOLV® HD90), lactose cellulose blends (e.g. CELLA-TOSE® 80, CELLATOSE® 90, PROSOLV® EASYtab SP), hydroxypropylmethyl cellulose, hydroxymethyl cellu-lose, polyvinylpyrrolidone, lubricants such as magnesium stearate, sodium stearyl fumarate, colloidal silicon dioxide, and talc.

Several tests attempting to mitigate the impact of the high water quantity used in high-shear granulation by the use of excipients generally capable of absorption of the water were made. However, these proved to be unsuccessful.

One embodiment of the compositions described herein includes pimavanserin tartrate granulation without binder, drying, and blending said granulation with microcrystalline cellulose having a bulk density of 0.35-0.46 g/ml, and wherein the bulk density of the blended composition is >0.4 g/ml, such as >0.5 g/ml.

In some embodiments the composition comprises micro-crystalline cellulose (MCC) having a bulk density of about 0.40 g/ml, such as 0.3-0.5 g/ml, such as 0.35-0.46 g/ml. In some embodiment the API having a bulk density of >0.40 g/ml and MCC having a bulk density of 0.30-0.50 g/ml and is blended with magnesium stearate in order to make up a composition having a bulk density of 0.40-0.55 g/ml.

One embodiment of the compositions described herein includes pimavanserin tartrate granulation with spraying water and without any binder, followed by, drying, and blending said granulation with less than 50% w/w microc-rystalline cellulose such as Avicel PH302 or equivalent microcrystalline cellulose, and about 1% w/w magnesium stearate. The spraying of water to pimavanserin tartrate is done while mixing in an appropriate granulator.

Another embodiment of the composition described above includes pimavanserin tartrate granulation containing less than 10% w/w Avicel PH302 and colloidal silicon dioxide, e.g. Aerosil Pharma 200 manufactured by Evonik, with a specific surface area from about 175 to about 225 m²/g blended with less than 60% w/w microcrystalline cellu-lose, such as Avicel PH302 or equivalent microcrystalline cellulose, and about 1% w/w magnesium stearate.

Another embodiment of the composition described above includes pimavanserin tartrate granulation containing less than 10% w/w Avicel PH101 and colloidal silicon dioxide with a specific surface area from about 175 to about 225 m²/g, e.g. Aerosil Pharma 200 manufactured by Evonik, blended with less than 60% w/w microcrystalline cellulose, such as Avicel PH302 or equivalent thereof, and about 1% w/w magnesium stearate.

As used herein, whenever a USP is referred to it is the current official version at the time of filing of the application, i.e 40-NF 35, released Nov. 1, 2016 and official May 1, 2017.

Provided herein are embodiment for manufacturing pima-vanserin granulation comprising: providing pimavanserin and adding water while mixing in an appropriate granulator, such as a high shear granulator; granulating and; drying the wet pimavanserin granulation, sizing the pimavanserin granulation, e.g. through a screen, such as a 10-20 mesh screen; and obtaining pimavanserin granulation. Said pima-vanserin granulation being suitable for encapsulation in size 4 capsules, for example by blending with a diluent before capsule filling (encapsulation).

Provided herein are embodiment for manufacturing pima-vanserin granulation by: providing pimavanserin (weighed and the loss-on-drying (LOD) moisture content determined) to a high shear granulator; pre-blending (optional); provid-ing granulation water, e.g. 3-8% w/w, e.g. by spraying at a

18

controlled rate and/or a controlled pattern (e.g. using an atomization nozzle) while monitoring the impeller speed and/or amperage, and granulating; stopping the provision of granulation water, e.g. when the impeller amperage increases; wet massing, e.g. without changing the impeller speed; drying the wet granulation, e.g. in a fluid bed dryer until the LOD moisture is at or below the LOD moisture of the pimavanserin as provided; and sizing, e.g. through a 10-mesh screen; and obtaining pimavanserin granulation. Said pimavanserin granulation being suitable for encapsu-lation in size 3 or 4 capsules, for example by providing additional excipients during the screening, followed by filling of the capsule.

It is important to control the amount of water, the water application rate and/or water application method thereof (e.g. using an atomization nozzle, or another suitable spray-ing device) as too much water may have a negative impact, e.g. change its properties, such as its crystallinity, of pima-vanserin. Adding too much water, e.g. 25% w/w, would have undesired effects on properties of pimavanserin, which would cause issues with the continued pharmaceutical manufacturing of capsules. In some embodiments water is sprayed (e.g. using an atomization nozzle) to pimavanserin while mixing. Addition of water without mixing may lead to localized over-wetting. Provided herein are embodiments wherein pimavanserin, for example pimavanserin tartrate, such as pimavanserin tartrate Form C, is granulated with water using high shear granulation. In some embodiments the amount of water is 1-10% w/w (water based on dry ingredient content), such as 3-8% w/w. In some embodi-ments the impeller speed and/or chopper speed of the high shear granulator is controlled in order to obtain a granulation of sufficient quality for further processing. The wet granu-lation is then dried, e.g. in fluid bed dryers or tray dryers at controlled conditions of temperature and drying air flow. The dried granulation is then sized using a screening mill or other appropriate milling (delumping), and blended with appropriate pharmaceutical diluents and/or binders, such as microcrystalline cellulose, enabling the filling of 5-34 mg granulated pimavanserin (equivalent to about 6 mg-40 mg pimavanserin tartrate) in a size 3 (0.30 ml volume) or 4 (0.21 ml volume) capsule. Some embodiments relates to the capsule being a capsule of size 4, and a two-piece capsule.

Provided herein is a process for manufacturing capsules containing 5-34 mg pimavanserin; by providing pimavan-serin, for example pimavanserin tartrate, such as pimavan-serin tartrate Form C and water, e.g. 1-10% w/w, such as 2-9% w/w, such as 3-8% w/w, such as 4-8% w/w, such as 5-8% w/w, such as 5-7% w/w to a high shear granulator, granulating pimavanserin and the water, drying the pima-vanserin granulation, sizing (or screening, may also be referred to as delumping) the dried pimavanserin granula-tion, e.g. using a screening mill, blending with one or more pharmaceutical excipients, such as one or more filler (di-luent) filling a size 3 or 4 capsule, e.g. a two-piece capsule, with pimavanserin granulation . Provided herein is a process for manufacturing capsules containing 5-34 mg pimavan-serin, wherein the process comprises the following (e.g. in said order): providing pimavanserin, for example pimavan-serin tartrate, such as pimavanserin tartrate Form C to a high shear granulator, granulating pimavanserin together with water (e.g. 1-10% w/w, such as 2-9% w/w, such as 3-8% w/w, such as 4-8% w/w, such as 5-8% w/w, such as 5-7% w/w) while controlling the water application rate, and/or atomization parameters (e.g. by using an appropriate nozzle such as an externally mixed, two-fluid, air-atomizing spray nozzle), impeller speed (e.g. by monitoring amperage),

US 11,452,721 B2

19

20

and/or chopper speed (e.g. by monitoring amperage), drying the granulated pimavanserin, e.g. using fluid bed drying, sizing the dried pimavanserin granulation, e.g. using a screening mill or other appropriate milling device (such as oscillating mills, impact mills), blending the sized pimavanserin granulation with one or more filler/diluent (optionally including a lubricant), and final blending with a lubricant (unless the filler/diluent includes a lubricant), filling a size 3 or 4 two-piece capsule with the blended pimavanserin composition. In some embodiments the capsule is a capsule of size 4 and the amount of pimavanserin is 34 mg. As specified herein, such as hereinbelow, excipients such as diluents, binders, lubricants, pharmaceutical flow agents, and/or other excipients compatible with pimavanserin may be included. Some embodiments provide pimavanserin, microcrystalline cellulose and magnesium stearate only. Some embodiements relate to the microcrystalline cellulose having a particle size distribution (D90) of 180-340 μm. Some embodiments relate to microcrystalline cellulose having a bulk density above >0.40 g/ml. Some embodiments relate to the microcrystalline cellulose having a particle size distribution (D90) of 180-340 μm and a bulk density above >0.40 g/ml.

Provided herein are embodiments wherein the capsule is a capsule of size 4, e.g. a two-piece capsule, such as a two-piece hard shell capsule, e.g. a two-piece capsule of gelatin or hydroxypropyl methylcellulose (HPMC). Some commercial examples are VCaps®, VCaps® Plus, Coni-Snap® marketed by Capsugel.

Provided are also embodiments wherein pimavanserin (granulated), microcrystalline cellulose, for example Avicel PH302 or an equivalent microcrystalline cellulose, and/or magnesium stearate, for example vegetable grade are encapsulated in a capsule of size 4, for example a two-piece capsule.

Provided are also embodiments wherein 34 mg pimavanserin (granulated) (equivalent to 40 mg pimavanserin tartrate), microcrystalline cellulose, such as microcrystalline cellulose having a particle size distribution (D90) of 180-340 μm, for example Avicel PH302 or an equivalent microcrystalline cellulose, and/or magnesium stearate, for example vegetable grade are encapsulated in a capsule of size 4, for example a two-piece capsule.

Provided are also embodiments wherein 10 or 20 mg pimavanserin (granulated), microcrystalline cellulose, for example Avicel PH302 or an equivalent microcrystalline cellulose, and/or magnesium stearate, for example vegetable grade are encapsulated in a capsule of size 4, for example a two-piece capsule.

Provided are also embodiments wherein 34 mg pimavanserin (granulated), 59 mg microcrystalline cellulose, for example Avicel PH302 or an equivalent microcrystalline cellulose, and/or 1 mg magnesium stearate, for example vegetable grade are encapsulated in a capsule of size 4, for example a two-piece capsule. No other excipients were added.

Also provided is a pharmaceutical composition, comprising a capsule of pimavanserin and one or more pharmaceutically acceptable excipient(s) as provided herein, wherein the composition is formulated such that at least 80% of pimavanserin is released in 30 minutes upon administration to a subject.

Also provided is a pharmaceutical composition, comprising a capsule of pimavanserin and one or more pharmaceutically acceptable excipient(s) as provided herein, wherein the composition is formulated such that at least 80% of the pimavanserin is released from the composition within 30 minutes upon in vitro dissolution testing according to USP<711> (apparatus 1 (basket apparatus)).

The final moisture content of the pimavanserin granulation is equivalent to the starting moisture content of the pimavanserin.

Another requirement achieved by the pimavanserin capsules disclosed herein can be a long shelf-life, i.e., a shelf-life of at least 1 year is obtained, such as 2 years of shelf-life.

Examples

Manufacturing of a capsule, size 4 two-piece capsule, comprising 34 mg pimavanserin equivalent to 40 mg pimavanserin tartrate

Pimavanserin 34 mg capsules may be prepared as outline herein below.

Granulation: The required ingredients for all operations of the entire process are weighed. The loss-on-drying (LOD) moisture content of the pimavanserin is determined, for example using an appropriate LOD instrument such as those manufacture by Mettler, Ariz. Instruments, Ohaus or Denver Instruments. Drying end point may be determined using temperature, time or weight loss. Pimavanserin is charged through a screen (25-40 mesh) into a high shear granulator, for example a Glatt Powerex 50 liter high shear granulator equipped with a 25 liter bowl. Following a pre-blend in the high shear granulator (200-400 rpm), granulation water, e.g. 5-8% w/w is sprayed at a controlled rate ((18.5-26.5 g/min) at 15 psi (10.0-20.0) atomization air pressure while monitoring the impeller speed ((200-400 rpm)) and amperage, chopper speed (1600-2000 rpm). When the impeller amperage increases (such as 13-18%,), the spray of water is stopped and the mixture wet massing for 5 minutes without changing the impeller or chopper speeds. Following the 5-minute wet massing, the wet granulation is discharged and placed in a fluid bed dryer (100-140 cfm; 45-55° C.); dew point 10° C.; filter shaking 15 sec/5 sec (interval/duration) until the LOD moisture is at or below the LOD moisture of the pimavanserin at dispensing. The dried granulation is discharged from the fluid bed dryer, screened through a screen (4-12 mesh), and packaged until diluent blending and encapsulation.

Diluent Blending: The screened, dried pimavanserin granulation is dispensed (weighed) for blending/encapsulation unit operations. The required diluent and lubricant quantities are also dispensed. The dispensing is followed by delumping of pimavanserin granulation with a screening mill such as 197S or U10 Comil equipped with a screen (4-12 mesh) at 2300-2500 rpm, blending of the granulation with diluent using a bin type blender such as 2 liter TOTE blender 20 minutes at 19-21 rpm or other appropriate blender, final blending with lubricant using the same bin type blender or other appropriate blender (3 minutes at 19-21 rpm) , and encapsulation using a IIM 2100 equipped with size 4 change parts and 5-12 mm dosing disk (50-90 segments per minute (spm)).

Optionally low shear granulation such as a V-Blender equipped with an intensifier bar, twin screw granulation, may be used instead of the granulation equipment specified above with appropriate adjustment to the milling/screening parameters to manufacture capsules of pimavanserin

Pimavanserin hard shell capsules (34 mg pimavanserin, equivalent to 40 mg pimavanserin tartrate) were manufactured. Table 2 contains an example of a suitable formulation.

As an alternative, the herein disclosed pimavanserin granulation may be compressed as a tablet.

As an alternative, the herein disclosed pimavanserin granulations may be compressed as a tablet without further excipients. Thus the composition disclosed in Table 2 in some embodiments is used to form tablets. Said tablets may be formed as an alternative to the filling of a capsule.

US 11,452,721 B2

21

Consequently the obtained pimavansering granulation may be compressed into a tablet of a weight of about 100 mg.

TABLE 2

| Composition of Pimavanserin granulation (34 mg) | | |
|---|---|---|
| Ingredients | Qty (% w/w) | Qty (mg)/dose |
| Pimavanserin Tartrate | 40.0 | 40.0ᵃ |
| Microcrystalline Cellulose (Avicel PH302, NF, EP) | 59.0 | 59.0 |
| Magnesium Stearate (Vegetable Source, USP, EP) | 1.0 | 1.0 |
| Total | 100.0 | 100.0 |

ᵃ40 mg pimavanserin tartrate salt is equivalent to 34 mg pimavanserin free base

Table 3 contains the manufacturing process equipment for pimavanserin capsules, 34 mg.

TABLE 3

| Process Step | Equipment class, sub-class | Manufacturer, model, size |
|---|---|---|
| Screening I (API) | Hand screen | 30 Mesh hand screen |
| Granulation | Vertical granulator | Glatt/Powrex VG-50M with 25 L Bowl |
| Fluid Bed Drying | Fluid bed | Glatt GPCG-5 with 25 L bowl |
| Screening II (granulation) | Hand screen | 10 Mesh hand screen |
| Milling | Screening mills, rotating impeller | Comil 197S or U10 with 045R03125 screen |
| Blending I | Diffusion mixers (Tumble), bin blender | TOTE Bin blender, 2 cubic foot |
| Screening III (Magnesium stearate) | Hand screen | 30 Mesh hand screen |
| Final Blending | Diffusion mixers (Tumble), bin blender | TOTE Bin blender, 2 cubic foot |
| Encapsulation | Encapsulator, dosing disk | IIM 2100, Size 4 change parts and 10 mm dosing disk |
| Polishing and weight checking | Not applicable | Bosch KKE 1500 |

Table 4 outlines the process parameters and ranges for pimavanserin capsules, 34 mg manufacture. Bold references are target values with the ranges displayed in parenthesis.

TABLE 4

| Process Step: Equipment | Process Parameter | Ranges |
|---|---|---|
| Screening I (API) 25-40 Mesh hand screen | Screen size | 25-40 Mesh hand screen |
| Granulation Glatt/Powrex VG-50M with 25 L bowl | Spray rate | (10-50) [g/min] |
| | Impeller speed | (200-400) [rpm] |
| | Chopper speed | (1600-2000) [rpm] |
| | Atomization Air Pressure | (3-20) [psig] |
| Fluid Bed Drying Glatt GPCG-5 with 25 L bowl | Process Air Volume | (90-210) [cfm] |
| | Inlet Air Temperature | (40-60) [° C.] |
| Screening II (granulation) 4-12 Mesh hand screen | Screen size | 4-12 Mesh hand screen |
| Screening | Screen size | 25-40 mesh |
| Blending I | Diffusion blender | |
| Screening (Magnesium stearate) | Screen size | 25-40 Mesh |
| Blending I | Diffusion blending | |
| Encapsulation dosing disk based encapsulator | Dosing disk | 5-12 mm |

In some embodiments disclosed herein relate to pimavanserin granulation, e.g. composed as in table 2, having a

22

weight of granulation of 100 mg ±7 (average of 20 samples), i.e. the weight relates to the granulation only, i.e. excluding capsule shell weight.

The bulk density of the blended composition is >0.4 g/ml, such as 0.4-0.6 g/ml, such as about 0.5 g/ml determined according to USP <616>, method 1. In some embodiments the bulk density of the composition is >0.4 g/ml, such as about 0.5 g/ml, such as 0.51 g/ml, such as 0.508 g/ml.

The bulk density of pimavanserin granulation is >0.4 g/ml, such as 0.4-0.6 g/ml, such as about 0.5 g/ml, determined according to USP <616>, method 1. In some embodiments the bulk density of the pimavanserin granulation is >0.4 g/ml, such as about 0.5 g/ml, such as 0.51 g/ml, such as 0.508 g/ml.

In addition to the bulk density and Carr's Index obtained according to USP <616>, method 1, FT4 Powder Rheology was obtained for the API (pimavanserin tartrate) and for the compositions disclosed herein using a FT4 Powder Rheometer according to ASTM D7891-15; Standard Test Method for Shear Testing of Powders Using the Freeman Technology FT4 Powder Rheometer Shear Cell.

As discussed herein above the flowability of the composition has been improved compared to the API (pimavanserin tartrate), which for example can be supported by the Specific Energy (SE) obtained from the FT4 measurements. Specific Energy is a measure of the powder's flowability when unconfined, such as during low stress filling, or low shear blending. The average Specific Energy (SE) for the API is about 10.08+/−0.23 mJ/g. The granulated pimavanserin had an average SE of 6.81+/−0.63 mJ/g, and the blended pimavanserin composition an average SE of 3.96+/−0.36 mJ/g. Thus the unconfined flowability was substantially improved compared to the API.

In addition to SE, the Flow Rate Index (FRI) of the composition showed significant improvement compared to the API (pimavanserin tartrate). FRI indicates sensitivity to changing the rate of flow, and the pimavanserin tartrate had an average FRI of 1.90±0.01, the granulated pimavanserin an average FRI of 1.52+/−0.10, and the blended pimavanserin composition had an average FRI of 1.08±0.06, again showing the improved properties for the granulated pimavanserin as well as the blended pimavanserin composition for filling into a capsule of size 3 or 4.

The FT4 Powder Rheometer was also used as yet another means to compare the bulk density between the API, the granulated pimavanserin and the blended pimavanserin compositions disclosed herein and in the accompanying claims. The bulk density is a conditioned bulk density as obtained by the FT4 measurement, in accordance with ASTM D7891-15; Standard Test Method for Shear Testing of Powders Using the Freeman Technology FT4 Powder Rheometer Shear Cell. Pimavanserin tartrate (API) had an average conditioned bulk density (CBD) of 0.336±0.006 g/ml, granulated pimavanserin tartrate had an average conditioned bulk density (CBD) of 0.478±0.028 g/ml, and the blended pimavanserin composition an average CBD of 0.504±0.020 g/ml.

The conditioned bulk density of the blended composition is >0.45 g/ml, such as 0.45-0.6 g/ml, such as 0.47-0.55 g/ml determined according to ASTM D7891-15. In some embodiments the bulk density of the composition >0.45 g/ml, such as an average of about 0.5 g/ml.

The conditioned bulk density of the granulated pimavanserin is >0.42 g/ml, such as 0.42-0.55 g/ml, such as 0.43-0.53 g/ml determined according to ASTM D7891-15. In some embodiments the bulk density of the granulated pimavanserin >0.42 g/ml, such as an average of about 0.48 g/ml.

US 11,452,721 B2

23

24

The blended pimavanserin composition used in the herein mention FT4 Powder Rheometry measurements comprised 34 mg pimavanserin, 59 mg microcrystalline cellulose and 1 mg magnesium stearate.

The capsules comprising 5-34 mg pimavanserin are stable upon actual or simulated storage under open conditions at 25° C.±2°/60%±5% (RH) relative humidity for at least 1 year, such as at least 1.5 years.

Alternative methods and equipment to be used in connection with the herein disclosed methods, compositions, capsules, tablets and disclosures may be found in SUPAC: manufacturing equipment addendum, an U.S. Department of Health and Human Services, Food and Drug Administration, Center for Drug Evaluation and Research (CDER) issued guidance for industry, e.g. in the December 2014 version, Pharmaceutical Quality/CMC.

The embodiments disclosed herein above meet all specifications outlined relating to the marketing authorization of Nuplazid®, for example:

Assay (90.0-110.0% of Label Claim), i.e. quantify the amount of pimavanserin free base in the drug product, for example using reverse phase HPLC with UV-detection at 210 nm. An example of eluent is a gradient comprised of two mobile phases such as ammonium buffer (pH 9.0), and acetonitrile/methanol (80/20 vol/vol).

Content Uniformity as determined using USP <905>, Uniformity of Dosage Forms and wherein the maximum Acceptance Value (AV) NMT (not more than) 15.0. The AV is calculated for the number of units tested; Level 1=10 units; Level 2=30 units using the following: the mean Assay value for the number of units tested Minus Either 98.5 (when the mean is less than 98.5% of target assay) and 101.5 (when the mean is greater than 101.5% of target assay) times 2.4 (10 units) or 2.0 (30 units) plus the difference between the Mean and the appropriate Upper/Lower % of target assay, using the method for hard capsules.

Dissolution USP <711>:

Stage 1: Q=80% within 30 minutes

Stage 2: Average of 12 units (Stage 1 & Stage 2) is equal to or greater than Q with no unit less than Q-15%

X-ray powder diffraction (XRPD) analyses on a Bruker AXS D8 Advance system with a Bragg-Brentano configuration using CuKα radiation confirmed that all XRPD patterns for the granulations correspond to the XRPD patterns of the currently approved NUPLAZID 17 mg tablet (pimavanserin tartrate form C), which for example as disclosed in U.S. 7,732, 615.

Long term stability data for capsules containing 34 mg pimavanserin, 59 mg microcrystalline cellulose and 1 mg magnesium stearate at 18 months were determined using standard procedures such as actual or simulated storage under open conditions at 25° C.±2°/60%±5% (RH) relative humidity, e.g. as outlined in WHO Technical Report Series, No. 953, 2009, Annex 2, and the following observations and determinations were made:

Appearance: unchanged at 18 months

Assay (90.0-110.0% of Label Claim): Day 8: 100±2%; 18 months: 100±2%

Total impurities: Day 0: 0.3%; 18 months: 0.3%, determined in line with Assay.

Dissolution (at 18 months): at least 80% of the pimavanserin is released from the composition within 30 minutes upon in vitro dissolution testing according to USP<711> (apparatus 1 (basket apparatus)).

Water content (determined in line with USP<921>, method Ia: Day 0: 2.9%; 18 months: 2.9%.

What is claimed is:

1. A pharmaceutically acceptable capsule for orally delivering 34 mg of pimavanserin to a patient, wherein the capsule has a size 3 or 4 capsule shell that contains a blended pimavanserin composition comprising:

granules comprising 40 mg pimavanserin tartrate and optionally one or more pharmaceutically acceptable excipients;

and one or more blending excipients; wherein the bulk density of the granules is >0.4 g/ml as determined by USP<616>, method 1.

2. The pharmaceutically acceptable capsule of claim 1, wherein one of the blending excipients is selected from the group consisting of magnesium stearate, sodium stearyl fumarate, colloidal silicon dioxide, and talc.

3. The pharmaceutically acceptable capsule of claim 1, wherein the blended pimavanserin composition has a D90 particle size distribution of 60-450 μm as measured using laser scattering particle size analysis.

4. A pharmaceutically acceptable capsule for orally delivering 34 mg of pimavanserin to a patient, wherein the capsule has a capsule shell with a capsule shell size 3 or 4, that encapsulates a blended pimavanserin composition comprising:

granules comprising 40 mg pimavanserin tartrate and one or more pharmaceutically acceptable excipients; and wherein the bulk density of the granules is >0.4 g/ml as determined by USP<616>, method 1.

5. The pharmaceutically acceptable capsule of claim 4, wherein the capsule shell is a hard shell size 4 capsule.

6. The pharmaceutically acceptable capsule of claim 1, wherein one of the blending excipients is selected from the group consisting of a cellulose, a polysaccharide, and polyvinylpyrrolidone.

7. The pharmaceutically acceptable capsule of claim 1, wherein one of the blending excipients is selected from the group consisting of microcrystalline cellulose, silicified microcrystalline cellulose, hydroxypropyl cellulose, hydroxypropylmethyl cellulose, hydroxymethyl cellulose, and a lactose cellulose blend.

8. The pharmaceutically acceptable capsule of claim 1, wherein the one of the blending excipients is selected from the group consisting of sucrose, mannitol, sorbitol, pregelatinized starch, and partially pregelatinized starch.

9. The pharmaceutically acceptable capsule of claim 1, wherein the blending excipients comprise microcrystalline cellulose and magnesium stearate.

10. The pharmaceutically acceptable capsule of claim 1, wherein the blending excipients are selected from the group consisting of filler/diluents, lubricants and mixtures thereof.

11. The pharmaceutically acceptable capsule of claim 1, wherein the granules comprise a pharmaceutically acceptable excipient which is a binder.

12. The pharmaceutically acceptable capsule of claim 10, wherein the binder is selected from the group consisting of cellulose, methyl cellulose, polyvinylpyrrolidone and polyethylene glycol.

13. The pharmaceutically acceptable capsule of claim 4 wherein the pharmaceutically acceptable excipients comprise a binder.

* * * * *

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| ACADIA PHARMACEUTICALS INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 1:22-cv-01387-GBW |
| | ) | (Consolidated; Lead Case) |
| AUROBINDO PHARMA LIMITED, et al. | ) | |
| | ) | **CONTAINS INFORMATION** |
| Defendants. | ) | **DESIGNATED AS "HIGHLY** |
| | ) | **CONFIDENTIAL – COUNSELS' EYES** |
| | ) | **ONLY"** |
| | ) | |

**REPLY EXPERT REPORT OF DR. FERNANDO J. MUZZIO**
**REGARDING U.S. PATENT NO. 11,452,721**

# TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................... 1

II.    SUMMARY OF OPINIONS .......................................................................... 1

III.   BASES FOR OPINIONS ................................................................................ 2

       A.    Experience, Compensation, Qualifications, and Prior Testimony ......... 2

       B.    Materials Considered ............................................................................. 2

       C.    Applicable Legal Standards ................................................................... 2

       D.    Scientific and Technical Background ..................................................... 3

IV.    RESPONSE TO DR. LITTLE'S OPINIONS ON INVALIDITY ...................... 5

       A.    Dr. Little's Opinion Regarding the Hypothetical POSA ........................ 5

       B.    Claim Construction ................................................................................ 5

             1.    A POSA would not interpret "pharmaceutically acceptable
                   capsule" as meaning a capsule shell that is "generally suitable for
                   use in pharmaceutical compositions." ......................................... 6

             2.    A POSA would not interpret the term "D90 particle size
                   distribution" to refer to "single D90 value that must fall within the
                   claimed range of 60–450 μm." .................................................... 8

V.     CLAIMS 1-7 AND 9-13 OF THE '721 PATENT ARE INVALID AS
       OBVIOUS ...................................................................................................... 9

       A.    Claim 1 .................................................................................................. 9

             1.    A POSA would have been motivated to modify the Nuplazid
                   Tablets, even in the absence of an explicit disclosure of a problem
                   with them. ................................................................................... 9

             2.    The possibility of making "multiparticulate dosage forms,
                   dispersible, soluble, and effervescent tablets, orally disintegrating
                   formulations, chewable tablets, films, and jellys" does not teach
                   away from making a pimavanserin capsule. .............................. 12

             3.    A POSA also would have been motivated to make a capsule to
                   permit easy identification of the product. ................................. 16

             4.    A POSA would have been motivated to formulate pimavanserin in
                   a capsule form to promote ease of swallowing. ........................ 18

             5.    A POSA would have selected an appropriate-sized capsule and
                   developed a granulation that would fill it. ................................. 22

**CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION– COUNSELS' EYES ONLY**

6. A POSA would have reasonably expected to be able to modify the disclosures of Ragnar-Tolf to arrive at the subject matter of claim 1 with a reasonable expectation of success. ................................................... 25

B. Claim 3 ......................................................................................... 32

C. Claims 2, 4–7, and 9–13 ............................................................... 34

D. Objective Indicia of Nonobviousness do not Support the Asserted Claims of the '721 Patent ......................................................................... 34

1. Prior patents covered pimavanserin and Nuplazid Tablets. ...................... 34

2. Nuplazid lacks a nexus to claims 4, 5, and 11–13 of the '721 patents. ......................................................................................... 37

a. Nuplazid is not an embodiment of claims 4, 5 and 13 because it lacks "one or more pharmaceutically acceptable excipients" as an intragranular component. ................................... 38

b. Nuplazid 34 mg capsules are not an embodiment of claims 11–13 because they lack a binder. ................................. 41

3. Unexpected Results ........................................................................ 42

4. Skepticism .................................................................................... 44

VI. CLAIMS 1–7 AND 9–13 OF THE '721 PATENT ARE INVALID AS INDEFINITE ................................................................................................. 46

A. The Term "Pharmaceutically Acceptable Capsule" is Undefined and Indefinite. ............................................................................................ 46

B. Claims 1–7 and 9–13 are Invalid for Claiming that Which the Patentee Did Not Regard as His or Her Invention ...................................................... 52

C. Claim 3 is Indefinite because a POSA Would Not Understand wWhat a D90 Particle Size Distribution of 60-450 μm" Means ......................... 56

D. Claims 12 and 13 are Invalid as Indefinite .......................................... 57

VII. CLAIMS 1–7 AND 9–13 OF THE '721 PATENT ARE INVALID FOR LACK OF WRITTEN DESCRIPTION ..................................................................... 58

A. The Specification of the '721 Fails to Provide Adequate Written Description for Granules Comprising Pimavanserin and Intragranular Excipients to the Extent Claimed ........................................................ 58

B. The '721 Patent Specification Fails to Provide Adequate Written Description for Granules Comprising Pimavanserin Tartrate with Bulk Densities of Greater Than 0.508 g/mL ................................................ 63

VIII. CLAIMS 1–7 AND 9–13 ARE INVALID FOR A LACK OF Enablement ................... 66

IX. SUPPLEMENTATION ......................................................................... 68

**CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION–
COUNSELS' EYES ONLY**

I, Fernando J. Muzzio, Ph.D., submit this expert report on behalf of MSN Laboratories Private Limited and MSN Pharmaceuticals, Inc. (collectively, "MSN") in the above-captioned action.

## I.    **INTRODUCTION**

1.      I previously submitted the Opening Expert Report of Dr. Fernando J. Muzzio Regarding U.S. Patent No. 11,452,721 (May 2, 2024) ("Opening Report" or "Op. Rep.") in this litigation.

2.      I have received the Responsive Expert Report of Steven R. Little, Ph.D., Concerning U.S. Patent No. 11,452,721 (June 7, 2024) ("Little Report" or "Little Rep."). I have been asked by counsel for MSN and Aurobindo whether I have any opinions in reply to Dr. Little, and if so, to provide them; this report sets forth my opinions in reply to Dr. Little.

3.      If called upon to testify at trial, I anticipate testifying regarding the items set forth in my Opening Report, as well as my opinions in reply to Dr. Little, as set forth in this report.

## II.    **SUMMARY OF OPINIONS**

4.      It remains my opinion that the Asserted Claims of the '721 patent are invalid as obvious over Nuplazid Tablets in view of Ragnar-Tolf, the prior art, and the knowledge and skills of a POSA.

5.      It remains my opinion that the Asserted Claims of the '721 are invalid as indefinite.

6.      It remains my opinion that the Asserted Claims of the '721 are invalid as lacking written description.

7.      It remains my opinion that the Asserted Claims of the '721 are invalid as lacking enablement.

CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION–
COUNSELS' EYES ONLY

## III.    BASES FOR OPINIONS

### A.    Experience, Compensation, Qualifications, and Prior Testimony

8.    The summary of my experience and qualifications are provided in my Opening

Report at paragraphs 6-24, which I incorporate herein by reference. My curriculum vitae is

provided as **Exhibit A** to this report and describes my educational background and experience,

my technical expertise, publications that I have authored, and patents on which I am an inventor.

In addition, my compensation remains the same as identified in paragraph 26 of my Opening

Report, and I have not testified on any additional matters to those identified in paragraph 25

since submitting my Opening Report.

### B.    Materials Considered

9.    In preparing this report, I have considered the materials listed in Exhibit B of my

Opening Report, as well as **Exhibit B** attached to this report as well as any items cited below, but

not listed there.

### C.    Applicable Legal Standards

10.    I am neither a patent lawyer nor an expert in patent law. I incorporate by reference

my understanding of patent law from my Opening Report.[1] I also have had the further legal

standards explained to me.

11.    With regard to obviousness, I understand from counsel that motivation to modify

the prior art may be found in different places and forms, and need not be explicitly stated in the

prior art reference at all, let alone originate from the thing that is to be modified. Rather, I

understand from counsel that a motivation may be found explicitly or implicitly in market forces;

design incentives; the interrelated teachings of multiple patents; any need or problem known in

---

[1] Op. Rep., ¶¶ 32-53.

CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION–
COUNSELS' EYES ONLY

the field of endeavor at the time of invention and addressed by the patent; and the background

knowledge, creativity, and common sense of the POSA.

12.     I understand from counsel that certain objective indicia may provide evidence that

an invention is non-obvious, including skepticism of others in the field and unexpected results.

The applicable legal standards for when unexpected results and skepticism demonstrate

nonobviousness of a claim are provided in paragraphs 46–47 of my Opening Report. I further

understand from counsel that courts have found that skepticism should only be recognized as

indicia of nonobviousness if it is displayed by those outside the company responsible for the

invention, as it seems conducive to the inventive process for coworkers to play the devil's

advocate, that is, to probe for weaknesses and test the merits of ongoing research. I further

understand that other courts have found that internal dialogue has no probative value of

nonobviousness, and that skepticism expressed in  private communication is likely less

considered and less self-scrutinized than statements of skepticism intended to be published to the

scientific community. I further understand other courts have held that skepticism is only

objective evidence of nonobviousness if it comes from someone other than the inventors.

### D.    <u>Scientific and Technical Background</u>

13.     The relevant scientific and technical background was provided in my Opening

Report.[2] I disagree with some of the statements Dr. Little makes within his Report.

14.     Dr. Little states that a POSA would not consider pre-formulation testing to be

routine.[3] I disagree.

---

[2] *Id.*, ¶¶ 64-89

[3] Little Rep., ¶¶ 83-85.

**CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION–**
**COUNSELS' EYES ONLY**

15.    Dr. Little, in paragraph 84 of his Report, states that "a POSA would understand that pimavanserin has its own unique physical and chemical characteristics that differ from other APIs. Thus, I do not agree that a POSA would have considered the steps necessary for developing a size 3 or 4 capsule containing 34 mg pimavanserin to be routine." I disagree. Every API is unique in its particular combination of physical and chemical characteristics; however, POSAs have knowledge of routine studies that I termed "preformulation" studies in my Opening Report that any POSA would conduct for *any* API in order to develop a target product profile. Furthermore, in the case of pimavanserin tartrate, the prior art provided several results of preformulation studies that a POSA would have considered relevant.

16.    In paragraph 85, Dr. Little opines that "a POSA reading the '721 Patent claims in view of the specification would not consider a determination of powder flowability to be within the scope of the claims. The claims of the '721 Patent do not address flowability or tapped density, and neither do they address the large-scale manufacturability of the claimed invention. Thus, I disagree with Dr. Muzzio's contention that a POSA would evaluate these powder properties to arrive at the claimed 34 mg size 3 or 4 capsules of pimavanserin." I disagree. This, to me, seems to be hindsight analysis, in that it dismisses properties and measurements that would have been of relevance to a POSA, simply because they do not appear in the patent claims. Regardless of whether flowability or manufacturability is a claim limitation or not, a POSA would have been motivated to evaluate properties such as powder flow in designing a dosage form, because ultimately—whether hand-filling a small quantity of capsules, engaging in large-scale manufacturing of tablets, or making an oral solution—the API would need to be

CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION–
COUNSELS' EYES ONLY

manufactured into a dosage form.[4] Indeed, powder flow would be a key parameter for a POSA to

evaluate in determining how to manufacture a dosage form, including whether to granulate the

API prior to compression into tablets or filling into capsules.

## IV.    RESPONSE TO DR. LITTLE'S OPINIONS ON INVALIDITY

### A.    Dr. Little's Opinion Regarding the Hypothetical POSA

17.    Dr. Little incorporates additional "real-world experience" into his POSA

definition.[5] I generally agree that a person with a bachelor's degree would likely need to have

more years of real-world experience to be considered a POSA than a person with a Ph.D. would

need to become a POSA, but this makes little difference in terms of my opinions. Regardless of

the differences between our opinions on the definition of a POSA, the opinions I provide in this

report would not be different depending upon whether Dr. Little's POSA definition or my own is

applied.

### B.    Claim Construction

18.    Dr. Little provides meanings he applies to claim terms in his report.[6] I disagree

---

[4] Similarly, Dr. Little opines that "a POSA would not consider the claims as requiring the
formulations to be reproducible on a commercial scale because they say nothing about preparing
capsules in large quantities," (*id.*, ¶ 88) in response to the opinions in paragraph 82 of my
Opening Report, and that "a POSA would not have considered to 'select an appropriate
formulation and process for scaled-up manufacture' for purposes of arriving at the claimed
inventions because scaled-up manufacture of the capsules is not a requirement of the claims."
(*Id.,* n. 8) I disagree with these, again, as based in hindsight analysis, in that they dismiss
concerns of a POSA simply because they are not specifically recited in the claims. Rather, a
POSA would have been aware of the properties that make formulations reproducible on a
commercial scale and would have been motivated to develop prototype formulations that
reasonably could be prepared on a commercial scale, and would similarly avoid developing
prototype formulations that were unlikely to be producible on a commercial scale.

[5] Little Rep., ¶ 28.

[6] Little Rep., ¶¶ 67–82.

CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION–
COUNSELS' EYES ONLY

with some of his opinions on claim construction.

      **1.**    **A POSA would not interpret "pharmaceutically acceptable capsule" as meaning a capsule shell that is "generally suitable for use in pharmaceutical compositions."**

    19.    In particular, Dr. Little opines that "a POSA would understand the term 'pharmaceutically acceptable' to have its plain and ordinary meaning, *i.e.*, a modifier that means 'generally suitable for use in a pharmaceutical compositions.'"[7] However, that "plain and ordinary meaning" does not make sense when applied throughout the claims. Claims 1 and 4, for instance, recite both "a pharmaceutically acceptable capsule for orally delivering 34 mg of pimavanserin to a patient" as well as "one or more pharmaceutically acceptable excipients." I do agree that a POSA would read "one or more pharmaceutically acceptable excipients" to encompass excipients that are generally suitable for use in pharmaceutical compositions. But I disagree that a POSA would apply that definition to "a pharmaceutically acceptable capsule." The phrase "pharmaceutically acceptable capsule" in claims 1 and 4 refers to the combination of a capsule shell that is filled with the blended pimavanserin composition comprising granules. Thus, the "pharmaceutically acceptable capsule" reflects the *finished dosage form* or pharmaceutical composition *itself*, and not a component of the dosage form.[8] With that context in mind, a POSA would not read the term "pharmaceutically acceptable" in "pharmaceutically acceptable capsule" to mean "generally suitable for use in a pharmaceutical composition," because the pharmaceutically acceptable capsule *is* a pharmaceutical composition itself, and it

---

[7] Little Rep., ¶ 72.

[8] *See,* e.g., '721 patent, claims 1 and 4 ("A pharmaceutically acceptable capsule for orally delivering 34 mg of pimavanserin to a patient, wherein the capsule has a size 3 or 4 *capsule shell* that *contains* a blended pimavanserin composition . . .")

CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION– COUNSELS' EYES ONLY

would be either nonsensical or redundant for the claim to refer to a pharmaceutical composition that is generally suitable for use in a pharmaceutical composition.

20.    Furthermore, I disagree with Dr. Little's opinion that a POSA would have understood "pharmaceutically acceptable capsule" from reference to several of the incorporated prior art documents that refer to a "pharmaceutically acceptable form" or "pharmaceutically acceptable dosage form."[9] These references all define a capsule, specifically, as a pharmaceutically acceptable dosage form, which any POSA would know to be true. That, in turn, would make the term "pharmaceutically acceptable capsule" redundant and meaningless to a POSA if it simply referred to the form as being one that was acceptable for application in a pharmaceutical product.[10]

21.    A further problem with Dr. Little's analysis regarding this claim term is that it ignores the "comparative experiments that resulted in unacceptable products" identified in columns 13–15 of the '721 patent. The specification states that "[p]rior to the surprising finding, i.e. the herein disclosed processes and compositions resulting in a robust and reliable filling of 5-34 mg pimavanserin in capsules of size 3 or 4, such as size 4 capsules, many experiments were done[,]" and then goes on to detail the "comparative experiments resulting in unacceptable *products*."[11] A POSA would not simply ignore these "comparative experiments" in reading the claims, and would expect the applicants to have distinguished the experiments resulting in

---

[9] Little Rep., ¶ 76.

[10] *See, e.g.*, U.S. Patent No. 7,601,740 at 10:4–21 ("[i]n some embodiments, the compounds described herein can be formulated into compositions for administration to patients in need thereof. Appropriate compositions … may be in the form of a … capsule … or any other pharmaceutically acceptable form.")

[11] '721 patent, 13:29–36.

CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION–
COUNSELS' EYES ONLY

"unacceptable products," which the specification states were done prior to finding "compositions resulting in a robust and reliable filling of 5-34 mg pimavanserin in capsules of size 3 or 4," from the claimed invention. The only operative language in the claims that would do so, however, is the "pharmaceutically acceptable capsule" language. Further, were I to adopt Dr. Little's proposed construction, my opinion is that the claims would be invalid as well for claiming that which the inventors did not regard as their invention.[12] I thus disagree with Dr. Little's opinion regarding the construction of this term.

> **2.    A POSA would not interpret the term "D90 particle size distribution" to refer to "single D90 value that must fall within the claimed range of 60–450 μm."**

22.    In paragraph 81, Dr. Little opines that a POSA would understand the term "D90 particle size distribution" to refer to a "single D90 value that must fall within the claimed range of 60–450 μm." I disagree. First, this is inconsistent with the plain language of the claim, which refers to a "D90 particle size distribution," and not "a particle size distribution having a D90 value." In that instance, "D90" refers to a particle size distribution, not a single percentile value that defines a portion of the particle size distribution. And while a POSA would know that "D90" refers to a percentile value within a particle size distribution, and not a particle size distribution itself, a POSA would not simply rewrite claim language in order to make it say something it does not.

23.    Second, Dr. Little states that "the specification for the '721 Patent states that '[e]xamples of suitable particle size distribution of the granulated pimavanserin is a particle size (D90) of 60-450 μm, such as 100-420 μm, such as above 250μm.' (*Id*. at 11:46-49.) The

---

[12] *See* Op. Rep., ¶¶ 180–182; *see also* section VI.C of this Report.

**CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION–
COUNSELS' EYES ONLY**

exemplary value 'such as above 250 μm,' in particular, would tell a POSA that this claim term refers to a single D90 value that must fall within the claimed range."[13] But this would not inform a POSA of the meaning of this term. A particle size distribution is a range of sizes characterized by a frequency of occurrence. Again, a D90, as a single value, is not a particle size distribution. The reference to the single value "above 250 μm" simply adds to the confusion, as a distribution with D90 values "above 250 μm" would include very large particles that would make such a blend useless for capsule filling; a POSA would not derive any understanding from this passage in the specification. Therefore, I disagree with Dr. Little's opinion in this regard.

## V.    CLAIMS 1-7 AND 9-13 OF THE '721 PATENT ARE INVALID AS OBVIOUS

24.    It remains my opinion that the Asserted Claims (claims 1–7 and 9–13) of the '721 patent are invalid as obvious over Nuplazid Tablets in view of Ragnar-Tolf, the prior art, and the knowledge and skills of a POSA.

### A.    Claim 1

25.    It remains my opinion that, to the extent it is definite, claim 1 of the '721 patent is invalid as obvious over Nuplazid Tablets in view of Ragnar-Tolf, the prior art, and the knowledge and skills of a POSA.

#### 1.    A POSA would have been motivated to modify the Nuplazid Tablets, even in the absence of an explicit disclosure of a problem with them.

26.    Dr. Little contends that a POSA would not be motivated to improve upon or change Nuplazid 17 mg tablets because there was no "prior art that discloses particular problems or patient dissatisfaction regarding the 17 mg Nuplazid Tablet[.]"[14] I disagree that a POSA would

---

[13] Little Rep., ¶ 81.

[14] Little Rep., ¶ 111.

**CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION–
COUNSELS' EYES ONLY**

not have been motivated to develop an alternate formulation of pimavanserin in the absence of some disclosure of a problem with that specific formulation. First, I understand from counsel that the prior art does not have to hold itself out as flawed in order for a POSA to alter it, and there is no need to demonstrate an explicit problem with the prior art in order to find motivation to modify the prior art. Rather, I understand from counsel that motivation may be found in different places and forms, and need not be explicitly stated in the prior art reference at all, let alone originate from the thing that is to be modified. Rather, I understand from counsel that a motivation may be found explicitly or implicitly in market forces; design incentives; the interrelated teachings of multiple patents; any need or problem known in the field of endeavor at the time of invention and addressed by the patent; and the background knowledge, creativity, and common sense of the POSA. Applying this understanding, a POSA reasonably would have been motivated to modify the 17 mg Nuplazid tablets for at least the reasons stated in my Opening Report.

27.     Thus, I also disagree with Dr. Little's opinion that "[d]ue to a lack of disclosure in the prior art, for each of Dr. Muzzio's five provided reasons [pill burden, color and shape of capsules, swallowing difficulty for patients, size of dosage form, and masking pimavanserin's bitter taste], a POSA would first have to discover whether the purported problem actually exists for the 17 mg Nuplazid Tablets, only after which would the POSA *then* turn to the prior art and attempt to develop a solution."[15] First, even Dr. Little grants that "a POSA would generally be aware of pill burden as a universal concern and be motivated to consolidate dosages into a single

---

[15] Little Rep., ¶ 112.

CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION–
COUNSELS' EYES ONLY

unit if practical,"[16] indicating that a POSA would have a reason to reformulate Nuplazid Tablets in a single, consolidated dosage form.[17] In addition, a POSA—knowing that the daily dose was 34 mg, taken all at once, once daily,[18] would know that there was both a cost benefit and manufacturing capacity benefit that would stem from consolidating the full 34 mg dose of pimavanserin into a single dosage form, which would also motivate a POSA to reformulate Nuplazid Tablets into a single, consolidated dosage form. Once a POSA begins the process of reformulation of the 17 mg tablets, a POSA could reasonably identify capsules as a good option for formulating pimavanserin, given their ability to mask the bitter taste of the active, to be made visually distinguishable from other tablets and capsules, and the acknowledgement in the art that they can be easier for some patients to swallow.[19]

28.    Moreover, since the dosage was determined to be 34 mg of pimavanserin (provided as 40 mg pimavanserin tartrate), a POSA would have had every incentive to develop a single dosage form containing the full dose of pimavanserin, for the simple reason that a single 34 mg dosage form is significantly less expensive to manufacture that two 17 mg dosage forms. That alone is more than enough motivation for a POSA to pursue the development of the higher dose product.

---

[16] *Id.*, ¶ 115,

[17] Dr. Little opines that "the fact that Nuplazid came to market as a two-tablet dosage form would signal to a POSA that such a goal may not be reasonably achievable, or that other factors may caution against it (*e.g.*, size of the single unit dosage form)." *Id.* But he points to no prior art literature demonstrating that such a goal was not reasonably achievable or that the size of the dosage form would caution against it. In the absence of such disclosure, a POSA would not have any reason to believe consolidation of the dosages into a single unit was not reasonably achievable.

[18] *See* Nuplazid Label, "Dosage and Administration," 2.

[19] *See* Op. Rep., ¶¶ 109–113.

**CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION–
COUNSELS' EYES ONLY**

**2.    The possibility of making "multiparticulate dosage forms, dispersible, soluble, and effervescent tablets, orally disintegrating formulations, chewable tablets, films, and jellys" does not teach away from making a pimavanserin capsule.**

29.    Dr. Little further opines that my "cited references actually teach away from utilizing capsules in an attempt to solve pill burden because there are better-suited dosage forms which do not require a patient to swallow a pill at all … such as multiparticulate dosage forms, dispersible, soluble, and effervescent tablets, orally disintegrating formulations, chewable tablets, and films and jellys."[20] I disagree for six reasons.

30.    First, the existence of such dosage forms does not "teach away" from a single capsule incorporating pimavanserin tartrate, as I understand from counsel that a reference only teaches away from the claimed invention if it suggests that the approach taken is unlikely to be productive of the result sought. In other words, in order for a reference to teach away from a capsule containing pimavanserin, it would need to provide some reason why providing a single pimavanserin capsule was unlikely to reduce a patient's pill burden with respect to two tablets. I have seen nothing in the prior art that suggests making a single capsule containing the full daily dose (34 mg pimavanserin as 40 mg pimavanserin tartrate) would not reduce a patient's pill burden with respect to two 17 mg pimavanserin tablets.

31.    Second, a POSA would have good reasons to pursue pimavanserin capsules instead of "multiparticulate dosage forms, dispersible, soluble, and effervescent tablets, orally disintegrating formulations, chewable tablets, and films and jellys."[21] In particular, each of these dosage forms would require some amount of taste-masking for the pimavanserin tartrate active,

---

[20] Little Rep., ¶ 115.

[21] *Id.*

**CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION–COUNSELS' EYES ONLY**

which the prior art discloses as having a "pronounced bitter taste,"[22] and "the unpleasant taste of liquid medicines was identified as one of the barriers for older patients with dysphagia to taking their medications."[23] Multiparticulate dosage forms, for instance, are generally "reconstituted in a drink . . . or applied onto food as sprinkles[;]"[24] dispersible, soluble, and effervescent tablets are "solid dosage forms that can be dispersed or dissolved in a liquid to form a solution or suspension[]" and "require effective taste-masking[.]"[25] Orally disintegrating tablets, films, and jellies are all dosage forms that disintegrate or dissolve while in the patients' mouth, and again would require some formulation steps to mask the taste of the active ingredient. Chewable tablets, obviously, are chewed in the mouth.[26] A POSA also would have recognized, from the prior art, that the taste of the drug substance in these forms could be a barrier to patient compliance with therapy; in fact, Schiele discloses that medication palatability is a factor in patients' aversion to drug intake, which in turn can be a factor in swallowing difficulties.[27] While a POSA reasonably could have attempted to make "multiparticulate dosage forms, dispersible, soluble, and effervescent tablets, orally disintegrating formulations, chewable tablets, and films and jellys"[28]of pimavanserin, a POSA *also* would have recognized that doing so would require

---

[22] Ragnar-Tolf at [0132].

[23] Liu at 1877.

[24] *Id.* at 1881.

[25] *Id.*

[26] An additional reason a POSA would have been concerned about chewable tablets is that chewing ability frequently declines with age. *See id.* at 1882 ("Use [of chewable tablets] in older patients could be limited due to the decline in chewing ability.")

[27] *See* Schiele at 940.

[28] Little Rep., ¶ 115 (citing Liu at 1881-83).

**CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION– COUNSELS' EYES ONLY**

additional work to taste-mask pimavanserin that would not be required for a capsule. Thus, a POSA would still have been motivated to make a capsule dosage form.

32.     Third, even accepting that a POSA may have been motivated to make a multiparticulate dosage form, doing so would also have reasonably motivated a POSA to granulate pimavanserin tartrate and load the granulation into a capsule, too. Liu defines a multiparticulate dosage form as "powders, *granules*, and pellets and are *usually presented in sachets or capsules*[.]"[29]That, in turn, could have provided a POSA with an additional motivation to make a capsule, in that such a dosage form would provide flexibility for the patient or caregiver: the dosage form could be administered either intact (i.e., by swallowing the capsules), or modified by sprinkling the capsule contents in food for certain patients.[30] This, in turn, would also overcome one of the key disadvantages of multiparticulate dosage forms, which is that they "are considered to be more time-consuming and more difficult to take than liquid formulations and chewable tablets due to the requirement of handling (mixing with food and drink) before administration."[31] Thus, the existence of such multiparticulate dosage forms hardly

---

[29] Liu at 1881 (emphasis added).

[30] Notably, other capsules (e.g., Prilosec capsules) on the market at the time had labeling instructions that directed patients to swallow the capsules whole, but provided patients with swallowing difficulty the option to open the capsules and sprinkle the contents on to soft foods, such as applesauce. *See, e.g.*, Prilosec Prescribing Information at 39 ("For patients who have difficulty swallowing capsules, the contents of a PRILOSEC Delayed-Release Capsule can be added to applesauce. One tablespoon of applesauce should be added to an empty bowl and the capsule should be opened. All of the pellets inside the capsule should be carefully emptied on the applesauce. The pellets should be mixed with the applesauce and then swallowed immediately with a glass of cool water to ensure complete swallowing of the pellets."); Tasigna Prescribing Information at "2. Dosage and Administration" ("For patients who are unable to swallow capsules, the contents of each capsule may be dispersed in one teaspoon of applesauce (puréed apple)."

[31] Liu at 1882.

**CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION–
COUNSELS' EYES ONLY**

teaches away from making a pimavanserin capsule.

33.     Fourth, the dosage forms Dr. Little identifies—multiparticulate dosage forms, dispersible, soluble, and effervescent tablets, orally disintegrating formulations, chewable tablets, and films and jellys—form a small fraction of the available oral dosage forms on the market today, while capsules make up a substantial portion of the oral solid market. In fact, of the new drugs approved in the period between 2014 and 2017, forty-nine were tablets and twenty-three were capsules.[32]

34.     Fifth, some of the dosage forms Dr. Little identifies have downsides that may make them less than adequate for patients and caregivers. Multiparticulate dosage forms and effervescent tablets, for instance, require additional preparation steps in that the dosage form must be dispersed in a liquid or sprinkled on food prior to administration. Capsules and tablets, on the other hand, require no preparation prior to administration. Thus, a POSA reasonably could have been motivated to pursue a capsule over these other dosage forms, for the reasons I identify in my Opening Report.

35.     Sixth, Dr. Little ignores that the dosage forms he identifies are, by and large, more complex and expensive to manufacture than a capsule or tablet. But a POSA would have been motivated to develop a dosage form that was inexpensive to manufacture. A single capsule containing the full 34 mg of pimavanserin would be significantly less expensive to manufacture than two dosage forms containing 17 mg each and also less expensive than any of the alternative dosage forms proposed by Dr. Little.

---

[32] *See* https://www.pharmamanufacturing.com/sector/small-molecule/article/11296791/oral-solid-dose-strong-and-steady

CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION–
COUNSELS' EYES ONLY

     **3.**      **A POSA also would have been motivated to make a capsule to permit easy identification of the product.**

36.      In paragraph 116–117 of his Report, Dr. Little criticizes my opinion that the color and shape of the Nuplazid Tablets would have motivated a POSA to consider a capsule. In particular, he opines that color and shape of tablets "would most certainly not be a primary concern of a POSA, nor would such a motivation justify completely reformulating a drug product."[33] Rather, he opines that tablets can be color-coded and printed, too.[34] But part of the issue with Dr. Little's analysis is that he seems to analyze the different motivations I presented in my report individually, rather than along the lines of what the prior art would have motivated a POSA to do as a whole. Given that Dr. Little grants that "a POSA would generally . . . be motivated to consolidate dosages into a single unit, if practical,"[35] a POSA already would have been motivated to reformulate Nuplazid Tablets into a single dosage form to reduce pill burden and manufacturing costs. Thus, the ability to impart bright colors to the product would have been attractive. Further, given that the prior art disclosed that "water was [a] source of discoloration[]"[36] of pimavanserin granulations, and that coating systems were "selected to minimize wetting of the tablet cores[,]"[37] a POSA reasonably could have been concerned about applying aqueous film coats (such as the Opadry FX coating Dr. Little identifies in his report) to

---

[33] Little Rep., ¶ 116.

[34] *Id.*, ¶ 117.

[35] *See* Little Rep., ¶ 115.

[36] Ragnar-Tolf at [0129].

[37] *Id.* at [0132].

**CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION–
COUNSELS' EYES ONLY**

pimavanserin tablets, as doing so could potentially induce degradation.[38] By contrast, the ability

to impart color *without* applying an aqueous coating would have provided a POSA with

additional motivation to select capsules.[39]

37.    I note that Dr. Little criticizes my opinion regarding film coating of tablets in that

I ignore "the costs of time and resources to reformulate the drug product into a capsule, and

instead [focus] on a comparatively tiny cost savings backed by no references whatsoever."[40] But,

again, I note that even Dr. Little grants that a POSA would have been "motivated to consolidate

dosages into a single unit if practical,"[41] a POSA following such motivation with respect to

Nuplazid Tablets would recognize those costs of time and resources to reformulate the drug

product that would be required to meet that end. At that point, a POSA would be considering

*how* to reformulate the drug, and could reasonably be motivated to consider capsules based on

---

[38] *See* Colorcon, Product Information Brochure: Opadry® *fx*TM, Special Effects Film Coating Systems® at 2 (2009) (identifying Opadry FX as using an "aqueous base" that "helps avoid associated solvent costs and ensures operator safety.") In addition, I note that introducing a coating process in manufacture would introduce yet one more step that could introduce a point of failure in manufacturing. Film coating, as mentioned, exposes the product to moisture, which can increase degradation. Moreover, when performing the coating process, tablets receive different amounts of coating. In my own direct experience, when using coating for taste masking, this variability can cause some tablets to have insufficient coating to provide effective taste masking. Quite often, tablets would temporarily stick to each other (twinning) or to the equipment (sticking) during coating. When these bonds break due to the movement of the tablet bed, defects in the coating are introduced, again leading to loss of masking. The coating film and the tablet core often have different thermal expansion coefficients, which can cause the coating to crack and peel off if the tablet is exposed to higher or lower temperature (for example, during transportation). Additionally, coating films can "age" over time, sometimes resulting in changes in tablet dissolution.

[39] *See* Op. Rep., ¶ 110.

[40] Little Rep., ¶ 117, n. 11.

[41] Little Rep., ¶ 115.

**CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION– COUNSELS' EYES ONLY**

factors such as coloration.[42]

> **4.    A POSA would have been motivated to formulate pimavanserin in a capsule form to promote ease of swallowing.**

38.    Dr. Little criticizes my opinion that tablets are perceived, by some patients, as more difficult to swallow than hard capsules as an "outdated perception that has been disproven as studies have since demonstrated that tablets are actually easier to swallow," citing to the Schiele reference. [43] I disagree with Dr. Little for two reasons: first, even the perception of capsules as easier to swallow would motivate a POSA to select capsules; and second, he misreads the Schiele reference.

39.    First, as noted, the perception of capsules as easier to swallow, as disclosed in Stegemann 2002, still would have motivated a POSA to make pimavanserin capsules. That reference discloses that, based upon patient perception, 66% of those surveyed chose capsules as easy to swallow, relative to only 18% for coated tablets and 4% for uncoated tablets. Given that Dr. Little does not dispute that the patient population here—Parkinson's disease patients—are known to have trouble swallowing oral medications, a POSA reasonably could have attempted to serve the market segment of patients who, simply put, perceive capsules as easier to swallow than tablets, in an effort to make the dosage form more acceptable to the patient population. Schiele, in fact reinforces that a POSA could reasonably reach this conclusion; Fig. 6 of Schiele shows that among patients with swallowing difficulties (white bars), roughly a third of patients

---

[42] I also grant that a POSA could have been motivated to reformulate Nuplazid Tablets as a single tablet. But just because a POSA could have pursued a tablet does not mean they would do so to the exclusion of capsules, either. Rather, many drug products are offered in both capsule and tablet form, as certain patients prefer one form over the other.

[43] Little Rep., ¶¶ 119 (citing Schiele at 941, Fig. 3)

**CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION– COUNSELS' EYES ONLY**

preferred tablets, a slightly smaller fraction preferred capsules, and roughly a third of patients had no preference for tablets versus capsules.



Fig. 6 Preferred types of dosage forms and tablet shapes in a general practice population with (37.4 %) and without (62.6 %) swallowing difficulties (N=1,051 consecutive patients)[44]

A POSA reading Schiele—particularly in light of Stegemann 2002—could thus reasonably infer that there existed a market segment that preferred capsules, perceived them as easier to swallow, and that such a segment would be reasonably served by making a capsule form.[45]

40.    Second, I also disagree with Dr. Little's citation to Fig. 3 of Schiele as showing that tablets are easier to swallow. What Fig. 3 of Schiele *actually* shows is that, without controlling for size, 21.4% of capsules caused swallowing difficulties relative to 13.4% of round

---

[44] Schiele at 944.

[45] A POSA, granted, could draw the conclusion that there are some patients that prefer tablets, too. But as discussed above, a POSA reasonably could have pursued both tablets and capsules, as the two are not mutually exclusive. *See supra* n. 42.

**CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION–
COUNSELS' EYES ONLY**

tablets, 17.3% of oval tablets, 19.8% of oblong tablets, and 11.0% of irregular tablets.[46] But a POSA would also recognize that these percentages do not account for dosage form size, which was the most prevalent reason given for difficulty in swallowing a dosage form.[47] Further, Schiele also discloses, along with the discussion of Fig. 3, "the average dimensions of dosage forms that caused swallowing difficulties" in Table 2, along with average dimensions of those same dosage forms that did *not* cause swallowing difficulty.[48] A brief examination of Table 2 shows that hard capsules that do *not* cause swallowing difficulties, on average, are larger in size than tablets that cause swallowing difficulties:

**Table 2** Relationship between dimensions of tablets and capsules and swallowing difficulties

| | Mean of tablets and capsules that caused difficulties | Mean of tablets and capsules that did not cause difficulties | Difference of the geometric means [%] | *p*-value |
|---|---|---|---|---|
| Round: Diameter [mm] | 8.7±2.0 | 8.1±1.7 | - 7.1 | <0.0001 |
| Round: Height [mm] | 3.8±1.2 | 3.5±1.1 | - 6.9 | <0.01 |
| Oval: Length [mm] | 15.0±4.4 | 13.2±3.3 | - 10.3 | <0.001 |
| Oval: Width [mm] | 7.4±1.8 | 6.6±1.4 | - 9.3 | <0.001 |
| Oval: Height [mm] | 4.5±1.5 | 4.6±1.3 | + 3.3 | n.s. |
| Oblong: Length [mm] | 16.7±4.0 | 13.3±4.7 | - 22.2 | <0.0001 |
| Oblong: Width [mm] | 7.3±1.6 | 6.2±2.0 | - 16.3 | <0.0001 |
| Oblong: Height [mm] | 5.8±1.6 | 4.9±1.7 | - 18.6 | <0.01 |
| Irregular shapes: Diameter [mm] | 9.4±1.1 | 8.8±1.4 | - 6.7 | n.s. |
| Irregular shapes: Height [mm] | 3.5±0.8 | 3.5±0.8 | - 1.2 | n.s. |
| Irregular shapes: Length [mm] | 7.3±0.5 | 8.1±1.5 | + 10.2 | n.s. |
| Irregular shapes: Width [mm] | 6.7±0.2 | 7.0±1.3 | + 2.1 | n.s. |
| Hard capsules: Diameter [mm] | 6.8±1.4 | 6.4±1.2 | - 7.1 | <0.05 |
| Hard capsules: Length [mm] | 19.0±2.0 | 17.5±2.8 | - 9.3 | <0.001 |
| Soft capsules: Diameter [mm] | 8.6±1.7 | 8.0±1.1 | - 7.0 | n.s. |
| Soft capsules: Length [mm] | 20.8±2.0 | 18.3±5.8 | - 16.7 | n.s. |

[49]

---

[46] Schiele at 941.

[47] *Id.* ("Reasons given for difficulties related to the dosage form were size (74.6 %), surface (70.5 %), shape (43.5 %), and flavor (22.1 %).")

[48] *Id.*

[49] *Id.* at 942.

**CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION–COUNSELS' EYES ONLY**

At least one other reference found that this table in Schiele shows larger capsules are easier to swallow than smaller tablets, stating that "Capsules 18 mm in length were readily acceptable to German patients who had problems with round tablets > 8 mm diameter, and oblong or oval tablets > 13 mm."[50] Schiele, thus, does not prove tablets are easier to swallow than capsules; rather, it reinforces the idea that patients can tolerate swallowing capsules better than they can tolerate swallowing similarly-sized or even smaller tablets.

41.    Further, the idea that capsules are easier to swallow is hardly "outdated," and later papers have even explicitly stated that "capsules are easier to swallow than tablets."[51] In addition, a study conducted between March 30 and May 13, 2016 in Parkinson's disease patients identified that capsules were the easiest to swallow for such patients, and concluded that "capsules might be preferentially used when dysphagia is suspected."[52]

42.    I also similarly disagree with Dr. Little's assessment of Liu as showing that "that "[o]esophageal passage of capsules was not affected either by capsule size or the amount of water taken at the same time."[53] The reference Liu cites in support of the quoted proposition

---

[50] Jeremy Fields et al., *Pill Properties that Cause Dysphagia and Treatment Failure*. 77 Curr Ther Res Clin Exp. 79, 81 (2015)

[51] *See* Esther T.L. Lau, et al. *Prevalence of swallowing difficulties and medication modification in customers of community pharmacists*. 45 J. Pharm. Res. 18, 22 (2015) ("Lau"). I also note this reference cites the same paper that Stegemann 2002 cites for the proposition that capsules are perceived as easier to swallow. *Compare id.* at 23 (reference 22) with Stegemann 2002 (discussing same paper). It also cites the Schiele reference. *See* Lau at 23 (reference 14).

[52] *See* Carsten Buhmann et al. *Pill swallowing in Parkinson's disease: A prospective study based on flexible endoscopic evaluation of swallowing*. 62 Parkinsonism and Related Disorders 51, 51 (2019). Although this reference is not prior art to the patents-in-suit, it is highly relevant to the question of whether "studies have . . . demonstrated that tablets are actually easier to swallow," as Dr. Little claims. Little Rep., ¶ 119.

[53] Little Rep., ¶ 121 (citing Liu at 1876, Table 3).

**CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION–
COUNSELS' EYES ONLY**

merely tests two identically-sized capsules containing different weights of material, and

determined that the weight of material did not make a difference in oesophageal transit time.



**Subjects and methods**

One hundred and twenty-one volunteers with no previous history
of gastric or cardiac disease were allocated randomly to two groups.
*Group 1*—This comprised 60 subjects aged 19-80 years (median 39
years) who received the following preparations (fig 1); A—large oval
tablet (weight 1030 mg); B—large round tablet (weight 915 mg); and
C—capsule (weight 510 mg, density < 1).

FIG 1—Size and shape of the six ingested tablets and capsules containing
barium sulphate.

*Group 2*—This comprised 61 subjects, aged 19-64 years (median 26
years) who were given the following preparations (fig 1); D—small
oval coated tablet (weight 408 mg); E—small oval uncoated tablet
(weight 400 mg); and F—capsule (weight 990 mg, density >1). The
tablets and capsules contained barium sulphate granulate and were
identical in size and shape to commonly used products. Further
information and details of the preparations are given elsewhere.[13]      54

That, in turn, would not teach a POSA that capsule dimensions have no effect on oesophageal

transit time, because the capsule dimensions were not varied in the test.

43.    Thus, I remain of the opinion that a POSA would have been motivated to develop

capsule formulations of pimavanserin based upon their ease of swallowing.

> **5.    A POSA would have selected an appropriate-sized capsule and
> developed a granulation that would fill it.**

44.    I also disagree with Dr. Little when he states that I contradict myself by arguing

that "a POSA would have preemptively selected a capsule size without the knowledge that the

prerequisite bulk density for the necessary weight of the material is obtainable and prior to

---

[54] H. Hey et al. *Oesophageal transit of six commonly used capsules*. 285 Br. Med. J. (Clin. Res.
Ed). 1717, 1717-1718 (1982).

**CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION–
COUNSELS' EYES ONLY**

engaging in formulation prototype development."[55] I disagree that there is any contradiction. My Opening Report stated that "*Usually* a POSA will be able to determine the appropriate capsule size through calculation of the weight of the material to be held by a single size capsule and the material's bulk or tapped density," but then grant "if a smaller capsule size is desired, the density of the formulation can be increased through granulation."[56] In my Opening Report, I also provided reasons why a POSA would be motivated to formulate pimavanserin into a capsule shell of size 3 or 4, given the disclosures in the prior art that would indicate to a POSA these capsule sizes are unlikely to cause swallowing difficulty.[57] Thus, a POSA could reasonably have been motivated to select the capsule size first and then attempt to make a capsule fill of sufficient density through granulation.

45.    Dr. Little opines that I "completely fail[] to acknowledge that the mean diameter and length of hard capsules that cause swallowing difficulty were 6.8+/-1.4 mm and 19.0+/-2.0 mm, respectively."[58] Dr. Little then states that "[u]sing the averages as Dr. Muzzio does, a size 2 capsule (6.35 mm in diameter and 18.0 mm in length) is actually not on the cusp when compared to the average dimensions of difficult to swallow capsules (6.8 mm and 19.0 mm in length), making Dr. Muzzio's analysis of the reference misleading."[59] I disagree. Dr. Little fails to account for the fact that both capsule sizes that caused swallowing difficulties, as well as capsule sizes that do *not* cause swallowing difficulties, are reported as ranges, rather than single values.

---

[55] Little Rep., ¶ 123.

[56] Op. Rep., ¶ 78.

[57] *Id.*, ¶ 112.

[58] Little Rep., ¶ 125

[59] *Id.*

CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION– COUNSELS' EYES ONLY

For instance, Schiele discloses that, for the hard capsules that cause swallowing difficulties, the length was within the range of 19 mm +/- 2 mm, which translates to a range of 17-21 mm, and the diameter was in the range of 6.8 mm +/- 1.4 mm, which translates to a range of 5.4 mm to 8.2 mm.[60] A POSA would recognize that the stated mean dimensions of the size 2 capsules (6.4 mm in diameter and 18.0 mm in length) fell squarely within this range, while size 4 (5.32 mm in diameter and 14.3 mm long) fall outside this range when considering the average size of the capsule. Size 3 capsules, in turn, fall outside the range in terms of their length, and on the lower end of the range when considering their diameter (5.82 mm in diameter and 15.9 mm in length). Thus, a POSA could reasonably conclude from these combined disclosures within Schiele that size 3 and 4 capsules were less likely to cause swallowing difficulties than capsules of size 2 or greater, and would be motivated to select a size 3 or 4 capsule shell.

46.     Finally, Dr. Little contradicts my opinion that capsules would be desirable to a POSA because they provide taste-masking of the pimavanserin active ingredient on the grounds that I "fail[] to consider that a POSA would have also weighed the time, cost, and effort in reformulating a blend for the purpose of avoiding any bitter taste of pimavanserin, which could have been addressed by a film coat and taste masking."[61] I disagree. As discussed above in paragraph 37, a POSA already would have had sufficient motivation to consolidate the two-tablet dose of pimavanserin into a single dosage form. Further, the taste-masking process Dr. Little identifies for tablets would have required film-coating, and a POSA reasonably could have been motivated to select capsules over tablets to avoid such film-coating processes for the reasons

---

[60] Schiele at 942 (Table 2).

[61] Little Rep., ¶ 127.

CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION–
COUNSELS' EYES ONLY

stated in paragraph 36. Finally, I will note that Dr. Little appears to consider the individual motivations for selecting capsules as a dosage form for pimavanserin one by one, without considering the sum-total of what the prior art would have taught a POSA.

> **6.** **A POSA would have reasonably expected to be able to modify the disclosures of Ragnar-Tolf to arrive at the subject matter of claim 1 with a reasonable expectation of success.**

47.     Dr. Little opines that, "if anything, Ragnar-Tolf teaches a POSA to pursue single unit dosage tablet formulations, rather than capsules."[62] I disagree, as Ragnar-Tolf states that "instead of compression into tablets, a dry or wet blend, such as those described above, is placed in a gelatin capsule or HPMC capsule."[63] Thus there is nothing in Ragnar-Tolf that explicitly teaches away from capsules, and rather capsules are presented as one possible dosage form for pimavanserin.

48.     In paragraph 130, Dr. Little opines that "a POSA would not consider the claimed formulations to have any flowability requirements, or to otherwise require achieving any particular result regarding pharmaceutical manufacturing (i.e., 'commercial manufacture, or "scale-up"')." He also opines that "a POSA would understand that capsules could even be hand-filled, and thus do not require the use of commercial capsule filling machines."[64] I do not disagree entirely with this sentence: a POSA certainly would understand that capsules can be filled by hand and are, in some instances, filled by hand.[65] But, accepting for the sake of

---

[62] Little Rep., ¶ 129.

[63] Ragnar-Tolf at [0063]; *See also*, [0102], [0105], [0119], [0121].

[64] Little Rep., ¶ 130.

[65] For example, it is quite common for a new drug that the very first oral dosage form used in early clinical studies is, in fact, a capsule filled by hand with just pure API (thus increasing the

CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION–
COUNSELS' EYES ONLY

argument that a POSA knows what constitutes a "pharmaceutically acceptable capsule," a POSA would still be motivated to develop a product that could be manufactured on a commercial scale and would recognize that certain properties were necessary to enable manufacture of capsules on a commercial scale. And it remains my opinion that two of those properties—content uniformity and powder flow, specifically—would have been key considerations to a POSA that would have informed his or her decision to granulate the API.

49.    In paragraph 133, Dr. Little says that I fail "to consider that none of the formulations of pimavanserin disclosed in Ragnar-Tolf contain the full amount of 40 mg pimavanserin tartrate in a blend that had a bulk density of approximately 0.6 g/mL." I disagree that I failed to consider this, as it is explicitly discussed in paragraph 122 of my Opening Report, and that I had an extensive discussion of why a POSA would reasonably expect to be able to succeed in making a granulation of pimavanserin tartrate with sufficient density to fit into a size 3 or size 4 capsule shell, based on the disclosures of Ragnar-Tolf. I will note, however, that Dr. Little offers no reasoning, technical analysis, or scientific basis as to why a POSA would not reasonably expect to be able to increase drug concentration within the wet granulations disclosed in Ragnar-Tolf based upon any disclosures in the prior art.

50.    In paragraph 134, Dr. Little states I did not point "to any evidence that would support the notion that increasing the drug load to fit 40 mg pimavanserin tartrate in a small-sized capsule could be readily achieved with a reasonable expectation of success."[66] I disagree, and note that I specifically addressed the scientific basis for this in paragraph 122 of my Opening

---

POSA's awareness that for a relatively small dosage such as 40 mg, capsules are a very viable option).

[66] Dr. Little reiterates substantially the same opinion in paragraphs 137–138 of his report.

**CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION–
COUNSELS' EYES ONLY**

Report. Further, however, I will also note that a POSA specifically would expect *any* granulation

of the pimavanserin tartrate active to have a bulk density of greater than 0.4 g/ml, and more

likely 0.5 or 0.6 g/ml, as these are the minimum bulk densities that a POSA would reasonably

expect from *any* granulation process, regardless of drug load. For instance, I can provide several

examples from the prior art of granulations that achieve these bulk densities, and Figure 1 of the

'721 patent even identifies a bulk density of 0.7 g/ml as "typical."[67]

51.     In paragraph 135, Dr. Little opines that I use hindsight analysis in opining that a

POSA would have been dissuaded from pursuing direct blending of pimavanserin and excipients

from the disclosures of Example 8. Specifically, Dr. Little opines that I failed to note that while

Ragnar-Tolf discloses that during blending, "the mixture tended to form aggregates, potentially

affecting content uniformity[,]"[68] that Ragnar-Tolf "also discloses a solution to the issue . . . that

'[i]t was found that the stepwise blending/sieving procedure ensured a homogenous blend was

maintained[,]'" and that addition of silicon dioxide aerosol and increasing the magnesium

stearate amount to 1.0% w/w for the 1 mg formulation, 1.5% w/w for the 5 mg formulation, and

2.0% for the 20 mg formulation resolved these issues.[69] I disagree both that I failed to account

for this disclosure, or that Ragnar-Tolf otherwise adequately discloses to a POSA that the

problem of aggregation was solved through these procedures. Rather, a POSA reading Table 6 of

---

[67] *See, e.g.*, W. Meng et al., *Statistical analysis and comparison of a continuous high shear
granulator with a twin screw granulator: Effect of process parameters on critical granule
attributes and granulation mechanisms*, 513 Int. J. Pharmaceutics 357, 365-366 (2016); M.
Pottman et al., *Model-based control of a granulation system*, 108 Powder Tech. 192, 199-200
(2000); *see also* '721 patent at FIG. 1.

[68] Ragnar-Tolf at [0125].

[69] Little Rep., ¶ 135 (citing *id.*).

CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION–
COUNSELS' EYES ONLY

Ragnar-Tolf would notice at least two of the tablets prepared by direct blending and

compression, which were nominally prepared by the stepwise blending/sieving procedure,[70] had

an RSD of greater than 6%, indicating potential issues with content uniformity.[71] A POSA would

know that an RSD higher than 6% would indicate a lack of blend homogeneity, and thus would

have been skeptical that the stepwise blending procedures Dr. Little points to "discloses a

solution" to the issues surrounding content uniformity.[72]

52.    In paragraph 136, Dr. Little states "that a POSA would [not] have exhibited any

preference for Example 9 over Example 8." To support this, Dr. Little points to "Table 6 of

Example 8…also discloses blends of pimavanserin with bulk and tapped densities that reach

about 0.6 g/ml." But Dr. Little fails to note that the tablets including higher concentration of

active ingredient (i.e., the two 20 mg tablets) also tended to have lower bulk and tapped densities

than the remaining blends.[73] Dr. Little also offers no opinion that a POSA would have

reasonably expected to be able to increase the pimavanserin concentration within these blends to

---

[70] *See* Ragnar-Tolf at [0127] ("Tablets containing 1 mg, 5 mg, and 20 mg of pimavanserin
tartrate Form A were made by first pre- blending the drug with spray-dried lactose as described
above. The mixture was blended manually with microcrystalline cellulose (AVICEL® PH102)
and silicon dioxide aerosol (AEROSIL®) and sieved with 1 mm net. The mixture was transferred
to a double-cone blender and blended for 6 minutes. Magnesium Stearate was charged to a
stainless steel bow pre-blend with an equal volume of dry blend from the blender. The mixture
was sieved manually with a 1 mm net. The sieved magnesium Stearate blend was then added to
the blender. Final blending was performed for 2 minutes.")
[71] *See id.*, Table 6.

[72] *See, e.g.*, *Draft Guidance For Industry Powder Blends and Finished Dosage Units - Stratified
In-process Dosage Unit Sampling and Assessment*, 2003 WL 24014263, at *6 (F.D.A. 2003)
("We also recommend that you assess the normality and determine RSD from the results of
stratified in-process dosage unit sampling and testing that were developed. The RSD value
should be used to classify the testing results as either readily pass (RSD ≤ 4.0%), marginally pass
(RSD ≤ 6.0%) or inappropriate for demonstration of batch homogeneity (RSD > 6.0%).")

[73] *See* Ragnar-Tolf, Table 6.

**CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION–COUNSELS' EYES ONLY**

achieve a blend of sufficient density to encapsulate 40 mg pimavanserin tartrate in a size 3 or 4 capsule. Even to the extent Dr. Little had, it would not otherwise change my opinion, as it would simply demonstrate a POSA had multiple avenues through which he or she could reasonably expect to succeed in making a size 3 or 4 capsule encapsulating 40 mg pimavanserin tartrate, including both granulation and blending pimavanserin tartrate with excipients.

53.     In paragraph 137, Dr. Little states "Dr. Muzzio is incorrect that achieving a granulation with 'sufficient bulk density' without increasing the drug load would be achievable with a reasonable expectation of success. The wet granulation process to which Dr. Muzzio cites neither teaches nor suggests that granulation would result in a blend such that the blend would contain 40 mg pimavanserin tartrate that could fit inside of a size 3 or 4 capsule." It is unclear to me whether Dr. Little meant "achieving a granulation with 'sufficient bulk density' <u>while</u> increasing the drug load would;" to the extent he did not, the statement would not make sense. But to the extent he did, achieving a bulk density of around 0.5 for a granulation that is only about 30-40% API is not challenging at all—if anything, it is a pretty typical density, as is shown from the references in paragraph 50.

54.     In paragraph 141, Dr. Little opines that "tapped density . . . is mentioned nowhere in the claims," and dismisses my consideration of it. I disagree that a POSA would dismiss tapped density of the blends in Ragnar-Tolf as irrelevant, particularly to capsule-filling. Tapped density, in particular, is close to the actual density inside the capsules when they are manufactured using standard machine-based techniques, e.g. using a dosator disc. As such, tapped density is relevant to how much material a capsule can hold.

55.     In paragraph 143, Dr. Little says "[t]he data included in the table that Dr. Muzzio includes in his report does not say anything about whether a POSA could increase drug

CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION– COUNSELS' EYES ONLY

concentration to 40 mg and maintain a similar bulk density at around 0.56 to 0.61 g/mL. It is my opinion that reducing the amount of API would allow a POSA to more easily manage the bulk density of the resulting blend. In my opinion, the difficulty arises where a POSA seeks to increase the amount of API. Dr. Muzzio assumes that a POSA would be able to achieve a blend having the same bulk density as the other formulations in this table, yet with double the drug load." I disagree. First, "40 mg" is not a concentration, but a total potency. The *concentration* is the 40 mg divided by the total blend weight, which would be about 40% if one was loading a total fill weight of 100 mg. Second, Dr. Little offers no reference or teaching in the prior art to support his opinion that "the difficulty arises where a POSA seeks to increase the amount of API," nor does he offer any scientific rationale for this statement, nor does he offer any opinion as to why Ragnar-Tolf would not reasonably indicate that a POSA could increase drug concentration in the granulations. In fact, in Paragraph 144, he acknowledges my opinion that "'[t]he bulk and tapped densities of the lubricated blend disclosed in Ragnar-Tolf are relatively close regardless of drug concentration, and the Carr's Index of these powders does not vary substantially with the drug concentration,'" but offers no substantive response or technical analysis as to why this is not true.[74]

56.    Dr. Little's opinion, essentially, is that my analysis is suspect because I fail to define any limit of *what* a POSA would expect the drug concentration could be and still achieve

---

[74] Dr. Little's sole point of disagreement here appears to be that "Carr's Index is not an indication of bulk density," which is true, but ultimately not a response. First, Carr's Index is calculated from the bulk and tapped density of the powder, and as such it is based upon, in part, bulk density. Second, it is hardly a response to my opinion, as Ragnar-Tolf discloses the bulk and tapped densities of the blend containing the pimavanserin granulation, and I calculated the Carr's Index from these reported values.

CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION–
COUNSELS' EYES ONLY

a bulk density of 0.56 to 0.61 g/ml.[75] But providing such an upper bound is not relevant to my opinion here, as a POSA would recognize from Ragnar-Tolf that prior pimavanserin granulations of 1%, 5%, and 20% pimavanserin tartrate exhibited bulk densities in this range, and that a POSA would thus reasonably expect an increase in drug concentration to, e.g., 30%-40%, not to adversely affect the bulk density to the point where loading the target amount of blend in a size 3-4 capsule would not be feasible. That, in turn, would provide a POSA with a reasonable expectation of success in preparing a pimavanserin tartrate granulation with (a) sufficient drug concentration and (b) sufficient density to fill a dose of 40 mg pimavanserin tartrate into a size 3 or 4 capsule. At a minimum, granulating pimavanserin in the manner described in Ragnar-Tolf would have been the clearest and most obvious avenue for a POSA towards making pimavanserin granules that were sufficiently dense to load a dose of 34 mg pimavanserin into a single size 3 or 4 capsule. And, as set forth in my Opening Report, a POSA would know this would not *require* making granules of pure pimavanserin tartrate at, e.g., concentrations as high as 100% pimavanserin tartrate; rather, a POSA would recognize it would require concentrations of, e.g., 30%-40% in the granulation.[76] Dr. Little, again, has not provided any technical reasoning or reference that would lead me to reconsider that opinion. It is thus my conclusion that claim 1 of the '721 patent would have been obvious.

---

[75] *See* Little Rep., ¶ 144. ("Dr. Muzzio's logic appears to be that *any drug load* of pimavanserin would have a bulk density of around 0.56 to 0.61 g/mL, because according to him, '[t]he bulk and tapped densities of the lubricated blend disclosed in Ragnar-Tolf are relatively close regardless of drug concentration, and the Carr's Index of these powders does not vary substantially with the drug concentration.'").

[76] Op. Rep., ¶ 122

CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION–
COUNSELS' EYES ONLY

**B.**    **Claim 3**

57.    It remains my opinion that, to the extent claim 3 is definite, it is invalid as obvious over Nuplazid Tablets in view of Ragnar-Tolf, the prior art, and the knowledge and skills of a POSA.

58.    In paragraph 154, Dr. Little states that "the sieve analysis that Dr. Muzzio points to would not provide a clear enough indication as to particle size distribution, because measuring the particle size distribution by sieves would not yield the same results as if said distribution were tested using laser light scattering analysis." I disagree. The sieve analysis of the granules in Ragnar-Tolf clearly demonstrates a particle size distribution with a D90 of 250 µm or less via sieve analysis and a D10 of greater than 90 µm, as measured via sieve analysis.[77] Although a POSA would recognize that measuring particle size distribution by sieves would not yield the exact same results as measuring distribution using light scattering analysis, results from the two techniques (if used properly) are not so different that a POSA would expect the granulations disclosed in Ragnar-Tolf to have a particle size distribution of D90 of greater than 450 µm or less than 60 µm when measured by light scattering analysis. Rather, a POSA would recognize that the measurement of particle size via sieving would differ somewhat from light scattering analysis, but not by so much that a POSA would expect it to fall outside the claimed range. In fact, a POSA would know that while the overall measured *distribution* of particle size will differ when measured by laser diffraction versus sieve analysis, they both would show that the particle sizes fall within the same range (as is shown below for the drug gabapentin), such that a POSA could use the D90 values from sieving to provide useful guidance regarding the D90 values that would

---

[77] *See* Ragnar-Tolf, Table 8.

**CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION–
COUNSELS' EYES ONLY**

be obtained from light scattering.



**Fig. 1.** Particle size distribution of gabapentin.                    [78]

Furthermore, as discussed in my Opening Report, "a POSA would have known that

pharmaceutical granulations almost always have particle size distributions with D90 larger than

60 microns; otherwise, the granulation step is considered to be incomplete."[79]

59.     Dr. Little, in his report, offers no further references, discussion, or technical

analysis that would lead me to reconsider my opinion that claim 3 of the '721 patent is obvious.

It thus remains my opinion that, to the extent claim 3 is definite, it is invalid as obvious over

Nuplazid Tablets in view of Ragnar-Tolf, the prior art, and the knowledge and skills of a POSA.

_____

[78] *See* D. Kayrak-Talay and J. D. Lister, *A priori performance prediction in pharmaceutical wet
granulation: Testing the applicability of the nucleation regime map to a formulation with a
broad size distribution and dry binder addition.* 418 Int. J. Pharmaceut. 254, 256 (2011).

[79] Op. Rep., ¶ 135.

CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION–
COUNSELS' EYES ONLY

C.    <u>Claims 2, 4–7, and 9–13</u>

60.    Dr. Little, in his report, offers no references, discussion, or technical analysis that
would lead me to reconsider my opinion that claims 2, 4–7, or 9–13 of the '721 patent are
obvious. It thus remains my opinion that, to the extent claims 2, 4–7, and 9–13 are definite, they
are each invalid as obvious over Nuplazid Tablets in view of Ragnar-Tolf, the prior art, and the
knowledge and skills of a POSA.

D.    <u>Objective Indicia of Nonobviousness do not Support the Asserted Claims of
the '721 Patent</u>

61.    It is further my opinion that the "objective indicia" of nonobviousness that Dr.
Little puts forward in his report do not support the nonobviousness of the '721 patent claims.

1.    **Prior patents covered pimavanserin and Nuplazid Tablets.**

62.    I understand that commercial success in an obviousness inquiry is based on the
concept that a successful commercial product embodying the claimed features of an invention
would have been brought to market sooner in response to market forces, had the idea been
obvious to persons skilled in the art. However, the economic premise underlying this theory
assumes that others would have been economically incentivized, and thus willing to invest the
resources, to bring the claimed invention to market sooner. This premise collapses in situations
where disincentives exist in the market for others to commercially exploit the claimed invention.
For example, even if the claimed features of an invention were obvious to persons skilled in the
art, they may not be economically motivated to pursue such claimed inventions—in particular, in
situations where an earlier patent claims technology required to practice the claimed invention.

63.    Counsel for MSN and Aurobindo have asked me whether three patents—U.S.
Patent Nos. 6,815,458 ("the '458 patent") 7,601,740 ("the '740 Patent") and 7,659,285 ("the
'285 patent")—claim components, technology, or methods of using technology required to

**CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION–COUNSELS' EYES ONLY**

practice the claimed subject matter of the '721 patent. In my opinion, they do. I am, however, offering no opinion on whether these patents would provide an economic disincentive to developing the claimed invention, or whether Nuplazid Capsules are commercially successful, or whether the commercial success of Nuplazid Capsules otherwise has a nexus to the patent claims (except as discussed in section V.D.2 below).

64.  Claim 1 of the '458 patent recites the following:

A compound of Formula (I)L



wherein Z is



in which R is a hydrogen, a cyclic or <u>straight-chained or branched acyclic organyl group</u>, a lower hydroxyalkyl group, a lower aminoalkyl group, or an aralkyl or heteroaralkyl up;

n is 1;

$X_1$ is methylene, vinylene, or an <u>NH</u> or N(lower alkyl) group;

and $X_2$ is <u>methylene</u>, or, when $X_1$ is methylene or vinylene, $X_2$ is methylene or a bond; or when $X_1$ is methylene, $X_2$ is O, S, NH, or N(lower alkyl) or a bond;

$Y_1$ is <u>methylene</u> and $Y_2$ is methylene, vinylene, ethylene, propylene, or <u>bond</u>; or $Y_1$ is a bond and $Y_2$ is vinylene; or $Y_1$ is ethylene and $Y_2$ is O, S, NH, or N(lower alkyl); $Ar_1$ and $Ar_2$ independently are unsubstituted or <u>substituted aryl</u> or heteroaryl groups, provided that $Ar_1$ and $Ar_2$ are not simultaneously

CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION–
COUNSELS' EYES ONLY

unsubstituted phenyl; and W is <u>oxygen</u>;

or a pharmaceutically acceptable salt or prodrug thereof.

Based upon my review of the '721 patent, this claim reads on pimavanserin tartrate wherein R is

a straight-chained organyl group, n is 1, $X_1$ is NH, $X_2$ is methylene, $Y_1$ is methylene, $Y_2$ is a

bond, $Ar_1$ and $Ar_2$ are both substituted aryl, and W is oxygen, and the compound is in the form of

a pharmaceutically acceptable salt (namely, the tartrate salt). Thus, practicing this claim is

necessary to making the subject matter claimed in the '721 patent, as it recites pimavanserin

tartrate in granules.

65.    Claim 1 of the '740 patent recites the following:

A composition comprising a compound of Formula (I):



or a pharmaceutically acceptable salt thereof, and a
pharmaceutically acceptable carrier.

Claim 11 of the same patent recites the tartrate salt of the compound of claim (I). From my

review of the '721 patent,[80] this compound is pimavanserin, and the tartrate salt of pimavanserin

would be pimavanserin tartrate. Thus, this patent claims subject matter required to practice

claims 1 and 4 of the '721 patent, as both recite pimavanserin tartrate in combination with a

capsule shell (which is a pharmaceutically acceptable carrier), as well as excipients.

---

[80] *See* '721 patent at 5:5–6:6 and Formula (I).

CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION–
COUNSELS' EYES ONLY

66.     Claim 1 of the '285 patent recites the following:

> 1. A method of treating Parkinson's Disease psychosis in a patient, comprising
>
> administrating to a patient having Parkinson's Disease a therapeutically effective amount of N-(1-methylpiperidin-4-yl)-N-(4-flourophenylmethyl)-N′-(4-(2-methylpropyloxy)phenylmethyl)carbamide or a pharmaceutically acceptable salt thereof.

Claim 8 of the same patent recites the method of claim 1 wherein the tartrate salt is administered. Based upon my review of the '721 patent, the compound "N-(1-methylpiperidin-4-yl)-N-(4-flourophenylmethyl)-N′-(4-(2-methylpropyloxy)phenylmethyl)carbamide" is pimavanserin,[81] and the tartrate salt of N-(1-methylpiperidin-4-yl)-N-(4-flourophenylmethyl)-N′-(4-(2-methylpropyloxy)phenylmethyl)carbamide would be pimavanserin tartrate. Thus, this claim recites a method of treating Parkinson's Disease psychosis by administrating to a patient having Parkinson's disease a therapeutically effective amount of pimavanserin tartrate. It thus covers a method of using pimavanserin tartrate.

## 2.     Nuplazid lacks a nexus to claims 4, 5, and 11–13 of the '721 patents.

67.     In paragraph 193, Dr. Little states that "[i]n my opinion, Nuplazid 34 mg Capsules is an embodiment of the Asserted Claims and has a nexus to the Asserted Claims based on my review of the Asserted Claims, the NDA for the Nuplazid 34 mg Capsules, and test results reflecting the bulk density and particle size distribution of Nuplazid 34 mg Capsules." Dr. Little has failed to provide, however, an explicit opinion disclosing why he considers Nuplazid 34 mg capsules to be "an embodiment of the Asserted Claims" on a claim-by-claim basis. He thus fails to demonstrate Nuplazid 34 mg capsules have nexus to these claims. I have, however, reviewed

---

[81] *See id*. at 5:5–6:1.

**CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION– COUNSELS' EYES ONLY**

the materials he cites as supporting existence of a nexus to the claims, and in some instances, they affirmatively demonstrate Nuplazid 34 mg capsules are *not* embodiments of the Asserted Claims.

> **a.    Nuplazid is not an embodiment of claims 4, 5 and 13 because it lacks "one or more pharmaceutically acceptable excipients" as an intragranular component.**

68.    It is my opinion that Nuplazid 34 mg capsules lacks nexus to claim 4, and thus claims 5 and 13 that depend therefrom, because Nuplazid 34 mg capsules lack an excipient as an intragranular component.

69.    Claim 4 of the '721 patent recites the following:

> A pharmaceutically acceptable capsule for orally delivering 34 mg of pimavanserin to a patient, wherein the capsule has a capsule shell with a capsule shell size 3 or 4, that encapsulates a blended pimavanserin composition comprising:
>
> granules comprising 40 mg pimavanserin tartrate and one or more pharmaceutically acceptable excipients;
>
> and wherein the bulk density of the granules is >0.4 g/ml as determined by USP<616>, method 1.

Claims 5 and 13 depend from claim 4 and thus incorporate each and every one of its limitations.

70.    To understand my opinion as to why Nuplazid 34 mg capsules is not an embodiment of these claims, it would help to have a brief discussion of the claim language, as well as what a POSA would understand as to the difference between "intragranular" versus "extragranular" excipients. When making a drug product via granulation, a POSA will frequently distinguish between "intragranular" components—i.e., those substances that are agglomerated into granules and thus are contained within the granules—versus "extragranular components"— i.e., components that are not part of the granules themselves, but are mixed with the granules after the granules have been made. Commonly, excipients such as binders, diluents, and

38

**CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION–COUNSELS' EYES ONLY**

disintegrants may be included within the granules along with the API, while other excipients (e.g., diluents, disintegrants, some amount of binder, glidants, and lubricants) will be blended with the granulation as extragranular components.

71.     Thus, in reading claim 1, a POSA would understand that the granules comprising 40 mg pimavanserin tartrate and one or more pharmaceutically acceptable excipients must contain (1) the entirety of the 40 mg pimavanserin tartrate within the granules, and (2) at least some excipient *within* the granules, i.e., as an intragranular component.

72.     ████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

**CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION– COUNSELS' EYES ONLY**



**CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION– COUNSELS' EYES ONLY**

[REDACTED]

        **b.**      **Nuplazid 34 mg capsules are not an embodiment of claims 11– 13** [REDACTED]

74.      It is my opinion that Nuplazid 34 mg capsules lack nexus to claims 11–13,

[REDACTED]

75.      Claims 11 and 13 both recite that the composition includes a pharmaceutically acceptable excipient which is a binder; claim 12 also recites a binder[83] and recites that the binder is selected from the group consisting of cellulose, methyl cellulose, polyvinylpyrrolidone, and polyethylene glycol.

---

[83] Again, this opinion is offered to the extent this claim is definite.

CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION–
COUNSELS' EYES ONLY

76.     Binders are excipients that either facilitate compaction of a powder blend into

tablets or are used in wet granulation to assist in preparing granules.[84] ████████████

███████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████

77.     Thus, it is my opinion that Nuplazid 34 mg capsules are not embodiments of any

of claims 11–13. It is thus my further opinion that any "objective indicia of nonobviousness"

related to Nuplazid 34 mg capsules lacks a nexus to the nonobviousness of claims 11–13 of the

'721 patent.

### 3.     Unexpected Results

78.     In paragraph 195, Dr. Little opines that "[a] POSA also would have understood

that pimavanserin tartrate has certain properties such that it would be difficult to encapsulate 40

mg of pimavanserin tartrate within a size 3 or 4 capsule[,]" and cites to the specification of the

'721 patent. I disagree that the disclosure of the '721 patent would have played any part in the

expectations of a POSA, and note that it appears Dr. Little is engaging in a hindsight analysis to

use the teachings of the '721 patent to demonstrate it would "be difficult" to modify the prior art.

Rather, Ragnar-Tolf would have disclosed to a POSA it was possible to use wet granulation to

make granulations of pimavanserin tartrate of sufficient density that one could encapsulate 100

mg of granulation in a size 3 or 4 capsule, and that the prior art would have disclosed *nothing*

---

[84] *See* Op. Rep., ¶¶ 77, 88.

**CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION– COUNSELS' EYES ONLY**

that would lead a POSA to believe increasing drug concentration such that one could provide the full 40 mg of pimavanserin tartrate in a small enough quantity of granulation to fill a size 3 or 4 capsule would have been unexpectedly difficult.

79.    In paragraph 195, Dr. Little says "[a] POSA by August 2017 also would have been aware of the existence of Nuplazid Tablets, which existed as two 17 mg tablets that had to be taken together once daily. A POSA would therefore have found the development of a single size 3 or 4 capsule containing the full 40 mg pimavanserin tartrate to be an unexpected improvement over the Nuplazid Tablets formulation." I disagree that a POSA would have drawn any expectation from "the existence of Nuplazid Tablets" regarding the unfeasibility of making a single, consolidated dosage form, for pimavanserin tartrate, for substantially the same reasons disclosed above in footnote 17.

80.    Further, documentary evidence from prior to the development of the Nuplazid 34 mg capsules shows that ████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████ ██ █████████████████████████████████
█████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████ ██ ███████████████████████████████████████████████

---

85 ACADIA_1082398 at ACADIA_1082399.

86 *Id.* at ACADIA_1082400.

43

**CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION– COUNSELS' EYES ONLY**

███████████████████████████████████████████ ■ This, in turn, does not indicate any skepticism that the full 40 mg of pimavanserin tartrate could be loaded into a size 3 or 4 capsule, but instead a belief that application of ordinary skill and traditional solutions could lead to the desired result. This hardly indicates that densification of pimavanserin tartrate was an unexpected result, or that there was a doubt that pimavanserin tartrate could be granulated to a sufficient density to load it into a size 3 or 4 capsule.

81.     Thus, I disagree that Dr. Little's allegation of unexpected results demonstrates nonobviousness of the Asserted Claims, and it remains my opinion that, to the extent they are definite, the Asserted Claims are invalid as obvious over Nuplazid Tablets in view of Ragnar-Tolf, the prior art, and the knowledge and skills of a POSA.

**4.     Skepticism**

82.     In paragraph 196, Dr. Little says "a POSA would have understood that there was skepticism in the field as to whether a 34 mg amount of pimavanserin could be formulated to fit inside of a size 3 or size 4 capsule. For example, I understand that Rajesh Agarwal, the Vice President of Pharmaceutical Development at Acadia, ████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████ I disagree that such alleged skepticism is indicative of nonobviousness, and I have seen evidence that counters such alleged skepticism.

83.     First, documentary evidence from prior to the development of the Nuplazid 34 mg capsules shows ███████████████████████████████████████ ███████████████████████████████████████████████████████

---

[87] *Id.* at ACADIA_1082401.

**CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION–
COUNSELS' EYES ONLY**

████████████████████████████████ That evidence, in turn, does not indicate

any skepticism that the full 40 mg of pimavanserin tartrate could be loaded into a size 3 or 4

capsule, but instead a belief that application of ordinary skill and traditional solutions could lead

to the desired result. I thus disagree there is evidence of skepticism.

84.     Second, there is no indication that the individuals who Dr. Agarwal contends

expressed skepticism were aware of the disclosures of Ragnar-Tolf. ████████████████

████████████████████████████████████████

███████████████████████████ [88]

85.     Third, I note that Dr. Little refers to no documentary evidence of the alleged

skepticism, and does not identify who expressed such skepticism, or how it was expressed.

Based on Dr. Agarwal's testimony, ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████ But that, in turn, does not indicate skepticism as to the *feasibility* of

doing so, especially considering the disclosures of Ragnar-Tolf regarding pimavanserin tartrate

granulations.

86.     Fourth, given that Dr. Agarwal testified that ████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

---

[88] Agarwal Tr. at 29:5–17.

[89] Agarwal Tr. at 28:9–24.

**CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION–
COUNSELS' EYES ONLY**

███████████████████████████, rather than a true expression of skepticism of

the feasibility of making the claimed subject matter that would evince nonobviousness.[90]

87.    Fourth, the claim that there was skepticism in being able to load the full 40 mg of

pimavanserin tartrate into a size 3 or 4 capsule is hardly credible. A size 3 capsule has a filled

volume of 0.3 ml, and a size 4 capsule has a filled volume of 0.21 ml. One could fill a size 3

capsule with 40 mg of pure, ungranulated crystalline pimavanserin, as long as the pure API had a

tapped density above 0.1333 g/ml, and one could fill a size 4 capsule with 40 mg of pure,

ungranulated crystalline pimavanserin as long as the pure API had a tapped density above 0.19

g/ml. According to the '721 patent, the ungranulated pimavanserin tartrate API has a bulk

density of about 0.3 g/ml, and any POSA aware of this density would be aware it would fit into a

size 3 or 4 capsule.

88.    Thus, the alleged expression of skepticism, to me, does not evince

nonobviousness of the Asserted Claims.

## VI.    CLAIMS 1–7 AND 9–13 OF THE '721 PATENT ARE INVALID AS INDEFINITE

### A.    The Term "Pharmaceutically Acceptable Capsule" is Undefined and Indefinite.

89.    In paragraph 199, Dr. Little criticizes my opinions on the grounds that he does not

understand how my opinions on the lack of definiteness of the term "pharmaceutically

acceptable capsule" are consistent with my opinions on obviousness.[91] I disagree that the two are

inconsistent. In several places within my Opening Report, I made it clear my opinions on

---

[90] *See supra* ¶ 12.

[91] Little Rep., ¶ 199.

CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION–
COUNSELS' EYES ONLY

obviousness were contingent on the claim being definite.[92] Nevertheless, I note that if the Court determines that "pharmaceutically acceptable capsule" has the alleged "plain and ordinary meaning" that Dr. Little asserts, it remains my opinion that claims 1-7 and 9-13 would be invalid as obvious.

90.    In paragraphs 202-204, Dr. Little reiterates his opinion on the construction of the term "a pharmaceutically acceptable capsule" in claims 1 and 4, and that the term means a capsule "that would be generally suitable for use in a pharmaceutical composition as well known in the art, and not tailored to any specific API." I disagree, for substantially the same reasons set forth above in IV.B starting on page 5. However, I also further disagree with his opinion that a "pharmaceutically acceptable capsule" is one that is "not tailored to any specific API." The pharmaceutically acceptable capsule recited in claim 1 is "for delivering 34 mg pimavanserin tartrate to a patient," very clearly includes a capsule shell of a particular size (i.e., size 3 or 4) and contains granules comprising a specific dose of pimavanserin with bulk density of greater than 0.4 g/ml. Thus, that "pharmaceutically acceptable capsule" is clearly tailored to administration of pimavanserin.

91.    The crux of Dr. Little's opinion on indefiniteness here is that "a POSA would have known that those 'comparative experiments' were limited to embodiments for 'the pharmaceutical manufacturing processes for obtaining suitable strength capsules,' which the Asserted Claims clearly do not require."[93] I disagree: Dr. Little's opinions in this regard are inconsistent with the claim language and the disclosure of the specification.

---

[92] *See, e.g.*, Op. Rep., ¶¶ 127; 133, 165.

[93] Little Rep., ¶ 206; *see also* Little Rep., ¶ 205.

CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION–
COUNSELS' EYES ONLY

92.    First, Dr. Little's opinion is inconsistent with the claim language, which requires a
"size 3 or 4 capsule shell that contains a blended pimavanserin composition," which in turn
includes "granules comprising 40 mg pimavanserin tartrate . . . wherein the bulk density of the
granules is >0.4 g/ml as determined by USP<616>, method I."[94] In turn, that defines that the
products must have been made by a "pharmaceutical manufacturing process[] for obtaining
suitable strength capsules," namely a granulation that results in a product with adequate bulk
density. A POSA would know, and the specification makes it clear, that granules must be made
according to a specific pharmaceutical manufacturing process, i.e., *granulation*. A POSA would
know—both from his or her knowledge and experience, as well as from the patent specification
itself—that granules are the particles that result from granulation, which in turn is a *process*.[95] In
fact, the specification makes it clear that being able to fit 40 mg of pimavanserin tartrate in a size
3 or 4 capsule was a direct result of the "pharmaceutical manufacturing described herein"
resulting in "pimavanserin granulation" where "the bulk density and the Carr's Index (Carr's
Compressibility Index) have been substantially altered *which enables the filling* of the above
mentioned small capsule."[96] Thus, a POSA reading the claims would recognize that they *do*
reference a product produced, in part, by a granulation process.

93.    Moreover, the requirement of a higher bulk density as an attribute of the claimed

---

[94] *See* '721 patent, claims 1 and 4.

[95] *See, e.g.*, '721 patent specification at 4:43-58 ("The term 'granulation' as used herein and as
conventionally used in the pharmaceutical industry, refers to the act or process in which primary
powder particles are made to adhere to form larger, multiparticulate entities called granules.")

[96] *See, e.g., id.* at 10:4-11 ("pimavanserin granulation, as obtained by the pharmaceutical
manufacturing described herein versus the native API . . . the bulk density and the Carr's Index
(Carr's Compressibility Index) have been substantially altered *which enables the filling* of the
above mentioned small capsule.") (emphasis added).

**CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION– COUNSELS' EYES ONLY**

granulation method is driven by the need to manufacture the capsules using a relatively high speed manufacturing process. As Dr. Little acknowledges, a POSA would know he or she could fill capsules by hand.[97] In such an event, increasing the active ingredient's density is not required, as a POSA simply could have filled the capsules by hand using with pure, ungranulated pimavanserin tartrate.[98] However, the POSA would not have been able to accomplish this in a capsule-filling machine, which requires a minimum level of flowability; such flowability is imparted by the granulation process, which increases particle size, density, and flowability.

94.    Second, in light of that, Dr. Little's opinions are inconsistent with how a POSA would understand the specification. When Dr. Little quotes the specification in paragraph 204 of his report, he references column 13, lines 29-33 of the specification but truncates it.[99] The full quote is reproduced below:

> Some requirements of the pharmaceutical manufacturing for pimavanserin are commercial operational speed, as well as stringent regulatory requirements. For example, the encapsulation equipment used is capable of -100,000 capsules per hour, such as 40,000-90,000 capsules per hour, such as 60,000-86,000 capsules per hour, such as 60,000- 70,000 capsules per hour. The manufacturing must be reproducible and robust to be capable of this output while producing quality product.
>
> Prior to the surprising finding, i.e. the herein disclosed processes and compositions resulting in a robust and reliable filling of 5-34 mg pimavanserin in capsules of size 3 or 4, such as size 4 capsules, many experiments were done.[100]

Thus, this passage, when read in full, would inform a POSA that pharmaceutical manufacturing

---

[97] Little Rep., ¶ 130.

[98] *See supra*, ¶ 87.

[99] Little Rep., ¶ 204.

[100] '721 patent at 13:21–33.

CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION–
COUNSELS' EYES ONLY

of pimavanserin is a completely generic term that applies, without restriction, to the entire

purpose of the invention. Furthermore, a POSA would recognize that the "surprising finding"

refers to the disclosed "processes and compositions," and that the comparative experiments were

performed *prior* to arriving at the "robust and reliable filling" of pimavanserin into a size 3 or 4

capsule. Additionally,  a POSA would read the '721 patent's comparative experiments as various

distinct methods of granulation, such as fluid bed layering, Wurster layering,

extrusion/spheronization, and twin-screw melt-granulation. And the specification very clearly

distinguishes these processes as resulting in "unacceptable products,"[101] i.e., *unacceptable*

*granules.* This, in turn, would be reinforced by the properties that led to the products being

deemed unacceptable, including stability, dissolution, amount of impurities, and alteration in the

crystalline form, are properties determined by assessing the *granules* that result from the

manufacturing process.[102]

95.     In addition, I disagree with Dr. Little's opinion in paragraph 205 of his report,

where he states that "A POSA's understanding that the 'comparative experiments' would not

limit or apply to the term 'pharmaceutically acceptable capsule' is further bolstered by various

provisions of the '721 Patent specification." In particular, Dr. Little opines that "a POSA would

have recognized that only 'some particular embodiments' were envisioned as 'having suitable

[altered] properties for the herein disclosed [pharmaceutical] manufacturing process,' thus other

embodiments must not be limited to having those same 'suitably altered properties.' In fact, a

POSA would understand that the capsules of other not-so-limited embodiments could even be

---

[101] *Id*. at 13:33-34.

[102] *See* Op. Rep., ¶¶ 177, 178.

CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION–
COUNSELS' EYES ONLY

manually or hand-filled, and thus do not require the use of commercial capsule filling machines."[103] This, however, is somewhat circuitous, and not cognizant of the fact that the claims specifically recite granules loaded into capsules. In fact, what the specification would teach a POSA is that achieving the altered properties of increased bulk density (as recited in the claim) through granulating 34 mg pimavanserin (again, as required by the claim) is *essential* to fitting that dose into a size 3 or 4 capsule, period.  And the comparative examples, in turn, would teach a POSA that some granulation processes that achieve the requisite bulk density will still result in *unacceptable* granules. The idea that the "manufacturing processes" is a separate invention from the capsules thus does not comport with the specification or claims, because both require some manufacturing steps to arrive at the claimed product.

96.    Given that, a POSA would determine there is no other operative language within the claims that would distinguish those *unacceptable* granules from acceptable ones besides the "pharmaceutically acceptable capsule" language. And a POSA would particularly draw that conclusion because those comparative experiments were deemed to be "unacceptable" for various factors commonly used in the assessment of pharmaceutical products, including flow, stability, impurity levels, dissolution rates, moisture content, or crystallinity, which are also specifically referenced in the comparative examples.[104]

97.    Dr. Little, in paragraph 207, highlights just why a POSA would be left with no ability to determine, with any reasonable certainty, what numerical limits or even qualitative limits a POSA would be able to apply to "pharmaceutically acceptable" versus "unacceptable"

---

[103] Little Rep., ¶ 205.

[104] *See* Op. Rep., ¶ 179.

CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION–
COUNSELS' EYES ONLY

flow, stability, particle size distribution, impurity levels, dissolution rate, ease of drying in a fluid

bed dryer, etc. In particular, he opines that I "highlight the absurdity" of a POSA relying on the

provision in the specification that the "embodiments disclosed herein above meet all

specifications outlined relating to the marketing of Nuplazid®" given that those provisions

contradict other statements in the specification. But Dr. Little then opines instead that "a POSA

utilizing his or her experience in the field of art, and common sense" would have recognized this

provision "must reference the specific embodiments above it, and not the entire specification."

That misses the point: without some clearly delineated specification for what makes a dosage

form "pharmaceutically acceptable" versus "unacceptable," a POSA would not have any

reasonable certainty as to the scope of the term "pharmaceutically acceptable capsule." For the

foregoing reasons, it remains my opinion claims 1-7 and 9-13 are indefinite for failure to

reasonably inform a POSA of the scope of the term "pharmaceutically acceptable capsule."

### B. Claims 1–7 and 9–13 are Invalid for Claiming that Which the Patentee Did Not Regard as His or Her Invention

98.     After reading Dr. Little's opinion in paragraphs 208-216, it is unclear to me

whether he actually understood my opinions expressed in paragraphs 180-182 of my Opening

Report, and I mostly consider his opinions non-responsive. Nevertheless, I will address a few.

99.     First, in paragraph 210, Dr. Little points to Table 2 of the '721 patent as

disclosing "that a 'Composition of Pimavanserin granulation (34 mg)' includes 40.0 mg of

pimavanserin tartrate, 59.0 mg of microcrystalline cellulose, and 1.0 mg of magnesium stearate

for a total weight of 100.0 mg" and that a POSA would understand this as disclosing "POSA

would understand these disclosures to describe granules comprising 40 mg pimavanserin tartrate

and one or more pharmaceutically acceptable excipients." I disagree that a POSA would have

understood this disclosure to describe *granules* comprising 40 mg pimavanserin tartrate and one

**CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION– COUNSELS' EYES ONLY**

or more pharmaceutically acceptable excipients. Rather, a POSA would understand that the formulation of Table 2 referred to granules of pimavanserin tartrate alone blended with extragranular magnesium stearate and microcrystalline cellulose, not granules comprising pimavanserin tartrate, microcrystalline cellulose, and magnesium stearate.

100.    As discussed above in paragraphs 70-72, a POSA reading claims 1 and 4 would recognize that "granules comprising 40 mg pimavanserin tartrate and one or more pharmaceutically acceptable excipients" would require the "one or more pharmaceutically acceptable excipients" to be *intragranular components* of the granules along with the pimavanserin tartrate. Thus, a POSA reading Table 2 would look to the manufacturing process described in the example to determine the order in which the ingredients were added, and what constitutes an *intragranular* component in the formulation of table 2 as opposed to an extragranular component. A POSA, reading that description, would recognize the example as disclosing preparation of granules of pimavanserin tartrate (alone) first, such that pimavanserin tartrate was the only *intragranular* component. Further, a POSA would understand that those granules of pimavanserin tartrate alone are *then* blended with the diluent/lubricant (i.e., microcrystalline cellulose/magnesium stearate) as *extragranular* components. This is confirmed by reading the example, in which pimavanserin tartrate and water are the only ingredients present during the granulation step, followed by drying to remove water, wherein then "the dried granulation is discharged from the fluid bed dryer, screened through a screen (4-12 mesh), and packaged until diluent blending and encapsulation. [105] The step of blending the granulation with diluent and lubricant is then described as a subsequent step to granulation, such that a POSA

---

[105] *See* '721 patent at 20:15-39.

**CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION–COUNSELS' EYES ONLY**

would understand the magnesium stearate and microcrystalline cellulose were blended with the granules as *extragranular* components, resulting in a blend of microcrystalline cellulose, magnesium stearate, and pimavanserin tartrate granules.[106] This, in turn, is reinforced by descriptions of the capsule fill blend description elsewhere in the specification, which notes that the "pimavanserin granulation" described is really a "*final blend* as disclosed in the example herein below and in table 2,"[107] which would tell a POSA that the reference to "pimavanserin granulation" in table 2 was actually a reference to the final blend disclosed in the example. And, as discussed above, the "final blend" of the example is a mixture of pimavanserin granules, with microcrystalline cellulose and magnesium stearate as extragranular components.[108]

101.    In paragraph 211, Dr. Little states "[t]he original claims of the application leading to the '721 Patent would have further confirmed a POSA's reading of these disclosures, and consequently, a POSA's understanding of what 'the joint inventors regarded as their invention.'" He further states, "[t]he first four original claims broadly recite '[a] capsule comprising 5-34 mg pimavanserin, or a pharmaceutically acceptable salt thereof … wherein the capsule is of size 3 or 4 … wherein the capsule is a two-piece capsule,' and 'further comprising one or more pharmaceutically acceptable excipient(s) selected from the group consisting of a filler, a binder,

---

[106] *Id*. at 20:40-53.

[107] *Id.* at 10:19-25 (Table 1).

[108] I further note that a POSA would rarely, if ever, include a lubricant such as magnesium stearate within a granule. Doing so would effectively nullify the lubricating function of magnesium stearate by burying most of the magnesium stearate particles within the granules, rather than having them present outside of the granules to avoid the material sticking to manufacturing surfaces. Moreover, magnesium stearate is strongly hydrophobic and can affect the dissolution of the granules. This would be, independent of the description in the specification, a further reason a POSA would not recognize magnesium stearate as an intragranular component here.

CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION–
COUNSELS' EYES ONLY

and a lubricant.' (WO2019/046167 at Claims 1-4 (Mar. 7, 2019).)"[109] But Dr. Little's assertion is beside the point, as the original claims do not recite *granules*, and could read on dry powder blends of pimavanserin, or even crystalline pimavanserin tartrate by itself, that was hand-filled into capsules. Rather, as addressed above in paragraphs 91-94, the issued claims recite *granules*, granules must be made by granulation processes, and the comparative experiments define granulation processes that resulted in *unacceptable products*, i.e., unacceptable granules, and thus would be unacceptable for use in a "pharmaceutically acceptable capsule" that is to contain granules.

102.    In other words, my opinion is not that the claims encompass subject matter the inventors expressly disclaimed *simply* because the granules recited in the claims can encompass pimavanserin tartrate and one or more pharmaceutically acceptable excipients. My opinion is that, unless the "pharmaceutically acceptable capsule" language operates to somehow exclude the unacceptable granulations from the scope of claims 1 and 4 (and thus the remaining claims), then claims 1 and 4 read on the *unacceptable* granules as well as the acceptable granules of pimavanserin alone. And thus, while prior patent claims within the same patent family distinguished the recited pimavanserin granules from the comparative examples on the basis that they were granulations of pimavanserin *alone*, without excipients,[110] the '721 patent claims offer

---

[109] Little Rep., ¶ 211.

[110] *See, e.g.*, U.S. Patent No. 10,449,185 ("the '185 patent") at claim 1 (reciting "granulated pimavanserin tartrate"); U.S. Patent No. 10,646,480 ("the '480 patent") at claims 1, 5, 12, and 14 (reciting "granulated pimavanserin tartrate"); U.S. Patent No. 10,849,891 ("the '891 patent") at claims 1 and 8 (reciting "granulated pimavanserin tartrate"); *and Acadia Pharms. Inc. v. Aurobindo Pharma Ltd.*, No. 20-985-RGA, 2022 WL 1026983, at *2 (D. Del. Apr. 6, 2022) (construing the term "40 mg granulated pimavanserin tartrate" in these patents as "40 mg pimavanserin tartrate granulated alone").

**CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION–
COUNSELS' EYES ONLY**

no basis to distinguish the granules comprising pimavanserin recited in the claims from the comparative experiments. And Dr. Little provides no opinion to the contrary, except with respect to claim 3.

103.    With regard to claim 3, Dr. Little states "none of the products made by these comparative experiments were reported in the specification as having acceptable particle size distribution."[111] I disagree, and note that Dr. Little offers no basis for that statement. Rather, the '721 patent discloses that the extrusion/spheronization process initially resulted in particles having "unacceptable . . . particle size distribution," after which point the particles were milled to "achieve a uniform particle size, yet the amount of impurities and stability were found to be unacceptable."[112] That, in turn, would inform a POSA they had an acceptable particle size distribution, as the purpose of milling would be to achieve a desired particle size distribution.

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

104.    Thus, I maintain my opinion that claims 1-7 and 9-13 are invalid as claiming subject matter the applicants did not regard as their invention.

**C.    Claim 3 is Indefinite because a POSA Would Not Understand wWhat a D90 Particle Size Distribution of 60-450 μm" Means**

105.    In paragraph 220, Dr. Little disagrees with my opinion on indefiniteness of claim 3 on the grounds that a "POSA would have been able to determine the appropriate settings

---

[111] Little Rep., ¶ 213.

[112] '721 patent at 14:19-23.

[113] ACADIA_1192493 at ACADIA_1192510.

**CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION–
COUNSELS' EYES ONLY**

necessary to measure particle size distribution without the parameters to be set out in the '721

patent specification. For example, a POSA would have had the ability to adjust the feed rate and

adjust for the optimum air pressure settings without requiring these disclosures in the

specification." Similarly, in paragraph 221, he opines that "a POSA also would have known how

to adjust these settings to account for the 'internal binding strength' of granules." I disagree. The

problem with Dr. Little's opinions in both respects is that claim 1 of the '721 patent, to the extent

the "pharmaceutically acceptable capsule" limitation does not operate to limit the granulation

process selected, allows for *any* granulation method to be used to produce the granules recited in

the claims. That, in turn, generates some question of the definiteness of this claim because the

parameters for measuring particle size will affect the ultimate measurement of particle size, as

set forth in my Opening Report. And while a POSA may have some knowledge of how to adjust

these parameters in general to measure particle size, that does not mean the POSA has

knowledge of how to measure the particle size to determine if the D90 of the particle size

distribution is within the range recited in the patent claims without some guidance as to those

parameters.

> **D.**    **Claims 12 and 13 are Invalid as Indefinite**

106.    In paragraph 224, Dr. Little states "a POSA reading the language of claim 12

would have understood that claim 12 relates to claim 11, and not to claim 10 as Dr. Muzzio

contends." Similarly, in Paragraph 226, Dr. Little states "a POSA reading claim 13 would have

understood that the term 'pharmaceutically acceptable excipients' was a typographical error, and

that instead the inventor intended to refer to the 'one or more pharmaceutically acceptable

excipients' as provided in claim 4, the independent claim from which claim 13 depends." I

disagree. A POSA simply would not rewrite claims to correct claim dependencies or insert

**CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION–
COUNSELS' EYES ONLY**

missing language, but would instead presume the claims were correct unless it was clear they were an obvious error. Moreover, Dr. Little offers no basis as to why a POSA reading the language of claim 12 would understand the *claim dependency* to claim 10 to be a typographical error rather than, for instance, the term "binder" in claim 12; were a POSA inclined to rewrite claims in such fashion, a POSA reasonably could have revised "binder" to "filler/diluents" in order to make the language consistent with claim 10.

107.    Nevertheless, it is not my opinion that a POSA would rewrite claims. Rather, it is my understanding that, to the extent there are typographical errors in a claim, there exists a process for correcting them within the United States Patent and Trademark Office through seeking a certificate of correction. Both Dr. Little and I apparently understand the patentees have sought such a certificate of correction for claims 12 and 13 of the '721 patent, and I understand such certificate has yet to issue. In the absence of such a correcting certificate—which may or may not issue—it is my opinion claims 12 and 13, as drafted, are indefinite.

## VII.    CLAIMS 1–7 AND 9–13 OF THE '721 PATENT ARE INVALID FOR LACK OF WRITTEN DESCRIPTION

### A.    The Specification of the '721 Fails to Provide Adequate Written Description for Granules Comprising Pimavanserin and Intragranular Excipients to the Extent Claimed

108.    It remains my opinion that claims 1-7 and 9-13 of the '721 patent are invalid for failure to provide adequate written description, as the specification would fail to reasonably convey to a POSA that the inventors were in possession of the full scope of formulations comprising granules with one or more pharmaceutically acceptable excipients.

109.    At the outset, I think it seems worthwhile to cite a key point of disagreement that I have with Dr. Little's opinion, which is that it fails to distinguish between places in the specification where pimavanserin, generally, is described in the specification as being *combined*

58

CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION–
COUNSELS' EYES ONLY

with excipients, or *granules of pimavanserin alone* being combined with excipients, with

describing granules comprising pimavanserin *and* excipients. As discussed above in paragraphs

70-72, a POSA reading claims 1 and 4 would recognize that "granules comprising 40 mg

pimavanserin tartrate and one or more pharmaceutically acceptable excipients" would require the

"one or more pharmaceutically acceptable excipients" to be *intragranular components* of the

granules along with the pimavanserin tartrate. Thus, in looking to the specification for instances

describing the claimed invention, a POSA would seek out something in the specification that

would clearly identify that the inventors were in possession of the full scope of granules

comprising 40 mg pimavanserin tartrate and *any* excipient in *any* amount as an intragranular

component, regardless of the excipients' function.

110.    Dr. Little engages in this analysis in paragraph 231, where he states "[t]he

specification … discloses that 'it is possible to include a binder in the granulation but for various

reasons not necessarily preferred,'" ('721 Patent at 12:37-42), which a POSA would understand

to mean that the granules can optionally contain a binder, *i.e.*, a pharmaceutically acceptable

excipient." I disagree that the description of a binder as an intragranular component is a

description of "one or more pharmaceutically acceptable excipients." At best, it is a description

of a single excipient class—a binder—which can be included as an intragranular component. A

POSA, however, would understand this description does not extend to diluents, disintegrants, or

any other functional class of excipients a POSA may choose to include within a granulation.

Furthermore, a POSA would not read the description of a binder, as an intragranular component,

to extend to, e.g., a combination of a binder and diluent; or a combination of a binder, diluent,

and disintegrant; or a combination of binder, diluent, disintegrant, and glidant; each of which

would be embraced by the term "one or more pharmaceutically acceptable excipients." Dr. Little,

**CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION– COUNSELS' EYES ONLY**

as a matter of fact, appears to grant this when he notes that the binder is simply "a pharmaceutically acceptable excipient"[114] and not "one or more pharmaceutically acceptable excipients." Again, this distinction is important, because it indicates the patentees described—at most—an embodiment with one excipient as an intragranular component, but are now claiming embodiments having any combination of excipients as intragranular components.

111.    Second, in paragraph 232, Dr. Little points to disclosures in the specification that recite granules comprising "pimavanserin tartrate and less than 10% (w/w) Avicel PH101 and colloidal silicon dioxide" and granules comprising "pimavanserin tartrate and less than 10% (w/w) Avicel PH302 and colloidal silicon dioxide," and then opines that "a POSA would understand that the specification expressly describes granules that include (i) no pharmaceutically acceptable excipients, (ii) one pharmaceutically acceptable excipient, and (iii) more than one pharmaceutically acceptable excipients." I disagree that a POSA would read the description provided in the specification so broadly. In fact, a POSA would recognize the description in the specification to recite a very narrow range of potential intrangranular components, including specific brands and grades of microcrystalline cellulose (Avicel) at a low total concentration within the granules. A POSA, for instance, would not extend this description to granules having more than 20% excipients, or as high as 60% excipients, given the limitation that the granules described are expressly limited to having no more than 10% excipients—and, again, specific excipients such as Avicel and colloidal silicon dioxide—as intragranular components.

112.    Dr. Little then points, in paragraph 233, to Table 2 of the '721 patent as an

---

[114] Little Rep., ¶ 231.

**CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION–
COUNSELS' EYES ONLY**

example of a pimavanserin granulation of weight of 100 mg, and containing microcrystalline cellulose and magnesium stearate. I disagree that a POSA would read the specification in this way, for substantially the reasons discussed above in paragraphs 99-100. Rather, a POSA would look at the manufacturing process described in the example as preparing granulation of pimavanserin tartrate first, by itself, such that pimavanserin tartrate was the only *intragranular* component, then blending that granulation with the diluent/lubricant (i.e., microcrystalline cellulose/magnesium stearate) as *extragranular* components.

113.    I also disagree that the claims of the priority application Dr. Little cites provide any written description support for "one or more pharmaceutically acceptable excipients" within the granules along with pimavanserin. In paragraphs 235-236, Dr. Little points to the original claims filed with the priority document as providing written description support for the claims; however, none of the claims or specification sections that he references even *mention* granules, much less granules comprising pimavanserin tartrate and one or more pharmaceutically acceptable excipients.[115] I thus fail to see how they can provide support for "one or more pharmaceutically acceptable excipients" as an intragranular component, as recited in the claims of the '721 patent.

114.    I also disagree that any of the specification portions that Dr. Little points to in paragraph 237-238 provide written description support for the claims as written, for reasons I have stated previously. For instance, I disagree that the portions of the specification he identifies as including a binder within the granulation[116] provide written description support for

---

[115] *See* Little Rep., ¶¶ 235-236 (citing WO2019/046167 at claims 1-4, 22, 27, 58-63 and 70).

[116] *See, e.g.*, Little Rep., ¶¶ 237-238 (citing '721 patent at, e.g., 3:63-4:12, 66, 4:8-10, 4:44-46, 4:47-49, 4:53-55, 12:40-42, and 16:6-10).

**CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION–
COUNSELS' EYES ONLY**

substantially the same reason discussed above in paragraph 111, or simply because the portions of the specification he identifies are describing things generally known in the art that are not specific to pimavanserin.[117]

115.     In paragraph 240, Dr. Little states that "a POSA, in reading the '721 Patent specification, would have considered the entirety of the disclosures contained therein, including the Ragnar-Tolf reference, because it is part of the patent specification." But Dr. Little then undermines his own opinion when he states that "the Ragnar-Tolf reference does not teach or otherwise provide any motivation to develop reduced-size capsule formulations of pimavanserin," and thus cannot provide a written description of the claim. While I do agree "that a POSA would have considered the wet granulation formulations identified through Example 9, and that it would be possible to include up to 20 mg of pimavanserin tartrate in such formulations[,]"[118] my understanding from counsel is that a description of the invention that simply renders the invention obvious is not enough to meet the written description requirement; rather, there must be an actual description of the claimed invention in the specification. And even Dr. Little grants that "none of the formulations of pimavanserin disclosed in Ragnar-Tolf contain the full amount of 40 mg pimavanserin tartrate[.]"[119] Thus, I fail to see how Ragnar-Tolf provides a description of the invention showing the inventors were in possession of the claimed subject matter.

116.     Thus, it remains my opinion that claims 1-7 and 9-13 of the '721 patent are

---

[117] *See, e.g.*, '721 patent at, e.g., 3:63-4:12, 66, 4:8-10, 4:44-46, 4:47-49, 4:53-55.

[118] Little Rep., ¶ 240.

[119] *Id.*, ¶ 133.

CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION–
COUNSELS' EYES ONLY

invalid for lack of written description.

**B.      The '721 Patent Specification Fails to Provide Adequate Written Description for Granules Comprising Pimavanserin Tartrate with Bulk Densities of Greater Than 0.508 g/mL**

117.      It remains my opinion that the specification fails to describe that the inventors were in possession of granules comprising pimavanserin tartrate and one or more pharmaceutically acceptable excipients with bulk densities of >0.4 g/ml, and thus that claims 1-7 and 9-13 are invalid for lack of written description.

118.      First and foremost, the major point of disagreement between Dr. Little's analysis and mine is that he believes that "the scope of the claims in regard to the bulk density limitation" would not have to reach bulk densities of 0.7 g/ml, 0.8g/ml, 0.9 g/ml, 1.0 g/ml, or higher and that "there would be no need for a disclosure in the specification to support written description of such bulk densities (because they are not within the scope of the claims[)]."[120] Indeed, in several places, Dr. Little appears to place an upper bound on the bulk densities encompassed within the claims of 0.6 g/ml,[121] on the grounds that the specification "would suggest to a POSA that a bulk density of >0.40 g/ml would refer to a lower bound necessary for fitting 34 mg pimavanserin into

---

[120] Little Rep., ¶ 251.

[121] *See, e.g.*, *id.* at n. 33 ("these disclosures would not have suggested to a POSA that bulk densities of greater than 0.6 g/ml, for example, are within the scope of the claims."); *id.*, ¶ 249 ("the '721 Patent provides sufficient written description support as to the meaning of the bulk density limitation of >0.4 g/ml as recited in the claims, and would not extend to the values of 0.7 g/ml, 0.8 g/ml, and 1.0 g/ml (or even higher) as Dr. Muzzio contends."); *id.*, ¶ 251 ("it is my opinion that in view of this disclosure, that a POSA would understand the bulk density range to be between 0.4 g/ml and about 0.6 g/ml"); *id.*, ¶ 252 ("As previously explained, Dr. Muzzio's understanding of the scope of the claims is incorrect. A POSA would not have understood the limitation of >0.4 g/ml to extend to . . . 'granules having bulk densities of 0.7 g/ml, 0.8 g/ml, or higher.'"); *id.*, ¶ 259 ("[A] POSA reading the '721 Patent claims in view of the specification would not understand bulk densities of "0.7, 0.8, 0.9, 1.0 g/ml, or higher" for pimavanserin granulations to be within the scope of the claims.")

**CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION–
COUNSELS' EYES ONLY**

the claimed capsule sizes, and that once this is met, there would be no need to reach the higher

bulk densities of 0.7 g/ml or higher that Dr. Muzzio points to."[122] I disagree that either the claim

language, the specification, or the knowledge of a POSA would point to an upper limit of 0.6

g/ml for the bulk density of the granules recited in the claim, or that the claim language excludes

bulk densities of 0.7 g/ml or higher, for three reasons: 1) such a reading is inconsistent with the

plain language of the claims; 2) such a reading is inconsistent with the claims when read in light

of the specification, and 3) such a reading is inconsistent with the knowledge of a POSA.

119.    First, the claim language indicates that the bulk density of the granules

comprising 40 mg pimavanserin tartrate must be *greater than* 0.4 g/ml, but specifies no upper

bound. This is the only reading that is consistent with the claim language in claims 1 and 4,

which specifies that "the bulk density of the granules is >0.4 g/ml as determined by USP<616>,

method I." That term, ">0.4 g/ml," clearly references a *lower* bound for the bulk density of the

granules, and the claim specifies no upper bound.

120.    Second, reading the specification in concert with the claims indicates there is no

upper bound to the bulk density of the granules as recited in the claims. For instance, the

specification states that "the bulk density of pimavanserin granulation is >0.4 g/ml, **such as** 0.4-

0.6 g/ml, such as about 0.5 g/ml determined according to USP<616>, method 1."[123] That, in turn,

would indicate to a POSA that the upper-bounded range of 0.4-0.6 g/ml is one embodiment of

the unbounded range of ">0.4 g/ml." A POSA would not limit the range of ">0.4 g/ml" to "0.4-

0.6 g/ml" based on this disclosure, because a POSA would recognize that doing so would be

---

[122] *Id.*, ¶ 250.

[123] '721 patent at 22:9-11.

CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION–
COUNSELS' EYES ONLY

conflating two distinct but overlapping ranges. Moreover, a POSA would recognize that the

specification discloses a range of capsule fill bulk densities in Fig. 1 of the '721 patent, which

identifies bulk densities of 0.7 g/ml as "typical" and 1.0 g/ml as "heavy." And while Dr. Little

grants that Fig. 1 of the '721 patent is a "capsule sizing chart[] that generally provide[s] the

amount of powder that a person developing capsule formulations ***could possibly*** load into

capsules[,]"[124] Dr. Little fails to account for the fact that it would also indicate a POSA's

expectations about the range of bulk densities that could reasonably be included in ">0.4 g/ml."

In fact, his report fails to address Figure 1 of the '721 patent with regard to written description at

all.

121.    Third, Dr. Little's reading of an upper bound for bulk density into the claim is

contrary to the knowledge of a POSA. A POSA, being an experienced pharmaceutical

formulator, would recognize that a range of bulk densities are possible from granulation, and that

typical bulk densities of granulations can be in the range of 0.6-0.8 g/ml.[125] Indeed, and as

addressed above in paragraph 83, documentary evidence from one of the named inventors

indicated an expectation of being able to use "traditional oral solids" technology such as high

shear granulation to produce granules of pimavanserin with densities of 0.6-0.8 g/ml. A POSA

simply would not ascribe an upper limit of what he or she knew to be *possible* in terms of a range

of bulk densities simply because there would be "no need to reach the higher bulk densities" as

Dr. Little opines.[126] Rather, a POSA looking at the specification of the '721 patent would

---

[124] Little Rep., ¶ 255.

[125] *See, e.g.*, '721 patent at Fig. 1.

[126] *Id.*, ¶ 250. I note, however, that there may be a number of reasons for a POSA to desire a bulk
density of pimavanserin tartrate granules greater than 0.6 g/ml, including (1) reducing the weight

CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION–
COUNSELS' EYES ONLY

recognize the claim had no upper limit in terms of bulk density.

122.    Dr. Little offers no opinion or citation pointing to how the '721 patent specification would disclose, describe, or otherwise indicate to a POSA that the inventors were in possession of bulk densities of greater than 0.6 g/ml, including values such as 0.7, 0.8, 0.9, or 1.0 g/ml, or higher. Rather, in order to find the claims adequately described, he redrafts the claims to provide them with an upper bound. I disagree that a POSA would redraft the claims in that way, and thus maintain my opinion that claims 1-7 and 9-13 are invalid for a lack of written description.

## VIII.    CLAIMS 1–7 AND 9–13 ARE INVALID FOR A LACK OF ENABLEMENT

123.    I maintain my opinion that claims 1-7 and 9-13 of the '721 patent are invalid for a lack of enablement.

124.    Once again, the major point of disagreement between Dr. Little's analysis and mine is that he believes that "[a] POSA would not have understood the limitation of >0.4 g/ml to extend to bulk densities as high as those proposed by Dr. Muzzio, e.g., 'granules having bulk densities of 0.7 g/ml, 0.8 g/ml, or higher."[127] I disagree with this for the reasons stated in

---

of the granules relative to the extragranular excipients to provide a more dilute blend, or (2) to blend the granules with a denser excipient (e.g., certain grades of lactose) while avoiding blend segregation. Nevertheless, regardless of what a POSA would have desired in this respect, it still remains the case that a POSA would not recognize the higher bulk densities as either described in the specification or excluded from the scope of the claims.

[127] *Id.*, ¶ 252. *See also id.*, ¶ 254 ("I disagree that a POSA reading the '721 Patent specification would understand from its disclosures that >0.4 g/mL would encompass bulk densities of 0.7 or greater for pimavanserin granulations."); *Id.*, ¶ 259 ("a POSA reading the '721 Patent claims in view of the specification would not understand bulk densities of '0.7, 0.8, 0.9, 1.0 g/ml, or higher' for pimavanserin granulations to be within the scope of the claims."); *Id.*, ¶ 264. ("it is my opinion that the scope of the claims would not extend to these higher bulk density values of 0.7, 0.8, 0.9, or 1.0 g/ml. Accordingly, a POSA would not need to know how to formulate such granulations because they would fall outside the scope of the claimed invention.").

CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION–
COUNSELS' EYES ONLY

paragraphs 118-122 above, and note that he fails to offer any reasons or analysis as to how the

specification would enable a POSA to achieve granules of pimavanserin and one or more

pharmaceutically acceptable excipients with a bulk density of greater than 0.6 g/ml, e.g. 0.7 g/ml,

without undue experimentation in light of the specification. That, in turn, makes it clear the

specification does not enable the claims as written.

125.    In paragraph 256, Dr. Little points to a number of examples as providing

enablement;[128] however, he offers no explanation of how a POSA would understand these as an

enabling disclosure of granules comprising 40 mg pimavanserin tartrate and one or more

pharmaceutically acceptable excipients having bulk densities across the full range of the claim

scope. In fact, he fails to mention any disclosure that would enable a POSA to modify the

manufacturing processes for these granulations that would result in bulk densities of 0.7 g/ml or

greater.[129] Similarly, in paragraph 260, Dr. Little opines that the '721 patent contains a working

example, without providing any demonstration of how this working example would enable a

POSA to make granules comprising pimavanserin tartrate and excipients having a bulk density

of greater than 0.6 g/ml. These thus do not provide an enabling disclosure of the full scope of the

claims.

126.    In paragraph 265, Dr. Little states "I understand that Defendants did not have to

---

[128] *Id.*, ¶ 265.

[129] I also note, as discussed above in paragraphs 109, that Dr. Little is again failing to distinguish between disclosures regarding blends of granules and *extragranular components* with disclosure of granules having excipients as *intragranular components*. For instance, as I discussed in paragraphs 112, the portion of the specification he describes at 20:10-22:3 refers to a blend of pimavanserin tartrate, granulated alone, that is then blended with extragranular magnesium stearate and microcrystalline cellulose; it is not granules comprising pimavanserin tartrate, microcrystalline cellulose, and magnesium stearate as intragranular components.

CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION–
COUNSELS' EYES ONLY

engage in undue experimentation in practicing the claimed invention to achieve a formulation

having a bulk density according to the claimed limitation, i.e. a bulk density of greater than 0.4

g/ml. (See, e.g., AURO_PIMAV00002806 at 00002838-841, 00002846-847, 00002851-857; see,

e.g., MSN_PIMA-014934 at 014953, 014970, 014971.) I further understand from counsel that

the fact Aurobindo and MSN did not have to engage in any significant trial-and-error supports a

finding that undue experimentation was not required to practice the claimed inventions." I

disagree that this is the least bit relevant to the enablement analysis. First, Dr. Little fails to show

how Aurobindo and MSN's later-developed formulations are the least bit relevant to what a

POSA would have been able to achieve through application of ordinary skill at the time of filing.

Second, Dr. Little fails to show that either MSN or Aurobindo's products contain granules of

pimavanserin tartrate that have a bulk density of greater than 0.6 g/ml, such that it would

meaningfully address my opinions on enablement. I thus fail to see how this is relevant to the

enablement issues I have outlined in my Opening Report.

127.    Accordingly, it remains my opinion that claims 1-7 and 9-13 are invalid for a lack

of enablement.

## IX.    SUPPLEMENTATION

128.    I may also testify in rebuttal to testimony or opinions offered by other witnesses. I

reserve the right to supplement or amend the instant report in light of additional information or

documents, or in response to any critique of my report or alternative opinions advanced by or on

behalf of Plaintiffs. At trial, I may also use a tutorial, graphics, and/or other demonstrative

exhibits to help explain my opinions and/or testimony.

**CONTAINS ALL PARTIES' HIGHLY CONFIDENTIAL INFORMATION–
COUNSELS' EYES ONLY**

Executed on June 27, 2024.

_____
Dr. Fernando J. Muzzio

# EXHIBIT 3

8/22/2024                 Acadia Pharmaceuticals, Inc. v. Aurobindo Pharma Limited, et al. Fernando J. Muzzio, Ph.D.
Confidential

**Page 1**

```
              THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF DELAWARE
-------------------------------X
ACADIA PHARMACEUTICALS, INC.,   :
              Plaintiff,        :
v                               : Case No.
                                : 1:22-cv-01387-GBW
AUROBINDO PHARMA LIMITED and    : (Consolidated lead case)
AUROBINDO PHARMA USA, INC.,     :
              Defendants.       :
-------------------------------X
ACADIA PHARMACEUTICALS INC.,    :
      Plaintiff,                :
v.                              :
MSN LABORATORIES PRIVATE LTD.   :
and MSN PHARMACEUTICALS, INC.,  :
      Defendants.               :
-------------------------------X

              *** CONFIDENTIAL ***
      Deposition of FERNANDO J. MUZZIO, PH.D.
              Washington, D.C.
          Thursday, August 22, 2024
                 9:33 a.m.
     Reported by: Matthew Goldstein, RMR, CRR
_____

              DIGITAL EVIDENCE GROUP
            1730 M Street, NW, Suite 812
                Washington, D.C. 20036
                 (202) 232-0646
```

**Page 2**

```
1      Deposition of FERNANDO J. MUZZIO, PH.D., held
2  at:
3
4
5              ArentFox Schiff LLP
6             1717 K Street, NW
7            Washington, D.C. 20006
8               202.857.6000
9
10
11
12
13
14
15
16      Pursuant to Notice, before Matthew Goldstein,
17  RMR, CRR, Notary Public in and for the District of
18  Columbia.
19
20
21
22
23
24
25
```

**Page 3**

```
1        A P P E A R A N C E S
2  ON BEHALF OF THE PLAINTIFF, ACADIA
3  PHARMACEUTICALS, INC.:
4     SCOTT F. PEACHMAN, ESQUIRE
5     PETER E. CONWAY, ESQUIRE
6     PAUL HASTINGS LLP
7     200 Park Avenue
8     New York, New York 10166
9     212.318.6962
10
11  ON BEHALF OF THE DEFENDANT, MSN LABORATORIES:
12     BRADFORD C. FRESE, ESQUIRE
13     MICHAEL J. BALDWIN, ESQUIRE
14     ARENT FOX, PLLC
15     1717 K Street
16     Washington, D.C. 20006
17     202.857.6000
18
19
20
21
22
23
24
25
```

**Page 4**

```
1   A P P E A R A N C E S  C O N T I N U E D
2     ON BEHALF OF THE DEFENDANT, AUROBINDO PHARMA:
3     MICHAEL P. HOGAN, ESQUIRE (REMOTE)
4     KRATZ & BARRY LLP
5     325 Chestnut Street
6     Suite 876
7     Philadelphia, Pennsylvania 19106
8     404.341.6600
9
10    ALSO PRESENT:
11    DESHAWN WHITE - VIDEOGRAPHER
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1 (Pages 1 to 4)

5

```
 1          C O N T E N T S
 2  EXAMINATION OF FERNANDO J. MUZZIO, PH.D.      PAGE
 3  By MR. PEACHMAN                    8
 4          E X H I B I T S
 5  MUZZIO        DEPOSITION EXHIBIT      PAGE
 6  Exhibit 1   Curriculum Vitae of Fernando J.   12
 7              Muzzio, Ph.D.
 8  Exhibit 2   Materials Reviewed and        14
 9              Considered By Fernando Muzzio
10  Exhibit 3   Exhibit B Materials Reviewed     16
11              and Considered
12  Exhibit 4   U.S. Patent No. 11,452,721 B2    17
13  Exhibit 5   Opening Expert Report of Dr.     38
14              Fernando J. Muzzio Regarding
15              U.S. Patent No. 11,452,721
16  Exhibit 6   Reply Expert Report of Dr.       40
17              Fernando J. Muzzio Regarding
18              U.S. Patent No. 11,452,721
19  Exhibit 7   United States Patent No.         43
20              10,004,682 B2
21  Exhibit 8   Memorandum Opinion               47
22  Exhibit 9   United States Patent             207
23              Application Publication No, US
24              2007/0264330 A1
25
```

6

```
 1          THE VIDEOGRAPHER:  This is video No. 1
 2  of the video-recorded deposition of Dr. Fernando
 3  Muzzio, in the matter of Acadia Pharmaceuticals,
 4  Inc., versus Aurobindo Pharma limited, et al., in
 5  the United States District Court for the District
 6  of Delaware, Case No. 1:22-cv-01387.
 7          This deposition is being held by -- oh,
 8  sorry, this deposition is being held at
 9  1717 K Street Northwest, Washington, D.C., on
10  August 22nd, 2024.
11          The time on the video screen is
12  9:33 a.m.
13          My name DeShawn White.  I am the legal
14  videographer from Digital Evidence Group.  The
15  court reporter is Matthew Goldstein, in
16  association with Digital Evidence Group.
17          Will counsel please introduce themselves
18  for the record, followed by the court reporter
19  administering the oath.
20          MR. PEACHMAN:  Scott Peachman of Paul
21  Hastings for plaintiff, Acadia Pharmaceuticals.
22  With me is my colleague, Peter Conway, also of
23  Paul Hastings for Acadia.
24          MR. FRESE:  Bradford Frese of the firm
25  ArentFox Schiff for the MSN defendants.  And with
```

7

```
 1  me is my colleague, Michael Baldwin, also of the
 2  ArentFox Schiff firm.
 3          MR. HOGAN:  This is Michael Hogan, Kratz
 4  & Barry, LLP, on behalf of the Aurobindo
 5  defendants.
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

8

```
 1          P R O C E E D I N G S
 2  Whereupon,
 3          FERNANDO J. MUZZIO, PH.D.,
 4  being first duly sworn or affirmed to testify to
 5  the truth, the whole truth, and nothing but the
 6  truth, was examined and testified as follows:
 7      EXAMINATION BY COUNSEL FOR THE PLAINTIFF
 8  BY MR. PEACHMAN:
 9      Q.  Thank you.  Good morning, Dr. Muzzio.
10      A.  Good morning.
11      Q.  My name is Scott Peachman.  I'm an
12  attorney representing Acadia in this matter.
13          Could you please state your name and
14  address for the record, please?
15      A.  My name is Fernando Javier Muzzio.  My
16  address is 9 Bay Avenue in Long Branch,
17  New Jersey.
18      Q.  That's a home address?
19      A.  That's a home address.
20      Q.  Okay.  And, Dr. Muzzio, you've been
21  deposed before?
22      A.  I have.
23      Q.  Okay.  So you should be familiar with
24  the process today, but in any event, I'm going to
25  go over some basic ground rules real quickly.
```

2 (Pages 5 to 8)

8/22/2024          Acadia Pharmaceuticals, Inc. v. Aurobindo Pharma Limited, et al. Fernando J. Muzzio, Ph.D.
                                        Confidential

9

1    The court reporter is going to be taking
2  down everything that we're saying.  For the sake
3  of the court reporter, we should do our best not
4  to talk over each other.  Okay?  I'll try not to
5  talk over you.  I ask that you do the same for me,
6  and so that way both my question and your answer
7  can be clearly heard for the court reporter.
8    Because the court reporter is taking
9  down what we say, it's important that you answer
10  my questions verbally, no "uh-huhs" or "okays,"
11  verbal answers to questions.
12    If you don't understand my question
13  today, please let me know, and I'll try to
14  rephrase it.  You're obligated to answer my
15  questions, even if your counsel lodges an
16  objection, unless your counsel instructs you not
17  to answer the question.
18    If you need to take a break, please let
19  me know.  But I just ask that if there's a
20  question that's pending at the time, that you
21  answer the question before any break.
22    Do you understand that the testimony
23  you're providing today is being given under oath?
24    A.  Yes, I do.
25    Q.  Okay.  And do you understand that being

10

1  under oath means you must provide complete,
2  truthful, and accurate testimony?
3    A.  I do.
4    Q.  Is there anything affecting your ability
5  to testify truthfully today, Dr. Muzzio?
6    A.  Not that I am aware of.
7    Q.  Okay.  Dr. Muzzio, do you understand why
8  you're here today?
9    A.  I believe I do.
10    Q.  Okay.  And why do you believe you're
11  here today?
12    A.  To provide answers to your questions.
13    Q.  Okay.  And you understand you're at a
14  deposition here, and you've offered opinions in
15  this case on behalf of MSN defendants?
16    A.  Yes, I do.
17    Q.  And you've submitted an expert report,
18  et cetera.  Okay.
19    And without disclosing the substance of
20  your communications with counsel, what did you do
21  to prepare for today's deposition?
22    A.  I read through my reports, Dr. Little's
23  reports, for today's deposition as opposed to
24  tomorrow's deposition.  I reviewed, again, a
25  number of references that I cited and some that

11

1  Dr. Little cited.  And then I met with counsel.
2    Q.  Okay.  How many times did you meet with
3  counsel?
4    A.  Twice.  Yesterday and the day before.
5    Q.  Okay.  Those were full days?
6    A.  No, the second day was not a full day.
7    Q.  Okay.  So a day and a half?
8    A.  Something like that, yes.
9    Q.  Okay.  And who was present at those
10  meetings?
11    A.  The two gentlemen sitting to my left.
12    Q.  Okay.  The two attorneys who made
13  appearances on the record today.  Okay.
14    Did you review any documents?  I think
15  you said that you reviewed reports.  Did you
16  review all the documents cited therein?
17    A.  At some point I did.  I also reviewed
18  some of the documents that were submitted by
19  either party as part of their regulatory
20  submissions.
21    Q.  Okay.  And when you say the documents
22  that were submitted as part of the regulatory
23  submissions, were those documents cited in the
24  expert reports?
25    A.  Yes.

12

1    Q.  Okay.  And did you review any documents
2  in preparation of your deposition that are not
3  identified in your expert report?
4    A.  I don't believe so.
5    Q.  Okay.  Did you speak to anyone besides
6  your counsel that's present here today to prepare
7  for your deposition?
8    A.  No.
9    Q.  Okay.  Besides meeting with counsel,
10  reviewing reports, and the cited documents, did
11  you do anything else to prepare for your
12  deposition today?
13    A.  Yeah, I tried to get a good night of
14  sleep.
15    Q.  Fair enough.
16    We're going to mark a document for you,
17  Dr. Muzzio.
18    MR. PEACHMAN:  This is going to be
19  Exhibit 1.
20    (Muzzio Deposition Exhibit 1 was marked
21  for identification and attached to the
22  transcript.)
23  BY MR. PEACHMAN:
24    Q.  All right.  Dr. Muzzio, the court
25  reporter has handed you what's been marked as

3  (Pages 9 to 12)

13

1  Exhibit 1.
2        Dr. Muzzio, is this a copy of your
3  curriculum vitae?
4        A.  It is.
5        Q.  Okay.  And did you draft this curriculum
6  vitae yourself?
7        A.  Yes.
8        Q.  Okay.  And according to Exhibit 1, look
9  at the first full page of the document, you're
10  currently a distinguished professor at Rutgers
11  University; correct?
12        A.  Correct.
13        Q.  All right.  You're also currently the
14  chief scientific officer at Acumen Biopharma; is
15  that right?
16        A.  Yes.
17        Q.  Okay.  And you're also the president of
18  Integra Continuous Manufacturing Systems; is that
19  right?
20        A.  Yes.
21        Q.  Okay.  And according to Exhibit 1,
22  you're a named inventor on multiple patents;
23  right?
24        A.  Yes.
25        Q.  And --

14

1        A.  And I have to say that I'm not
2  100 percent sure, but there might have been
3  another patent not listed here that may be issued
4  more recently.
5        Q.  Yeah, that's one of my questions.
6        Are there any patent applications or
7  patents that you are a named inventor on that are
8  not in this curriculum vitae?
9        A.  Let's go to the section.  I should have
10  numbered the pages here, but -- so I've been quite
11  busy on patent applications in the last couple of
12  years, and I don't believe every patent
13  application is listed.
14        Q.  Okay.  Is there a reason that you
15  haven't listed all of those applications?
16        A.  I usually don't list applications.
17  Because until the patent issue...
18        Q.  Okay.  Dr. Muzzio, you can put that to
19  the side for now.  We'll come back to that later.
20  I'd like to mark another document.
21        MR. PEACHMAN:  We're going to mark this
22  as Exhibit 2.
23        (Muzzio Deposition Exhibit 2 was marked
24  for identification and attached to the
25  transcript.)

15

1  BY MR. PEACHMAN:
2        Q.  Okay.  Dr. Muzzio, the court reporter
3  has handed you what's been marked as Exhibit 2.
4        Dr. Muzzio, is this a complete copy of
5  the materials that you reviewed and considered for
6  your opening expert report?
7        A.  I believe it is.
8        Q.  Okay.  And have you reviewed and
9  considered any additional documents in preparation
10  for today's deposition?
11        A.  I'm not 100 percent sure, but I believe
12  there were a few additional references included in
13  report 2.
14        Q.  You're talking about the reply report?
15        A.  Yeah.
16        Q.  Okay.  So beyond the additional
17  references in the reply report and the references
18  that are listed here, did you review anything else
19  for your deposition today?
20        A.  To the extent of my knowledge, we have
21  disclosed to you everything that I have
22  considered.
23        Q.  Okay.  And just to be clear, we're going
24  to go ahead and mark the materials considered in
25  the second one.  So --

16

1        MR. PEACHMAN:  We're going to mark this
2  as Exhibit 3.
3        (Muzzio Deposition Exhibit 3 was marked
4  for identification and attached to the
5  transcript.)
6  BY MR. PEACHMAN:
7        Q.  All right.  And, Dr. Muzzio, you've been
8  handed what's been marked as Exhibit 3.
9        And, Dr. Muzzio, this is a complete copy
10  of the materials you reviewed and considered for
11  your rebuttal expert report; right?
12        A.  I will accept your representation that
13  this is a copy of what was submitted.
14        MR. PEACHMAN:  We're going to mark this
15  the form of that, because I think you said
16  "rebuttal" and meant "reply."
17        MR. PEACHMAN:  I meant reply.  So this
18  is for the reply report.
19  BY MR. PEACHMAN:
20        Q.  So Exhibits 2 and 3 are the materials
21  you considered for your opening expert report and
22  your reply expert report.
23        So beyond the documents that are in
24  Exhibit 2 and 3, did you review any other
25  documents for your deposition today?

8/22/2024        Acadia Pharmaceuticals, Inc. v. Aurobindo Pharma Limited, et al. Fernando J. Muzzio, Ph.D.
Confidential

17

1     A. No, I don't believe I have.
2     Q. Okay. Thank you.
3          Dr. Muzzio, I'm going to hand you
4     another exhibit. This is going to be the
5     '721 patent.
6          (Muzzio Deposition Exhibit 4 was marked
7     for identification and attached to the
8     transcript.)
9     BY MR. PEACHMAN:
10     Q. All right. Dr. Muzzio, you've been
11     handed what's been marked as Exhibit 4. This is
12     U.S. Patent 11,452,721.
13          Dr. Muzzio, are you familiar with this
14     patent?
15     A. Yes.
16     Q. Okay. And as a preliminary matter, can
17     we agree to refer to this as the '721 patent?
18     A. Yes.
19     Q. Okay. And, similarly, today when we
20     talk about pimavanserin and pimavanserin tartrate,
21     this is all the same API; right?
22     A. Pimavanserin is not the same as
23     pimavanserin tartrate, but sure.
24     Q. Okay. Fair enough.
25          And when I refer to the specification of

18

1     the patent, do you know what I'm referring to?
2     A. Yes, I do.
3     Q. Okay. And if I refer to the claims of
4     the patent, generally, you know what I'm referring
5     to?
6     A. Yes, counsel.
7     Q. Okay. And if we can go to Claim 1.
8     It's in the back of Exhibit 4, the last page.
9          Are you there, Dr. Muzzio?
10     A. I am.
11     Q. All right. If you could just read
12     Claim 1.
13     A. Do you want me to read it out loud?
14     Q. No, you don't need to read it out loud,
15     but you see it there; right? Just review it.
16     A. Yes.
17          (Witness peruses the exhibit.)
18     BY MR. PEACHMAN:
19     Q. Okay, Dr. Muzzio.
20          And you've offered opinions in this case
21     about what a person of ordinary skill in the art
22     is, right?
23     A. I have.
24     Q. Okay. And would a person of ordinary
25     skill in the art understand that Claim 1 of the

19

1     '721 patent is directed to a formulation of
2     pimavanserin tartrate?
3     A. The word "formulation" doesn't appear in
4     the claim.
5     Q. Fair enough.
6          But would you say that the understanding
7     would be that this would be a formulation of
8     pimavanserin tartrate?
9     A. The word "formulation" is used in
10     patents in various ways. I don't believe the word
11     "formulation" is defined in this particular
12     patent. So I'm trying to be precise.
13          Because the word "formulation" can be
14     used in two or three different ways, I hesitate to
15     answer that question.
16     Q. Okay. Well, I think we can agree that
17     it's a pharmaceutically acceptable capsule.
18     That's recited in Claim 1; correct?
19     A. The claim recites a pharmaceutically
20     acceptable capsule.
21     Q. Okay. And would a person of ordinary
22     skill in the art understand that Claim 1 is
23     directed to a process for producing a formulation
24     of pimavanserin tartrate?
25          MR. FRESE: Objection; calls for a legal

20

1     conclusion.
2          THE WITNESS: What Claim 1 talks about
3     is using granules. Granules are usually
4     manufactured using a process called granulation.
5     It's hard to have granules without granulating.
6     So to that extent, this claim is invoking the use
7     of granulation.
8     BY MR. PEACHMAN:
9     Q. Okay.
10     A. It also talks about capsules. Capsules
11     have to be filled. So to the extent that is
12     reciting a capsule for readily delivery drug,
13     somebody has to have filled that capsule. That's
14     also a manufacturing process.
15     Q. Okay, Dr. Muzzio.
16          And just so I understand, so when you
17     read -- say the word "pharmaceutically acceptable
18     capsule," you're reading that claim as requiring
19     some specific process to make it; is that right?
20          MR. FRESE: Objection; calls for a legal
21     conclusion.
22          But you can answer.
23          THE WITNESS: So the scope of the claim
24     is defined by the words in the claim that recite
25     the capsule. It does not say how exactly the

8/22/2024          Acadia Pharmaceuticals, Inc. v. Aurobindo Pharma Limited, et al. Fernando J. Muzzio, Ph.D.
Confidential

---

21

1    capsule needs to be made.  It does -- by talking
2    about a capsule that contains granules, it does
3    point a POSA towards the fact that you needed to
4    granulate and fill a capsule.
5    BY MR. PEACHMAN:
6        Q.  Okay.
7        A.  But I would not -- I don't think I have
8    a current opinion as to whether this claim
9    actually recites a process as an invention.
10       Q.  Okay.  So you have no opinion whether
11   the process of making a pharmaceutically
12   acceptable capsule is incorporated into Claim 1?
13       A.  I believe I have offered the opinion
14   that Claim 1 is indefinite precisely because it
15   doesn't properly distinguish between processes
16   that actually work and processes that didn't and
17   results of those processes that worked and results
18   of those processes that didn't.  That's my
19   opinion.
20       Q.  Yeah, we'll get to your opinions today
21   on indefiniteness, Dr. Muzzio.
22           I guess my question is -- you mentioned
23   pharmaceutically acceptable capsule, and we just
24   discussed that.  You also discussed granule, and
25   you mentioned that there are processes made to

---

22

1    make granules.
2            Is it your opinion that Claim 1 requires
3    a specific method of making a granule?
4            MR. FRESE:  Objection; calls for a legal
5    conclusion.
6            THE WITNESS:  I do not believe I have
7    offered that opinion that a specific way of making
8    the granules is required.
9    BY MR. PEACHMAN:
10       Q.  Okay.  So you have no opinion one way or
11   the other whether the granules that are recited in
12   Claim 1 require a specific method of granulation
13   to be formed?
14       A.  I do not believe I have offered that
15   opinion.  Can you show me where in the report I
16   might have offered that opinion so I can see the
17   context of your question?
18       Q.  Right.  Dr. Muzzio, we'll get to your
19   report.
20           I guess what I wanted to understand
21   before we can move into things is you've offered
22   opinions speaking about how a POSA would
23   understand certain terms, and I need to understand
24   whether you believe that processes to make the
25   elements recited in Claim 1 are actually

---

23

1    incorporated in that claim.
2            So we can all agree that there's no
3    method of making a granule that's recited in
4    Claim 1 or is a limitation of Claim 1; correct?
5            MR. FRESE:  Objection; calls for a legal
6    conclusion.
7            THE WITNESS:  Claim 1 does not, reading
8    it here, appear to recite any particular way of
9    making the granules or exclude any particular ways
10   of making the granules, which I believe is part of
11   the problem with this claim.
12   BY MR. PEACHMAN:
13       Q.  Okay.  Dr. Muzzio, we can agree, as you
14   just stated, that there's no actual method of
15   granulation required in order to meet the granule
16   limitation of Claim 1?
17           MR. FRESE:  Objection; asked and
18   answered.
19           THE WITNESS:  I stand by that.
20   BY MR. PEACHMAN:
21       Q.  I think I'm asking a slightly different
22   question.  So when you look at Claim 1, there's
23   nothing in the text of Claim 1 that recites a
24   method of granulation that's required for this
25   claim; correct?

---

24

1        A.  Well --
2            MR. FRESE:  Objection; asked and
3    answered.
4    BY MR. PEACHMAN:
5        Q.  Dr. Muzzio, you can answer the question.
6        A.  The word "acceptable" appearing there,
7    whatever that word means in this context, would
8    indicate to a POSA there are some acceptable
9    capsules and some not acceptable capsules.
10           And in order to be within scope,
11   somebody would have to use a process that leads to
12   an acceptable capsule, whatever that means.  So to
13   that extent, the claim is invoking a result being
14   required without actually properly explaining what
15   that result is.
16           So you could think, okay, there are some
17   processes that produce acceptable capsules.  There
18   are some processes that produce unacceptable
19   capsules.  And a POSA would need to understand
20   what the difference is, but the POSA can't in this
21   patent.
22       Q.  All right.  And so, Dr. Muzzio, just so
23   I understand what you said, you said that in order
24   to be within the scope of the claim, somebody
25   would have to use a process that leads to an

---

6  (Pages 21 to 24)

25

1  acceptable capsule.
2        So to be clear, are you telling me,
3  Dr. Muzzio, that you are reading the word
4  "acceptable capsule" to require a specific process
5  of making the capsule as a limitation of Claim 1?
6        MR. FRESE:  Objection; vague and asked
7  and answered.
8        THE WITNESS:  That claim element is
9  indicating that in order to fall within the scope
10  of the claim, the capsule has to be acceptable.
11  That presumably means that some capsules are
12  acceptable and some are not and that some
13  processes to make capsules lead to acceptable
14  capsules and some processes to make capsules lead
15  to unacceptable capsules.
16        So strictly to that extent, no, I don't
17  think I'm saying there is a specific process.  So
18  to that extent, it's telling the POSA that there
19  would be some processes that lead to acceptable
20  capsules and some processes that lead to
21  unacceptable capsules.  And so the ones that lead
22  to unacceptable capsules would in theory not be
23  within the scope.
24        But the specification fails to explain
25  to the POSA what makes a capsule acceptable or

26

1  unacceptable and which processes to choose or not
2  to choose to make acceptable capsules.  And,
3  therefore, that's a problem with this claim.
4        And I think I've given you now three
5  different versions of the same answer.
6  BY MR. PEACHMAN:
7    Q.  Yeah.  And I guess my question is more
8  simple than that.  It's when you look at the text
9  of Claim 1 that says, "pharmaceutically acceptable
10  capsule," no method is recited for making that
11  pharmaceutically acceptable capsule in the claim;
12  correct?
13    A.  I would say that no specific one method
14  with dispositive direction is recited for making a
15  pharmaceutically acceptable capsule.  So there
16  could in theory be more than one way to make a
17  pharmaceutically acceptable capsule.
18    Q.  And, in fact, it could be any way.  As
19  long as the pharmaceutically acceptable capsule is
20  made, it meets the limitation of Claim 1; correct?
21        MR. FRESE:  Objection; calls for a legal
22  conclusion.
23        THE WITNESS:  Well, provided that
24  somebody could tell what is an acceptable capsule,
25  which, in my opinion, you can't, given the

27

1  specification of the patent.
2  BY MR. PEACHMAN:
3    Q.  Okay.  So putting aside your opinion on
4  whether one could understand what the term
5  "pharmaceutically acceptable capsule" means, you
6  would agree with me that there's no specific
7  method of making the pharmaceutically acceptable
8  capsule that's required by Claim 1?
9        MR. FRESE:  Objection; calls for a legal
10  conclusion.
11        THE WITNESS:  I cannot set aside that
12  claim element and preserve the full meaning of the
13  claim as a POSA would understand it.  That's --
14  I'm trying to find an analogy of how I understand
15  your question.  I guess I don't need to do that.
16  I cannot set that claim element aside and answer
17  your question.
18  BY MR. PEACHMAN:
19    Q.  Okay.  So you have no opinion whether
20  the pharmaceutically acceptable capsule can be
21  created by any process?
22    A.  I do have the opinion that the claim
23  requires that capsule to be pharmaceutically
24  acceptable without actually the patent telling you
25  what would make it so.  That's my opinion.

28

1    Q.  Okay.
2    A.  I'm sorry, never mind.
3    Q.  Okay.  And could we move to Claim 4 in
4  Exhibit 4, the '721 patent?
5    A.  Uh-huh.  Yes.
6    Q.  And could you just briefly read that
7  claim?
8    A.  Yes.
9        (Witness peruses the exhibit.)
10        THE WITNESS:  Okay.
11  BY MR. PEACHMAN:
12    Q.  All right.  And so, Dr. Muzzio, looking
13  at Claim 4, you'd agree with me that like Claim 1,
14  Claim 4 doesn't recite any specific process in
15  which the pharmaceutically acceptable capsule is
16  made; right?
17    A.  I would provide the same answer I
18  provided for Claim 1.
19    Q.  Okay.  So everything that you've
20  mentioned for Claim 1 today also applies to
21  Claim 4.
22    A.  To the extent of the question that you
23  just asked me.
24    Q.  And Claim 4 also recites a
25  pharmaceutically acceptable excipient.  Do you see

29

1  that?  In the granules limitation?
2      A.  Yes, I do see that.
3      Q.  Granules comprising 40 milligrams of
4  pimavanserin tartrate and one or more
5  pharmaceutically acceptable excipients, right?
6      A.  Yes, it does.
7      Q.  And does Claim 4 require any process for
8  making the pharmaceutically acceptable excipient?
9      A.  A process for making the excipient, are
10  you sure that's the question?
11      Q.  Yeah.  So do you read Claim 4 as
12  requiring any specific process for forming a
13  pharmaceutically acceptable excipient?
14      A.  No, it does not.
15      Q.  Okay.  So the pharmaceutically
16  acceptable excipient is -- precisely is what's
17  stated here, right, just a pharmaceutically
18  acceptable excipient?
19          And so, similarly, a pharmaceutically
20  acceptable capsule recited in Claim 4 also doesn't
21  require any process in which to make it; correct?
22          MR. FRESE:  Object to the form.
23          THE WITNESS:  I'm not sure whether the
24  first part of your statement was a question or
25  not.  Whether you asked me two things --

30

1      Q.  Well, I --
2      A.  -- or you asked me one or is --
3      Q.  Well, I -- okay.
4      A.  You asked me two questions.
5      Q.  All right.  So, Dr. Muzzio, you just
6  testified that there's no process required by
7  Claim 4 to make a pharmaceutically acceptable
8  excipient?
9      A.  Except to the extent that it needs to be
10  pharmaceutically acceptable, which does import
11  some meaning and is defined in the specification.
12      Q.  Okay.  So let me just be clear.
13      A.  Other than that, no.
14      Q.  So for pharmaceutically acceptable
15  excipient, that also requires a specific process
16  to make it?
17      A.  No, no, no, because a pharmaceutically
18  acceptable excipient can be any one of thousands
19  of different materials -- and they're all made by
20  different ways.  So when you asked me whether you
21  can acquire a process to make a pharmaceutically
22  acceptable excipient, to me, I fail to understand
23  what you mean by that.
24          Because this could imply thousands of
25  different excipients, all made by many different

31

1  processes.  So none of those processes can
2  possibly be required because not one specific
3  excipient is actually required, except that they
4  need to be pharmaceutically acceptable, as defined
5  in the specification, right.
6          So there are limits of how you can make
7  those excipients because they have to be
8  pharmaceutically acceptable.  That's my answer.
9  That's the only limitation on the method of making
10  the excipients that one could glean from what's
11  written in the claim.
12      Q.  Okay.  And when you read
13  "pharmaceutically acceptable capsule" in Claim 4,
14  it's the same opinion, right, Dr. Muzzio, that as
15  long as you're making a pharmaceutically
16  acceptable capsule, that meets the limitations of
17  Claim 4?
18          MR. FRESE:  Objection; form.
19          THE WITNESS:  Well, I would expect that
20  somebody would also object to mischaracterizing my
21  testimony, because I absolutely did not say that.
22  No, I do not hold the same opinion as to the
23  meaning of "pharmaceutically acceptable capsule"
24  versus "pharmaceutically acceptable excipient."
25  And I think you are suggesting that the opinion is

32

1  the same.  It is not.
2  BY MR. PEACHMAN:
3      Q.  And why would you have a different
4  opinion about a pharmaceutically acceptable
5  capsule and a pharmaceutically acceptable
6  excipient?
7      A.  Because a capsule is different than an
8  excipient, and what makes an excipient
9  pharmaceutically acceptable is different than what
10  makes a capsule pharmaceutically acceptable.  And
11  because the patent defines "pharmaceutically
12  acceptable excipient" but doesn't define
13  "pharmaceutically acceptable capsule," except by
14  excluding a number of processes that according to
15  the specification did not work and, therefore, led
16  to capsules that were not acceptable.
17          Moreover, the capsule is a dosage form.
18  So the intended use of the capsule is different
19  than the intended use of the excipient.
20      Q.  Okay.  So you believe that there are
21  limitations on a pharmaceutically acceptable
22  capsule based on the specification, and you
23  believe that those limitations are limiting the
24  scope of Claim 4; correct?
25          MR. FRESE:  Object to form.

8  (Pages 29 to 32)

8/22/2024        Acadia Pharmaceuticals, Inc. v. Aurobindo Pharma Limited, et al. Fernando J. Muzzio, Ph.D.
Confidential

33

1    THE WITNESS:  What I believe is that the
2  specification does a really poor job at informing
3  the POSA of what a pharmaceutically acceptable
4  capsule is within the context of this patent.
5  BY MR. PEACHMAN:
6    Q.  Okay.
7    A.  And I have offered an opinion multiple
8  times already.
9    Q.  And, Dr. Muzzio, you testified that the
10  patent defines pharmaceutically acceptable
11  excipient?
12    A.  I -- that's -- I'm going by memory.  Let
13  me go and check it.
14    Q.  Yeah, could you, please.
15    A.  Or you can point me to where it is --
16    Q.  Well, I need to understand how you read
17  the patent, Dr. Muzzio.
18    Do you, sitting here today, believe that
19  the '721 patent defines what a pharmaceutically
20  acceptable excipient is?
21    A.  Let me not rely on my memory.  I'd
22  rather look for the passage.
23    I'd like to make sure that I'm
24  consistent with my report.  So I would like to go
25  to the sections of my report where I actually deal

34

1  with this specific topic to make sure that I
2  remain consistent with my report, if you don't
3  mind.
4    Q.  Okay.  So without seeing your report,
5  you can't recall right now whether it's defined in
6  the patent or not?
7    A.  I'm not finding it right now.
8    Q.  Okay.  And would a person of ordinary
9  skill in the art have understood what a
10  "pharmaceutically acceptable excipient" means?
11    A.  A person of ordinary skill in the art,
12  when reading this patent, would have understood
13  what a pharmaceutically acceptable excipient was.
14    Q.  And why is that?
15    A.  Because there is no deliberate confusion
16  here that is introduced in the specification about
17  what a pharmaceutically acceptable capsule is when
18  it comes to excipients.  So -- but I insist, I
19  would like to review my report where I talk about
20  this because I would like to remain consistent
21  with the opinions that I offered in my report
22  rather than have to rely on memory.
23    Q.  But would you agree that a person of
24  ordinary skill in the art would apply the plain
25  and ordinary meaning to a pharmaceutically

35

1  acceptable excipient?
2    A.  Unless there is a definition in the
3  specification that would be the expectation.  But
4  I would like to review my report to make sure that
5  I'm being consistent with what I said in my
6  report.
7    Q.  Okay.  And there's no definition in the
8  '721 patent for "pharmaceutically acceptable
9  capsule" either; correct?
10    A.  May I please check my report?
11    Q.  We'll get to your report really soon.  I
12  just -- I have this one question.
13    There's no definition in the '721 patent
14  for "pharmaceutically acceptable capsule";
15  correct?
16    A.  There is language as to what would be a
17  capsule that's not acceptable.
18    Q.  Right.
19    A.  So --
20    Q.  Dr. Muzzio, my question is a little
21  different.  There's no definition in the
22  '721 patent for what a "pharmaceutically
23  acceptable capsule" is; correct?
24    MR. FRESE:  Object to form and asked and
25  answered.

36

1    THE WITNESS:  There is language as to
2  what -- to be excluded without actually being very
3  clear about how to make those distinctions.
4  BY MR. PEACHMAN:
5    Q.  And that language that's provided, it's
6  not a definition of the term "pharmaceutically
7  acceptable capsule"; correct?
8    MR. FRESE:  Objection; calls for a legal
9  conclusion, and objection to form.
10    THE WITNESS:  Well, I mean, I could
11  define a human as a member of the homo sapien
12  species or I can define a human as somebody who's
13  not a dog, somebody who's not a horse, somebody
14  who's not a cow and I am providing information
15  about what a human is.  So by exclusion, I'm
16  beginning to build a class of a thing, right.
17  BY MR. PEACHMAN:
18    Q.  So --
19    A.  And that is what is happening here, I
20  believe, but not in a clear way that would allow a
21  POSA to understand what the boundaries are
22  exactly.
23    Q.  Okay.  Just so I understand it, it's
24  your opinion that it's not clear whether or not
25  "pharmaceutically acceptable capsule" is defined

9  (Pages 33 to 36)

---

37

1  in the '721 specification because the language is
2  unclear; correct?
3      MR. FRESE:  Objection to the form.
4      THE WITNESS:  I think I've given you
5  opinions in my report extensively to that extent,
6  where the claim element of pharmaceutically
7  acceptable capsule poses some limitations in the
8  scope of the claim and there are things that are
9  excluded, but the boundary between what's included
10 and what's excluded isn't clear.  That's my
11 opinion.
12 BY MR. PEACHMAN:
13     Q.  So we're going to hand you your report,
14 Dr. Muzzio.
15     MR. PEACHMAN:  This is going to be
16 Exhibit 5.  And this is large.  We clipped it.
17 So --
18     MR. FRESE:  So we have a bound copy here
19 that we could mark.
20     MR. PEACHMAN:  Okay.  Do you have one
21 for the witness and one for yourself, or do we
22 need to hand you --
23     MR. FRESE:  You can hand me one.
24     MR. PEACHMAN:  Okay.  So we can mark the
25 witness' version as Exhibit 5.  This is the

---

38

1  opening report.
2      MR. FRESE:  Yeah.
3      MR. PEACHMAN:  And this will be
4  Exhibit 5.
5      (Muzzio Deposition Exhibit 5 was marked
6  for identification and attached to the
7  transcript.)
8      MR. PEACHMAN:  And can I just be handed
9  Exhibit 5?  I just want to look through the
10 witness' version just to see.
11     MR. FRESE:  Sure.
12     MR. PEACHMAN:  Okay.
13 BY MR. PEACHMAN:
14     Q.  Okay.  All right.  Dr. Muzzio, you've
15 been handed what's been marked as Exhibit 5.
16     And, Dr. Muzzio, is this the opening
17 report that you submitted in this case?
18     A.  Yes, it is.
19     Q.  Okay.  And have you had the opportunity
20 to reread your report in the process of preparing
21 for the deposition today?
22     A.  I have.
23     Q.  And when I say "the report," I mean
24 Exhibit 5.
25     Is there anything in your report that

---

39

1  you believe needs to be corrected, Exhibit 5?
2      A.  I saw a couple of typos in a couple of
3  places.  I don't remember exactly where they are.
4  If we run into them, I'll point them to you.
5      Q.  Okay.  So you believe there to be
6  potentially some typos, but no substantive changes
7  to your report?
8      A.  Correct.  I don't believe there are any
9  substantive changes that need to be made to the
10 report.
11     Q.  Okay.  And this is a report you prepared
12 on both of MSN and Aurobindo; correct?
13     A.  I believe that is true.
14     Q.  And we're going to refer to this
15 document throughout the day but I think for now
16 you can just put it to the side and we'll go to
17 specific parts of it.
18     MR. PEACHMAN:  So I'd like to mark
19 now -- this will be Exhibit 6.
20     MR. FRESE:  And, again, we have a bound
21 copy.
22     MR. PEACHMAN:  Yeah, okay.
23     THE COURT REPORTER:  Do you want to use
24 the bound?
25     MR. PEACHMAN:  Yeah.  We'll mark this as

---

40

1  Exhibit 6, and then I'll take a look at it real
2  quick.
3      (Muzzio Deposition Exhibit 6 was marked
4  for identification and attached to the
5  transcript.)
6      MR. PEACHMAN:  All right.  And do you
7  want a copy?
8      MR. FRESE:  Yes, please.  Thank you.
9  BY MR. PEACHMAN:
10     Q.  So, Dr. Muzzio, you've been handed
11 what's been marked as Exhibit 6.  This is your
12 reply expert report; correct?
13     A.  That is correct.
14     Q.  All right.  And you had the opportunity
15 to reread your report in the process of preparing
16 for the deposition today?
17     A.  Yes, I have.
18     Q.  Okay.  You have.
19     And is there anything in your reply
20 expert report, Exhibit 6, that you believe needs
21 to be corrected?
22     A.  Like I said, there might be one or two
23 typos that I've seen, but other than that, no.
24     Q.  Okay.  So no substantive corrections to
25 Exhibit 6?

---

41

1    A.  No substantive corrections that I'm
2  aware of.
3    **Q.  Okay.  And was this report also**
4  **submitted on behalf of MSN and Aurobindo?**
5    A.  I believe that's the case.
6    **Q.  Okay.  And, Dr. Muzzio, your opinions in**
7  **this case are contained in your reports, Exhibit 5**
8  **and Exhibit 6, for validity; correct?**
9    A.  They are.
10    **Q.  Okay.  And the bases for those opinions**
11  **are also identified and contained in your reports?**
12    A.  I tried my best to provide those bases.
13    **Q.  Okay.  And sitting here today, you do**
14  **not have any additional opinions in this case**
15  **other than those are contained in Exhibit 5 and**
16  **Exhibit 6?**
17    A.  Nothing at this point I plan to offer.
18    **Q.  So sitting here today, you don't have**
19  **anything additional.**
20    A.  Nothing that I plan to offer.
21    **Q.  Okay.**
22    A.  At this point.
23    **Q.  Dr. Muzzio, how did you prepare**
24  **Exhibit 5 and Exhibit 6?**
25    A.  It was a collaboration with counsel.

42

1    **Q.  Okay.  So did you draft certain sections**
2  **of the report yourself?**
3    A.  Yes.
4    **Q.  And which sections did you draft on your**
5  **own?**
6    A.  The two reports together amount to, what
7  I recall, about 180 pages.  So it would be
8  impossible for me to tell you from memory exactly
9  which sections I drafted and which ones I didn't.
10    I did not draft the sections that talk
11  about legal standards, for example.  Those I did
12  not draft.  Those were originally drafted by
13  counsel and I read them and I had a few comments
14  about those.  But the rest of the report I either
15  drafted or edited heavily as the reports were
16  coming together.
17    **Q.  And, Dr. Muzzio, did you work or consult**
18  **with anyone else besides your counsel to prepare**
19  **the reports?**
20    A.  No.
21    **Q.  Okay.  We're also going to refer to this**
22  **document throughout the day, but for now you can**
23  **just put it to the side.**
24    Dr. Muzzio, I just want to mark one more
25  exhibit.

43

1    MR. PEACHMAN:  This is going to be
2  Exhibit 7.
3    (Muzzio Deposition Exhibit 7 was marked
4  for identification and attached to the
5  transcript.)
6    MR. FRESE:  Thank you.
7  BY MR. PEACHMAN:
8    **Q.  Okay.  Dr. Muzzio, you've been handed**
9  **what's been marked as Exhibit 7.  And this is**
10  **U.S. Patent 10,004,682; correct?**
11    A.  Yes.
12    **Q.  And is this one of the patents in which**
13  **you were a named inventor?**
14    A.  Yeah.
15    **Q.  Okay.  Are you familiar with this**
16  **patent?**
17    A.  I haven't looked at this patent in
18  something like 12 or 13 years, but, you know, to
19  the extent that -- with that caveat, I am familiar
20  with it.
21    **Q.  And did you take part in drafting this**
22  **patent?**
23    A.  So the patent was drafted by counsel.  I
24  reviewed it a couple of times.  So to that extent,
25  yes.

44

1    **Q.  Okay.  So you reviewed it a couple of**
2  **times and agreed that it should be filed.**
3    A.  At the time, yes.
4    **Q.  Okay.  And the patent is titled,**
5  **Formulation and Manufacture of Pharmaceuticals by**
6  **Impregnation onto Porous Carriers; correct?**
7    A.  That's the title.
8    **Q.  Okay.  And can we refer to this patent**
9  **today as the '682 patent?**
10    A.  Sure.
11    **Q.  Okay.  And we're also going to put that**
12  **to the side for now.  Thank you.**
13    I'd like to start, I guess, with your
14  reply expert report, and that would be Exhibit 6.
15  Do you have that in front of you?  If you could
16  just go to Exhibit 6.  And if you go to
17  paragraph 4.
18    And this is your summary of opinions;
19  right?
20    A.  Okay.
21    **Q.  So in your summary of opinions, you are**
22  **offering opinions as to invalidity.  And you**
23  **mentioned there's two different references,**
24  **Nuplazid tablets and Ragnar-Tolf, right?**
25    A.  Uh-huh.

11  (Pages 41 to 44)

8/22/2024    Acadia Pharmaceuticals, Inc. v. Aurobindo Pharma Limited, et al. Fernando J. Muzzio, Ph.D.
Confidential

45

1  Q.  You're also offering opinions as to
2  indefiniteness, written description, and
3  enablement; right?
4      A.  Uh-huh.
5          MR. FRESE:  Dr. Muzzio, could you just
6  answer "yes" or "no" rather than "uh-huh" or
7  "huh-huh" --
8          THE WITNESS:  Yes.
9          MR. FRESE:  -- so that the court
10 reporter can transcribe it cleanly.
11         THE WITNESS:  Thank you, Counsel.
12         Yes.
13 BY MR. PEACHMAN:
14     Q.  Thank you.
15         And, Dr. Muzzio, as part of the opinions
16 that you've offered, do you believe that you're
17 offering opinions on the construction of the
18 claims in Claim 1?
19     A.  So the court has construed the claims,
20 but I believe that there are some terms where I
21 have a different opinion as to the meaning of
22 those terms than your witness.  So to the extent
23 that we're arguing about what a claim means, maybe
24 we are having a conversation about how to construe
25 that term.

46

1      Q.  Okay.  I just need to understand --
2      A.  Is that --
3      Q.  Yeah.  So are you -- are you
4  reconstruing the claim terms that the court has
5  already construed in this case?
6      A.  I'm adopting the court's construction,
7  but the court did not construe some terms in which
8  apparently we have a disagreement.  So --
9      Q.  Okay.  And which terms do you believe
10 that the court did not construe that you're now
11 offering an opinion on?
12     A.  I believe that my report and
13 Dr. Little's report clearly indicate a different
14 interpretation for the term "pharmaceutically
15 acceptable capsule."
16     Q.  Okay.  So are you offering an opinion on
17 what the construction should be for the term
18 "pharmaceutically acceptable capsule"?
19     A.  I am offering an opinion that I disagree
20 with how Dr. Little is construing that term.
21     Q.  Okay.  I understand you respond to
22 Dr. Little, but are you yourself, Dr. Muzzio,
23 offering any opinion on how the term
24 "pharmaceutically acceptable capsule" should be
25 construed in Claim 1?

47

1      A.  I am offering an opinion on how it
2  should not be construed in Claim 1.
3      Q.  Okay.  So by offering an opinion on how
4  it shouldn't be, you are offering an opinion on
5  how it should be construed; correct?
6      A.  Well, I feel that this is more semantics
7  than anything else.  You know, you have to educate
8  me as an attorney on whether I am doing that or
9  not, but I am clear that I am offering an opinion
10 about Dr. Little's construction of that term,
11 which is that I disagree with his construction.
12     Q.  Okay.  And, Dr. Muzzio, did you review
13 the court's memorandum opinion on claim
14 construction?
15     A.  Yes, I have.
16         MR. PEACHMAN:  This is going to be
17 Exhibit 8.
18         (Muzzio Deposition Exhibit 8 was marked
19 for identification and attached to the
20 transcript.)
21 BY MR. PEACHMAN:
22     Q.  Okay.  Dr. Muzzio, you've been handed
23 what's marked as Exhibit 8.
24         And can you see at the top of the
25 document it says, Document 43, filed

48

1  December 13th, 2023?
2      A.  I do.
3      Q.  And the title under the court caption is
4  "Memorandum Opinion"?
5      A.  Yes, I see that.
6      Q.  Okay.  And this is the claim
7  construction opinion that you reviewed before;
8  correct?
9      A.  Yes, I believe it is.
10     Q.  Okay.  And under the title, Exhibit 8
11 states, Before the court is -- and there's a list
12 of the parties, right -- a joint request for
13 construction of Claims 1 and 4 of the '721 patent;
14 right?
15     A.  Uh-huh.  Yes.
16     Q.  Okay.  And in your expert reports
17 concerning validity issues, that's I think
18 Exhibits 5 and 6, did you apply the court's
19 constructions as described in this memorandum
20 opinion?
21     A.  I did.
22     Q.  Okay.  And on page 2 of Exhibit 8, can
23 you look at the first sentence, Dr. Muzzio?
24     A.  Yes.
25     Q.  Okay.  So the first sentence states that

49

1  the words of the claim are generally given their
2  ordinary and customary meaning as understood by a
3  person of ordinary skill in the art when read in
4  the context of the specification and the
5  prosecution history, correct?
6      A.  Yes.
7      Q.  And do you understand what this means
8  that when the words of the claims are construed as
9  having their plain and ordinary meaning as
10 understood by a POSA, that plain and ordinary
11 meaning is determined in the context of the
12 specification?
13     MR. FRESE:  Objection; calls for a legal
14 conclusion.
15     THE WITNESS:  It says what it says.
16 BY MR. PEACHMAN:
17     Q.  But that's your understanding, though,
18 the plain and ordinary meaning is -- it's
19 determined by the context of the specification?
20     MR. FRESE:  Same objection.
21     THE WITNESS:  That's what it says.
22 BY MR. PEACHMAN:
23     Q.  Okay.  And do you understand that the
24 specification informs a person of ordinary skill
25 in the art what the plain and ordinary meaning of

50

1  a claim term should be?
2      MR. FRESE:  Objection to form.
3      THE WITNESS:  Sorry, I don't think I
4  understand your question.
5  BY MR. PEACHMAN:
6      Q.  Do you understand that the specification
7  of a patent informs a person of ordinary skill in
8  the art what the plain and ordinary meaning of a
9  claim term should be?
10     MR. FRESE:  Same objection.
11     THE WITNESS:  Yes, I do understand that.
12 BY MR. PEACHMAN:
13     Q.  Okay.  And if you could move to page 5
14 of Exhibit 8.
15     On the left-hand side, do you see where
16 it says, granules comprising 40 milligrams
17 pimavanserin tartrate?
18     A.  I do.
19     Q.  All right.  And that was one of the
20 terms that was construed by the court in
21 Exhibit 8; right?
22     A.  That appears to be the case.
23     Q.  Okay.  And if you see on the right side,
24 for that term, the court construed "granules
25 comprising 40 milligrams pimavanserin tartrate" as

51

1  having its plain and ordinary meaning and the
2  scope of the term "granule" includes granules
3  granulated with pimavanserin and excipients;
4  right?
5      A.  That's what the court found.
6      Q.  Okay.  And if you go to page -- the next
7  page -- actually, it's page 9.  If you look at the
8  first full paragraph, Dr. Muzzio.
9      A.  Yes.
10     Q.  The first sentence of the paragraph
11 says, Next, the court considers the specification
12 and finds that it also shows Acadia did not
13 clearly disavow granules containing both
14 pimavanserin and excipients; right?
15     A.  That's what it says.
16     Q.  Okay.  So do you understand that the
17 court -- it was looking at the specification here
18 to determine the meaning of the term "granules
19 comprising 40 milligrams pimavanserin tartrate"?
20     A.  The sentence says that Acadia did not
21 disavow granules containing both pimavanserin and
22 excipients.  This sentence by itself is not
23 telling me which claim term this applies to, in
24 which claim.
25     Q.  Okay.  Well, let me just continue on,

52

1  and I think the context will be a little clearer
2  for you.
3      Do you see where it says, For example,
4  the specification states that granules are
5  multiparticle entities consisting of primary
6  powder particles that were made to adhere together
7  and that granules may, for example, be formed by
8  collecting particles together by creating
9  mechanical bonds between them, for example, by
10 compression or by using a binder?
11     A.  Yes, I see that.
12     Q.  Okay.  So do you understand that the
13 court here is construing the definition of the
14 term "granules" as understood by a person of
15 ordinary skill in the art in the context of the
16 specification?
17     A.  Yes.
18     Q.  Okay.  And do you acknowledge that the
19 court found that a person of ordinary skill in the
20 art, reading the specification, would understand
21 that granules are multiparticle entities
22 consisting of primary particle powders that are
23 made to adhere together?
24     A.  That's what the court has found.
25     Q.  Okay.  And that's the definition of

13 (Pages 49 to 52)

8/22/2024        Acadia Pharmaceuticals, Inc. v. Aurobindo Pharma Limited, et al. Fernando J. Muzzio, Ph.D.
Confidential

53

1  "granules" that you used in your invalidity
2  analysis?
3      A.  Yes.
4      Q.  Okay.  And does this definition of
5  "granules" require the granules to be made to
6  adhere together by any specific granulation
7  process?
8          MR. FRESE:  Object to form.
9          THE WITNESS:  It doesn't exclude any
10  specific way of creating granules.
11  BY MR. PEACHMAN:
12      Q.  Okay.  And so this definition doesn't
13  depend on any preexisting granulation process
14  whatsoever?
15          MR. FRESE:  Objection; vague.
16          THE WITNESS:  As it pertains exclusively
17  to the definition of the term "granules," the
18  words in this paragraph do not exclude any
19  particular process for making those granules.
20  However, when you do read the specification in
21  full, it clearly points to some processes that
22  create granules that are unacceptable.  They are
23  still granules, but according to the inventors,
24  they're not acceptable granules.
25

54

1  BY MR. PEACHMAN:
2      Q.  Okay.  And --
3      A.  So the claim in full does exclude some
4  ways of making granules that lead to unacceptable
5  results.
6      Q.  Okay.  Just to be clear, it's your
7  opinion that Claims 1 and 4 of the '721 patent
8  exclude ways of making granules from their scope?
9          MR. FRESE:  Objection to form.
10          THE WITNESS:  I believe that when the
11  claim is read in full, not just by focusing on the
12  single word "granules," but rather the entire
13  claim, by using the preamble "pharmaceutically
14  acceptable" and by having examples of things that
15  did not create pharmaceutically acceptable
16  outcomes, the implication is that the processes
17  used to create those granules led to results that
18  were not acceptable.
19          And, therefore, those processes
20  practiced in that way as to create granules that
21  are not acceptable should not be included in the
22  scope of the claim.  Unfortunately, the claims
23  doesn't tell you exactly how that decision was
24  made that those were unacceptable, and that's the
25  confusion the POSA would have.

55

1  BY MR. PEACHMAN:
2      Q.  Okay.  So -- let me just be clear.  So
3  your opinion is that the word "granules" doesn't
4  require any specific manufacturing process, but
5  you're reading the term "pharmaceutically
6  acceptable capsules" as requiring a specific
7  process?
8          MR. FRESE:  Objection; mischaracterizes
9  testimony.
10          THE WITNESS:  No, I'm reading the words
11  "pharmaceutically acceptable" as excluding, not
12  requiring, excluding certain processes without
13  providing the POSA the means to figure out how to
14  know which ones are excluded and why.
15  BY MR. PEACHMAN:
16      Q.  Okay.  And, Dr. Muzzio, if you could
17  just stay on the same paragraph we're looking at.
18  The paragraph says that the specification then
19  explains that a binder is an excipient holding the
20  ingredients together, and forming granules or
21  tablets would require mechanical strength and make
22  it volume to the formulation.  Thus, the
23  specification contemplates that a binder may be
24  paired with pimavanserin to form a granule.
25          Do you see that?

56

1      A.  I see that.
2      Q.  All right.  And the court doesn't state
3  that a binder may be paired with pimavanserin
4  during any specific granulation process; right?
5      A.  Can you rephrase that?  Because I can
6  understand that question --
7      Q.  Sure.
8      A.  -- in different ways, and I'm not sure
9  which way is the correct one.
10      Q.  Yeah, so the court doesn't state that
11  the specification requires the binder to be paired
12  with pimavanserin during any specific granulation
13  process; right?
14          MR. FRESE:  Object to form.
15          THE WITNESS:  So there are a few ways to
16  make granules, not all of which require binders;
17  but when a binder is required, the specific
18  process that you're using to make that granule
19  would require that you do it in a certain way or
20  in a certain subset of ways.
21  BY MR. PEACHMAN:
22      Q.  Right.  But the court in this paragraph
23  is not saying that a binder must be paired with
24  pimavanserin by any specific granulation process;
25  right?

57

1    A.   The court in this paragraph is not
2 saying that you have to carry out the granulation
3 process in a specific way.
4    **Q.   And do you understand the court's**
5 **memorandum opinion is requiring a binder to be**
6 **combined with pimavanserin with a specific**
7 **granulation process?**
8        MR. FRESE:  Object to form.
9        THE WITNESS:  I don't believe I have
10 offered that opinion.
11 BY MR. PEACHMAN:
12    **Q.   So you have no opinion sitting here**
13 **today whether a binder must be combined with**
14 **pimavanserin with a specific granulation process**
15 **in Claims 1 and 4?**
16        MR. FRESE:  Objection; mischaracterizes
17 testimony.
18        THE WITNESS:  I believe I have offered
19 the opinion, and I would like to go to the section
20 of my report where I offered that opinion.  I
21 believe that my opinion is that the specification
22 points to certain ways to create granulations
23 that, according to the inventors, did not work and
24 that, therefore, led to unacceptable results.
25 And, therefore, those methods practiced that way

58

1 should be excluded from the scope of the claims,
2 without telling the POSA how to know when to
3 exclude or not.  I believe that's the extent of
4 the opinion that I offered on this.
5 BY MR. PEACHMAN:
6    **Q.   Okay.  Dr. Muzzio, if you go to page 11**
7 **of this document, the last paragraph.**
8        **Do you see where the court states that**
9 **the specification explains -- this is the second**
10 **sentence of the last paragraph.  Okay.**
11        **Here it states, The specification**
12 **explains that the term "blending" refers to the**
13 **mixing of pharmaceutical ingredients to form a**
14 **mixture of ingredients.  Further, the**
15 **specification includes examples of excipients**
16 **being mixed with pimavanserin prior to or during**
17 **granulation; right?**
18    A.   It says that.
19    **Q.   Okay.  And would you agree that in the**
20 **court's construction of the various terms, it**
21 **found that the specification includes examples of**
22 **excipients being mixed with pimavanserin during**
23 **granulation?**
24        MR. FRESE:  Object to form.
25        THE WITNESS:  I think your question is a

59

1 little imprecise because the word "during
2 granulation" can be interpreted in a couple of
3 different ways.  I'm not sure whether you mean
4 ingredients, powder ingredients having been mixed
5 prior to the granulation or whether you mean that
6 something is being added together with a
7 granulation fluid or -- so can you please clarify
8 that --
9 BY MR. PEACHMAN:
10    **Q.   Sir, if we could just look at the fourth**
11 **sentence of the last paragraph.**
12    A.   Uh-huh.
13    **Q.   The court's memorandum opinion states,**
14 **Further, the specification includes examples of**
15 **excipients being mixed with pimavanserin prior to**
16 **or during granulation --**
17    A.   Okay.
18    **Q.   -- right?**
19    A.   I --
20    **Q.   So you would agree that the court found**
21 **that the specification of the '721 patent includes**
22 **examples of excipients being mixed with**
23 **pimavanserin prior to or during granulation?**
24    A.   That's what the court --
25        MR. FRESE:  Objection to form of the

60

1 question.
2        THE WITNESS:  That's what the court is
3 saying.
4        MR. FRESE:  We've been going about an
5 hour.  Is now a good time for a break, or do you
6 have just a few more questions in this line?
7        MR. PEACHMAN:  Yeah, we can break, I
8 guess.  It's fine.
9        MR. FRESE:  Okay.
10        THE VIDEOGRAPHER:  The time is
11 10:35 a.m.  We are now off the record.
12        (Recess from the record.)
13        THE VIDEOGRAPHER:  The time is
14 10:44 a.m.  We are now on the record.
15 BY MR. PEACHMAN:
16    **Q.   Welcome back, Dr. Muzzio.**
17    A.   Thank you, Counsel.
18    **Q.   Could we go to Exhibit 6, which is your**
19 **reply expert report.**
20    A.   Okay.
21    **Q.   And if we could go to paragraph 16.**
22        MR. PEACHMAN:  Oh, there's been a
23 request.  If you could move over just a little
24 bit, Dr. Muzzio.  I guess the camera is not
25 picking you up.

8/22/2024          Acadia Pharmaceuticals, Inc. v. Aurobindo Pharma Limited, et al. Fernando J. Muzzio, Ph.D.
Confidential

61

1        THE VIDEOGRAPHER:  Perfect.
2        MR. PEACHMAN:  Yeah.  Thank you.
3    BY MR. PEACHMAN:
4        Q.  Okay.  And, Dr. Muzzio, in paragraph 16,
5    do you see where it states, In paragraph 85,
6    Dr. Little opines that a POSA reading the
7    '721 patent claims in view of the specification
8    would not consider it a determination of powder
9    flowability to be within the scope of the claims.
10       The claims of the '721 patent do not
11   address flowability or tap density, and neither do
12   they address the large-scale manufacturability of
13   the claimed invention.  Thus, I disagree with
14   Dr. Muzzio's contention that a POSA would evaluate
15   these powder properties to arrive at the claimed
16   34-milligram size 3 or 4 capsules of pimavanserin,
17   right?
18       And that's Dr. Little's opinion.  And
19   then you state, I disagree.
20       Do you see that?
21       A.  Yes.
22       Q.  Okay.  And what you state is, I
23   disagree.  This seems to me -- I'm sorry.
24       This to me seems to be hindsight
25   analysis in that it dismisses properties and

62

1    measurements that would have been of relevance to
2    a POSA simply because they do not appear in the
3    patent claims; right?
4        A.  Uh-huh.
5        Q.  Okay.  And then you -- you go on, and
6    you say that even though flowability and
7    manufacturability are not claim limitations, a
8    POSA would have been motivated to evaluate the
9    properties such as powder flow in designing a
10   dosage form; right?
11       A.  Yes.
12       Q.  Okay.  So for your obviousness analysis,
13   it's your opinion that flowability, tap density,
14   and large-scale manufacturability would have been
15   key parameters to a person of ordinary skill in
16   the art in determining how to formulate
17   34 milligrams pimavanserin to fit into a size 3 or
18   4 capsule; right?
19       MR. FRESE:  Objection; vague.
20       THE WITNESS:  Let me take a minute to
21   review exactly what I said here.
22       (Witness peruses the exhibit.)
23       THE WITNESS:  So I believe this section
24   of my report is talking about the scientific and
25   technical background relevant to the

63

1    interpretation of a POSA of this patent as a
2    whole.  I am not talking about obviousness here.
3        That this discussion may inform how we
4    discuss obviousness later on in the report might
5    be right.  But right here, the paragraph you have
6    read is not directed exclusively to an obviousness
7    analysis.
8        What we are arguing about is whether or
9    not it would have been relevant to a POSA that the
10   powder needs to have certain attributes to be
11   useful for the intended purpose.
12   BY MR. PEACHMAN:
13       Q.  Okay.  Just to be clear, so it's your
14   opinion that flowability, tap density, and
15   large-scale manufacturability would have been key
16   parameters for a person of ordinary skill in the
17   art to determine how to formulate 34 milligrams
18   pimavanserin into a size 3 or 4 capsule; right?
19       MR. FRESE:  Objection; mischaracterizes
20   testimony and mischaracterizes his opinion.
21       THE WITNESS:  Is the question concerned
22   only with this section of my report or with some
23   other section of my report?  If it's concerned
24   with some other section of my report, please point
25   me to that section so that I can --

64

1    BY MR. PEACHMAN:
2        Q.  Yeah.
3        A.  -- make sure I understand the correct
4    scope of your question.
5        Q.  Yeah, I'm just -- what I'm asking,
6    Dr. Muzzio, is:  Is it your opinion, outside of
7    paragraphs -- we don't need to talk about 16,
8    specifically.
9        I'm just asking, do you have an opinion,
10   sitting here today, whether flowability, tap
11   density, and large-scale manufacturability would
12   have been key parameters for a person of ordinary
13   skill in the art to determine how to formulate
14   34 milligrams of pimavanserin into a size 3 or
15   4 capsule?
16       MR. FRESE:  I'll make the same
17   objection, that it mischaracterizes the testimony
18   and prior opinion and also that it's compound.
19   BY MR. PEACHMAN:
20       Q.  You can go ahead and answer the
21   question, Dr. Muzzio.
22       A.  Let me make sure that I take a look at
23   all the places where I talk about that.
24       As a general matter, a POSA seeking to
25   develop a capsule, and in many cases a tablet as

65

1  well, would indeed be painfully aware of the need
2  to achieve certain flow, density, and
3  manufacturability characteristics for any
4  prototype formulation intended for solid dose
5  manufacturing.
6      **Q. Okay. So --**
7      A.  If it's a general question, that's the
8  general answer.
9      **Q. Okay. Thank you, Dr. Muzzio.**
10     **And you also agree with Dr. Little's**
11  **assessment, if you look at paragraph 16, that**
12  **flowability, tap density, and manufacturability**
13  **limitations don't appear in the claims of the**
14  **'721 patent; right?**
15     A.  Can you show me where I say that?
16  Because I'm not finding it.
17     **Q. Dr. Little is stating that the claims of**
18  **the '721 patent do not address flowability or tap**
19  **density and neither do they address large-scale**
20  **manufacturability of the claimed invention; right?**
21  **That's what Dr. Little says.**
22     **And then you state, I disagree; right?**
23     A.  Correct, I do.
24     **Q. Okay. So you -- but you would agree**
25  **that flowability, tap density, and**

66

1  **manufacturability limitations don't appear in the**
2  **patent claims?**
3      A.  I might be looking at the wrong report.
4      **Q. Dr. Muzzio --**
5      A.  I am still reviewing, if you don't mind.
6      **Q. Yeah, I was trying to help you.**
7      **In paragraph 16, if you look five lines**
8  **up from the bottom, you state, "simply because**
9  **they do not appear in the patent claims."**
10     **So I think that that's where you've**
11  **offered that opinion already.**
12     A.  Well, I say a few words before those
13  words.
14     **Q. Okay.**
15     A.  This, to me, seems to be hindsight
16  analysis in that it dismisses properties and
17  measurements that would have been of relevance to
18  a POSA. So the POSA apparently is being informed
19  by an awareness that those properties are
20  important, which means that that informs how the
21  POSA is reading the claim.
22     "Simply because they," meaning the
23  words, right, "don't appear in the patent claims."
24  So the words do not appear in the patent claim.
25  That doesn't mean that the POSA, when reading the

67

1  claim in view of the specification, is not being
2  informed by the need to have certain attributes be
3  met in order for the invention to be practiced,
4  possible to be practiced.
5      **Q. Okay. And do you believe that**
6  **flowability, tap density, and manufacturability**
7  **are limitations in the claim of the '721 patent?**
8      MR. FRESE:  Object to form.
9      THE WITNESS:  Well, I do believe I
10  offered an opinion, and I would appreciate help
11  finding it, where I indicate that the fact that
12  the claim calls for granules to put 40 milligrams
13  of pimavanserin tartrate inside a capsule.
14     The reason why it's being called -- that
15  granules are being involved are multiple reasons.
16  One reason is because that's how you achieve the
17  density and the flowability that enable
18  manufacturability.  Because just to put
19  40 milligrams of pimavanserin in a capsule, you
20  don't need to granulate.
21  BY MR. PEACHMAN:
22     **Q. Right. Dr. Muzzio, just so I understand**
23  **your opinion, so do you believe that the granules**
24  **that are recited in the claims of the '721 patent**
25  **have some limitation on flowability, tap density,**

68

1  **or manufacturability?**
2      MR. FRESE:  Objection to form.
3      THE WITNESS:  I have off-- -- I know I
4  have offered an opinion about that.  Let me find
5  the opinion I have offered so I can be consistent.
6  BY MR. PEACHMAN:
7      **Q. Yeah, I guess, Dr. Muzzio, we don't need**
8  **to get into the substantive opinion.**
9      **We can agree that the claims of the**
10  **'721 patent don't expressly recite anything to do**
11  **with flowability, tap density, or**
12  **manufacturability; right?**
13     MR. FRESE:  Objection to form.
14     THE WITNESS:  What my opinion is is that
15  even though the claim language doesn't exactly
16  recite those words, a POSA reading that claim,
17  reading that you need to granulate in order to put
18  40 milligrams of pimavanserin in a size 3 or
19  size 4 capsule would know that the reason you're
20  doing that is because you need to densify, because
21  you need flow, because you need to be able to do
22  this in a way that leads to efficient
23  manufacturing.
24     Because if it was just the problem --
25  the entirety of the problem was how to put

17 (Pages 65 to 68)

8/22/2024          Acadia Pharmaceuticals, Inc. v. Aurobindo Pharma Limited, et al. Fernando J. Muzzio, Ph.D.
Confidential

---

69

1  40 milligrams of pure raw pimavanserin in a
2  capsule, you don't need to granulate.
3         So the fact that the claim is restricted
4  to granulation is telling the POSA that there are
5  flow, density, and manufacturability -- I don't
6  want to use the word "requirements" -- attributes
7  that need to -- that are part of the invention.
8  BY MR. PEACHMAN:
9      Q.  So these are considerations that a POSA
10 would have, but not limitations on Claim 1 or 4 of
11 the '721 patent?
12     A.  The POSA reading that claim, seeing the
13 word "granules" and seeing that the granules have
14 a certain bulk density requirement, would know
15 that, among other reasons, that is being done to
16 make sure that the granules have sufficient flow,
17 sufficient tap density, and to enable
18 manufacturability.  That's what the POSA would
19 understand, reading that claim.
20     Q.  Okay.  So a POSA interpreting the scope
21 of granules in the '721 patent would believe that
22 it has requirements on bulk density, flowability,
23 and manufacturability; right?
24        MR. FRESE:  Objection to form, calls for
25 a legal conclusion.

---

70

1         THE WITNESS:  Bulk density is explicitly
2  recited.
3  BY MR. PEACHMAN:
4      Q.  Okay.  And you also believe that
5  flowability and tap density would also be
6  requirements of the granules in the '721 patent;
7  right?
8         MR. FRESE:  Objection to form and calls
9  for a legal conclusion.
10        THE WITNESS:  I think I should go to the
11 explicit place in the report where I do talk about
12 those things, to remain consistent with my prior
13 testimony.
14 BY MR. PEACHMAN:
15     Q.  Yeah, you discuss here how these are
16 things of relevance to a POSA or things that a
17 POSA would consider, but I'm trying to understand
18 how that relates to your opinions on the scope of
19 the claim terms; right?
20     A.  And I think I answered your question
21 three times.  Hopefully the three times were
22 consistent with each other.  Maybe I can try in a
23 different way.
24        So the way I read Claim 1, if
25 pimavanserin is not granulated, it's outside the

---

71

1  scope of the claim.  So it's only within the scope
2  of the claim when it is granulated.  However, you
3  can put 40 milligrams of pure ungranulated
4  pimavanserin in a size 3 capsule.
5         So the POSA would say, Okay, why did
6  they ask me to granulate?  There must be a
7  purpose, a reason, why I'm being asked to
8  granulate.  Because I don't have to granulate to
9  put pimavanserin in a capsule.  So I'm being asked
10 to granulate.
11        And the reason the POSA would know is so
12 that you have sufficient density flow to enable
13 manufacturability.  So it's intrinsic to how a
14 POSA would read this claim.
15     Q.  Okay.  So your opinion is it's intrinsic
16 how a POSA would understand the scope of granules
17 in the '721 patent, that it would require certain
18 things regarding density, flow and
19 manufacturability?
20        MR. FRESE:  Objection; mischaracterizes
21 prior testimony.
22        THE WITNESS:  Maybe the word "intrinsic"
23 was a poorly chosen word.  I know that that word
24 carries some legal meaning, and I did not mean the
25 word in that sentence.  What I meant is to say the

---

72

1  POSA reading the claim, in view of the
2  specification, which also explains that you need
3  to improve flow and you need to have
4  manufacturability in order to make the product,
5  the POSA would know that the reason that granules
6  are being involved primarily is so that, among
7  other reasons, you have sufficient flow to enable
8  manufacturability.  The POSA would also know that
9  the minute the POSA thinks, I want to make a
10 capsule.
11 BY MR. PEACHMAN:
12     Q.  Okay.  So if --
13     A.  Whether it's pimavanserin or anything
14 else.
15     Q.  If I'm hearing you correctly,
16 Dr. Muzzio, are you saying these are
17 considerations a POSA would have when looking at
18 the claim terms, but these are not limitations on
19 the granules themself in the claim?
20     A.  I'm not trying to rewrite the claim.
21 I'm just saying the claim calls for granules
22 having a certain bulk density, and there are --
23     Q.  That's the only requirement; right?
24     A.  Yeah, but there are reasons for that
25 requirement; right?

---

18  (Pages 69 to 72)

73

1      Q.   And, Dr. Muzzio, can we go to
2  paragraph 19 of your reply expert report,
3  Exhibit 6.
4          And here, once again, Dr. Little is
5  offering an opinion, and he's stating that a POSA
6  would understand the term "pharmaceutically
7  acceptable" to have its plain and ordinary
8  meaning, i.e., a modifier that means generally
9  suitable for use in a pharmaceutical composition.
10     A.   Uh-huh.
11     Q.   And then you go on, I think it is, to
12 state, However, that "plain and ordinary" meaning
13 does not make sense when applied throughout the
14 claims.  Claims 1 and 4, for instance, recite both
15 a pharmaceutically acceptable capsule for orally
16 delivering 34 milligrams of pimavanserin to a
17 patient, as well as one or more pharmaceutically
18 excipients; right?
19     A.   Uh-huh.
20     Q.   And then you say --
21     MR. FRESE:  Just --
22 BY MR. PEACHMAN:
23     Q.   -- I do agree that a POSA would read one
24 or more pharmaceutically acceptable excipients to
25 encompass excipients that are generally suitable

74

1  for use in pharmaceutical compositions; right?
2      A.   Yes.
3      Q.   And what would a person of ordinary
4  skill in the art understand the term "excipients"
5  to mean?
6      A.   Yeah, I noticed that when responding to
7  my report, Dr. Little appears to question whether
8  I understand the meaning of the word "excipient."
9      Q.   Yeah, I guess, Dr. Muzzio, my question
10 for you is:  Sitting here today, what is your
11 understanding of how a person of ordinary skill in
12 the art would understand the term "excipient" in
13 the '721 patent?
14     MR. FRESE:  Object to form.
15     THE WITNESS:  A person of ordinary skill
16 in the art would understand the word "excipient"
17 to mean an ingredient that is suitable for use in
18 a composition, that does not interact adversely
19 with the function of the drug substance, and that
20 in many cases enables the creation of a product
21 with the intended mode of action.  And that would
22 be a function of excipient.
23 BY MR. PEACHMAN:
24     Q.   Okay.  And there's another meaning for a
25 nonfunctional excipient?  Sorry, strike that,

75

1  strike that.
2          Dr. Muzzio, would you agree that when
3  applied to excipients, the term "pharmaceutically
4  acceptable" is a modifier that means generally
5  suitable for use in pharmaceutical compositions?
6      A.   Yeah.
7      Q.   Okay.
8      A.   Yes, I agree that that is a -- that is a
9  legitimate reading of the term.
10     Q.   Okay.  And what support do you have for
11 that belief?
12     A.   I'm agreeing with Dr. Little.  Do I need
13 to provide support?
14     Q.   Well, I guess you're agreeing with him.
15     A.   Do I agree --
16     Q.   What is the foundation for your
17 agreement?  Like, what do you base your agreement
18 on?  Is it your experience?
19     A.   Yes, it's my experience.
20     Q.   Okay.  You don't cite anything else to
21 support it.  So that's what it's based on?
22     A.   I am very aware of the knowledge of a
23 POSA.  So I am providing that agreement.  I agree
24 with your witness on something.
25         Do I need to provide citations of why I

76

1  agree with your witness on something?
2      Q.   Well, Dr. Muzzio, first of all, it's
3  your deposition.  Let me clarify my question just
4  a little bit.
5          So, Dr. Muzzio, so you agree with
6  Dr. Little that "pharmaceutically acceptable" is a
7  modifier that means generally suitable for use in
8  pharmaceutical compositions; correct?
9      A.   When it comes to excipients.
10     Q.   Okay.  So you --
11     A.   That modifier may need something else
12 when it comes to other things.
13     Q.   Okay.  So you disagree that a person of
14 ordinary skill in the art would apply that same
15 definition of "pharmaceutically acceptable" when
16 used in the context of pharmaceutically acceptable
17 capsule?
18     A.   Yes, I disagree.
19     Q.   Okay.  And if we -- I want to look at
20 Exhibit 7, which is your patent, the '682 patent.
21     A.   I'm sorry, which document are you
22 talking about?
23     Q.   This is Exhibit 7.
24     A.   Okay.  My patent.
25     Q.   Right.  Yeah, the '682 patent.

8/22/2024    Acadia Pharmaceuticals, Inc. v. Aurobindo Pharma Limited, et al. Fernando J. Muzzio, Ph.D.
Confidential

77

1    And if we could look at Column 14,
2    line 41.
3    Dr. Muzzio, do you see at line 41, the
4    '682 patent states, Capsules are solid dosage
5    forms in which the drug is enclosed with neither
6    hard shell or soft soluble container or shell.
7    Capsules are generally of the hard gelatin or soft
8    gelatin type, right?
9    A. I see that.
10    Q. And you go on and provide more
11    descriptions, including that hard gelatin capsules
12    consist of two parts, the base and body, which is
13    longer and has a lesser diameter; right?
14    A. Uh-huh.
15    Q. And is this provision here consistent
16    with how a person of ordinary skill in the art
17    typically understands the term "capsule"?
18    A. So if you read this paragraph closely,
19    you would realize that the word "capsule" itself
20    is being used in two different ways in this
21    paragraph, which I guess I would have to take it
22    up with the attorney that drafted that paragraph.
23    But it's being used both to mean the solid dosage
24    form in the first instance, and then to mean the
25    shell itself in the second instance, right.

78

1    And in some sense, I guess, that is also
2    to some extent done in the patent at issue, where
3    the word "capsule" refers both to the dosage form,
4    as well as the shell itself.
5    Q. Okay. So you would agree that a person
6    of ordinary skill in the art in the '721 patent
7    has a similar conception of "capsule," that it
8    could pertain to the entire solid dosage form or
9    the capsule shell?
10    A. I think that a person of ordinary skill
11    in the art reading the '721 patent Claim 1, when
12    reading pharmaceutically acceptable capsule, will
13    understand that that refers to the dosage form.
14    Because the claim actually very explicitly
15    distinguishes the dosage form use of the word
16    "capsule" from the capsule shell.
17    I do, too, here. This patent does, too,
18    because it does talk -- I mean, I think that the
19    fact that the word can have two meanings doesn't
20    really confuse the POSA. Because when reading the
21    paragraph in my patent, we know when the word
22    means the dosage form and when the word means the
23    shell. And the same is true about the patent
24    claim in '721.
25    Q. Okay. Can we look at the Claim 29 of

79

1    this document, the '682 patent.
2    A. Okay. 29?
3    Q. Yeah, Claim 29.
4    A. Okay.
5    Q. And here it states, A method, according
6    to Claim 1, wherein the method further comprises a
7    capsule filling step and optionally making other
8    ingredients to make substantial uniform
9    pharmaceutical capsules containing one or more
10    active substances such that any single active
11    pharmaceutical ingredient (API) and content
12    variability in the pharmaceutical capsules has a
13    relative standard deviation of less than
14    3 percent.
15    Did I read that correctly?
16    A. You did.
17    Q. Okay. And what is the meaning of
18    "capsule" used in this claim, for example?
19    A. It's the dosage form.
20    Q. Okay. And what does the phrase
21    "pharmaceutically acceptable capsule" mean? Is
22    there any difference?
23    A. Well, this technology in this patent can
24    also be used to make supplements. Supplements are
25    not generally regarded as pharmaceutical products.

80

1    They're supplements. The same technology has been
2    used to make catalysts. And while I have never
3    seen anybody put a catalyst inside a capsule,
4    there's also nothing preventing anyone from doing
5    that.
6    Q. Okay. So by modifying the term
7    "capsule" with "pharmaceutical," you're specifying
8    it's a capsule for pharmaceutical use; right?
9    A. It's been ten years since I read this
10    document, and I don't recall what the
11    specification says in detail. But generally
12    speaking, I think if I modify "capsules" with the
13    word "pharmaceutical," I'm comparing that I am
14    talking about I am making a capsule for
15    pharmaceutical use.
16    Q. And could you replace the term
17    "pharmaceutical" with "pharmaceutically
18    acceptable" to make it a pharmaceutically
19    acceptable capsule, and it would have the same
20    meaning?
21    MR. FRESE: Object to form.
22    THE WITNESS: No, it wouldn't have the
23    same exact meaning necessarily, no.
24    BY MR. PEACHMAN:
25    Q. How could a capsule be a pharmaceutical

20  (Pages 77 to 80)

8/22/2024          Acadia Pharmaceuticals, Inc. v. Aurobindo Pharma Limited, et al. Fernando J. Muzzio, Ph.D.
Confidential

81

1  capsule but not a pharmaceutically acceptable
2  capsule?
3      A.  Because I could be doing this earlier in
4  development when I'm developing a formulation, but
5  I haven't yet imparted the product with all the
6  necessary attributes to be suitable for human
7  consumption.
8          I could be doing this before I've done
9  stability testing.  I could be doing this before
10 I've done -- I mean, this is mainly concerned with
11 the ability to make product that is uniform.
12 That's what this claim is directed to.
13     Q.  Do you believe that a pharmaceutical
14 capsule could not be suitable for human
15 consumption?
16     A.  Absolutely.
17     Q.  Why is that?
18     A.  What if I'm making a capsule for animal
19 use, that's not human consumption.  What if I'm
20 making a capsule for testing a prototype, but I
21 haven't yet reached the point where I can make it
22 for human consumption.  What if I'm making it
23 under non-GMP conditions.
24     Q.  Okay.  And, Dr. Muzzio, if we go to
25 Claim 8, which is on Column 26.

82

1      A.  Which document?
2      Q.  The same, the '682 patent.
3      A.  Uh-huh.
4      Q.  Claim 8 states, The method, according to
5  Claim 1, wherein the porous carrier is a
6  pharmaceutically acceptable material; right?
7      A.  Uh-huh.  Yes.
8      Q.  And do you know if your '682 patent
9  provides a definition for "pharmaceutically
10 acceptable"?
11     A.  I don't remember.  Can you point me to
12 it?
13     Q.  Well, would you believe me if I told you
14 your '682 patent does not define the term
15 "pharmaceutically acceptable"?
16     A.  I will accept your representation.
17     Q.  That wouldn't be surprising to you?
18     A.  Not necessarily.
19     Q.  Okay.  And if we can go to Column 21,
20 line 24.
21     A.  21, 24.
22     Q.  Yeah, Column 21 at line 24.
23     A.  Uh-huh.
24     Q.  Do you see here where the '682 patent
25 says, Unless defined otherwise, all technical and

83

1  scientific terms used herein have the same meaning
2  as commonly understood by one of ordinary skill in
3  the art to which this invention belongs?
4          Do you see that?
5      A.  Uh-huh.
6      Q.  So "pharmaceutically acceptable" is not
7  otherwise defined in the specification, because a
8  person of ordinary skill in the art would consider
9  it to be a technical term with a commonly
10 understood meaning; right?
11         MR. FRESE:  Object to form.
12         THE WITNESS:  When reading this patent,
13 that would be the case.
14 BY MR. PEACHMAN:
15     Q.  Well, would you agree that
16 "pharmaceutically acceptable," as a general term,
17 would have been understood by a person of ordinary
18 skill in the art and have a commonly understood
19 meaning?
20     A.  Unless the people writing that
21 specification insert additional language that
22 muddle the waters, so to speak, and make the
23 interpretation more complicated and more
24 difficult, which is the case in the '721 patent.
25     Q.  And what would a person of ordinary

84

1  skill in the art commonly understand the term
2  "pharmaceutically acceptable" to mean?
3      A.  In the context of which document?
4      Q.  Well, I guess the term "pharmaceutically
5  acceptable."
6          Let's say in the '721 patent, what would
7  a person of ordinary skill in the art understand
8  "pharmaceutically acceptable" to be?
9      A.  As referred to an ingredient, as
10 referred to a salt, as referred to a finished
11 dose, those would be different.
12     Q.  Okay.  Well, in Claim 8, for example,
13 Claim 8 says, a pharmaceutically acceptable
14 material.
15         What does "pharmaceutically acceptable"
16 mean there?
17     A.  Claim 8 of?
18     Q.  Claim 8 of the '682 patent, what you
19 were just looking at.
20     A.  My document.
21     Q.  Where it says, pharmaceutically
22 acceptable material.
23     A.  I would have to review the spec to make
24 sure I -- even if I accept your representation
25 that the term is not defined, that there isn't

8/22/2024          Acadia Pharmaceuticals, Inc. v. Aurobindo Pharma Limited, et al. Fernando J. Muzzio, Ph.D.
Confidential

85

1  other language that actually informs the thinking
2  of a person of ordinary skill in the art, I don't
3  want to have to rely on vague and incomplete
4  memory ten years after the fact of what we did or
5  did not say in this patent.
6      **Q.  Sitting here today, can you give me an**
7  **example of a pharmaceutically unacceptable**
8  **material for a porous carrier?**
9      A.  Yes.
10     **Q.  What's that?**
11     A.  Let's say a carrier that contains a
12 heavy metal that is toxic to a human being.
13     **Q.  Okay.  So if a pharmaceutically -- okay.**
14     **If a porous carrier contains a material**
15 **that's dangerous to a human being, it's no longer**
16 **pharmaceutically acceptable?**
17     A.  Let me amend my answer.  If a porous
18 carrier contains a harmful material in such a
19 concentration such that when administered to a
20 patient at the maximum intended amount would cause
21 harm to the patient, then that material would not
22 be pharmaceutically acceptable.  That would apply
23 to an ingredient.
24     **Q.  Okay.  And would the porous carrier also**
25 **be pharmaceutically acceptable if it contains a**

86

1  **pharmaceutically acceptable material?**
2      MR. FRESE:  Object to form.
3      THE WITNESS:  Now you completely lost
4  me.  Are we talking about the carrier, or are we
5  talking about the impregnated carrier?
6  BY MR. PEACHMAN:
7      **Q.  Well, here, it says, a porous carrier --**
8  **in Claim 8, a porous carrier that has a**
9  **pharmaceutically acceptable material?**
10     A.  So the carrier is the material.
11     **Q.  Okay.  And it's related to Claim 1,**
12 **which is talking about a pharmaceutical final**
13 **dosage form; right?  Is the pharmaceutical final**
14 **dosage form also pharmaceutically acceptable if it**
15 **contains a pharmaceutically acceptable porous**
16 **carrier?**
17     MR. FRESE:  Objection; mischaracterizes
18 the document.
19     THE WITNESS:  So, again, repeat the
20 question, please.
21 BY MR. PEACHMAN:
22     **Q.  So Claim 8 is talking about a porous**
23 **carrier that has a pharmaceutically acceptable**
24 **material.**
25     A.  Yes.

87

1      **Q.  Would the pharmaceutical final dosage**
2  **form in Claim 1, from which this depends, also be**
3  **pharmaceutically acceptable because the porous**
4  **carrier is a pharmaceutically acceptable material?**
5      MR. FRESE:  Objection to form and
6  mischaracterizes the document.
7      THE WITNESS:  It's the other way around.
8  In order for the pharmaceutical dosage form of
9  Claim 1 to be pharmaceutically acceptable, the
10 carrier would have to be pharmaceutically
11 acceptable itself when using the amount intended.
12 And the amount also matters, by the way.
13 BY MR. PEACHMAN:
14     **Q.  Can we look at Claim 14.**
15     **So Claim 14 discusses filling a capsule**
16 **with at least one active pharmaceutical ingredient**
17 **impregnated porous carrier; right?**
18     A.  Uh-huh.
19     **Q.  Does Claim 14 specify that the porous**
20 **carrier is pharmaceutically acceptable material?**
21     A.  Well, Claim 14 -- well, it talks about a
22 pharmaceutical final dosage form, right.
23     **Q.  Okay.  And would -- sorry, go ahead.**
24 **Continue your answer, if you still have an answer.**
25     A.  But if your point is to say that some of

88

1  the language in the claims in a patent that I
2  authored is not the best, I don't have any problem
3  with that.  And if you believe that maybe you
4  should sue for invalidity of my patent, you're
5  more than welcome to do that.
6      **Q.  I guess the question I have,**
7  **Dr. Muzzio --**
8      A.  That's my question.  What is the point
9  of --
10     **Q.  Would a person of ordinary skill in the**
11 **art understand that a porous carrier needs to be**
12 **pharmaceutically acceptable material because it's**
13 **being filled into a capsule that's a**
14 **pharmaceutical final dosage form?**
15     A.  Likely, yes.  But --
16     **Q.  Okay.  So because a final dosage form is**
17 **limited to being a final pharmaceutical dosage**
18 **form, a person of ordinary skill in the art would**
19 **understand that the components and ingredients**
20 **inside of it would also be pharmaceutically**
21 **acceptable; right?**
22     A.  It would have to be also used in a
23 manner that is consistent with making sure that
24 the product at the end of the day is
25 pharmaceutically acceptable.

22 (Pages 85 to 88)

Case 1:22-cv-01387-GBW    Document 103-15    Filed 11/14/24    Page 127 of 174 PageID
#: 2395

8/22/2024         Acadia Pharmaceuticals, Inc. v. Aurobindo Pharma Limited, et al. Fernando J. Muzzio, Ph.D.
Confidential

89

1    Q.  Okay.  If we could look at your opening
2  report, which is Exhibit 5, I believe.
3         Okay.  Page 66.
4    A.  Page 66?
5    Q.  Yeah.
6    A.  Okay.
7    Q.  So under header B, you offer the opinion
8  that Claims 1 through 7 and 9 through 13 are
9  indefinite, because the term "pharmaceutically
10  acceptable capsule" is undefined and a POSA
11  wouldn't understand its scope.
12         Is that your opinion, Dr. Muzzio?
13    A.  It is.
14    Q.  Okay.  And if we look at paragraph 176,
15  you state that, It's my opinion that Claims 1
16  through 7 and 9 through 13 are indefinite.
17  Claims 1 and 4 both recite a pharmaceutically
18  acceptable capsule.  However, neither the claims
19  nor the specification or the prosecution history
20  of the '721 patent provides a POSA with reasonable
21  certainty regarding what aspects, if any, go into
22  making a capsule pharmaceutically acceptable;
23  right?
24    A.  Uh-huh.  Yes.
25    Q.  Okay.  So that's the opinion that you're

90

1  offering.  And then you offer another opinion, I
2  believe, on 177, where you state, The
3  specification fails to define the term
4  "pharmaceutically acceptable capsule"; right?
5    A.  Yes.
6    Q.  Okay.  And then you have a Footnote 155.
7         Do you see that?
8    A.  Yes.
9    Q.  In which you state, The specification
10  does define the term "pharmaceutically acceptable
11  salt" as one that does not abrogate the properties
12  of the biological activity and properties of the
13  compound, but a POSA would not consider that
14  definition particularly relevant to a capsule;
15  right?
16    A.  Yes.
17    Q.  You don't explain here at this
18  Footnote 155, why a POSA would not consider the
19  definition of a "pharmaceutically acceptable salt"
20  to be particularly relevant to a capsule; right?
21    A.  I don't.
22    Q.  And what is the reason that they
23  wouldn't consider it to be particularly relevant
24  to a capsule?
25    A.  Because a salt, among many salts, you

91

1  can create for an API would have to have the -- an
2  ion or cation or however you are creating that
3  salt, the acid that you are adding or whatever,
4  for example, be nontoxic.  It would have to not
5  effect adversely the solution.  It would have to
6  not effect adversely other properties of the
7  material.
8         So when looking at whether a salt is
9  pharmaceutically acceptable or not, and it says
10  here, right, as an abrogate -- the answer is here
11  in the report.  It says it's -- and it's,
12  actually, literally taken from the specification,
13  right.  It doesn't abrogate the biological
14  activity.  So that would be how the
15  pharmaceutically acceptable modifier applies to
16  the salt.
17         But that's not how that modifier,
18  pharmaceutically acceptable, would apply to, let's
19  say, a binder.  And it would definitely not be how
20  in general the modifier generally acceptable would
21  apply to, let's say, a tablet.  Yeah.
22         Those are different entities functioning
23  in different ways.  And, therefore, what makes or
24  doesn't make it pharmaceutically acceptable is not
25  always the same thing.  And so a POSA would know

92

1  that.  And your witness actually happens -- this
2  happens to be one of the very, very few things
3  that your witness chose to agree with me on.
4    Q.  So is it your opinion that a POSA
5  wouldn't learn anything from the term
6  "pharmaceutically acceptable" -- when it says,
7  "pharmaceutically acceptable salt," they wouldn't
8  be able to extract any meaning from what that term
9  "pharmaceutically acceptable" would mean as
10  applied to a capsule?
11    A.  I don't believe I have offered that
12  opinion.
13    Q.  Well, I guess I'm asking you right now,
14  Dr. Muzzio, when it says "pharmaceutically
15  acceptable salt" and a POSA sees that word, would
16  they not be able to extract any meaning from the
17  modifier, pharmaceutically acceptable, and apply
18  it to capsule?
19    A.  A POSA doesn't need to do that.  A POSA
20  doesn't need to learn what "pharmaceutically
21  acceptable" means in the context of a salt to then
22  try to figure out what "pharmaceutically
23  acceptable" means in the context of a capsule.
24    Q.  Wouldn't it be a reasonable for a person
25  of ordinary skill in the art to try to understand

93

1  what a "pharmaceutically acceptable capsule" means
2  to look at other terms that are defined as
3  pharmaceutically acceptable in the patent?
4      A.  No.  A person of ordinary skill in the
5  art, as defined, would generally understand what
6  "pharmaceutically acceptable" means, except in the
7  case of the '721 patent where the specification
8  manages to confuse the meaning of that term to the
9  point where now it's impossible to figure out what
10  it means in the context of the claim.
11      Q.  You testified that a POSA would
12  understand "pharmaceutically acceptable salt" to
13  be something that was nontoxic and didn't
14  adversely affect the solution.
15      Why couldn't a POSA, similarly, believe
16  that "pharmaceutically acceptable," as applied to
17  capsule, would mean nontoxic and doesn't create
18  effects in solution?
19      MR. FRESE:  Objection; mischaracterizes
20  prior testimony.
21      THE WITNESS:  Yeah, the POSA could bring
22  that meaning into pharmaceutically acceptable
23  capsule, but the POSA would also know that the
24  capsule is intended for administration to humans.
25  So there would be a number of other requirements

94

1  that pharmaceutically acceptable capsule would
2  need to meet besides those two.
3      And that's part of the problem and part
4  of the opinion I have provided here, that the
5  '721 patent discloses four or five instances of
6  granulations made in different ways that were
7  presumably known, found to be acceptable,
8  because -- and they list a bunch of reasons,
9  because of impurities being present, because the
10  particle size wasn't the desired one, because the
11  excipient wasn't what they wanted, and a bunch of
12  other things, right, without actually explaining
13  exactly what values of those parameters made it
14  acceptable or not.
15      So even if a POSA could find some common
16  context to the use of those two words as applied
17  to different materials, a POSA would still have
18  trouble understanding what those two words mean in
19  the claim.
20      And I think I've given you this opinion
21  in the order of 20 times now.
22  BY MR. PEACHMAN:
23      Q.  Dr. Muzzio, can you go to the
24  '721 patent, which is Tab -- sorry, it's
25  Exhibit 3.

95

1      MR. FRESE:  It's Exhibit 4.
2      MR. PEACHMAN:  Exhibit 4, sorry.
3      THE WITNESS:  Thank you.
4  BY MR. PEACHMAN:
5      Q.  Column 2, line 34.
6      A.  Yeah.
7      Q.  Okay.  And at the "Definitions" section,
8  it states, Unless defined otherwise, all technical
9  and scientific terms understood herein have the
10  same meaning as commonly understood by one of
11  ordinary skill in the art; right?
12      A.  Uh-huh.
13      Q.  So this is very similar to the
14  definition that you provided in your '682 patent;
15  right?
16      A.  Uh-huh.
17      MR. FRESE:  Yes or no, not "uh-huh"
18  or --
19      THE WITNESS:  Yes.  Yes.
20      MR. FRESE:  Thank you.
21      THE WITNESS:  Yes, sorry.
22  BY MR. PEACHMAN:
23      Q.  And if you look at Column 2, line 48.
24      A.  Yes.
25      Q.  The '721 specification states, As used

96

1  herein, physiological acceptable --
2      A.  Yes.
3      Q.  -- defines a diluent binder or excipient
4  that does not abrogate the biological activities
5  and properties of the pharmaceutically acceptable
6  compound; right?
7      A.  Yes.
8      Q.  And the term "physiologically
9  acceptable" is expressly indicated to define an
10  excipient; right?
11      A.  Yes.
12      Q.  And if you continue on to line 52, the
13  '721 specification defines "pharmaceutically
14  acceptable salt" to be a salt of a compound that
15  does not abrogate the biological activity and
16  properties of the compound; right?
17      A.  Yes.
18      Q.  And then it also defines, on the next
19  column, Column 3, line 8, that pharmaceutically
20  acceptable solvates and hydrates are complexes of
21  the compound.
22      Do you see that?
23      A.  Yes.
24      Q.  There's another definition provided
25  there for "pharmaceutically acceptable solvates

8/22/2024          Acadia Pharmaceuticals, Inc. v. Aurobindo Pharma Limited, et al. Fernando J. Muzzio, Ph.D.
Confidential

97

1    and hydrates"?
2        A.  Right.
3            MR. FRESE:  Objection to form and
4    mischaracterizes the document.
5    BY MR. PEACHMAN:
6        Q.  And, Dr. Muzzio, if we could go back --
7    just flip back one page back to Column 2 at 48.
8            The '721 patent's definition of a
9    "physiologically acceptable excipient" and its
10   definition of a "pharmaceutically acceptable salt"
11   in the paragraph below, both provide that the
12   ingredients do not abrogate the biological
13   activities and properties of the compound; right?
14       A.  Yes.
15       Q.  And we previously discussed,
16   Dr. Little's opinions that a POSA would read the
17   "one or more pharmaceutically acceptable
18   excipients" to encompass excipients that are
19   generally suitable for use in pharmaceutical
20   compositions.
21           And I think that you agree and that we
22   discussed that a POSA would read the "one or more
23   pharmaceutically acceptable excipients" to
24   encompass excipients that are generally suitable
25   for use in pharmaceutical compositions; right?

98

1        A.  I agree that I said that.
2        Q.  Right.  And we can agree that
3    pharmaceutically acceptable excipients are not
4    only generally suitable for use in pharmaceutical
5    compositions, but they also do not abrogate the
6    biological activity and properties of a specific
7    compound; right?
8        A.  To a point.
9        Q.  Okay.  And, Dr. Muzzio, how would a POSA
10   understand the term "capsule," as used in the
11   '721 patent?
12           MR. FRESE:  Objection to form.
13           THE WITNESS:  So the word "capsule" is
14   used in at least two meanings, as in dosage form,
15   which is the way it is used in the preamble of
16   Claim 1 and Claim 4, and as in capsule shell,
17   referring to the actual shell ingredient used to
18   make a capsule, used to make a finished dose.
19   BY MR. PEACHMAN:
20       Q.  Okay.  And that understanding, is that
21   based on anything in the specification, or is that
22   just your experience?
23       A.  No, there are passages in the
24   specification that use the word in one way or in
25   the other.

99

1        Q.  Okay.  And how would a POSA understand
2    the term "pharmaceutically acceptable capsule" in
3    the '721 patent?  What would be their
4    understanding of the term?
5            MR. FRESE:  Objection; asked and
6    answered.
7            THE WITNESS:  As used in Claim 1 and
8    Claim 4, a POSA would know that it refers to the
9    dosage form.  But a POSA would not be able to
10   understand exactly what are the boundaries that
11   would make this dosage form pharmaceutically
12   acceptable or not.
13           Because, again, the '721 patent provides
14   multiple instances of processes that lead to
15   unacceptable results without providing the
16   criteria for making those decisions.
17   BY MR. PEACHMAN:
18       Q.  Okay.  So if we could go to your reply
19   report again.  This is Exhibit 6.  You may have it
20   in front of you.
21           Okay.  It's the other one.
22       A.  Yeah.
23       Q.  And we go to paragraph 20.
24       A.  Yes.
25       Q.  Yeah.

100

1            So you state that, Furthermore, I
2    disagree with Dr. Little's opinion that a POSA
3    would have understood "pharmaceutically acceptable
4    capsule," from reference to several of the
5    incorporated prior art documents that refer to a
6    pharmaceutically acceptable form or
7    pharmaceutically acceptable dosage form.
8            And then you state that, These
9    references all define a "capsule" specifically as
10   a pharmaceutically acceptable dosage form, which
11   any POSA would know to be true.  That, in turn,
12   would make the term "pharmaceutically acceptable
13   capsule" redundant and meaningless to a POSA if it
14   simply referred to the form as being one that was
15   acceptable for application in a pharmaceutical
16   product; right?
17       A.  Yes.
18       Q.  And a capsule is a dosage form; right?
19       A.  That's one of the meanings of the word
20   "capsule."
21       Q.  Okay.  And a dosage form, a capsule is
22   also a container or a shell that encloses a
23   medicine.
24       A.  That's another different meaning of the
25   word "capsule."

25  (Pages 97 to 100)

8/22/2024    Acadia Pharmaceuticals, Inc. v. Aurobindo Pharma Limited, et al. Fernando J. Muzzio, Ph.D.
Confidential

101

1    Q.  And a person of ordinary skill in the
2    art would understand that an empty capsule, as in
3    the container of a shell, is made out of inactive
4    ingredients or excipients; right?
5        A.  Not always.
6        Q.  But it can be; correct?
7        A.  Often that is true.
8        Q.  Okay.  And could a capsule be made out
9    of ingredients or excipients that would make it
10   unacceptable for application in a pharmaceutical
11   product?
12       A.  It can, as in somebody could do that.
13   Yes, somebody could do that.
14       Q.  So if a capsule is, like, made out of
15   lead, it would be unacceptable for application in
16   a pharmaceutical product; correct?
17       MR. FRESE:  Objection; incomplete
18   hypothetical.
19       THE WITNESS:  Most likely in most
20   circumstances, that would be probably be true.
21   BY MR. PEACHMAN:
22       Q.  Okay.  So while a capsule is a dosage
23   form, the composition of the capsule itself can
24   make it not acceptable for an application in a
25   pharmaceutical product; right?

102

1        A.  You're confusing me and losing me.
2    Somebody can make a capsule that is not
3    acceptable.
4        Q.  Okay.  So you could make a capsule
5    that's not a pharmaceutically acceptable dosage
6    form?
7        A.  I can make a capsule that is not a
8    pharmaceutically acceptable dosage form, for sure.
9        Q.  If you look at -- actually, 21, so
10   we're -- yeah, we're still looking at that.
11       The first sentence, A further problem
12   with Dr. Little's analysis regarding this claim
13   term is that it ignores the comparative
14   experiments that resulted in unacceptable
15   products; right?
16       A.  Uh-huh.  Yes.
17       Q.  I think we referred to that today.
18       A.  Yes.
19       Q.  And still on 21, you state that, A POSA
20   would not simply ignore these comparative
21   experiments in reading the claims and would expect
22   the applicants to have distinguished the
23   experiments resulting in unacceptable products;
24   right?
25       A.  Yes.

103

1        Q.  And I know that that paragraph goes on.
2        Dr. Muzzio, do you know whether an
3    inventor of a patent is allowed to disclose more
4    than one invention in a patent specification?
5        MR. FRESE:  Objection; calls for a legal
6    conclusion.
7        THE WITNESS:  I think that what
8    constitutes the invention is the claims
9    themselves.  You can say many things in a
10   specification.
11   BY MR. PEACHMAN:
12       Q.  Do you read the '721 patent as
13   disclosing more than one type of invention?
14       MR. FRESE:  Objection; form and calls
15   for a legal conclusion.
16       THE WITNESS:  I don't believe I have
17   offered any opinions about how many inventions are
18   disclosed, if any.
19   BY MR. PEACHMAN:
20       Q.  Okay.  So --
21       A.  In the '721 patent.
22       Q.  So do you know one way or the other --
23       A.  My opinion is that the claims do not
24   constitute anything inventive.
25       Q.  Okay.  Do you know one way or the other

104

1    whether an inventor is required to claim each
2    invention that's disclosed in a patent
3    specification?
4        MR. FRESE:  Objection; calls for a legal
5    conclusion.
6        THE WITNESS:  I don't understand your
7    question.
8    BY MR. PEACHMAN:
9        Q.  So if a patent discloses multiple
10   different types of inventions, is the inventor
11   required to claim every one of those different
12   iterations of the invention?
13       MR. FRESE:  Objection; calls for a legal
14   conclusion.
15       THE WITNESS:  In my own experience, the
16   patent office comes back to you and says, Make a
17   choice.  Which invention are you pursuing right
18   now?
19   BY MR. PEACHMAN:
20       Q.  Okay.  So a claim is directed to one
21   type of invention?
22       MR. FRESE:  Objection; calls for a legal
23   conclusion.
24       THE WITNESS:  I did not attend law
25   school.  I don't know the answer to that question.

26 (Pages 101 to 104)

105

1  BY MR. PEACHMAN:
2      Q.  Okay.  Let's do it another way.  If you
3  look at the '721 patent at the "Summary" section.
4  I think it's Column 1.
5          And at the bottom, do you see where it
6  says "Summary"?
7      A.  Yes.
8      Q.  Okay.  And it says, Provided herein are
9  capsules comprising 5 to 34 milligrams
10 pimavanserin equivalent to 6 to 40 milligrams
11 pimavanserin tartrate or a pharmaceutically
12 acceptable salt; right?
13     A.  It says that.
14     Q.  All right.  And then do you see at the
15 top of Column 2, Provided herein are also
16 pharmaceutical compositions consisting of 5 to
17 34 milligrams pimavanserin?
18         Do you see that?
19     A.  I do.
20     Q.  And then the next below that says,
21 Provided herein are also processes for
22 manufacturing a capsule comprising 5 to
23 34 milligrams pimavanserin?
24     A.  Yes.
25     Q.  In your opinion, would a POSA read these

106

1  three different disclosures as a single invention
2  or three related inventions?
3      A.  Or none.
4      Q.  Okay.  Well, assuming that these are
5  inventions, would a POSA read these as one
6  invention or as three inventions?
7          MR. FRESE:  Objection; incomplete
8  hypothetical.
9          THE WITNESS:  I don't know that the POSA
10 would read any of these as an invention.  Just
11 because you disclose a process doesn't mean that
12 the process is inventive; is it?
13 BY MR. PEACHMAN:
14     Q.  Well, I guess there's a -- a POSA would
15 understand that capsules comprising pimavanserin
16 are separate from processes for manufacturing a
17 capsule for pimavanserin; right?
18         MR. FRESE:  Objection to form.
19         THE WITNESS:  But you're asking me to
20 count inventions, and that presumes that they are
21 inventive, which they might not be.  And, in my
22 opinion, they're not.
23 BY MR. PEACHMAN:
24     Q.  Putting aside your opinion that you
25 don't believe these are inventions, a POSA looking

107

1  at the first description of capsules comprising 5
2  to 34 milligrams of pimavanserin would understand
3  that that's capsules.
4          Whereas, for example, in the next
5  column, processes for manufacturing a capsule, is
6  a related but separate invention; right?
7          MR. FRESE:  Objection to form.
8          THE WITNESS:  Again, I'm not a lawyer,
9  I'm not an expert in patent law, but I vaguely
10 understand that sometimes you can have a process
11 that defines a product.  So I don't think you can
12 always distinguish the product and the process
13 just because in one place you talk about a product
14 and another place you talk about a process, right.
15         So I don't know that a POSA reading this
16 would say, Oh, there are many inventions here.
17 I --
18 BY MR. PEACHMAN:
19     Q.  Okay.  So you think a POSA would read
20 these all as the same invention?
21         MR. FRESE:  Objection; mischaracterizes
22 prior testimony.
23         THE WITNESS:  I think a POSA would read
24 this trying to understand the claims, period.  And
25 then would look at the claims to say, Okay, what

108

1  is being claimed as being inventive is what's in
2  the claims already in view of the specification.
3  BY MR. PEACHMAN:
4      Q.  Okay.
5      A.  But besides that, I don't know why a
6  POSA would be trying to count inventions.
7      Q.  Okay.  So do you have any opinion
8  whether Column 1, line 65, through Column 2,
9  line 16, would be understood by a POSA as a single
10 invention or multiple inventions?
11         MR. FRESE:  Objection to form, compound.
12         THE WITNESS:  Point me, please, to where
13 in my report I actually respond to the contention
14 that these are multiple inventions, so that I can
15 make sure that I give you a precise and consistent
16 answer.
17 BY MR. PEACHMAN:
18     Q.  Dr. Muzzio, you offer a lot of opinions
19 in this case, and they are based on how a POSA
20 would read and understand the specification.
21     A.  Yes.
22     Q.  So really all I'm trying to understand
23 from you is how you believe a POSA would read
24 Column 1, line 65, through Column 2, line 16.
25         I want to understand if you think a POSA

109

1 would be reading that section as defining a single
2 invention or different inventions?
3     A.  So, Counsel, when I provided those
4 opinions in my report, I had the benefit of being
5 able to sit in my office and reflect on things and
6 be thoughtful and mindful and precise.  And now
7 I'm on the relatively stressful situation of
8 having to answer questions in a deposition, and I
9 want to avoid any opportunity to give you an
10 off-the-cuff answer that might not take into full
11 consideration all the facts in the case.
12        So if you would please point me to where
13 in my report I address these points so that I can
14 refresh myself of the exact language I used so
15 that I can give you a precise answer, I would
16 appreciate that.
17        Alternatively, I can look for it and it
18 would take me a while, but I will try to find it.
19     Q.  Okay.  So sitting here today, do you
20 have any opinion right now whether Column 1,
21 line 65, through Column 2, line 16, would be
22 understood by a POSA as describing a single
23 invention or multiple inventions?
24     A.  My opinion right now is that it's
25 completely immaterial to have -- a POSA would read

110

1 Claim 1.  And a POSA would read Claim 1 as
2 understanding that the term "pharmaceutically
3 acceptable capsule" is unclear in the context of
4 this patent, because there are processes for
5 making the product and there are processes that
6 result in unacceptable product, and the
7 recommended dose is not defined.  That opinion I
8 can give you right now.
9     Q.  Could Claim 1 of the '721 patent be
10 claiming the invention of a pharmaceutical
11 capsule, which is separate from an invention
12 related to a process for making a pharmaceutical
13 capsule?
14        MR. FRESE:  Objection to form and calls
15 for a legal conclusion.
16        THE WITNESS:  I don't think so.  Because
17 when the POSA reads Claim 1 and sees "a
18 pharmaceutical capsule," but the POSA has read the
19 spec and the specification has multiple columns
20 talking about some other ways to make capsules
21 that were not acceptable, the POSA would then say,
22 Okay, there must be some difference between the
23 process that leads to a pharmaceutically
24 acceptable capsule and then one that doesn't.  And
25 I will only infringe this claim if I'm using the

111

1 ones that lead to an acceptable capsule, but I
2 have no way to know which one is which, in the
3 context of this specification.
4 BY MR. PEACHMAN:
5     Q.  Can you go to Column 9, line 4?
6     A.  Will you please just give me one second.
7        (Witness peruses the exhibit.)
8        THE WITNESS:  So in my report,
9 paragraph 91 --
10 BY MR. PEACHMAN:
11     Q.  And which exhibit are you referring to?
12 Is this the reply report, Exhibit 6?
13     A.  Exhibit 6.
14     Q.  Okay.
15     A.  I think I gave you an answer to the
16 question you're asking, which is that a POSA
17 reading this claim knows that there is a process
18 being involved, which is granulation, and then
19 there's another process being involved, which is
20 capsule filling.
21        So granulation or capsule filling are
22 not separate inventions because the claim requires
23 granulation and capsule filling for the invention
24 to be practiced.  So you cannot separate
25 granulation as a process or capsule filling as a

112

1 process from the filled capsule filled with
2 granules.
3        So if at least for that reason, the
4 claim variates in pharmaceutical processes, which
5 are manufacturing processes.  So I offer
6 paragraphs 191 and 92 as the answer to your
7 question.
8     Q.  If one was to make the claimed
9 composition in Claim 1 of the '721 patent, but not
10 granulate the pimavanserin and excipients
11 themselves, would they have infringed the claim?
12     A.  One --
13        MR. FRESE:  Objection to form, vague.
14        THE WITNESS:  One more time, please.
15 BY MR. PEACHMAN:
16     Q.  If a person was to make the claimed
17 composition in Claim 1 of the '721 patent, but not
18 granulate the pimavanserin and excipients
19 themselves, would they have personally infringed
20 that claim?
21        MR. FRESE:  Objection; form and calls
22 for a legal conclusion.
23        THE WITNESS:  It's also --
24        MR. FRESE:  And incomplete hypothetical.
25        THE WITNESS:  -- an impossible

28  (Pages 109 to 112)

113

1 hypothetical. Because the composition requires
2 granules. So how can one make this composition
3 without granulating?
4 BY MR. PEACHMAN:
5 **Q. Okay. So they would have to -- to meet**
6 **that claim, they would not only have to make the**
7 **granule, but they would have to make the**
8 **granulation process, as well?**
9 MR. FRESE: Objection to form,
10 incomplete hypothetical, calls for a legal
11 conclusion.
12 THE WITNESS: To granulate, you have to
13 make granules.
14 BY MR. PEACHMAN:
15 **Q. Right. And your opinion is that Claim 1**
16 **requires the granulation process also to be**
17 **performed?**
18 MR. FRESE: Objection to form,
19 incomplete hypothetical, calls for a legal
20 conclusion.
21 THE WITNESS: Claim 1 requires granules,
22 which means somebody granulated. Unless I'm
23 misunderstanding something, this seems to be a
24 theological question or something. I mean, how
25 can you use granules without granulating?

114

1 BY MR. PEACHMAN:
2 **Q. Okay. So in order to meet the**
3 **limitations of Claim 1, someone needs to perform a**
4 **granulation process and make the granules?**
5 A. I'm shaking my head. Yes. Yes.
6 **Q. Okay. And so, Dr. Muzzio, I want to go**
7 **to --**
8 A. And I don't mean to be disrespectful to
9 you.
10 **Q. Oh, I'm not --**
11 A. It's just that I feel a little confused
12 by the question because I don't understand really
13 what you might -- I'm trying to understand what
14 you might really be trying to ask me here.
15 **Q. Yeah, I mean, I think that we clarified**
16 **sort of your thought on sort of if processes are**
17 **needed. I wanted to move on because we were sort**
18 **of on this line for a while.**
19 **If you look at Column 9, line 4.**
20 A. Of which document?
21 **Q. Oh, of the Exhibit 6 -- sorry, sorry,**
22 **not Exhibit 6, the patent.**
23 MR. FRESE: Exhibit 4.
24 MR. PEACHMAN: The '721 patent.
25 THE WITNESS: Okay. Exhibit 4,

115

1 Column 9?
2 BY MR. PEACHMAN:
3 **Q. Yeah, Exhibit 4, Column 9.**
4 A. Yes.
5 **Q. And here you state -- sorry, the patent**
6 **states, the '721 patent states, It is herein been**
7 **demonstrated that altering the flow in bulk**
8 **density pimavanserin and compositions comprising**
9 **pimavanserin using the methods described herein**
10 **results in a reproducible and quantitatively**
11 **accurate filling of small sized capsules, for**
12 **example, size 3 or 4 capsules in a scaled-up**
13 **pharmaceutical manufacturing process; right?**
14 A. Yeah.
15 **Q. Okay. And so a POSA would understand**
16 **here that the '721 patent is describing**
17 **compositions comprising pimavanserin that are made**
18 **using the methods described herein; right?**
19 A. Yeah.
20 **Q. Right. And the methods that are**
21 **described are reproducible and quantitatively**
22 **accurate filling?**
23 A. Enable.
24 **Q. Right.**
25 A. Yes.

116

1 **Q. And so a person of ordinary skill in the**
2 **art would appreciate here that the '721 patent is**
3 **describing an invention related to pharmaceutical**
4 **manufacturing as having certain requirements such**
5 **as manufacturing efficiency and economic**
6 **requirements, right, if you look at the paragraph**
7 **right below it?**
8 MR. FRESE: Objection to form, vague.
9 THE WITNESS: I think that's simply
10 clarifying what's in the previous paragraph. It
11 talks about manufacturing of a 100 -- of a million
12 capsules or more. It talks about manufacturing at
13 a certain speed. And so it then goes on and says,
14 you know, what I was talking about in the previous
15 paragraph, means that, you know, I can implement
16 the process.
17 BY MR. PEACHMAN:
18 **Q. Right.**
19 A. So that it's efficient and economical.
20 **Q. The '721 patent here, though --**
21 A. It's just clarifying the previous
22 paragraph.
23 **Q. It's describing methods that are used in**
24 **order to make pimavanserin compositions; right?**
25 MR. FRESE: Objection; form.

29 (Pages 113 to 116)

117

1      THE WITNESS:  No, I think it's just
2  saying that it's been shown that you can make
3  capsules efficient and economically.  And you can
4  make those by doing -- by following the teaching
5  of the patent.
6  BY MR. PEACHMAN:
7      Q.  Okay.  And if we're staying on Column 9,
8  lines 4 through 15, at the bottom of that segment,
9  it talks about how pharmaceutical manufacturing,
10  as used herein, has certain requirements to it,
11  such as manufacturing efficiency and economical
12  requirements; right?
13      A.  I read this to mean that when people in
14  the industry manufacture pharmaceutical products,
15  they usually try to be efficient and economical.
16  That's how I read this.
17      Q.  Okay.  And if we go to Column 13,
18  line 20, do you see, Dr. Muzzio, where it states
19  that, Some requirements of the pharmaceutical
20  manufacturing for pimavanserin are commercial
21  operation speed, as well as stringent regulatory
22  requirements?
23      A.  Yeah.
24      Q.  So here, the '721 patent is, once again,
25  providing some kind of requirements for how

118

1  pharmaceutical manufacturing of pimavanserin would
2  be conducted; right?
3      A.  Yeah, but in reference to the main
4  teachings of the patent, which are that you
5  granulate and you get a certain density and a
6  certain particle size distribution so that you can
7  fill lots of capsules.
8      So, basically, the claim as written
9  pertains to the practice of this process where you
10  can make a large number of capsules efficiently,
11  accurately, economically.
12      Q.  When you say, "the claim as written," do
13  you mean the claims of the '721 patent?
14      A.  Yes.
15      Q.  So you -- just so I understand, you're
16  saying that the claims of the '721 patent would
17  require all these things that are described here
18  in Column 13?
19      MR. FRESE:  Objection, mischaracterizes
20  testimony.
21      THE WITNESS:  I'm saying that the claims
22  call for granulation.  They call for a certain
23  density.  And those are attributes you need so
24  that you can manufacture large numbers of capsules
25  accurately and economically.

119

1  BY MR. PEACHMAN:
2      Q.  Okay.  But here in Column 13, what's
3  being described are just requirements for
4  pharmaceutical manufacturing; right?
5      It's referring to a process, but not to
6  a final product, Column 13, 20 through 28?
7      MR. FRESE:  Objection to form.
8      THE WITNESS:  It says, Some requirements
9  of the pharmaceutical manufacturing for
10  pimavanserin.  So it's referring to a product.
11  BY MR. PEACHMAN:
12      Q.  Right.  But it's discussing requirements
13  of the pharmaceutical manufacturing process.
14  That's the focus of Column 13, lines 20 through
15  28?
16      MR. FRESE:  Objection to form.
17      THE WITNESS:  No, I think it's telling a
18  POSA that, POSA, when you -- as almost always will
19  be the case, when you are designing a product to
20  make lots of capsules, as in here, use the
21  teachings of the patent.
22      So the teachings of the patent will
23  enable you to do what you know you need to do,
24  which is make a lot of capsules.  Because if you
25  only want to make a few, you can just put pure

120

1  pimavanserin in a capsule, and you're done with
2  it.
3  BY MR. PEACHMAN:
4      Q.  Okay.  But the claims of the patent, the
5  '721, they don't expressly mention that the
6  capsules need to be pharmaceutically
7  manufacturable; do they?
8      A.  I'm sorry, what?
9      Q.  The claims of the '721 patent don't
10  require the capsules to be made in a
11  pharmaceutically manufacturable way; right?
12      MR. FRESE:  Objection to form, vague,
13  ambiguous.
14      THE WITNESS:  You're making capsules
15  that you recite need to be pharmaceutically
16  acceptable.
17  BY MR. PEACHMAN:
18      Q.  Right.  But there's no limitation --
19      A.  That's a pharmaceutical manufacturing
20  process.  To make capsules that are
21  pharmaceutically acceptable, you're engaging in a
22  pharmaceutical manufacturing process.
23      Q.  Okay.  So you are construing the
24  "pharmaceutically acceptable capsule" term to
25  require a manufacturing process of making

30  (Pages 117 to 120)

121

1  pharmaceuticals?
2        MR. FRESE:  Objection; mischaracterizes
3  testimony.
4  BY MR. PEACHMAN:
5        Q.  I saw you're shaking your head.  So --
6        A.  I'm going to go back to my report again
7  to find the precise place where I gave you the
8  previous language, because I don't want to speak
9  off the cuff.
10        So I point you to paragraph 92 and 93 of
11  my reply report, where I explicitly give you the
12  answer to the precise question you're asking,
13  where I could read the whole paragraph, or I can
14  just point to you that I indicate that granulation
15  is a pharmaceutical manufacturing process, capsule
16  filling is a pharmaceutical manufacturing process,
17  and that the requirement to have the recited bulk
18  density is so that you can do the high-speed
19  filling of capsules listed in the specification.
20        Q.  Okay.  I think you pointed me to 92
21  through 93.
22        A.  Page 48.
23        Q.  Yeah.  Maybe I just -- well, let's stick
24  on 92.
25        And what do you mean at the last

122

1  sentence there, where you say, a POSA reading the
2  claims would recognize that they do reference a
3  product produced in part by a granulation process?
4        A.  What do I mean?  I mean what it says.
5        Q.  So you're saying that they reference a
6  product, but they're not actually part of the
7  claim.  Is that what you're trying to say?
8        MR. FRESE:  Objection to form.
9        THE WITNESS:  No, I don't think I'm
10  using the word "reference" as opposed to --
11  BY MR. PEACHMAN:
12        Q.  How are you using the word "reference"?
13        A.  -- "explicitly state."
14        That the claims are citing a product
15  that is made -- or recite -- the claims recite a
16  product made by, among other things, a granulation
17  process.
18        Q.  Okay.  But the claim construction
19  opinion that we went over today, the court found
20  that the granules that are made are not limited to
21  any specific process; right?
22        MR. FRESE:  Object to form.
23        THE WITNESS:  Okay.  I have been
24  thinking about at which point we were going to
25  talk about this.

123

1        So the problem with your question is the
2  word "specific."  Granulation is specific as
3  opposed to dry blending or tableting or some other
4  process.  But there are many, many different kinds
5  of granulation.  So --
6  BY MR. PEACHMAN:
7        Q.  But the court doesn't --
8        A.  The claim -- I --
9        Q.  Sorry, continue.
10        A.  May I continue my answer?
11        Q.  Continue.
12        A.  The claim construction -- the court's
13  construction doesn't tell you one particular,
14  specific granulation process.  It doesn't say, You
15  need to granulate in this particular way, using
16  these specific parameters, under this specific set
17  of conditions, using this particular piece of
18  equipment.
19        That would be a specific granulation
20  process.  However, you could say, they do specify
21  granulation as opposed to something that is not
22  granulation, right.  So the word "specific" in
23  this context could mean a couple of different
24  things.
25        Q.  Well, the court's construction of

124

1  "granule" also doesn't put any exclusion on
2  granulation processes either; right?
3        A.  It doesn't, no.
4        Q.  But you are saying that there are
5  exclusions on granulation processes in Claim 1?
6        A.  No, I'm not.
7        Q.  Based on a different term?
8        A.  The specification is saying that.  The
9  specification is saying that there were a whole
10  bunch of granulation processes that were attempted
11  but did not work, presumably leading to
12  undesirable results which, therefore, need to be
13  distinguished from what did work, which is what is
14  being claimed, right.
15        Q.  Okay.  So you're not reading Claim 1 as
16  having any exclusion on any granulation processes.
17  That's how a POSA would read it, too?
18        MR. FRESE:  Objection; compound.
19        THE WITNESS:  As I said many times
20  already and I say in the report, a POSA would read
21  Claim 1, in view of the specification, as
22  excluding certain ways to granulate that did not
23  work, not knowing what exactly determines when one
24  of those methods work or doesn't work.
25        So a POSA would not know whether a

8/22/2024    Acadia Pharmaceuticals, Inc. v. Aurobindo Pharma Limited, et al. Fernando J. Muzzio, Ph.D.
Confidential

125

1 specific way of granulating infringes or doesn't.
2 But the POSA would know that she needs to
3 granulate.
4 BY MR. PEACHMAN:
5     Q.  Okay.
6         MR. FRESE:  We've been going well over
7 an hour.  Is now a good time to break?
8         MR. PEACHMAN:  Well, I think he
9 referenced 92 through 93, and I had one question
10 on 93.  So I just want to wrap that up real quick,
11 if you don't mind.  I think --
12        MR. FRESE:  If it's okay.
13 BY MR. PEACHMAN:
14    Q.  Is that okay with you, Dr. Muzzio?
15    A.  Yes.
16    Q.  Okay.  So on 93, you state that the
17 requirement of a higher bulk density as an
18 attribute of the claimed granulation method is
19 driven by the need to manufacture the capsules
20 using a relatively high-speed manufacturing
21 process; right?
22    A.  In 93?
23    Q.  Yeah, I think that's paragraph --
24    A.  Yeah.
25    Q.  -- 93; right?

126

1     A.  Yeah.  One of the reasons, yes.
2     Q.  So just to step back, the first sentence
3 of 93, you state, Moreover, the requirement of a
4 higher bulk density as an attribute of a claimed
5 granulation method is driven by the need to
6 manufacture the capsules using a relatively
7 high-speed manufacturing process; right?
8     A.  Yeah.
9     Q.  Okay.
10    A.  It says that.
11    Q.  Okay.  And to be clear, though, we've
12 discussed the claims are not directed to any kind
13 of granulation method; right?
14    A.  The claim is not directed to any
15 particular, specific way to granulate relative to
16 the many different ways to granulate.
17    Q.  But paragraph 93 in the first sentence,
18 you refer to a claimed granulation method.
19        Do you see that?
20    A.  Yeah.
21    Q.  What claimed granulation method are you
22 referring to?
23    A.  I guess what that meant is that the
24 claim requires granulation.
25    Q.  Okay.

127

1     A.  So a granulation method is required.
2     Q.  Okay.  And you believe that that
3 required granulation method also involves the need
4 to manufacture the capsules using a relatively
5 high-speed manufacturing process?
6         MR. FRESE:  Objection to form,
7 mischaracterizes the document.
8         THE WITNESS:  Well, the claim does
9 recite the density, and that density is required
10 so that you can put enough granulation in the
11 capsule.  But because you're granulating or
12 claiming a density, it also has to do with the
13 granulation flowing well enough that you can put
14 it into capsules.
15 BY MR. PEACHMAN:
16    Q.  Okay.  So are you --
17    A.  At high speed.
18    Q.  Are you interpreting the claimed bulk
19 requirement as including the ability to
20 manufacture capsules with a relatively high-speed
21 manufacturing process?
22        MR. FRESE:  Object to form.
23        THE WITNESS:  I believe that that's one
24 of the two reasons why that bulk density is
25 claimed is so that you can make capsules at high

128

1 speed.
2 BY MR. PEACHMAN:
3     Q.  Okay.
4     A.  And I say so in the report.
5     Q.  And we're referring to Claims 1 and 4 of
6 the '721 patent?
7     A.  Those are the two claims that require a
8 density.
9     Q.  Okay.  All right.  Thank you.
10        MR. PEACHMAN:  And we can probably break
11 now.  I've got more about this, but let's break.
12        MR. FRESE:  Okay.
13        THE VIDEOGRAPHER:  The time is
14 12:12 p.m.  We're now off the record.
15        (Recess from the record.)
16        THE VIDEOGRAPHER:  The time is 1:05 p.m.
17 We are now record.
18 BY MR. PEACHMAN:
19    Q.  Dr. Muzzio, welcome back after the lunch
20 break.
21    A.  Thank you, Counsel.
22    Q.  I'd like to pick up on Exhibit 6, which
23 is your reply report.
24    A.  Yeah.
25    Q.  Okay.  Could we go to paragraph 96?

32  (Pages 125 to 128)

8/22/2024    Acadia Pharmaceuticals, Inc. v. Aurobindo Pharma Limited, et al. Fernando J. Muzzio, Ph.D.
Confidential

129

```
1    A.  Sure.
2    Q.  All right.  And, Dr. Muzzio, in the
3  first sentence of paragraph 96, you state that,
4  Given that a POSA would determine there is no
5  operative language within the claims, that would
6  distinguish those unacceptable granules from
7  acceptable ones, besides the pharmaceutically
8  acceptable capsule language.
9        Do you see that?
10   A.  I do.
11   Q.  And so I just want to be clear,
12 Dr. Muzzio, what your opinion is here.
13       Are you saying that a POSA would look to
14 the claims of the '721 patent to see where they
15 could be altered to distinguish between acceptable
16 and unacceptable granules?
17       MR. FRESE:  Objection to form.
18       THE WITNESS:  I don't think I understand
19 your question.
20 BY MR. PEACHMAN:
21   Q.  Yeah, well --
22   A.  What do you mean by "altered"?
23   Q.  Well, here, you're saying that the POSA
24 would determine that there's no other operative
25 language within the claims that would distinguish
```

130

```
1  unacceptable granules from acceptable ones besides
2  this term, "pharmaceutically acceptable capsules";
3  right?
4    A.  Yes.
5    Q.  So are you saying that in this case, a
6  POSA would look to the claims of the '721 patent
7  and look for somewhere that would distinguish
8  between "acceptable" and "unacceptable" and, based
9  on that analysis, would then have given a certain
10 scope to "pharmaceutically acceptable capsules"?
11       MR. FRESE:  Object to form.
12       THE WITNESS:  Again, I offer 96 as my
13 opinion.  I think it's clear what it says.  You
14 know, the specification recites unacceptable --
15 unacceptable ways of making granules, which,
16 again, presumes there are acceptable ways, which
17 the specification describes.
18       And they look at the claims and say,
19 Okay, the only thing in the claim that
20 distinguishes what's acceptable versus what's
21 unacceptable is those three words,
22 "pharmaceutically acceptable capsule."  There are
23 no other words in the claim that would exclude the
24 unacceptable way of making granules.
25       So, you know, we tried to understand
```

131

```
1  that term from the perspective of the
2  specification disclosed in acceptable versus not
3  acceptable ways.  So that would inform the POSA,
4  when reading the claim, that there has to be the
5  claim element that actually distinguishes the
6  acceptable versus the not acceptable ways of
7  making granules.
8  BY MR. PEACHMAN:
9    Q.  And why would a POSA need to work that
10 concept into the claims?  Why would they need to
11 add that?
12   A.  Because the POSA needs to understand if
13 the POSA is infringing or not.  And if there are
14 some things that, as per the specification, are
15 not within the scope of the claim, the POSA will
16 want to know what those things are to either -- to
17 know whether she or he is infringing or not.
18   Q.  Okay.  And is it your opinion that the
19 POSA would work this concept into the claims
20 despite the court in this case construing granules
21 comprising 40 milligrams pimavanserin tartrate and
22 not distinguishing between acceptable and
23 unacceptable granules?
24       MR. FRESE:  Objection to form, calls for
25 a legal conclusion.
```

132

```
1        THE WITNESS:  Yeah, just because the
2  court construed some terms doesn't mean that the
3  POSA wouldn't have questions and try to understand
4  the claims some other way.
5  BY MR. PEACHMAN:
6    Q.  The court construed --
7    A.  Besides, the POSA doesn't have the
8  benefit of the claim construction.
9    Q.  Well, the POSA analysis that you've done
10 does build into the court's claim construction?
11   A.  Sure, sure, sure.
12   Q.  Okay.
13   A.  But you're asking me what would a POSA
14 think.
15   Q.  So you're saying that the POSA would
16 tackle this question before that construction was
17 available; is that -- that's your opinion?
18   A.  No, what I'm saying is what I said here.
19 The POSA reads in the spec that some things are
20 not acceptable, reads in the spec that some things
21 are acceptable, and reads the claims and sees that
22 the first thing that comes up in the claims is
23 pharmaceutically acceptable something.
24       And so the POSA would say, Okay, the
25 things that were described as not acceptable in
```

33 (Pages 129 to 132)

Case 1:22-cv-01387-GBW    Document 103-15    Filed 11/14/24    Page 138 of 174 PageID #: 2406

8/22/2024    Acadia Pharmaceuticals, Inc. v. Aurobindo Pharma Limited, et al. Fernando J. Muzzio, Ph.D.
Confidential

133

1 the spec must not be part of the scope. But I
2 don't know what made them acceptable or
3 unacceptable. So I have no way to know what that
4 claim term means in the context of this claim in
5 view of this spec.
6     Q.  And in the memorandum opinion that we
7 went over earlier today from the court, where the
8 court construed granules comprising 40 milligrams
9 pimavanserin tartrate, the court doesn't at any
10 point distinguish between acceptable and
11 unacceptable granules; right?
12     MR. FRESE: Object to form.
13     THE WITNESS: The claim construction
14 provided by the court does not get into the
15 meaning of that term.
16 BY MR. PEACHMAN:
17     Q.  All right. So despite the court not
18 bringing up the distinction between acceptable and
19 unacceptable granules when construing what a
20 granule means, you still believe that a POSA would
21 work in the concept of unacceptable granules to
22 Claim 1; correct?
23     MR. FRESE: Object to form and
24 mischaracterizes testimony.
25     THE WITNESS: I am looking for the claim

134

1 construction. I think I have it.
2 BY MR. PEACHMAN:
3     Q.  It's Exhibit 8.
4     A.  Yes. It seems that -- I'm not a lawyer.
5 So I don't know really all the details on how
6 claim construction opinions come to be, but it
7 appears from reading the document that the court
8 is responding to a joint request to clarify
9 certain terms by the parties. And it appears that
10 the parties did not ask the court to clarify that
11 particular term. So it looks like the court
12 clarified other terms.
13     Q.  The parties did ask the court to clarify
14 the term "granules" comprising 40 milligrams
15 pimavanserin tartrate; right?
16     A.  But you're asking me about the meaning
17 of "pharmaceutically acceptable capsule" here.
18     Q.  I'm asking --
19     A.  And I don't believe that -- let me
20 finish.
21     Q.  Go ahead.
22     A.  I don't believe that the court was asked
23 to clarify that term in particular. So -- unless
24 I'm mistaken in how -- in what the court did in
25 response to what, you know. It seems that nobody

135

1 asked the court to clarify that.
2     Q.  Okay. I guess what I'm trying to get at
3 is in the sentence, you're talking about
4 unacceptable granules and acceptable granules,
5 essentially.
6       Half of that term is "granules", and
7 that was a construed term; correct?
8     MR. HOGAN: Object to form.
9     THE WITNESS: The reason we're having
10 the whole argument is because Dr. Little, in his
11 report, came up with this, in my opinion, very
12 contorted way of reading those three words, and
13 that's why we're talking about it after the court
14 had issued its opinion.
15       So, you know, I don't think it's either
16 here or there that the court didn't provide
17 explicit opinion on the meaning of
18 "pharmaceutically acceptable capsule."
19 BY MR. PEACHMAN:
20     Q.  So in your analysis -- or sorry, strike
21 that.
22       In your opinions of what a
23 "pharmaceutically acceptable capsule" means, did
24 you consider at all the court's claim construction
25 opinion and whether it made any distinction

136

1 between acceptable and unacceptable granules?
2     MR. FRESE: Object to form.
3     THE WITNESS: So I'm looking at the
4 court memorandum. And please correct me if I'm
5 wrong, but I don't see the court construing
6 "pharmaceutically acceptable granules." I don't
7 see those words recited among the terms that the
8 court is construing. The court is construing
9 "granules," not "pharmaceutically acceptable
10 granules."
11       So, of course, I took into consideration
12 what the court is saying, but I'm trying to
13 understand how a POSA would read the term
14 "pharmaceutically acceptable capsule," and the
15 court appears to have construed "granules."
16 BY MR. PEACHMAN:
17     Q.  Right. And in paragraph --
18     A.  So I don't understand what you're asking
19 me then.
20     Q.  In paragraph 96, you state that, a POSA
21 would look at "pharmaceutically acceptable
22 capsule," the term, and within that term
23 distinguish between unacceptable granules and
24 granules; right?
25     MR. FRESE: Objection; form,

34  (Pages 133 to 136)

137

1  mischaracterizes the document.
2       THE WITNESS:  Well, it seems we seem to
3  be focusing on very, very, very specific
4  semantics.
5  BY MR. PEACHMAN:
6       Q.  I'm focusing on your words.
7       A.  Paragraph 96 -- yes, yes, my words.
8  Yes, of course.
9       Paragraph 96, I say, Given that a POSA
10  would determine that there is no other operative
11  language within the claims that would distinguish
12  those unacceptable granules -- so I'm not saying
13  pharmaceutically acceptable or pharmaceutically
14  unacceptable.  I'm saying unacceptable -- from
15  acceptable ones.
16       So if you read that in view of how the
17  spec -- the specification is built, the
18  specification tells you, There are all these
19  things that didn't work.  Those are the
20  unacceptable granules.  And then there is this
21  thing that worked.  So those are acceptable
22  granules.
23       And then you go to the claim and say,
24  Okay, what's included in this claim?  And if the
25  specification is telling me all these things are

138

1  unacceptable and this is acceptable, you would
2  say, Okay, they must be talking about what the
3  specification would be understood to describe
4  acceptable granules, right.  That's what I'm
5  saying.
6       And then after that, the POSA would say,
7  Okay, am I infringing?  And read again and say,
8  Gee, they list lots of reasons why these things
9  were not acceptable, but they don't really tell me
10  how much impurity, what particle size, what the
11  moisture content, how long does it take to dry and
12  on and on and on, right.
13       There's also reasons listed why those
14  things were not useful in the context of the
15  invention, without really telling me what the
16  boundaries are around the things that work or
17  don't work.
18       Q.  Okay.  So I'm just -- I'm trying to
19  understand your opinion that a POSA would sort of
20  look for operative language that would distinguish
21  unacceptable granules from granules.
22       And if I'm hearing you correctly, as
23  part of offering that opinion, you didn't find it
24  inconsistent with the court's findings on
25  granules, or they make no distinction between

139

1  "unacceptable" and "acceptable"?
2       MR. FRESE:  Objection to form.
3       THE WITNESS:  Didn't you ask me that
4  already?
5  BY MR. PEACHMAN:
6       Q.  Yeah, and the answer is yes; right?
7       MR. FRESE:  Objection to form.
8       THE WITNESS:  My answer is that what I
9  see in the claim construction opinion is that the
10  court construed granules.  The court did not
11  construe acceptable or not acceptable granules or
12  pharmaceutically acceptable capsules.
13       So I can incorporate into my analysis
14  the court's opinion, which is "granules comprising
15  40 milligrams pimavanserin tartrate" and similar
16  terms are to be read, and given their plain and
17  ordinary meaning and that the scope of the term
18  "granules" includes granules granulated with
19  excipients.
20       I have no problem incorporating that
21  into my analysis of the "pharmaceutically
22  acceptable capsule" term.
23  BY MR. PEACHMAN:
24       Q.  Okay.  Dr. Muzzio, can we just back up a
25  little bit.  We were on 96.  Can we go to 90?

140

1       A.  Sure.
2       Q.  Paragraph 90.
3       A.  Of course.
4       Q.  All right.  In paragraph 90, you state
5  here that Dr. Little reiterates his opinion on the
6  construction of the term of "pharmaceutically
7  acceptable capsule" in Claims 1 and 4, and that
8  the term means a capsule that would be generally
9  suitable for use in a pharmaceutical composition
10  is well known in the art and not tailored to any
11  specific API.
12       And then you disagree with his opinion;
13  right?
14       A.  Uh-huh.
15       Q.  And you state that, I further disagree
16  with his opinion that a pharmaceutically
17  acceptable capsule is one that is not tailored to
18  any specific API.  The pharmaceutically acceptable
19  capsule recited in Claim 1 is for delivering
20  34 milligrams pimavanserin tartrate to a patient,
21  which very clearly includes a capsule shell of a
22  particular size, i.e., size 3 or 4, and contains
23  granules comprising a specific dose of
24  pimavanserin with a bulk density of greater than
25  .4 grams per milliliter.

35 (Pages 137 to 140)

141

1    And you say, Thus, that pharmaceutically
2  acceptable capsule is clearly tailored to
3  administration of pimavanserin.
4    I guess what I'd like to understand,
5  Dr. Muzzio, is that the claimed pharmaceutically
6  acceptable capsule, I think, according to your
7  opinion, is limited by the requirements in the
8  rest of the claim, right, but the term
9  "pharmaceutically acceptable capsule" implicitly
10 must be broader on its own, right?
11    MR. FRESE:  Objection to form, compound,
12 vague, ambiguous.
13    THE WITNESS:  So I'll try to clarify.  I
14 think the essence of the dispute is that my
15 opinion is that the pharmaceutically acceptable
16 capsule is the dosage form, which includes the
17 shell and what's inside the shell.
18    What Dr. Little argues, wrongly in my
19 opinion, that the pharmaceutically acceptable
20 capsule is just the shell.  That's the essence of
21 the argument.
22 BY MR. PEACHMAN:
23    Q.  Okay.
24    A.  And so --
25    Q.  I'm trying to understand the last

142

1  sentence, where you say that the pharmaceutically
2  acceptable capsule is clearly tailored to the
3  administration of pimavanserin.
4    Is it your opinion that the scope of
5  "pharmaceutically acceptable capsule" would
6  include pimavanserin or administration of
7  pimavanserin?
8    A.  As used in this claim.
9    Q.  Okay.  So in the context of the entire
10 claim?
11    A.  Yeah.
12    Q.  Okay.  So the term itself,
13 "pharmaceutically acceptable capsule," doesn't
14 build in anything about administration of
15 pimavanserin; right?
16    A.  No, I'm not saying that.  I'm saying the
17 opposite.  I'm saying, in the context of this
18 claim, the term is used to mean a dosage form that
19 administers pimavanserin that has been granulated.
20    Q.  Okay.  That's helpful.  Thank you.
21    Could we go to 97.  The bottom of
22 page 51.
23    A.  Yes.
24    Q.  Okay.  Here, there's another dispute
25 with Dr. Little.  And I'll let you read the

143

1  paragraph, Dr. Muzzio, and then we'll discuss it.
2    (Witness peruses the exhibit.)
3    THE WITNESS:  Okay.
4  BY MR. PEACHMAN:
5    Q.  Okay.  And do you see, Dr. Muzzio, where
6  you say -- it's about the middle of that
7  paragraph, and it's on page 52.
8    But Dr. Little then opines instead that
9  a POSA, utilizing his or her experience in the
10 field and common sense, would have recognized this
11 provision must reference the specific embodiments
12 above it and not the entire specification.
13    And then you state, That misses the
14 point without some clearly delineated
15 specification for what makes a dosage form
16 pharmaceutically acceptable versus unacceptable, a
17 POSA would not have any reasonable certainty as to
18 the scope of the term "pharmaceutically acceptable
19 capsule"; right?
20    A.  Yes.
21    Q.  Dr. Muzzio, is it possible that the term
22 "pharmaceutically acceptable capsule" is not
23 clearly delineated in the specification of the
24 '721 patent for the same reason that
25 "pharmaceutically acceptable excipient" is not

144

1  delineated?
2    MR. FRESE:  Objection to form, calls for
3  speculation.
4    THE WITNESS:  Not in my opinion.
5  BY MR. PEACHMAN:
6    Q.  Is it -- it's your opinion that
7  "pharmaceutically acceptable excipient" would have
8  been readily understood by a POSA?  We discussed
9  that earlier today; right?
10    A.  My opinion is that there is nothing in
11 the specification providing confusing guidance as
12 to what a pharmaceutically acceptable excipient
13 would be, and there is plenty in the specification
14 that provides confusing guidance as to what
15 "pharmaceutically acceptable capsule" is.  That's
16 my opinion.
17    Q.  So it's your opinion that if a POSA is
18 given some information and that information
19 doesn't make sense, that they would not give the
20 customary and ordinary meaning of
21 "pharmaceutically acceptable" to the term
22 "pharmaceutically acceptable capsule"?
23    MR. FRESE:  Objection; mischaracterizes
24 testimony.
25    THE WITNESS:  Well, you're paraphrasing.

36  (Pages 141 to 144)

8/22/2024          Acadia Pharmaceuticals, Inc. v. Aurobindo Pharma Limited, et al. Fernando J. Muzzio, Ph.D.
Confidential

---

145

1  My opinion is that if you include in the
2  specification something that would muddy the
3  waters, something that would introduce the concept
4  that some things are acceptable and some are not,
5  but you don't tell me which ones are which, then
6  the POSA, when finding that term, will say, Hmm,
7  there is more here than just the words.  There is
8  also the context provided by the spec.
9  BY MR. PEACHMAN:
10      Q.  But how much confusion does there need
11  to be, Dr. Muzzio?  I mean, there could be no
12  information provided about pharmaceutically
13  acceptable capsule.  There could be some
14  information.
15      How much confusion is needed before a
16  POSA decides to reject the customary and ordinary
17  meaning of "pharmaceutically acceptable"?
18      MR. FRESE:  Objection to form,
19  incomplete hypothetical, compound.
20      THE WITNESS:  Are you asking me for a
21  percentage --
22  BY MR. PEACHMAN:
23      Q.  Yeah.
24      A.  -- like 80 or 57 percent confusion --
25      Q.  You're saying that a POSA --

---

146

1      A.  -- as opposed to 63 percent confusion?
2  I'm not sure what you're asking.
3      Q.  I'd like to know.  You're saying that a
4  POSA would reject applying the customary and
5  ordinary meaning of "pharmaceutically acceptable,"
6  the "pharmaceutically acceptable capsule," because
7  of some additional information in the
8  specification.
9      How much additional information would
10  need to be provided for them to reject that
11  definition?  I'm trying to understand sort of in
12  your analysis, at what point would there be that
13  rejection of the commonly understood definition?
14      MR. FRESE:  Objection to form, compound,
15  incomplete hypothetical.
16      THE WITNESS:  I don't believe I have
17  provided an opinion on the actual amount of
18  confusion required for a POSA to say, I don't know
19  what this means.
20      But when, as is the case here, the
21  specification provides five or six separate
22  instances of things that did not work and then one
23  instance of things that work and it doesn't tell
24  me -- and it tells me, there are all these factors
25  that determine that these things didn't work, but

---

147

1  then doesn't tell me how to evaluate those
2  factors, I think there's more than enough
3  confusion in this case.
4  BY MR. PEACHMAN:
5      Q.  And what if those comparative examples
6  could be interpreted a different way?  Let's say
7  they could be contrasting a process of making a
8  composition of pimavanserin as opposed to what's
9  actually claimed here, which is a pharmaceutical
10  composition?
11      MR. FRESE:  Objection; form, incomplete
12  hypothetical, and compound.
13      THE WITNESS:  Well, except that the
14  claim requires granulation, and all of those are
15  generally described in the context of these are
16  all granulation methods.  So --
17  BY MR. PEACHMAN:
18      Q.  So you see them all as one in the same?
19      A.  Let me finish.
20      No, I don't see them as one in the same.
21  Quite the opposite, I see them as quite diverse
22  and different from each other.  And, yet, all of
23  them are acceptable for a variety of reasons, but
24  without any guidance as to how to evaluate whether
25  those reasons apply or don't apply to somebody

---

148

1  coming and trying to use a granulation method and
2  trying to practice the invention or not.
3      Q.  Well, granulation involves excipients;
4  right?
5      MR. FRESE:  Objection to form.
6      THE WITNESS:  Not always.
7  BY MR. PEACHMAN:
8      Q.  Well --
9      A.  In fact, the whole point of the
10  specification that's written and the most clear
11  thing being described as inventive in the
12  '721 patent, which I'm not saying it is inventive,
13  I'm saying it's being described as inventive, is
14  granulating without excipients.
15      Q.  The court found in the memorandum
16  opinion, that we've discussed earlier today, that
17  granulation can include excipients?
18      A.  Sure, but I'm responding to your
19  statement.
20      Q.  Okay.
21      A.  Granulation always requires excipients.
22  I think that's what you said.
23      Q.  Okay.  And wouldn't the excipients and
24  the granules have to be pharmaceutically
25  acceptable to some degree in a pharmaceutically

---

37  (Pages 145 to 148)

149

1 **acceptable capsule?**
2          MR. FRESE:  Objection; form.
3          THE WITNESS:  So, again, in being able
4 to create a pharmaceutically acceptable dosage
5 form, as commonly understood in the art, not
6 within the context of the '721 patent, you have to
7 meet certain requirements, which include not only
8 which materials you use, but also in which amounts
9 you use them.  I can give you an example.
10          Sodium lauryl sulfate is a commonly used
11 surfactant.  It's used in pharmaceutical
12 manufacturing.  It's also used in making laundry
13 detergent.  So you have different standards of
14 purity on the same molecule for when you can use
15 the acid pharmaceutical ingredient and when you
16 cannot.
17          And even when it is pure enough, you
18 have to be sure that you give less than
19 150 milligrams a day to a full-grown adult,
20 because if you do more, then it can become toxic.
21 So it's not just that the material is pure enough,
22 it's also that it's being used in an amount
23 consistent with not being harmful.
24          So there are multiple things that you
25 consider when you try to answer the question, the

150

1 pharmaceutical dosage form is pharmaceutically
2 acceptable, beyond the things you look at when you
3 say, Is this excipient pharmaceutically
4 acceptable?
5 BY MR. PEACHMAN:
6     **Q.  Okay.  I think -- the question, I think,**
7 **was more simple, is that if a POSA has a**
8 **pharmaceutically acceptable capsule --**
9     A.  Yes.
10    **Q.  -- they would understand that excipients**
11 **in a granulation would also need to be**
12 **pharmaceutically acceptable excipients; right?**
13          MR. FRESE:  Objection; form, incomplete
14 hypothetical.
15          THE WITNESS:  You would not use a
16 material that is not considered to be
17 pharmaceutically acceptable, and you would not use
18 a pharmaceutically acceptable material in a way
19 that is inconsistent with making a
20 pharmaceutically acceptable product.
21          In fact, there is further than what I
22 said.  You could have a pharmaceutically
23 acceptable material used in an amount that meets
24 the requirements to avoid, you know, toxicity, but
25 you could use that excipient in such a way where

151

1 you end up needing a dosage form that is not
2 pharmaceutically acceptable.
3          For example, if you put ingredients
4 together in such a way where you were supposed to
5 create a sustained release product, but the way in
6 which you put the ingredients together end up
7 causing dose dumping, meaning very rapid
8 dissolution in the stomach, that could create
9 toxicity.
10          Such a product would not be
11 pharmaceutically acceptable, even if every
12 ingredient is pharmaceutically acceptable and even
13 if every ingredient is using an amount consistent
14 with its proper use.  But you could still end up
15 with a dosage form that is not pharmaceutically
16 acceptable.
17          I'm trying to share the concept that
18 there is more involved in being able to understand
19 if a dosage form is pharmaceutically acceptable or
20 not than in being able to decide whether an
21 ingredient is pharmaceutically acceptable.
22 BY MR. PEACHMAN:
23    **Q.  Okay.**
24    A.  I'm trying to use the same -- those
25 words to always mean the same thing no matter

152

1 what.  It's just --
2    **Q.  Got it.  I'm just trying to understand**
3 **the distinction.  I think maybe if we just go to**
4 **Claim 4, that might help me.**
5          **This will be in Exhibit 4, the**
6 **'721 patent.**
7    A.  Before we proceed, can I get rid of some
8 of these things?  It would make everything --
9          MR. FRESE:  Just make yourself a nice
10 pile.
11 BY MR. PEACHMAN:
12    **Q.  Yeah, you can clean up and organize a**
13 **little bit.**
14    A.  Okay.  I presume you're not going to go
15 back to my résumé, the list of things considered.
16 So I have fewer things to look through.  Okay.
17    **Q.  All right.**
18    A.  So you wanted me to go to Claim 4.
19    **Q.  Yeah, Claim 4.**
20          **Okay.  So it's your opinion, Dr. Muzzio,**
21 **that a pharmaceutically acceptable capsule for**
22 **oral delivery here in Claim 4, it must have -- it**
23 **must have granules that are made according to an**
24 **acceptable process; right?**
25          MR. FRESE:  Objection to form.

38  (Pages 149 to 152)

8/22/2024          Acadia Pharmaceuticals, Inc. v. Aurobindo Pharma Limited, et al. Fernando J. Muzzio, Ph.D.
Confidential

153

```
1        THE WITNESS:  No, they have to be made
2  using a process such that the granules themselves
3  are acceptable --
4  BY MR. PEACHMAN:
5        Q.  Okay.
6        A.  -- to be used by some very unclear set
7  of criteria.
8        Q.  Okay.  And Claim 4, it says, granules
9  comprising 40 milligrams pimavanserin tartrate and
10  one or more pharmaceutically acceptable
11  excipients.
12        Do you see that?
13        A.  I do.
14        Q.  But your opinion is that the
15  pharmaceutically acceptable excipients are not
16  limited to any acceptable process or not; right?
17        MR. FRESE:  Objection to form.
18  BY MR. PEACHMAN:
19        Q.  In how they're made?
20        MR. FRESE:  Mischaracterizes opinion.
21        THE WITNESS:  The excipients are not
22  limited by a process.  Different modalities of
23  granulation would be feasible by using certain
24  subsets of the whole universe of pharmaceutically
25  acceptable excipients.
```

154

```
1  BY MR. PEACHMAN:
2        Q.  Okay.  Got you.  I'm just trying to
3  understand.  Because it sounds as though you're
4  saying that for there to be a pharmaceutically
5  acceptable capsule, there's a limitation on how
6  the granules are made, but there's no limitation
7  on how the pharmaceutically acceptable excipients
8  are made; is that correct?
9        MR. FRESE:  Objection to form,
10  mischaracterizes opinion -- or testimony.
11  Mischaracterizes testimony.
12        THE WITNESS:  The pharmaceutically
13  acceptable excipients have to be pharmaceutically
14  acceptable.  That poses limitations on how they
15  are made.  You have to make them in a way that
16  they don't contain toxic material and things like
17  that.  But this claim is not telling me how to
18  make the excipients, if that's your question.
19  BY MR. PEACHMAN:
20        Q.  Okay.
21        A.  Unless I misunderstood.
22        Q.  It's also not telling you how to make
23  the granules either; correct?
24        A.  The claim is not telling me how to make
25  the granules.  The specification tries to tell me
```

155

```
1  how not to make the granules and, in my opinion,
2  fails to do that.
3        Q.  Okay.  So just to be clear, your opinion
4  is that a pharmaceutically acceptable capsule in
5  Claim 4 places limitations on how the granules are
6  made, but doesn't place any limitations on how the
7  pharmaceutically acceptable excipients are made?
8        MR. FRESE:  Objection to form,
9  mischaracterizes testimony.
10        THE WITNESS:  It places limitations on
11  attributes the granules cannot exceed.  It rules
12  out the granules exhibiting certain attributes.
13  And so when you make the granules by whichever
14  method, it should exclude the various ways to
15  carry out that method that end up producing
16  granules that had those unacceptable attributes.
17        But, unfortunately, it doesn't tell me
18  what are the limits on those attributes that I
19  need to use to figure out, Okay, is this granule
20  made this way acceptable or unacceptable?  I
21  really don't know.
22  BY MR. PEACHMAN:
23        Q.  But the pharmaceutically acceptable
24  excipients are involved in the granulation; right?
25        A.  Of course.
```

156

```
1        Q.  Okay.  So, I mean, if there's a
2  limitation on the process of making the granules,
3  necessarily there would be a limitation on the
4  pharmaceutically acceptable excipients, which are
5  in the granulation; right?
6        MR. FRESE:  Objection; mischaracterizes
7  prior testimony.
8        THE WITNESS:  That's not really true.
9  BY MR. PEACHMAN:
10        Q.  Well, Claim 4, it says, Granules --
11        A.  If I may finish?
12        Q.  Okay.  Go ahead.
13        A.  It's not really true.  Because you can
14  always have some very small amounts of a whole
15  bunch of things, and you're still okay, right.
16        What it says is that if I want to wet
17  granulate, I can either wet granulate without a
18  binder or I need a binder, right.  So saying,
19  Okay, if you're going to use wet granulation, you
20  likely either can granulate without a binder, or
21  you need something that is a binder, right, to be
22  able to wet granulate that way.
23        So it invokes the needs of using a
24  binder if granulating -- wet granulating without a
25  binder is not feasible for whatever reason for a
```

39 (Pages 153 to 156)

157

1  particular circumstance.  So in that sense, it not
2  only limits the presence of other excipients, it's
3  that it requires that some excipients be used,
4  right.
5         Like, another example, if you're
6  granulating by roller compaction, you might need
7  to have a material present there to allow for the
8  proper flow of the API so that it can go through
9  the roller compactor.
10        Because this particular API probably
11  doesn't go through a roller compactor unless you
12  can mix it with something else that allows it to
13  travel through, because of the way in which you
14  convey materials in a roller compact.  Otherwise,
15  you're not able to roller compact on materials.
16  So you cannot use that particular method of
17  granulation.
18        But it doesn't say you couldn't put a
19  disintegrant or you couldn't put a lubricant or
20  you couldn't put a flavoring agent or you couldn't
21  put a whatever, preservative.  It doesn't say
22  that.  So when you say, places limitations on
23  which excipients you can use, I fail to see how
24  that is the case.
25     Q.  Yeah.  So the pharmaceutically

158

1  acceptable capsule, we've discussed this at length
2  today, you believe there to be some restrictions
3  on how the granules are made, because there could
4  be, for instance, unacceptable granules.  So when
5  you look at --
6     A.  Yes.
7     Q.  -- the limitation in Claim 4, granules
8  comprising of 40 milligrams pimavanserin tartrate
9  and one or more pharmaceutically acceptable
10  excipients --
11     A.  Yes.
12     Q.  -- so if there's a limitation placed on
13  how the granules are made here in Claim 4, that
14  limitation would also apply to the
15  pharmaceutically acceptable excipients, which are
16  in the granulation; right?
17     A.  Maybe.
18        MR. FRESE:  Objection to form,
19  incomplete hypothetical.
20        THE WITNESS:  Maybe.
21  BY MR. PEACHMAN:
22     Q.  What do you mean "maybe"?  Why would it
23  not?
24     A.  Well, if it is the use of an excipient
25  that causes the granule to be unacceptable, then,

159

1  yeah, you shouldn't use that excipient.  But if it
2  is the temperature in which you run the process
3  that is making the granule unacceptable, then that
4  criterion doesn't have anything to do with which
5  excipient to use.  It just has to do with which
6  temperature you run the process.
7         And I believe that the difference
8  between your questions and my answers is that I
9  think you're still trying to use the word
10  "pharmaceutically acceptable" to always mean the
11  same thing no matter which context.  And I keep
12  telling you those words mean one thing when you
13  talk about a dosage form, and they mean something
14  else when you talk about an ingredient or even a
15  granule.
16     Q.  Well, I guess we have gone over that.
17  So pharmaceutically acceptable excipient, we've
18  discussed today, you would believe would have the
19  ordinary meaning of how someone would understand
20  that.  It's excipient that's generally used for
21  pharmaceuticals.
22        I'm paraphrasing, but that's right?
23        MR. FRESE:  Objection to form to the
24  extent it mischaracterizes prior testimony.
25

160

1  BY MR. PEACHMAN:
2     Q.  Okay.
3        MR. FRESE:  And you can answer.
4        THE WITNESS:  More or less, yes.
5  BY MR. PEACHMAN:
6     Q.  Okay.  But then based on how you're
7  reading "pharmaceutically acceptable capsule,"
8  there's a restriction on the type of granulation
9  processes in which to make the granules recited in
10  Claim 4?
11        MR. FRESE:  Objection to form,
12  mischaracterizes prior testimony.
13        THE WITNESS:  In view of the
14  specification, the specification is what's telling
15  me that I need to consider attributes of those
16  granules.
17  BY MR. PEACHMAN:
18     Q.  Right.  And so --
19     A.  And the specification is also telling me
20  that certain modalities of granulation led to
21  those granules being unacceptable and, therefore,
22  those ways of granulating not being included in
23  the scope of the invention, such as it is.
24     Q.  Yeah.  So the pharmaceutically
25  acceptable excipients in the context of Claim 4

40  (Pages 157 to 160)

161

1 are limited to the processes of granules that you
2 believe are acceptable, according to your opinion;
3 right?
4     A.  No.
5         MR. FRESE:  Objection to form.
6         THE WITNESS:  I have multiple times now
7 said the opposite.  And I think you're trying to
8 make me say something that I haven't said.
9         What I have said is, the specification
10 discloses ways to make granules that lead to
11 unacceptable granule results, and so warns you to
12 use those ways to granulate.  That's what the
13 specification says.
14         Now, those ways of making granules may
15 use some excipients, but I think that the main
16 issue here is that the specification identifies
17 several ways to make granules that led to
18 unacceptable results.
19         I don't think the specification produces
20 a specific list of criteria that made those
21 unacceptable.  Unfortunately, however, the claim,
22 read as it's written, reads in some of those
23 presumably unacceptable processes.  Because it
24 reads in some of the excipients that were used in
25 those processes, right.

162

1         So somebody reading that will say, Gee,
2 on the one hand, I hear that this way to make
3 granules is not acceptable, but on the other hand,
4 the claim could include those ingredients used in
5 that manner.  And so the scope of the claim that
6 includes things that the specification tells me
7 are not part of the invention.
8 BY MR. PEACHMAN:
9     Q.  Okay.  Thank you, Dr. Muzzio.
10         Can we go to paragraph 99 of your reply
11 report?  That's Exhibit 6, I think it was.
12     A.  Yeah.
13     Q.  And let's go to, yeah, 99.
14         All right.  So go ahead and read that to
15 yourself, Dr. Muzzio.  Just paragraph 99.
16         (Witness peruses the exhibit.)
17         THE WITNESS:  Yeah.
18 BY MR. PEACHMAN:
19     Q.  Okay.  And so what you're discussing
20 here is Table 2 of the '721 patent; right?
21     A.  Correct.
22     Q.  Okay.  And if you could go to the
23 '721 patent, which is Exhibit 4.
24     A.  Uh-huh.
25     Q.  Okay.  And let's look at Column 20,

163

1 line 58.
2         Do you see here, Dr. Muzzio, where the
3 '721 specification says, pimavanserin hard shell
4 capsules, 34 milligrams pimavanserin equivalent to
5 40 milligram pimavanserin tartrate, were
6 manufactured?
7     A.  I see that.
8     Q.  Table 2 contains an example of a
9 suitable formulation; right?
10     A.  Yes.
11     Q.  Okay.  And then if we turn the next
12 page, you see Table 2 near the top of Column 21;
13 right?
14     A.  Yeah.
15     Q.  And so a person of ordinary skill in the
16 art would understand that Table 2 lists the
17 ingredients that compose a pimavanserin
18 granulation; right?
19     A.  Not exactly.  Even though I know that
20 the table says those words, I don't agree with
21 that, no.
22     Q.  Well, the title of Table 2, it says,
23 Composition of Pimavanserin Granulation; correct?
24     A.  As opposed to composition of
25 pimavanserin granules.

164

1     Q.  Okay.  Is it your understanding that
2 pimavanserin granulation and granulated
3 pimavanserin are used interchangeably in the
4 '721 patent?
5         MR. FRESE:  Object to form.
6         THE WITNESS:  Say again, please.
7 BY MR. PEACHMAN:
8     Q.  Well, let's make -- can you go to
9 Column 4, line 51?
10     A.  Uh-huh.
11     Q.  All right.  And so at line 51, the
12 '721 patent says, The terms "granulated
13 pimavanserin" and "pimavanserin granulation" are
14 used interchangeably herein; correct?
15     A.  It says that, but it doesn't say
16 pimavanserin granules are used interchangeably.
17     Q.  Just "pimavanserin granulation"?
18     A.  Right, it doesn't say "granules."  And I
19 said, a POSA reading this would not necessarily
20 think this is the composition of pimavanserin
21 granules.  And I can explain why.
22     Q.  Would a POSA consider that to be a
23 formulation of pimavanserin granulation?
24     A.  In the way in which the word
25 "granulation" is used sometimes in the field, yes.

41  (Pages 161 to 164)

165

1    Q.   Would a POSA understand that Table 2
2 describes a pimavanserin granulation of a total
3 weight of 100 milligrams?
4        MR. FRESE:  Object to form.
5        THE WITNESS:  What a POSA would know is
6 that this is the final plan that is going to go
7 into the capsules.  And the POSA reading the
8 example would also very clearly see that the
9 granules were just pimavanserin, that they were
10 mixed with extragranular microcrystalline
11 cellulose and mag stearate, because nobody would
12 put mag stearate inside a granule for an
13 immediate-release product.  So there's an
14 extragranular ingredient, and a POSA would know
15 that.
16       And the POSA would know, also, that the
17 person would have to be stable that's making the
18 mistake that's very common in the field of calling
19 the final blend a, quote-unquote, granulation,
20 which unfortunately happens way too often.
21 BY MR. PEACHMAN:
22    Q.   Well, Dr. Muzzio, if you go to
23 Column 21, I think it's line 66 at the bottom.
24       Do you see where it says, In some
25 embodiments disclosed herein relate to

166

1 pimavanserin granulation, for example, as composed
2 in Table 2, having a weight of 100 milligrams;
3 right?
4    A.   Uh-huh.
5    Q.   And there's plus or minus 7 in an
6 average of 20.  And then it says, i.e., the weight
7 relates to the granulation only, excluding the
8 capsule shell weight?
9    A.   Right.  So what that means is that the
10 100 milligrams is what's inside the capsule, and
11 it doesn't include the capsule shell itself,
12 right.
13    Q.   So --
14    A.   But it doesn't say that the
15 100 milligrams of granulation, quote-unquote, is
16 just granules.  And, again, having been in the
17 field for 34 years, having read many of these
18 ANDAs and NDAs, having done a lot of consulting
19 for companies, I can tell you that because
20 granulation is used 80 percent of the time to make
21 solid dosage forms, people in the field very often
22 refer to the final plan as the, quote-unquote,
23 granulation.
24       And that's the way in which it's been
25 used here, as is very clear to a POSA that

167

1 actually reads the example and understands that
2 Column 20, under granulation, 2015 through 2040,
3 very, very, very, very clearly is telling you that
4 you're granulating pimavanserin alone.
5        And then after 41, it's telling you to
6 mix those granules of pimavanserin alone with the
7 other materials.  And then it's telling you to put
8 them into capsules.  And then it tells you look at
9 Table 4.  That's the example.  That's the, you
10 know, disclosure of the final composition.
11    Q.   So neither Table 2 or the passage that
12 we read at Column 21, starting at line 66, to
13 Column 22, line 3, mention anything about
14 granulating pimavanserin alone; correct?
15       MR. FRESE:  Objection to form.
16       THE WITNESS:  Nothing where?  Nothing --
17 sorry?
18 BY MR. PEACHMAN:
19    Q.   So Table 2 -- let's take Table 2.
20       Table 2 doesn't say anything about
21 granulating pimavanserin alone; does it?
22    A.   No, it does.
23    Q.   Where does it say that anywhere in
24 Table 2?
25    A.   Because mag stearate is not going to be

168

1 inside the granules.
2        (Reporter seeks clarification.)
3        THE WITNESS:  Because magnesium stearate
4 is not going to be inside the granules.
5 BY MR. PEACHMAN:
6    Q.   Table 2 doesn't indicate what's intra-
7 or extragranular; does it?
8    A.   Table 2 tells you that you're using a
9 lubricant as part of the composition, and you
10 don't put that lubricant inside the granules.
11    Q.   Well, that's your interpretation, but
12 Table 2 --
13    A.   No.
14    Q.   -- doesn't specify that; does it?
15    A.   That's not my interpretation.  That is
16 what people do in the field.  And I can tell you
17 the technical reasons why people don't put
18 magnesium stearate inside of granules for an
19 immediate-release drug.
20    Q.   Let me go to paragraph 100, which is I
21 think is the -- we were on 99 of your report.  If
22 we can go back to your report, Dr. Muzzio.
23    A.   Yes.
24    Q.   At paragraph 100, do you see where on
25 line 5 you say, A POSA reading Table 2 would look

42  (Pages 165 to 168)

8/22/2024          Acadia Pharmaceuticals, Inc. v. Aurobindo Pharma Limited, et al. Fernando J. Muzzio, Ph.D.
Confidential

169

1 to the manufacturing process described in the
2 example --
3     A.  Sorry, sorry, I don't know where you're
4 at.  Paragraph 100, line 5?
5     Q.  Paragraph 100, line 5, yeah.
6     A.  Does a POSA reading Table 2 -- yes.
7     Q.  Yeah -- would look to the manufacturing
8 process described in the example --
9     A.  Yes.
10     Q.  -- to determine the order in which the
11 ingredients were added --
12     A.  Yes.
13     Q.  -- what constitutes intragranular
14 component of the formulation of Table 2 --
15     A.  Yes.
16     Q.  -- as opposed to an extragranular, a
17 POSA reading this description would recognize the
18 examples of disclosing a preparation of granules
19 of pimavanserin tartrate alone --
20     A.  Yes.
21     Q.  -- for such that the pimavanserin
22 tartrate was the only intragranular component;
23 right?
24     A.  Yes.
25     Q.  So you're saying that a POSA would read

170

1 this and would see intragranular and extragranular
2 components; right?
3     A.  Yes.
4     Q.  And they would see pimavanserin to be
5 intragranular?
6     A.  Yes.
7     Q.  Okay.  And then you go on in that
8 paragraph to talk about what is here is really a
9 final blend, shown in Table 2, which I think you
10 just discussed?
11     A.  Yes.
12     Q.  Okay.  Are you aware that the court in
13 the memorandum opinion found that a blended
14 pimavanserin composition doesn't need to have an
15 extragranular component?
16     A.  I am aware.
17     Q.  Okay.  And how is that consistent with
18 your interpretation of Table 2, if claim
19 blended pimavanserin composition doesn't need to
20 have an extragranular component?
21     MR. FRESE:  Objection to form.
22     THE WITNESS:  Doesn't need to have it
23 doesn't mean that it can't.  There's nothing
24 prohibiting in the claim construction from having
25 an extragranular ingredient.  I'm not saying that

171

1 it has to be extragranular because that's --
2 that's a must in a claim.  I'm saying that when I
3 read the example, that's what the example says.
4 And I don't believe the claim construction in any
5 way prohibits an extragranular ingredient.
6 BY MR. PEACHMAN:
7     Q.  Well, a POSA could read Table 2 as
8 100 milligrams of granulated pimavanserin
9 compressed into a tablet, and that would be
10 consistent with the court's construction of a
11 blended composition; wouldn't it?
12     MR. FRESE:  Objection to form,
13 incomplete hypothetical.
14     THE WITNESS:  Why would a POSA want to
15 read Table 2 as a composition compressing to a
16 tablet?  Now you lost me.
17 BY MR. PEACHMAN:
18     Q.  Table 2 doesn't indicate intra- or
19 extragranular excipients.  It just has a final
20 weight and list of ingredients?
21     A.  Okay.  So if you're going to compress
22 this composition into a tablet, absolutely you
23 don't want to put the magnesium stearate inside
24 the granules.  Because now you really need the
25 lubricant even more.

172

1     Q.  Could you look at Column 20, line 63?
2     A.  Yeah.
3     Q.  Okay.  So here it states, As an
4 alternative, the herein disclosed pimavanserin
5 tartrate granulations may be compressed into a
6 tablet without further excipients; right?
7     A.  It says that.
8     Q.  And then the composition disclosed in
9 Table 2 in some embodiments forms tablets,
10 et cetera.
11     So here, it's talking about how you can
12 take the components and then compress them into a
13 tablet --
14     A.  Yes.
15     Q.  -- of further excipients?
16     A.  Yeah.
17     Q.  So why wouldn't a POSA be able to read
18 Table 2 in view of the specification and believe
19 that to be a blended composition without an
20 extragranular excipient?
21     MR. FRESE:  Objection to form.
22     THE WITNESS:  I think I've answered that
23 question five or six times.  You asked me whether
24 the POSA looking at Table 2 would say, this is
25 going to be compressed into a tablet.

43 (Pages 169 to 172)

173

1    And I said just looking at Table 2 not
2  necessarily, right.  Because the whole patent is
3  about putting things in capsules.
4    Now, it's true that the paragraph right
5  above says, you know, as an alternative to filling
6  a capsule, you could compress into a tablet.
7  Yeah, you can compress this composition into a
8  tablet, but in no way says everything has to be
9  inside of granules.
10    And, in fact, number one, you don't want
11  to put the magnesium stearate inside the granules.
12  Number two, the role of microcrystalline
13  cellulose, if you were to compress this into a
14  tablet, would be a compression binder.
15    There is plenty of literature that says
16  that if you put microcrystalline cellulose inside
17  a granule having used wet granulation, you lose a
18  lot of the binding capacity of microcrystalline
19  cellulose.
20    So now you have two reasons why those --
21  a POSA would say, Huh, yeah, those are going to be
22  outside.  Because I need the binding capacity of
23  microcrystalline cellulose, which I don't want to
24  lose by making them [inaudible], and I need the
25  lubricating capability of mag stearate, which I

174

1  don't want to lose by putting inside a granule,
2  and I don't want to make the granule hydrophobic,
3  which would make it hard to dissolve, which is
4  what would happen if I put it inside the granule.
5    So somebody who has experience in the
6  field, like a POSA looks at this formulation and
7  understands that -- and then reads the example and
8  further understands that Table 2, which is being
9  described in the example, is talking about making
10  granules of pimavanserin alone, which seems to be
11  the main point of the whole specification, and
12  then mixing those granules with Avicel and mag
13  stearate, as if they're granule ingredients, and
14  arrive at a final blend, which unfortunately
15  they're calling it a granulation.
16  BY MR. PEACHMAN:
17    Q.  All right.  So your opinions here are
18  premised on the fact that you believe a POSA would
19  interpret pimavanserin granulation as having an
20  intragranular and extragranular component as
21  opposed to just a granulation?
22    MR. FRESE:  Objection to form and
23  mischaracterizes his testimony.
24    THE WITNESS:  No, I don't think it's a
25  premise of my interpretation.  I think it's what

175

1  the example says.  We could read the example.
2  It's very clear in the example, that magnesium
3  stearate and microcrystalline cellulose don't show
4  up until after the granulation is finished.  It's
5  dried, it's milled, and now it's being blended.
6  That's --
7  BY MR. PEACHMAN:
8    Q.  That's assuming that the composition of
9  Table 2 is being limited to the exemplary
10  manufacturing process you mentioned; right?
11    A.  Table 2 is introduced as part of the
12  example, right.  So if you want to take this
13  Table 2 out of context and say, you know, devoid
14  of any other context.
15    Q.  Does Table 2 state that it's prepared
16  according to any specific manufacturing process?
17    A.  Table 2 is introduced as part of the
18  example.  So when I'm reading this example and
19  then I'm directed to Table 2, I understand that
20  Table 2 reflects what was cited in the example.
21    Q.  When you say "the example," what example
22  do you mean?
23    A.  The one and only working example in the
24  whole patent, the one that begins on Column 20,
25  line 9.

176

1    Q.  All right.  And this example provides
2  many other different variations in the tables;
3  right?
4    MR. FRESE:  Objection to form --
5    THE WITNESS:  I honest to God --
6    MR. FRESE:  -- vague.
7    THE WITNESS:  -- have no idea what you
8  mean by that.
9  BY MR. PEACHMAN:
10    Q.  So you read all the tables in the
11  '721 patent as being limited to the exemplary
12  process in Column 20, starting at line 15?
13    A.  When --
14    MR. FRESE:  Objection to form.
15    THE WITNESS:  When did I say that?
16  BY MR. PEACHMAN:
17    Q.  Well, I'm asking, because I'm trying to
18  understand why you believe that Table 2 is limited
19  to the granulation process in Column 20, although
20  it doesn't indicate it in the table?
21    A.  Because they will do what's called in
22  the middle of the example.
23    Q.  And so its location in --
24    A.  And because the amounts of materials
25  listed in Table 2 are the same amounts of

44  (Pages 173 to 176)

8/22/2024        Acadia Pharmaceuticals, Inc. v. Aurobindo Pharma Limited, et al. Fernando J. Muzzio, Ph.D.
Confidential

177

1  materials listed in the example, and because the
2  actual materials listed in Table 2 are the actual
3  materials listed in the example, and because
4  what's listed in Table 2 is consistent with how
5  the example explains you're going to make these
6  capsules, and because given what those materials
7  are, a POSA would know how those materials were
8  used.
9        Q.  What are the different ways that a
10  person of ordinary skill in the art would
11  understand the term "pimavanserin granulation"?
12        A.  Are we in the context of this patent or
13  as a general standalone term?
14        Q.  I'll start with as a general standalone
15  term.
16        A.  Well, I analyze two ways.  One would be
17  as in the outcome of the granulation step.  And
18  the other would be as the final blend that it just
19  about going to be encapsulated or compressed as a
20  general proposition.
21        (Reporter seeks clarification.)
22        THE WITNESS:  In this case in
23  particular, though, because Table 2 clearly
24  provides in a succinct manner what was done in the
25  example, when read with a fair mind willing to

178

1  understand, Table 2 is talking about what was done
2  in the example and, therefore, Table 2 is closest,
3  granules of pimavanserin alone that they were
4  mixed with extragranular ingredients, mainly
5  microcrystalline cellulose and magnesium stearate.
6  And that's my opinion, which I think I've given
7  now a few times.
8  BY MR. PEACHMAN:
9        Q.  If we go back to Column 20, where we
10  were looking at it, pimavanserin hard shell
11  capsules, 34 milligram pimavanserin equivalent to
12  40 milligram pimavanserin tartrate, were
13  manufactured.
14        Table 2 contains an example of a
15  suitable formulation; right?
16        A.  Yes.
17        Q.  So the '721 patent is telling a POSA
18  that this is another example formulation?
19        A.  No, why is it saying it's another
20  example?
21        Q.  The '721 patent doesn't say that this is
22  a formulation based on any specific manufacturing
23  process.  In fact, it just says it's an example of
24  a suitable formulation; right?
25        MR. FRESE:  Object to form.

179

1        THE WITNESS:  So can you please help me
2  understand where does it say that there's now a
3  new example?
4        Because I read it as a continuation of
5  the same example, among other reasons because the
6  equipment used in Table 3 is the equipment
7  referred to in the description of the granulation
8  process followed by the diluent blending process.
9        So, to me, it's all one example.  And I
10  don't know why a POSA would see this as more than
11  one example.
12  BY MR. PEACHMAN:
13        Q.  Well, the '721 patent, Column 20,
14  line 60 says, Table 2 contains an example of a
15  suitable formulation; correct?
16        So it's providing an example.  It
17  doesn't indicate that it's a formulation based on
18  anything else?
19        MR. FRESE:  Sorry, are you done?
20        MR. PEACHMAN:  Yeah.
21        MR. FRESE:  Okay.  Objection to form,
22  compound.
23        THE WITNESS:  Sorry, I don't think I --
24  can you repeat, please?
25

180

1  BY MR. PEACHMAN:
2        Q.  The '721 patent at Column 20, line 60,
3  states that, Table 2 contains an example of a
4  suitable formulation.
5        So it's providing an example.  The
6  '721 patent doesn't state that it's based on
7  anything else?
8        MR. FRESE:  Same objection.
9  BY MR. PEACHMAN:
10        Q.  Right?
11        A.  In my opinion, there is one example in
12  this patent -- one working example in this patent.
13  It begins on Column 20, line 9.  It carries
14  through.  It continues and continues.  There is no
15  separate example from that working example that I
16  can see.
17        And my opinion is that a POSA would read
18  Table 2, after reading Column 20, line 9 through
19  line whatever, 60-something, and would understand
20  that Table 2 is talking about what was described
21  in Column 20 and would understand that the
22  granules are pimavanserin alone and that the
23  microcrystalline cellulose and mag stearate were
24  added extragranularly.
25        The POSA would understand that also

45 (Pages 177 to 180)

181

1 because it would be counterproductive to put
2 magnesium stearate inside the granules, whether
3 you're going to compress into a tablet or fill a
4 capsule. And, in particular, if you're going to
5 compress into a tablet, you will also know that
6 the way in which we use Avicel 302 is as a
7 compaction binder.
8 So a POSA would have absolutely no
9 reason to read Table 2 as microcrystalline
10 cellulose and mag stearate being intragranular.
11 That's my opinion, and that's going to continue to
12 be my opinion.
13 Q. If you look at Column 22, line 4.
14 Do you see where it says, The bulk
15 density of the blended composition is greater than
16 .4?
17 A. Right.
18 Q. And then some other densities are
19 provided?
20 A. Uh-huh.
21 Q. And then if you look at Column 22,
22 line 9, it says, The bulk density of pimavanserin
23 granulation is.
24 Do you see that?
25 A. Yeah.

182

1 Q. So the specification makes a distinction
2 between a blended composition and a pimavanserin
3 granulation.
4 Do you see that?
5 A. Yeah, I do.
6 Q. So a POSA would see that there's a
7 difference between a pimavanserin granulation and
8 an overall blended composition?
9 MR. FRESE: Object to form.
10 THE WITNESS: Which actually makes my
11 point, right. Now they go back to using the word
12 "granulation" to mean the granules. Because
13 that's the only context in which you would
14 distinguish it from the final blended composition,
15 where presumably now you added something to the
16 granules, which is exactly what they did here,
17 right.
18 BY MR. PEACHMAN:
19 Q. But pimavanserin --
20 A. Because, otherwise, why do they end up
21 having different bulk densities.
22 Q. Well, Dr. Muzzio, you said that a POSA
23 would only understand the term "pimavanserin
24 granulation" in this context to mean a final
25 blend?

183

1 A. No, I didn't say that.
2 Q. How would a POSA interpret --
3 A. I did not say that. And it would be
4 better if -- you know, if when you ask me
5 questions, please try not to change the meaning of
6 what I've said.
7 Q. Okay.
8 A. Because then it forces me to clarify
9 again and again and again what is it that I
10 actually said.
11 Q. Okay.
12 A. I said that, unfortunately, the word
13 "granulation" is used in two different ways.
14 Sometimes it's meant to be the outcome of a
15 granulation step, and sometimes it's meant to mean
16 the final blend. I said that very clearly
17 multiple times. I don't know why you're saying
18 now that I said that it always means one thing.
19 Q. In the context of the patent.
20 A. What I say is that a POSA reading
21 Table 2, after reading Column 20, would understand
22 that in this particular instance of in the title
23 of Table 2, the POSA would very clearly know that
24 this is the final blend composition. That is what
25 I said. And I maintain that and that's my opinion

184

1 and it's going to remain my opinion.
2 MR. FRESE: Let's take a break.
3 MR. PEACHMAN: Okay. Sure.
4 THE VIDEOGRAPHER: The time is 2:09 p.m.
5 We are now off the record.
6 (Recess from the record.)
7 THE VIDEOGRAPHER: The time is 2:25 p.m.
8 We are now on the record.
9 BY MR. PEACHMAN:
10 Q. Dr. Muzzio, welcome back from the break.
11 A. Thank you, Counsel.
12 Q. I wanted to ask you some questions about
13 Exhibit 7 again. This is the '682 patent.
14 A. Okay.
15 Q. And, Dr. Muzzio, if you look at the
16 bottom of Column 1, right around line 63.
17 Do you see here --
18 A. I'm not there yet.
19 Q. Okay. Yeah, it's not a problem.
20 A. Okay.
21 Q. Yeah, and line 63, Column 1.
22 A. Uh-huh.
23 Q. The patent states, In addition to cost
24 saving in the manufacturing process, a very
25 important part of the overall economics is the

46 (Pages 181 to 184)

185

1  cost associated with research and development
2  efforts.  Currently to at least some degree, these
3  research investments are driven by the difficulty
4  of the particular drug formulation; right?
5      A.  Yes.
6      Q.  Okay.  And then in Column 2, the '682
7  patent states that this generally is true of new
8  molecules where processing difficulties can cause
9  delays in launching the product and for generic
10 products where difficulties in developing a
11 suitable formulation often are paramount factors
12 controlling successful development; correct?
13     A.  True.
14     Q.  Okay.  Do you have reason to disagree
15 with the lines we just read?
16     A.  It was true when I wrote it, and it's
17 true now.
18     Q.  Okay.  And then in Column 2 going on,
19 the '682 patent here states that, These
20 difficulties can be associated with the API
21 properties, difficult to control crystal form, low
22 bulk density, cohesive powders, difficult to
23 achieve particle size distribution, PSD,
24 et cetera, or with the drug product properties,
25 low blend uniformity, inconsistent release

186

1  profile, poor powder floor, et cetera; right?
2      A.  Indeed.
3      Q.  So here, in Column 2, you've identified
4  a number of difficulties that are associated with
5  developing a particular drug formulation; correct?
6      MR. FRESE:  Objection; form.
7      THE WITNESS:  No.
8  BY MR. PEACHMAN:
9      Q.  You state right here in Column 2,
10 Dr. Muzzio, that these difficulties can be
11 associated with, and you list out a number of
12 factors; correct?
13     A.  Yeah, but it's not for a particular
14 formulation.  These are general problems that
15 affect many formulations.
16     Q.  Right.  So these are the difficulties
17 that would be associated in general with
18 developing a drug formulation.
19         You would agree with that?
20     A.  Some of them, yes.
21     Q.  And when you say "some of them," do you
22 disagree with any of the ones that are listed here
23 in Column 2 as being a difficulty for drug
24 formulation?
25     A.  No, but there are others in addition to

187

1  the ones I listed.  That's why I used the word
2  "et cetera."
3      Q.  Oh.  What are the other difficulties
4  that are associated with developing a particular
5  drug product?
6      A.  Sometimes you have instabilities,
7  chemical or physical, for example.  Sometimes you
8  have some of those instabilities triggered by the
9  presence of some excipients.  Sometimes you have a
10 very complex release profile that might be
11 difficult to achieve.  Sometimes the drug is very
12 poorly soluble.  I don't know that I talk about
13 poor solubility here.
14         But, very particularly, something that I
15 don't talk about here, but it's a very important
16 thing is when you have a combination of a very
17 high dose and very poorly soluble API, those are
18 additional difficulties.
19         Sometimes when the anticipated market
20 volume is very low, sometimes when the amount of
21 API needs to be titrated for the patient, forcing
22 you to potentially have to make doses with many,
23 many different potencies, like Coumadin or some
24 other anti-coagulates.  I mean, there's many
25 difficulties.  These are some of the most common

188

1  that are addressed by the technology disclosed in
2  this patent.
3      Q.  And have you experienced these type of
4  difficulties yourself in developing drug
5  formulation?
6      A.  Yeah.  Hold on, these ones.  Are you
7  talking about the ones listed here, or are you
8  talking about the ones --
9      Q.  The ones you just testified to.
10     A.  -- I just added?
11     Q.  The ones you just added.
12     A.  Yeah, I have actually dealt with all of
13 those things.
14     Q.  Okay.  Is it the individual API
15 properties that make the formulation development
16 difficult?
17     MR. FRESE:  Objection to form, vague.
18     THE WITNESS:  It's one of the main
19 contributing factors, not the only one.
20 BY MR. PEACHMAN:
21     Q.  Okay.  Dr. Muzzio, I'd like to put the
22 '682 patent aside for a second.  And I wanted to
23 look at your reply report.
24         And I think your -- let's see here.
25 Paragraph 15, I'd like to go to.

47 (Pages 185 to 188)

189

1    A.  That would be Exhibit?
2    **Q.  6.**
3    A.  6.  Paragraph?
4    **Q.  15.**
5    A.  Okay.  Yeah.
6    **Q.  All right.  And in paragraph 15, you**
7    **state that, Dr. Little, in paragraph 84 of his**
8    **report, states that a POSA would understand that**
9    **pimavanserin has its own unique physical and**
10   **chemical characteristics that differ from other**
11   **APIs.  Thus, I do not agree that a POSA would have**
12   **considered the steps necessary for developing a**
13   **size 3 or 4 capsule containing 34 milligram**
14   **pimavanserin to be routine.**
15   **And then you state, I disagree.  Every**
16   **API is unique in its particular combination of**
17   **physical and chemical characteristics; however,**
18   **POSAs have knowledge of routine studies that I**
19   **termed "preformulation" studies in my opening**
20   **report that any POSA would conduct for any API in**
21   **order to develop a target product profile; right?**
22   A.  Yes.
23   **Q.  Okay.  Is it your opinion that the**
24   **development of any formulation for any API is**
25   **routine experimentation for a person of ordinary**

190

1    **skill in the art --**
2    A.  No.
3    **Q.  -- as long as they conduct**
4    **preformulation?**
5    A.  No.
6    **Q.  When is it -- when is the development of**
7    **a formulation for an API not routine**
8    **experimentation for a POSA?**
9    A.  What I believe is my opinion, as
10   expressed here, is that even though every API is
11   different and unique -- and I say that; right?
12   It's right there -- is that, that said, there are
13   some things you pretty much always do.  And that's
14   why I call those routine steps, is because you
15   will always characterize the particle size
16   distribution.  You will always characterize the
17   intrinsic solubility.  You will always want to
18   know whether the API is compatible with target
19   excipients.
20   These are things that are,
21   quote-unquote, routine because they're part of the
22   standard list of things that you would do.
23   **Q.  Okay.**
24   A.  That doesn't make it routine to develop
25   a product.

191

1    **Q.  Okay.  So while these are common steps**
2    **that people know to perform, it might not be**
3    **routine experimentation, depending upon the**
4    **characteristics of the API?**
5    MR. FRESE:  Object to form and to the
6    extent it mischaracterizes prior testimony.
7    THE WITNESS:  Let me think for a moment
8    how to address this.
9    So I was responding to Dr. Little's
10   statement here that -- he says that the steps
11   required to develop this particular product are
12   not routine, when I think he was responding to my
13   opinion that you could do certain things for a
14   given drug, and based on the results, if you want
15   to do a different product for the same drug, you
16   don't necessarily have to repeat every single one
17   of your preformulation steps.
18   That was the original opinion.  I said,
19   you know, for example, if you develop a
20   20 milligram dose for a product and now you want
21   to develop a 30 milligram dose for the same API,
22   you can use some of the same results.  That was
23   the original opinion.
24   Now, Dr. Little appears to have
25   disagreed with almost everything I say, even

192

1    things that are so known in the art that, you
2    know, are very well established.  So I was
3    responding to him disagreeing with that very
4    commonsense statement that you can reuse some of
5    the knowledge for the same API, right.
6    BY MR. PEACHMAN:
7    **Q.  Okay.**
8    A.  And so in that context, I think I'm
9    providing this list.
10   **Q.  So you're interpreting Dr. Little's**
11   **remarks about the steps that were taken, and what**
12   **you're opining is that the steps that one would do**
13   **with any API were known, right, that one could**
14   **reuse the steps?**
15   A.  Right.
16   **Q.  But you're not disagreeing with him that**
17   **it would not be routine experimentation to develop**
18   **a formulation for a unique API?**
19   A.  I believe the right context of my
20   opinion is that if you learn in Ragnar-Tolf how to
21   make a 20 milligram dose and there is a whole
22   bunch of preformulation knowledge disclosed there,
23   that a lot of that knowledge would immediately
24   inform a POSA how to proceed to develop the
25   40 milligram dose and that, yes, going from the 20

48  (Pages 189 to 192)

8/22/2024          Acadia Pharmaceuticals, Inc. v. Aurobindo Pharma Limited, et al. Fernando J. Muzzio, Ph.D.
Confidential

193

1  to the 40 could be to a significant degree
2  routine.
3       I believe that's my opinion, which
4  Dr. Little didn't seem to have taken out of
5  context to argue that if you develop a brand-new
6  formulation for a brand-new molecule that's not
7  routine. I'm not disagreeing that developing a
8  formulation for an entirely new molecular entity,
9  often -- often involves nonroutine steps.
10      Sometimes the steps are completely
11 routine. Sometimes you're dealing with APIs
12 within a class. They're similar enough to each
13 other that you can take one API out and put
14 another. And that's called platform formulations
15 routinely used by generic companies, not so much
16 high branded.
17      You know, I can -- for example, I can
18 look at all the opioid formulations that we were
19 all filing ten years ago in court that they were
20 all very, very, similar, they were all on PDO. So,
21 you know, was there anything not routine from
22 going from oxycodone 20 milligrams to oxymorphone
23 20 milligrams in PDO, I would argue not. That's
24 why the patents were invalidated. But, yeah, the
25 disagreement largely has to do with the context

194

1  having been changed along the way.
2       Q. Okay. And you mentioned Ragnar-Tolf.
3  Does Ragnar-Tolf speak to the physical and
4  chemical characteristics of pimavanserin?
5       A. It does.
6       Q. Does it tell you how to alter
7  formulations to make different dosage forms and
8  different dose amounts?
9       MR. FRESE: Objection to form, vague,
10 ambiguous.
11      THE WITNESS: It does.
12 BY MR. PEACHMAN:
13      Q. We'll get to Ragnar-Tolf.
14      One question I wanted to ask you is:
15 Does a POSA have to know the results of
16 preformulation studies before they know whether
17 they can develop something routinely?
18      MR. FRESE: Object to form.
19      THE WITNESS: It depends on the API, how
20 well known that API is, whether it's an API that
21 is in a well-known class. You know, there are a
22 number of additional considerations that may come
23 into play, depending on the actual molecule we're
24 talking about. And there might be several
25 surprises here and there, depending on what we're

195

1  talking about.
2       But if you're talking about developing a
3  different dosage form of the same molecular entity
4  that you have already developed, you would be well
5  advised to look at that preformulation data to
6  make sure that you're aware of things that might
7  be important.
8  BY MR. PEACHMAN:
9       Q. You mentioned -- sorry, are you done
10 with your answer?
11      A. Yes, I am, thank you.
12      Q. You mentioned whether an API is in a
13 well-known class.
14      Is pimavanserin in a well-known class of
15 drugs?
16      A. I haven't considered that.
17      Q. Have you considered the physicochemical
18 characteristics of pimavanserin and how that
19 affects its ability to formulate?
20      A. To some extent.
21      Q. When you say "to some extent," what have
22 you considered?
23      A. I have considered that the dose is
24 relatively low. I have considered that it's a
25 readily soluble molecule. I have considered that

196

1  it has a melting point above 100 degrees C. I
2  have considered that it appears to be
3  substantially hydrophilic.
4       I have considered, as disclosed in
5  Ragnar-Tolf, that it has a tendency to
6  agglomerate, and that some of the direct
7  compression results led to significant variability
8  in dose. I have considered that you want to be
9  able to develop a small dosage form. I have
10 considered those things.
11      Q. What about permeability of the drug, did
12 you consider that?
13      MR. FRESE: Object to form.
14      THE WITNESS: Actually, I did not look
15 at the permeability, no. Because I wasn't asked
16 to formulate a pimavanserin dosage form. If
17 somebody asked me to formulate it, I would.
18 BY MR. PEACHMAN:
19      Q. Well, you are offering opinions in this
20 case about whether the claims, Claims 1 and 4 and
21 the dependents, that are asserted would be
22 obvious; right?
23      A. I have.
24      Q. And as part of that obvious analysis,
25 you're considering the motivations that a POSA may

49 (Pages 193 to 196)

8/22/2024    Acadia Pharmaceuticals, Inc. v. Aurobindo Pharma Limited, et al. Fernando J. Muzzo, Ph.D.
Confidential

197

1  have had --
2      A.  Yes.
3      Q.  -- in formulating pimavanserin?
4          Okay.  And as part of those
5  considerations, wouldn't a POSA be interested in
6  the permeability of a drug substance?
7      A.  Well, if the POSA knows that there's
8  been an immediate-release formulation already on
9  the market for several years, where the same
10  amount of drug was formulated as an
11  immediate-release formulation, which means that
12  the drug completely dissolves in the stomach and
13  the POSA would know that that drug was approved,
14  meaning that it was approved based on
15  pharmacokinetic and pharmacodynamic information,
16  the POSA would know that the permeability was
17  enough.
18          Moreover, the POSA would know what the
19  ingredients were in that formulation.  The
20  formulation doesn't show the presence of a
21  permeability enhancer or a chaperone molecule or
22  anything that requires enhancing the permeability
23  in any way.
24          And besides, it would take a couple of
25  minutes to go to PubMed and bring up the molecule.

198

1  And, you know, if you want at the next break, I'll
2  tell you the permeability.  It's not that hard.
3      Q.  What are the other properties that a
4  person of ordinary skill in the art would have
5  considered in deciding whether it would be routine
6  to formulate a drug?
7          MR. FRESE:  Object to form, incomplete
8  hypothetical.
9  BY MR. PEACHMAN:
10      Q.  To be clear, I mean API properties.
11          MR. FRESE:  And, sorry, could you just
12  say that a little bit -- oh, the API properties.
13  Same objection.
14          THE WITNESS:  We're not talking about
15  formulating here.  We're talking about
16  reformulating, right.  So whether it would be
17  routine to reformulate this 20 milligram tablet,
18  two tablets taken simultaneously as a single dose
19  40 milligrams for a drug that is readily soluble,
20  where the dosage is just 20 milligrams, where the
21  initial formulation is rather simple, yeah, that
22  would have been routine to a POSA to know that you
23  could turn that into a 40 milligram formulation.
24  I don't see anything particularly challenging in
25  doing that.

199

1  BY MR. PEACHMAN:
2      Q.  Okay.  So in your opinion, formulating a
3  drug is different than reformulating a drug?
4      A.  Well, reformulating a drug benefits from
5  the knowledge -- some of the knowledge or all of
6  the knowledge, depending on whether it's done by
7  the same company or a different company, but
8  there's knowledge about the original formulation
9  that already dispels some of the things you need
10  to know.
11          For example, safety and efficacy are no
12  longer an issue, right, because it has been
13  established.  And if the drug was approved as an
14  immediate-release formulation in a simple
15  formulation like this, that would suggest that
16  permeability is not an issue, period.
17          You still would want to know about
18  stability, but if there are published references
19  that have already disclosed a fair amount of, you
20  know, expedient compatibility, you have already
21  quite a bit of information about that.
22          So you're not asking -- or you are
23  asking me, but I don't think I need to answer this
24  question in the abstract for the general
25  proposition of what does it take to create a

200

1  formulation, and is that routine or not.  I think
2  my answer should be superscribed to this
3  particular API, which is the one I provided
4  opinions on.
5      Q.  Okay.  So in your opinion, you didn't
6  need to look into all the variables that a person
7  of ordinary skill in the art would consider in
8  first formulating a drug.  Because it's a
9  reformulation, you can --
10      A.  No, I --
11      Q.  -- truncate the analysis; right?
12      A.  No.
13          MR. FRESE:  Objection to form, compound.
14          Go ahead and answer.
15          THE WITNESS:  I believe my opinion is
16  that going from two 20 milligram tablets to one
17  40 milligram in dosage form for a readily soluble
18  drug like this one is not a particularly difficult
19  thing to do.
20          I think that that's my opinion.  And it
21  would have been straightforward for a POSA to
22  predict that you could indeed granulate this drug
23  and stick it in a capsule with a high expectation
24  of success.  That has been my opinion.
25

201

1  BY MR. PEACHMAN:
2      Q.  Okay.
3      A.  And it still is.
4      Q.  Can we go to paragraph 27 of Exhibit 6?
5      A.  Yes.
6      Q.  Do you see here you say, Thus, I also
7  disagree with Dr. Little's opinion that due to a
8  lack of disclosure in the prior art, for each of
9  Dr. Muzzio's five provided reasons, pill burden,
10  color and shape of capsules, swallowing difficulty
11  for patients, size of dosage form, and masking
12  pimavanserin's bitter taste, a POSA would have to
13  discover whether the purported problem actually
14  exists for the 17 milligram Nuplazid tablets, only
15  after which would the POSA then turn to the prior
16  art and attempt to develop a solution.
17      Do you see that?
18      A.  I do.
19      Q.  All right.  And I believe on the same
20  paragraph, and it continues onto the next page,
21  you state that, In addition, a POSA, knowing that
22  the daily dose was 34 milligrams taken all at
23  once, once daily, would know that there was a cost
24  benefit and manufacturing-capacity benefit that
25  would stem from consolidating the full

202

1  34 milligram dose pimavanserin to a single dosage
2  form, which would motivate a POSA to reformulate
3  Nuplazid tablets into a single consolidated dosage
4  form.
5      Do you see that?
6      A.  Uh-huh.
7      Q.  All right.  And a person of ordinary
8  skill in the art, as of the relevant time frame
9  for the '721 patent, would know that Nuplazid had
10  come to market as a two-unit dosage form; right?
11      A.  Yeah.
12      Q.  And one deduction that a POSA would have
13  made is that there must have been something that
14  prevented Acadia from developing a single dosage
15  form; right?
16      MR. FRESE:  Objection to form.
17      THE WITNESS:  Absolutely not.
18  BY MR. PEACHMAN:
19      Q.  Well, if a POSA was motivated to
20  consolidate dosage forms into a single unit, if
21  practical, wouldn't it have been a fair assumption
22  that Acadia had tried to make a single dosage form
23  with pimavanserin, but yet released two?
24      MR. FRESE:  Objection to form.
25      THE WITNESS:  Not necessarily.

203

1  BY MR. PEACHMAN:
2      Q.  And why would that not be a fair
3  assumption?  How are you so certain?
4      A.  Because there are many instances where
5  pharmaceutical companies may develop a first
6  version of the product and only later on, through
7  post-market studies or whatever, decide that the
8  correct, best formulation to put into the market
9  is a different one.  There are many cases of
10  products introduced in various potencies and then
11  over time that changing.
12      I can give you an example right now that
13  I'm very, very intimately familiar with, right.
14  There are cancer drugs that are sometimes
15  introduced as 50 milligrams, and then, with the
16  benefit of additional work, we learn that we need
17  to maybe increase that dose.  But we don't want to
18  be giving the patient three, four, five tablets.
19  It happens.  It's quite common.
20      But that doesn't mean that the POSA
21  would think that it would be -- it would have been
22  particularly difficult to do that.  I mean, you're
23  talking about putting 40 milligrams, which is a
24  really small amount of drug, in a single dosage
25  form.  Why would that be considered challenging.

204

1      Q.  Would a person of ordinary skill in the
2  art have been aware of instances where
3  pharmaceutical companies tried to make a
4  single-unit dosage form but ended up releasing two
5  different dosage forms to market?
6      A.  POSAs would be aware that pharmaceutical
7  companies introduce multiple dosage forms into the
8  market and that not all of those dosage forms
9  survived or some things become preferred or
10  eventually you needed -- I mean, you know, when
11  pharmaceutical companies develop products, they
12  develop for the global market, not one country,
13  but different countries have different
14  requirements in terms of the size or dosage form.
15      For example, in Asia, they don't want to
16  see total weight of a tablet larger than a
17  thousand milligrams, right.  That's not true of
18  U.S. or Europe.  You know, the dosage themselves
19  tend to be smaller in some countries than in
20  others, because people sometimes are smaller in
21  different countries.  There are many reasons why
22  different dosage forms are introduced.
23      But in 2017, after the dosage treatment
24  has been well established to be 40 milligrams once
25  a day, a POSA would look at that and say, Hey, I

51  (Pages 201 to 204)

8/22/2024    Acadia Pharmaceuticals, Inc. v. Aurobindo Pharma Limited, et al. Fernando J. Muzzio, Ph.D.
Confidential

205

1 can save my company a bunch of money and I can
2 release another capacity if I put all this into a
3 single dosage form, and just because somebody
4 didn't do it before doesn't mean it's going to be
5 particularly difficult to do it now.
6     Q.  Can you identify any reasons that a
7 person of ordinary skill in the art would assume
8 that Nuplazid came to market as a two-unit dosage
9 form because they couldn't make a single one?
10     MR. FRESE:  Objection to form.
11     THE WITNESS:  Well, in the specific case
12 of this particular product, when you look at the
13 tablet they made, you assume the formulation they
14 had used, if they had actually compressed that
15 same exact blend into a 40 milligram rather than
16 20 milligram -- or let's say they took that blend
17 and used a bigger dye, yeah.
18     And they said, Okay, I'm going to make
19 40 milligram tablets, which I'm going to end up
20 with and granulate 300 milligrams total weight,
21 something like that, just relatively simple
22 calculation tells you that that tablet may be
23 larger than what might be easily swallowable,
24 right.
25     So I immediately would say, Okay, if I

206

1 want to put all 40 milligrams into a dosage form,
2 I also have to be mindful of the size of the
3 dosage form.
4 BY MR. PEACHMAN:
5     Q.  All right.  And in view of how big a
6 single tablet would be, that would indicate to a
7 POSA that that's why it was released as two
8 separate tablets?
9     A.  Maybe.  A POSA may not have the benefit
10 of what Acadia did or didn't do and why they did
11 it.  They might not know.  I mean, there may be
12 other reasons that they choose from.  Maybe for
13 some reason there was some type of marketing
14 reason, and companies often make choices due to
15 marketing, not just technical.
16     But a POSA faced with the proposition of
17 putting 40 milligrams of this immediate-release,
18 readily soluble molecule -- sorry.
19     A POSA faced with the proposition of
20 putting 40 milligrams of this readily soluble drug
21 into an immediate-release formulation would
22 probably look at that and say, I think this is
23 likely to be pretty easy.  I should try.  And I
24 know what to do about it.  And the steps are not
25 that difficult.

207

1     Q.  So a POSA, as of the relevant time frame
2 of the '721 patent, would have had both the
3 Nuplazid label and also the Ragnar-Tolf reference;
4 right?
5     A.  I believe that's correct.
6     Q.  And in both of those references,
7 Nuplazid -- or strike that, pimavanserin was
8 formulated in a -- as multiple tablets; right?
9     MR. FRESE:  Objection; form.  And
10 objection; mischaracterizes the documents.
11     THE WITNESS:  Ragnar-Tolf talks about
12 dosage forms that go from 1 milligram to
13 80 milligram, I believe.  Do I have Ragnar-Tolf?
14 I don't know if I do.
15 BY MR. PEACHMAN:
16     Q.  We can get it for you.
17     A.  Will you, please?
18     Q.  We will find it.
19     A.  I appreciate that.
20     MR. FRESE:  It hasn't been marked yet.
21     MR. PEACHMAN:  This is 9?
22     THE COURT REPORTER:  9, yeah.
23     (Muzzio Deposition Exhibit 9 was marked
24 for identification and attached to the
25 transcript.)

208

1     THE WITNESS:  Thank you, appreciate it.
2 BY MR. PEACHMAN:
3     Q.  Okay.  Dr. Muzzio, you've been handed
4 Ragnar-Tolf Exhibit 9.
5     We will get to that in my questions.  I
6 did want to continue to move on with the report,
7 but --
8     A.  Okay.  That's fine.
9     Q.  Yeah.
10     A.  I was looking for the place where they
11 do teach higher dosage forms.
12     Q.  Yeah.  Okay.  And we'll get to that.  I
13 think you're referring to one of the tables, which
14 we will get to and come back to.
15     A.  Okay.
16     Q.  In your report, on the same paragraph
17 that we were on, we were on 27, and on the page 11
18 where it continues, you mentioned around the
19 fourth line up -- or fifth line up, Once a POSA
20 begins the process of reformulation of
21 17 milligram tablets, a POSA could reasonably
22 identify capsules as a good option for formulating
23 pimavanserin, given their ability to mask the
24 bitter taste of the active to be made visually
25 distinguishable from other tablets and capsules

52 (Pages 205 to 208)

8/22/2024    Acadia Pharmaceuticals, Inc. v. Aurobindo Pharma Limited, et al. Fernando J. Muzzio, Ph.D.
Confidential

209

1  and the acknowledgment in the art that they could
2  be easier for some patients to swallow; right?
3      A.  Yeah.
4      Q.  All right.  And so a person of ordinary
5  skill in the art, in your opinion, could identify
6  capsules, but they could also identify something
7  else; right?
8      A.  Yes.
9      Q.  Okay.  And you don't say here;
10 correct -- you say they could identify capsules?
11     A.  Yes.
12     Q.  Okay.  So a POSA could identify
13 capsules.  They could identify something else.
14         What else could they identify?
15     A.  I think that, in my opinion, the two
16 options on the table that a POSA would have looked
17 at, unless you have a very good reason to look at
18 something else, would have been either tablets or
19 capsules.
20     Q.  Okay.  And you also mention here that
21 the acknowledgment in the art that they can be
22 easier for some patients to swallow; right?
23 That's the last factor you mentioned?
24     A.  It's one of the factors.
25     Q.  Okay.  So capsules, in your opinion were

210

1  known to be easier to swallow for some patients;
2  is that right?
3      A.  There was plenty of literature at the
4  time and earlier, indicating that for some
5  patients capsules are easier to swallow or that
6  they perceive them as easier to swallow.  But I
7  would like to point you to three lines earlier,
8  where it also talks about the better ability to
9  mask the bitter taste and, then on the next line,
10 the fact that you can make up so it's to be much
11 easier to distinguish than tablets.
12         So there is a combination of reasons.
13 And that doesn't even get into the fact that the
14 capsules are easier to formulate than tablets.
15 You can formulate a capsule much faster,
16 typically, than a tablet.  They usually have fewer
17 ingredients, which means fewer things that could
18 go wrong.
19         I mean, there's a lot of reasons why,
20 for this particular situation with just
21 40 milligrams of drug, the capsule may be the
22 preferred option over the tablet.
23     Q.  And when you say the acknowledgment in
24 the art that they can be easier to swallow for
25 some patients, capsules were not known to be

211

1  easier to swallow for most patients; right?
2         MR. FRESE:  Object to form.
3         THE WITNESS:  I believe we're only
4  talking about elderly patients that experience
5  problems swallowing.  And I stand by the opinions
6  I gave that when you consider dosage forms of
7  similar size, capsules are easier to swallow.
8  BY MR. PEACHMAN:
9      Q.  Did you do an analysis of whether most
10 patients in the target demographic that were --
11 whether capsules would have been easier to swallow
12 than tablets?
13     A.  I believe my analysis, among other
14 things, indicates that there were -- there was a
15 substantial population of patients that perceive
16 capsules as easier to swallow, especially when
17 adjusted for size.
18     Q.  Tablets -- sorry?
19     A.  And that should be, in my opinion,
20 enough to motivate a POSA to develop a capsule.
21     Q.  You said when "adjusted for size."
22 Tablets are usually smaller than capsules; right?
23         MR. FRESE:  Object to form.
24         THE WITNESS:  When you look at the
25 universe of all tablets and the universe of all

212

1  capsules, you tend to have more larger capsules
2  than tablets, but that's neither here nor there,
3  because this capsule is going to be small.  And
4  for the size of capsules that we're talking about
5  here, these would be easy to swallow.
6  BY MR. PEACHMAN:
7      Q.  When you say "these capsules," you mean
8  the caps that are recited in the claims?
9      A.  No.
10         MR. FRESE:  Object to form.
11         THE WITNESS:  I say the capsule size I
12 need to put 40 milligrams inside, which is what I
13 know I need to put as of 2017.  I don't need the
14 claims at all.
15         (Reporter seeks clarification.)
16         THE WITNESS:  I do not need the claims
17 of the '721 patent at all.
18 BY MR. PEACHMAN:
19     Q.  Dr. Muzzio, if you look at paragraph 31
20 of your report, just skipping forward a few
21 paragraphs.
22         You state, Second, a POSA would have a
23 good reason to pursue pimavanserin capsules
24 instead of multiparticulate dosage forms,
25 dispersible, soluble, and effervescent tablets

8/22/2024    Acadia Pharmaceuticals, Inc. v. Aurobindo Pharma Limited, et al. Fernando J. Muzzio, Ph.D.
Confidential

213

1 orally disintegrating formulations, chewable
2 tablets and films and jellys.
3        And then you go on to state that, In
4 particular, each of these dosage forms would
5 require some amount of taste masking for the
6 pimavanserin tartrate active, while the prior
7 art -- of which the prior art discloses as having
8 a pronounced bitter taste, an unpleasant taste of
9 liquid medicines was identified as one of
10 barriers for older patients with dysphagia taking
11 medications.
12        Do you see that?
13    A.  Yes. Yeah.
14    Q.  Is it your opinion that a person of
15 ordinary skill in the art would not know how to
16 taste mask a drug in formulation development?
17        MR. FRESE:  Object to form.
18        THE WITNESS:  My opinion is that a
19 person of ordinary skill in the art would know
20 that the easiest and most effective way to taste
21 mask is to use a capsule.  So when looking for --
22 BY MR. PEACHMAN:
23    Q.  Go ahead.
24    A.  When looking for a dosage form that
25 would provide effective taste masking in a simple

214

1 and easily implementable way, they would know that
2 for that particular purpose for a 40 milligram
3 dosage form, capsules would be far and away the
4 most effective and straightforward way to do it,
5 especially when compared to these other ways.
6    Q.  Would it have been routine for a person
7 of ordinary skill in the art to add taste masking
8 to formulations other than capsules?
9        MR. FRESE:  Object to form.
10        THE WITNESS:  Taste masking for things
11 other than capsules can lead to failures and I am
12 personally aware of situations where those lead to
13 failures for tablets, for example.  In addition,
14 for all these so-called alternatives, the amount
15 of contact area between the API entity and saliva
16 is much greater than for a capsule or a coated
17 tablet.  Those two would be the ones showing the
18 smallest amount of contact area.
19        And the problem here is leakage of the
20 bitter tasting molecule into saliva.  So the
21 amount of contact area and the intimacy of contact
22 is very important.  So when you're talking about
23 multiparticulates and effervescents and oral
24 disintegrating and chewables and all that, you're
25 looking at things where you have maximum contact

215

1 with saliva, which makes the likelihood of failure
2 highest.
3 BY MR. PEACHMAN:
4    Q.  Have you ever added taste masking to the
5 different dosage forms you recite in paragraph 31,
6 the multiparticulate dosage forms, dispersible,
7 solubles, and effervescent tablets?
8    A.  Not to all of them, but I'm a chemical
9 engineer and I know about molecular diffusion and
10 mass transfer.  And I have worked on taste masking
11 of bitter-taste medicines.
12    Q.  So your opinions on whether taste
13 masking would be routine for dosage forms other
14 than capsules is not based on personal formulation
15 experience but knowledge of dispersions?
16    A.  For some -- I said my opinion is based
17 for some of them in common sense and in
18 understanding of transport phenomenal, which I
19 have taught at the undergraduate and graduate
20 level for about two decades, general experience in
21 the field of about 34 years, and having worked on
22 taste masking for some forms, not all of them.
23    Q.  Don't both capsules and coated tablets
24 require swallowing?
25    A.  Yes, they both require swallowing.

216

1    Q.  They're both going to have some exposure
2 to the gastric tract?
3    A.  So there is a big difference between
4 them, though.
5    Q.  And what's that?
6    A.  Well, in a tablet, you are counting on
7 the coating being completely seamless, and that
8 often doesn't happen.  If you're coating half a
9 million tablets in a pan, you're going to end up
10 with some tablets having more coating than others.
11        You're also going to end with some
12 tablets having coating defects.  Because sometimes
13 the tablets stick to each other, and when they
14 separate, there's now a gap.  You also have some
15 instances of the coating cracking because the
16 coating may be too rigid or because the tablet was
17 exposed to a little extra heat.
18        There's a number of reasons why the
19 coating may not be completely effective.  Capsules
20 don't do that because the capsule is a premade
21 shield, and solids don't leak out of capsules.
22        But you can have saliva penetrating
23 through defects in the coating of a tablet.  I
24 worked on one particular drug that is very, very
25 fully -- very horridly tasting.  It was a sleep

54  (Pages 213 to 216)

8/22/2024    Acadia Pharmaceuticals, Inc. v. Aurobindo Pharma Limited, et al. Fernando J. Muzzio, Ph.D.
Confidential

217

1 medication, and it tasted very bad. So the
2 company tried to do a film coating to prevent the
3 patient from experiencing the coating.
4          Because the problem was that when the
5 coating failed and the patient could perceive the
6 taste of the drug, the patient couldn't fall
7 asleep. Yeah, I worked on that project for about
8 three years, and we did realize what the problem
9 was with the coating. And I can offer that direct
10 experience.
11          It's not the only time I've worked on
12 taste masking, but it's one instance where I
13 learned that, yeah, we can coat the tablet. But
14 it's more expensive, more complicated, extra
15 processing steps, and it has a certain percentage
16 of instances of failure.
17     **Q.   If a person of ordinary skill in the art
18 was to use a single capsule as opposed to two
19 tablets, that would also require reformulation
20 work, right, and increasing the amount of
21 active --**
22          MR. FRESE:  Objection; compound.
23 BY MR. PEACHMAN:
24     **Q.   -- correct?**
25     A.   Right. If a person of ordinary skill in

218

1 the art wanted to offer the two new Nuplazid
2 tablets to a single tablet, that also would
3 require significant reformulation. Because,
4 otherwise, you end up with a tablet that's too
5 big.
6     **Q.   So in view of all the reformulation work
7 that a person of ordinary skill in the art would
8 need to do, that would be more difficult than just
9 adding taste masking to tablets; right?**
10          MR. FRESE:  Object to form.
11          THE WITNESS:  I think that that
12 comparison doesn't make any sense, Counsel.
13 BY MR. PEACHMAN:
14     **Q.   Well --**
15     A.   You're trying to put the 40 milligrams
16 into a single dosage form that is swallowable. So
17 to go from the 20 milligram tablet to a single
18 formulated tablet requires very significant
19 reformulation, because you want that tablet to be
20 smaller than the double of the volume of the
21 single tablet.
22          So you have to talk about using
23 different excipients, maybe a different process,
24 maybe, again, granulating differently, maybe --
25 you know, you're talking about doing lots of

219

1 different things. So it would be easier, I think,
2 to formulate the 40 milligrams as a single capsule
3 than as a single tablet, or at least comparable.
4          I mean, Dr. Little's statement that
5 reformulating into a capsule is so much more
6 difficult is wrong. I'm trying to remain polite
7 to my colleague here.
8 BY MR. PEACHMAN:
9     **Q.   All right. Could we go to paragraph 32
10 of your reply report?  Thanks.**
11     A.   Yes.
12     **Q.   And here, in paragraph 32, you state
13 that, Third, even accepting that a POSA may have
14 been motivated to make a multiparticulate dosage
15 form, doing so would have reasonably motivated a
16 POSA to granulate pimavanserin tartrate and load
17 the granulation into a capsule, too.  Liu defines
18 a multiparticulate dosage form as "powders,
19 granules, and pellets that are usually presented
20 in sachets or capsules."**
21     A.   Yes.
22     **Q.   Do you see that?**
23     A.   Yeah.
24     **Q.   Okay. And then you say, "That. In
25 turn, could have provided a POSA with additional**

220

1 **motivation to make a capsule..."?**
2     A.   Uh-huh.
3     **Q.   When you state here that Liu defines a
4 multiparticulate dosage form as powders, granules,
5 and pellets, and usually presented in sachets or
6 capsules, a POSA would know that multiparticulate
7 dosage forms may be in the form of non-granulated
8 powders; right?**
9          MR. FRESE:  Object to form.
10          THE WITNESS:  That depends on what do we
11 mean by the word "granulated" in that particular
12 context. Can you provide, please, more
13 information?
14 BY MR. PEACHMAN:
15     **Q.   Well, you state, Liu defines a
16 multiparticulate dosage form as powders; right?**
17     A.   Uh-huh.
18     **Q.   So that's one instance of where the
19 multiparticulate dosage form would be in a powder
20 form, not a granule; right?**
21     A.   I would need to look at Liu to answer
22 your question to be able to make sure that I
23 recall correctly the context in which the word
24 "powders" is used here.
25     **Q.   Well, Liu is --**

221

1    A.  It is unfortunate all of these words are
2  used in loose ways in the literature.
3    Q.  Well, Liu advised contrasting "powders"
4  from "granules"; right?  There's a comma between
5  the two words?
6    MR. FRESE:  Object to form.
7    THE WITNESS:  Yeah, but the difference
8  could be based on size as opposed to whether or
9  not you're putting together multiple particulates
10  into a single one.  You know, there can be more
11  than one way to read these.  But, anyway, what's
12  the question?
13  BY MR. PEACHMAN:
14    Q.  In offering your opinions, did you
15  investigate whether Liu's mention of "powders" --
16    A.  I don't recall.
17    Q.  -- refers to granulated material?
18    A.  I don't recall.
19    Q.  Okay.  And so Liu also mentions
20  "pellets" here.
21    Do you see that?
22    A.  Yes.  Yeah.
23    Q.  So in choosing a multiparticulate, a
24  POSA may have also landed on pellets as opposed to
25  granules; right?

222

1    A.  Well, I don't recall, but I will say
2  that some of the things that the '721 patent
3  identifies as granules are actually called
4  pellets.  People often call coated beads pellets
5  instead of granules.  Yet, the '721 patent talks
6  about granules.  So, you know, again -- but what
7  is the question?
8    Q.  And, Dr. Muzzio, you also mentioned how
9  Liu defines a multiparticulate dosage form is
10  usually presented in the form of sachets?
11    A.  Yes.
12    Q.  So a POSA using a multiparticulate
13  dosage form may also choose a sachet; right?
14    MR. FRESE:  Object to form.
15    THE WITNESS:  Sure, a POSA may choose a
16  sachet, except that now you're, again, increasing
17  the amount of contact in the mouth between the
18  material that contains the bitter-tasting drug and
19  saliva.  I think the point of this paragraph is to
20  say that even when you're working with the
21  multiparticulates, you often put them in a
22  capsule.  That's the point.
23  BY MR. PEACHMAN:
24    Q.  Yeah, but doesn't the paragraph -- I
25  mean, your own paragraph says that Liu defines

223

1  multiparticulate dosage forms as usually presented
2  in sachets or capsules; correct?
3    A.  Correct.
4    Q.  Liu puts no emphasis on "capsules" over
5  "sachets"?
6    A.  Yeah, but to point out that these things
7  that are offered as alternatives to capsules are
8  not entirely alternatives to capsules.  And if I
9  want to taste mask, I will put them in a capsule,
10  not a sachet.
11    Q.  The multiparticulate dosage form may
12  have led a POSA to use powders or pellets and may
13  have presented them in the form of sachets?
14    MR. FRESE:  Object to form.
15    THE WITNESS:  Is that a question or a
16  statement, I'm not sure?
17  BY MR. PEACHMAN:
18    Q.  Well, I'm trying to understand your
19  opinion, Dr. Muzzio, because you highlight
20  "granules" and "capsules" in a sentence that has
21  five different options?
22    A.  I'm glad you find my opinion amusing,
23  but the point I'm making is some of these
24  alternatives that are represented here are more
25  expensive, more difficult to make, harder to taste

224

1  mask, and even then some of them usually come in
2  as capsules.  That's the opinion I offer.  And I
3  stand by that opinion.
4    Q.  Okay.  Does Liu define the size of the
5  capsule?
6    A.  I don't remember.  Do you want to put
7  Liu in front of me?
8    Q.  Sitting here today, do you know whether
9  Liu talks about capsules that are size 3 or 4?
10    MR. FRESE:  Objection to form.
11    THE WITNESS:  Sitting here today, there
12  are dozens of references involved here, and I
13  can't remember every single line of Liu.  So I'll
14  be happy to give you a better answer after I
15  review it.
16  BY MR. PEACHMAN:
17    Q.  Would a multiparticulate dosage form
18  have motivated a POSA to pursue a size 3 or
19  4 capsule?
20    A.  A POSA would have been a lot less
21  motivated to pursue a multiparticulate dosage form
22  than either a capsule or a tablet.  I don't
23  believe a POSA would have pursued a
24  multiparticulate dosage form until and unless the
25  POSA had tried and failed to develop a capsule.

56 (Pages 221 to 224)

225

1    So, to me, these multiparticulate dosage
2 forms don't come into play at all for a POSA's
3 ability to develop the dosage form based on the
4 prior art, without needing at all the '721 patent.
5    Q.   Okay.  Dr. Muzzio, if we go to
6 paragraph 33 of your reply report.  Here, you
7 state that, Fourth, the dosage forms Dr. Little
8 identifies multiparticulate dosage forms,
9 dispersible, soluble, and effervescent tablets,
10 orally disintegrated formulations, chewable
11 tablets, and films and jellys form a small
12 fraction of the available oral dosage forms on the
13 market today, while capsules make up a substantial
14 portion of the oral solid market.  In fact, of the
15 new drugs approved in the period between 2014 and
16 2017, 49 were tablets and 23 were capsules; right?
17    A.   Yeah.
18    Q.   So in the period from 2014 to 2017, the
19 vast majority of new drug approvals were tablets;
20 right?
21    MR. FRESE:  Objection; vague, ambiguous.
22    THE WITNESS:  The vast majority.  Oral
23 solid dose products, the split between tablets and
24 capsules tends to be something, like, 60/30 or
25 maybe 65/32, something like that, with the other 1

226

1 or 2 percent being these other --
2 BY MR. PEACHMAN:
3    Q.   Yeah, 49, you mentioned, were tablets
4 and 23 were capsules.  So if you add those two
5 together, 49 divided by 72 is about 70 percent of
6 approvals were tablets; right?
7    A.   There is a 2 to 1 speed here, and that's
8 pretty common, yeah.  So another way to look at it
9 is about a third of all things all there is
10 capsules, and POSAs are extremely familiar with
11 capsules.  So for this reason and, also, because
12 very often when developing a new molecule or
13 entity, the very, very first version of an oral
14 dosage product tends to be a capsule.
15    Q.   So if the vast majority of FDA
16 approvals, two thirds were tablets, wouldn't a
17 POSA be motivated to develop a tablet?
18    MR. FRESE:  Object to form.
19    THE WITNESS:  In this particular
20 instance, with the specific issues at play of
21 solubility, taste masking, et cetera, a POSA would
22 have been plenty motivated to develop a capsule,
23 yeah, a POSA could have been motivated to develop
24 a tablet.  I don't think that -- let me put it
25 this way.  Some POSAs could have been motivated to

227

1 develop tablets.  Some other POSAs could have been
2 motivated to develop capsules.
3 BY MR. PEACHMAN:
4    Q.   Okay.
5    A.   With a very good, you know, reasonable
6 split.  I also disagree with your characterization
7 the overwhelming majority.  In my mind the
8 overwhelming majority of the tablets were
9 95 percent, but they're 2 to 1.
10    Q.   Okay.  If we go to paragraph 34 of your
11 reply report.
12    Here you state that, Fifth, some of the
13 dosage forms Dr. Little identifies have downsides
14 that may make them less than adequate for patients
15 and caregivers.  Multiparticulate dosage forms and
16 effervescent tablets, for instance, require
17 additional preparation steps and that the dosage
18 form must be disbursed in a liquid or sprinkled on
19 food prior to administration; right?
20    A.   Yes.
21    Q.   The preparation steps that you mentioned
22 here, the additional ones, such as dispersal in a
23 liquid, that would obviate the need for a patient
24 to drink something to take the medication; right?
25    MR. FRESE:  Object to form.

228

1 BY MR. PEACHMAN:
2    Q.   If you're putting the dosage form -- if
3 you're disbursing it in a liquid, right, the
4 patient could drink the medicine without needing
5 to swallow; right?
6    MR. FRESE:  Object to form.
7    THE WITNESS:  I think that says,
8 evidently, yes, the patient could have drunk
9 instead of swallowed, yes.
10 BY MR. PEACHMAN:
11    Q.   Right.  And that's a benefit of doing
12 that additional step, is that it's already in a
13 liquid form and easy to swallow; right?
14    A.   I had both my mother and my
15 mother-in-law in assisted care, as they both went
16 over their 90s.  And, you know, my experience,
17 which might be anecdotal, but I think it's pretty
18 common to people my age, is that you don't want
19 add complexity to have personnel needs to struggle
20 to care for maybe 10, 20, 30 elderly patients all
21 at once.  That leads to noncompliance.  That leads
22 to many problems.
23    So the easiest it is to administer the
24 dose, the more reliable the result is going to be.
25 And then I also add, if you have a very

8/22/2024    Acadia Pharmaceuticals, Inc. v. Aurobindo Pharma Limited, et al. Fernando J. Muzzio, Ph.D.
Confidential

229

1  poorly-tasting product dispersing in a liquid,
2  it's inviting trouble.
3      Q.  Okay.  You also state that capsules and
4  tablets, on the other hand, require no preparation
5  prior to administration; right?
6      A.  Yeah.
7      Q.  Okay.  But capsules and tablets also
8  require liquid to swallow them; right?
9          MR. FRESE:  Object to form and
10  foundation.
11         THE WITNESS:  Yeah, but they don't
12  require the caregiver to be doing a manipulation
13  before administering to the patient and then, you
14  know, stirring it and making sure it has dissolved
15  and staying there.  You know, I mean, it's a
16  simpler overall thing.
17  BY MR. PEACHMAN:
18      Q.  So the administration is different, but
19  with capsules and tablets, they require additional
20  liquid, and the patient needs to swallow them;
21  right?
22      A.  Yes.
23         MR. FRESE:  Objection to form, compound.
24         THE WITNESS:  Yes, typically, to swallow
25  a capsule or a tablet, the patient needs to take a

230

1  sip of water.
2  BY MR. PEACHMAN:
3      Q.  All right.  Let's go to paragraph 35 of
4  your reply report.  Here, you state, Six,
5  Dr. Little ignores that the dosage forms he
6  identifies are by and large more complex and
7  expensive to manufacture than a capsule or tablet,
8  but a POSA would have been motivated to develop a
9  dosage form that was inexpensive to manufacture;
10  right?
11      A.  Yes.
12      Q.  And then you say that, A single capsule
13  containing the full 34 milligrams of pimavanserin
14  would be significantly less expensive to
15  manufacture than two dosage forms containing
16  17 milligrams each and also less expensive than
17  any alternative dosage forms proposed by
18  Dr. Little; right?
19      A.  Correct.
20      Q.  Are capsules more expensive to
21  manufacture than tablets?
22      A.  Not necessarily.
23      Q.  When are they not more expensive?
24      A.  When you can make one capsule instead of
25  the tablets, for example.  When you can avoid a

231

1  lot of excipients.  When you have idle capacity
2  sitting there that you're not using, which some
3  companies do, right.
4      Q.  So besides previous stock that a company
5  may have, are capsules generally more expensive to
6  manufacture than tablets?
7          MR. FRESE:  Object to form,
8  mischaracterizes testimony.
9          THE WITNESS:  Some people think so.
10  Some other people disagree.
11  BY MR. PEACHMAN:
12      Q.  And what's your opinion --
13      A.  It's based on many factors.
14      Q.  What's your opinion based on?
15      A.  What is my opinion based on?  From this
16  statement.  It's having worked with many companies
17  on both capsules and tablets for 30-plus years.
18      Q.  Did you investigate the relative cost to
19  manufacture a capsule as opposed to a tablet?
20      A.  For pimavanserin, in particular, I did
21  not.
22      Q.  For any API, did you -- let's say for
23  most APIs, did you investigate what the relative
24  cost would be to manufacture a capsule as opposed
25  to a tablet?

232

1          MR. FRESE:  Objection to form, vague.
2          THE WITNESS:  At some point in the
3  context of some other project, 15 or 20 years ago,
4  I did participate in studies like that.  I think
5  it's very product dependent.
6  BY MR. PEACHMAN:
7      Q.  Okay.  So your basis for your opinion
8  that -- let me strike that.
9          Dr. Muzzio, let's go to paragraph 37.
10         And, okay, here you state, I note that
11  Dr. Little criticizes my opinion regarding film
12  coating of tablets in that I ignore the costs of
13  time and resources to reformulate the drug product
14  into a capsule, and instead [focus] on a
15  comparatively tiny cost savings backed by no
16  references whatsoever.  But, again, I note that
17  even Dr. Little grants that a POSA would have been
18  motivated to consolidate dosages into a single
19  unit if practical, a POSA following such
20  motivation with respect to Nuplazid Tablets would
21  recognize these costs of time and resources to
22  reformulate the drug product that would be
23  required to meet that end.  At that point, a POSA
24  would be considering how to reformulate the drug,
25  and could be reasonably be motivated to consider

58  (Pages 229 to 232)

8/22/2024    Acadia Pharmaceuticals, Inc. v. Aurobindo Pharma Limited, et al. Fernando J. Muzzio, Ph.D.
Confidential

233

1  capsules based on factors such as coloration.
2       Did I read that right, Dr. Muzzio?
3  A.  I think so.
4  Q.  Okay.  So we've been talking here today,
5  Dr. Muzzio, about your opinions that cost concerns
6  would drive a POSA to potentially choose a capsule
7  over another dosage form.
8       But here, you appear to be opining that
9  while costs and time and resources would be
10 required to formulate Nuplazid tablets, that's not
11 an issue, because a decision had already been made
12 to formulate the drug; right?
13      MR. FRESE:  Object to form,
14 mischaracterizes the document.
15      THE WITNESS:  I think I've said
16 something quite different, and I think that when
17 you paraphrase what I say and give your own twist,
18 you really changed the meaning of what I have
19 said, which I would just really appreciate if you
20 would please stop doing.
21      What -- and by the way, I don't recall
22 that Dr. Little provided any evidence whatsoever
23 of what he characterized as a comparatively tiny
24 cost savings.  I mean, he says that, I don't have
25 references.

234

1       I don't think that there's any reference
2  for that rather provocative statement that
3  avoiding coating is a comparatively tiny cost
4  savings.  I have no idea, I don't know if he has
5  ever coated a tablet, that he would say something
6  like that.  I really don't know.
7       But at any rate, what I'm saying is that
8  the minute that you know that you have to go from
9  20 milligrams per tablet, two tablets, to
10 40 milligrams in a single dosage form, you are
11 reformulating.  And so the idea that the only
12 thing you have to do for tablets is coat versus
13 now you have a whole reformulation effort for
14 capsules is a misreading of my testimony, and it's
15 also a mischaracterization of the situation.
16      The situation is such that you have to
17 reformulate, if you want to put the 40 milligrams
18 in a single dosage form.  And it's not cheaper for
19 reformulating to a tablet versus reformulating to
20 a capsule, given the circumstances.  Because you
21 have to change the ingredients.  You have to
22 change the process.
23      You're changing a lot of things no
24 matter what.  You're going to file a new NDA, a
25 post-approval supplement.  You're going to have to

235

1  run clinicals or biostudies.  I mean, all of those
2  things cost a heck of a lot more money than just
3  developing a single step.  But in this case, the
4  coating step is not going to be the one that
5  warranties success from the onset.  So that was my
6  point.
7  BY MR. PEACHMAN:
8  Q.  And I think you would agree with me that
9  a person of ordinary skill in the art would
10 consider the entire cost involved in making a
11 decision about what dosage form to pursue; right?
12 A.  Yes.
13      MR. FRESE:  Object to form.
14      THE WITNESS:  I agree that a person of
15 ordinary skill in the art or, more appropriately,
16 the financial guys at the company would consider
17 the entire cost of the reformulation and the
18 manufacture and the filing and the clinicals and a
19 whole bunch of other things, yes.
20 BY MR. PEACHMAN:
21 Q.  And those financial decisions would
22 drive the considerations that a POSA would have in
23 choosing a dosage form and which work to do in
24 development; right?
25      MR. FRESE:  Object to form, incomplete

236

1  hypothetical.
2       THE WITNESS:  Those are some of the
3  motivations, not the only ones.  Like I said,
4  capacity savings is also very important, yeah.
5  Capacity -- GMP manufacturing capacity is very,
6  very expensive.  So if you go from two dosage
7  forms to one, you're basically doubling your
8  capacity under the same room.  I mean, is that
9  clear, or do you need me to explain that?
10 BY MR. PEACHMAN:
11 Q.  Yeah, you can continue.
12 A.  I need to serve a million patients, and
13 instead of making 2 million tablets, I can make
14 1 million tablets or 1 million capsules, right.  I
15 have basically doubled my manufacturing capacity,
16 because I only need to make half the dosage forms.
17 Q.  Okay.  Dr. Muzzio, can we go to
18 paragraph 44 of your reply report?
19 A.  Uh-huh.  Yeah, I'm there.
20 Q.  All right.  And I want to go to page 23.
21 So it's further on in that paragraph.
22      And you state, around the middle of that
23 paragraph, In my opening report, I also provided
24 reasons why a POSA would be motivated to formulate
25 pimavanserin into a capsule shell of size 3 or 4.

237

1  Given the disclosures in the prior art, that would
2  indicate to a POSA these capsule sizes are
3  unlikely to cause swallowing difficulty.
4        Thus, a POSA could reasonably have been
5  motivated to select a capsule size first and then
6  attempt to make a capsule fill of sufficient
7  density through granulation; right?
8     A.  Yeah.
9     Q.  And just so I am clear about your
10 opinion, Dr. Muzzio, you're saying that a POSA
11 would select a capsule size first and then would
12 attempt to make a capsule fill of sufficient
13 density through granulation; right?
14    A.  Yeah.
15    MR. FRESE:  Object to form.
16    THE WITNESS:  That's what the words are
17 that are there.
18 BY MR. PEACHMAN:
19    Q.  Okay.  Can we go to paragraph 56 of your
20 reply report?
21    MR. PEACHMAN:  Actually, is this about a
22 good time for a break?  It's been about an hour or
23 so.
24    MR. FRESE:  That's fine.
25    MR. PEACHMAN:  Okay.

238

1     THE VIDEOGRAPHER:  The time is 3:29 p.m.
2  We are now off the record.
3     (Recess from the record.)
4     THE VIDEOGRAPHER:  The time is 3:44 p.m.
5  We are now on the record.
6  BY MR. PEACHMAN:
7     Q.  Dr. Muzzio, welcome back from the break.
8     A.  Thank you.
9     Q.  I'd like to go back to your reply
10 report, Exhibit 6.  And I'd like to go to
11 paragraph 56.
12    A.  Yeah.
13    Q.  Okay.  And could you read paragraph 56
14 to yourself?
15    (Witness peruses the exhibit.)
16    THE WITNESS:  Okay.
17 BY MR. PEACHMAN:
18    Q.  Okay.  And so here, you're discussing
19 Dr. Little's opinion about your analysis of the
20 Ragnar-Tolf reference; right?
21    And there's a discussion here about an
22 upper bounds -- whether there was an upper bounds
23 that a POSA would recognize from Ragnar-Tolf;
24 correct?
25    A.  Loosely speaking, yes.

239

1     Q.  And so, Dr. Muzzio, is there an upper
2  bounds as to what percentage a person of ordinary
3  skill in the art would reasonably expect they
4  could increase drug concentration to in a size 3
5  or 4 capsule based on Ragnar-Tolf?
6     MR. FRESE:  Object to form.
7     THE WITNESS:  I believe my testimony
8  here says that provides such an upper bound is not
9  relevant.  And I don't think I have provided such
10 an opinion.
11 BY MR. PEACHMAN:
12    Q.  So you have no opinion sitting here
13 today whether there's an upper bounds to what a
14 POSA would believe they could increase the drug
15 concentration to, based on Ragnar-Tolf?
16    A.  No, I said I haven't provided such an
17 opinion, and such an opinion is not relevant to --
18 or such a bound is not relevant to the opinion I
19 did provide.
20    Q.  Okay.  Well, do you have an opinion as
21 to the upper bounds that a POSA would believe they
22 could increase the drug concentration to, based on
23 the Ragnar-Tolf reference?
24    A.  So a POSA would know that it's pretty
25 common to granulate API with binders in wet

240

1  granulation and achieve, as a very common thing,
2  98 percent drug loading, using 2 percent binder,
3  which is pretty common.
4     You could use less than 2 percent or a
5  little more than 2 percent, but in the high 90s,
6  without getting into the whole issue of
7  granulating without a binder.
8     Q.  Okay.  But in the context of granulating
9  with a binder, is there any limit to how far a
10 person of ordinary skill in the art would believe
11 they could increase the drug concentration to in a
12 size 3 or 4 capsule based on the Ragnar-Tolf
13 disclosure?
14    A.  Let me quickly look at one thing in
15 Ragnar-Tolf to make sure that I am telling you the
16 correct thing.
17    So a POSA looking at Ragnar-Tolf,
18 Table 5 -- oh, no, sorry, that's direct
19 compression.
20    A POSA looking at Table 7, Ragnar-Tolf,
21 would see that Ragnar-Tolf teaches the use of
22 mannitol as a filler diluent as high as
23 91 percent, while keeping starch and povidone --
24 povidone is the binder in this case, yeah -- and
25 then mag stearate is extragranular.

8/22/2024          Acadia Pharmaceuticals, Inc. v. Aurobindo Pharma Limited, et al. Fernando J. Muzzo, Ph.D.
Confidential

241

1      So a POSA looks at this table and knows
2  that he or she can increase the mannitol
3  substantially, because the mannitol is not there
4  to provide any function to the ability of being
5  able to granulate.  There's absolutely no reason
6  that a POSA couldn't go to 30, 40, 50, 60 percent,
7  you know, higher too.
8      **Q.  So you said 50 to 60 percent.  How did**
9  **you --**
10     A.  Easy.
11     **Q.  -- come up with that number?**
12     A.  Because I have a lot of mannitol that I
13  can take out, and I still can granulate.
14     **Q.  Did you calculate based on the numbers**
15  **in Ragnar-Tolf what percentage the drug loading**
16  **could be increased to, based on the examples**
17  **provided?**
18     MR. FRESE:  Object to form.
19     THE WITNESS:  I'm telling you that based
20  on my experience granulating products and looking
21  at this table, knowing that somebody was able to
22  successfully granulate this using just
23  1.15 percent povidone, which is a relatively low
24  amount of binder, and that they were able to
25  increase from 1 to 5 to 20 without any real

242

1  decrease in density or any other important
2  variables, that, yeah, you can keep going easy.
3      But you don't need to go as high as
4  possible.  You only need to go to about 30 percent
5  to put the 40 milligrams of pimavanserin in a
6  size 4 capsule.
7  BY MR. PEACHMAN:
8      **Q.  Have you ever heard of a bulk density**
9  **cliff?  Is that a term you've heard?**
10     A.  I have.  It's been a while.  You might
11  want to refresh me on that.
12     **Q.  Well, do you have any recollection of**
13  **when you've heard that term before?**
14     A.  Sitting here right now, I don't exactly.
15  I mean, the term is not unfamiliar, but I wouldn't
16  want to try to define it for you at this point.
17     **Q.  Do you know if a person of ordinary**
18  **skill in the art would ever run into an issue**
19  **where they could no longer increase the bulk**
20  **density of the drug as they extrapolate it and**
21  **increase concentration?**
22     A.  That doesn't sound like a cliff.  That
23  sounds like a plateau.  I'm not sure what you're
24  asking me.
25     **Q.  Well, are you aware of a plateau where**

243

1  **the bulk density -- so the person of ordinary**
2  **skill in the art is trying to increase the amount**
3  **of the drug, and they can only get to a certain**
4  **bulk density.**
5      **Are you aware of that instance?**
6      A.  That is a very reasonable assumption.
7  You will get to a certain bulk density and, yeah,
8  it is possible that you are only going to be able
9  to go so high and no higher.  But the densities
10  being cited here in the high .5s, low .6, are
11  pretty common --
12     **Q.  Well, how --**
13     A.  -- and higher than what's needed.  So...
14     **Q.  And how would a person of ordinary skill**
15  **in the art know whether that bulk density could be**
16  **used in a formulation that had double the drug**
17  **content and a much smaller volume?**
18     A.  So it doesn't have to have double the
19  drug content, in terms of the concentration of
20  drug.  It only has to increase by about
21  50 percent, from 20 to 30-something.  And I did
22  provide a calculation on that.
23     But even 40 percent drug content is not
24  very high compared to many formulations that I
25  have seen.  And in any case, you haven't obviously

244

1  tried.  You have taken, you know, one experiment
2  that's -- you know.
3      **Q.  And how would a POSA have reasonably**
4  **expected that they wouldn't have run into any**
5  **issue with keeping the bulk density greater than**
6  **.4, while also putting 34 milligrams of**
7  **pimavanserin into a size 3 or 4 capsule?**
8      A.  I would put it in a slightly different
9  way.  I would say a POSA looking at this data
10  would not have a reason to expect a problem.
11  There's nothing here telling me that there would
12  be a problem in going higher in drug.  I'm still
13  pretty low.
14     And I don't see any meaningful change
15  going from 5 -- 1 to 5 to 20, so keep going.  And
16  we're not talking about very high concentrations
17  of drug.  We're talking about relatively low
18  concentrations of drug.  So a POSA looking at this
19  would say, I might very likely be able to get
20  there, and I'll give it a shot.  And it's an
21  obvious thing to try.  So --
22     **Q.  It says 20 milligrams here.  Going from**
23  **20 milligrams to 40 milligrams is 100 percent**
24  **increase; right?**
25     A.  No, it says tablet strength,

www.DigitalEvidenceGroup.com          Digital Evidence Group C'rt 2024          202-232-0646

245

1  20 milligram.  But you're talking about filling a
2  size 4 capsule, which can accommodate up to 130 or
3  so milligrams of blend.  So to be at 40 milligrams
4  in 130 milligrams of fill weight, you only need to
5  get to 31, 32 percent.
6      I have the calculations somewhere in the
7  report.  Let me find them.  Or maybe you can help
8  me find it.  It's somewhere in there.  Somewhere
9  in there it is, the calculation.
10     Q.  In your opening report, Dr. Muzzio, you
11 do talk about that.  I don't know if that's what
12 you're referring to.
13     A.  Okay.  Where in the opening report
14 should I look?
15     Q.  Okay.  122.  All right.  So 122 of
16 Exhibit 5, I think.
17     A.  Thank you.  This is not the paragraph I
18 was remembering.  Somewhere else I calculate
19 precisely what the percentage drug would be in
20 the -- and it's in the order of 31, 32 percent.
21     MR. FRESE:  I can short-circuit this, if
22 you'd like.
23     MR. PEACHMAN:  Do you have a paragraph?
24     MR. FRESE:  Yeah, paragraph 117.
25     THE WITNESS:  117, thank you.

246

1  BY MR. PEACHMAN:
2      Q.  Okay.  So this is the calculation you're
3  referring to, Dr. Muzzio, on paragraph 117?
4      A.  Yes.
5      Q.  And so you calculate the percentage of
6  pimavanserin tartrate.  It would need to be for a
7  40 milligram -- okay.  All right.  40 milligram.
8      I guess the question is -- this is just
9  a calculation.  Is there an established way to do
10 this calculation, or how did you go about picking
11 how to do this?
12     A.  I know the volume.  I'm assuming a
13 density of .6.  So if I know the volume and I know
14 the density, I can estimate a mass.  And if I have
15 the mass of 126, when I put 40 milligrams of drug
16 in 126 milligrams of final blend, I can do that
17 quite easily.
18     And I can -- I accounted for a 2 percent
19 mag stearate.  So I can operate -- if I can get to
20 a density of .6 for a size 4 capsule, I only need
21 about 32 and a half percent drug.
22     I try.  Let's say that I find out that
23 the density hits .57 instead of .6.  Okay.  Then I
24 need 34 percent instead of 32.5, but we're talking
25 about a relatively quick couple of experiments to

247

1  confirm that.
2      Q.  So you would need to do a number of
3  experiments in order to know if this calculation
4  would hold, as you've provided?
5      MR. FRESE:  Object to form.
6      THE WITNESS:  In general, you do
7  experiments to verify hypothesis.
8  BY MR. PEACHMAN:
9      Q.  Right.  And just because something is
10 feasible doesn't mean it's readily achievable;
11 right?
12     MR. FRESE:  Object to form, vague, and
13 incomplete hypothetical.
14     THE WITNESS:  Well, let me put it this
15 way.  The POSA reading Ragnar-Tolf and the
16 Nuplazid tablet label has seen nothing to tell the
17 POSA that it's not achievable.
18 BY MR. PEACHMAN:
19     Q.  They've also seen nothing to suggest
20 that it would work; right?
21     A.  Well, the POSA --
22     MR. FRESE:  Object to form.
23     THE WITNESS:  The POSA presumably has
24 done enough granulations to know that getting to a
25 density of .55 to .6 is not a big deal, and

248

1  granulating API with 30, 40, 50 concentration is also not a big deal.  It's done
2  concentration is also not a big deal.  It's done
3  routinely.  It's usually successful.
4      So the POSA would have an expectation of
5  success, which bears out, right.  Because by now
6  between Ragnar-Tolf and the '721 patent, people
7  have been able to successfully granulate this
8  seven or eight different ways in those densities.
9  BY MR. PEACHMAN:
10     Q.  And those densities are reported in a
11 size zero capsule; right?
12     A.  Huh?
13     Q.  Those densities are reported in a
14 size -- it's a tablet, first of all; right?  Those
15 are tablet densities?
16     MR. FRESE:  Object to form.  Sorry,
17 vague --
18 BY MR. PEACHMAN:
19     Q.  When you give the numbers that you
20 provided, the 20 percent, what are you referring
21 to?  Table 7?
22     A.  I think I'm talking about Table 8.
23     Q.  Table 8.  Okay.
24     A.  Those are densities of granulations, not
25 densities of tablets.  Those are densities of

62  (Pages 245 to 248)

249

1 granulations.
2     Q.  Densities of granulations.
3         And these are not put into small size
4 capsules; correct?
5     A.  Not yet.  There's nothing preventing the
6 POSA to do that, and Ragnar-Tolf tells you that
7 that's a perfectly legitimate option.
8     Q.  When you say Ragnar-Tolf tells you it's
9 a legitimate option, where you are referring to?
10    A.  In multiple locations.  And I can find
11 the actual spot.  I think it's reference No. 63 in
12 paragraph 47, listing four instances where
13 Ragnar-Tolf tells you that he can put the drug in
14 a capsule.  So it would be paragraph [sic] 63,
15 102, 105, 119, and 131.  Five times.  Page 25.
16    Q.  Did you say paragraph 63?
17    A.  No, I said paragraph 47, Footnote 63,
18 page 25, third from the bottom in my -- in
19 Exhibit 6, my reply report.
20    Q.  Okay.  Paragraph 47, Footnote 63.  Okay.
21       So paragraph -- so you've seen your
22 footnote here, Dr. Muzzio.  If you could look at
23 the Ragnar-Tolf reference at paragraph 63, there's
24 no mention of a size 3 or 4 capsule; right?
25    A.  There is a mention of capsules.

250

1     Q.  Okay.  And the other paragraphs you've
2 also mentioned here, none of them mention a size 3
3 or 4 capsule; right?
4     A.  The POSA reading Ragnar-Tolf learns that
5 Ragnar-Tolf is telling you that those formulations
6 can be put into capsules.  The issue of size 3 or
7 size 4 comes into play for the POSA when the POSA
8 also knows from multiple sources that this patient
9 population has difficulty swallowing.
10    Q.  And Ragnar-Tolf also mentions other
11 dosage forms that could be used other than
12 capsules, too; right?
13    A.  Sure.
14    Q.  All right.  Dr. Muzzio, you -- actually,
15 let me see here.
16       In your opinion about a POSA would --
17 you know, they could fit a blend for the drug
18 concentration of 30 to 40 percent in a size 3 or
19 4 capsule, how many types of -- how many
20 experiments would that be?  Can you just detail it
21 out for me?
22       MR. FRESE:  Object to form.
23       THE WITNESS:  Probably one.
24 BY MR. PEACHMAN:
25    Q.  One.  Well, I think you said experiments

251

1 before.  Now it's only a single one.
2     A.  Yeah, but you could probably make it
3 work with one.  You don't need to aim for 32 or
4 33.  You could run one experiment aiming for 40,
5 likely to be successful.  You get to a density of
6 .6.  Now that you know you need a diluent.
7 Because, otherwise, your concentration is too
8 high.  Based on the density of the granulation,
9 you know how much diluent to use.  You stick it
10 into a capsule, and you're home.
11    Q.  And it also could not work, too; right?
12    A.  Well, of course.  I mean, you can get
13 run over by a bus going home.
14    Q.  And if it didn't work, what would be the
15 next step?  What would be the next experiment?
16    A.  It would depend on why it didn't work.
17 It would depend on what do you see when you
18 conclude that it didn't work, but it would almost
19 for sure work.
20    Q.  And why might the experiment not have
21 worked, why would a POSA think it might not have
22 worked?
23       MR. FRESE:  Object to form, incomplete
24 hypothetical.
25       THE WITNESS:  I think it would have

252

1 worked.  In my opinion, it would have worked.
2 BY MR. PEACHMAN:
3     Q.  Is there any reason it might not have
4 worked?
5       MR. FRESE:  Objection; calls for
6 speculation.
7       THE WITNESS:  Sure, somebody could do
8 the experiment wrong, you know, among many things.
9 There could be a power failure in the building.  I
10 mean, there is an infinite number of reasons why
11 something may or may not happen, but I don't think
12 they're relevant here.
13       The point is the POSA would have
14 expected this to work, and it would most likely
15 work.  And it did work when people tried seven
16 different ways.  So...
17 BY MR. PEACHMAN:
18    Q.  When you say "it did work," none of that
19 is prior art to the patent?
20    A.  No, Ragnar-Tolf is prior art.
21    Q.  Right.  When you say "it did work,"
22 Ragnar-Tolf didn't formulate --
23    A.  But that --
24    Q.  -- 30 milligrams pimavanserin --
25    A.  But that --

63  (Pages 249 to 252)

253

1    MR. FRESE:  Hold on, pause after the
2 question, and let me interpose my objection.
3    THE WITNESS:  Sorry.  Sorry.
4    MR. FRESE:  Objection to form.
5    You can answer.
6    THE WITNESS:  So say again, please.
7 BY MR. PEACHMAN:
8    **Q.  When you said that it works, there's no**
9 **prior art reference that actually shows that**
10 **34 milligrams pimavanserin was put into a size 3**
11 **or 4 capsule that was successful?**
12    A.  No, it just provides evidence of my
13 opinion that it would have worked, because it did
14 work.  I'm not saying that a POSA needed to know
15 that it worked to try.  I'm saying the POSA would
16 have expected it to work.
17    And you're asking me, How do you know
18 that it would have worked?
19    And I say, Well, look, when somebody
20 tried, it did work, right.
21    So the only evidence we have on the
22 table is that this is not particularly difficult
23 to do.
24    **Q.  Can we go to paragraph 34?**
25    **And this is in, let's see here, your**

254

1 reply report, Exhibit 6.
2    A.  Okay.
3    **Q.  All right.  And here, you're offering**
4 **your opinions on objective indicia of**
5 **nonobviousness.**
6    A.  I'm sorry, I am in the wrong report,
7 maybe.
8    **Q.  Yeah, Exhibit 6, page 34.**
9    A.  Oh, page 34.
10    **Q.  Yeah, page 34, sorry.  I had said**
11 **"paragraph," I apologize.**
12    A.  I don't know.  Maybe I went to the wrong
13 place.
14    Okay.  Yes.
15    **Q.  Do you see here that you have header D,**
16 **objective indicia of nonobviousness.**
17    A.  I see that, Counsel, yes.
18    **Q.  And if you look on page 37 of your reply**
19 **report.**
20    A.  Yes.
21    **Q.  You state that Nuplazid lacks a nexus to**
22 **Claims 4, 5, and 11 through 13 in the '721 patent;**
23 **right?**
24    A.  Yes.
25    **Q.  All right.  So you would agree with me**

255

1 **that Nuplazid is an embodiment of Claims 1 through**
2 **3, 6 through 7, and 9 through 10 of the**
3 **'721 patent; right?**
4    MR. FRESE:  Object to form.
5    THE WITNESS:  I think I want to limit my
6 testimony to what I say in my report, which is
7 it's not an embodiment of those --
8 BY MR. PEACHMAN:
9    **Q.  Okay.**
10    A.  -- claims.  I don't want to opine off
11 the cuff.
12    **Q.  Okay.  So you have no opinion as to**
13 **whether Nuplazid has a nexus to Claims 1 through**
14 **3, 6 through 7, and 9 through 10 of the**
15 **'721 patent?**
16    A.  Sitting here today, I don't think I
17 offered an opinion in that manner.
18    **Q.  Okay.  Can we go to paragraph 72?**
19    A.  Okay.
20    **Q.  Okay.  And here, you state that, The**
21 **primary way a person of ordinary skill in the art**
22 **would distinguish whether a component was an**
23 **intragranular component versus an extragranular**
24 **component would be to determine when it was added**
25 **in manufacturing the drug product, relative to the**

256

1 granulation process; right?
2    A.  Correct.
3    **Q.  Okay.  And if that's the primary way,**
4 **what are the other ways that a person of ordinary**
5 **skill in the art would determine whether a**
6 **component was an intragranular one?**
7    A.  They could look at the pharmaceutical
8 development report, which usually has a table that
9 indicates the composition of the product that
10 usually tells you these things are intragranular
11 and these things are extragranular.
12    MR. FRESE:  And, Dr. Muzzio, if you
13 could move a little bit that way for the
14 videographer.  Thank you.
15    THE WITNESS:  Sure.
16    So that would be another way.
17    And, finally, lacking all of that
18 information, the POSA can look at what the
19 ingredients are and, based on the POSA's
20 knowledge, would know that some ingredients are
21 simply not used in inside granules.
22    And, therefore, if they're there, or
23 vice versa, that some ingredients are used quite
24 commonly as wet granulation binders, if they're
25 present, they're almost for sure being used.

64 (Pages 253 to 256)

257

1    Lacking all of that information, a POSA
2  can do something called chemical imaging of the
3  product. If the product is viable, they could cut
4  the tablet and do a chemical map of what's there,
5  visualize the granules, identify the molecules
6  within the granule versus the molecules outside
7  the granule.
8    There are, to my knowledge, a few ways
9  to do that. There are ways you can do that.
10 BY MR. PEACHMAN:
11   Q. Okay. And would a POSA assume that
12 granules always form when any given combination of
13 ingredients are subjected to a granulation
14 process?
15   MR. FRESE: Object to form, incomplete
16 hypothetical.
17   THE WITNESS: If you carry out the
18 granulation process and you form granules, you
19 know that you form granules. So I don't
20 understand the question.
21 BY MR. PEACHMAN:
22   Q. Okay.
23   A. If you don't form granules, you also
24 know that.
25   Q. So if a granulation process is

258

1  performed, a POSA would assume that granules have
2  been made?
3    A. It would be more than assume. I think
4  it would be you know.
5    Q. Okay. So the existence -- let me strike
6  that, actually.
7    Can we go to 78 in your reply report?
8    A. Okay.
9    Q. "Unexpected Results" heading, do you see
10 that?
11   A. Yes.
12   Q. All right. And you state here that,
13 Rather -- this is about the third line up at the
14 bottom of page 42.
15   Rather, Ragnar-Tolf would have disclosed
16 to a POSA it was possible to use wet granulation
17 to make granulations of pimavanserin tartrate of
18 sufficient density that one could encapsulate
19 100 milligrams of pimavanserin --
20   A. Of granulation.
21   Q. -- yeah, of granulation, sorry, in a
22 size 3 or 4 capsule and that the prior art would
23 have disclosed nothing that would have led a POSA
24 to believe increasing drug concentration such that
25 one could provide the full 40 in a small enough

259

1  quantity of granulation to fill a size 3 or
2  4 capsule would have been unexpectedly difficult.
3    So in your opinion, Ragnar-Tolf
4  discloses it was possible, but it was difficult to
5  increase the drug concentration to the full 50;
6  right?
7    A. No, Ragnar-Tolf doesn't disclose that it
8  would have been difficult. Where would that
9  Ragnar-Tolf --
10   Q. You mentioned it wouldn't have been
11 unexpectedly difficult. You don't mention it
12 would -- I mean, I'm trying to understand the
13 level of difficulty that you believe it requires.
14   A. So we're playing semantics again. I'm
15 disagreeing with Dr. Little what he says it would
16 have been difficult or that it was unexpected
17 because it would have been difficult.
18   I'm saying there's nothing in
19 Ragnar-Tolf that tells you it would be difficult.
20 Therefore, there is no reason to characterize that
21 as an unexpected result.
22   Q. If we could look at 79.
23   Here, you state that -- well, you're
24 describing Dr. Little's opinion first; right?
25   And then you state, around the middle of

260

1  the paragraph, I disagree that a POSA would have
2  drawn any expectation from the existence of
3  Nuplazid tablets regarding the unfeasibility of
4  making a single consolidated dosage form for
5  pimavanserin tartrate for substantially the same
6  reasons disclosed above in Footnote 17; right?
7    A. Uh-huh.
8    Q. And then if we go to Footnote 17, I
9  think it's page 11 of your reply report.
10   And you state here, Little -- Dr. Little
11 opines the fact that Nuplazid came to market as a
12 two tablet dosage form and signal to a POSA that
13 such a goal may not be reasonably achievable,
14 although other factors may caution against it,
15 such as the size of the single use dosage form,
16 but he points to no prior art.
17   This is you responding here, right,
18 Doctor? Because you say, But he points to no
19 prior art literature demonstrating that such a
20 goal was not reasonably achievable or that the
21 size of the dosage form would caution against it,
22 and the absence of such disclosure a POSA would
23 have -- would not have any reason to believe
24 consolidation of dosages into a single unit was
25 not reasonably achievable; right?

65 (Pages 257 to 260)

8/22/2024    Acadia Pharmaceuticals, Inc. v. Aurobindo Pharma Limited, et al. Fernando J. Muzzio, Ph.D.
Confidential

261

1    A.  Yes.
2    Q.  Is your opinion that a Nuplazid label is
3  not prior art?
4        MR. FRESE:  Object to form.
5        THE WITNESS:  I believe the Nuplazid
6  label is prior art.
7  BY MR. PEACHMAN:
8    Q.  All right.  And the Nuplazid label would
9  have been at least one piece of prior art,
10 demonstrating that two tablets are how
11 pimavanserin was formulated at the time?
12   A.  Yes.
13   Q.  Right.  And Ragnar-Tolf also was making
14 a tablet dosage form pimavanserin; right?
15   A.  Yes.
16   Q.  When you say he points to no prior art
17 literature, I mean, these are both pieces of prior
18 art literature that talk about tablets of
19 pimavanserin, right, and one in expressly two
20 dosage forms?
21   A.  Can we please read the whole sentence?
22       He points to no prior art literature
23 demonstrating that such a goal was not reasonably
24 achievable.
25       So there are at least those two closest

262

1  in my sentence.  You only repeat the first one.
2  I'm not saying there is no prior art, or he didn't
3  cite any prior art.  I'm saying he didn't cite any
4  prior art demonstrating that such a goal was not
5  reasonably --
6    Q.  So is it your opinion that the POSA
7  would not have considered the Nuplazid label and
8  Ragnar-Tolf as instances where a POSA attempted
9  and failed to make a single-unit dosage form?
10       MR. FRESE:  Object to form.
11       THE WITNESS:  There's nothing in that
12 label or in Ragnar-Tolf saying that somebody
13 attempted and failed.  What there is, on the other
14 hand, is the following, right, somewhere around
15 80 percent of all solid dose products are
16 granulated successfully.  And the 20 percent that
17 are not granulated, they're not granulated not
18 because somebody tried and failed to granulate.
19 They're not granulated because somebody found that
20 you don't need to granulate and, therefore, you
21 could make the product without having to
22 granulate, it saves time and money.
23       There are very -- I mean, it's not as if
24 granulation fails 50 percent of the time.  It
25 really is something that works very, very, very

263

1  often.  So if you want to tell me that somebody is
2  going to have a reason to think that granulation
3  is not going to work, you have to show me why.
4        And Dr. Little shows zero evidence why
5  anybody would have expected this to be difficult.
6  And just because somebody didn't do it doesn't
7  mean that it would be difficult to do.
8  BY MR. PEACHMAN:
9    Q.  Okay.  Dr. Muzzio, can you go to
10 paragraph 80 in your reply report?
11   A.  80 of this?
12   Q.  Yeah, it's still reply report,
13 Exhibit 6.
14   A.  Yes, I'm there.
15   Q.  Yeah.
16       So, further, documentary evidence from
17 prior to the development of Nuplazid 34 milligram
18 capsule shows that the named inventors had
19 identified multiple processes for preparing
20 granulations of pimavanserin tartrate to achieve
21 granules with sufficient density to load into a
22 size 3 or 4 capsule; right?
23   A.  Uh-huh.
24   Q.  And you're discussing this evidence in
25 the context of the unexpected results, right, if

264

1  you look at the page before it, I believe?
2    A.  Yes.
3    Q.  But the documentary evidence that you're
4  referring to in paragraph 80, those are the
5  confidential Catalent documents that are not prior
6  art to a POSA; right?
7    A.  Yes.
8    Q.  And so a POSA would not have been aware
9  of the documents?
10   A.  But that's not why I'm citing those
11 documents.  That's not the reason why I cite those
12 documents.  The POSA would not have seen those
13 documents.  The reason I'm citing those documents
14 is because the Catalent folks are POSAs, and they
15 expected this to work.
16   Q.  So you said you're citing this as --
17   A.  Evidence that a POSA at the time would
18 have expected this to work.
19   Q.  And if you look at the same paragraph,
20 you go on to state that, The document also
21 notes -- let me find -- the bottom, the last
22 sentence.
23       The document also notes that ███████
   ██ ████████████████████████████████
   ██ ███████████████████████████

66 (Pages 261 to 264)

265

1 █████████ This does not indicate any skepticism that
2 the full 40 milligrams of pimavanserin tartrate
3 could be loaded into a size 3 or 4 capsule, but
4 instead a belief that the application of the
5 ordinary skill and traditional solutions could
6 lead to a desired result; right?
7     A.  Yes.
8     Q.  So this document, which is not prior art
9 you're discussing, can't support the idea that a
10 POSA would have been skeptical of making the
11 claimed invention as of the filing date of the
12 '721 patent; right?
13     MR. FRESE:  Object to form.
14     THE WITNESS:  You now lost me.
15 BY MR. PEACHMAN:
16     Q.  Yeah.  So this document, we've
17 established, is not prior art that you're
18 discussing.
19     So it wouldn't have any bearing on
20 whether a person of ordinary skill in the art as
21 of the filing date of the '721 patent would have
22 been skeptical of arriving at Claim 1; correct?
23     A.  Actually, the document shows that a
24 bunch of people who were POSAs working before the
25 filing date were not skeptical and thought it

266

1 would work.  That's what the document shows.
2     Q.  So help me understand your opinion.
3     So you believe that a document that's
4 not prior art supports your opinions that a POSA,
5 as of the filing date of the '721, would have been
6 skeptical in making the invention?
7     MR. FRESE:  Objection to form.
8     THE WITNESS:  Would not have been
9 skeptical.  I'm not sure why you keep changing my
10 testimony.  The document, which is not prior art,
11 but it's documentary evidence that a whole bunch
12 of POSAs got together before the filing date and
13 thought this would be very feasible, and they were
14 not skeptical at all.  So, I mean, I don't think
15 that's a difficult-to-understand opinion.
16 BY MR. PEACHMAN:
17     Q.  Okay.  So you believe that skepticism
18 can be shown by documents that are not prior art?
19 Is that your understanding?
20     MR. FRESE:  Objection to form.
21     THE WITNESS:  I think it's lack of
22 skepticism, right, not --
23 BY MR. PEACHMAN:
24     Q.  Your understanding is lack of skepticism
25 can be shown by documents that are not prior art;

267

1 correct?
2     A.  Are you asking me a legal question or a
3 technical one?
4     Q.  Well, I'm just asking for your
5 understanding about your opinions as to lack of
6 skepticism?
7     A.  I'm saying Dr. Little claims that there
8 was skepticism without showing any evidence of it,
9 and there is evidence there that when POSAs look
10 at this, they were not skeptical.  That's what I'm
11 saying.
12     Q.  Are you aware of any evidence before the
13 filing date of the '721 patent to show that POSAs
14 were not skeptical?
15     A.  Any evidence, yeah, this is evidence.
16 Any --
17     Q.  This is not prior art evidence?
18     A.  Any prior art evidence --
19     Q.  Yes.
20     A.  -- that POSAs were not skeptical.
21     I think that the whole collective
22 experience of the pharmaceutical development
23 community shows that these kind of granulations
24 are very feasible and usually work.  I think there
25 is an enormous record of people being able to put

268

1 40 milligrams of lots of different APIs inside
2 capsules --
3     Q.  Right.
4     A.  -- without any trouble.
5     And, also, I would point to the fact I
6 think that POSAs would not have been skeptical,
7 because there was ample record of success for many
8 different compounds for these or higher drug
9 loadings happily going into capsules without any
10 trouble, so happily granulating to densities
11 higher than .4, .5, .6, without any trouble.
12     And I think that we can torture the
13 English language as much as you want, but it
14 doesn't change those facts.
15     Q.  And you mentioned that the scientists in
16 the Catalent documentation were POSAs.
17     A.  Yeah.
18     Q.  These were scientists within a company
19 with confidential information.  How do you know
20 that these are reflective of what a person of
21 ordinary skill in the art would have been as of
22 the filing date of the patent?
23     MR. FRESE:  Object to form.
24     THE WITNESS:  Because I have visited
25 Catalent in New Jersey multiple times, as recently

Case 1:22-cv-01387-GBW    Document 103-15    Filed 11/14/24    Page 172 of 174 PageID
#: 2440

8/22/2024          Acadia Pharmaceuticals, Inc. v. Aurobindo Pharma Limited, et al. Fernando J. Muzzio, Ph.D.
Confidential

269

1 as four months ago, because I have talked with
2 many of their customers that hire them for work.
3 Because I think that many of those guys are
4 described by how we describe a POSA, somebody with
5 education and experience in the field.
6        Are you actually telling me that they're
7 not POSAs?  Why would they not be?  I don't
8 fully --
9 BY MR. PEACHMAN:
10    Q.  Well, I'm asking for your understanding
11 of -- if you think these people are POSAs and why.
12    A.  I think they're POSAs.
13    Q.  These are people in a company with
14 confidential information producing a product.
15    A.  Yeah, the same is true about the people
16 who work at Acadia or who work at MSN.  They're
17 also people developing products with confidential
18 information.  How is that different?
19    Q.  Do you believe that people working at
20 Acadia before the filing date of the patent were
21 POSAs?
22    A.  Some were.
23        MR. FRESE:  Objection to form.
24        THE WITNESS:  Some were, sure.
25

270

1 BY MR. PEACHMAN:
2    Q.  Dr. Muzzio, let's look at 87 of your
3 reply report.
4    A.  87.
5    Q.  So here, once again, you're talking
6 about skepticism; right?  And if you could go to
7 the bottom of the paragraph.
8        According to the '721 patent, the
9 ungranulated pimavanserin tartrate API has a bulk
10 density of about .3 grams per mL, and any POSA
11 aware of this density would be aware it would fit
12 into a size 3 or 4 capsule.
13        Do you see that?
14    A.  Yes.
15    Q.  Does the '721 patent claim compositions
16 without granules comprised of pimavanserin.
17        MR. FRESE:  Object to form.
18        THE WITNESS:  I would need to take
19 another look at the '721 patent to make sure I
20 give you an accurate answer.
21 BY MR. PEACHMAN:
22    Q.  Okay.  Because your opinion here talks
23 about ungranulated pimavanserin tartrate, which
24 I'm trying to understand the relevance.
25    A.  Well, so to the extent that the

271

1 skepticism is that there was skepticism that you
2 can put this much pimavanserin in a capsule this
3 size, I'm saying you could put that pimavanserin
4 in a capsule this size even if you don't
5 granulate.
6        And I'm citing to the '721 patent only
7 as a source of the information of the density of
8 the pure ungranulated pimavanserin.
9    Q.  So why is the density of ungranulated
10 pimavanserin tartrate something showing a lack of
11 skepticism to arrive at the claimed formulations?
12    A.  Are you asking me that for real?
13 Because if you can put ungranulated pimavanserin
14 and the density is going to increase after you
15 granulate, then you can put the granulated
16 pimavanserin in.
17        And if you understand that, you can
18 re-granulate something to be 98 percent drug, then
19 the fact that you can fit the ungranulated
20 material means that almost for sure you can fit
21 the granulated material.
22        So where is this skepticism coming from?
23    Q.  Okay.
24        MR. PEACHMAN:  I think we just need a
25 short break.

272

1        MR. FRESE:  Okay.
2        MR. PEACHMAN:  Yeah, maybe four or
3 five minutes.
4        THE VIDEOGRAPHER:  The time is
5 4:25 p.m., and we are now off the record.
6        (Recess from the record.)
7        THE VIDEOGRAPHER:  The time is 5:33 p.m.
8 We are now -- sorry, the time is 4:33 p.m.  We are
9 now on the record.
10        MR. PEACHMAN:  Dr. Muzzio, thank you for
11 coming back today.
12        THE WITNESS:  Thank you.
13        MR. PEACHMAN:  We have no further
14 questions for you.  Thank you for coming today and
15 answering our questions.
16        I'd like to thank the court reporter, as
17 well, and videographer, everybody, today.
18        MR. FRESE:  Okay.  Do you want to
19 designate the transcript as confidential, because
20 we did discuss that one document?
21        MR. PEACHMAN:  Okay.  Sure.
22        MR. FRESE:  Okay.
23        THE VIDEOGRAPHER:  Counsel, does this
24 conclude --
25        MR. PEACHMAN:  So we're going to

68 (Pages 269 to 272)

8/22/2024          Acadia Pharmaceuticals, Inc. v. Aurobindo Pharma Limited, et al. Fernando J. Muzzio, Ph.D.
Confidential

273

1  designate confidential, based on the discussion of
2  that Catalent document.
3      MR. FRESE:  All right.  Dr. Muzzio, I
4  have no questions.  We reserve the right to read
5  and sign.
6      THE VIDEOGRAPHER:  This concludes for
7  today's deposition.  The date is August 22nd,
8  2024.  The time is 4:34 p.m.
9      We are now off the record.
10     (Off the record at 4:34 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

274

1  DISTRICT OF COLUMBIA )
2
3      I, Matthew Goldstein, RMR, CRR, Notary
4  Public within and for the District of Columbia, do
5  hereby certify:
6
7      That I reported the proceedings in the
8  within entitled matter, and that the within
9  transcript is a true record of said proceedings.
10
11     I further certify that I am not related
12 to any of the parties to the action by blood or
13 marriage, and that I am in no way interested in
14 the outcome of this matter.
15
16     IN WITNESS WHEREOF, I have hereunto set
17 my hand this 25th day of August, 2024.
18
19
20
21
22     _____
23          Matthew Goldstein, RMR, CRR
24
25

275

1  Fernando J. Muzzio, Ph.D., c/o
   ARENT FOX, PLLC
2  1717 K Street
   Washington, D.C. 20006
3
4  Case: Acadia Pharmaceuticals, Inc. v. Aurobindo Pharma Limited, et al.
   Date of deposition: August 22, 2024
5  Deponent: Fernando J. Muzzio, Ph.D.
6
7  Please be advised that the transcript in the above
8  referenced matter is now complete and ready for signature.
9  The deponent may come to this office to sign the transcript,
10 a copy may be purchased for the witness to review and sign,
11 or the deponent and/or counsel may waive the option of
12 signing. Please advise us of the option selected.
13 Please forward the errata sheet and the original signed
14 signature page to counsel noticing the deposition, noting the
15 applicable time period allowed for such by the governing
16 Rules of Procedure. If you have any questions, please do
17 not hesitate to call our office at (202)-232-0646.
18
19
20 Sincerely,
   Digital Evidence Group
21 Copyright 2024 Digital Evidence Group
   Copying is forbidden, including electronically, absent
22 express written consent.
23
24
25

276

1  Digital Evidence Group, L.L.C.
   1730 M Street, NW, Suite 812
2  Washington, D.C. 20036
   (202) 232-0646
3
4  SIGNATURE PAGE
   Case: Acadia Pharmaceuticals, Inc. v. Aurobindo Pharma Limited, et al.
5  Witness Name: Fernando J. Muzzio, Ph.D.
   Deposition Date: August 22, 2024
6
7  I do hereby acknowledge that I have read
   and examined the foregoing pages
8  of the transcript of my deposition and that:
9
10 (Check appropriate box):
   ( ) The same is a true, correct and
11 complete transcription of the answers given by
   me to the questions therein recorded.
12 ( ) Except for the changes noted in the
   attached Errata Sheet, the same is a true,
13 correct and complete transcription of the
   answers given by me to the questions therein
14 recorded.
15
16 _____    _____
17 DATE                WITNESS SIGNATURE
18
19
20
21 _____    _____
22 DATE                NOTARY
23
24
25

69 (Pages 273 to 276)

277

```
1    Digital Evidence Group, LLC
2    1730 M Street, NW, Suite 812
3    Washington, D.C.  20036
4    (202)232-0646
5
6         ERRATA SHEET
7
8    Case: Acadia Pharmaceuticals, Inc. v. Aurobindo Pharma Limited, et al.
9    Witness Name: Fernando J. Muzzio, Ph.D.
10   Deposition Date: August 22, 2024
11   Page No.    Line No.    Change
12
13
14
15
16
17
18
19
20
21   _____    _____
22    Signature               Date
23
24
25
```