**THE UNITED STATES DISTRICT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| ACADIA PHARMACEUTICALS INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 1:22-cv-01387-GBW |
| | ) | (Consolidated; Lead Case) |
| AUROBINDO PHARMA LIMITED, et al. | ) | |
| | ) | **PUBLIC VERSION FILED** |
| Defendants. | ) | **NOVEMBER 14, 2024** |
| | ) | |
| | ) | |

**DEFENDANTS' BRIEF IN OPPOSITION OF PLAINTIFFS' MOTION *IN LIMINE* TO PRECLUDE DEFENDANTS FROM REARGUING CLAIM CONSTRUCTION**

## <u>TABLE OF CONTENTS</u>

I.  DR. MUZZIO's OPINIONS RELY ON THE COURT'S CLAIM CONSTRUCTION, RATHER THAN RELITIGATING IT. ............................................. 1

II.  THE COURT HAS NOT MADE A DETERMINATION THAT THE INVENTORS DID NOT DISCLAIM THE COMPARATIVE EXPERIMENTS. ............. 3

III.  CONCLUSION ............................................................................................................. 3

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Intervet Am., Inc. v. Kee-Vet Lab'ys, Inc.*,
    887 F.2d 1050 (Fed. Cir. 1989)...............................................................................1

*In re Prater*,
    415 F.2d 1393 (C.C.P.A. 1969) ...........................................................................2

**Statutes**

35 U.S.C. § 112.........................................................................................................2

35 U.S.C. § 112(b)...............................................................................................1, 3

Plaintiff's motion *in limine* misleadingly "quotes" Defendant's expert, Dr. Muzzio, in a backdoor effort to bar Defendants' indefiniteness defense. Completely contrary to Plaintiff's characterization that Dr. Muzzio is "relitigating" this Court's claim construction, Dr. Muzzio instead *relies* on the construction for his opinion that the asserted claims of the '721 patent are invalid under 35 U.S.C. § 112(b). The Court should deny Plaintiff's motion.

## I.    DR. MUZZIO'S OPINIONS RELY ON THE COURT'S CLAIM CONSTRUCTION, RATHER THAN RELITIGATING IT.

At its core, Dr. Muzzio's opinion is *not* that "the Court should have found that 'the claims encompass subject matter the inventors expressly disclaimed" during claim construction. *See* Pl. Mot. at 3. Rather, Dr. Muzzio's opinion is that the claims, *as construed by the Court*, are invalid under 35 U.S.C. § 112(b) as indefinite, or for failing to claim that which the inventors regarded as their invention. *See* Ex. A at ¶¶ 177-182; *see also* Ex. 2 at ¶¶ 94-97, 102.

Plaintiff cites two paragraphs of Dr. Muzzio's Reply Report—¶¶ 101 and 102. *See* Pl. Mot. at 2. But Dr. Muzzio's opinions in these paragraphs are related to patent validity, *not* claim construction. "Ambiguity, undue breadth, vagueness, and triviality are matters which go to claim *validity* for failure to comply with [35 U.S.C. § 112(b)], not to interpretation or construction." *Intervet Am., Inc. v. Kee-Vet Lab'ys, Inc.*, 887 F.2d 1050, 1053 (Fed. Cir. 1989) (emphasis in original). Dr. Muzzio, in fact, explicitly states that he is *not* attempting to relitigate claim construction or specification disclaimer: he states, "my opinion is not that the claims encompass subject matter the inventors expressly disclaimed *simply because the granules recited in the claims can encompass pimavanserin tartrate and one or more pharmaceutically acceptable excipients*." Ex. 2 at ¶ 102.[1] Rather, Dr. Muzzio's opinions are that the claims, *as construed by the Court*,

---

[1] Misleadingly, Plaintiff truncates the underlined language when quoting Dr. Muzzio on this point in their brief. *See* Op. Br. at 2.

embrace the "[c]omparative experiments resulting in unacceptable products" in columns 13 and 14 of the '721 patent's specification. *See* Ex. 1, 13:33-34. Thus, Dr. Muzzio is hardly "resuscitat[ing] the rejected specification disavowal" of claim scope directed to granules comprising pimavanserin and excipients, as Plaintiff claims. Pl. Mot. at 2. Just the opposite, in fact.

Here, the '721 patent's specification contains two columns of disclosure that identify pimavanserin granules that were "unacceptable products" for one or more reasons, including high levels of impurities, poor stability, unfavorable dissolution, or changes in crystallinity. *See, e.g.*, Ex. 1 at 13:33-34; 13:55-58; 13:66-66; 14:17-22; 14:40-44; 14:57-64. In his Opening Report, Dr. Muzzio opined that a POSA would look to these "unacceptable products" in an attempt to identify the metes and bounds of the claims, *i.e.*, in order to *exclude* the "unacceptable products" from the claims. *See* Ex. A at ¶¶ 177-182; *see also* Ex. 2 at ¶¶ 94-97, 102. Dr. Muzzio opines, however, that a POSA would *not* be able to ascertain "what stability testing conditions or degradation levels, what level of impurities, what particle size distributions, what dissolution profile, what change in the crystallinity, or what level of ease in drying in a fluid bed dryer was considered 'acceptable' or 'unacceptable' in these experiments," and thus they would not reasonably inform a POSA as to the scope of what lies inside and outside the claims. *See* Ex. A at ¶¶ 177, 180.

Dr. Muzzio also opines that if the claims do *not* exclude the specification's "unacceptable products" from the scope of the claims, the claims are invalid for encompassing these "unacceptable products." *Id.*, ¶ 180. Where a claim extends to subject matter the patent specification or inventor has identified as something other than their invention, it is invalid under 35 U.S.C. § 112. *See, e.g.*, *In re Prater*, 415 F.2d 1393, 1404 (C.C.P.A. 1969) (where a claim "reads on subject matter for which appellants do not seek coverage, and therefore tacitly admit to be

beyond that which 'applicant regards as his invention,' we feel that the claim fails to comply with [35 U.S.C. § 112(b)]"). If Plaintiff broadened the scope of the claims to encompass granules of pimavanserin tartrate with excipients, but otherwise failed to *exclude* unacceptable products that are *also* granules of pimavanserin tartrate with excipients, the claims are invalid. That determination, in turn, *relies* on the Court's claim construction (rather than relitigating it). As Dr. Muzzio explains, "while prior patent claims within the same patent family distinguished the recited pimavanserin granules from the comparative examples on the basis that they were granulations of pimavanserin alone, without excipients, the '721 patent claims [that encompass granules of pimavanserin tartrate with excipients] offer no basis to distinguish . . . the comparative experiments." *See* Ex. 2 at ¶ 102. Thus, Dr. Muzzio does not *relitigate* issues decided at claim construction, but rather *applies* the Court's constructions and concludes that the claims are invalid because they are overbroad. Plaintiff's motion should thus be denied.

## II.    THE COURT HAS NOT MADE A DETERMINATION THAT THE INVENTORS DID NOT DISCLAIM THE COMPARATIVE EXPERIMENTS.

Further, the Court has not ruled on whether the "comparative experiments" were disclaimed. In an attempt to bar Dr. Muzzio's indefiniteness opinions, Plaintiff alleges that the Court already "rejected Defendants' specification disavowal argument." Pl. Mot. at 1; *see also* Pl. Mot. at 3. While the Court found that the specification "did not clearly disavow granules containing both pimavanserin and excipients," D.I. 43 at 9, it never discussed or made any factual findings regarding the "comparative experiments resulting in unacceptable products." *See id.* Plaintiffs' motion should thus be denied.

## III.    CONCLUSION

For the foregoing reasons, the Court should deny Plaintiff's motion.

DATED:  November 1, 2024

**SEITZ, VAN OGTROP & GREEN, P.A.**          **KRATZ & BARRY LLP**

*/s/ James S. Green, Jr.*                            */s/ R Touhey Myer*
James S. Green, Jr. (#4406)                    R Touhey Myer (#5939)
222 Delaware Avenue, Suite 1500          800 N. West Street
Wilmington, Delaware 18901                  Wilmington, DE 19801
T: (302) 888-7607                                  (302) 527-9378
jsgreen@svglaw.com                              tmyer@kratzandbarry.com


*Of Counsel:*                                          *Of Counsel:*

Richard J. Berman                                  Timothy H. Kratz (Pro Hac Vice)
Janine A. Carlan                                    George J. Barry III (Pro Hac Vice)
Bradford C. Frese                                  Michael P. Hogan (Pro Hac Vice)
Michael Baldwin                                    John Thallemer (Pro Hac Vice)
**ARENTFOX SCHIFF LLP**                     **KRATZ & BARRY LLP**
1717 K. St. NW                                      1050 Crown Pointe Parkway, Suite 500
Washington, DC 20006                            Atlanta, GA 30338
T: (202) 857-6000                                  (404) 431-6600
richard.berman@afslaw.com                    tkratz@kratzandbarry.com
janine.carlan@afslaw.com                       gbarry@kratzandbarry.com
bradford.frese@afslaw.com                     mhogan@kratzandbarry.com
michael.baldwin@afslaw.com                  jthallemer@kratzandbarry.com


*Attorneys for Defendants,*                      *Attorneys for Defendants,*
*MSN Laboratories Private Limited*          *Aurobindo Pharma Ltd. and*
*and MSN Pharmaceuticals, Inc.*              *Aurobindo Pharma USA, Inc.*

4

# EXHIBIT A

**THE UNITED STATES DISTRICT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| ACADIA PHARMACEUTICALS INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 1:22-cv-01387-GBW |
| | ) | (Consolidated; Lead Case) |
| AUROBINDO PHARMA LIMITED, et al. | ) | |
| | ) | **CONTAINS INFORMATION** |
| Defendants. | ) | **DESIGNATED BY ACADIA AS** |
| | ) | **"HIGHLY CONFIDENTIAL –** |
| | ) | **COUNSELS' EYES ONLY"** |

<u>**OPENING EXPERT REPORT OF DR. FERNANDO J. MUZZIO**</u>
<u>**REGARDING U.S. PATENT NO. 11,452,721**</u>

## <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION ................................................................................................. 1

II.    PROFESSIONAL BACKGROUND AND EXPERIENCE ..................................... 2

III.   SUMMARY OF OPINIONS .............................................................................. 9

IV.   BASES FOR OPINIONS...................................................................................... 9

    A.    Materials Considered ................................................................................. 9

    B.    Applicable Legal Standards ....................................................................... 9

        1.    Basic Assumptions of Patent Law ............................................... 10

        2.    Obviousness ................................................................................ 11

            a.    The "Prima Facie" Obviousness Case. ........................... 11

            b.    Secondary Considerations or Objective Indicia............................ 13

        3.    Written Description....................................................................... 14

        4.    Enablement ................................................................................... 15

        5.    Definiteness.................................................................................. 16

    C.    U.S. Patent No. 11,452,721...................................................................... 17

        1.    Asserted Claims .......................................................................... 17

        2.    Specification ................................................................................ 18

        3.    Prosecution History...................................................................... 18

        4.    Claim Construction ...................................................................... 19

    D.    Scientific and Technical Background ........................................................ 20

        1.    The hypothetical POSA .............................................................. 20

        2.    The level of ordinary skill, and background knowledge, of a POSA. ......................................................................................... 20

            a.    Preformulation Testing ................................................... 21

            b.    Prototype Formulation .................................................... 25

            c.    Excipient Selection and Function ................................... 28

            d.    Prototype Evaluation and Scale-Up ............................... 30

V.    BASES FOR MY OPINIONS ON INVALIDITY ......................................... 31

    A.    THE ASSERTED CLAIMS OF THE '721 PATENT ARE INVALID AS OBVIOUS OVER THE PRIOR ART ...................................................... 31

        1.    Scope and Content of the Prior Art............................................. 31

            a.    Nuplazid Tablets ............................................................ 31

**CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY"**

          b.     U.S. Patent App. Pub. No. 2007/0264330 ("Ragnar-Tolf") ......... 33

2.    Claims 1–7 and 9–13 of the '721 patent are invalid as obvious over Nuplazid Tablets, in view of Ragnar-Tolf and additional prior art .......... 40

    a.     Claim 1 is invalid as obvious over Nuplazid Tablets, in view of Ragnar-Tolf, the prior art, and the knowledge and skills of a POSA.................................................................. 40

        (1)    The differences between Nuplazid Tablets and Claim 1.................................................................. 41

        (2)    A POSA would have been motivated to modify the 17 mg Nuplazid tablet to a size 3 or 4 capsule containing 40 mg pimavanserin tartrate............................ 42

        (3)    A POSA could have identified and modified the disclosures of Ragnar-Tolf to arrive at claim 1 with a reasonable expectation of success.................................. 46

        (4)    Conclusion ...................................................... 54

    b.     Claim 2 is invalid as obvious over Nuplazid Tablets, in view of Ragnar-Tolf, the prior art, and the knowledge and skills of a POSA.................................................................. 54

    c.     Claim 3 is invalid as obvious over Nuplazid Tablets, in view of Ragnar-Tolf, the prior art, and the knowledge and skills of a POSA.................................................................. 55

    d.     Claim 4 is invalid as obvious over Nuplazid Tablets, in view of Ragnar-Tolf, the prior art, and the knowledge and skills of a POSA.................................................................. 58

    e.     Claim 5 is invalid as obvious over Nuplazid Tablets, in view of Ragnar-Tolf, the prior art, and the knowledge and skills of a POSA.................................................................. 58

    f.     Claim 6 is invalid as obvious over Nuplazid Tablets, in view of Ragnar-Tolf, the prior art, and the knowledge and skills of a POSA.................................................................. 59

    g.     Claim 7 is invalid as obvious over Nuplazid Tablets, in view of Ragnar-Tolf, the prior art, and the knowledge and skills of a POSA.................................................................. 60

    h.     Claim 9 is invalid as obvious over Nuplazid Tablets, in view of Ragnar-Tolf, the prior art, and the knowledge and skills of a POSA.................................................................. 61

    i.     Claim 10 is invalid as obvious over Nuplazid Tablets, in view of Ragnar-Tolf, the prior art, and the knowledge and skills of a POSA.................................................................. 62

**CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY"**

j.    Claim 11 is invalid as obvious over Nuplazid Tablets, in view of Ragnar-Tolf, the prior art, and the knowledge and skills of a POSA ................................................................ 63

k.    Claim 12 is invalid as obvious over Nuplazid Tablets, in view of Ragnar-Tolf, the prior art, and the knowledge and skills of a POSA ................................................................ 64

l.    Claim 13 is invalid as obvious over Nuplazid Tablets, in view of Ragnar-Tolf, the prior art, and the knowledge and skills of a POSA ................................................................ 64

3.    Objective Indicia of Nonobviousness ....................................... 65

B.    THE ASSERTED CLAIMS OF THE'721 PATENT ARE INVALID AS INDEFINITE ................................................................................. 66

1.    Claims 1–7 and 9–13 are indefinite because the term "pharmaceutically acceptable capsule" is undefined and a POSA would not reasonably understand its scope .............................. 66

2.    Claims 1–7 and 9–13 are invalid for claiming that which the patentee did not regard as his or her invention. ...................... 72

3.    Claim 3 is indefinite because the specification and prosecution history fail to reasonably inform a POSA what a "D90 particle size distribution of 60–450 μm" means. ......................................... 74

4.    Claims 12 and 13 are invalid as indefinite. .............................. 76

C.    THE ASSERTED CLAIMS OF THE '721 PATENT ARE INVALID AS LACKING WRITTEN DESCRIPTION ............................................... 77

1.    The specification fails to describe "granules comprising 40 mg pimavanserin tartrate and optionally one or more pharmaceutically acceptable excipients" or "granules comprising 40 mg pimavanserin tartrate and one or more pharmaceutically acceptable excipients." ........................................................... 78

2.    The specification fails to describe granules comprising pimavanserin tartrate with bulk densities of greater than 0.508 g/ml (e.g., 0.7, 0.8, or 1.0 g/ml). ........................................ 83

D.    THE CLAIMS OF THE '721 PATENT ARE INVALID FOR LACK OF ENABLEMENT. ............................................................................. 87

1.    The scope of the claims is broad. ............................................ 88

2.    The one working example, and the guidance provided in the specification, indicate undue experimentation would be required ........... 89

3.    Undue experimentation would be required to practice the claims. .......... 92

VI.    SUPPLEMENTATION AND REBUTTAL ...................................... 93

iii

**CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY"**

I, Fernando J. Muzzio, Ph.D., submit this expert report on behalf of MSN Laboratories Private Limited and MSN Pharmaceuticals, Inc. (collectively, "MSN"), as well as Aurobindo Pharma Limited and Aurobindo Pharma USA, Inc. ("Aurobindo") in the above-captioned action.

## I.     INTRODUCTION

1.      I understand that this is a Hatch-Waxman case. MSN filed with the United States Food and Drug Administration ("FDA") Abbreviated New Drug Application ("ANDA") No. 210793 ("MSN's ANDA") seeking approval to market 34 mg pimavanserin oral capsules. I understand that ANDA No. 210793 lists Nuplazid®, pimavanserin tartrate (EQ 34 mg base), oral capsule, as the reference listed drug. Aurobindo filed with the United States Food and Drug Administration ("FDA") Abbreviated New Drug Application No. 214782 ("Aurobindo's ANDA") seeking approval to market 34 mg pimavanserin oral capsules. I understand that ANDA No. 214782 lists Nuplazid®, pimavanserin tartrate (EQ 34 mg base), oral capsule, as the reference listed drug.

2.      I understand that Acadia Pharmaceuticals Inc. ("Plaintiff") has filed a suit for patent infringement against MSN and Aurobindo in the United States District Court for the District of Delaware.

3.      I understand that Plaintiff has sued MSN, alleging the pimavanserin capsule described in MSN's ANDA infringes claims 1, 3–5, and 10–13 of U.S. Patent No. 11,452,721 ("the '721 Patent"). I understand that Plaintiff has sued Aurobindo, alleging the pimavanserin capsule described in Aurobindo's ANDA infringes claims 1–7 and 9–13 of the '721 patent. I have referred, collectively, to claims 1–7 and 9–13 as "the Asserted Claims."

4.      I have been asked by counsel for MSN to analyze whether the claims 1, 3–5, and 10–13 of the '721 patent are valid or not. I have also been asked by counsel for Aurobindo to

1

CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY
CONFIDENTIAL – COUNSELS' EYES ONLY"

analyze whether the Asserted Claims of the '721 patent are valid or not.

5.    If called upon to testify at trial I anticipate testifying regarding:

  a.    My professional background, qualifications, and experience;

  b.    The '721 Patent's claims, specification, and prosecution history;

  c.    The scope and content of the claims of the '721 Patent

  d.    The opinions set forth in this report regarding the invalidity of the '721
     Patent under 35 U.S.C. § 103, and 112.

  e.    Other issues incidental to the invalidity of the '721 Patent such as the prior
     art and the person of ordinary skill in the art related to the patents-in-suit.

## II.    PROFESSIONAL BACKGROUND AND EXPERIENCE

6.    My curriculum vitae is provided as **Exhibit A** to this report and describes my

educational background and experience, my technical expertise, publications that I have

authored, and patents on which I am an inventor. I also provide the following summary of my

experience relevant to the opinions expressed in this report.

7.    I am currently a Distinguished Professor in the Department of Chemical and

Biochemical Engineering at Rutgers University, The State University of New Jersey ("Rutgers").

I am also the Director of the National Science Foundation Engineering Research Center ("NSF-

ERC") on Structured Organic Particulate Systems.

8.    I obtained my undergraduate degree in chemical engineering from the University

of Mar del Plata, Mar del Plata, Argentina in 1985. In 1991, I earned my Ph.D. in chemical

engineering from the University of Massachusetts at Amherst where I worked under the direction

of Professor Julio M. Ottino.

9.    In 1991, I joined the faculty at Rutgers University as an Assistant Professor. I was

CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY"

promoted to Associate Professor (with Tenure) in 1996, and to Full Professor in 2000. In 2007, I earned the rank of Professor II, a rank reserved by Rutgers University for faculty members who are recognized by their peers as global leaders in their fields. In 2013, Rutgers changed my work title from Professor II to Distinguished Professor of Chemical and Biochemical Engineering.

10.    I am also a member of the graduate programs in Pharmaceutical Sciences, Biomedical Engineering, Materials Engineering, and Mechanical Engineering at Rutgers. As a professor, I have supervised more than forty graduate student Ph.D. theses and mentored more than thirty-five postdoctoral scholars. I have supervised and directed the work of students and scholars in the field of pharmaceutical sciences, including synthesis of active pharmaceutical ingredients, mixing and granulation of pharmaceutical materials, blend and content uniformity of solid dose pharmaceutical products, formulation development for a variety of dosage forms, including tablets and capsules, manufacturing process development, and materials characterization, including ingredient density, blend density, and flow properties.

11.    I have authored about 320 research articles that have been published in peer-reviewed journals in the fields of chemical and pharmaceutical engineering and pharmaceutical processing and manufacturing, including dozens of articles that examined properties and powders, granulations, and blends and related those properties to product attributes such as weight uniformity, content uniformity, and drug release profiles. I am an inventor on eleven patents, including patents focusing on powder blending, liquid mixing, powder sampling, and pharmaceutical processes used to make products. Most of these patents deal with active pharmaceutical ingredients or their mixtures with other ingredients.

12.    I have presented more than 500 seminars, conferences, and lectures at invited sessions and at professional meetings. Many of my published and presented works relate to

3

CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY"

technical issues associated with powder, granulation, and blend characterization and dosage form design. The use of statistical methods to design experiments and analyze material property and product data has been a constant theme in my research, my consulting, and my role as a member of an advisory committees for the U.S. Food and Drug Administration ("FDA") and the United States Pharmacopeia ("USP").

13.     Much of my professional career since 1991 has been directly related to various aspects of pharmaceutical engineering, processing, and manufacturing. My career has combined both fundamental research, funded largely by the National Science Foundation and the FDA, and industrial applications, funded primarily by the pharmaceutical industry and the USP. I have also been funded by the Department of Defense (U.S. Army and DARPA), by the National Institutes of Health, and by the Department of Energy.

14.     I have received a number of awards and honors, including the American Society of Chemical Engineers, North American Mixing Forum 2008 Award for Excellence and Sustained Contributions to Mixing Research and Practice, and (twice) the American Institute of Physics Prize (Gallery of Fluid Motion by Physics of Fluids). In 2014, I was a recipient of the PSE Innovation award for my research modeling pharmaceutical manufacturing systems. In 2015, I was a recipient of the Rutgers University Teacher-Scholar award in recognition of my research and teaching in pharmaceutical manufacturing. The same year, I was named "Professor of the Year" by the Rutgers School of Engineering. In 2016, I was a recipient of the "Inventor of the Year" award of the NJ Inventors Hall of Fame for my contributions in pharmaceutical process design. In 2018, I received the R&D Council of New Jersey Chairman's Award, for my contributions to implement advanced manufacturing technology in the pharmaceutical industry, and in 2020, I received the American Institute of Chemical Engineers, Pharmaceutical

CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY
CONFIDENTIAL – COUNSELS' EYES ONLY"

Discovery, Development, & Manufacturing Division Quality by Design Award. I note that

Quality by Design, or QbD as it is usually referred to, is a subspecialty of statistical sciences

focused on the use of experimental design to achieve process understanding and maximize

pharmaceutical product quality.

15.    The most important distinction in my career was the award of the National

Science Foundation's ("NSF") Engineering Research Center ("ERC") on Structured Organic

Particulate Systems (C-SOPS) in 2006. I led the team that developed the proposal to get the

center funded and I still serve as C-SOPS' director. The ERC is the largest research award

granted by the NSF to an engineering institution, which we used to build C-SOPS as one of the

largest university-based research organizations in the U.S. dedicated to modernizing

pharmaceutical manufacturing processes and products. The Center included staff from four

major research universities in the U.S. and many international partners and has more than 50

member companies. The FDA and the USP were also members of the Center.

16.    In 1996, I founded a consulting company called Mixing Consultants, Inc. The

company applied technical knowledge and theoretical, computational, statistical, and

experimental methods to assist its clients with characterization, design, optimization, and control

of mixing processes for powders, liquids, and suspensions. The company served a wide spectrum

of companies, primarily in the pharmaceutical area, but also includes companies in the food,

chemical, personal care, and energy industries. The company focused its consulting efforts on

teaching clients how to use statistical data analysis to design and optimize manufacturing

processes, including API synthesis and purification, mixing, granulation, and finished product

manufacturing.

17.    In 2012, I co-founded another consulting company called Acumen BioPharma

**CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY
CONFIDENTIAL – COUNSELS' EYES ONLY"**

LLC, where I currently serve as CSO. The company provides consulting services related to

pharmaceutical formulation and manufacturing, including the analysis of pharmaceutical patents,

and the development of IP strategies.

18.     In 2014, I incorporated another consulting company, Integra Continuous

Manufacturing Systems, Inc., where I currently serve as president. As its name indicates, this

company focuses on continuous flow manufacturing systems for both API and finished products

and provides support to pharmaceutical companies seeking to implement advanced

manufacturing methods.

19.     For the last thirty years, I have had many opportunities to collaborate with the

FDA on a number of projects, to participate in FDA forums on regulatory and manufacturing

issues, and to provide training to FDA personnel. For example, I worked with a group of experts

sponsored by the Product Quality Research Institute ("PQRI") on developing a guidance for

stratified sampling of blending processes, which was later adopted by the FDA. In 2010-2014, I

served as a Voting Member of the Committee on Pharmaceutical Sciences and Clinical

Pharmacology of the FDA, where I remained a consulting member until 2016. In 2015 and 2016,

I coordinated a group of thirty contributors from fifteen pharmaceutical companies working on

the development of a proposed FDA draft guidance on continuous manufacturing, which was

officially submitted to the FDA in July 2016 and was posted for public comment by the FDA on

June 2017, and was used by the FDA and the ICH to generate their own guidances on continuous

manufacturing.

20.     I am currently the principal investigator of three active grants from the FDA

totaling more than $10 million. These grants focus on the development of regulatory guidance

elements for continuous manufacturing systems, on training FDA employees regarding advanced

CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY
CONFIDENTIAL – COUNSELS' EYES ONLY"

manufacturing technology, and on creating a knowledge management system for advanced

pharmaceutical manufacturing.

21.    I have been a member of the scientific advisory boards of a number of

organizations, including the Rutgers Energy Institute, the Rutgers Institute for Advanced

Materials, Devices and Nanotechnology, and the Rutgers Center for Innovative Ventures and

Technology. I am also a co-Founder of the National Institute of Pharmaceutical Technology and

Education ("NIPTE"), where I have served as co-chair of the education and research committees.

I also served as a member of the scientific advisory board of the Research Center for

Pharmaceutical Engineering ("RCPE") based at the Graz Technical University in Austria. In

2014, together with RCPE and the Center for Continuous Manufacturing and Crystallization

("CMAC") based at the University at Strathclyde, Scotland, I co-founded the International

Institute for Advanced Pharmaceutical Manufacturing, where I served on the Board of Directors

until 2017.

22.    In 2015, I co-founded the National Institute of Pharmaceutical Technology and

Education ("NIPTE"), where I have served initially as co-chair of the education and research

committees, and more recently, in 2022, as Chair of the Institute Faculty. I currently serve as the

director of the advanced manufacturing focus group, where I am in charge of strategic research

initiatives of the Institute.

23.    I serve as a member of the Editorial Board of several peer-reviewed journals,

including Integrated Pharmacy Research and Practice, Chemical Engineering Science

(International Board), Journal for Pharmaceutical Innovation and the professional trade

publication Pharmaceutical Technology. I was a columnist in the Trade Magazine "Powder and

Bulk Engineering" where for two years I wrote a quarterly column on powder processing. I have

CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY
CONFIDENTIAL – COUNSELS' EYES ONLY"

also served as a reviewer for a number of funding agencies including the National Science

Foundation, the Canadian National Research Center, the Fulbright Foundation, and the

Petroleum Research Fund. In addition, I have served as a reviewer for many peer-reviewed

journals, including the American Institute of Chemical Engineering Journal; Physics of Fluids A;

Advances in Polymer Technology; Industrial and Engineering Chemistry Journal; Journal of the

American Ceramic Society; Chemical Engineering Sciences; Journal of Fluid Mechanics;

International Journal of Pharmaceutics; Pharmaceutical Research; Drug Development and

Industrial Pharmacy; and Journal of Chemical Engineering, among others.

     24.     In the course of my research, I have supervised numerous projects involving the

design of pharmaceutical experiments, process sampling, data collection, curation, and analysis,

and the development of process specifications. As highlights, among many, I mention my work

in 1994-1996 as part of the PQRI working group on blend uniformity, which was directly used

by FDA to develop a draft guidance on blend uniformity that set general specifications for

sampling blending processes and established acceptance criteria for blend homogeneity and

content uniformity of finished solid dose products such as tablets and capsules, my work

developing statistical methodologies for the proper comparison of drug release profiles, my work

establishing methods for determining confidence intervals for the relative standard deviation of

sample sets, and my work within the ERC-SOPS to create best practices for the implementation

of continuous manufacturing processes, which produced guidelines that were incorporated into

guidances both by the FDA and the ICH. In the course of my work, I have also been consulted

on numerous commercial products for dozens of pharmaceutical companies, in areas spanning

from API synthesis and purification to product formulation and manufacturing process

development, to product quality control.

8

CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY
CONFIDENTIAL – COUNSELS' EYES ONLY"

25.     I have previously testified as an expert in the following cases in the last four

years:

> a. *Otsuka Pharmaceutical Co. v. Zenara Pharma Pvt. Ltd.*, No. 19-1938-LPS
>
>    (D.Del.) (Rexulti® (brexpiprazole))
>
> b. *Eisai R&D Management Co., Ltd. et al v. Shilpa Medicare Ltd. et al.*, No.
>
>    19-cv-19998 (CPO) (AMD) (D.N.J.) (Lenvima® (Lenvatinib))

26.     I am being compensated at a rate of $800 per hour for my work in this case. My

compensation is in no way tied to the outcome of this case.

III.     <u>SUMMARY OF OPINIONS</u>

27.     It is my opinion that the Asserted Claims of the '721 patent are invalid as obvious

over Nuplazid Tablets in view of Ragnar-Tolf, the prior art, and the knowledge and skills of a

POSA.

28.     It is my opinion that the Asserted Claims of the '721 patent are invalid as

indefinite.

29.     It is my opinion that the Asserted Claims of the '721 patent are invalid as lacking

written description.

30.      It is my opinion that the Asserted Claims of the '721 patent are invalid as lacking

enablement.

IV.     <u>BASES FOR OPINIONS</u>

A.     <u>Materials Considered</u>

31.     In preparing this report, I have considered the materials listed in **Exhibit B**,

attached to this report as well as any items cited herein, but not listed there.

B.     <u>Applicable Legal Standards</u>

32.     I am neither a patent lawyer nor an expert in patent law. Counsel has informed me

9

CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY
CONFIDENTIAL – COUNSELS' EYES ONLY"

that the following law is applicable to the relevant issues in this case. I have relied upon these

legal principles in forming the opinions set forth in this report.

                1.       Basic Assumptions of Patent Law

33.      I understand from counsel that each patent claim is to be presumed valid, and

should only be considered invalid if there is clear and convincing evidence that the patent claim

is invalid. I further understand from counsel that the validity or invalidity of each claim is to be

considered separately.

34.      I understand from counsel that determining a patent's validity in light of the prior

art is a two-step process: first the patent claims and terms are construed by the Court, and second

those construed claims and terms are examined and evaluated in light of the scope and content of

the relevant prior art.

35.      When viewing the prior art, I understand from counsel that the appropriate

perspective is one of a "person of ordinary skill in the art," or a "POSA." I understand the POSA

to be a hypothetical person existing at the time of the invention, having the appropriate skill and

knowledge level in a particular field of the claimed invention. The POSA has presumed

knowledge of all publicly available prior art at the time of the invention. The hypothetical POSA

can be more than one person, or a person with access to the knowledge of a team of people of

varying disciplines. When evaluating and determining the knowledge level of the POSA, I have

been advised to consider the following: (a) the educational level of such a person, (b) the

sophistication of the technology, (c) the typical type of problems encountered in the art, (d) the

general speed of innovation in the field, and (e) solutions to the typical problems disclosed in

prior art. I understand from counsel that the POSA is neither a genius nor automaton, but a

person of ordinary creativity.

**CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY"**

36.    I understand from counsel that when construing claims, terms are interpreted through the eyes of the POSA at the time of the invention. I also understand that the patent-in-suit is to be considered as a whole, and not on an individual claim or term basis.

    2.    Obviousness

        a.    The "Prima Facie" Obviousness Case.

37.    I understand from counsel that a patent claim may be invalid if, as a whole, it would have been obvious to a POSA as of the effective filing date of the patent claim, in view of the prior art. The named inventor's path to making or conceiving of the claimed subject matter cannot, however, serve to demonstrate the subject matter's obviousness.

38.    Specifically, I understand from counsel that a patent claim is invalid if the subject matter of the patent claim would have been obvious to a POSA in view of a prior-art reference or disclosure or a combination of prior-art references/disclosures. Again, all publicly available relevant prior art, including common knowledge in the field, may be used in considering the obviousness of a patent.

39.    I understand from counsel that, whether a patent claim would have been obvious requires an analysis of the scope and content of the prior art and a comparison of the prior art to the patent claim in light of the level of ordinary skill in the pertinent art. I understand from counsel that the scope and content of the prior art includes all printed publications, goods on sale, and other items that were otherwise available to the public as of the earliest effective priority date of the patent.

40.    I further understand that a claim will only be found obvious if a POSA would have had some motivation to modify the prior art to arrive at the claimed invention, and the POSA would have had a reasonable expectation of success in making such modification to the

11

CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY"

prior art. I understand from counsel that examples of some rationales for modifying the prior art include combining prior art elements according to known methods to yield predictable results, simple substitution of one known element for another to obtain predictable results, using known techniques to improve similar devices in the same way, applying a known technique to a known device ready for improvement to yield predictable results, choosing from a finite number of identified and predictable solutions with a reasonable expectation of success, known work in one field of endeavor that may prompt variations of it for use in either the same field or a different one, design incentives or market pressures that would prompt predictable variations of the prior art, or some teaching, suggestion, or motivation in the prior art that would lead a POSA to combine the prior art reference teachings to arrive at the claimed invention.

41.    I understand from counsel that the motivation to modify the prior art can come from a number of sources. For instance, the motivation may exist from a recognized reason to solve a problem in the art and the existence of a finite number of identified, predictable, and known solutions, such that a POSA would have good reason to pursue the known options within his or her technical grasp.

42.    Likewise, counsel has informed me that a patent claim may be obvious where the prior art discloses that a particular variable in a process, composition, or other patented subject matter is "result-effective," (i.e., a variable that achieves a recognized result, such as refrigerator temperature affects how long food remains fresh) and the difference between the prior art and the claimed subject matter is that the claimed subject matter recites a particular optimal value of that result-effective variable. Counsel has explained to me that, to be "result-effective," there must be some disclosure, teaching, or suggestion in the prior art that a particular variable may affect a particular result of interest to a POSA.

12

CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY"

43.    I have been instructed by counsel that prior art considered previously by the USPTO during prosecution of a patent may potentially carry less weight in an obviousness analysis, but that a patent challenger's burden to prove the invalidity of the patents by clear and convincing evidence does not change whether the prior art was considered by the Examiner or not.

44.    I understand from counsel that the obviousness analysis, prior to taking into account secondary indicia is sometimes referred to as a "prima facie" obviousness case, which may be overcome with an appropriate showing with regard to objective indicia of nonobviousness. However, I understand that there is never any shift in the burden of proof with respect to obviousness—i.e., the burden of proving obviousness always rests upon the party asserting the patent is invalid.

b.    Secondary Considerations or Objective Indicia.

45.    I further understand from counsel that one must consider if there is evidence of objective indicia (or "secondary considerations") of non-obviousness. Such objective indicia may include commercial success of the claimed subject matter, fulfilling a long-felt but unresolved need, copying of the claimed subject matter, failure of others to make the claimed subject matter, skepticism of others in the art, praise for the invention from others of skill in the art, and/or unexpected results. I understand from counsel that for objective indicia to support the nonobviousness of the claimed invention, there must be a nexus between the patent claim and the evidence of objective indicia. For instance, for a patentee to show that a particular product met a long-felt need and thus supports non-obviousness, there must be some evidence that the product is covered by the patent claim, and that the features of that product that are claimed in the patent were responsible for meeting the long-felt need.

13

**CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY"**

46.     I understand from counsel that a claimed invention demonstrates unexpected results when the claimed invention exhibits some superior property or advantage that a person of ordinary skill in the relevant art would have found surprising or unexpected. I understand that the evidence of unexpected results must be made in comparison to the closest prior art to the claimed invention. I also understand that the showing of unexpected results must be commensurate in scope with the claim, i.e., it is insufficient to show only one embodiment of the claim exhibits the unexpected property or advantage, while other embodiments do not exhibit that property or advantage.

47.     I understand from counsel that POSA's expressing skepticism that the claimed subject matter would work for its intended purpose, or expressing surprise that the invention worked for its intended purpose, may indicate non-obviousness of the invention. Counsel has further explained to me that such skepticism must be specific to the invention itself, rather than generic to the field of the invention.

        3.      Written Description

48.     I understand from counsel that a patent claim must have a written description in the patent specification. I understand that a patent claim has sufficient written description if the disclosures in the patent filing (including the original claims, specification, and abstract as filed) would reasonably convey to a POSA that the inventors had possession of the claimed subject matter as of the filing date of the original application. Conversely, I understand from counsel that a claim is deemed invalid for insufficient written description if the specification (including the original claims, abstract, and drawings) of the patent, as filed, does not clearly convey to a POSA the inventor or joint inventors was "in possession" of the claimed invention. This test requires an objective inquiry into the entire application, as filed, from the perspective of a POSA.

CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY"

49.    I further understand from counsel that the written-description requirement is not satisfied by merely describing the result to be achieved with the claimed invention without describing the particular way in which the claimed invention will achieve the result; that is, the description requirement requires showing possession of the invention and not merely a result that might occur if one made the invention.

50.    I further understand from counsel that a claim is directed to a genus if multiple different disclosed embodiments in the specification would be encompassed by the patent claim. In the case of a claim directed to a genus, counsel has also informed me that the applicant must describe not only the outer limits of the genus, but also a representative number of members of the genus or structural features common to the members of the genus, in either case with sufficient precision that a relevant artisan can visualize or recognize the members of the genus. Counsel has informed me that broad outlines of the genus's perimeter are insufficient to provide written description. Further, counsel has informed me that a patent specification can provide written description through the words of the specification, through "blaze marks" in the specification that would lead a POSA to the claimed invention, or a representative number of species falling within the scope of the genus or structural features common to the members of the genus so that one of skill in the art can visualize or recognize the inventors were in possession of the full genus.

### 4. Enablement

51.    I understand from counsel there is an "enablement" requirement in addition to the written description requirement. In order to meet the enablement requirement, the specification of the patent must enable a POSA to make and use the invention claimed in the patent without undue experimentation as of the filing date of the patent application. Some factors that may be

**CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY"**

considered to determine whether a patent claim requires undue experimentation include: (1) the breadth of the claims; (2) the nature of the invention; (3) the state of the prior art; (4) the level of one of ordinary skill; (5) the level of predictability in the art; (6) the amount of direction provided by the inventor; (7) the existing working examples; and (8) the quantity of experimentation needed to make or use the invention based on the content of the disclosures. I further understand that a patent claim must be enabled to the full scope of its coverage, such as the full claimed range of measurements, quantities, or species in a genus claim.

5.     Definiteness

52.     I further understand from counsel that there is a requirement that the specification conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or a joint inventor regards as the invention. I understand from counsel this is also known as the "definiteness" requirement for claims. I understand from counsel that a claim is not definite, (i.e., it is indefinite), if the claim, read in light of the specification delineating the patent, and the prosecution history of the patent, fails to inform, with reasonable certainty, those skilled in the art about the scope of the claim. I understand that the inquiry into the interpretation of the alleged indefinite term in a claim should be made into whether the intrinsic record (i.e., the claim language, patent specification, and file history) inform a POSA of the meaning of the term; however, to the extent the intrinsic record does not inform a POSA of the meaning of the term, one may look to the extrinsic evidence from the time of filing to see if a POSA would otherwise understand the term.

53.     I also understand there is a second component to the definiteness requirement that requires the claims to cover the subject matter which the inventor or joint inventor regards as his invention. I understand from counsel that where it would be apparent to one of skill in the art,

CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY
CONFIDENTIAL – COUNSELS' EYES ONLY"

based on the specification, that the invention set forth in a claim is not what the patentee

regarded as his invention, then the claim is invalid. I further understand from counsel that the

claim may be invalid even if the claim can be read to encompass subject matter the patentee

regarded as his or her invention, if the claim scope is broad enough to extend to subject matter

the patentee has stated is not his or her invention in the specification, affidavits, or otherwise.

C.    U.S. Patent No. 11,452,721

54.    I have been asked to provide analysis and opinions related to the validity of

claims 1–7 and 9–13 of the '721 patent.

55.    I have been informed by counsel that the '721 patent are, at earliest, entitled to a

priority date of August 30, 2017.

56.    The '721 patent generally relates to formulations of pimavanserin, particularly

capsules containing pimavanserin, processes for manufacturing said capsules, and

pharmaceutical compositions containing pimavanserin.[1] It names Ravi Tejwani, Stephen Abele,

and Emmanuel Vizzotti as inventors.[2]

1.    Asserted Claims

57.    In this case I understand the following claims are being asserted against the

Defendants:

> 1. A pharmaceutically acceptable capsule for orally delivering 34
> mg of pimavanserin to a patient, wherein the capsule has a size 3
> or 4 capsule shell that contains a blended pimavanserin
> composition comprising: granules comprising 40 mg pimavanserin
> tartrate and optionally one or more pharmaceutically acceptable
> excipients; and one or more blending excipients; wherein the bulk
> density of the granules is >0.4 g/ml as determined by USP<616>,

---

[1] *See* '721 patent, title, abstract.

[2] *Id.*

17

**CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY
CONFIDENTIAL – COUNSELS' EYES ONLY"**

method 1.

3. The pharmaceutically acceptable capsule of claim 1 wherein the
blended pimavanserin composition has a D90 particle size
distribution of 60-450 μm as measured using laser scattering
particle size analysis.

4. A pharmaceutically acceptable capsule for orally delivering 34
mg of pimavanserin to a patient, wherein the capsule has a capsule
shell with a capsule shell size 3 or 4, that encapsulates a blended
pimavanserin composition comprising: granules comprising 40 mg
pimavanserin tartrate and one or more pharmaceutically acceptable
excipients; and wherein the bulk density of the granules is >0.4
g/ml as determined by USP<616>, method 1.

5. The pharmaceutically acceptable capsule of claim 4, wherein the
capsule shell is a hard shell size 4 capsule.

10. The pharmaceutically acceptable capsule of claim 1 wherein
the blending excipients are selected from the group consisting of
filler/diluents, lubricants and mixtures thereof.

11. The pharmaceutically acceptable capsule of claim 1 wherein
the granules comprise a pharmaceutically acceptable excipient
which is a binder.

12. The pharmaceutically acceptable capsule of claim 10, wherein
the binder is selected from the group consisting of cellulose,
methyl cellulose, polyvinylpyrrolidone and poly-ethylene glycol.

13. The pharmaceutically acceptable capsule of claim 4 wherein
the pharmaceutically acceptable excipients comprise a binder.

    2.    Specification

58.    I have reviewed and considered the specification of the '721 patent. To the extent

it is important to my opinions below, I have noted how in the relevant section of the report. I

reserve the right to outline those portions of the '721 patent specification at trial.

    3.    Prosecution History

59.    I have reviewed and considered the prosecution history of the '721 patent. To the

extent it is important to my opinions below, I have noted how in the relevant section of the

18

CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY
CONFIDENTIAL – COUNSELS' EYES ONLY"

report. I reserve the right to outline those portions of the '721 patent specification at trial.

4.      Claim Construction

60.      I have been informed by counsel that claim terms are to be given their ordinary

meaning unless the court has defined a term. The Court has considered certain terms in the '721

patent and construed several of them. For the terms the Court has not construed, I have

endeavored to give them the plain and ordinary meaning as would be understood by a POSA.

61.      Specifically, I understand that the court considered and determined in its

December 13, 2023, Claim Construction Order that "A blended pimavanserin composition

comprising: granules comprising 40 mg pimavanserin tartrate and optionally one or more

pharmaceutically acceptable excipients; and one or more blending excipients" is to be attributed

its plain and ordinary meaning, such that no extra-granular components are required.[3]

62.      I also understand the Court ruled "A blended pimavanserin composition

comprising: granules comprising 40 mg pimavanserin tartrate and one or more pharmaceutically

acceptable excipients" should be given its plain and ordinary meaning, and that no extra-granular

components are required.[4]

63.      I also understand the Court ruled "granules comprising 40 mg pimavanserin

tartrate;" "Granules comprising 40 mg pimavanserin tartrate and optionally one or more

pharmaceutically acceptable excipients;" and "Granules comprising 40 mg pimavanserin tartrate

and one or more pharmaceutically acceptable excipients" are to be interpreted with the plain and

ordinary meaning, notably that granules includes granules granulated with pimavanserin and

---

[3] D.I. 44 at 1; *see also* D.I. 43 at 10–12.

[4] *See* D.I. 44 at 1; *see also* D.I. 43 at 10–12.

CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY
CONFIDENTIAL – COUNSELS' EYES ONLY"

excipients.[5]

### D.    Scientific and Technical Background

64.    In this section, I will explain the scientific and technical knowledge that would

have been available to a POSA regarding both pharmaceutical formulation and pimavanserin

tartrate, in general.

#### 1.    The hypothetical POSA

65.    In my opinion, a person of ordinary skill in the subject matter of the '721 patent

would have possessed a relatively high level of skill, such as having at least a Bachelor's degree,

and more likely a Master's degree or Doctoral degree in a relevant field, including

pharmaceutical sciences, chemistry, chemical engineering, or materials science, and several

years of experience in research and development of pharmaceutically relevant solid dose

formulations, including, but not limited to, the manufacturing processes of such formulations and

the selection and use of ingredients in such formulations. A POSA may be expected to work as

part of a team, and is able to draw upon the knowledge and expertise of others on the team, such

as analytical chemists experienced in characterization of drug substance and drug product,

doctors with relevant knowledge of the conditions to be treated and the patient population, and

others. I was at least a person of ordinary skill in the relevant art at the priority date of the '721

Patent.

#### 2.    The level of ordinary skill, and background knowledge, of a POSA.

66.    For small molecules such as pimavanserin, the vast majority are formulated as

solid oral dosage forms, with tablets and capsules tending to be the most commonly used solid

oral dosage forms. For solid oral dosage forms, there are generally a number of routine steps that

---

[5] D.I. 44 at 1; *see also* D.I. 43 at 6–10.

**CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY
CONFIDENTIAL – COUNSELS' EYES ONLY"**

are followed in developing a dosage form for a new active ingredient. These include

preformulation testing, prototype formulation, prototype manufacturing process, formulation and

process evaluation and optimization, and stability testing.

### a.    Preformulation Testing

67.    The first step in making any dosage form, including a solid oral one, is to conduct

what are called "preformulation" studies, which will help inform the ultimate formulation of the

dosage form, including selection of excipients (i.e., inactive ingredients) and their relative

quantities. Such preformulation studies often include gathering information regarding the

stability of the active pharmaceutical ingredient ("API"), both in the solid state and in solution,

and under the influence of environmental stresses such as light, temperature, and humidity.[6] It

may also include information about physical characteristics of the API, including its particle size,

crystalline form, powder properties (such as particle size, bulk and tapped density, and related

properties such as flowability and compressibility), melting point, taste, color, appearance, and

odor.[7] Likewise, preformulation studies may include developing information on the solubility of

the API in various fluids, and its dependence on pH in various aqueous solvents, e.g., various

types of dissolution media.[8] A reasonably skilled artisan would also conduct excipient

compatibility studies between the API and various common excipients, in order to determine

whether certain excipients are physically or chemically incompatible with the drug, whether they

may adversely affect the flow and bonding properties of the bulk drug, or otherwise adversely

---

[6] Pharmaceutical Dosage Forms 1989 at 77.

[7] *Id.*

[8] *Id.*

CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY"

affect formulation.[9] Similarly, if the POSA is making a capsule formulation, he or she would test the active ingredient's compatibility with the capsule shell.[10]

68.    In terms of powder properties, several are known to affect how easily a formulation will be manufactured, and whether it can be manufactured into capsules or tablets. One such property that a POSA would evaluate is powder flowability.[11] While there are multiple tests that measure flowability, there are also intrinsic properties of the API that a POSA would evaluate in preformulation testing, such as bulk and tapped density, that can provide estimates of flowability.

69.    The United States Pharmacopeia ("USP") provides a section on bulk density and how to measure it. The USP is the definitive guide, in the United States and recognized globally, on how to measure and analyze certain properties in pharmaceutical preparation, including bulk density and its related measurement, tapped density. USP 35, <616>, in fact, is specifically directed to methods of measuring these properties. In pharmaceutical testing, processing, and manufacturing, bulk density refers to the ratio of the mass of a loosely packed powder sample to its volume, including the contribution of interparticulate void volume.[12] Bulk density depends both upon the "envelop density" of the powder particles as well as the spatial arrangement of the particles in the powder bed.[13] The USP provides three methods of measuring bulk density. Method

---

[9] *Id.* at 79–80.

[10] *See* Lachman at 389; Stegemann 2002 at 10.

[11] *See, e.g.*, Ansel at 170 (noting that "[i]n preparing capsules on an industrial scale using high-speed automated equipment, the powder mix or granules must be free-flowing to allow steady passage of the capsule fill from the hopper, through the encapsulating equipment, and into capsule shells.").

[12] USP 35, <616>.

[13] *Id.*

**CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY
CONFIDENTIAL – COUNSELS' EYES ONLY"**

I requires passing approximately 100 g of test powder through a sieve, into a dry graduated 250

mL graduated cylinder, followed by leveling the sample without compaction and measuring the

volume of the powder to the nearest graduated unit.[14] Another related measure is the tapped

density.[15] This refers to the density of the "densely packed" powder sample measured after being

tapped to reduce interparticulate voids.[16]

70.     Bulk density and tapped density are used together to calculate a factor called the

"Carr's Index," which is used in the pharmaceutical arts as a method of estimating the flowability

of a powder. Carr's Index is calculated using the following formula:

$$Carr's\ Index = 100 * (1 - \frac{\sigma_B}{\sigma_T})$$

where $\sigma_B$ and $\sigma_T$ are the bulk and tapped densities, respectively.[17] Generally speaking, the larger

the Carr's Index, the less flowable and more compressible a powder is likely to be, with powders

having a Carr's index of less than 15% indicating good flow characteristics and Carr's indexes of

greater than 25% indicating poor flowability.[18]

71.     Also very important, the POSA would characterize the API in terms of its particle

size distribution ("PSD"). The PSD is a statistical quantification of the proportion of a material

that is composed of particles of a given size. The PSD can be expressed in many different ways

---

[14] *Id.*

[15] *Id.*

[16] *Id.*

[17] *See* USP <616>. The USP expresses this in terms of the volume of a bulk versus tapped
sample of equal mass; however, a POSA would recognize that this is equivalent to the ratio of
the bulk and tapped densities.

[18] Lachman at 67.

CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY
CONFIDENTIAL – COUNSELS' EYES ONLY"

including, most commonly, the proportions by mass, volume, and number of particles, although

proportion by mass is the most frequently employed description. In this representation, the mass-

based PSD is the proportion of the mass of the material with particles of a given size.

72.     The PSD depends significantly on the method used to determine it. The reason is

that different methods depend in different ways on particle attributes, most critically particle

shape, that affect the measurement. For example, when using laser light scattering, the method

assumes that particles are spherical and reports an "equivalent particle diameter" that scatters

light in the same way as the actual particle. When using a set of vibrated sieves with different

openings to determine the PSD, the method reports the sizes of particles that are retained in a

given mesh with openings of a given size. For non-spherical particles, this is usually determined

by a particle's second largest dimension. When using microscopy and image analysis, the sizes

measured by the method are those of the projection of the particle onto the field of view and can

be affected by orientation effects.

73.     The PSD is sometimes described in terms of "indices," of which the most

common are D10, indicating the size of particles such that 10% of them (e.g., by mass) are

smaller than the cited size; D50, or the median; and D90, indicating that 10% of the particles are

larger than the cited size.  Similarly defined, D25 and D75 are also used, as well as the D75-D25

(interquartile range) and other derived quantities.

74.     To the extent that the POSA already has previous preformulation testing results

available for a particular API, it would be unnecessary for the POSA to redo those

preformulation tests each time a new formulation of that API is developed. For instance, if a drug

is available in a 100 mg tablet strength, and the POSA wished to make a 200 mg tablet strength,

the POSA can and would rely on much of the preformulation data generated in making the 100

24

**CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY
CONFIDENTIAL – COUNSELS' EYES ONLY"**

mg strength in designing the 200 mg tablet.

75.     Generally, based on knowledge gained in preformulation studies of the API (and

based on clinical factors that may be provided from individuals with knowledge of the clinical

profile of the API), a POSA will develop a target product profile for formulation prior to

selecting excipients, in order to define what constitutes an "acceptable" dosage form that

includes one or more of these factors, and tests to which a dosage form will be subjected to

determine if it meets that profile: a summary that includes the condition(s) and patient

population(s) that the product intends to treat, whether the treatment is for acute or chronic

treatment of those patients, the risk/side effect profile of the drug, and properties directly related

to formulation such as the therapeutic molecule class (e.g., an antibody, small molecule, or a

peptide), the frequency of administration, the dosage form (e.g., tablet, capsule, oral solution,

ready-to-use liquid, concentrate, or lyophilized solid), whether the dosage form is a unit dosage

form or multi-dose unit dosage form, the dose of API that will be present in the dosage form, the

route of administration (e.g., oral, intravenous or subcutaneous), and desired shelf life and

storage conditions (e.g., refrigerated or room temperature storage).

<blockquote>b.     Prototype Formulation</blockquote>

76.     After conducting preformulation studies with the API, the POSA must then make

a rational determination of which compatible excipients will impart the desired properties to the

formulation. For tablets and capsules, other factors besides chemical and physical stability with

the API may influence the choice of excipients in a tablet formulation. For instance, a drug

substance may be found to flow poorly, which would retard its filling into capsules,[19] or to bond

---

[19] Lachman at 389.

CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY"

poorly into a tablet. As such, the POSA may choose to introduce a glidant as an excipient to improve flow, or a binder in order to improve the API's bonding into tablets.[20] Some oral dosage forms, such as tablets, are designed for immediate release of the drug upon dissolution and might require the use of disintegrants in order to facilitate disintegration of the tablet and rapid dissolution of the drug substance.[21]

77.    The dose of the drug is a key consideration, as well. If the dose is too large (e.g., >200 mg), a POSA may select a tablet rather than a capsule, as it may not be technically feasible to fill the dose even into the largest capsule shell.[22] For doses greater than 100 mg, the properties of the API itself (e.g., density, particle size and shape, adhesion, wetting properties, etc.) are of key importance, as the quantities of excipients that can be used in a capsule formulation are relatively small.[23] For lower doses (e.g., <50 mg), a POSA would recognize that the relevant properties of the API could be managed through judicious use of excipients (e.g., adding a glidant to reduce adhesion, or adding a lubricant to prevent the powder blend from adhering to metal surfaces of a capsule filling machine).[24]

78.    For capsules, an important aspect of prototype development is the selection of the appropriate size capsule. Usually a POSA will be able to determine the appropriate capsule size through calculation of the weight of the material to be held by a single size capsule and the material's bulk or tapped density (i.e., the weight per unit volume), and thus will be able to select

---

[20] *See* Pharmaceutical Dosage Forms 1989 at 105 (binders) and 115 (glidants).

[21] *See id*. at 108.

[22] Stegemann 2002 at 11.

[23] *See id.* at 11.

[24] *See id.* at 11–12.

**CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY"**

an appropriate size capsule.[25] Immediate-release capsules with a simple powder filling are the best-known type of hard gelatin capsules.[26] Making capsule formulations generally involves mixing excipients with the API, followed by filling the mix into the capsules.[27] However, if a smaller capsule size is desired, the density of the formulation can be increased through granulation.[28]

79.    Granulation is a process used to produce larger particles (a.k.a granules) from material aggregations consisting of smaller primary particles, but without changing the phase condition of most of the solid particles.[29] Granules are used in both the production of tablets and in capsule filling.[30] The most widely used general method of granulation is wet granulation, though other granulation processes (including dry granulation, roller compaction, and melt granulation) may be used.[31]

80.    In evaluating a granulation or a powder blend for filling into capsules or compression into tablets, a POSA would evaluate several empirical aspects of the granulation or blend. These would include aspects such as bulk and tapped density and particle size distribution.

---

[25] *See* Remington 1995 at 1643 ("The experienced pharmacist, having calculated the weight of material to be held by a single capsule, often will select the correct size immediately."); Stegemann 2002 at 13.

[26] Stegemann 2002 at 7.

[27] *Id.*

[28] *Id.* at 13.

[29] Z.D. Ormos. *Granulation and Coating*, Powder Technology and Pharmaceutical Processes 359 (Dominique Chulia et al. eds., 2d. ed., 1998). ("Ormos").

[30] *Id.*

[31] *See, e.g.*, Remington 2005 at 896–901.

**CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY"**

81.    Safety considerations are also paramount in formulating an oral solid dosage form. Every excipient used in the United States is required to be safe at the levels used in the dosage form. Specifically, the United States Pharmacopeia/National Formulary (USP/NF) sets forth a broad, restrictive statement requiring all excipients to be harmless in the amounts used, and also provides tests and standards that an excipient must meet for marketing in the United States to ensure the excipients are non-toxic.[32] Furthermore, several excipients are "generally recognized as safe" or "GRAS" for use as food additives, which therefore makes them typically safe as excipients in an oral solid dosage form.

82.    After determining appropriate and compatible excipients and an appropriate manufacturing process, a POSA may begin to develop prototype formulations in order to choose final excipients and their concentration in a final dosage form.[33] The POSA will generally begin making dosage forms using appropriate excipients that were identified as chemically and physically compatible with the API, as well as functionally useful in these formulations. A POSA will generally make several prototypes and evaluate them based on the desired product profile and critical quality attributes (such as release rate and stability) as well as the manufacturability and consistency of the dosage form. After preparing and evaluating several prototype formulations, the POSA (perhaps in combination with input from others with expertise in clinical matters, analytical chemistry, and other fields) will select an appropriate formulation and manufacturing process for pilot scale and commercial manufacture, or "scale-up."

c.    Excipient Selection and Function

83.    Oral solid dosage forms will generally contain one or more inactive ingredients,

---

[32] Pharmaceutical Dosage Forms 1989 at 121.

[33] *Id.* at 82–83.

CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY"

or excipients, that impart some function within the formulation. In order to develop an acceptable dosage form for a particular API, a POSA will generally begin by using appropriate excipients that were identified as chemically and physically compatible with the API and with each other, and known to be functionally useful in oral solid dosage forms. Generally, excipients are classified according to some primary function that they perform in the dosage form, and are broken down into categories such as diluents, binders, lubricants, antiadherents, glidants, disintegrants, release modifiers, wetting agents, and miscellaneous components such as buffers, adsorbents, and stabilizers.[34] For capsule formulations, commonly used classes of excipients include diluents, lubricants, glidants, disintegrants, and wetting agents.[35] Occasionally, an excipient will serve more than one function within a tablet or capsule, and the function a particular excipient serves may differ between tablets and capsules.[36]

84.    Diluents in capsule formulations include excipients such as mannitol, lactose, corn starch, microcrystalline cellulose, and certain grades of starch (e.g., Starch 1500).[37] Diluents serve, in capsule formulations, to improve plug formation and compression when filling capsules using dosator disks or dosator tubes.[38]

85.    Lubricants in capsule formulation serve to improve flow properties of a powder and reduce its adhesion to metal parts. The most common lubricant is magnesium stearate, which

---

[34] Pharmaceutical Dosage Forms 1989 at 92.

[35] *See* Stegemann 2002 at 8.

[36] *See id.*

[37] *Id.*

[38] *Id.*

CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY"

is used in approximately 80% of all capsule formulations.[39]

86.     Glidants, like lubricants, also improve flow properties of a powder.[40] Powder adhesion to the capsule machine can lead to difficulties during capsule filling, as the fill substance sticking to the machine can lead to unacceptable fill variations.[41] Adding a glidant, such as Aerosil, can help prevent such adhesion, particularly in combination with a lubricant.[42]

87.     Disintegrants, in addition, can help ensure that a powder mixture disintegrates properly and that the API dissolves quickly, a key consideration for immediate-release capsules. For poorly-soluble drugs, it may be necessary to include a disintegrant in a capsule.[43]

88.     For capsules that are filled with granulated API, binders may also be used in preparing the granules. Binders can be used in solution or in powder form.[44] Binders serve to assist in the agglomeration processes in granulation, and can include gelatin, starch and starch derivatives, sucrose, dextrin, acacia gum, methylcellulose, carboxymethylcellulose sodium, ethylcellulose, hydroxypropyl cellulose (HPC), polyvinylpyrrolidone (PVP or Povidone), polyethylene glycol (PEG) and others.[45]

        d.      Prototype Evaluation and Scale-Up

89.     After selecting appropriate excipients, a POSA will generally make several

---

[39] *Id.*; *see also id.* at 13.

[40] *Id.* at 8.

[41] *Id.* at 11.

[42] *Id.*

[43] *See id.* at 11.

[44] Ormos at 363.

[45] *See id.*

30

prototypes and evaluate them based on the desired product profile and critical quality attributes (such as dissolution and stability) as well as the manufacturability and consistency of the oral solid dosage form. After preparing and evaluating several prototype formulations, the POSA (perhaps in combination with input from others with clinical, analytical chemistry, and other expertise) will select an appropriate formulation and process for scaled-up manufacture, based on whether or not it meets the tests set forth in the target product profile described in paragraph 75 on page 25.

## V.  BASES FOR MY OPINIONS ON INVALIDITY

### A.  THE ASSERTED CLAIMS OF THE '721 PATENT ARE INVALID AS OBVIOUS OVER THE PRIOR ART

1.  Scope and Content of the Prior Art

a.  Nuplazid Tablets

90.  Nuplazid Tablets were FDA approved on April 29, 2016.[46] Acadia announced the approval via a press release, stating the product would be launched in June 2016.[47] I understand from counsel that both the Nuplazid Tablets, as well as the labeling for Nuplazid, constitute prior art to the '721 patent as they were sold (and the labeling was publicly accessible) more than one year before the August 2017 priority date of the '721 patent.

91.  The prescribing information for Nuplazid discloses that the product is indicated

---

[46] Letter from R. Temple to Acadia Pharmaceuticals, Inc. re: NDA 207318 (Apr. 29, 2016).

[47] *See* Business Wire, "*FDA Approves ACADIA Pharmaceuticals' NUPLAZID™ (pimavanserin) - The First Drug Approved for the Treatment of Hallucinations and Delusions Associated with Parkinson's Disease Psychosis.*" (Apr. 29, 2016) https://www.businesswire.com/news/home/20160429006144/en/FDA-Approves-ACADIA-Pharmaceuticals%E2%80%99-NUPLAZID%E2%84%A2-pimavanserin---The-First-Drug-Approved-for-the-Treatment-of-Hallucinations-and-Delusions-Associated-with-Parkinson%E2%80%99s-Disease-Psychosis.) (last accessed Apr. 30, 2024).

**CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY"**

for treatment of hallucinations and delusions associated with Parkinson's disease psychosis.[48]

Nuplazid was supplied as a white to off-white, round, coated tablet debossed with "P" on one side and "17" on the reverse, in 60-count bottles.[49] The tablets were to be stored at 20°C to 25°C—i.e., room temperature.[50] The recommended dose was two tablets, each containing a 17 mg dose, taken orally once daily.[51]

92.     Each tablet of Nuplazid was a film-coated tablet containing 20 mg of pimavanserin tartrate, which is equivalent to 17 mg of pimavanserin free base.[52] Inactive ingredients in the tablets include pregelatinized starch, magnesium stearate, and microcrystalline cellulose, along with hypromellose, talc, titanium dioxide, polyethylene glycol, and saccharin sodium present in the film coat.[53]

93.     The Nuplazid label further notes that the patient population tends to be elderly, as Parkinson's disease is a disorder occurring primarily in individuals over 55 years of age.[54] The Nuplazid label further discloses that the mean age of the patients enrolled in the 6-week clinical studies with Nuplazid was 71 years, with 49% of the patients being between 65 and 75 years old and 31% being over 75 years old.[55]

---

[48] Nuplazid Label at 1.

[49] *Id*. at 13 ("HOW SUPPLIED/STORAGE AND HANDLING").

[50] *Id*.

[51] *Id*.

[52] *Id.* at 7–8.

[53] *Id.*

[54] *Id*. at 6.

[55] *Id.*

32

**CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY
CONFIDENTIAL – COUNSELS' EYES ONLY"**

   b.  U.S. Patent App. Pub. No. 2007/0264330 ("Ragnar-Tolf")

  94.  Ragnar-Tolf was published on November 15, 2007. It is explicitly identified on
the face of the '721 patent.[56] It was also cited in prosecution of the '721 patent.

  95.  Ragnar-Tolf teaches "stable pharmaceutical formulations of pimavanserin."[57]
More specifically, Ragnar-Tolf discloses several embodiments of pimavanserin and one
pharmaceutically acceptable excipient chosen from a group consisting of, *inter alia*: a starch, a
sugar, a cellulose preparation, gelatin, polyethylene glycol ("PEG"), magnesium stearate, talc,
polyvinylpyrrolidone ("PVP"), and combinations thereof.[58]

  96.  Ragnar-Tolf discloses that pimavanserin may be pimavanserin tartrate.[59] Ragnar-
Tolf further discloses that pharmaceutical preparations include push-fit capsules made of gelatin,
as well as others.[60]

  97.  Ragnar-Tolf further discloses a "wet formulation" method to make tablets.[61]
Ragnar-Tolf also discloses that tablets can contain 1, 2, 5, 10, 20, 40, 60, or 80 mg of
pimavanserin tartrate.[62]

  98.  Ragnar-Tolf discloses that only certain excipients are compatible with

---

[56] '721 patent at References Cited

[57] Ragnar-Tolf at Abstract.

[58] *Id.* at [0007].

[59] *Id*.

[60] *Id*. at [0051].

[61] *Id.* at [0062].

[62] *Id.* at [0067].

**CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY"**

pimavanserin tartrate.[63] Ragnar-Tolf discloses that some excipients may be avoided in formulation to preserve the activity of the drug substance.[64] In particular, Ragnar-Tolf discloses avoiding sodium starch gylcolate and sodium croscarmellose in a formulation.[65] Ragnar-Tolf further discloses that formulation with water is avoided, and non-aqueous solvents (e.g., ethanol) are used in wet formulation techniques.[66]

99.     Ragnar-Tolf discloses an excipient compatibility study with pimavanserin tartrate crystalline form A.[67] In that study, physical mixtures of pimavanserin tartrate and fourteen processing excipients, including gelatin and hydroxypropyl methylcellulose capsules, were prepared.[68] The stability of the drug in the presence of each excipient was studied in dry samples, as well as in samples containing 30% w/w water (relative to drug weight).[69] The samples were stored for up to three months at accelerated conditions (i.e., 40°C/75% relative humidity) and tested at time points zero, one month, and three months.[70] The samples, at each time point, were evaluated using an HPLC technique to determine pimavanserin tartrate content as well as impurity levels.[71] The results of the dry sample and wet sample stability tests, relative to drug

---

[63] *Id.* at [0054].

[64] *Id.* at [0064].

[65] *Id.*

[66] *Id.*

[67] *See id.* at [0102]–[0124].

[68] *Id.* at [0102].

[69] *Id*. at [0103].

[70] *Id.*

[71] *See id.* at [0108]–[0119].

34

CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY
CONFIDENTIAL – COUNSELS' EYES ONLY"

assay, are provided in Tables 2 and 3 of Ragnar-Tolf, and the total related substances data for

both sets of samples is provided in Table 4. Ragnar-Tolf additionally disclosed that "for the dry

mixtures, the 3-month total related substances data for the lactose, starch, HPMC, sodium lauryl

sulfate, magnesium stearate, polyethylene glycol, gelatin capsule, and HPMC capsule mixtures

indicated values approximately less than or equal to that of drug alone, indicating that these

materials could be suitable candidates for [a] dry formulation[]."[72] Ragnar-Tolf concludes the

description with a statement that "most of the processing excipients studied had limited effect on

the chemical stability of the drug substance when used dry and are suitable for use in the

development of solid-dose formulations."[73]

100.    Ragnar-Tolf discloses formulations of 1 mg, 5 mg, and 20 mg pimavanserin

tartrate Form A for direct compression into tablets.[74]

101.    Ragnar-Tolf also discloses wet granulation formulations of 1 mg, 5 mg, and 20

mg crystalline Form A that were made for compression into tablets.[75] The compositions of the

tablets are provided in Table 5, reproduced below:

---

[72] *Id.* at [0123].

[73] *Id.* at [0124].

[74] *Id.* at [0125].

[75] *Id*. at [0129].

**CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY"**

## TABLE 5

Final compositions (mg/tablet) of direct compression tablets.

| | Tablet strength | | |
| --- | --- | --- | --- |
| | 1 mg | 5 mg | 20 mg |
| Drug | 1.03 | 5.13 | 20.5 |
| Lactose monohydrate, spray-dried | 87.5 | 82.9 | 66.5 |
| Microcrystalline cellulose | 10.0 | 10.0 | 10.0 |
| Silicon dioxide aerosol | 0.50 | 0.50 | 1.00 |
| Magnesium stearate, vegetable | 1.00 | 1.50 | 2.00 |

[76]

Physical and analytical characteristics of the blends and tablets are disclosed in Table 6:

---

[76] *Id.* at [0127].

36

**CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY"**

TABLE 6

| Physical and analytical characteristics of direct compression tablets. | | | | | |
|---|---|---|---|---|---|
| Tablet strength | 1 mg | 5 mg | 20 mg | 20 mg | 5 mg |
| LOD (%) | 1.4% | 1.7% | 1.8% | 1.8% | 1.8% |
| Bulk/Tapped density g/ml | 0.59/0.67 | 0.55/0.66 | 0.40/0.52 | 0.48/0.57 | 0.58/0.68 |
| Tablet weight | 99.9 mg | 99.8 mg | 101 mg | 101 mg | 101 mg |
| Crushing strength | 62N | 56N | 74N | 67N | 56N |
| Tablet height | 3.7 mm | 3.6 mm | 3.8 mm | 3.7 mm | 3.7 mm |
| Friability, 100 rot (%) | 0.1% A | 0% A | 0% A | — | — |
| Friability, 200 rot (%) | — | — | — | 0.1% A | 0% A |
| Disintegration time | 7 | 11 | 9 | 11 | 10 |
| Content uniformity, mg/tablet | 0.9 mg | 5.2 mg | 20.7 mg | — | 5.0 mg |
| Rsd (%) | 8.5% | 2.8% | 2.7% | — | 7.8% |
| Released amount %, 30 min | 93% | 106% | 108% | — | — |

LOD = limit of detection;

Rsd = relative standard deviation                                                        [77]

102.    Ragnar-Tolf also discloses a wet granulation process for making pimavanserin tartrate tablets with crystalline Form A.[78] Wet granulations of 1 mg, 5 mg, and 20 mg pimavanserin tartrate were make for compression into tablets, using ethanol as a granulating solvent.[79] Ragnar-Tolf discloses the granulation process, which includes the steps of preblending pimavanserin tartrate, pregelatinized starch, and mannitol in an intensive mixer, followed by granulating the mixture using a solution of povidone in 99.5% ethanol.[80] The granulation was

---

[77] *Id.* at [0128].

[78] *Id.* at [0129].

[79] *Id.*

[80] *Id.* at [0130].

**CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY"**

then dried in a drying cabinet at 40°C, followed by sieving with a 1.1 mm net. [81] The sieved

granulation was then placed in a blender. [82] Magnesium stearate was charged to a stainless steel

bowl with an equal volume of the dry blend from the blender, sieved with a 1 mm net, and the

sieved magnesium stearate was then added to the blender with the remaining granulation. [83] Final

blending was performed for two minutes, followed by compressing the blend into tablets. [84]

Ragnar-Tolf discloses the ingredient amounts (by percentage) for the tablets in Table 7:

### TABLE 7

Ingredient amounts (%) for wet granulation formulations.

| | Tablet strength | | |
|---|---|---|---|
| | 1 mg | 5 mg | 20 mg |
| Drug | 1.03 | 5.13 | 20.5 |
| Mannitol | 91.3 | 87.2 | 71.1 |
| Pregelatinized Starch | 5.00 | 5.00 | 5.00 |
| Povidone | 1.15 | 1.15 | 1.15 |
| Magnesium stearate | 1.5 | 1.5 | 2.0 |
| Ethanol 99.5%** | 19.8 | 16.5 | 16 |

**Evaporates during manufacturing process                                    [85]

Ragnar-Tolf also discloses the physical and analytical characteristics of the wet granulation

formulations in Table 8:

---

[81] *Id.*

[82] *Id.*

[83] *Id.*

[84] *Id.*

[85] *Id.*

**CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY"**

## TABLE 8

Physical and analytical characteristics of wet granulation formulations.

| Tablet strength | 1 mg | 5 mg | 20 mg | 5 mg | 20 mg |
|---|---|---|---|---|---|
| LOD (%) | 1.5% | 0.8% | 2.3% | 0.9% | 1.6% |
| Sieving analysis (%) | | | | | |
| >710 | 0 | 0 | 0 | 0 | 0 |
| 500-710 | 0 | 0 | 1 | 0 | 1 |
| 250-500 | 8 | 5 | 7 | 4 | 6 |
| 125-250 | 69 | 69 | 69 | 71 | 72 |
| 90-125 | 19 | 21 | 18 | 21 | 18 |
| <90 | 5 | 4 | 6 | 5 | 4 |
| Bulk/Tapped density g/ml | 0.57/0.60 | 0.58/0.64 | 0.61/0.63 | 0.5610.60 | 0.56/0.61 |
| Tablet weight | 100 mg | 100 mg | 100 mg | 101 mg | 99.7 mg |
| Crushing strength | 61N | 51N | 58N | 61N | 44N |
| Tablet height | 3.7 mm | 3.8 mm | 3.8 mm | 3.7 mm | 3.8 mm |
| Friability, 100 rot. (%) | 0.1 | 0.1 | 0 | — | — |
| Friability, 200 rot. (%) | — | — | — | 0.1 | 0.1 |
| Disintegration time | 6 min | 6 min | 5 min | 6 min | 5 min |
| Content uniformity, mg/tabl | 1.0 mg | 5.4 mg | 20.5 mg | — | 20.1 mg |
| Released amount %, 30 min | 98% | 117% | 102% | — | — |

[86]

103.    Ragnar-Tolf also discloses that a test panel was given small amounts of pimavanserin tartrate, and it was noted that the compound has a pronounced bitter taste.[87] Accordingly, an experiment was run in which a taste-masking coating was applied to direct-compressed 5 mg and 20 mg tablet cores.[88]

---

[86] *Id.* at [0131].

[87] *Id.* at [0132].

[88] *Id.*

39

**CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY
CONFIDENTIAL – COUNSELS' EYES ONLY"**

104.    Ragnar-Tolf also discloses an excipient compatibility study between pimavanserin

tartrate crystalline form C.[89] Binary physical mixtures of form C and various excipients were

prepared, placed in amber glass vials, and stored in capped and uncapped stability chambers

under controlled conditions (40°C/75% RH and 25°C/60%RH).[90] The samples were tested for

assay, related substances, moisture content, and appearance at zero, two, four, and eight weeks.[91]

From this test, lactose monohydrate, lactose anhydrous, AVICEL® PH102, AVICEL® PH112,

CELLACTOSE® 80, STARCH 1500®, calcium phosphate (dibasic anhydrous), PROSOLV®,

sodium lauryl sulfate, magnesium stearate, sodium stearyl fumarate, talc, and Opadry were found

to be compatible, while sodium starch glycolate, croscarmellose sodium, and silicon dioxide

were found to be not compatible.[92]

       2.      Claims 1–7 and 9–13 of the '721 patent are invalid as obvious over
             Nuplazid Tablets, in view of Ragnar-Tolf and additional prior art

105.    It is my opinion that the Asserted Claims of the '721 patent are invalid as obvious

over Nuplazid Tablets, in view of Ragnar-Tolf, and in view of the prior art and the knowledge

and skills of a POSA.

       a.      Claim 1 is invalid as obvious over Nuplazid Tablets, in view of
             Ragnar-Tolf, the prior art, and the knowledge and skills of a
             POSA.

106.    Claim 1 recites the following:

       A pharmaceutically acceptable capsule for orally delivering 34 mg
       of pimavanserin to a patient,

---

[89] *See id.* at [0134]–[0137].

[90] *Id.*

[91] *See id.*

[92] *Id.* at [0137].

**CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY"**

> wherein the capsule has a size 3 or 4 capsule shell that contains a blended pimavanserin composition comprising:
>
> granules comprising 40 mg of pimavanserin tartrate and optionally one or more pharmaceutically acceptable excipients;
>
> and one or more blending excipients;
>
> wherein the bulk density of the granules is >0.4 g/ml as determined by USP<616>, method 1.

(1)    The differences between Nuplazid Tablets and Claim 1.

107.    As discussed above, Nuplazid Tablets were already available and marketed in a 17 mg dosage strength. Those tablets were FDA approved on April 29, 2016, and were thus available more than one year prior to the priority date of the '721 patent. In analyzing the differences between the claims and the 17 mg Nuplazid tablet, I note the following:

- The 17 mg Nuplazid tablet was a tablet formulation, rather than a pharmaceutically acceptable capsule in a size 3 or 4 capsule shell.

- There is no disclosure that the prior art 17 mg tablet Nuplazid formulation was made with granules, or granules having a bulk density of >0.4 g/ml.[93]

- The claims recite a formulation for orally delivering 34 mg pimavanserin to a patient using granules having 40 mg pimavanserin tartrate. The tablet formulation delivered 17 mg pimavanserin as 20 mg pimavanserin tartrate and thus required two tablets to administer 34 mg pimavanserin to a patient.[94]

It is my opinion that it would have been obvious to modify Nuplazid Tablets to arrive at the claimed invention from, *inter alia*, the disclosures of Ragnar-Tolf and the knowledge and skills of a POSA.

---

[93] I have seen some indications that Nuplazid tablets were made using a direct compression process that did not involve wet granulation. *See* ACADIA_0069936 at ACADIA_0069943–4 and ACADIA_0069955–8.

[94] Nuplazid Label at 7–8.

CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY
CONFIDENTIAL – COUNSELS' EYES ONLY"

(2)     A POSA would have been motivated to modify the 17 mg
Nuplazid tablet to a size 3 or 4 capsule containing 40 mg
pimavanserin tartrate.

108.    A POSA would have identified several reasons why the 17 mg Nuplazid tablet
was not ideal and could have been reasonably motivated to develop an alternate 34 mg capsule
formulation of pimavanserin tartrate as an improvement. The first reason is that the daily dose of
34 mg of pimavanserin was provided in two 17 mg tablets that were to be taken together, rather
than a single dosage form. This would increase a patient's "pill burden." Pill burden refers to the
number of oral dosage forms or doses a patient must swallow during the day.[95] A POSA would
recognize that pill burden is frequently associated with noncompliance with medication, and
reducing a patient's pill burden can improve medication compliance.[96] Elderly patients and
Parkinson's patients both typically have high pill burdens, which others had identified as major
factors influencing their compliance and satisfaction with their treatment regimen.[97] A POSA
would thus be motivated to deliver a 34 mg dose of pimavanserin in a single dosage form.

109.    A second issue would have been with the color and the shape of the tablets.  The
tablets, as white, debossed tablets contained limited information that would permit a patient to
distinguish them from other medications he or she was taking. In the elderly, where

---

[95] *See, e.g.*, Debbie Kwan & Barbara Farrell, *Polypharmacy: Optimizing Medication Use in Elderly Patients.* 4(1) CGS Journal of CME 21 (2013).

[96] *See, e.g.*, Richard Chapman et al., *Predictors of Adherence with Antihypertensive and Lipid-Lowering Therapy.* 165 Arch. Intern. Med. 1147, 1150 (2005) ("Studies have suggested that simplifying a drug regimen by eliminating even one pill . . . could improve adherence.").

[97] *See, e.g.*, Anil Kumar et al., *Impact of Pill Burden and Socio-Economic Status of Patients on Adherence to Pharmacologic Therapy in Elderly.* 6(1) W. London Med. J. 23, 26 (2014) (noting "pill burden stood out as a major factor influencing compliance."); Nobutaka Hattori et al., *Patient perspectives on Parkinson's disease therapy in Japan and the United States: results of two patient surveys.* 3 Patient Related Outcome Measures 31, 38 (2012) ("physicians felt strongly that patients would be more satisfied with reduced pill burden (96.3%)").

42

CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY"

polypharmacy is commonplace, use of color in the dosage form itself can assist a patient in identifying and automatic processing of the correct administration of a product.[98]

110.    In a capsule, bright colors can be imparted to the product without application of aqueous coating, i.e., simply through selection of a brightly-colored capsule body. For instance, Stegemann 2005 provides the following illustration to show polymedication as viewed at different distances:



[99]

As described in that reference, "[i]t is obvious that the colored two-piece capsules remain easy detectable and distinguishable, while the white tablets only vary in dimension, which is hard to distinguish or to relate to any therapy."[100] In the case of the capsules, Stegemann 2005 further discloses that "[i]mprints can further help in distinguishing when the imprint color is in contrast to the capsule color. Doctors or pharmacists can actively use these color differences for advice and patient education to improve the compliance."[101] Because hard capsules can be easily colored in bright and easily distinguishable colors and printed to identify the medication, thus

---

[98] Sven Stegemann, *Colored capsules – a contribution to drug safety*. 67(9) Pharm Ind. 1088, 1092 (2005).

[99] *Id.*

[100] *Id.*

[101] *Id.*

43

CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY"

reducing medication errors, and improving patient compliance, this would have motivated a POSA to consider a capsule form, too.[102]

111.    A third problem is that Nuplazid Tablets were in a tablet form, which can be difficult to swallow for certain patients. Patients with Parkinson's disease, and elderly patients in general, frequently have dysphagia (difficulty swallowing).[103] Coated or uncoated tablets are perceived by some patients as more difficult to swallow than hard capsules.[104] This, in turn, could decrease patient compliance or make a dosage form less acceptable to the patient population, which in turn would have motivated a POSA to make a hard capsule dosage form.

112.    Furthermore, a POSA would be aware that the capsule size would need to be small enough to be acceptable to a patient and not cause swallowing difficulty. Schiele discloses a study in which it was found that the mean diameter and length of hard capsules that did not cause swallowing difficulty were 6.4+/-1.2 mm and 17.5+/-2.8 mm, respectively.[105] Both size 3 capsules (5.82 mm in diameter and 15.9 mm long) and size 4 (5.32 mm in diameter and 14.3 mm long) are smaller in length and diameter, while a size 2 capsule is on the cusp (18 mm vs. 17.5 mm), and size 1, 0, and 00 capsules are both larger and longer in diameter.[106] Thus, a POSA would reasonably have been motivated to make a dosage form containing 34 mg pimavanserin

---

[102] While tablets can be color-coded, they are usually given a single color, and do not offer as many options as capsules for making distinct, identifiable products, as it is more expensive to film-coat and print them.

[103] Liu at 1873–74; Schiele at 938, 945.

[104] *See* Stegemann 2002 at 13 ("Comparing the perception of tablets and capsules Overgaard et al. found that 66 % of the patients chose capsules, 18 % coated tablets and only 4 % uncoated tablets as easy to swallow.").

[105] Schiele at 942.

[106] *See* Capsule Connection.

**CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY"**

(as 40 mg pimavanserin tartrate) in a size 3 or 4 capsule.

113.    Fourth, a POSA would realize there would be additional benefits to putting pimavanserin into a capsule dosage form. One is that the pimavanserin drug substance was disclosed, in the prior art, as having a pronounced bitter taste.[107] Capsules have long been used to encapsulate foul-tasting or foul-smelling ingredients to promote patients taking them, without the need for additional taste-masking coatings.[108]

114.    Thus, from those aspects, a POSA would have been reasonably able to identify several aspects of a target product profile for an alternative dosage to Nuplazid Tablets. In particular, a POSA would have known the following aspects from the Nuplazid label:

| TARGET PRODUCT PROFILE FOR PIMAVANSERIN TARTRATE | |
|---|---|
| **Aspect** | **Target for a Modified Pimavanserin Dosage Form** |
| Condition | Hallucinations and delusions associated with Parkinson's disease psychosis.[109] |
| Patient population | Patients with Parkinson's disease; primarily an elderly patient population.[110] Such a patient population frequently has dysphagia, or difficulty swallowing.[111] |
| Acute/Chronic Treatment | Chronic.[112] |

---

[107] Ragnar-Tolf at [0132].

[108] *See* Stegemann 2002 at 1, 12 (noting "none" for capsule taste and odor); and Lachman at 374 (stating that capsules's tastelessness is an "advantage . . . particularly beneficial for drugs having an unpleasant taste or odor.").

[109] NUPLAZID Label at 1.

[110] *Id.* at 6 ("Parkinson's disease is a disorder occurring primarily in individuals over 55 years of age. The mean age of patients enrolled in the 6-week clinical studies with NUPLAZID [see Adverse Reactions (6.1)] was 71 years, with 49% 65-75 years old and 31% >75 years old.").

[111] *See* paragraph 111.

[112] *Id.* at 8.

45

**CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY"**

| TARGET PRODUCT PROFILE FOR PIMAVANSERIN TARTRATE | |
|---|---|
| **Aspect** | **Target for a Modified Pimavanserin Dosage Form** |
| Therapeutic molecule class | Small-molecule atypical antipsychotic.[113] |
| Route of administration | Oral[114] |
| Frequency of administration | A single dose, daily[115] |
| Oral pharmacokinetics | Orally bioavailable and displaying dose-proportional pharmacokinetics after single oral doses from 17 to 255 mg.[116] |

Given those aspects, a POSA also reasonably would have been motivated to develop a capsule dosage form, containing the full 40 mg pimavanserin tartrate (to deliver a 34 mg dose of pimavanserin), which was available in a single capsule of no greater than size 3 or 4, for the reasons discussed in paragraphs 108–113 above. Thus, it is my opinion that a POSA would have been reasonably motivated to make a pimavanserin tartrate formulation that would include 40 mg pimavanserin tartrate (for delivering a 34 mg dose of pimavanserin) in a single, size 3 or 4 capsule.

(3)    A POSA could have identified and modified the disclosures of Ragnar-Tolf to arrive at claim 1 with a reasonable expectation of success.

115.    In an effort to develop such a formulation, a POSA would look to available literature regarding preformulation testing of pimavanserin.[117] In doing so, a POSA would look

---

[113] *Id.* at 7.

[114] *Id.* at 1.

[115] *Id.* at 8.

[116] *Id.* at 8.

[117] *See* section IV.D.2.a beginning on page 21.

**CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY
CONFIDENTIAL – COUNSELS' EYES ONLY"**

to Ragnar-Tolf, which discloses excipient compatibility studies between pimavanserin tartrate

and various pharmaceutical excipients.[118] The excipient compatibility study of form A in

Ragnar-Tolf would have taught a POSA that pimavanserin tartrate was compatible with hard

gelatin and HPMC capsules.[119]

116.    A POSA, looking to load a 40 mg dose of pimavanserin tartrate into a size 3 or 4

capsule, would have known that the powder blend used for capsule filling would need to have

good enough flow properties to be used in capsule filling, and high enough bulk density to allow

filling the target amount of blend into the selected capsule. A POSA would know, for instance,

that size 3 capsules have a volume of 0.30 ml, and size 4 capsules have a volume of 0.21 ml.[120]

As is shown below from the chart in Stegemann 2002, the mass of material that one can fit into a

capsule depends upon the bulk density of the material. For example, for a material having a bulk

density of 0.6 g/ml, one can reasonably expect to fit at least 126 mg of blend into a size 4

capsule:

---

[118] *See* paragraph 99 on page 34 and paragraph 104 on page 40.

[119] *See* Ragnar-Tolf at [0123].

[120] *See* Stegemann 2002 at 6.

**CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY"**

| Capsule size | Capsule volume in ml | Capacity in mg powder density | | | |
|---|---|---|---|---|---|
| | | 0.6 | 0.8 | 1.0 | 1.2 g/ml |
| 000 | 1.37 | 822 | 1096 | 1370 | 1644 |
| 00el | 1.02 | 612 | 816 | 1020 | 1224 |
| 00 | 0.91 | 546 | 728 | 910 | 1092 |
| 0el | 078 | 468 | 624 | 780 | 936 |
| 0 | 0.68 | 408 | 544 | 680 | 816 |
| 1 | 0.50 | 300 | 400 | 500 | 600 |
| 2 | 0.37 | 222 | 296 | 370 | 444 |
| 3 | 0.30 | 180 | 240 | 300 | 360 |
| 4 | 0.21 | 126 | 168 | 210 | 252 |
| 5 | 0.10 | 78 | 104 | 130 | 156 |

*Table 1: Examples for hard gelatin capsule dimensions and filling capacities.* [121]

A POSA thus would have looked to determine the bulk density of pimavanserin tartrate blends disclosed in Ragnar-Tolf, and would have determined they were between 0.4–0.59 g/mL for the powder blends disclosed in Example 8, and 0.57–0.61 g/ml for the pimavanserin tartrate granules disclosed in Example 9.[122]

117.    That, in turn, would have told a POSA two things: first, it was possible to granulate pimavanserin tartrate to achieve a bulk density of approximately 0.6 g/mL. A POSA, however, would have recognized the need to increase the concentration of pimavanserin tartate in the blends to deliver a 34 mg pimavanserin dose in a size 3 or 4 capsule. For example, if one were to attempt to fill a capsule with a sufficient quantity of the 20.5% granulated blend (which has a bulk density of 0.61 g/ml, as disclosed in Table 8), one would have to fill the capsule with 200 mg of blend to include 40 mg of pimavanserin tartrate. That, in turn, would require a fill volume of 0.310 ml, which would be too much to fit in a size 3 or 4 capsule. Based on these

---

[121] Stegemann 2002 at 6.

[122] *See* Ragnar-Tolf at Table 6 (Example 8) and Table 8 (Example 9).

**CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY"**

results, it would have been obvious to a POSA to increase the concentration of pimavanserin tartrate in the granulation, so that it would fit readily into a size 4 capsule. Since the target volume of a size 4 capsule is 0.21 ml, and a POSA would expect a density of about 0.6 g/ml (as that was achieved with the other granulations), a POSA would have calculated that the 40 mg of pimavanserin tartrate would need to be contained within about 126 mg of final blend. Thus, the concentration of pimavanserin tartrate in this final blend would need to be 40 mg pimavanserin tartrate/126 mg blend = 31.7% (w/w). Since the final blend contains 2% magnesium stearate, the granulation, itself, would need to contain 31.7%/0.98% = 32.4% (w/w) pimavanserin tartrate.

118. A POSA also would have looked to the disclosures in examples 8 and 9 of Ragnar-Tolf to determine information regarding the flow properties of pimavanserin tartrate blends and their bulk density. A POSA, looking at Example 8, would have been dissuaded from pursuing direct blending and filling of capsule ingredients. As indicated in example 8, "[i]t was discovered that during blending, the mixture tended to form aggregates, potentially affecting content uniformity."[123] That alone would have made a POSA suspect that increasing the concentration of pimavanserin tartrate in the blends would potentially result in an unacceptable product.

119. This, in turn, would have led the POSA to further consider the wet granulation processes in Example 9. The usual approach used to overcome an API with tendency to agglomerate or segregate is wet granulation. Given the agglomeration/segregation problems identified in Example 8 of Ragnar-Tolf, a POSA would have looked to the wet granulation methods disclosed in example 9 as a potential solution. A POSA also would know that

---

[123] Ragnar-Tolf at [0125].

2504 of 106 PageID

**CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY
CONFIDENTIAL – COUNSELS' EYES ONLY"**

granulation can be used to increase bulk density of a drug-containing powder, such that the

powder can be filled into smaller size capsules than would otherwise be possible using the

powder blend itself.[124] This is because, as I discussed in paragraph 79 above on page 27,

granulation is a process used to produce larger particles, or granules, from material aggregations

consisting of smaller particles. This, in turn, will increase the powder packing density by

reducing interparticulate voids and decreasing inter-particle cohesion. In fact, as disclosed in

Table 8 in Example 9, the wet granulated pimavanserin tartrate/excipient mixtures have bulk and

tapped densities that are around 0.6 g/ml, regardless of concentration of pimavanserin tartrate.

Furthermore, Ragnar-Tolf discloses that the wet granulation formulations had "acceptable

analytical parameters."[125] All of these observations, combined, would have motivated the POSA

to consider wet granulation methods.

120.    A POSA would understand the wet granulation process disclosed in Ragnar-Tolf

as follows:

- The appropriate weight of pimavanserin tartrate form A, pregelatinized starch,
  and mannitol were pre-blended in an intensive mixer.[126]

- The mixture was granulated using a solution of povidone in ethanol.[127]

- The granulation was then dried in a drying cabinet at 40°C.[128]

---

[124] *See, e.g.*, Stegemann 2002 at 13.

[125] Ragnar-Tolf at [0130].

[126] *See id*.

[127] *See id.*

[128] *See id.*

**CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY"**

- The dried granulation was sieved with a 1.1 mm screen and placed in a blender.[129]

- Magnesium stearate was charged to a stainless steel bowl, and pre-blended, with an equal volume of granulation from the blender.[130]

- That blend was then sieved manually with a 1 mm screen.[131]

- The sieved magnesium stearate blend was added to the blender and final blending was performed for 2 minutes.[132]

Although the granulation and blend disclosed in Ragnar-Tolf was compressed into tablets,[133] a POSA would recognize it would be reasonable to load it into a capsule. Ragnar-Tolf discloses that pharmaceutical dosage forms include capsules.[134] Early examples in Ragnar-Tolf loaded pimavanserin tartrate into size 0 capsules in an excipient compatibility study.[135] Furthermore, a POSA would know that granulations can be filled into capsules or compressed into tablets.[136]

121.    Looking at the blends that result from the wet granulation process, a POSA would have had a reasonable expectation that he or she could make a pimavanserin tartrate granulation with sufficient bulk density, then combine the granulation with a blending excipient (here, magnesium stearate) and successfully increase the drug load in a single size 4 capsule to 40 mg

---

[129] *See id.*

[130] *See id.*

[131] *See id.*

[132] *See id.*

[133] *See id.*

[134] *Id.* at [0051].

[135] *See, e.g.*, Ragnar-Tolf at [0102]–[0124].

[136] *See, e.g.*, Stegemann 2002 at 13. In addition, the '721 patent admits that "[g]ranulation is extensively used in the manufacturing of tablets and capsules[,]" indicating that filling a granulation into capsules was known in the pharmaceutical arts. *See* '721 patent at 4:49–50.

**CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY"**

of the overall formulation.

122.    Further, a POSA would reasonably expect such granules would be useful in making a blended pimavanserin composition having sufficient flow and density to permit encapsulation. The bulk and tapped densities of the lubricated blend[137] disclosed in Ragnar-Tolf are relatively close regardless of drug concentration, and the Carr's Index of these powders does not vary substantially with the drug concentration, as shown below:

| Property | 1 mg tablet | 5 mg tablet | 20 mg tablet | 5 mg tablet | 20 mg tablet |
|---|---|---|---|---|---|
| Drug concentration (w/w)[138] | 1.03% | 5.13% | 20.5% | 5.13% | 20.5% |
| Bulk/Tapped Density (g/ml) | 0.57/0.60 | 0.58/0.64 | 0.61/0.63 | 0.56/0.61 | 0.56/0.61 |
| Carr's Index | 5 | 9 | 3 | 8 | 8 |

This would indicate to a POSA that increasing drug concentration in the granules to ~30% was unlikely to decrease the bulk density beyond a point where one could not load a 40 mg of pimavanserin tartrate into a single size 4 capsule, or adversely affect the flow properties of the drug. Thus, a POSA would reasonably expect to be successful in using the granulation process disclosed in Example 9 of Ragnar-Tolf, and that it could be used to make a blend comprising granules containing 40 mg pimavanserin tartrate and pharmaceutically acceptable excipients (here, mannitol, pregelatinized starch, and povidone), and at least one blending excipient (e.g.,

---

[137] Ragnar-Tolf discloses that, after drying the granulation, it is blended with magnesium stearate, a lubricant. Ragnar-Tolf at [0130]. However, a POSA would read Table 8 to disclose the bulk density of *tablets*, but rather the bulk density of the blend used to make the tablet. Thus, I (and a POSA) would reasonably interpret the disclosure of bulk and tapped densities in Table 8 to refer to the bulk and tapped densities of the blend, not the granules alone or the tablets.

[138] Reported as the weight percentage of ingredient from Table 7 of Ragnar-Tolf.

CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY"

magnesium stearate), which could be encapsulated into a size 4 or size 3 capsule.

123.    Further, although a POSA would read Ragnar-Tolf as disclosing the bulk and tapped densities of the *blend* of granules and magnesium stearate (rather than the granules alone), a POSA would reasonably expect the bulk density of the granules to be greater than 0.4 g/ml. As discussed above, the granulation process in Example 9 of Ragnar-Tolf discloses a process in which pimavanserin tartrate granules (containing mannitol/pregelatinized starch/povidone) are blended with magnesium stearate, a lubricant. While lubrication can increase the density of a blend by filling in interparticulate voids and decreasing cohesion, in this case the granulation is already free flowing (i.e., having a Carr's Index of less than 15), so the effect of magnesium stearate on density, if any, would be very small. A POSA thus would not have expected the addition of a small amount (2% by weight) of lubricant to increase the bulk density of the granules by nearly 50%. Rather, a POSA reading Ragnar-Tolf would reasonably expect that the granules produced by the process would have a bulk density of greater than 0.4 g/ml,[139] and that they would fit into a capsule of size 4.

124.    Thus, a POSA would have been reasonably motivated from Nuplazid Tablets to make a pharmaceutically acceptable capsule formulation of pimavanserin, in a single size 3 or 4 capsule shell, for delivering a 34 mg dose of pimavanserin to a patient. To do so, a POSA would have been motivated to make a blend comprising granules comprising more than 30% pimavanserin tartrate and one or more pharmaceutically acceptable excipients from the wet granulation procedure disclosed in Example 9 of Ragnar-Tolf. Ragnar-Tolf further would have

---

[139] In addition, I note that Ragnar-Tolf does not disclose the method used to measure the bulk density or tapped density. However, there were various known methods for measuring bulk density at the time it was published and prior to the priority date of the patent, one of which was USP <616> method 1. *See* USP 35, <616>.

CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY"

told a POSA he or she could likely be successful in increasing the pimavanserin tartrate concentration beyond 20% without adversely affecting bulk density. Ragnar-Tolf further would have taught a POSA to include a blending excipient (here, magnesium stearate) along with the granules. And Ragnar-Tolf would have provided a POSA with a reasonable expectation of success that such a blended pimavanserin composition would include granules having a bulk density of greater than 0.4 g/ml, such that they could be filled into a size 3 or 4 capsule shell.

(4)    Conclusion

125.    For the foregoing reasons, it is my opinion that claim 1 of the '721 patent is invalid as obvious over Nuplazid Tablets in view of Ragnar-Tolf, the prior art, and the knowledge and skills of a POSA.

b.    Claim 2 is invalid as obvious over Nuplazid Tablets, in view of Ragnar-Tolf, the prior art, and the knowledge and skills of a POSA.

126.    Claim 2 recites the following:

2. The pharmaceutically acceptable capsule of claim 1 wherein one of the blending excipients is selected from the group consisting of magnesium stearate, sodium stearyl fumarate, colloidal silicon dioxide, or talc.

Claim 2 depends from claim 1. I have addressed the limitations of claim 1 above in section V.A.2.a above on page 40.

127.    To the extent this claim is definite (*see* section V.A.3 below on page 65), it is invalid as obvious over Nuplazid Tablets in view of Ragnar-Tolf, the prior art, and the knowledge and skills of a POSA.

128.    As discussed above in paragraph 120 above on page 50, the granulation process disclosed in Ragnar-Tolf involves blending pimavanserin tartrate form A, pregelatinized starch, and mannitol together, followed by wet granulation with a solution of povidone in water,

54

CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY
CONFIDENTIAL – COUNSELS' EYES ONLY"

followed by blending the resulting granulation with magnesium stearate. Thus, Ragnar-Tolf

discloses magnesium stearate as a "blending excipient."

129.    Moreover, magnesium stearate and other lubricants are commonly used in a

majority of capsule formulations to facilitate plug formation and ejection, and a POSA would

have known to add a lubricant as a matter of common practice.[140]

130.    For the foregoing reasons, it is my opinion that claim 2 of the '721 patent is

invalid as obvious over Nuplazid Tablets in view Ragnar-Tolf, the prior art, and knowledge and

skills of a POSA.

> c.    Claim 3 is invalid as obvious over Nuplazid Tablets, in view of
> Ragnar-Tolf, the prior art, and the knowledge and skills of a
> POSA.

131.    Claim 3 recites the following

> 3. The pharmaceutically acceptable capsule of claim 1 wherein the
> blended pimavanserin composition has a D90 particle size
> distribution of 60-450 μm as measured using laser scattering
> particle size analysis.

Claim 3 depends from claim 1. I have addressed the limitations of claim 1 above in section

V.A.2.a above on page 40.

132.    To the extent this claim is definite (*see* section V.B.3 on page 74), it is invalid as

obvious over Nuplazid Tablets in view of Ragnar-Tolf, the prior art, and the knowledge and

skills of a POSA.

133.    Assuming that the claim language actually means "the blended pimavanserin

composition has a particle size distribution with a D90 of 60-450 μm," a POSA would have

found it obvious and been motivated to achieve a particle size distribution with a D90 value

---

[140] *See, e.g.,* Stegemann 2002 at 12–13.

CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY"

somewhere between 60 to 450 µm. Looking at Ragnar-Tolf, Table 8, a POSA would understand that the disclosed wet granulation process generated particles where, by a sieve analysis, 90% of the particles were under 250 µm in size, while more than 90% of the particles were greater than 90 µm in size.[141] Thus, such a blend has a D90 slightly smaller than 250 µm, while having a D10 slightly larger than 90 µm. Further, the particle size distributions reported in Table 8 of Ragnar-Tolf are relatively consistent regardless of the drug load.[142] Although these particles are measured by sieve analysis, which can generate particle size distributions different from a laser scattering particle size analysis, a POSA would still reasonably expect that the D90 of the particle size distribution resulting from Ragnar-Tolf would fall somewhere between 60 and 450 µm, given the breadth of that range as well as the disclosure of the sieve analysis.

134.    Moreover, I understand from counsel that a presumption of obviousness applies where a claimed range overlaps with a range disclosed in the prior art, which presumption can be overcome if the prior art teaches away from the claimed range, the claimed range produces new and unexpected results, or other evidence demonstrates non-obviousness of the claimed range. Further, I understand from counsel that where the general conditions of a claim are disclosed in the prior art, it is not inventive to discover the optimum or workable ranges by routine experimentation, particularly where the difference would involve routine optimization of a known result-effective variable. Particle size was such a known result-effective variable in pharmaceutical (and capsule) manufacturing as it is "critically important to the homogeneity and

---

[141] Ragnar-Tolf at Table 8.

[142] See id.

**CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY"**

fluidity of the powder."[143] The POSA would also know methods of controlling particle-size distribution in granulation, including varying the speed of rotation of any impellers, controlling drying temperature, varying the amount of granulating liquid, changing the binder and the amount of binder, and comminuting the granulation to the desired granule size after drying.[144] Further still, the prior art discloses that "[t]he size of particles should ideally measure between 10μm and 150μm,"[145] which would include particle size distributions that overlap with the claimed range.

135.    Morerover, a POSA would have known that pharmaceutical granulations almost always have particle size distributions with D90 larger than 60 microns; otherwise, the granulation step is considered to be incomplete. Further, a POSA would have known that a D90 less than 500 microns would be needed to ensure appropriate filling of the capsule with a diameter of less than 5 mm, as it is well known that large particles can cause filled weight variability. In fact, claim 3 recites the entire particle size range of any granulation that is developed to fill capsules, and it is nothing more than a recitation of well-established knowledge in the field.

136.    For the foregoing reasons, it is my opinion that claim 3 of the '721 patent is invalid as obvious over Nuplazid Tablets in view of Ragnar-Tolf, the prior art, and knowledge and skills of a POSA.

---

[143] Stegemann 2002 at 11.

[144] Remington 1995 at 1694.

[145] *Id.*

CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY
CONFIDENTIAL – COUNSELS' EYES ONLY"

      d.      Claim 4 is invalid as obvious over Nuplazid Tablets, in view of
Ragnar-Tolf, the prior art, and the knowledge and skills of a
POSA.

137.    Claim 4 recites the following

A pharmaceutically acceptable capsule for orally delivering 34 mg
of pimavanserin to a patient, wherein the capsule has a capsule
shell with a capsule shell size 3 or 4, that encapsulates a blended
pimavanserin composition comprising:

granules comprising 40 mg pimavanserin tartrate and one or more
pharmaceutically acceptable excipients;

and wherein the bulk density of the granules is >0.4 g/ml as
determined by USP<616>, method 1.

138.    Claim 4 differs from claim 1 in the following respects: the granules *must*

comprise one or more pharmaceutically acceptable excipients (which were optional in claim 1),

and the claim does not separately recite a blending excipient. As Ragnar-Tolf discloses granules

including pimavanserin tartrate and excipients (namely, povidone, pregelatinized starch, and

mannitol), this claim would be obvious for substantially the same reasons as claim 1, as

discussed in section V.A.2.a above on page 40.

139.    For the foregoing reasons, it is my opinion that claim 4 of the '721 patent is

invalid as obvious over Nuplazid Tablets in view of Ragnar-Tolf, the prior art, and knowledge

and skills of a POSA.

      e.      Claim 5 is invalid as obvious over Nuplazid Tablets, in view of
Ragnar-Tolf, the prior art, and the knowledge and skills of a
POSA.

140.    Claim 5 recites the following

The pharmaceutically acceptable capsule of claim 4, wherein the
capsule shell is a hard shell size 4 capsule.

Claim 5 depends from claim 4. I have addressed the limitations of claim 4 above in section

V.A.2.d above above.

58

**CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY"**

141.    It would have been obvious to use a size 4 capsule shell to encapsulate a blended pimavanserin composition comprising granules comprising 40 mg pimavanserin tartrate and one or more pharmaceutically acceptable excipients. As discussed above in section V.A.2.a(2) above, a POSA would reasonably recognize that both size 3 and 4 capsules were small enough to be acceptable to a patient and not cause swallowing difficulty.[146] Moreover, as discussed above in section V.A.2.a(3) above on page 46, a POSA would have reasonably expected to be successful in granulating 40 mg pimavanserin tartrate to arrive at a blend that would have sufficient density to fit in a size 4 capsule.

142.    For the foregoing reasons, it is my opinion that claim 5 of the '721 patent is invalid as obvious over Nuplazid Tablets in view of Ragnar-Tolf, the prior art, and knowledge and skills of a POSA.

              f.    Claim 6 is invalid as obvious over Nuplazid Tablets, in view of Ragnar-Tolf, the prior art, and the knowledge and skills of a POSA.

143.    Claim 6 recites the following

6. The pharmaceutically acceptable capsule of claim 1, wherein one of the blending excipients is selected from the group consisting of a cellulose, a polysaccharide, or polyvinylpyrrolidone.

Claim 6 depends from claim 1. I have addressed the limitations of claim 1 above in section V.A.2.a above on page 40.

144.    It is my opinion that this claim is invalid as obvious over Nuplazid Tablets in view of Ragnar-Tolf, the prior art, and the knowledge and skills of a POSA.

145.    As discussed above in paragraph 120 above on page 50, the granulation process

---

[146] *See* paragraph 112 on page 44.

59

CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY
CONFIDENTIAL – COUNSELS' EYES ONLY"

disclosed in Ragnar-Tolf involves blending pimavanserin tartrate form A, pregelatinized starch, and mannitol together, followed by wet granulation with a solution of povidone in water, followed by blending the resulting granulation with magnesium stearate. Thus, Ragnar-Tolf discloses pregelatinized starch, a polysaccharide,[147] and polyvinylpyrrolidone as a "blending excipient" under the Court's construction. It also would have been obvious for a POSA to use these materials as extra-granular "blending excipients" to provide the desired bulk to the blend and achieve the desired loading into a size 4 capsule.

146.    For the foregoing reasons, it is my opinion that claim 6 of the '721 patent is invalid as obvious over Nuplazid Tablets in view of Ragnar-Tolf, the prior art, and knowledge and skills of a POSA.

> g.    Claim 7 is invalid as obvious over Nuplazid Tablets, in view of Ragnar-Tolf, the prior art, and the knowledge and skills of a POSA.

147.    Claim 7 recites the following

> 7. The pharmaceutically acceptable capsule of claim 1, wherein one of the blending excipients is selected from the group consisting of microcrystalline cellulose, silicified microcrystalline cellulose, hydroxypropyl cellulose, hydroxypropylmethyl cellulose, hydroxymethyl cellulose, and a lactose cellulose blend.

Claim 7 depends from claim 1. I have addressed the limitations of claim 1 above in section V.A.2.a above on page 40.

148.    It is my opinion that this claim is invalid as obvious over Nuplazid Tablets in view of Ragnar-Tolf, the prior art, and the knowledge and skills of a POSA.

149.    As discussed above in paragraph 120 above on page 50, the granulation process

---

[147] *See, e.g.*, '721 patent at 16:63–65 (defining polysaccharides as including starches and pregelatinized starch).

CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY"

disclosed in Ragnar-Tolf involves blending pimavanserin tartrate form A, pregelatinized starch, and mannitol together, followed by wet granulation with a solution of povidone in water, followed by blending the resulting granulation with magnesium stearate. A POSA reasonably could have added microcrystalline cellulose, silicified microcrystalline cellulose, hydroxypropyl cellulose, hydroxypropylmethyl cellulose, hydroxymethyl cellulose, or a lactose cellulose blend, as these are all art-recognized fillers and bulking agents that would be used by a POSA to increase the bulk of a blend and ensure that the correct dose is filled into a capsule with a specific fill volume. Ragnar-Tolf, in fact, discloses microcrystalline cellulose and hydroxypropyl methylcellulose as excipients that are compatible with pimavanserin tartrate,[148] and microcrystalline cellulose is an inactive ingredient in Nuplazid Tablets,[149] which could have reasonably motivated a POSA to select it as a blending excipient.

150.    For the foregoing reasons, it is my opinion that claim 7 of the '721 patent is invalid as obvious over Nuplazid Tablets in view of Ragnar-Tolf, the prior art, and knowledge and skills of a POSA.

h.    Claim 9 is invalid as obvious over Nuplazid Tablets, in view of Ragnar-Tolf, the prior art, and the knowledge and skills of a POSA.

151.    Claim 9 recites the following

9. The pharmaceutically acceptable capsule of claim 1, wherein the blending excipients comprise microcrystalline cellulose and magnesium stearate.

Claim 9 depends from claim 1. I have addressed the limitations of claim 1 above in section V.A.2.a above on page 40.

---

[148] See Ragnar-Tolf at [0124]–[0130].

[149] See Nuplazid Label at 7–8.

**CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY"**

152.    It is my opinion that this claim is invalid as obvious over Nuplazid Tablets in view of Ragnar-Tolf, the prior art, and the knowledge and skills of a POSA.

153.    As discussed above in paragraph 120 above on page 50, the granulation process disclosed in Ragnar-Tolf involves blending pimavanserin tartrate form A, pregelatinized starch, and mannitol together, followed by wet granulation with a solution of povidone in water, followed by blending the resulting granulation with magnesium stearate. And, as discussed above in paragraph 149 on page 60, a POSA reasonably would have been motivated to add microcrystalline cellulose based on its presence in Nuplazid Tablets, its disclosed compatibility with pimavanserin tartrate, and to add bulk to the blend.

154.    For the foregoing reasons, it is my opinion that claim 9 of the '721 patent is invalid as obvious over Nuplazid Tablets in view of Ragnar-Tolf, the prior art, and knowledge and skills of a POSA.

> i.    Claim 10 is invalid as obvious over Nuplazid Tablets, in view of Ragnar-Tolf, the prior art, and the knowledge and skills of a POSA.

155.    Claim 10 recites the following

> 10. The pharmaceutically acceptable capsule of claim 1 wherein the blending excipients are selected from the group consisting of filler/diluents, lubricants and mixtures thereof.

156.    Claim 10 depends from claim 1. I have addressed the limitations of claim 1 above in section V.A.2.a above on page 40.

157.    As discussed above in paragraph 120 above on page 50, the granulation process disclosed in Ragnar-Tolf involves blending pimavanserin tartrate form A, pregelatinized starch, and mannitol together, followed by wet granulation with a solution of povidone in water, followed by blending the resulting granulation with magnesium stearate. Mannitol is an art-

recognized diluent[150] and magnesium stearate is perhaps the most common lubricant.[151]

158. For the foregoing reasons, it is my opinion that claim 10 of the '721 patent is invalid as obvious over Nuplazid Tablets in view of Ragnar-Tolf, the prior art, and knowledge and skills of a POSA.

j. Claim 11 is invalid as obvious over Nuplazid Tablets, in view of Ragnar-Tolf, the prior art, and the knowledge and skills of a POSA.

159. Claim 11 recites the following

> The pharmaceutically acceptable capsule of claim 1 wherein the granules comprise a pharmaceutically acceptable excipient which is a binder.

160. Claim 11 depends from claim 1. I have addressed the limitations of claim 1 above in section V.A.2.a above on page 40.

161. Ragnar-Tolf also discloses granules comprising a binder. Binders are generally included in granulations to aid in agglomeration and binding of the particles into a binder. As discussed above in paragraph 120 above on page 50, the granulation process disclosed in Ragnar-Tolf involves blending pimavanserin tartrate form A, pregelatinized starch, and mannitol together, followed by wet granulation with a solution of povidone in water. A POSA would recognize that povidone, also called polyvinylpyrrolidine or PVP, is a granulation binder.[152]

162. For the foregoing reasons, it is my opinion that claim 11 of the '721 patent is invalid as obvious over Nuplazid Tablets in view of Ragnar-Tolf, the prior art, and knowledge

---

[150] *See, e.g.*, Handbook of Pharmaceutical Excipients, 424 (Mannitol) (2009).

[151] *See id.*at 404 (magnesium stearate). In fact, both Ragnar-Tolf and the '721 patent identify magnesium stearate as a lubricant. *See, e.g.*, Ragnar-Tolf at [0014]; '721 patent at 17:6–7.

[152] Notably, the '721 patent references polyvinylpyrrolidone (i.e., povidone) as a binder. *See, e.g.*, '721 patent at 4:3–12.

**CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY"**

and skills of a POSA.

      k.    Claim 12 is invalid as obvious over Nuplazid Tablets, in view of Ragnar-Tolf, the prior art, and the knowledge and skills of a POSA.

163.    Claim 12 recites the following

The pharmaceutically acceptable capsule of claim 10, wherein the binder is selected from the group consisting of cellulose, methyl cellulose, polyvinylpyrrolidone and poly-ethylene glycol.

164.    Claim 12 depends from claim 10. I have addressed the limitations of claim 1 above in section V.A.2.f above on page 59. Furthermore, as discussed in paragraph 161 above on page 63, Ragnar-Tolf discloses granules comprising a binder, which is polyvinylpyrrolidone.

165.    For the foregoing reasons, and to the extent this claim is definite, it is my opinion that claim 12 of the '721 patent is invalid as obvious over Nuplazid Tablets in view of Ragnar-Tolf, the prior art, and knowledge and skills of a POSA.

      l.    Claim 13 is invalid as obvious over Nuplazid Tablets, in view of Ragnar-Tolf, the prior art, and the knowledge and skills of a POSA.

166.    Claim 13 recites the following

The pharmaceutically acceptable capsule of claim 4 wherein the pharmaceutically acceptable excipients comprise a binder.

Claim 5 depends from claim 4. I have addressed the limitations of claim 4 above in section V.A.2.d above on page 58. Furthermore, as discussed in paragraph 161 above on page 63, Ragnar-Tolf discloses granules comprising a binder, which is polyvinylpyrrolidone.

167.    For the foregoing reasons, it is my opinion that claim 13 of the '721 patent is invalid as obvious over Nuplazid Tablets in view of Ragnar-Tolf, the prior art, and knowledge and skills of a POSA.

**CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY"**

3.    Objective Indicia of Nonobviousness

168.    As discussed above in section IV.B.2.b above on page 13, counsel has informed me that certain secondary considerations may weigh against obviousness, including long-felt but unresolved need, failure of others, unexpected results, praise, or copying.

169.    I note that the '721 patent, in various places, refers to certain results as "surprising." For instance, the '721 patent describes "the surprising finding that pimavanserin could be successfully wet granulated achieving the targeted improved physical properties (e.g. bulk density) without the addition of a binder,"[153] and that "it was surprisingly found that a 100% pimavanserin high-shear granulation was possible by using only small water quantities[.]"[154] However, these findings do not demonstrate patentability of the Asserted Claims.

170.    First, the Asserted Claims extend to granulations that include pimavanserin tartrate and a binder. As such, the alleged surprising finding that "pimavanserin could be successfully wet granulated . . . without the addition of a binder" and the alleged surprising finding "that a 100% pimavanserin granulation was possible" does not serve to demonstrate patentability of the claims.

171.    Second, I understand that Plaintiff has contended "the claimed inventions of the '721 patent exhibit superior properties or advantages that a POSA would have found surprising or unexpected over the closest prior art, such as, formulations comprising a ***reduced quantity of excipients*** allowing a single 34 mg dose of pimavanserin to fit into a small capsule of size 3 or 4." But again, this "result" only extends to those embodiments comprising "a reduced quantity of

---

[153] '721 patent at 10:54–58.

[154] *Id.* at 15:6–8.

65

CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY"

excipients," and as noted below, the '721 patent claims place no limit on the quantity of excipients that can be present in the pimavanserin tartrate granulation.

172.    Furthermore, as shown by various references, including Stegemann 2002 and Ragnar-Tolf, among others, it was known that granulating an active ingredient (including pimavanserin) could densify the active ingredient. As such, the result is not an "unexpected" one.

173.    I have seen no documents or evidence showing that the claimed subject matter demonstrates unexpected results, as I have seen prior art (namely, Ragnar-Tolf) disclosing lubricated granulations of pimavanserin tartrate having 1%, 5%, and 20% drug loads with sufficient bulk density that would allow their loading into size 3 or 4 capsules, and it is my opinion that a POSA would reasonably have expected to be able to make such a granulation having a 30% drug load or higher, such that the granules in a single size 3 or 4 capsule would contain 40 mg pimavanserin tartrate.

174.    I am unaware of any evidence of the following secondary considerations: long-felt but unmet need, teaching away, industry skepticism, commercial success, or other evidence that would indicate the patent claims are non-obvious. However, I reserve the right to respond to any evidence of secondary considerations Plaintiffs may raise in a further expert report.

## B.    THE ASSERTED CLAIMS OF THE '721 PATENT ARE INVALID AS INDEFINITE

175.    It is my opinion that claims 1–7 and 9–13 of the '721 patent are invalid as indefinite, as the claims fail to particularly point out and distinctly claim that which the applicants regarded as their invention.

1.    Claims 1–7 and 9–13 are indefinite because the term "pharmaceutically acceptable capsule" is undefined and a POSA would not reasonably understand its scope.

176.    It is my opinion that claims 1–7 and 9–13 are indefinite. Claims 1 and 4 both

66

**CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY"**

recite "a pharmaceutically acceptable capsule;" however, neither the claims, nor the specification, nor the prosecution history of the '721 patent provide a POSA with reasonable certainty regarding what aspects, if any, go into making a capsule "pharmaceutically acceptable."

177.    First, I note the specification fails to define the term "pharmaceutically acceptable capsule."[155] Second, in looking at the specification to ascertain what constitutes a "pharmaceutically acceptable capsule," a POSA would note that the specification outlines several "[c]omparative experiments that resulted in unacceptable products."[156] The table below outlines these experiments and the reasons the granulations so made were found to be unacceptable for inclusion in appropriately-sized capsules:

| Experiment | Reasons Granulation was "Unacceptable" |
|---|---|
| "Top spray layering (use of conventional top-spray fluidized bed granulation equipment to apply the drug layer to a small substrate particle), e.g. using the following composition about 63% w/w microcrystalline cellulose (the spherical particle (bead) around which the API Is layered or applied), about 28% w/w of pimavanserin tartrate (API), about 6% w/w povidone (binder), such as povidone K30, and about 2% w/w HPMC E5 (Methocel™ E5) (hydroxypropylmethyl cellulose). The top-spray fluid bed layering resulted in particles having an acceptable flow and bulk density. . . . "[157] | Stability, particle size distribution, amount of impurities, and "less favorable dissolution."[158] "These unacceptable disadvantages . . . resulted in deeming this process option unsuitable for the current purpose."[159] |

---

[155] The specification does define the term "pharmaceutically acceptable salt" as one that does not abrogate the properties of the biological activity and properties of the compound, but a POSA would not consider that definition particularly relevant to a capsule.

[156] *See* '721 patent at 13:33–15:2.

[157] *Id.* at 13:35–52.

[158] *Id.* at 13:53–58.

[159] *Id.*

**CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY"**

| Experiment | Reasons Granulation was "Unacceptable" |
|---|---|
| "Wurster Layering . . . was tested and found to produce particles having an acceptable flow and bulk density . . . . One composition tested was the same as in the top-spray layering." [63% w/w microcrystalline cellulose (the spherical particle (bead) around which the API is layered or applied), about 28% w/w of pimavanserin tartrate (API), about 6% w/w povidone (binder), such as povidone K30, and about 2% w/w HPMC E5 (Methocel™ E5) (hydroxypropylmethyl cellulose)].[160] | Stability, particle size distribution, amount of impurities, and "less favorable dissolution."[161] "These unacceptable disadvantages . . . resulted in deeming this process option unsuitable for the current purpose."[162] |
| "Extrusion/spheronization is especially useful in producing semi-spherical, dense granules. The physical advantages of extrusion/spheronization vs. other multiparticulate approaches can include relatively high drug loading, improved flow properties, narrow particle size distribution, smooth and a coatable surface, low friability, and uniform packing characteristics. The process consists of five operations, i.e. wet granulating the formulation, followed by screening to form cylindrical extrudates, adding the extrudate to a spheronizer forming spheres from the extrudate, and drying the spheres. Optionally coatings may be applied to the spheres. A composition containing about 27% w/w pimavanserin tartrate as a 32% w/w slurry in water, about 68% w/w microcrystalline cellulose (e.g. Avicel PH 101), about 4% hydroxypropylmethyl cellulose (e.g. Methocel™ A15LV), and about 1% w/w povidone (e.g. povidone K30) resulted in particles having acceptable flow | Unacceptable stability, particle size distribution, and amount of impurities.[164] |

[160] *Id.* at 13:59–67.

[161] *Id.* at 13:62–66.

[162] *Id.*

[164] *Id.* at 14:19–23.

**CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY"**

| Experiment | Reasons Granulation was "Unacceptable" |
|---|---|
| and bulk density. . . ."[163] | |
| "Twin-Screw Melt Granulation has increased in popularity in pharmaceutical manufacturing due to the numerous advantages of this continuous manufacturing technique over traditional batch wet granulation. Twin-Screw Melt Granulation does not require the use of organic or aqueous solvents, making the entire process less consuming in terms of time and energy as compared to wet granulation, and in view of other tests disclosed hereinabove the use of solvent was deemed as a potential source for the impurities and may have been a factor for the stability issues observed. Consequently Twin-Screw Melt Granulation was evaluated using a binder/disintegrant, heat and agitation. As binder/disintegrant a low substituted hydroxypropyl cellulose (e.g. LH-B1 marketed by Shin Etsu), and Kollidon® VA64 marketed by BASF were used in separate compositions using about 50% w/w pimavanserin tartrate and LH-B1 and Kollidon VA64 respectively. In either case the resulting particles were screened and evaluated resulting in particles having an acceptable flow and bulk density . . . ."[165] | Unacceptable finding of impurities as well as unacceptable dissolution.[166] |
| "Conventionally wet granulation (both high shear and low shear) have been used for a long time in pharmaceutical manufacturing, an example of a conventional wet granulation process is described in W02009/061909 wherein table 7 discloses 40-50% w/w of water being used in the wet granulation, i.e. conventionally a wet granulation uses a | Large, wet, adhesive pimavanserin granules that would not be easily dried in a fluid bed dryer; potential for high impurities and changes in the crystallinity of pimavanserin.[169] |

---

[163] *Id.* at 14:1–19.

[165] *Id.* at 14:24–41.

[166] *Id*. at 14:42–43.

[169] *Id.* at 14:57–15:2.

CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY"

| Experiment | Reasons Granulation was "Unacceptable" |
|---|---|
| liquid, e.g. water in order to prepare a wet mass with sufficient plasticity which can be subsequently wet-milled and dried produce granules with improved flow and density properties. High shear granulation was chosen for evaluation due to the higher energy it is capable of imparting to the particles, which was known to improve the particle density, sphericity, and consequently the capsule filling capability and particle flow, respectively. The quantity of water used in conventional or traditional wet granulation proved to be problematic resulting in very large, wet, adhesive pimavanserin granules that would not be easily dried in a fluid bed dryer."[167]<br><br>"Several embodiments were evaluated using excipients commonly used to mitigate the impact of high water content while providing excellent granule properties. These did not improve the resulting over-wetting of the pimavanserin blend and resulted in an adhesive wet mass that would not would not be easily dried in a fluid bed dryer."[168] | |

Thus, the specification identifies the following factors that may make a granulation acceptable versus "unacceptable" here, including:

- Flow

- Bulk density

- Stability

- Particle size distribution

---

[167] *Id.* at 14:44–61.

[168] *Id.* at 14:64–15:2.

70

**CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY
CONFIDENTIAL – COUNSELS' EYES ONLY"**

- Impurities

- Dissolution

- Not "easily dried in a fluid bed dryer"

- Changes in crystallinity of pimavanserin.

However, neither the specification nor the prosecution history define what levels of flow, what stability testing conditions or degradation levels, what level of impurities, what particle size distributions, what dissolution profile, what change in the crystallinity, or what level of ease in drying in a fluid bed dryer was considered "acceptable" or "unacceptable" in these experiments, and thus they would not reasonably inform a POSA as to the scope of what constitutes a "pharmaceutically acceptable capsule."

178.    The '721 patent specification does, at the end, state that "embodiments disclosed herein above meet all specifications outlined relating to the marketing authorization of Nuplazid®, for example[,]" and then lists tests such as assay, content uniformity, dissolution, and X-ray powder diffraction.[170] Several of these are standard specifications for any dosage form—e.g., assay values within 10% of the label claim, RSD of content uniformity <6%, etc. Nevertheless, a POSA would not recognize these as reasonably delineating those factors that made the comparative experiments "unacceptable" as these specifications fail to elucidate what would constitute, e.g., acceptable vs. unacceptable flow, acceptable vs. unacceptable impurity levels, and acceptable vs. unacceptable stability. For example, there is no publicly-available specification for pimavanserin tartrate that a POSA could refer to in order to determine, e.g., whether total impurities of 2%, 1%, or 0.5% by weight would be "acceptable" or "unacceptable,"

---

[170] *Id.* at 23:17–47.

CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY"

or what level of impurities could accumulate over time and still be "acceptable." Further still, some of these Nuplazid specifications contradict other statements in the specification: for instance, the Nuplazid specification requires the pimavanserin tartrate to be pimavanserin tartrate form C,[171] while other statements in the specification state that, in some embodiments, pimavanserin can be present as pimavanserin tartrate Form A.[172] Furthermore, there is no general limit or specification for particle size distribution for pimavanserin tartrate, as selection of particle size distribution generally depends upon the particular application for the powder. Likewise, there is no known limit on any powder flow property that would render to a POSA that the outcome of any specific process would be acceptable or unacceptable. Thus, a POSA would not have been able to delineate from the specification what made a granulation "acceptable" versus "unacceptable."

179.    Given the claim language and the disclosures of the specification,[173] a POSA would not be able to ascertain with reasonable certainty what constitutes a "pharmaceutically acceptable capsule" comprising granules of pimavanserin tartrate in terms of flow, stability, particle size distribution, impurity levels, dissolution rates, ease of drying in a fluid bed dryer, or crystallinity, among others. Given that, it is my opinion that claims 1–7 and 9–13 are invalid as indefinite.

2.    Claims 1–7 and 9–13 are invalid for claiming that which the patentee did not regard as his or her invention.

180.    To the extent "pharmaceutically acceptable capsule" is either not limiting on the

---

[171] *Id.* at 23:41–47.

[172] *Id.* at 7:53–55.

[173] I have also not seen anything in the file history of the '721 patent that would permit a POSA to reasonably ascertain the meaning of "pharmaceutically acceptable capsule," either.

CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY"

claims, or does not otherwise operate to exclude the "comparative experiments resulting in unacceptable products" disclosed in the '721 patent specification, it is my opinion that the claims are invalid for failure to particularly point out and claim that which the joint inventors regarded as their invention. The specification makes it clear that these experiments were comparative experiments that were distinct from the invention.[174] Yet, it is clear both from the patent specification and internal documents produced by Acadia that the granules produced in these processes had sufficient bulk density to fit into a size 3 or 4 capsule, and some (such as post-milling extruded/spheronized granules) had acceptable particle size (claim 3).[175] In addition, several of these comparative experiments contained excipients recited in the dependent claims as either blending excipients or within the granules, including microcrystalline cellulose (e.g., the top-spray coating, Wurster coating, extrusion/spheronization granules; *see also* claims 6 and 7); fillers/diluents (e.g., the top-spray coating, Wurster coating, extrusion/spheronization granules claim 10); and polyvinylpyrrolidone binders (e.g., the twin-screw melt granulations comprising Kollidon VA64;[176] *see also* claims 11–13).

181.    Moreover, while the specification identifies the "surprising" invention the ability to granulate pimavanserin without a binder, achieved by using "non-typical values of parameters," this is not the invention claimed in the patent.[177] Rather, the patent claims

---

[174] *See, e.g.*, *id.* at 15:3–5 ("Contrary to the above-disclosed comparative experiments the present application describes processes to manufacture capsules of size 4 comprising 5-34 mg pimavanserin.").

[175] *See, e.g.*, *id.* at 13:33–14:43 (noting each process had acceptable bulk density); *see also* ACADIA_1192504–09.

[176] Kollidon VA64 is a polyvinylpyrrolidone/vinyl acetate copolymer.

[177] *See, e.g.*, '721 patent at 10:39–52 (disclosing that "pimavanserin has been successfully granulated without the use of binder by spraying, at a controlled rate and under controlled

CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY
CONFIDENTIAL – COUNSELS' EYES ONLY"

(particularly claims 1 and 4) extend to capsules containing pimavanserin tartrate granulated with
any pharmaceutically acceptable excipient, and not just pimavanserin alone. Even in one instance
where the '721 patent identifies including a class of excipients in the granulation—namely, a
binder—the '721 patent identifies that while it is *possible* to do so, it is not necessarily preferred
to do so.[178]

182.    Thus, for the foregoing reasons, it would be apparent to a POSA, based on the
specification and/or extrinsic evidence, that the invention set forth in claims 1–7, and 9–13
encompasses subject matter the patentee explicitly did not regard as his or her invention.

3.    Claim 3 is indefinite because the specification and prosecution history fail
to reasonably inform a POSA what a "D90 particle size distribution of 60–
450 μm" means.

183.    Claim 3 recites that the "blended pimavanserin composition has a D90 particle
size distribution of 60-450 μm as measured using laser scattering particle size analysis."
Percentile measures, such as D90, represent the particle size in relation to which 90 percent of
the distribution is smaller—one such index alone does not disclose a "particle size distribution."
Thus, the term "D90 particle size distribution of 60-450 μm" is indefinite, because it is unclear to
what the range refers. The term can be interpreted by a POSA to have at least either of the
following non-overlapping meanings: "blended pimavanserin composition has a particle size
distribution of 60-450 μm" (i.e., assuming the "D90" item was simply included in error); or

---

atomization conditions, a controlled amount of water to pimavanserin during the wet granulation
to provide granulated pimavanserin suitable for further processing."); *id.* at 12:37–42
(identifying including binders in the granulation as "not necessarily preferred"); *id.* at 15:6–8
("[I]t was surprisingly found that a 100% pimavanserin high-shear granulation was possible
using only small water quantities[.]").

[178] '721 patent at 12:37–42.

**CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY
CONFIDENTIAL – COUNSELS' EYES ONLY"**

"blended pimavanserin composition has a particle size distribution with a D90 of 60-450 μm."

Depending which one the POSA believes is the correct one would lead the POSA in different

directions seeking to achieve different outcomes.

184.    Moreover, while the claim refers to "laser scattering particle size analysis,"

several key parameters are not specified in the patent specification. Laser scattering particle size

analysis can be used in multiple ways, and the results depend strongly on certain settings. For

instance, the specification states that the particle size distribution is conducted on a Malvern

Mastersizer 2000 LLS PS system using a Scirocco 2000 dry dispersion unit using "standard non-

GMP conditions, and in a sample size of about 2 – 10 g."[179] But the manual for that system notes

that several parameters may change how the particle size is measured, such as the vibration feed

rate,[180] intensity of the pressure drop in the Scirocco system,[181] the level of obscuration,[182] and

the specific model used to calculate the particle size distribution. None of these parameters are

specified in the patent.

185.    Moreover, as the measurement technique has the potential to break apart granules,

the strength of the granule itself can become important in determining the measurement

---

[179] *Id.* at 11:50–54.

[180] *Scirocco 2000: User Manual.* 3-4 (June 9, 2017) ("Scirocco Manual") ("If the [feed rate] is
too high, the sample concentration may become too high and any agglomerates may not disperse
correctly. If the [feed rate] is too low the concentration may become too low and/or the sample
flow may become intermittent.")

[181] *Id.* at 3-2 ("The optimum air pressure setting depends on the sample so a few trial
measurements are recommended. A typical starting air pressure is between 1 and 3 bar. If the
sample is fragile, for example  freeze dried coffee, . . . a lower pressure [is recommended]. If the
sample is dense or cohesive, use a higher pressure. An air pressure set too high may physically
change the particle size, giving wrong results.").

[182] *See id.* at 3-12 ("For dry powder measurements practical limits are between 0.5 and 6% but
exact settings can only be found by experimentation.").

CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY
CONFIDENTIAL – COUNSELS' EYES ONLY"

parameters for particle size. Granules with more internal binding strength will require different

parameters for measuring the particle size than a more loosely-bound granule.

186.    Accordingly, for the foregoing reasons, it is my opinion that claim 3 is invalid as

indefinite.

4.    Claims 12 and 13 are invalid as indefinite.[183]

187.    Claim 12 of the '721 patent is invalid as indefinite. Claim 12 recites "[t]he

pharmaceutically acceptable capsule of claim 10, wherein the binder is selected from the group

consisting of cellulose, methyl cellulose, polyvinylpyrrolidone, and polyethylene glycol."

However, claim 12 depends from claim 10, which does not recite a binder.

188.    A POSA, reading claim 12, would not know whether the claim required a binder.

Claim 10 requires that the blending excipient of claim 1 is selected from the group "consisting of

filler/diluents, lubricants, and mixtures thereof." I understand from counsel that the claim term

"consisting of" excludes unrecited embodiments; thus, a POSA would recognize claim 12 to

exclude binders from the scope of the blending excipients. The POSA would then recognize that

the binder would have to be one of the optional "one or more pharmaceutically acceptable

excipients" recited in claim 1. However, due to claim 12's use of the definite article "the," it

would be unclear whether the claim encompassed compositions that did not include a binder

(given claim 1's statement that the one or more pharmaceutically acceptable excipients are

optional), or whether the claim required the presence of a binder. Nothing in the specification or

file history would further answer this question to a POSA.

---

[183] I understand from counsel that Plaintiff has requested a Certificate of Correction to the '721
patent on March 1, 2024 revising the language in claims 12 and 13. However, the requested
Certificate of Correction has not yet issued. To the extent it issues, I reserve the right to revise
my opinion.

CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY
CONFIDENTIAL – COUNSELS' EYES ONLY"

189.    Because a POSA would not have reasonable certainty as to the scope of claim 12,

it is my opinion that claim 12 is invalid as indefinite.

190.    It is also my opinion that claim 13 is also invalid as indefinite. Claim 13 depends

from claim 4 and recites that "the pharmaceutically acceptable excipients comprise a binder."

The use of the term "pharmaceutically acceptable excipients" in claim 13 would generally be

understood by a POSA to require more than one pharmaceutically acceptable excipient, as the

claim does not recite the specific language of claim 4 ("one or more pharmaceutically acceptable

excipients") and uses the plural term "pharmaceutically acceptable excipients." In addition, the

claim says the "pharmaceutically acceptable excipients comprise a binder," which indicates

additional components are present. Given the incongruity between claim 13 and claim 1, from

which it depends, a POSA would not be apprised with reasonable certainty of whether claim 13

encompassed compositions with only one pharmaceutically acceptable excipient within the

granules. It is thus my opinion that claim 13 is indefinite.

### C.    THE ASSERTED CLAIMS OF THE '721 PATENT ARE INVALID AS LACKING WRITTEN DESCRIPTION.

191.    It is my opinion that claims 1–7 and 9–13 of the '721 patent are invalid as lacking

written description for two separate reasons. First, the specification would not reasonably

convey, to a POSA, that the inventors were in possession of the full scope of formulations

comprising "granules comprising 40 mg pimavanserin tartrate and . . . one or more

pharmaceutically acceptable excipients" as recited in claim 1 and incorporated into claims 2–3,

6–7, and 9–12 via dependence on claim 1, and "granules comprising 40 mg pimavanserin tartrate

and one or more pharmaceutically acceptable excipients" in a size 3 or 4 capsule, as recited in

claim 4 and incorporated into claims 5 and 13. Second, the specification would not reasonably

convey, to a POSA, that the inventors were in possession of the full scope of "granules

**CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY
CONFIDENTIAL – COUNSELS' EYES ONLY"**

comprising 40 mg pimavanserin tartrate . . . wherein the bulk density of the granules is >0.4 g/ml

as determined by USP<616>, method 1" as recited in claims 1 and 4, and incorporated into the

remaining Asserted Claims.

> 1.  The specification fails to describe "granules comprising 40 mg
> pimavanserin tartrate and optionally one or more pharmaceutically
> acceptable excipients" or "granules comprising 40 mg pimavanserin
> tartrate and one or more pharmaceutically acceptable excipients."

192.    It is my opinion that the specification fails to describe granules comprising 40 mg

pimavanserin tartrate and optionally one or more pharmaceutically acceptable excipients," or

"granules comprising 40 mg pimavanserin tartrate and one or more pharmaceutically acceptable

excipients." The relevant legal standards for written description are set forth above in paragraphs

48–50 above starting on page 14.

193.    First, it is my opinion that claims 1 and 4 (and the remaining dependent claims)

are genus claims. They both recite different pharmaceutical compositions disclosed in the

specification that may be encompassed by the claims. For instance, the specification does, in

some instances, describe granulations that contain specific excipients (namely, Avicel PH101,

Avicel PH302, and colloidal silicon dioxide) in limited quantities (i.e., less than 10% w/w of the

granulation).[184] The specification also does discloses that "[i]t is . . . possible to include a binder

in the granulation but for various reasons not necessarily preferred."[185] Thus, the specification

does describe granules that include the following limited excipients:

- Pimavanserin tartrate and a binder;

- Pimavanserin tartrate and less than 10% (w/w) Avicel PH101 and colloidal
  silicon dioxide;

---

[184] *See, e.g.*, '721 patent at 17:34–49.

[185] *Id.* at 12:37-42.

78

**CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY
CONFIDENTIAL – COUNSELS' EYES ONLY"**

- Pimavanserin tartrate and less than 10% (w/w) Avicel PH302 and colloidal
  silicon dioxide.

The specification does not, however, affirmatively state anywhere that the granules can

optionally contain one or more pharmaceutically acceptable excipients, that the granules can

*include* one or more pharmaceutically acceptable excipients, or provide examples of granules

including excipients other than these limited examples. Thus, the specification, in my opinion,

fails to provide support for the claims in the words of the specification itself.

194.    The specification does frequently mention combining pimavanserin, or a

pimavanserin granulation, with other excipients, without limitation on what the excipients can

be.[186] These, however, are not descriptions of "granules comprising pimavanserin tartrate . . . and

one or more pharmaceutically acceptable excipients" as recited in claims 1 and 4 (and

incorporated into the remaining claims). Rather, these descriptions make it clear that either

pimavanserin granulated *by itself* is blended with other excipients as extra-granular components,

or generally refer to mixing pimavanserin with excipients rather than specifically describing

them as used in a granulation process with pimavanserin. In fact, the only working example in

the patent granulates pure pimavanserin without using a binder.

195.    It is also my opinion that there are no blaze marks to granules comprising

pimavanserin tartrate and one or more pharmaceutically acceptable excipients. Rather, much of

---

[186] *See, e.g.*, *id.* at 1:65–2:3 (pimavanserin with a filler and a lubricant); 2:4–16 (pimavanserin
granulation blended with one or more filler); 8:64-9:3 (disclosing pimavanserin in a capsule);
10:39-11:28 (describing granulating pimavanserin without a binder to produce pimavanserin
granules for further processing); 11:29–12:9 (describing blending pimavanserin granulation with
excipients); 13:29-32 (describing "robust and reliable filling of 5-34 mg pimavanserin in
capsules of size 3 or 4"); 15:3-16:18 (describing a "100% pimavanserin high shear granulation");
18:14-43 (describing processes for granulating pimavanserin without excipients followed by
blending the dry granulation "with appropriate pharmaceutical diluents and/or binders"); 18:44–
56 (describing a process for granulating pimavanserin followed by "blending with one or more
pharmaceutical excipients, such as one or more filler"); 18:57–19:23 (same); and 23:5-8.

**CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY"**

the discussion in the specification of the '721 patent focuses on the fact that pimavanserin can be granulated alone, without a binder or other excipients, and the benefits of doing so. Further, as discussed above in paragraph 177 on page 67, the specification includes an extensive discussion of "comparative experiments" that include granulation processes that use excipients, but which were considered "unacceptable" by the patentee for various reasons.

196.    These, in turn, would not constitute a blaze mark to the claimed invention because they would distinguish that which the patent describes as particularly inventive (i.e., granulation of pimavanserin alone) from other conventional processes (i.e., those that use excipients). By way of example, the specification discloses the following conventional wet granulation process as being unacceptable:

> Conventionally wet granulation (both high shear and low shear) have been used for a long time in pharmaceutical manufacturing, an example of a conventional wet granulation process is described in W02009/061909 wherein table 7 discloses 40-50% w/w of water being used in the wet granulation, i.e. conventionally a wet granulation uses a liquid, e.g. water in order to prepare a wet mass with sufficient plasticity which can be subsequently wet-milled and dried produce granules with improved flow and density properties. High shear granulation was chosen for evaluation due to the higher energy it is capable of imparting to the particles, which was known to improve the particle density, sphericity, and consequently the capsule filling capability and particle flow, respectively. The quantity of water used in conventional or traditional wet granulation proved to be problematic resulting in very large, wet, adhesive pimavanserin granules that would not be easily dried in a fluid bed dryer. Additionally, large quantity of water would also result in high impurities and changes in the crystallinity of pimavanserin.
>
> Several embodiments were evaluated using excipients commonly used to mitigate the impact of high water content while providing excellent granule properties. These did not improve the resulting over-wetting of the pimavanserin blend and resulted in an adhesive wet mass that would not would not be easily dried in a fluid bed

**CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY"**

dryer.[187]

The '721 patent specification, however, contrasts the inventive granules on the grounds that they were made using 100% pimavanserin (i.e., no excipients) and without large quantities of water and binder.

> Contrary to the above-described comparative experiments, the present application describes processes to manufacture capsules of size 4 comprising 5-34 mg pimavanserin. As additionally disclosed above it was surprisingly found that a 100% pimavanserin high-shear granulation was possible by using only small water quantities, often large quantities of water and a binder conventionally used in high-shear granulation.[188]

197.    There are also insufficient representative examples of granulations in the patent specification to constitute a written description. As discussed above, the patent specification offers three limited examples of granulations of pimavanserin in combination with excipients, each of which is limited to specific excipients and limited quantities of excipients. The patent specification offers a further example of pimavanserin granulated by itself.[189] That, in turn, would not constitute a written description of all granules comprising pimavanserin tartrate and *any* pharmaceutically acceptable excipient, *any* combination of one or more pharmaceutically acceptable excipients, in *any* amount.[190]

---

[187] *Id.* at 14:44–15:2.

[188] *Id.* at 15:3–10.

[189] This, again, assumes that the granulations described in the "comparative experiments resulting in unacceptable products" described in column 13, line 35 through column 15, line 2 are not part of the written description of the invention. To the extent they do, the claims would be invalid for the reasons discussed in section V.B.2 above on page 72.

[190] To a certain extent, the limitation that the granules must be filled in a size 3 or 4 capsule could be interpreted to place a limitation on the quantity of excipients if the bulk density had an upper bound. E.g., if the bulk density were limited to being between 0.4–0.6 g/mL, a POSA would recognize the capsule could have a fill weight of about 180 mg or less, and thus the granules could only include up to 140 mg of excipients. However, as discussed below, there is no

**CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY"**

198.    Claim 11 recites that "the granules comprise a pharmaceutically acceptable excipient which is a binder," and claim 13 recites that "the pharmaceutically acceptable excipients comprise a binder." These claims are not adequately described, either. For starters, both claims depend from claims that recite that the granules include "one or more pharmaceutically acceptable excipients," which makes it clear the claims can include more excipients besides the binder. As discussed above, there are no examples or description of granules comprising pimavanserin, a binder, and additional excipients that are commensurate in scope with the claim language. Further, these claims still would not restrict or otherwise limit the quantities of binder or excipients in the granules. In fact, the specification, read as a whole, teaches the POSA away from using binders or any other intragranular excipients.[191]

199.    Finally, the only working example in the '721 patent[192] does not provide an indication to the POSA that the inventors were in possession of a method of granulating pimavanserin tartrate with one or more pharmaceutically acceptable excipients. The example relates to granulating pimavanserin alone,[193] and is written in potential, non-definite language. The entire single working example is largely a hypothetical exercise, rather than an actual

---

upper bound for the bulk density in the claim, which is a further independent reason for the claims lacking adequate written description. *See* section V.C.2, starting on this page.

[191] *See, e.g.*, '721 patent at 10:39–52 (disclosing that "pimavanserin has been successfully granulated without the use of binder by spraying, at a controlled rate and under controlled atomization conditions, a controlled amount of water to pimavanserin during the wet granulation to provide granulated pimavanserin suitable for further processing."; *id.* at 12:37–42 (identifying including binders in the granulation as "not necessarily preferred"); *id.* at 15:6–8 ("[I]t was surprisingly found that a 100% pimavanserin high-shear granulation was possible using only small water quantities.").

[192] *See id.* at 20:9–24:2.

[193] *See id.* at 20:21–22.

**CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY
CONFIDENTIAL – COUNSELS' EYES ONLY"**

experiment.[194] I understand from counsel that such an example is what is termed a "prophetic

example" rather than an experiment that was actually done, which is allowed in a patent

application. Nevertheless, the example relates solely to granulating pimavanserin alone, and does

not provide any indication to a POSA that the process conditions disclosed (e.g., water quantity,

spray rate, impeller speed, and chopper speed) would be effective for granulating pimavanserin

tartrate with excipients.

200.    Thus, for the foregoing reasons, it is my opinion that claims 1–7 and 9–13 are

invalid as not adequately described.

2.    The specification fails to describe granules comprising pimavanserin
tartrate with bulk densities of greater than 0.508 g/ml (e.g., 0.7, 0.8, or 1.0
g/ml).

201.    It is further my opinion that the Asserted Claims of the '721 patent are

inadequately described for failure to show the inventors were in possession of granules

comprising pimavanserin tartrate and one or more excipients with bulk densities of >0.4 g/ml as

measured by USP <616>, Method 1.

202.    Claim 1 and claim 4 of the '721 patent both recite that the granules have bulk

densities of >0.4 g/ml as determined by USP <616>, method 1. This claim language would

include granules having a range of bulk densities, including granules having bulk densities of 0.6

g/ml, 0.7 g/ml, 0.8 g/ml, and 1.0 g/ml (or even higher). Further, the '721 patent specification

classifies each of these as "Typical Powder Densit[ies]," with 0.7 g/ml being "standard."[195]

Furthermore, a POSA would recognize these powder densities as not being inconceivable for

---

[194] *See id.* at 20:9–39.

[195] *See* '721 patent, Fig. 1.

**CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY"**

pharmaceutical formulations and capsule fills; other references, such as Stegemann 2002, provide indications that powder densities for use in capsules can be as high as 1.2 g/ml.[196]

203.    A POSA would understand, from both the patent specification and the prior art, that the increased bulk density of pimavanserin granulation relative to pimavanserin bulk drug is a result of it being formed into granules via a granulation process. The '721 patent discloses that granulation, as "conventionally used in the pharmaceutical industry, refers to the act or process in which primary powder particles are made to adhere to form larger, multiparticle entities called granules. Granules may, for example, be formed by collecting particles together by creating mechanical bonds between them . . . . Granulation is extensively used in the manufacturing of tablets and capsules."[197] Furthermore, a POSA would have understood granulation to be a process for increasing the density of, or densifying, powders such that they can fit into smaller volumes.[198]

204.    The '721 patent discloses, however, a single bulk density measurement of 0.508 g/ml for a *blend* of a pimavanserin granulation, not the granulation itself.[199] A POSA would not understand that disclosure of the *blend* to disclose the bulk density of the *granules*, particularly in a case where the granules are only 40% of the blend.[200] It does not disclose granulations with

---

[196] *See* Stegemann 2002 at 6.

[197] *See* '721 patent at 4:43–50.

[198] *See* Stegemann 2002 at 13.

[199] *See* '721 patent at 10:18–25 (note the asterisk that indicates the bulk density measurement is for the "final blend as disclosed in the example herein below and in Table 2."). Table 2 discloses a blend of 40% pimavanserin tartrate granules, 59% microcrystalline cellulose, and 1% magnesium stearate. *See id.* at 21:4–15.

[200] *See, e.g.*, footnote 137; *see also* paragraph 122 on page 52.

84

CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY"

higher bulk density. It further does not disclose how one would adjust the granulation parameters to increase the bulk density, how one could increase bulk density through including identified excipients in the granulation, or how one could otherwise achieve bulk densities of 0.7 g/ml, 0.8 g/ml, 0.9 g/ml, or 1 g/ml for granules comprising pimavanserin tartrate.[201]

205.    A large part of the issue is that the written description points to various granulation process parameters for making the capsules as atypical or novel relative to conventional granulation. For instance, the '721 patent discloses that "the pharmaceutical compositions described herein comprised in a capsule refer to compositions prepared by methodologies *not conventionally used in granulation*, such as high and low shear granulation, e.g., using low amounts of water."[202] Similarly, the '721 patent states that "disclosed herein are formulation, granulation, dry milling, blending and encapsulation of pimavanserin containing novel elements. Salient features are that the known granulation technology uses *atypical parameters* to achieve the desired results."[203] But the specification does not disclose, or

---

[201] I also note that the '721 patent incorporates, by reference, Ragnar-Tolf in its entirety. *See, e.g.*, '721 patent at 7:59–62. As discussed above, Ragnar-Tolf does disclose a blend comprising a pimavanserin granulation with bulk densities of 0.56, 0.57, 0.58, and 0.61 g/ml. *See* paragraph 121 on page 51. I understand from counsel that incorporation by reference, into a first patent, of material from a second patent or publication can serve to make that material from the second patent or publication part of the first patent's specification. I also understand, however, that a written description that merely renders the invention obvious is insufficient to provide written description for the claim, and the '721 patent does not explicitly disclose or lead a POSA to conclude the inventors were in possession of the idea of modifying the wet granulations disclosed in Ragnar-Tolf to make granules comprising 40 mg pimavanserin tartrate and loading those granules into a size 3 or 4 capsule. Rather, the '721 patent disclosure only points to Ragnar-Tolf as disclosing formulation of pimavanserin into tablets. *See* '721 patent at 7:57–61. Thus, this cannot constitute a written description of the invention, despite the fact that I believe Ragnar-Tolf renders the claims obvious.

[202] '721 patent at 8:51–54. (Emphasis added.)

[203] *Id.* at 10:39–43. (Emphasis added.)

85

CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY"

otherwise demonstrate, that the patentees were in possession of methods that increased the bulk density of pimavanserin granules beyond 0.508 g/ml.

206.    In fact, while repeatedly referring to such "atypical parameters", the specification never provides a clear and definite statement of what those parameters are and what values they should have, other than identifying the granulation of pimavanserin *alone* and the use of reduced amounts of water. Neither of these two "atypical parameters" are elements of the claimed invention, and the claimed invention extends beyond granulating pimavanserin by itself. Rather, as discussed above in paragraph 199 on page 82, the lone "working example" in the specification is a "prophetic example" that relates to granulating pimavanserin alone, not pimavanserin with excipients. Furthermore, the example never describes any range of bulk densities of granules of pimavanserin achieved, even with or without excipients, or guidance on how to modify process parameters to achieve granules with higher bulk density.

207.    Furthermore, as discussed above in paragraph 177 on page 67, the specification includes an extensive discussion of "comparative experiments" that include granulation processes a POSA would recognize, from the patent disclosure, as being set outside of the scope of that which the patentees regarded as the invention. That, in turn, would lead a POSA to conclude granules produced by these processes from the "comparative experiments" would not constitute a written description of the invention.[204] Even then, the examples do not demonstrate that the inventors were in possession of pimavanserin granules of bulk density greater than 0.508 g/ml, as they do not describe or otherwise demonstrate the bulk density of the granules obtained

---

[204] Notably, several of these processes resulted in products with acceptable flow and bulk density, but were considered as generating "unacceptable products" for various reasons. However, the specification never demonstrates what bulk densities were achieved. *See, e.g.*, 13:35–15:2.

CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY"

from these processes.

208.    Although the '721 patent provides a simple recitation of the ">0.4 g/ml" limitation within the specification,[205] this would not be enough to demonstrate to a POSA that the inventors were in possession of the full scope of what was claimed. Rather, I understand from counsel that where a patentee chooses to claim a particular result, the patent needs to adequately describe the achievement of that result so as to demonstrate to a POSA that the patentee possessed and actually invented what he claimed. Thus, a single embodiment of pimavanserin granulation with a bulk density of 0.508 g/ml would not adequately demonstrate to a POSA that the patentees were in possession of pimavanserin granulations with even "typical" powder bulk densities of 0.7 g/ml, much less greater bulk densities such as 0.9 g/ml, 1.0 g/ml, or higher.[206]

209.    Accordingly, it is my opinion that claims 1–7 and 9–13 of the '721 patent are invalid as not adequately described.

## D.    THE CLAIMS OF THE '721 PATENT ARE INVALID FOR LACK OF ENABLEMENT.

210.    It is further my opinion that the Asserted Claims of the '721 patent are not enabled across the full scope of the claim, as the specification would not enable a POSA to practice the full scope of the claim. In particular, the specification does not enable or otherwise demonstrate to a POSA how to make granules comprising pimavanserin tartrate and one or more

---

[205] *See, e.g.*, *id.* at 22:9–14.

[206] This is particularly true to the extent Plaintiffs assert that a POSA would not have had a reasonable expectation of success, based on Ragnar-Tolf, of making granules containing 40 mg pimavanserin tartrate and one or more pharmaceutically acceptable excipients at a bulk density of greater than 0.4 g/ml through his or her ordinary skill. To the extent the POSA would not have such a reasonable expectation of success, the POSA would be similarly skeptical that the '721 patent provided enough evidence that the patentees were in possession of a granulations of pimavanserin tartrate having bulk densities greater than 0.508 g/ml.

**CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY
CONFIDENTIAL – COUNSELS' EYES ONLY"**

excipients with bulk densities of >0.4 g/ml as measured by USP <616>, Method 1, across the full

scope of the bulk densities claimed. Rather, it would require undue experimentation for a POSA

to make granules having bulk densities of 0.7 g/ml, 0.8 g/ml, or higher.

211.    As discussed above in paragraph 51 on page 15, there are several factors that a

proper legal analysis of a patent's enablement should consider in determining whether a

specification calls for undue experimentation, including (1) the breadth of the claims; (2) the

nature of the invention; (3) the state of the prior art; (4) the level of one of ordinary skill; (5) the

level of predictability in the art; (6) the amount of direction provided by the inventor; (7) the

existing working examples; and (8) the quantity of experimentation needed to make or use the

invention. I will analyze several of these in turn.

1.    The scope of the claims is broad.

212.    The scope of the claims is broad. As discussed above in paragraph 202 above on

page 83, claim 1 and claim 4 of the '721 patent both encompass granules with bulk densities

unbound by any upper limit, including theoretical bulk densities that a POSA would recognize as

theoretically impossible (e.g., 100 g/ml). I understand from counsel, however, that such an open-

ended claim limitation is not inherently improper if, depending on the particular facts of the

invention, the disclosure, and the prior art, a POSA would recognize there is an inherent, albeit

not precisely known, upper limit and the specification enables one of skill in the art to approach

that limit. I need not, however, opine on what the inherent, albeit not precisely known, limit is,

because the '721 patent would indicate to a POSA that bulk densities of 0.7 g/ml and 1.0 g/ml

**CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY
CONFIDENTIAL – COUNSELS' EYES ONLY"**

were theoretically *possible* for pharmaceutical granulations.[207]

213.    The scope of the claims is also broad because it encompasses pimavanserin

granulated with the full range of pharmaceutically acceptable excipients. Claim 1 would include

pimavanserin tartrate granulated alone, or in combination with one or more pharmaceutically

acceptable excipients; claim 4 includes pimavanserin tartrate granulated in combination with one

or more pharmaceutically acceptable excipients.[208] Thus, in these regards, the scope of the claims

is broad.

        2.    The one working example, and the guidance provided in the specification,
            indicate undue experimentation would be required.

214.    As discussed in paragraph 204 above on page 84, the '721 patent discloses a

single working example of a pimavanserin granulation with a bulk density of 0.508 g/ml.[209] The

'721 patent does not disclose granulations with higher bulk density. This would provide limited

guidance to a POSA of how to achieve a pimavanserin granulation with a bulk density of, e.g.,

0.7, 0.8, 0.9, 1.0 g/ml, or higher. As mentioned, however, this single working example is a

prophetic example that provides no guidance on excipient selection, excipient amounts, and

when or how to add excipients to the granulation.[210]

215.    A further issue with the '721 patent specification is that it provides guidance on

granulation processes for pimavanserin that *did not work*, and only one that did. As discussed

---

[207] *See, e.g.*, '721 patent, FIG. 1. I note this chart is consistent with the disclosures of, e.g., Stegemann 2002, which shows densities for filling into capsules of 1.2 g/ml. *See* Stegemann 2002 at 6.

[208] Claims 11–13, while requiring a binder as one of the excipients, do not otherwise limit or exclude other excipients from within the granulation.

[209] *See* '721 patent at 10:18–25.

[210] *See, e.g.*, paragraph 199 on page 82 above.

CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY
CONFIDENTIAL – COUNSELS' EYES ONLY"

above in section paragraph 177 on page 67, the specification includes an extensive discussion of
"comparative experiments" that include granulation processes a POSA would be dissuaded from
pursuing on the grounds that they generated "unacceptable" products. One such granulation
process is the "conventional wet granulation" process disclosed in column 14, line 44–column
15, line 2. There, the '721 patent discloses that using a "quantity of water used in conventional or
traditional wet granulation proved to be problematic resulting in very large, wet, adhesive
pimavanserin granules that would not be easily dried in a fluid bed dryer."[211] The patent further
discloses that embodiments "were evaluated using excipients commonly used to mitigate the
impact of high water content while providing excellent granule properties. These did not improve
the over-wetting of the pimavanserin blend," resulting in an adhesive wet mass again.[212]
Ultimately, the specification discloses that pimavanserin tartrate was successfully granulated
through a "100% pimavanserin high-shear granulation . . . using only small water quantities."[213]
The specification provides guidance that a small amount of water in such a granulation is "such
as 2-15% w/w, e.g. 3-10% w/w, 3-8% w/w amount of water [added] to pimavanserin by
spraying."[214] The specification also discloses that "Salient features [of the granulation process]
are that the known granulation technology uses atypical parameters to achieve the desired results.
Spray rate, atomization and quantity of water are examples of atypical parameters used in
combination with wet granulation to obtain the targeted properties of pimavanserin formulation

---

[211] '721 patent at 14:57–61.

[212] *Id.* at 14:64–15:2.

[213] *Id.* at 15:3–8.

[214] *Id.* at 10:54–60.

**CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY
CONFIDENTIAL – COUNSELS' EYES ONLY"**

disclosed herein[,]"[215] and does provide some guidance on how to use these with a 100%

pimavanserin granulation to achieve a sufficient bulk density.[216]

216.    The '721 patent, however, does not offer any guidance or examples that would

teach a POSA any of the following:

- which, if any, excipients could be successfully used in a pimavanserin granulation
  using only small amounts of water;

- how much of those excipients one could successfully granulate in a pimavanserin
  granulation using only small amounts of water;

- which, if any, excipients, could be used to increase the bulk density of the
  pimavanserin granules;

- how to vary the granulation parameters such as spray rate, atomization, and
  quantity of water to successfully granulate pimavanserin with excipients without
  overwetting;

- how to vary granulation parameters, such as spray rate, atomization and quantity
  of water or impeller speed in the high shear granulator, to increase bulk density of
  pimavanserin tartrate granules to 0.7, 0.8, 0.9, or 1.0 g/ml;

- what excipients to use in a pimavanserin granulation to increase the bulk density
  of pimavanserin tartrate granules to 0.7, 0.8, 0.9, or 1.0 g/ml.

217.    I also note that the '721 patent incorporates, by reference, Ragnar-Tolf in its

entirety. *See, e.g.*, *id.* at 7:59–62. I do agree that Ragnar-Tolf would provide a POSA with some

guidance on how to granulate pimavanserin tartrate with excipients to generate higher-density

granules of pimavanserin for filling into a size 3 or 4 capsule. Yet, to the extent that Plaintiffs

assert the disclosure of Ragnar-Tolf alone would not have provided a POSA with a reasonable

expectation of generating granules comprising 40 mg pimavanserin tartrate of sufficient bulk

density for filling into a size 3 or 4 capsule, it cannot support enablement of the claims, either.

---

[215] *Id.* at 10:41–46.

[216] *See id.* at 15:10–52; *see also id.* at 10:4–25.

CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY
CONFIDENTIAL – COUNSELS' EYES ONLY"

Further, nothing in Ragnar-Tolf indicates that a POSA would reasonably be enabled to produce

granules having the requisite amount of pimavanserin tartrate and a bulk density of, e.g., 0.7

g/ml, 0.8 g/ml, 1.0 g/ml, or higher.

218.    Accordingly, the limited guidance and lack of working examples in the

specification indicate a POSA would require undue experimentation to practice the claimed

invention.

3.    Undue experimentation would be required to practice the claims.

219.    Given the lack of guidance and working examples in the specification, and the

scope of the claims, it is my opinion undue experimentation would be required to practice them.

Given the lack of direction regarding the factors I identify in paragraph 216 on page 91, a POSA

would be left to engage in a trial-and-error search for blends of pimavanserin tartrate and

excipient(s) that could be granulated using the low-water high-shear granulation process

disclosed in the specification, and which would result in granules with densities of 0.7 g/ml or

greater.

220.    Even if seeking to replicate the prophetic example disclosed in the '721 patent

specification, a POSA would have to conduct numerous experiments to successfully make

granules of pimavanserin tartrate having bulk densities greater than 0.7 g/ml. Given the array of

excipients that are known in the pharmaceutical arts, that the prophetic example is limited to

granulating pimavanserin *without* excipients, and that including excipients would require altering

the parameters for granulation relative to granulating pimavanserin alone, the POSA would

literally need to engage in a systematic, trial-and-error effort to make granules containing

pimavanserin tartrate and excipients having the recited bulk density. And even then, the POSA

would be left with little guidance as to how he or she could increase the bulk density of the

CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY
CONFIDENTIAL – COUNSELS' EYES ONLY"

granulation to 0.7 g/ml, 0.8 g/ml, or higher.

221.    To the extent Plaintiff's expert(s) assert that undue experimentation would not be

required because the state of the prior art, the level of one of ordinary skill, and the level of

predictability in the art would have provided a POSA sufficient direction and guidance to make

the pimavanserin granules of the invention, including granules with a bulk density greater than

0.7 g/ml, using otherwise conventional granulation processes because such experimentation is

routine and not undue, it would be further evidence that the Asserted Claims would have been

obvious to a POSA for the reasons discussed above in section V.A.

222.    Accordingly, it is my opinion that claims 1–7 and 9–13 of the '721 patent are

invalid as not enabled.

## VI.    **SUPPLEMENTATION AND REBUTTAL**

223.    I may also testify in rebuttal to testimony or opinions offered by other witnesses. I

reserve the right to supplement or amend the instant report in light of additional information or

documents, or in response to any critique of my report or alternative opinions advanced by or on

behalf of Plaintiffs. At trial, I may also use a tutorial, graphics, and/or other demonstrative

exhibits to help explain my opinions and/or testimony.

**CONTAINS INFORMATION DESIGNATED BY ACADIA AS "HIGHLY CONFIDENTIAL – COUNSELS' EYES ONLY"**

Executed on May 2, 2024.

_____
Dr. Fernando J. Muzzio