**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ACADIA PHARMACEUTICALS INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 22-1387-GBW |
| | ) |
| AUROBINDO PHARMA LIMITED *et al.*, | ) CONSOLIDATED |
| | ) |
| Defendants. | ) **PUBLIC VERSION FILED** |
| | ) **NOVEMBER 14, 2024** |

**ACADIA'S MOTION *IN LIMINE* TO PRECLUDE**
**AUROBINDO FROM REARGUING CLAIM CONSTRUCTION**

ACADIA moves to preclude Aurobindo's expert, R. Christian Moreton, from resurrecting Aurobindo's specification disavowal argument, which the Court already rejected during claim construction, or seeking to contravene the Court's finding that the construed terms are not explicitly limited or redefined by the specification. Aurobindo should be precluded from arguing a plain and ordinary meaning of the claims inconsistent with the *Markman* decision.

During *Markman*, Aurobindo argued that ACADIA disavowed formulations where pimavanserin was granulated with other excipients and that Defendants' "proposed constructions … are … fully supported by the consistent description of the claimed invention and its manufacturing process in the '721 patent specification." (D.I. 39 at 17.) Aurobindo asserted that the embodiment "describ[ing] processes to manufacture capsules," (Ex. 1 ('721 patent) at 15:3-5), provides "comparative experiments resulting in *unacceptable* products," and thus, "discloses the invention, which would presumably generate acceptable products, as involving a wet granulation process with 'a small quantity of water' conducted on pimavanserin API alone." (D.I. 39 at 19 (citing Ex. 1 ('721 patent) at cols. 13-15 ("manufacturing embodiment")) (emphasis in original).) In short, Aurobindo argued "that the foundation of the claimed subject matter is 40 mg pimavanserin tartrate granulated alone [and] that foundation is a limitation of all issued claims of the '721 patent." (*Id.* at 42.)

The Court rejected Aurobindo's specification disavowal argument and found that the disputed terms have their "plain and ordinary meaning," "granule" is not limited to pimavanserin granulated alone, and that "blended pimavanserin composition" need not possess an extra-granular component. (D.I. 43 at 3-6.) On specification disavowal, the Court found that "Acadia did not clearly disavow granules containing both pimavanserin and excipients," (*id.* at 9), and that "[w]hile the specification also describes a mixing process that occurs after granulation, nowhere does the

specification explicitly state that extra-granular excipients are mandatory." (*Id.* at 11.)  Dr. Moreton "attempt[s] to resurrect a claim construction that the district court already rejected," however, "[r]estating a previously settled argument does not create an 'actual dispute regarding the proper scope of the claims.'"  *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1207 (Fed. Cir. 2010); *TEK Glob., S.R.L. v. Sealant Sys. Int'l, Inc.*, 920 F.3d 777, 787 (Fed. Cir. 2019) (rejecting attempt to "toe[] a fine line" around claim construction by arguing support in 'the *plain language* of [the] claim").

Specifically, Dr. Moreton tries to resuscitate the rejected specification disavowal by arguing that, *inter alia*, "[t]he '721 patent… claims, allegedly a novel… process for preparing the claimed granules comprising 40 mg pimavanserin tartrate.  The claimed process requires a granulation step and a granulating agent or binder, or a compression/compaction step to form granules." (Ex. 2 (Moreton Report) at ¶ 5.)  Dr. Moreton further opines that "[w]hile it is apparent that the asserted claims 1 and 4 are directed to formulations of pimavanserin tartrate, the '721 patent makes clear that the method of producing the claimed granules comprising 40 mg pimavanserin tartrate is novel and critical to the desired product result." (*Id.* at ¶ 51.)  Dr. Moreton then alleges that Aurobindo does not infringe because "the process used to manufacture Aurobindo's ANDA Product is a dry blending process which … does not involve a classic wet granulation technique… [or a] compression step like the method used to make the granules claimed in the '721 patent." (*Id.* at ¶ 59.)  However, claims 1 and 4 of the '721 patent do not claim a process for preparing granules nor do they contain limitations that require Dr. Moreton's process steps.  Furthermore, when asked during deposition whether he "read the court's claim construction opinion," Dr. Moreton admitted: "I don't think I did look at them, but certainly I've discussed with counsel if there was anything in what I was saying that was in contradiction or conflict with the

court's definitions." (Ex. 3 (Moreton Tr.) at 58:15-18.) Dr. Moreton then proceeded to answer, "I don't recall," when asked a series of questions, including "what claim terms have been construed by the court," "if the court construed granules," and "if the court required a process limitation for either claim 1 or claim 4." (*Id.* at 59:15-25.) As Dr. Moreton did not read the Court's *Markman* decision or have any knowledge on its findings, it is not surprising that he failed to apply the Court's constructions in his noninfringement analysis.

The Court has already found that the specification "did not clearly disavow granules containing both pimavanserin and excipients." (D.I. 43 at 9.) As a result, Dr. Moreton's opinion that a POSA would understand the '721 patent claims to require the specific processes described in the manufacturing embodiment directly conflicts with the Court's much broader constructions for the claims. *See, e.g., Finjan*, 626 F.3d at 1206-07 ("district court construed [a term] as having 'its plain and ordinary meaning,'" because "the defendant's proposed construction would unjustifiably narrow the term's broad scope, which was not explicitly limited or redefined by the specification," therefore, "the district court [had] rejected Defendants' construction"); *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1325-26 (Fed. Cir. 2012); *TEK Glob.*, 920 F.3d at 787. "Parties, their experts, and their attorneys are not permitted at trial to reargue claim construction or to take positions that are inconsistent with the Court's construction." *See, e.g., Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 763 F.Supp.2d 671, 695 (D. Del. 2010). Because the Court expressly rejected Dr. Moreton's purported disclaimer, the Court may prevent Aurobindo's expert from rearguing this previously settled issue under noninfringement contentions to obtain a second stab at reconstruing the terms at trial. *See, e.g., Finjan*, 626 F.3d at 1206-07.

*Of Counsel*:

Chad J. Peterman
Bruce M. Wexler
Scott F. Peachman
Peter E. Conway
PAUL HASTINGS LLP
200 Park Avenue
New York, New York 10166
(212) 318-6000

Felix A. Eyzaguirre
PAUL HASTINGS LLP
600 Travis Street, 58th Floor
Houston, TX 77002
(713) 860-7300


Dated:  October 25, 2024

SAUL EWING LLP

*/s/ Michelle C. Streifthau-Livizos*

James D. Taylor (#4009)
Jessica M. Jones (#6246)
Michelle C. Streifthau-Livizos (#6584)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
james.taylor@saul.com
jessica.jones@saul.com
michelle.streifthau-livizos@saul.com

*Attorneys for Plaintiff*
*ACADIA Pharmaceuticals Inc.*

# EXHIBIT 1

US011452721B2

(12) **United States Patent** (10) Patent No.: **US 11,452,721 B2**
Tejwani et al. (45) **Date of Patent:** ***Sep. 27, 2022**

(54) **FORMULATIONS OF PIMAVANSERIN**

(71) Applicant: **ACADIA Pharmaceuticals Inc.**, San Diego, CA (US)

(72) Inventors: **Ravindra Tejwani**, Monmouth Junction, NJ (US); **Stephen Edward Abele**, White Plains, NY (US); **Emanuel Joseph Vizzotti**, Millburn, NJ (US)

(73) Assignee: **ACADIA Pharmaceuticals Inc.**, San Diego, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **17/693,830**

(22) Filed: **Mar. 14, 2022**

(65) **Prior Publication Data**

US 2022/0193057 A1     Jun. 23, 2022

**Related U.S. Application Data**

(63) Continuation of application No. 17/080,731, filed on Oct. 26, 2020, which is a continuation of application No. 16/836,086, filed on Mar. 31, 2020, now Pat. No. 10,849,891, which is a continuation of application No. 16/571,554, filed on Sep. 16, 2019, now Pat. No. 10,646,480, which is a continuation of application No. 16/363,378, filed on Mar. 25, 2019, now Pat. No. 10,449,185, which is a continuation of application No. PCT/US2018/048096, filed on Aug. 27, 2018.

(60) Provisional application No. 62/552,300, filed on Aug. 30, 2017.

(30) **Foreign Application Priority Data**

Sep. 1, 2017    (SE) .................................... 1730232-4

(51) **Int. Cl.**

| | |
|---|---|
| *A61K 9/48* | (2006.01) |
| *A61K 31/4468* | (2006.01) |
| *A61K 9/16* | (2006.01) |
| *A61K 9/20* | (2006.01) |
| *A61K 47/38* | (2006.01) |

(52) **U.S. Cl.**

CPC ........ *A61K 31/4468* (2013.01); *A61K 9/1652* (2013.01); *A61K 9/1688* (2013.01); *A61K 9/1694* (2013.01); *A61K 9/2009* (2013.01); *A61K 9/2013* (2013.01); *A61K 9/2054* (2013.01); *A61K 9/485* (2013.01); *A61K 9/4808* (2013.01); *A61K 9/4833* (2013.01); *A61K 9/4858* (2013.01); *A61K 9/4866* (2013.01); *A61K 47/38* (2013.01); *C07B 2200/13* (2013.01)

(58) **Field of Classification Search**

CPC .. A61K 9/4833; A61K 9/4841; A61K 9/4883; A61K 9/4891

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,983,234 | A | 9/1976 | Sayers |
| 4,138,492 | A | 2/1979 | Noverola et al. |
| 4,255,432 | A | 3/1981 | Kluge et al. |
| 4,332,804 | A | 6/1982 | Clark |
| 4,353,900 | A | 10/1982 | Clark |
| 4,353,901 | A | 10/1982 | Clark |
| 4,367,232 | A | 1/1983 | Boix-Iglesias et al. |
| 4,795,646 | A | 1/1989 | Schlunken |
| 4,853,394 | A | 8/1989 | King |
| 5,025,013 | A | 6/1991 | Barreau |
| 5,214,055 | A | 5/1993 | Peglion et al. |
| 5,216,165 | A | 6/1993 | Mobilio et al. |
| 5,461,066 | A | 10/1995 | Gericke et al. |
| 5,595,872 | A | 1/1997 | Wetterau, II et al. |
| 5,621,010 | A | 4/1997 | Sueda et al. |
| 5,707,798 | A | 1/1998 | Brann |
| 5,795,894 | A | 8/1998 | Shue |
| 5,837,730 | A | 11/1998 | Javitt |
| 5,869,488 | A | 2/1999 | Shue |
| 5,877,173 | A | 3/1999 | Olney et al. |
| 5,912,132 | A | 6/1999 | Brann |
| 5,955,281 | A | 9/1999 | Brann |
| 6,107,324 | A | 8/2000 | Behan |
| 6,140,509 | A | 10/2000 | Behan |
| 6,150,393 | A | 11/2000 | Behan |
| 6,358,698 | B1 | 3/2002 | Weiner et al. |
| 6,451,343 | B1 | 9/2002 | Glinecke et al. |
| 6,479,480 | B1 | 11/2002 | Moyes |
| 6,486,153 | B1 | 11/2002 | Castro Pineiro |
| 6,670,137 | B2 | 12/2003 | VanMechelen et al. |
| 6,756,393 | B2 | 6/2004 | Andersson et al. |
| 6,815,458 | B2 | 11/2004 | Andersson et al. |
| 6,911,452 | B2 | 6/2005 | Schlienger |
| 7,022,698 | B2 | 4/2006 | Hamied et al. |
| 7,041,667 | B1 | 5/2006 | Armour et al. |
| 7,087,593 | B2 | 8/2006 | Kelly et al. |
| 7,115,634 | B2 | 10/2006 | Thurieau et al. |
| 7,217,719 | B2 | 5/2007 | Schlienger |
| 7,253,186 | B2 | 8/2007 | Andersson et al. |
| 7,351,707 | B2 | 4/2008 | Schlienger |
| 7,393,861 | B2 | 7/2008 | Thurieau et al. |
| 7,476,682 | B2 | 1/2009 | Andersson et al. |
| 7,538,222 | B2 | 5/2009 | Andersson et al. |
| 7,601,740 | B2 | 10/2009 | Weiner et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 984843 A | 3/1976 |
| CN | 104844502 A | 8/2015 |

(Continued)

OTHER PUBLICATIONS

U.S. Appl. No. 09/800,096, Azacyclic compounds, filed Mar. 6, 2001, U.S. Pat. No. 6,815,458.

(Continued)

*Primary Examiner* — Micah Paul Young

(74) *Attorney, Agent, or Firm* — Goodwin Procter LLP

(57) **ABSTRACT**

Provided herein are capsules containing pimavanserin, processes for manufacturing said capsule, and pharmaceutical compositions containing pimavanserin.

**13 Claims, 4 Drawing Sheets**

## US 11,452,721 B2

Page 2

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 7,659,285 | B2 | 2/2010 | Weiner et al. |
| 7,713,995 | B2 | 5/2010 | Weiner et al. |
| 7,732,462 | B2 | 6/2010 | Weiner et al. |
| 7,732,615 | B2 | 6/2010 | Thygesen et al. |
| 7,790,899 | B2 | 9/2010 | Tolf et al. |
| 7,816,383 | B1 | 10/2010 | Bradford et al. |
| 7,820,695 | B2 | 10/2010 | Weiner et al. |
| 7,858,789 | B2 | 12/2010 | Thurieau et al. |
| 7,863,296 | B2 | 1/2011 | Weiner et al. |
| 7,868,176 | B2 | 1/2011 | Thygesen et al. |
| 7,875,632 | B2 | 1/2011 | Weiner et al. |
| 7,923,564 | B2 | 4/2011 | Thygesen et al. |
| 7,994,193 | B2 | 8/2011 | Weiner et al. |
| 8,008,323 | B2 | 8/2011 | Weiner et al. |
| 8,110,574 | B2 | 2/2012 | Thurieau et al. |
| 8,227,487 | B2 | 7/2012 | Weiner et al. |
| 8,236,960 | B2 | 8/2012 | Thygesen et al. |
| 8,377,959 | B2 | 2/2013 | Weiner et al. |
| 8,618,130 | B2 | 12/2013 | Weiner et al. |
| 8,921,393 | B2 | 12/2014 | Weiner et al. |
| 9,050,343 | B2 | 6/2015 | Peters et al. |
| 9,211,289 | B2 | 12/2015 | Weiner et al. |
| 9,296,694 | B2 | 3/2016 | Andersson et al. |
| 9,446,037 | B2 | 9/2016 | Mills et al. |
| 9,486,453 | B2 | 11/2016 | Javitt |
| 9,566,271 | B2 | 2/2017 | Weiner et al. |
| 9,757,366 | B2 | 9/2017 | Mills et al. |
| 9,765,053 | B2 | 9/2017 | Andersson et al. |
| 10,028,944 | B2 | 7/2018 | Weiner et al. |
| 10,449,185 | B2 * | 10/2019 | Tejwani ................. A61K 9/485 |
| 10,517,860 | B2 | 12/2019 | Parkinson |
| 10,525,046 | B2 | 1/2020 | Weiner et al. |
| 10,597,363 | B2 | 3/2020 | Carlos et al. |
| 10,646,480 | B2 * | 5/2020 | Tejwani ............... A61K 9/4833 |
| 10,849,891 | B2 * | 12/2020 | Tejwani ............... A61K 9/2054 |
| 10,953,000 | B2 | 3/2021 | Parkinson |
| 10,981,870 | B2 | 4/2021 | Carlos et al. |
| 10,981,871 | B2 | 4/2021 | Carlos et al. |
| 11,135,211 | B2 | 10/2021 | Burstein |
| 11,191,757 | B2 | 12/2021 | Parkinson |
| 2002/0004513 | A1 | 1/2002 | Andersson et al. |
| 2002/0156068 | A1 | 10/2002 | Behan |
| 2002/0165225 | A1 | 11/2002 | Kankan et al. |
| 2004/0006081 | A1 | 1/2004 | Burrows |
| 2004/0106600 | A1 | 6/2004 | Andersson et al. |
| 2004/0213816 | A1 | 10/2004 | Weiner et al. |
| 2004/0229908 | A1 | 11/2004 | Nelson |
| 2005/0014757 | A1 | 1/2005 | Andersson et al. |
| 2005/0148018 | A1 | 7/2005 | Weiner et al. |
| 2005/0244862 | A1 | 11/2005 | Brann |
| 2005/0256108 | A1 | 11/2005 | Schlienger |
| 2005/0261278 | A1 | 11/2005 | Weiner et al. |
| 2005/0261340 | A1 | 11/2005 | Weiner et al. |
| 2005/0288328 | A1 | 12/2005 | Weiner et al. |
| 2006/0094758 | A1 | 5/2006 | Andersson et al. |
| 2006/0106063 | A1 | 5/2006 | Thhygesen et al. |
| 2006/0111399 | A1 | 5/2006 | Thhygesen et al. |
| 2006/0194778 | A1 | 8/2006 | Andersson et al. |
| 2006/0194834 | A1 | 8/2006 | Andersson et al. |
| 2006/0199794 | A1 | 9/2006 | Schlienger |
| 2006/0199818 | A1 | 9/2006 | Andersson et al. |
| 2006/0199842 | A1 | 9/2006 | Weiner et al. |
| 2006/0204486 | A1 | 9/2006 | Pyke et al. |
| 2006/0205710 | A1 | 9/2006 | Schlienger |
| 2006/0205722 | A1 | 9/2006 | Andersson et al. |
| 2006/0205780 | A1 | 9/2006 | Thygesen et al. |
| 2006/0205781 | A1 | 9/2006 | Thygesen et al. |
| 2006/0264465 | A1 | 11/2006 | Weiner et al. |
| 2006/0264466 | A1 | 11/2006 | Weiner et al. |
| 2006/0286610 | A1 | 12/2006 | Brann |
| 2006/0292606 | A1 | 12/2006 | Brann |
| 2007/0260064 | A1 | 11/2007 | Tolf at al. |
| 2007/0264330 | A1 * | 11/2007 | Ragnar-Tolf ......... A61K 9/2059 424/464 |
| 2008/0051429 | A1 | 2/2008 | Van Kammen et al. |

| | | | |
|---|---|---|---|
| 2008/0280886 | A1 | 11/2008 | Gant et al. |
| 2009/0053329 | A1 | 2/2009 | Peters et al. |
| 2009/0082342 | A1 | 3/2009 | Uldam et al. |
| 2009/0082388 | A1 | 3/2009 | Hacksell |
| 2009/0186921 | A1 | 7/2009 | Andersson et al. |
| 2014/0018348 | A1 | 1/2014 | Javitt |
| 2014/0162942 | A1 | 6/2014 | Ghosal et al. |
| 2014/0221395 | A1 | 8/2014 | Dhanoa |
| 2014/0329903 | A1 | 11/2014 | Burstein et al. |
| 2014/0349976 | A1 | 11/2014 | Hacksell et al. |
| 2015/0231126 | A1 | 8/2015 | Peters |
| 2015/0313888 | A1 | 11/2015 | Mills et al. |
| 2016/0237036 | A1 | 8/2016 | Andersson et al. |
| 2018/0037549 | A1 | 2/2018 | Biljan |
| 2019/0030015 | A1 | 1/2019 | Weiner et al. |
| 2019/0047955 | A1 | 2/2019 | Carlos et al. |
| 2019/0117636 | A1 | 4/2019 | Burstein |
| 2019/0216791 | A1 | 7/2019 | Tejwani et al. |
| 2019/0231767 | A1 | 8/2019 | Parkinson |
| 2019/0240211 | A1 | 8/2019 | Parkinson |
| 2020/0009122 | A1 | 1/2020 | Tejwani et al. |
| 2020/0061045 | A1 | 2/2020 | Burstein |
| 2020/0078346 | A1 | 3/2020 | Parkinson |
| 2020/0165202 | A1 | 5/2020 | Carlos et al. |
| 2020/0181087 | A1 | 6/2020 | Carlos et al. |
| 2020/0222381 | A1 | 7/2020 | Tejwani et al. |
| 2020/0237739 | A1 | 7/2020 | Coate et al. |
| 2020/0323836 | A1 | 10/2020 | Weiner et al. |
| 2021/0077479 | A1 | 3/2021 | Tejwani et al. |
| 2021/0161880 | A1 | 6/2021 | Foff |
| 2021/0283118 | A1 | 9/2021 | Tejwani et al. |
| 2022/0000852 | A1 | 1/2022 | Burstein |
| 2022/0016101 | A1 | 1/2022 | Burstein et al. |
| 2022/0024871 | A1 | 1/2022 | Carlos et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 104961672 A | 10/2015 |
| CN | 105111135 A | 12/2015 |
| CN | 105153016 A | 12/2015 |
| CN | 105418460 A | 3/2016 |
| CN | 105481757 A | 4/2016 |
| CN | 105820110 A | 8/2016 |
| CN | 106543072 A | 3/2017 |
| EP | 0005318 B1 | 11/1979 |
| EP | 0061333 B1 | 9/1982 |
| EP | 0260070 B1 | 3/1988 |
| EP | 0379441 A1 | 7/1990 |
| EP | 0548015 B1 | 6/1993 |
| EP | 0625507 B1 | 11/1994 |
| EP | 1576985 A1 | 9/2005 |
| HU | 157325 | 3/1998 |
| JP | 51052176 | 5/1976 |
| JP | 52085174 A | 7/1977 |
| WO | WO-9427967 A1 | 12/1994 |
| WO | WO-9708166 A1 | 3/1997 |
| WO | WO-9711940 A1 | 4/1997 |
| WO | WO-9738665 A2 | 10/1997 |
| WO | WO-9738984 A1 | 10/1997 |
| WO | WO-9811128 A1 | 3/1998 |
| WO | WO-9817646 A1 | 4/1998 |
| WO | WO-98/44921 A1 | 10/1998 |
| WO | WO-98/50534 A1 | 11/1998 |
| WO | WO-9952927 A1 | 10/1999 |
| WO | WO-2000/020636 A1 | 4/2000 |
| WO | WO-0023076 A2 | 4/2000 |
| WO | WO-0056335 A1 | 9/2000 |
| WO | WO-0059497 A1 | 10/2000 |
| WO | WO-0069810 A1 | 11/2000 |
| WO | WO-2001/029008 A1 | 4/2001 |
| WO | WO-0144191 A1 | 6/2001 |
| WO | WO-0166521 A1 | 9/2001 |
| WO | WO-0187839 A1 | 11/2001 |
| WO | WO-2001089498 A2 | 11/2001 |
| WO | WO-024649 A1 | 3/2002 |
| WO | WO-2002038142 A2 | 5/2002 |
| WO | WO-02076464 A1 | 10/2002 |
| WO | WO-02079186 A2 | 10/2002 |
| WO | WO-03057698 A2 | 7/2003 |

US 11,452,721 B2

Page 3

**(56)** **References Cited**

FOREIGN PATENT DOCUMENTS

| WO | WO-03062206 | A2 | 7/2003 |
|---|---|---|---|
| WO | WO-03070246 | A1 | 8/2003 |
| WO | WO-03086400 | A1 | 10/2003 |
| WO | WO-04000808 | A2 | 12/2003 |
| WO | WO-04039322 | A2 | 5/2004 |
| WO | WO-04064753 | A2 | 8/2004 |
| WO | WO-2004064738 | A2 | 8/2004 |
| WO | WO-05053796 | A1 | 6/2005 |
| WO | WO-05063254 | A2 | 7/2005 |
| WO | WO-05112927 | A1 | 12/2005 |
| WO | WO-2006036874 | A1 | 4/2006 |
| WO | WO-2006037043 | A1 | 4/2006 |
| WO | WO-06104826 | A2 | 10/2006 |
| WO | WO-2007124136 | A1 | 11/2007 |
| WO | WO-2007133802 | A2 | 11/2007 |
| WO | WO-2008116024 | A2 | 9/2008 |
| WO | WO-2008141057 | A1 | 11/2008 |
| WO | WO-2008144326 | A2 | 11/2008 |
| WO | WO-2008144665 | A1 | 11/2008 |
| WO | WO-2009035473 | A2 | 3/2009 |
| WO | WO-2009039460 | A2 | 3/2009 |
| WO | WO-2009039461 | A2 | 3/2009 |
| WO | WO-2010011353 | A1 | 9/2010 |
| WO | WO-2011047341 | A2 | 4/2011 |
| WO | WO-2011085216 | A2 | 7/2011 |
| WO | WO-2014085362 | A1 | 6/2014 |
| WO | WO-2015/087283 | A1 | 6/2015 |
| WO | WO-2016201373 | A1 | 12/2016 |
| WO | WO-2017011767 | A2 | 1/2017 |
| WO | WO-2017015272 | A1 | 1/2017 |
| WO | WO-2017165635 | A1 | 9/2017 |
| WO | WO-2017172757 | A1 | 10/2017 |
| WO | WO-2018118626 | A1 | 6/2018 |
| WO | WO-2018200977 | A1 | 11/2018 |
| WO | WO-2019046167 | A1 | 3/2019 |
| WO | WO-2019177973 | A1 | 9/2019 |
| WO | WO-2020092618 | A1 | 5/2020 |
| WO | WO-2021016369 | A1 | 1/2021 |
| WO | WO-2021030607 | A1 | 2/2021 |

OTHER PUBLICATIONS

U.S. Appl. No. 10/409,782, Azacyclic compounds, filed Apr. 7, 2003, U.S. Pat. No. 6,756,393.
U.S. Appl. No. 13/053,079, Methods of treatment using selective 5-HT2A inverse agonists, filed Mar. 21, 2011, U.S. Pat. No. 9,765,053.
U.S. Appl. No. 14/628,156, Azacyclic compounds, filed Feb. 20, 2015, U.S. Pat. No. 9,296,694.
U.S. Appl. No. 10/759,564, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed Jan. 15, 2004, U.S. Pat. No. 7,601,740.
U.S. Appl. No. 11/416,527, Selective Serotonin 2A/2C Receptor Inverse Agonists as Therapeutics for Neurodegenerative Diseases, filed May 3, 2006 2006, U.S. Pat. No. 7,732,462.
U.S. Appl. No. 11/416,855, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed May 3, 2006, U.S. Pat. No. 7,659,285.
U.S. Appl. No. 11/416,594, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed May 3, 2006, U.S. Pat. No. 7,713,995.
U.S. Appl. No. 12/759,662, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed Apr. 13, 2010, U.S. Pat. No. 7,994,193.
U.S. Appl. No. 12/759,664, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed Apr. 13, 2010, U.S. Pat. No. 8,008,323.
U.S. Appl. No. 13/169,893, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed Jun. 27, 2011, U.S. Pat. No. 8,227,487.
U.S. Appl. No. 13/539,011, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed Jun. 29, 2012, U.S. Pat. No. 8,377,959.

U.S. Appl. No. 13/750,778, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed Jan. 25, 2013, U.S. Pat. No. 8,618,130.
U.S. Appl. No. 14/086,838, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed Nov. 21, 2013, U.S. Pat. No. 8,921,393.
U.S. Appl. No. 14/537,793, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed Nov. 10, 2014, U.S. Pat. No. 9,211,289.
U.S. Appl. No. 14/935,246, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed Nov. 6, 2015, U.S. Pat. No. 9,566,271.
U.S. Appl. No. 15/397,582, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed Jan. 3, 2017, U.S. Pat. No. 10,028,944.
U.S. Appl. No. 16/019,485, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed Jun. 26, 2018, U.S. Pat. No. 10,525,046.
U.S. Appl. No. 17/474,816, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed Sep. 14, 2021, Pending.
U.S. Appl. No. 10/850,819, Selective serotonin receptor inverse agonists as therapeutics for disease, filed May 21, 2004, U.S. Pat. No. 7,820,695.
U.S. Appl. No. 11/134,769, Selective serotonin receptor inverse agonists as therapeutics for disease, filed May 20, 2005, U.S. Pat. No. 7,863,296.
U.S. Appl. No. 12,378,385, Selective serotonin receptor inverse agonists as therapeutics for disease, filed Feb. 11, 2009, U.S. Pat. No. 7,875,632.
U.S. Appl. No. 11/235,558, N-(4-fluorobenzyl)-N-(1-methylpiperidin-4-yl)-N'-(4-(2-methylpropyloxy)phenylmethyl)carbamide and its tartrate salt and crystalline forms, filed Sep. 26, 2005, U.S. Pat. No. 7,732,615.
U.S. Appl. No. 11/235,381, Salts of N-(4-fluorobenzyl)-N-(1-methylpiperidin-4-yl)-N'-(4-(2-methylprop-yloxy)phenylmethyl)carbamide and their preparation, filed Sep. 26, 2005, U.S. Pat. No. 7,868,176.
U.S. Appl. No. 12/795,547, Synthesis of N-(4-fluorobenzyl)-N-(1-methylpiperidin-4-yl)-N'-(4-(2-methylpropyloxy)phenylmethyl)carbamide and its tartrate salt and crystalline forms, filed Jun. 7, 2010, U.S. Pat. No. 7,923,564.
U.S. Appl. No. 13/081,427, Synthesis of N-(4-fluorobenzyl)-N-(1-methylpiperidin-4-yl)-N'-(4-(2-methylpropyloxy)phenylmethyl)carbamide and its tartrate salt and crystalline forms, filed Apr. 6, 2011, U.S. Pat. No. 8,236,960.
U.S. Appl. No. Synthesis of N-(4-fluorobenzyl)-N-(1-methylpiperidin-4-yl)-N'-(4-(2-methylpropyloxy)phenylmethyl)carbamide and its tartrate salt and crystalline forms, filed May 15, 2007, U.S. Pat. No. 7,790,899.
U.S. Appl. No. 13/754,769, Combination of pimavanserin and risperidone for the treatment of psychosis, filed Jan. 30, 2013, U.S. Pat. No. 9,050,343.
U.S. Appl. No. 14/647,438, Methods for the treatment of Parkinson's disease psychosis using pimavanserin, filed May 26, 2015, U.S. Pat. No. 9,446,037.
U.S. Appl. No. 15/246,412, Methods for the treatment of Parkinson's disease psychosis using pimavanserin, filed Aug. 24, 2016, U.S. Pat. No. 9,757,366.
U.S. Appl. No. 15/744,636, Methods for preparing N-(4-fluorobenzyl)-N-(1-methylpiperidin-4-yl)-N'-(4-(2-methylpropyloxy)phenylmethyl)carbamide and its tartrate salt and polymorphic form, filed Jan. 12, 2018, U.S. Pat. No. 10,597,363.
U.S. Appl. No. 16/743,607, Methods for preparing N-(4-fluorobenzyl)-N-(1-methylpiperidin-4-yl)-N'-(4-(2-methylpropyloxy)phenylmethyl)carbamide and its tartrate salt and polymorphic form, filed Jan. 15, 2020, U.S. Pat. No. 10,981,870.
U.S. Appl. No. 16/686,809, Methods for preparing N-(4-fluorobenzyl)-N-(1-methylpiperidin-4-yl)-N'-(4-(2-methylpropyloxy)phenylmethyl)carbamide and its tartrate salt and polymorphic form, filed Feb. 10, 2020, U.S. Pat. No. 10,981,871.
U.S. Appl. No. 17/203,266, Methods for preparing N-(4-fluorobenzyl)-N-(1-methylpiperidin-4-yl)-N'-(4-(2-

US 11,452,721 B2

Page 4

(56)        References Cited

OTHER PUBLICATIONS

methylpropyloxy)phenylmethyl)carbamide and its tartrate salt and polymorphic form, filed Mar. 16, 2021, Pending, 20220024871.
U.S. Appl. No. 17/176,723, 5-HT2A serotonin receptor inverse agonists or antagonists for use in reducing amyloid-beta peptides and accumulation of amyloid plaques, filed Feb. 16, 2021, Pending, 20220000852.
U.S. Appl. No. 16/087,604, Combination of pimavanserin and cytochrome p450 modulators, filed Sep. 21, 2018, U.S. Pat. No. 10,953,000.
U.S. Appl. No. 16/379,169, Combination of pimavanserin and cytochrome p450 modulators, filed Apr. 9, 2019, U.S. Pat. No. 10,517,860.
U.S. Appl. No. 16/684,883, Combination of pimavanserin and cytochrome p450 modulators, filed Nov. 19, 2019, U.S. Pat. No. 11,191,757.
U.S. Appl. No. 17/518,776, Combination of pimavanserin and cytochrome p450 modulators, filed Nov. 4, 2021, Pending.
U.S. Appl. No. 16/607,234, Pimavanserin for Treating Impulse Control Disorder, filed Oct. 22, 2019, U.S. Pat. No. 11,135,211.
U.S. Appl. No. 17/412,659, Pimavanserin for Treating Impulse Control Disorder, filed Aug. 26, 2021, Pending.
U.S. Appl. No. 16/471,543, Methods for the Treatment of Alzheimer's Disease Psychosis Using Pimavanserin, filed Jun. 19, 2019, Pending, 20200237739.
U.S. Appl. No. 16/363,378, Formulations of Pimavanserin, filed Mar. 25, 2019, U.S. Pat. No. 10,449,185.
U.S. Appl. No. 16/571,554, Formulations of Pimavanserin, filed Sep. 16, 2019, U.S. Pat. No. 10,646,480.
U.S. Appl. No. 16/836,086, Formulations of Pimavanserin, filed Mar. 31, 2020, U.S. Pat. No. 10,849,891.
U.S. Appl. No. 17/080,731, Formulations of Pimavanserin, filed Oct. 26, 2020, Pending, 20210283118.
U.S. Appl. No. 17/290,479, Methods of Treating Depression, Anxiety and Sexual Dysfunction Using the Compound Primavanserin, filed Apr. 30, 2021, Pending, 20220016101.
U.S. Appl. No. 17/108,623, Methods for Treating Dementia Related Psychosis, filed Dec. 1, 2020, Pending, 20210161880.
U.S. Appl. No. 17/635,459, Pimavanserin for Treating Neurodegenerative Diseases, filed Feb. 15, 2022, Pending.
U.S. Appl. No. 17/629,098, Pimavanserin for Treating Schizophrenia for Treating Psychosis Secondary to Neurodegenerative Disorders or Depressive Disorder, filed Jan. 21, 2022, Pending.
"ACP-103," Drugs of the Future, Prous Science (2006) vol. 31, No. 11, pp. 939-943.
"NUPLAZID™ (pimavanserin) Sponsor Background Information for a Meeting of the Psychopharmacologic Drugs Advisory Committee on Mar. 29, 2016," Acadia Pharmaceuticals Inc. 2016. Retrieved from the Internet (URL): <https://www.fda.gov/downloads/advisorycommittees/committeesmeetingmaterials/drugs/psychopharmacologicdrugsadvisorycommittee/ucm492453.pdf> (173 pages).
"Pimavanserin (Nuplazid) for parkinson's disease psychosis," Medical Letter on Drugs and Therapeutics, New Rochelle, NY, US (Jun. 2016) vol. 58, pp. 74-75.
Aarsland et al., "Decreased burden among caregivers of patients with Parkinson's disease psychosis (PDP) treated with pimavanserin, a selective 5-HT2A inverse agonist," (Meeting Abstract) Neurology (2015) vol. 84, No. 14, Suppl P6.044.
Abbas et al., "Pimavanserin tartrate: a 5-HT2A inverse agonist with potential for treating various neuropsychiatric disorders," Expert Opinion on Pharmacotherapy (2008) vol. 9, No. 18, pp. 3251-3259.
Acadia Pharmaceuticals, "Acadia Pharmaceuticals Announces FDA approval of New Dosing Formulation and Strength for NUPLAZID (Pimavanserin)," Press Release, San Diego (CA) Jun. 29, 2018. Retrieved from the internet (URL): http://ir.acadia-pharm.com/phoenix.zhtml?c=125180&p=irol-newsArticle&ID=2356605 (3 pages).
Adam, et al., "Effects of repeated ritanserin on middle-aged poor sleepers," Psychopharmacology (1989) 99:219-221.

Aizenstein et al., "Frequent Amyloid Deposition Without Significant Cognitive Impairment Among the Elderly," Arch. Neurol. 65(11):1509-1517 (2008).
Akin, et al., "Decreased serotonin 5-HT 2A receptor-stimulated phosphoinositide signaling in fibroblasts from melancholic depressed patients," Neuropsychopharmacology (2004) 29:2081-2087.
Anonymous, "Use of Liquids and/or Soft Foods as Vehicles for Drug Administration: General Considerations for Selection and In Vitro Methods for Product Quality Assessments Guidance for Industry," Jul. 13, 2018 (Jul. 13, 2018), XP055676101, Retrieved from the Internet: URL:https://www.fda.gov/media/114872/downl <http://www.fda.gov/media/114872/downl> oad [retrieved on Mar. 12, 2020].
Antunes, et al., "The novel object recognition memory: neurobiology, test procedure, and its modifications," Cogn. Process (2012) 13:93-110.
Bakshi, et al., "Clozapine antagonizes phencyclidine-induced deficits in sensorimotor gating of the startle response," The Journal of Pharmacology and Experimental Therapeutics (1994) 271(2)787-794.
Basha, A., "Synthesis of N, N'-disubstituted Ureas from Carbamates," Tetrahedron Letters 29(21):2525-2526 (1988).
Bekris et al. "Cerebrospinal Fluid Ab42 Levels and APP processing pathway genes in Parkinson's disease," Movement Disorders, 2015, vol. 30, No. 7, pp. 936-944, 2015.
Bennett, et al., "Suppression of dyskinesias in advanced Parkinson's disease. II. Increasing daily clozapine doses suppress dyskinesias and improve parkinsonism symptoms," Neurology (1993) 43:1551-1554.
Bhana et al., "A Review of its Use in the Management of the Behavioural and Psychological Symptoms of Dementia," Drugs & Aging 16(6):451-471 (2000).
Biagi, et al., "1,2,3-Triazoles: Structural changes on two effective inhibitors of the prostaglandin synthesis in vitro," Farmaco Ed. Sci. (1988) 43:597-611.
Bibbiani, et al., "Serotonin 5-HT1A agonist improves motor complications in rodent and primate parkinsonian models," Neurology (2001) 57:1829-1834.
Blakley, et al., "Bidirectional changes in ethanol consumption in rats with site-specific antisense down-regulation of 5-hydroxytryptamine2A receptors in brain," The Journal of Pharmacology and Experimental Therapeutics (2001) 299(1):277-289.
Blier, et al., "Potential mechanisms of action of atypical antipsychotic medications in treatment-resistant depression and anxiety," J. Clin. Psychiatry (2005) 66(suppl 8):30-40.
Blier, et al., "Putative mechanisms of action of antidepressant drugs in affective and anxiety disorders and pain," Journal of Psychiatry & Neuroscience (2001) 26(1):37-43.
Bogolubsky et al., "Bis(2,2,2-trifluoroethyl) carbonate as a condensing agent in one-pot parallel synthesis of unsymmetrical aliphatic ureas," (2014), pages S1-S67. Retrieved from URL: http://pubs.acs.org/doi/suppl/10.102 1/co500025f/suppl_file co500025f_si_001.pdf, Table S2, pp. S9, entry 47.
Bogolubsky et al., "Bis(2,2,2-trifluoroethyl) carbonate as a condensing agent in one-pot parallel synthesis of unsymmetrical aliphatic ureas," ACS Combinatorial Science (2014) vol. 16, Issue 6, pp. 303-308.
Bond et al., "Physiological effects of inverse agonists in transgenic mice with myocardial overexpression of the beta-adrenoceptor," Nature (1995) 374:272-276.
Bonman et al., "5-HT2B receptors play a key role in mediating the excitatory effects of 5-HT in human colon in vitro," Br. J. Pharmacol. (2002) vol. 135, No. 5, pp. 1144-1151.
Brann, M. R. "Identification of ligands by selective amplification of cells transfected with receptors and marker enzymes," Chemical Abstracts (1998) 128 : 111548.
Buddhala et al. "Correlation between decreased CSF a-synuclein and Ab1-42 in Parkinson disease," Neurobiology of Aging, 2015, vol. 36, pp. 476-484, 2015.
Chaturvedi, D., "Perspectives on the Synthesis of Organic Carbamates," Tetrahedron 68:15-45 (2012).
Chaturvedi, D., "Recent Developments on the Carbamation of Amines," Curr. Org. Chem. 15:1593-1624 (2011).

## US 11,452,721 B2

Page 5

(56)                **References Cited**

OTHER PUBLICATIONS

Choi et al., "5HT2B receptor-mediated serotonin morphogenic functions in mouse cranial neural crest and myocardiac cells," *Development* (1997) vol. 124, pp. 1745-1755.

Cirrito et al., "Serotonin signaling is associated with lower amyloid-β levels and plaques in transgenic mice and humans," *PNAS* (2011) vol. 108, No. 36, pp. 14968-14973.

Colovic et al., "Acetylcholinesterase Inhibitors: Pharmacology and Toxicology," *Current Neuropharmacology* 11:315-335 (2013).

Cummings et al., "Pimavanserin for patients with Parkinson's disease psychosis: a randomised, placebo-controlled phase 3 trial," *Lancet* (2014) vol. 383, pp. 533-540.

Cummings et al., "Pimavanserin: Potential Treatment for Dementia-Related Psychosis." J. Prev. Alzheimers Dis. 5(4): 253-258 (2018).

Cunningham et al., "Serotonin at the Nexus of Impulsivity and Cue Reactivity in Cocaine Addiction," *Neuropharmacology* 76(0 0): 460-478.

Database CA [online] Chemical Abstracts Service, Columbus, Ohio, US; 2016, Wang et al., "Intermediate of pimavanserin and its analog, preparation method thereof and preparation method of pimavanserin and its analog," XP002761533, retrieved from STN Database accession No. 2016:451070 (reference date: Mar. 23, 2016).

Database CA [online] Chemical Abstracts Service, Columbus, Ohio, US; 2016, Zheng, Xuchun et al: "A process for preparing pimavanserin tartrate," XP002761538, retrieved from STN Database accession No. 2016:1261850 (reference date: Aug. 3, 2016).

Database WPI Week 201622, Derwent Publications Ltd., London, GB; AN 2016-17318M, XP002761536 (reference date: Aug. 19, 2015).

Database WPI Week 201623, Derwent Publications Ltd., London, GB; AN 2015-708058, XP002761532 (reference date: Oct. 7, 2015).

Database WPI Week 201635, Derwent Publications Ltd., London, GB; AN 2016-02257F, XP002761534 (reference date: Dec. 2, 2015).

Database WPI Week 201640, Derwent Publications Ltd., London, GB; AN 2016-01442V, XP002761535 (reference date: Dec. 16, 2015).

Database WPI Week 201641, Derwent Publications Ltd., London, GB; AN 2016-24419S, XP002761537 (reference date: Apr. 13, 2016).

DeClerck, et al., "Increase in slow-wave sleep in humans with the serotonin-S2 antagonist ritanserin," *Current Therapeutic Research* (1987) 41(4):427-432.

Delecluse, et al., "A case of tardive tremor successfully treated with clozapine," *Movement Disorders* (1998) 13(5):846-847.

Dine et al., "One-Pot, Solvent-Free Access to Unsymmetrical Ureas by Palladium-Catalysed Reductive Alkylation Using Molecular Hydrogen," Eur. J. Chem., 5445-5454 (2013).

Dube et al., "Carbonyldiimidazole-Mediated Lossen Rearrangement." Org. Lett. 11(24):5622-5625 (2009).

Dunn, et al., "Analgetic and antiinflammatory 7-aroylbenzofuran-5-ylacetic acids and 7-aroylbenzothiophene-5-ylacetic acids," *J. Med. Chem.* (1986) 29:2326-2329.

Durif, et al., "Low-dose clozapine improves dyskinesias in Parkinson's disease," *Neurology* (1997) 48:658-662.

Eichelbaum, et al., "Influence of pharmacogenetics on drug disposition and response," *Clinical and Experimental Pharmacology and Physiology* (1996) 23:983-985.

Everett, et al., "L-Dopa: Effect on concentrations of dopamine, norepinephrine, and serotonin in brains of mice," *Science* (1970) 168:849-850.

Factor, et al. "Clozapine for the treatment of drug-induced psychosis in Parkinson's disease: Results of the 12 week open label extension in the PSYCLOPS trial," *Movement Disorders* (2001) 16(1):135-139.

Factor, et al., "Clozapine prevents recurrence of psychosis in Parkinson's disease," *Movement Disorders* (1992) 7(2):125-131.

Fava, M. et al. "A Phase 2, Randomized, Double-Blind, Placebo-Controlled Study of Adjunctive Pimavanserin in Patients with Major Depressive Disorder and an Inadequate Response to Therapy (CLARITY)." J Clin Psychiatry. Sep. 24, 2019;80(6) (13 pages).

Fitzgerald et al., "Possible Role of Valvular Serotonin 5-HT2B Receptors in the Cardiopathy Associated with Fenfluramine," *Molecular Pharmacol.* (1999) vol. 57, pp. 75-81.

Friedman et al., "A Multi-Center, Placebo-Controlled, Double-Blind Trial to Examine the Safety and Efficacy of Pimavanserin in the Treatment of Psychosis in Parkinson's Disease," *Neurology* (2010) vol. 74, No. 9, Suppl. 2, pp. A299.

Friedman, et al., "Atypical antipsychotics in the treatment of drug-induced psychosis in Parkinson's disease," *Movement Disorders* (2000) 15(2):201-211.

Friedman, et al., "Low-dose clozapine for the treatment of drug-induced psychosis in Parkinson's disease," N. *Engl. J. Med.* (1999) 340(10):757-763.

Friedman, J. H. "Clozapine treatment of psychosis in patients with tardive dystonia: Report of three cases," *Movement Disorders* (1994) 9(3):321-324.

Gillman, P. K. "Monoamine oxidase inhibitors, opioid analgesics and serotonin toxicity," *British Journal of Anaesthesia* (2005) 95(4):434-441.

Goldman et al., "Genetic counseling and testing for Alzheimer disease: Joint practice guidelines of the American College of Medical Genetics and the National Society of Genetic Counselors," *Genetics in Medicine* (2011) vol. 13, No. 6, pp. 597-605.

Hacksell et al., 2014, "On the Discovery and Development of Pimavanserin: A Novel Drug Candidate for Parkinson's Psychosis," Neurochem. Res., vol. 39, pp. 2008-2017.

Han et al., "Synthesis of Carbamates and Ureas Using Zr(IV)-Catalyzed Exchange Processes," Organic Letters 9(8): 1517-1520 (2007).

Hatoum, H. T. et al., "The Use of the Occupational Disruptiveness Scale of the Neuropsychiatric Inventory-Nusing Home Version to Measure the Impact of Rivastigmine on the Disruptive Behavior of Nursing Home Residents with Alzheimer's Disease," *Journal of the American Medical Directors Association* (2005) vol. 6, No. 4, pp. 238-245.

Highlights of Prescribing Information Nuplazid™ (pimavanserin), Revised Apr. 2016. Retrieved from the Internet (URL): https://www.accessdata.fda.gov/drugsatfda_docs/label/2016/207318lbl.pdf (14 pages).

Highlights of Prescribing Information Nuplazid® (pimavanserin), Revised Jun. 2018. Retrieved from the Internet (URL): https://www.accessdata.fda.gov/drugsatfda_docs/label/2018/207318s005lbl.pdf (15 pages).

Highlights of Prescribing Information Nuplazid® (pimavanserin), Revised Mar. 2018. Retrieved from the Internet (URL): https://www.accessdata.fda.gov/drugsatfda_docs/label/2018/207318s002s004lbl.pdf (15 pages).

Idzikowski, at al. 1991. A dose response study examining the effects of ritanserin on human slow wave sleep. Br. J. Clin. Pharmac., 31:193-196.Idzikowski, at al., "A dose response study examining the effects of ritanserin on human slow wave sleep," *Br. J. Clin. Pharmac.* (1991) 31:193-196.

International Search Report and Written Opinion for International Application No. PCT/US2013/071792, dated, Jan. 1, 2014 (9 pages).

International Search Report and Written Opinion in corresponding PCT Application PCT/US2016/042933 dated Oct. 14, 2016 (13 pages).

International Search Report and Written Opinion in corresponding PCT Patent Application No. PCT/US08/057557 dated Oct. 24, 2008 (10 pages).

International Search Report and Written Opinion in corresponding PCT Patent Application No. PCT/US2017/023795 dated May 29, 2017 (11 pages).

International Search Report and Written Opinion in corresponding PCT Patent Application No. PCT/US2017/024526 dated Jul. 5, 2017 (18 pages).

International Search Report and Written Opinion in corresponding PCT Patent Application No. PCT/US2017/066340 dted Mar. 5, 2018 (13 pages).

US 11,452,721 B2

Page 6

(56)        References Cited

OTHER PUBLICATIONS

International Search Report and Written Opinion in corresponding PCT Patent Application No. PCT/US2018/029831 dated Jul. 11, 2018 (10 pages).
International Search Report and Written Opinion in corresponding PCT Patent Application No. PCT/US2018/048096 dated Oct. 30, 2018 (12 pages).
International Search Report and Written Opinion of the International Searching Authority for International Application No. PCT/US2019/021618 dated Jun. 12, 2019 (10 pages).
International Search Report and Written Opinion of the International Searching Authority for International Application No. PCT/US2019/058927 dated Jan. 23, 2020 (16 pages).
International Search Report and Written Opinion of the International Searching Authority for International Application No. PCT/US2020/043103 dated Dec. 18, 2020 (12 pages).
International Search Report and Written Opinion of the International Searching Authority for International Application No. PCT/US2020/46212 dated Oct. 23, 2020 (10 pages).
International-type Search Report by International Searching Authority for SE1630067-5 dated Sep. 23, 2016 (18 pages).
Ito et al., "Prediction of Human Drug Clearance from in Vitro and Preclinical Data Using Physiologically Based and Empirical Approaches," Pharm. Res., (2005) vol. 22, No. 1, pp. 103-112.
Kalgutkar, et al., "Selective inhibitors of monoamine oxidase (MAO-A and MAO-B) as probes of its catalytic site and mechanism," Medicinal Research Reviews (1995) 15(4)325-388.
Katritzky et al., Chapter V. "Reaction of Amines with Carbamic Acid Esters," Comprehensive Organic Functional Group Transmformations, pp. 501-502 (1995).
Kennedy et al., "The BACE1 inhibitor verubecestat (MK-8931) reduces CNS β-amyloid in animal models and in Alzheimer's disease patients," Sci. Transl. Med. 8, 363ra150 13 pages (2016).
Kondo et al., "Novel Ruthenium-Complex Catalyzed Synthesis of Ureas from Formamides and Amines," Organometallics 16:2562-2570 (1997).
Kotachi et al., "Ruthenium catalysed N,N'-Diarylurea Synthesis from N-Aryl Substituted Formamides and Aminoarenes," J. Chem. Soc., Chem. Comm., 7:549-550 (1990).
Lane et al., "Alzheimer's Disease," Eur. J. Neurol. 25:59-70 (2018).
Lashley et al. "Cortical a-synuclein load is associated with amyloid-b plaque burden in subset of Parkinson disease patients," Acta Neuropathol. 2008, 115, 417-425.
Leysen, et al. "Serotonergic component of neuroleptic receptors," Nature (1978) 272:168-171.
Liechti, et al., "Effects of MDMA (ecstasy) on prepulse inhibition and habituation of startle in humans after pretreatment with Citalopram, Haloperidol, or Ketanserin," Neuropsychopharmacology (2001) 24(3):240-252.
Linder, et al. "Pharmacogenetics: A laboratory tool for optimizing therapeutic efficiency," Clinical Chemistry (1997) 43(2):254-266.
Loudon et al., "Conversion of Aliphatic Amides into Amines with [I,I-Bis(trifluoroacetoxy)iodo]benzene. 1. Scope of Reaction," J. Org. Chem. 49:4272-4276 (1984).
Marek et al., "The Selective 5-HT2A receptor Antagonist MI00907 Enhances Antidepressant-Like Behavioral Effects of the SSRI Fluoxetine," Neuropsychopharmacology (2005) vol. 30, No. 12, pp. 2205-2215.
Marek, et al., "Synergistic action of 5-HT2A antagonists and selective serotonin reuptake inhibitors in neuropsychiatric disorders," Neuropsychopharmacology (2003) 28:402-412.
Matsumura et al., "A New Method for Synthesis of Unsymmetrical Ureas Using Electochemically Prepared Trifluoroethyl Carbamates," J. Org. Chem. 65:1549-1551 (2000).
Medical Review(s), Application No. 207318Orig1s000, Center for Drug Evaluation and Research, Submission Date Sep. 1, 2015 [available online Jun. 3, 2016]. Retrieved from the Internet (URL): <https://www.accessdata.fda.gov/drugsatfda_docs/nda/2016/207318Oriq1s000MedR.pdf> (173 pages).

Meltzer et al., "Co-therapy with pimavanserin and risperidone 2 mg provides an improved clinical profile," Schizophrenia Research (2008) vol. 98, pp. 16.
Meltzer, et al., "Pimavanserin, a Serotonin(2A) Receptor Inverse Agonist, for the Treatment of Parkinson's Disease Psychosis," Neuropsychopharmacology (2010) vol. 35, No. 4, pp. 881-892.
Meltzer, et al., "Serotonin Receptors: Their Key Role in Drugs to Treat Schizophrenia," Progress in Neuro-Pyschopharmacology & Biol. Psych. (2003) vol. 27, pp. 1159-1172.
Meltzer, et al., "Plasma clozapine levels and the treatment of L-DOPA-induced psychosis in Parkinson's disease," Neuropsychopharmacology (1995) 12(1):39-45.
Meltzer, H. Y. "The role of serotonin in antipsychotic drug action," Neuropsychopharmacology (1999) 21(2S): 106S-115S.
Morley et al., "Antibody to Amyloid p Protein Alleviates Imparied Acquisition, Retention, and Memory Processing in SAMP8 Mice," Neurobiology of Learning and Memory (2002), 78(1):125-138.
Naritomi et al., "Prediction of human hepatic clearance from in vivo animal experiments and in vitro metabolic studies with liver microsomes from animals and humans," Drug Metab. Dispos. (2001) vol. 29, No. 10, pp. 1316-1324.
NDA Approval/Supplement Approval, NDA 210793 NDA 207318/S-003, Letter Signed Jun. 28, 2018. Retrieved from the Internet (URL): https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2018/210793Orig1s000,207318Orig1s003ltr.pdf (5 pages).
Nebigil et al., "Serotonin is a novel survival factor of cardiomyocytes: mitochondria as a tarqet of 5-HT2B-receptor signaling," FASEB J. (2003) vol. 27, No. 10, pp. 1373-1375.
Ng, et al., "L-dopa-induced release of cerebral monoamines," Science (1970) 170:76-77.
Nordstrom, et al., "High 5-HT2 receptor occupancy in clozapine treated patients demonstrated by PET," Psychopharmacology (1993) 110:365-367.
Norton et al., "Caregivers of PDP patients have an increased risk of developing emotional and social distress that is decreased when PDP is treated with pimavanserin," (Meeting Abstract) Journal of Parkinson's Disease (Sep. 2016) vol. 6, No. S1, pp. 257, Abstract No. P42.11.
Norton et al., "Decreased burden among caregivers of patients with Parkinson's disease psychosis (PDP) treated with pimavanserin, a selective 5-HT2A inverse agonist," (Meeting Abstract) Journal of Parkinson's Disease (Sep. 2016) vol. 6, No. S1, p. 88, Abstract No. P12.08.
Obach et al., "The Prediction of Human Pharmacokinetic Parameters from Preclinical and In Vitro Metabolism Data," J. Pharm. Exp. Therap. (1997) vol. 283, No. 1, pp. 46-58.
Ogawa, et al., "Effects of R-102444 and its active metabolite R-96544, selective 5-HT2A receptor antagonists, on experimental acute and chronic pancreatitis: Additional evidence for possible involvement of 5-HT2A receptors in the development of experimental pancreatitis," European Journal of Pharmacology (2005) 521:156-163.
Paiva, et al., "Effects of ritanserin on sleep disturbances of dysthymic patients," Psychopharmacology (1988) 96:395-399.
Patel, et al., "The highly selective 5-hydroxytryptamine (5-HT)2A receptor antagonist, EMO 281014, significantly increases swimming and decreases immobility in male congenital learned helpless rats in the forced swim test," Synapse (2004) 52:73-75.
Pierce, et al., "5-hydroxytryptamine-induced synovial plasma extravasation is mediated via 5-hydroxytryptamine2A receptors on sympathetic efferent terminals," The Journal of Pharmacology and Experimental Therapeutics (1995) 275(1):502-508.
Poewe, W. "Psychosis in Parkinson's Disease," Movement Disorders (2006) vol. 18, Suppl. 6, pp. S80-S87.
Pollak, et al., "Clozapine in drug-induced psychosis in Parkinson's disease," Lancet (1999) 353:2041-2042.
Price et al., "Pimavanserin, a 5-HT2A receptor inverse agonist, reverses psychosis-like behaviors in a rodent model of Alzheimer's disease," Behavioural Pharmacology (2002), 23:426-433.
R&D Focus Drug News (Jan. 24, 2000). Pimvaserin ACADIA lead compounds identified.
R&D Focus Drug News (Nov. 12, 2001). Pimvaserin ACADIA preclinical data.

**US 11,452,721 B2**

Page 7

(56)　　　**References Cited**

OTHER PUBLICATIONS

Sadzot, et al., "Hallucinogenic drug interactions at human brain 5-HT2 receptors: Implications for treating LSD-induced hallucinogenesis," *Psychopharmacology* (1989) 98:495-499.

Saltzman, et al., "Cloning of the human serotonin 5-HT2 and 5-HT1C receptor subtypes," *Biochemical and Biophysical Research Communications* (1991) 181(3):1469-1478.

Sandler and Karo, Chapter E., "Reaction of Amines with Urethanes and Carbamates," Organic Functional Group Preparations, Academic Press pp. 161-162 (1986).

Satori and Maggi, "Acyclic and Cyclic Ureas," Science of Synthesis 18: 695-699 (2005).

Saxena, et al., "Cardiovascular effects of serotonin agonists and antagonists," *Journal of Cardiovascular Pharmacology* (1990) 15(Supp. 7):S17-S34.

Shanmugam, S. "Granulation Techniques and Technologies: Recent Progresses," *BioImpacts* (2015) vol. 5, No. 1, pp. 55-63.

Shigemori et al., "The factoral structure of the mini mental state examination (MMSE) in Japanese dementia patients," BMC Geriatrics 10(36): 7 pages (2010).

Stoner et al., "Integrated oral bioavailability projection using in vitro screening data as a selection tool in drug discovery," *Int. J. Pharm.* (2004) vol. 269, No. 1, pp. 241-249.

Swedish Search Report for Patent Application No. 1730232-4 dated Mar. 28, 2018 (10 pages).

Thavonekham, "A Practical Synthesis of Ureas from Phenyl Carbamates," Synthesis 11:1189-1194 (1997).

Vanover et al., "Pharmacological Characterization of AC-90179 [2-(4-Methoxy-phenyl)-N-(4-methyl-benzyl)-N-(1-methyl-piperidiny-4-yl)-acetamide Hydrochloride]: A Selective Serotonin 2A Receptor Inverse Agonist," *J. Pharmacology & Experimental Therapeutics* (2004) vol. 310, No. 3, pp. 943-951.

Vanover, Kimberly E. et al., "Pharmacokinetics, tolerability, and safety of ACP-103 following single or multiple oral dose administration in healthy volunteers," *Journal of Clinical Phamacol.* (2007) vol. 47, No. 6, pp. 704-714.

Vanover, Kimberly E. et al., "Pharmacological and Behavioral Profile of N-(4-Fluorophenylmethyl)-N-(1-methylpiperidin-4-yl)-N'-(4-(2-methylpropyloxy)phenylmethyl) Carbamide (2R,3R)-Dihydroxybutanedioate (2:1) (ACP-103), a Novel 5-Hydroxytryptamine$_{2A}$ Receptor Inverse Agonist," *The Journal of Pharmacology and Experimental Therapeutics* (2006) 317(2):910-918.

Vinogradova et al., Palladium Catalyzed Cross-Coupling of Aryl Chlorides and Triflates with Sodium Cyanate: A Practical Synthesis of Unsymmetrical Ureas, J. Am. Chem. Soc. 134:11132-11135 (2012).

Volk et al., "Synthesis of methyl ethyl and phenyl 4 2 methylnpropoxy benzyl carbamates," The IP.com Prior Art Database, Disclosure No. IPCOM000244271D, (Nov. 27, 2015).

Weintraub et al., "Association of Dopamine Agonist Use With Impulse Control Disorders in Parkinson Disease," *Arch Neurol.* 2006 63(7):969-973.

Weintraub et al., "Clinical Spectrum of Impulse Control Disorders in Parkinson's Disease," *Movement Disorders 2015* 30(2):121-127.

Wood et al., "The Use of the Neuropsychiatric Inventory in Nursing Home Residents: Characterization and Measurement," Am. J. Geriatr. Psychiatr. 8(1):75-83 (2000).

Ye et al. "Improving response inhibition in Parkinson's disease with Atomoxetine." Biological Psychiatry, Apr. 15, 2015, 77, 740-748.

Yoshimura et al., "Hypervalent Iodine Catalyzed Hofmann Rearrangement of Carboxamides Using Oxone as Terminal Oxidant," JOC 77:11399-11404 (2012).

Yoshimura et al., (Tosylimino)phenyl-λ3-iodane as a Reagent for the Synthesis of Metyl Carbamates via Hofmann Rearrangement of Aromatic and Aliphatic Carboxamides, Journal of Organic Chemistry 77:2087-2091 (2012).

*Acadia Pharmaceuticals Inc.* v. *Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Declaration of R. Christian Moreton, Ph.D in Support of Defendants' Reply Claim Construction Brief, dated Jan. 19, 2022 (11 pages).

*Acadia Pharmaceuticals Inc.* v. *Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Defendants' Sur-Reply Claim Construction Brief, dated Jan. 21, 2022 (23 pages).

*Acadia Pharmaceuticals Inc.* v. *Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Acadia's Opening Claim Construction Brief, dated Oct. 8, 2021 (24 pages).

Acadia's NUPLAZID® product information, Retrieved from the Internet (URL): https://www.acadia-pharm.com/product/ (dated Oct. 4, 2021, 2 pages) (Exhibit 1 of *Acadia Pharmaceuticals Inc.* v. *Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Acadia's Opening Claim Construction Brief, dated Oct. 8, 2021).

Highlights of Prescribing Information NUPLAZID™ (pimavanserin), Revised Apr. 2016. Retrieved from the Internet (URL): https://www.accessdata.fda.gov/drugsatfda_docs/label/2016/207318lbl.pdf (14 pages) (Exhibit 2 of *Acadia Pharmaceuticals Inc.* v. *Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Acadia's Opening Claim Construction Brief, dated Oct. 8, 2021).

Highlights of Prescribing Information NUPLAZID® (pimavanserin), Revised Jun. 2018. Retrieved from the Internet (URL): https://www.accessdata.fda.gov/drugsatfda_docs/label/2018/207318s005lbl.pdf (15 pages) (Exhibit 3 of *Acadia Pharmaceuticals Inc.* v. *Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Acadia's Opening Claim Construction Brief, dated Oct. 8, 2021).

2017 U.S. Pharmacopeia National Formulary, vol. 1 (7 pages) (Exhibit 4 of *Acadia Pharmaceuticals Inc.* v. *Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Acadia's Opening Claim Construction Brief, dated Oct. 8, 2021).

*Acadia Pharmaceuticals Inc.* v. *Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Declaration of R. Christian Moreton, Ph.D in Support of Defendants' Answering Claim Construction Brief, dated Nov. 12, 2021 (28 pages).

*Acadia Pharmaceuticals Inc.* v. *Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Declaration of R. Christian Moreton, Ph.D in Support of Defendants' Answering Claim Construction Brief, dated Nov. 12, 2021 (64 pages).

*Acadia Pharmaceuticals Inc.* v. *Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Defendants' Responsive Claim Construction Brief, dated Nov. 12, 2021 (30 pages).

USP 40 Phase-solubility general information, Retrieved from the Internet (URL): www.getintopharma.com <http://www.getintopharma.com> (5 pages) (Exhibit 1 of *Acadia Pharmaceuticals Inc.* v. *Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Declaration of R. Christian Moreton, Ph.D in Support of Defendants' Answering Claim Construction Brief, dated Nov. 12, 2021).

Curriculum Vitae of Richard Christian Moreton (29 pages) (Exhibit A of *Acadia Pharmaceuticals Inc.* v. *Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Declaration of R. Christian Moreton, Ph.D in Support of Defendants' Answering Claim Construction Brief, dated Nov. 12, 2021).

*Acadia Pharmaceuticals Inc.* v. *Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Acadia's Reply Claim Construction Brief, dated Dec. 17, 2021 (28 pages).

*Acadia Pharmaceuticals Inc.* v. *Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Declaration of Alexander M. Klibanov, Ph.D., in Support of Plaintiff's Reply Claim Construction Brief, dated Dec. 16, 2021 (61 pages).

Curriculum vitae of Alexander M. Klibanov (43 pages) (Exhibit A of *Acadia Pharmaceuticals Inc.* v. *Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Declaration of Alexander M. Klibanov, Ph.D., in Support of Plaintiff's Reply Claim Construction Brief, dated Dec. 16, 2021).

Notice Letter of Paragraph IV Certification Regarding U.S. Pat. Nos. 10,449,185 and 10,646,480 from Aurobindo Pharma Ltd. to Acadia Pharmaceuticals, Inc. dated Jun. 10, 2020 (179 pages).

Notice Letter of Paragraph IV Certification Regarding U.S. Pat. No. 10,449,185 from Teva Pharmaceuticals USA, Inc. to Acadia Pharmaceuticals, Inc. dated Jun. 10, 2020 (83 pages).

**US 11,452,721 B2**

Page 8

---

(56)          **References Cited**

OTHER PUBLICATIONS

Notice Letter of Paragraph IV Certification Regarding U.S. Pat. Nos. 7,732,615; 7,923,564; and 10,449,185 from MSN Laboratories Private Ltd. to Acadia Pharmaceuticals, Inc. dated Jun. 15, 2020 (18 pages).

Notice Letter of Paragraph IV Certification Regarding U.S. Pat. No. 10,646,480 from MSN Laboratories Private Ltd. to Acadia Pharmaceuticals, Inc. dated Jun. 18, 2020 (28 pages).

Notice Letter of Paragraph IV Certification Regarding U.S. Pat. Nos. 10,449,185, and 10,646,480 from Zydus Pharmaceuticals (USA) Inc. to Acadia Pharmaceuticals, Inc. dated Jun. 22, 2020 (67 pages).

Notice Letter of Paragraph IV Certification Regarding U.S. Pat. No. 10,646,480 from Teva Pharmaceuticals USA, Inc. to Acadia Pharmaceuticals, Inc. dated Jun. 23, 2020 (18 pages).

Notice Letter of Paragraph IV Certification Regarding U.S. Pat. No. 10,849,891 from Teva Pharmaceuticals USA, Inc. to Acadia Pharmaceuticals, Inc. received Dec. 23, 2020 (16 pages).

Notice Letter of Paragraph IV Certification Regarding U.S. Pat. No. 10,849,891 from Aurobindo Pharma Ltd. to Acadia Pharmaceuticals, Inc. dated Jan. 13, 2021 (26 pages).

Notice Letter of Paragraph IV Certification Regarding U.S. Pat. No. 10,849,891 from Zydus Pharmaceuticals (USA) Inc. to Acadia Pharmaceuticals, Inc. received Feb. 17, 2021 (22 pages).

Notice Letter of Paragraph IV Certification Regarding U.S. Pat. No. 10,849,891 from MSN Laboratories Private Ltd. to Acadia Pharmaceuticals, Inc. received Apr. 16, 2021 (38 pages).

*Acadia Pharmaceuticals Inc.* v. *Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Defendants' Initial Invalidity Contentions, dated Apr. 26, 2021 (241 pages) (redacted).

*Acadia Pharmaceuticals Inc.* v. *Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Joint Claim Construction Brief, filed Jan. 28, 2022 (93 pages).

*Acadia Pharmaceuticals Inc.* v. *Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Joint Claim Construction Appendix, filed Jan. 28, 2022 (225 pages).

*Acadia Pharmaceuticals Inc.* v. *Aurobindo Pharma Ltd., et al.* Civil Action No. 20-985-RGA, Memorandum Opinion, filed Apr. 6, 2022 (13 pages).

*Acadia Pharmaceuticals Inc.* v. *Aurobindo Pharma Limited and Aurobindo Pharma USA, Inc.*, D.Del. Civil Action No. 1-20-cv-00985: Complaint against Aurobindo Pharma Limited and Aurobindo Pharma USA, Inc. filed by Acadia Pharmaceuticals Inc., Jul. 24, 2020 (127 pages).

*Acadia Pharmaceuticals Inc.* v. *Hetero Labs Limited, Hetero Labs Limited Unit-V, and Hetero USA Inc.*, D.Del. Civil Action No. 1-20-cv-01022: Complaint against Hetero Labs Limited, Hetero Labs Limited Unit-V, and Hetero USA Inc. filed by Acadia Pharmaceuticals Inc., Jul. 30, 2020 (90 pages).

*Acadia Pharmaceuticals Inc.* v. *MSN Laboratories Private Ltd. and MSN Pharmaceuticals, Inc.*, D.Del. Civil Action No. 1-20-cv-01029: Complaint against MSN Laboratories Private Ltd. and MSN Pharmaceuticals, Inc. filed by Acadia Pharmaceuticals Inc., Jul. 30, 2020 (71 pages).

*Acadia Pharmaceuticals Inc.* v. *Teva Pharmaceuticals USA, Inc. and Teva Pharmaceutical Industries Ltd.*, D.Del. Civil Action No. 1-20-cv-00986: Complaint against Teva Pharmaceuticals USA, Inc. and Teva Pharmaceutical Industries Ltd. filed by Acadia Pharmaceuticals Inc., Jul. 24, 2020(126 pages).

*Acadia Pharmaceuticals Inc.* v. *Zydus Pharmaceuticals (USA) Inc. and Cadila Healthcare Limited*, D.Del. Civil Action No. 1-20-cv-01021: Complaint against Zydus Pharmaceuticals (USA) Inc. and Cadila Healthcare Limited filed by Acadia Pharmaceuticals Inc., Jul. 30, 2020 (153 pages).

* cited by examiner

| EMPTY HARD CAPSULE SPECIFICATIONS | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| APPROXIMATE COMPARATIVE SIZE | CAPSULE SIZE | CONVENTIONAL FILL WEIGHT (mg) | | | VOLUME (Theoretical) | LENGTH | EXTERNAL DIAMETER | WEIGHT |
| | | TYPICAL POWDER DENSITY | | | (ml) | ±0.8(mm) | (mm) | ±10% |
| | | 0.45 (light) | 0.7 (standard) | 1.0 (heavy) | | | | |
| | 000 | 615 | 960 | 1370 | 1.37 | 26.1 | 9.9 | 163 |
| | 00 | 430 | 665 | 950 | 0.95 | 23.3 | 8.5 | 118 |
| | 0 | 305 | 475 | 680 | 0.68 | 21.7 | 7.65 | 96 |
| | 1 | 225 | 350 | 500 | 0.5 | 19.4 | 6.91 | 76 |
| | 2 | 165 | 260 | 370 | 0.37 | 18.0 | 6.35 | 61 |
| | 3 | 135 | 210 | 300 | 0.3 | 15.9 | 5.82 | 48 |
| | 4 | 95 | 145 | 210 | 0.21 | 14.3 | 5.31 | 38 |
| | 5 | 60 | 90 | 130 | 0.13 | 11.1 | 4.91 | 28 |

FIG. 1

U.S. Patent     Sep. 27, 2022     Sheet 1 of 4     US 11,452,721 B2

U.S. Patent          Sep. 27, 2022          Sheet 2 of 4          US 11,452,721 B2



FIG. 2



FIG. 3

U.S. Patent          Sep. 27, 2022          Sheet 4 of 4          US 11,452,721 B2



FIG. 4



FIG. 5

US 11,452,721 B2

1

# FORMULATIONS OF PIMAVANSERIN

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 17/080,731, filed on Oct. 26, 2020, which is a continuation of U.S. patent application Ser. No. 16/836,086, filed on Mar. 31, 2020, which is a continuation of U.S. patent application Ser. No. 16/571,554, filed on Sep. 16, 2019, which is a continuation of U.S. patent application Ser. No. 16/363,378, filed on Mar. 25, 2019, which is a continuation of International Patent Application No. PCT/US2018/048096, filed on Aug. 27, 2018, which claims priority to and the benefit of U.S. Provisional Patent Application No. 62/552,300, filed Aug. 30, 2017, and Swedish Patent Application No. 1730232-4, filed Sep. 1, 2017.

## BACKGROUND

Pimavanserin, the active component in Nuplazid®, is approved for treatment of hallucinations and delusions associated with Parkinson's disease psychosis at a dose of 34 mg, taken as two 17 mg tablets once a day. The tablets are immediate release, film-coated tablet containing 20 mg of pimavanserin tartrate, which is equivalent to 17 mg of pimavanserin free base. Inactive ingredients include pregelatinized starch, magnesium stearate, and microcrystalline cellulose. Additionally, the following inactive ingredients are present as components of the film coat: hypromellose, talc, titanium dioxide, polyethylene glycol, and saccharin sodium.

Patients suffering from neurodegenerative diseases, such as Parkinson's disease are at a risk of non-compliance when administered a drug of too large size, or if taken as more than one tablet per day as said patients often have difficulty swallowing. Formulations of pimavanserin are described in WO 2007/133802. Pimavanserin is currently approved and administered as tablets containing 20 mg pimavanserin tartrate (equivalent to 17 mg pimavanserin), taken as two tablets once a day. Each with a total 150 mg tablet weight before film coating, i.e. total weight per dose is 300 mg (equivalent to 34 mg pimavanserin). In order to simplify administration and patient compliance of pimavanserin it would be advantageous to administer pimavanserin as a single dose.

Improved manufacturing processes for single unit dose forms, particularly for smaller sized single unit dosage forms, for oral administration of a therapeutic quantity of pimavanserin are critical. The physical properties of pimavanserin, e.g. bulk density and flow, when prepared in a tablet form requires, e.g. binders and other agents that increase the finished dosage size. Pimavanserin manufactured following conventional techniques has low bulk density and poor flowability and a tendency to clump, which will adversely impact reproducibility and quantitative accurate filling of capsules during the manufacturing process.

Consequently there is a need to improve the properties of pimavanserin allowing dosing of the daily therapeutic dose as a single administration.

## SUMMARY

Provided herein are capsules comprising 5-34 mg pimavanserin (equivalent to 6-40 mg pimavanserin tartrate), or a pharmaceutically acceptable salt thereof

2

Provided herein are also pharmaceutical compositions consisting of 5-34 mg pimavanserin or a pharmaceutically acceptable salt thereof, a filler and a lubricant .

Provided herein are also processes for manufacturing a capsule comprising 5-34 mg pimavanserin or a pharmaceutically acceptable salt thereof comprising: adding water to pimavanserin or a pharmaceutically acceptable salt thereof, and granulating pimavanserin or a pharmaceutically acceptable salt thereof with the water; controlling the impeller speed and/or amperage; drying the granulated pimavanserin or a pharmaceutically acceptable salt thereof; sizing the dried granulated pimavanserin or a pharmaceutically acceptable salt thereof; blending the dried and granulated pimavanserin or a pharmaceutically acceptable salt thereof and one or more filler; encapsulating the blended pimavanserin composition in a capsule of size 3 or 4.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 shows a table disclosing specifications of capsule sizes, commercially available.

FIG. 2 schematically discloses a process flow chart for pimavanserin granulation.

FIG. 3 schematically discloses a process flow chart for encapsulating pimavanserin granulation

FIG. 4 shows a particle size distribution diagram of pimavanserin tartrate.

FIG. 5 shows a particle size distribution diagram of granulated pimavanserin.

## DETAILED DESCRIPTION

### Definitions

Unless defined otherwise, all technical and scientific terms used herein have the same meaning as is commonly understood by one of ordinary skill in the art. All patents, applications, published applications and other publications referenced herein are incorporated by reference in their entirety. In the event that there are a plurality of definitions for a term herein, those in this section prevail unless stated otherwise.

As used herein, "pharmaceutical composition" refers to a composition of one or more active pharmaceutical ingredient(s) alone, or administered with other chemical components, such as diluents, binders, lubricants, pharmaceutical flow agents, and/or other excipients, e.g. for forming a unit dose, such as a tablet, a capsule etc.

As used herein, "physiologically acceptable" defines a diluent, binder, or excipient that does not abrogate the biological activity and properties of the pharmaceutically active compound.

As used herein, "pharmaceutically acceptable salt" refers to a salt of a compound that does not abrogate the biological activity and properties of the compound. Pharmaceutical salts can be obtained by reaction of a compound disclosed herein with an acid or base. Base-formed salts include, without limitation, ammonium salt ($NH_4^+$); alkali metal, such as, without limitation, sodium or potassium, salts; alkaline earth, such as, without limitation, calcium or magnesium, salts; salts of organic bases such as, without limitation, dicyclohexylamine, piperidine, piperazine, methylpiperazine, N-methyl-D-glucamine, diethylamine, ethylenediamine, tris(hydroxymethyl)methylamine; and salts with the amino group of amino acids such as, without limitation, arginine and lysine. Useful acid-based salts include, without limitation, acetates, adipates, aspartates, ascorbates, benzoates, butyrates, caparate, caproate, capry-

US 11,452,721 B2

3

late, camsylates, citrates, decanoates, formates, fumarates, gluconates, glutarate, glycolates, hexanoates, laurates, lactates, maleates, nitrates, oleates, oxalates, octanoates, propanoates, palmitates, phosphates, sebacates, succinates, stearates, sulfates, sulfonates, such as methanesulfonates, ethanesulfonates, p-toluenesulfonates, salicylates, tartrates, and tosylates.

Pharmaceutically acceptable solvates and hydrates are complexes of a compound with one or more solvent of water molecules, or 0.5 to about 100, or 1 to about 100, or 1 to about 10, or one to about 2, 3 or 4, solvent or water molecules.

As used herein, to "modulate" the activity of a receptor means either to activate it, i.e., to increase its cellular function over the base level measured in the particular environment in which it is found, or deactivate it, i.e., decrease its cellular function to less than the measured base level in the environment in which it is found and/or render it unable to perform its cellular function at all, even in the presence of a natural binding partner. A natural binding partner is an endogenous molecule that is an agonist for the receptor.

An "agonist" is defined as a compound that increases the basal activity of a receptor (e.g. signal transduction mediated by the receptor).

As used herein, "partial agonist" refers to a compound that has an affinity for a receptor but, unlike an agonist, when bound to the receptor it elicits only a fractional degree of the pharmacological response normally associated with the receptor even if a large number of receptors are occupied by the compound.

An "inverse agonist" is defined as a compound, which reduces, or suppresses the basal activity of a receptor, such that the compound is not technically an antagonist but, rather, is an agonist with negative intrinsic activity.

As used herein, "antagonist" refers to a compound that binds to a receptor to form a complex that does not give rise to any response, as if the receptor was unoccupied. An antagonist attenuates the action of an agonist on a receptor. An antagonist may bind reversibly or irreversibly, effectively eliminating the activity of the receptor permanently or at least until the antagonist is metabolized or dissociates or is otherwise removed by a physical or biological process.

As used herein, a "subject" refers to an animal that is the object of treatment, observation or experiment. "Animal" includes cold- and warm-blooded vertebrates and invertebrates such as birds, fish, shellfish, reptiles and, in particular, mammals. "Mammal" includes, without limitation, mice; rats; rabbits; guinea pigs; dogs; cats; sheep; goats; cows; horses; primates, such as monkeys, chimpanzees, and apes, and, in particular, humans.

As used herein, an "excipient" refers to an inactive ingredient that is added to a pharmaceutical composition to provide, without limitation, bulk, consistency, stability, binding ability, lubrication, disintegrating ability, etc., to the composition. A "diluent" is a type of excipient.

As used herein, a "diluent", "bulking agent" and "filler" refer to an ingredient (excipient) in a pharmaceutical composition that lacks pharmacological activity but may be pharmaceutically necessary or desirable, e.g. to enhance or improve the properties of the pharmaceutical blend for manufacturing or physiological purposes. For example, a diluent or filler may be used to increase the bulk of a potent drug whose mass is too small for manufacture or administration.

As used herein, a "binder" is an excipient holding the ingredients together, and forming granules or tablets with required mechanical strength, and may give volume to the formulation. Specific examples of binders are mono-, di-, and poly-saccharides and derivatives thereof; sugar alcohols

4

such as xylitol, sorbitol or maltitol; protein, such as; synthetic polymers, such as polyvinylpyrrolidone (PVP), polyethylene glycol (PEG). Binders are classified according to their application, e.g. solution binders are dissolved in a solvent (for example water or alcohol may be used in wet granulation processes). Examples include gelatin, cellulose, cellulose derivatives, polyvinylpyrrolidone, starch, sucrose and polyethylene glycol. Dry binders are added to the powder blend, either after a wet granulation step, or as part of a direct powder compression (DC) formula. Examples include cellulose, methyl cellulose, polyvinylpyrrolidone and polyethylene glycol.

As used herein a "lubricant" refers to an excipient which for example prevents ingredients and excipients to lump together, and/or sticking to the capsule filling machine. A lubricant may also ensure that the formation, filing and ejection of the capsule can occur, for example by lowering friction. Examples of lubricants are talc, silicon dioxide (silica), fatty acids or fatty acid salts, such as magnesium stearate, sodium stearate fumarate, stearic acid, etc.

As used herein a "disintegrant" refers to an excipient which disintegrate a pharmaceutical preparation on contact with an aqueous fluid.

As used herein, "coadministration" of pharmacologically active compounds refers to the delivery of two or more separate chemical entities, whether in vitro or in vivo. Coadministration means the simultaneous delivery of separate agents; the simultaneous delivery of a mixture of agents; as well as the delivery of one agent followed by delivery of a second agent or additional agents. Agents that are coadministered are typically intended to work in conjunction with each other.

The term "an effective amount" as used herein means an amount of active compound or pharmaceutical agent that elicits the biological or medicinal response in a tissue, system, animal or human that is being sought by a researcher, veterinarian, medical doctor or other clinician, which includes alleviation or palliation of the symptoms of the disease being treated.

The terms screen, screening, delump, delumping, dry milling, and sizing are used interchangeably herein. These terms refer to separation according to size.

The term "granulation" as used herein, and as conventionally used in the pharmaceutical industry, refers to the act or process in which primary powder particles are made to adhere to form larger, multiparticle entities called granules. Granules may for example be formed collecting particles together by creating mechanical bonds between them, e.g. by compression or by using a binder. Granulation is extensively used in the manufacturing of tablets and capsules.

The terms "granulated pimavanserin" and "pimavanserin granulation" are used interchangeably herein.

Generally a granulation process combines one or more particles and forms a granule that will allow tableting or the encapsulation process to be within required limits. The granulation process can be made predictable and repeatable. The granulation can be performed in a variety of equipment such as, but not limited to, low shear, high shear granulators, fluid bed granulator, roller compactor, and slugger.

The term "blending" refers to the mixing of pharmaceutical ingredients to form a mixture of the ingredients, e.g. active pharmaceutical ingredient (API) and diluent, as defined by pharmaceutical specifications in the compendial references using a variety of equipment such as, but not limited to, "V"-blenders, bin-blenders, cone-blenders.

The term "encapsulation" refers to a range of techniques used to enclose medicines in a shell, e.g. a two-piece capsule, such as a two-piece hard shell capsule. The capsule

US 11,452,721 B2

**5**

referred to herein may be taken orally. Capsules may be designed with a telescoping cap and body manufactured from e.g. gelatin or cellulose.

Compounds

Pimavanserin, which is also known as N-(1-methylpip- eridin-4-yl)-N-(4-fluorophenylmethyl)-N'-(4-(2-methylpro-

**6**

pyloxy)phenylmethyl)carbamide,     N-[(4-fluorophenyl) methyl]-N-(1-methyl-4-piperidinyl)-N'-[4-(2- methylpropoxy)phenyl]methyl -urea, 1-(4-fluorobenzyl)-1- (1-methylpiperidin-4-yl)-3-[4-(2-methylpropoxy)benzyl] urea, or ACP-103. Pimavanserin commonly is administered as pimavanserin tartrate and has the structure of Formula (I):

(I)



Pimavanserin has previously been synthesized according to the method disclosed in Scheme I.

SCHEME I: SYNTHESIS OF PIMAVANSERIN

US 11,452,721 B2

7

8

-continued



Alternative methods for preparing pimavanserin are disclosed in WO2017/015272, which is incorporated herein by reference in its entirety.

Pimavanserin and methods for its use are described in U.S. Pat. Nos. 7,601,740; 7,659,285; 7,713,995; 7,732,462; 7,994,193 and 8,008,323, the entirety of each of which is hereby incorporated by reference. Pimavanserin can be obtained in a number of salt and crystalline forms. Exemplary pharmaceutically acceptable salts include the tartrate, hemi-tartrate, citrate, fumarate, maleate, malate, phosphate, succinate, sulphate, and edisylate (ethanedisulfonate) salts. Pimavanserin salts including the aforementioned ions, among others, are described in U.S. Patent Publication No. 2006-0111399, filed Sep. 26, 2005, the entirety of which is incorporated herein by reference. In an embodiment provided herein, pimavanserin is the tartrate salt of pimavanserin. Several crystalline forms of the tartrate salt of pimavanserin have been described in U.S. Patent Publication No. 2006-0106063, filed Sep. 26, 2006, the entirety of which is incorporated herein by reference. See also U.S. Pat. Nos. 7,732,615; 7,795,547; 7,790,899; 7,868,176, the entirety of each of which is incorporated herein by reference. In an embodiment provided herein, pimavanserin is the crystalline form of the tartrate salt of pimavanserin Form A. In another embodiment, pimavanserin is the crystalline form of the tartrate salt of pimavanserin Form C. Pimavanserin (including, for example, the tartrate salt) may be formulated into tablets, such as is described in U.S. Patent Publication Nos. 2007-0260064, filed May 15, 2007 and 2007-0264330, filed May 15, 2007, each of which are incorporated herein by reference in their entireties.

The pharmacological activity of pimavanserin has been previously reported. See U.S. Patent Publication Nos. 2004/0213816 and 2009/0053329, the entirety of each of which is hereby incorporated by reference. Pimavanserin is active in a number of models thought to be predictive of antipsychotic activity such as DOI ((±)-2,5-dimethoxy-4-iodoamphetamine, a serotonin agonist) induced head twitches in the rat and attenuation of hyperactivity in mice induced by the N-methyl-D-aspartate antagonist MK-801. The compound was effective in these models at oral doses of 3 and 10 mg/kg.

Suitable routes of administration of pimavanserin may, for example, include oral, rectal, transmucosal, topical, or intestinal administration; parenteral delivery, including intramuscular, subcutaneous, intravenous, intramedullary injections, as well as intrathecal, direct intraventricular, intraperitoneal, intranasal, or intraocular injections. The compounds can also be administered in sustained or controlled release dosage forms, including depot injections, osmotic pumps, pills, transdermal (including electrotransport) patches, and the like, for prolonged and/or timed, pulsed administration at a predetermined rate. Embodiments provided herein relate to oral administration of a capsule comprising pimavanserin granulation.

The pharmaceutical compositions described herein comprised in a capsule refer to compositions prepared by methodologies not conventionally used in granulation, such as high and low shear granulation, e.g. using low amounts of water.

For oral administration, the compositions can be formulated readily by combining the active pharmaceutical ingredient (API) (e.g., pimavanserin or pimavanserin tartrate) with pharmaceutically acceptable binders or diluents well known in the art. Such binders or diluents enable the API disclosed herein to be formulated as tablets, pills, dragees, capsules, liquids, gels, syrups, slurries, suspensions and the like, for oral ingestion by a patient to be treated.

Provided herein is pimavanserin and pharmaceutically acceptable salts thereof having altered properties, such as increased bulk density, improved flow, and compressibility allowing the pharmaceutical manufacturing of a capsule

US 11,452,721 B2

9

comprising about 5-34 mg pimavanserin, such as about 34 mg, which for example may be filled in a size 3 or 4 capsule, such as a capsule of size 4.

It has herein been demonstrated that altering the flow and bulk density of pimavanserin, and compositions comprising pimavanserin using methods described herein results in a reproducible and quantitatively accurate filling of small sized capsules (e.g. size 3 or 4 capsules) in a scaled up pharmaceutical manufacturing processes, e.g. for manufacturing of about 1,000,000 capsules or more, for example at a speed of 40-90,000 capsules per hour.

Pharmaceutical manufacturing as used herein implies certain requirement being met such as manufacturing efficiency and economical requirements. Although also product quality and performance are ensured through the design of effective and efficient manufacturing processes, product and process specifications are based on a mechanistic understanding of how formulation and process factors affect product performance, e.g. variability between batches, assuring continuous real-time quality of the product and the materials, e.g. excipients. Additionally, regulatory policies and procedures used to meet official requirements such as those set out by health authorities, such as EMA (European Medicine agency) and FDA (U.S. Food and Drug Administration) and similar agencies in order to obtain the required quality of a drug product has an impact on the pharmaceutical manufacturing. For example, risk-based regulatory approaches recognize the level of scientific understanding of how formulation and manufacturing process factors affect product quality and performance and the capability of process control strategies to prevent or mitigate the risk of producing a poor quality product. For example, manual filling of capsules would not be considered relevant by those skilled in the art as manual filling of capsules cannot provide high reproducibility at the filling speed required to manufacture batches containing more than 100,000 capsules. Consequently those skilled in the art setting out to improve the formulation of an existing active pharmaceutical ingredient (API) for example to improve patient compliance, are working with tools used within the field of pharmaceutical manufacturing of small molecules.

Generally when improving the flow of an API (active pharmaceutical ingredient) the fill weight is increased. Increasing the fill weight is counterproductive to filling a small volume, such as a size 3 or even a size 4 capsule, at the production speeds required, such as 40-90,000 capsules per hour.

Disclosed herein are pharmaceutical manufacturing processes for obtaining suitable strength capsules of pimavanserin or a pharmaceutically acceptable salt thereof, said process comprises spraying water to pimavanserin, followed by a granulation process, wherein pimavanserin is granulated without addition of a binder, and blending followed by encapsulation. The particle size distribution, and/or bulk density of the granulated pimavanserin is controlled and matched to other excipient(s) to improve flow of the composition and assure content uniformity and low variability of the product. Additionally matching of excipient(s) allows reproducibility during encapsulation of pimavanserin. The matching of physical properties of API and other excipients used herein enables pharmaceutical manufacturing, in particular capsule filling (encapsulating the dried pimavanserin granulation in capsules of size 3 or 4) at sufficient speed such as more than 40,000 capsules per hour. Matching of API may for example be done by matching the particle size distribu-

10

tion of the API and one or more excipient. The bulk density of the API and the one or more excipients may also be matched.

For example, as shown in table 1, pimavanserin granulation, as obtained by the pharmaceutical manufacturing described herein vs the native API (active pharmaceutical ingredient (e.g., pimavanserin tartrate), obtained for example as decribed in W02017/015272), the bulk density and the Carr's Index (Carr's Compressibility Index) have been substantially altered which enables the filling of the above mentioned small capsule. Carr's Index compares the difference between the bulk density and tapped density of a substance to determine its compressibility. The bulk density and the Carr's Index may be determined in accordance with USP<616> (method for performing Bulk and Tapped Densities, method 1) and USP<1174> (definition of powder flow) respectively.

TABLE 1

|  | Pimavanserin granulation* | Native API |
|---|---|---|
| Bulk density (g/ml) according to USP <616> | 0.508  (n = 4) | 0.294  (n = 2) |
| Carr's Index | 24  (n = 4) | 36  (n = 2) |

*final blend as disclosed in the example herein below and in table 2

Table 1 visualizes that filling of a capsule, in particular a capsule of size 3 or 4 (capsule volumes of 0.30 and 0.21 ml respectively, approximately 120 mg and 85 mg respectively at a bulk density of 0.5 g/ml). As evident from Table 1, native pimavanserin (API) would be challenging for a size 3 capsule and not possible for a capsule of size 4 without improving the bulk density (as comparison 85 mg of pimavanserin granulation would require about 0.17 ml compared to 0.29 ml for the native API) and flowability (Carr index is frequently used in pharmaceutical manufacturing as an indication of the flowability of a powder, e.g. 2016 U.S. Pharmacopoeias-National Formulary [USP 35 NF 30]).

In particular, disclosed herein is formulation, granulation, dry milling, blending, and encapsulation of pimavanserin containing novel elements. Salient features are that the known granulation technology uses atypical parameters to achieve the desired results. Spray rate, atomization and quantity of water are examples of atypical parameters used in combination with wet granulation to obtain the targeted properties of pimavanserin formulation disclosed herein. For example, pimavanserin has been successfully granulated without the use of binder by spraying, at a controlled rate and under controlled atomization conditions, a controlled amount of water to pimavanserin during the wet granulation to provide granulated pimavanserin suitable for further processing (e.g. drying, blending, etc.) in the pharmaceutical manufacturing of capsules containing 5-34 mg pimavanserin, such as 10-34 mg capsules of size 3 or 4. Prior to the surprising finding that pimavanserin could be successfully wet granulated achieving the targeted improved physical properties (e.g. bulk density) without the addition of a binder, and by adding a small, such as 2-15% w/w, e.g. 3-10% w/w, 3-8% w/w amount of water to pimavanserin by spraying, many different granulation methods were contemplated and tested, and some discussed more in detail herein-below.

In one embodiment, High Shear Granulation (HSG) utilizing a small quantity of water, such as approximately 3-8% w/w of the dry ingredients, under appropriate HSG parameters for atomization, spray rate, impeller speed, and chopper speed was found to provide the required improvements

US 11,452,721 B2

11

to the pimavanserin (API) physical properties, such as increased bulk density, improved flow, and compressibility. The small quantity of water, its application using appropriate water atomization and/or water application rate are important reasons for the improved properties of pimavanserin. It has herein been demonstrated that the atomized spraying of a small amount of water during the granulation of pimavanserin achieves a wetting of pimavanserin that provides a granulated pimavanserin suitable for pharmaceutical manufacturing of a capsule, such as a capsule of size 4 comprising 10-34 mg pimavanserin. The actual amount of water to be sprayed at the granulation of pimavanserin may vary from batch to batch (depending on surrounding factors such as humidity, temperature, exact properties of the API batch, etc) but is still consider to be a small amount, e.g. 3-10% w/w based on the dry ingredients. The amount of water and the granulation process disclosed herein is controlled by controlling the impeller energy to achieve the targeted impeller speed. The appropriate impeller speed ensures sufficient mixing and controls the growth of granules. The specific small amount of water needed for each batch is controlled by the power consumption (amperage) of the granulator, i.e., if the amperage is too high, additional amounts of water could be sprayed to the granulate in order to obtain pimavanserin having the properties desired in order to pharmaceutically manufacture capsules comprising 5-34 mg pimavanserin. Adding too much water may alter other properties of the API, such as its crystallinity. The properties are achieved via a manufacturing process that includes granulation, using a suitable granulator, e.g. a high shear granulator, simultaneously spraying the adequate amount of water while mixing, followed by screening, and blending appropriate quantities of excipients. In some embodiments the lack of a binder, and using pimavanserin, properly wetted and not over-wetted are believed to be reasons for the fill uniformity observed using the herein described manufacturing process. Over-wetted granulation could seriously affect the further processing. In some embodiments particle size distribution of the granulated pimavanserin is controlled and matched to the particle size distribution of the diluents and other excipients to minimize segregation and improve flow and capsule filling reproducibility. The particle size distribution is also considered a factor involved in the successful filing of capsules of size 3 or 4, as a too aggressive milling would cause a wider particle size distribution and hamper the encapsulation. Examples of suitable particles size distribution of the granulated pimavanserin is a particle size distribution (D90) of 60-450 μm, such as 100-420 μm, such as above 250 μm. Particle size distribution referred to herein is obtained using Laser light scattering particle size (LLS PS) analyses of granulated pimavanserin conducted on a Malvern Mastersizer 2000 LLS PS system using a Scirocco 2000 dry dispersion unit using standard non-GMP conditions, and in a sample size of about 2 -10 g. Suitable diluents such as microcrystalline cellulose, silicified microcrystalline cellulose, low substituted hydroxylpropyl cellulose or similar materials to a concentration approximately one-half of the granulation and lubricated with magnesium stearate, sodium stearyl fumarate or other suitable lubricants to prevent sticking to the encapsulation tooling. In some embodiments the particle size distribution of the diluent is matched to the above mentioned particle size distribution of granulated pimavanserin, for example microcrystalline cellulose having a particle size distribution (D90) is 180-420 μm, such as above 250 μm. In some embodiments the lubricant, such as magnesium stearate is also matched to the API. In some embodiments the matching

12

of the particle size distribution of the lubricant, compared to the diluent, is less important in view of the lower amounts used in some embodiments. Optionally suitable binders and/or disintegrants may be included in the blending of the pimavanserin granulation. In some embodiments pimavanserin is blended with a diluent, e.g. microcrystalline cellulose and lubricant, magnesium stearate only, whereas amounts of water were added by spraying during the granulation process

In some embodiments the particle size distribution (D90) of the composition is 60-380 μm, such as 75-350 μm, such as 100-300 μm.

FIG. 4 discloses the particle size distribution of pimavanserin tartrate, prior to the herein disclosed granulation process.

FIG. 5 discloses the particle size distribution of the granulated pimavanserin. The arrow in FIG. 5 indicates the area of particles size distribution of the API. A substantial change in the particle size distribution can be seen, e.g. the D90 has increased from about 30 μm for the API to above 279 μm.

The matching of particles size distribution of the API and diluent is considered one factor influencing the herein disclosed robust process and reproducible encapsulation of pimavanserin, e.g. 10-34 mg pimavanserin in size 4 capsules, e.g. two-piece capsules.

In some embodiment bulk density between the API and the diluent and optionally the lubricant are matched, for example granulated pimavanserin having a bulk density above >0.40 g/ml, such as about 0.5 g/ml, and the diluent 0.35-0.46 g/ml.

In some embodiments both the bulk density and the particle size distribution is used in combination in order to adequately match at least the pimavanserin granulate and the diluent in order to obtain capsules of size 4 comprising 10-34 mg pimavanserin.

In some particular embodiments the granulation of pimavanserin may be completed and the obtained pimavanserin granulation having suitable properties for the herein disclosed manufacturing process, in the absence of a binder. It is however possible to include a binder in the granulation but for various reasons not necessarily preferred.

In some embodiments disclosed herein the blended pimavanserin composition, as described herein, comprised in a capsule (e.g a size 4 capsule) have an average Specific Energy (SE) of less than 5 mJ/g, such as less than 4.5 mJ/g, such as less than 4 mJ/g, as obtained by FT4 measurement.

In some embodiments disclosed herein the blended pimavanserin composition, as described herein, comprised in a capsule (e.g a size 4 capsule) have an average Flow Rate Index (FRI) of 0.9-1.2, such as 1.0-1.1, as obtained by FT4 measurement.

In some embodiments disclosed herein the blended pimavanserin composition, as described herein, comprised in a capsule (e.g a size 4 capsule) have an average Specific Energy (SE) of less than 4.5 mJ/g, and an average Flow Rate Index (FRI) of 0.9-1.2.

Pharmaceutical Formulations

Some embodiments include a pharmaceutical composition comprising granulated pimavanserin tartrate, Form C which may include a small percentage of Form A, including a pharmaceutically acceptable diluent, binder or excipient, or combination thereof.

The pharmaceutical compositions disclosed herein, are in some embodiments, provided as a two-piece hard shell capsules made of gelatin (fish, mammalian, or vegetable sourced) or other combinations. The two-piece hard shell

US 11,452,721 B2

13

capsules may contain the pimavanserin granules with a filler/diluent and/or lubricants.

The finished dosage forms may be presented in packaging containing metal or plastic foil such as a blister pack. The pack may also be accompanied with a notice associated with the container in form prescribed by a governmental agency regulating the manufacture, use, or sale of pharmaceuticals, which notice is reflective of approval by the agency of the form of the drug for human or veterinary administration. Such notice, for example, may be the labeling approved by the U.S. Food and Drug Administration for prescription of drugs, or the approved package insert.

WO 2007/133802 discloses that only certain components are compatible with pimavanserin, and although certain components are compatible their use in the herein disclosed capsule may not be preferred. A particular example is lactose as it may have implications to the administration to subject being lactose intolerant.

Some requirements of the pharmaceutical manufacturing for pimavanserin are commercial operational speed, as well as stringent regulatory requirements. For example, the encapsulation equipment used is capable of ~100,000 capsules per hour, such as 40,000-90,000 capsules per hour, such as 60,000-86,000 capsules per hour, such as 60,000-70,000 capsules per hour. The manufacturing must be reproducible and robust to be capable of this output while producing quality product.

Prior to the surprising finding, i.e. the herein disclosed processes and compositions resulting in a robust and reliable filling of 5-34 mg pimavanserin in capsules of size 3 or 4, such as size 4 capsules, many experiments were done.

Comparative experiments resulting in unacceptable products

For example, the pharmaceutical industry has used fluid-bed layering extensively for several decades to produce small spherical particles with improved properties (e.g. flowability and compressibility) for further downstream processing, such as capsule filling. During this two-phase process that includes simultaneous spraying and drying, the addition of a binder causes primary particles to increase the diameter of the substrate by the addition of a dense layer of the drug and a binder, one such technique evaluated was top spray layering (use of conventional top-spray fluidized bed granulation equipment to apply the drug layer to a small substrate particle), e.g. using the following composition about 63% w/w microcrystalline cellulose (the spherical particle (bead) around which the API is layered or applied), about 28% w/w of pimavanserin tartrate (API), about 6% w/w povidone (binder), such as povidone K30, and about 2% w/w HPMC E5 (Methocel™ E5) (hydroxypropylmethyl cellulose). The top spray fluid-bed layering resulted in particles having an acceptable flow and bulk density but unacceptable stability and particle size distribution as well an unacceptable amount of impurities. These unacceptable disadvantages, such as unacceptable stability, less favourable dissolution, resulted in deeming this process option unsuitable for the current purpose.

Wurster Layering (a similar and more common process to the Top Spray Layering described above) was tested and found to produce particles having an acceptable flow and bulk density but unacceptable stability and particle size distribution as well an unacceptable amount of impurities. These unacceptable disadvantages, such as unacceptable stability, less favourable dissolution, resulted in deeming this process option unsuitable for the current purpose. One compostion tested was the same as in the top spray layering.

14

Extrusion/spheronization is especially useful in producing semi-spherical, dense granules. The physical advantages of extrusion/spheronization vs. other multiparticulate approaches can include relatively high drug loading, improved flow properties, narrow particle size distribution, smooth and a coatable surface, low friability, and uniform packing characteristics. The process consists of five operations, i.e. wet granulating the formulation, followed by screening to form cylindrical extrudates, adding the extrudate to a spheronizer forming spheres from the extrudate, and drying the spheres. Optionally coatings may be applied to the spheres. A composition containing about 27% w/w pimavanserin tartrate as a 32% w/w slurry in water, about 68% w/w microcrystalline cellulose (e.g. Avicel PH 101), about 4% hydroxypropylmethyl cellulose (e.g. Methocel™ A15LV), and about 1% w/w povidone (e.g. povidone K30) resulted in particles having an acceptable flow and bulk density but unacceptable stability and particle size distribution as well an unacceptable amount of impurities. The particles were milled in order to achieve a uniform particle size, yet the amount of impurities and stability were found to be unacceptable.

Twin-Screw Melt Granulation has increased in popularity in pharmaceutical manufacturing due to the numerous advantages of this continuous manufacturing technique over traditional batch wet granulation. Twin-Screw Melt Granulation does not require the use of organic or aqueous solvents, making the entire process less consuming in terms of time and energy as compared to wet granulation, and in view of other tests disclosed hereinabove the use of solvent was deemed as a potential source for the impurities and may have been a factor for the stability issues observed. Consequently Twin-Screw Melt Granulation was evaluated using a binder/disintegrant, heat and agitation. As binder/disintegrant a low substituted hydroxypropyl cellulose (e.g. LH-B1 marketed by Shin Etsu), and Kollidon® VA64 marketed by BASF were used in separate compositions using about 50% w/w pimavanserin tartrate and LH-B1 and Kollidon VA64 respectively. In either case the resulting particles were screened and evaluated resulting in particles having an acceptable flow and bulk density but unacceptable finding of impurities as well as unacceptable dissolution.

Conventionally wet granulation (both high shear and low shear) have been used for a long time in pharmaceutical manufacturing, an example of a conventional wet granulation process is described in WO2009/061909 wherein table 7 discloses 40-50% w/w of water being used in the wet granulation, i.e. conventionally a wet granulation uses a liquid, e.g. water in order to prepare a wet mass with sufficient plasticity which can be subsequently wet-milled and dried produce granules with improved flow and density properties. High shear granulation was chosen for evaluation due to the higher energy it is capable of imparting to the particles, which was known to improve the particle density, spherocity, and consequently the capsule filling capability and particle flow, respectively. The quantity of water used in conventional or traditional wet granulation proved to be problematic resulting in very large, wet, adhesive pimavanserin granules that would not be easily dried in a fluid bed dryer. Additionally, large quantity of water would also result in high impurities and changes in the crystallinity of pimavanserin.

Several embodiments were evaluated using excipients commonly used to mitigate the impact of high water content while providing excellent granule properties. These did not improve the resulting over-wetting of the pimavanserin

US 11,452,721 B2

15

blend and resulted in an adhesive wet mass that would not would not be easily dried in a fluid bed dryer.

Contrary to the above disclosed comparative experiments the present application describes processes to manufacture capsules of size 4 comprising 5-34 mg pimavanserin. As additionally disclosed above it was surprisingly found that a 100% pimavanserin high-shear granulation was possible by using only small water quantities, often large quantities of water and a binder conventionally used in high-shear granulation. In order for a small quantity of water to be effective, the distribution of the water should be finely divided providing small points of localized wetting of pimavanserin. Localized wetting is considered wetting of an immediate area around the water droplets. Examples of suitable size of the water droplets to be sprayed are about 0.05-0.15 mm The granulation of pimavanserin, for example without the presence of a binder, was achieved using a small amount of water and a nozzle, such as an atomizing nozzle, capable of producing a spray pattern that covered a large area of pimavanserin and preventing over-wetting of large areas of the batch. Suitable nozzles are commercially available, e.g. from Spraying Systems Co. Spraying of low amounts of water and appropriate impeller speed and chopper speed of the high shear granulator achieved pimavanserin granulation having altered properties and improved the flow, e.g. bulk density compared to the native API. The total quantity of water added to the pimavanserin granulation should be limited to a global value the would not result in a global state of over-wetting (global refers to a large area of the batch being over-wetted), which as described above would occur during conventional wet granulation of pimavanserin, causing an adhesive wet mass that would not be easily dried in a fluid bed dryer, i.e. not resulting in a sufficiently dried product, or too long drying times, and increasing the risk of changing the crystalline form of pimavanserin (e.g. changing pimavanserin into amorphous forms), which could result in slow dissolution when administered to a patient. As disclosed above conventionally high shear granulation utilizes amounts of water that would lead to over wetting of an API, such as pimavanserin, and the present inventors have demonstrated that an appropriate water application, e.g. using a nozzle, capable of spraying water over a large area of the API, combined with a chopper/impeller speed (e.g. by controlling amperage), results in granulated pimavanserin having improved bulk density suitable for filling amounts disclosed herein into capsules of size 4.

In addition to the global, or batch, over-wetting a local over-wetting may also impair the properties of the API. One solution presented herein relates to applying a spray of water having a droplet size such as 0.05-0.15 mm, e.g. using a nozzle spraying the water and resulting in adequate wetting, locally and globally.

Suitable drying times of the wet granulation described herein is 120 min, such as 100 min, such as 80 min, such as 60 min. A drying time of 60 min is preferred, e.g. in view of process efficiency etc. The global quantity of water will vary depending on many factors such as the capacity of the high shear granulator, loading of the high shear granulator, the batch of pimavanserin to be granulated, surrounding environment, and may be controlled by impeller speed and chopper speed as well as the spray rate and spray pattern parameters (e.g. using a atomization nozzle), and the amperage (energy consumption) of the granulator. As the high shear granulator is an "open" system and energy from the impeller actually incorporates into the product causing the product temperature to increase favorably limiting the global impact of the added water when applied at a low rate.

16

However, the range of water was found to be approximately 3-15% w/w, such as 3-10% w/w, such as 3-8% w/w (based on the mass of the pimavanserin in the granulator at the start of the granulation process). As disclosed herein it has been demonstrated that pimavanserin can be granulated without the use of a binder, i.e. utilizing water only. It is however contemplated that in some embodiments suitable binders, such as cellulose, methyl cellulose, polyvinylpyrrolidone and polyethylene glycol may be used, although not a necessity. The present high shear granulation of pimavanserin utilizing e.g. 3-8% w/w water, applied by an nozzle, which can generate an atomized spray pattern, provides benefits.

Embodiments disclosed herein relate to pimavanserin tartrate as crystalline Form C, Form A or a combination thereof.

The doses referred to herein, i.e. 5-34 mg refers to pimavanserin free base (equivalent to about 6 mg-40 mg pimavanserin tartrate).

Some embodiments relates to pimavanserin tartrate Form C (40 mg of pimavanserin tartrate, equivalent to 34 mg pimavanserin free base) being encapsulated in capsules of size 3 or 4, such as capsules of size 4.

One embodiment of the compositions described herein includes pimavanserin tartrate granulation without binder, dried, and thereafter blended with less than 60% w/w microcrystalline cellulose such as Avicel PH302 or equivalent microcrystalline cellulose, and about 1% w/w magnesium stearate.

In some embodiments the compositions described herein comprises granulated pimavanserin and microcrystalline cellulose is at least 20% w/w microcrystalline cellulose, such as 30% w/w microcrystalline cellulose, such as 40% w/w microcrystalline cellulose, such as 50% w/w microcrystalline cellulose, such as 50-89% w/w microcrystalline cellulose, such as 20-94% w/w, such as 50-94% w/w, such as 57-94% w/w, such as 57-89% w/w microcrystalline cellulose, such as 57-79% w/w microcrystalline cellulose, or 57-60% w/w microcrystalline cellulose, or 57-59.5% w/w microcrystalline cellulose, or 58.5-59.5% w/w microcrystalline cellulose, or 59% w/w microcrystalline cellulose.

In some embodiments the compositions described herein comprises granulated pimavanserin and microcrystalline cellulose and magnesium stearate, such as 0.1-3% w/w, such as 0.5-2% w/w magnesium stearate, or 0.5-1.5% w/w magnesium stearate, or 1% w/w magnesium stearate.

In some embodiments the compositions described herein comprises granulated pimavanserin (5, 10, 20 or 34 mg) and microcrystalline cellulose is at least 20% w/w microcrystalline cellulose, such as 30% w/w microcrystalline cellulose, such as 40% w/w microcrystalline cellulose, such as 50% w/w microcrystalline cellulose, such as 50-89% w/w microcrystalline cellulose, such as 20-94% w/w, such as 50-94% w/w, such as 57-94% w/w, such as 57-89% w/w microcrystalline cellulose, such as 57-79% w/w microcrystalline cellulose, or 57-60% w/w microcrystalline cellulose, or 57-59.5% w/w microcrystalline cellulose, or 58.5-59.5% w/w microcrystalline cellulose, or 59% w/w microcrystalline cellulose and magnesium stearate, such as 0.1-3% w/w, such as 0.5-2% w/w magnesium stearate, or 0.5-1.5% w/w magnesium stearate, or 1% w/w magnesium stearate.

The compositions disclosed herein comprise pimavanserin and additional compatible excipients, e.g. sugars, sucrose, mannitol, sorbitol, polysaccharides (e.g. from corn, wheat, rice, potato), as well as pregelatinized or partially pregelatinized starches (e.g. STARCH 1500®), cellulose preparations such as microcrystalline cellulose (MCC) (e.g. AVICEL® PH 302, AVICEL® PH 102, VIVAPUR® 302,

US 11,452,721 B2

17

VIVAPUR® 102, EMCOCEL® HD 90), silicified microc-rystalline cellulose (e.g. PROSOLV® 50, PROSOLV® 90, PROSOLV® HD90), lactose cellulose blends (e.g. CELLA-TOSE® 80, CELLATOSE® 90, PROSOLV® EASYtab SP), hydroxypropylmethyl cellulose, hydroxymethyl cellu-lose, polyvinylpyrrolidone, lubricants such as magnesium stearate, sodium stearyl fumarate, colloidal silicon dioxide, and talc.

Several tests attempting to mitigate the impact of the high water quantity used in high-shear granulation by the use of excipients generally capable of absorption of the water were made. However, these proved to be unsuccessful.

One embodiment of the compositions described herein includes pimavanserin tartrate granulation without binder, drying, and blending said granulation with microcrystalline cellulose having a bulk density of 0.35-0.46 g/ml, and wherein the bulk density of the blended composition is >0.4 g/ml, such as >0.5 g/ml.

In some embodiments the composition comprises micro-crystalline cellulose (MCC) having a bulk density of about 0.40 g/ml, such as 0.3-0.5 g/ml, such as 0.35-0.46 g/ml. In some embodiment the API having a bulk density of >0.40 g/ml and MCC having a bulk density of 0.30-0.50 g/ml and is blended with magnesium stearate in order to make up a composition having a bulk density of 0.40-0.55 g/ml.

One embodiment of the compositions described herein includes pimavanserin tartrate granulation with spraying water and without any binder, followed by, drying, and blending said granulation with less than 50% w/w microc-rystalline cellulose such as Avicel PH302 or equivalent microcrystalline cellulose, and about 1% w/w magnesium stearate. The spraying of water to pimavanserin tartrate is done while mixing in an appropriate granulator.

Another embodiment of the composition described above includes pimavanserin tartrate granulation containing less than 10% w/w Avicel PH302 and colloidal silicon dioxide, e.g. Aerosil Pharma 200 manufactured by Evonik, with a specific surface area from about 175 to about 225 m²/g blended with less than 60% w/w microcrystalline cellu-lose, such as Avicel PH302 or equivalent microcrystalline cellu-lose, and about 1% w/w magnesium stearate.

Another embodiment of the composition described above includes pimavanserin tartrate granulation containing less than 10% w/w Avicel PH101 and colloidal silicon dioxide with a specific surface area from about 175 to about 225 m²/g, e.g. Aerosil Pharma 200 manufactured by Evonik, blended with less than 60% w/w microcrystalline cellulose, such as Avicel PH302 or equivalent thereof, and about 1% w/w magnesium stearate.

As used herein, whenever a USP is referred to it is the current official version at the time of filing of the application, i.e 40-NF 35, released Nov. 1, 2016 and official May 1, 2017.

Provided herein are embodiment for manufacturing pima-vanserin granulation comprising: providing pimavanserin and adding water while mixing in an appropriate granulator, such as a high shear granulator; granulating and; drying the wet pimavanserin granulation, sizing the pimavanserin granulation, e.g. through a screen, such as a 10-20 mesh screen; and obtaining pimavanserin granulation. Said pima-vanserin granulation being suitable for encapsulation in size 4 capsules, for example by blending with a diluent before capsule filling (encapsulation).

Provided herein are embodiment for manufacturing pima-vanserin granulation by: providing pimavanserin (weighed and the loss-on-drying (LOD) moisture content determined) to a high shear granulator; pre-blending (optional); provid-ing granulation water, e.g. 3-8% w/w, e.g. by spraying at a

18

controlled rate and/or a controlled pattern (e.g. using an atomization nozzle) while monitoring the impeller speed and/or amperage, and granulating; stopping the provision of granulation water, e.g. when the impeller amperage increases; wet massing, e.g. without changing the impeller speed; drying the wet granulation, e.g. in a fluid bed dryer until the LOD moisture is at or below the LOD moisture of the pimavanserin as provided; and sizing, e.g. through a 10-mesh screen; and obtaining pimavanserin granulation. Said pimavanserin granulation being suitable for encapsu-lation in size 3 or 4 capsules, for example by providing additional excipients during the screening, followed by filling of the capsule.

It is important to control the amount of water, the water application rate and/or water application method thereof (e.g. using an atomization nozzle, or another suitable spray-ing device) as too much water may have a negative impact, e.g. change its properties, such as its crystallinity, of pima-vanserin. Adding too much water, e.g. 25% w/w, would have undesired effects on properties of pimavanserin, which would cause issues with the continued pharmaceutical manufacturing of capsules. In some embodiments water is sprayed (e.g. using an atomization nozzle) to pimavanserin while mixing. Addition of water without mixing may lead to localized over-wetting. Provided herein are embodiments wherein pimavanserin, for example pimavanserin tartrate, such as pimavanserin tartrate Form C, is granulated with water using high shear granulation. In some embodiments the amount of water is 1-10% w/w (water based on dry ingredient content), such as 3-8% w/w. In some embodi-ments the impeller speed and/or chopper speed of the high shear granulator is controlled in order to obtain a granulation of sufficient quality for further processing. The wet granu-lation is then dried, e.g. in fluid bed dryers or tray dryers at controlled conditions of temperature and drying air flow. The dried granulation is then sized using a screening mill or other appropriate milling (delumping), and blended with appropriate pharmaceutical diluents and/or binders, such as microcrystalline cellulose, enabling the filling of 5-34 mg granulated pimavanserin (equivalent to about 6 mg-40 mg pimavanserin tartrate) in a size 3 (0.30 ml volume) or 4 (0.21 ml volume) capsule. Some embodiments relates to the capsule being a capsule of size 4, and a two-piece capsule.

Provided herein is a process for manufacturing capsules containing 5-34 mg pimavanserin; by providing pimavan-serin, for example pimavanserin tartrate, such as pimavan-serin tartrate Form C and water, e.g. 1-10% w/w, such as 2-9% w/w, such as 3-8% w/w, such as 4-8% w/w, such as 5-8% w/w, such as 5-7% w/w to a high shear granulator, granulating pimavanserin and the water, drying the pima-vanserin granulation, sizing (or screening, may also be referred to as delumping) the dried pimavanserin granula-tion, e.g. using a screening mill, blending with one or more pharmaceutical excipients, such as one or more filler (di-luent) filling a size 3 or 4 capsule, e.g. a two-piece capsule, with pimavanserin granulation . Provided herein is a process for manufacturing capsules containing 5-34 mg pimavan-serin, wherein the process comprises the following (e.g. in said order): providing pimavanserin, for example pimavan-serin tartrate, such as pimavanserin tartrate Form C to a high shear granulator, granulating pimavanserin together with water (e.g. 1-10% w/w, such as 2-9% w/w, such as 3-8% w/w, such as 4-8% w/w, such as 5-8% w/w, such as 5-7% w/w) while controlling the water application rate, and/or atomization parameters (e.g. by using an appropriate nozzle such as an externally mixed, two-fluid, air-atomizing spray nozzle), impeller speed (e.g. by monitoring amperage),

and/or chopper speed (e.g. by monitoring amperage), drying the granulated pimavanserin, e.g. using fluid bed drying, sizing the dried pimavanserin granulation, e.g. using a screening mill or other appropriate milling device (such as oscillating mills, impact mills), blending the sized pimavanserin granulation with one or more filler/diluent (optionally including a lubricant), and final blending with a lubricant (unless the filler/diluent includes a lubricant), filling a size 3 or 4 two-piece capsule with the blended pimavanserin composition. In some embodiments the capsule is a capsule of size 4 and the amount of pimavanserin is 34 mg. As specified herein, such as hereinbelow, excipients such as diluents, binders, lubricants, pharmaceutical flow agents, and/or other excipients compatible with pimavanserin may be included. Some embodiments provide pimavanserin, microcrystalline cellulose and magnesium stearate only. Some embodiements relate to the microcrystalline cellulose having a particle size distribution (D90) of 180-340 μm. Some embodiments relate to microcrystalline cellulose having a bulk density above >0.40 g/ml. Some embodiments relate to the microcrystalline cellulose having a particle size distribution (D90) of 180-340 μm and a bulk density above >0.40 g/ml.

Provided herein are embodiments wherein the capsule is a capsule of size 4, e.g. a two-piece capsule, such as a two-piece hard shell capsule, e.g. a two-piece capsule of gelatin or hydroxypropyl methylcellulose (HPMC). Some commercial examples are VCaps®, VCaps® Plus, Coni-Snap® marketed by Capsugel.

Provided are also embodiments wherein pimavanserin (granulated), microcrystalline cellulose, for example Avicel PH302 or an equivalent microcrystalline cellulose, and/or magnesium stearate, for example vegetable grade are encapsulated in a capsule of size 4, for example a two-piece capsule.

Provided are also embodiments where in 34 mg pimavanserin (granulated) (equivalent to 40 mg pimavanserin tartrate), microcrystalline cellulose, such as microcrystalline cellulose having a particle size distribution (D90) of 180-340 μm, for example Avicel PH302 or an equivalent microcrystalline cellulose, and/or magnesium stearate, for example vegetable grade are encapsulated in a capsule of size 4, for example a two-piece capsule.

Provided are also embodiments wherein 10 or 20 mg pimavanserin (granulated), microcrystalline cellulose, for example Avicel PH302 or an equivalent microcrystalline cellulose, and/or magnesium stearate, for example vegetable grade are encapsulated in a capsule of size 4, for example a two-piece capsule.

Provided are also embodiments wherein 34 mg pimavanserin (granulated), 59 mg microcrystalline cellulose, for example Avicel PH302 or an equivalent microcrystalline cellulose, and/or 1 mg magnesium stearate, for example vegetable grade are encapsulated in a capsule of size 4, for example a two-piece capsule. No other excipients were added.

Also provided is a pharmaceutical composition, comprising a capsule of pimavanserin and one or more pharmaceutically acceptable excipient(s) as provided herein, wherein the composition is formulated such that at least 80% of pimavanserin is released in 30 minutes upon administration to a subject.

Also provided is a pharmaceutical composition, comprising a capsule of pimavanserin and one or more pharmaceutically acceptable excipient(s) as provided herein, wherein the composition is formulated such that at least 80% of the pimavanserin is released from the composition within 30

minutes upon in vitro dissolution testing according to USP<711> (apparatus 1 (basket apparatus)).

The final moisture content of the pimavanserin granulation is equivalent to the starting moisture content of the pimavanserin.

Another requirement achieved by the pimavanserin capsules disclosed herein can be a long shelf-life, i.e., a shelf-life of at least 1 year is obtained, such as 2 years of shelf-life.

Examples

Manufacturing of a capsule, size 4 two-piece capsule, comprising 34 mg pimavanserin equivalent to 40 mg pimavanserin tartrate

Pimavanserin 34 mg capsules may be prepared as outline herein below.

Granulation: The required ingredients for all operations of the entire process are weighed. The loss-on-drying (LOD) moisture content of the pimavanserin is determined, for example using an appropriate LOD instrument such as those manufacture by Mettler, Ariz. Instruments, Ohaus or Denver Instruments. Drying end point may be determined using temperature, time or weight loss. Pimavanserin is charged through a screen (25-40 mesh) into a high shear granulator, for example a Glatt Powerex 50 liter high shear granulator equipped with a 25 liter bowl. Following a pre-blend in the high shear granulator (200-400 rpm), granulation water, e.g. 5-8% w/w is sprayed at a controlled rate ((18.5-26.5 g/min) at 15 psi (10.0-20.0) atomization air pressure while monitoring the impeller speed ((200-400 rpm)) and amperage, chopper speed (1600-2000 rpm). When the impeller amperage increases (such as 13-18%,), the spray of water is stopped and the mixture wet massing for 5 minutes without changing the impeller or chopper speeds. Following the 5-minute wet massing, the wet granulation is discharged and placed in a fluid bed dryer (100-140 cfm; 45-55° C.); dew point 10° C.; filter shaking 15 sec/5 sec (interval/duration) until the LOD moisture is at or below the LOD moisture of the pimavanserin at dispensing. The dried granulation is discharged from the fluid bed dryer, screened through a screen (4-12 mesh), and packaged until diluent blending and encapsulation.

Diluent Blending: The screened, dried pimavanserin granulation is dispensed (weighed) for blending/encapsulation unit operations. The required diluent and lubricant quantities are also dispensed. The dispensing is followed by delumping of pimavanserin granulation with a screening mill such as 197S or U10 Comil equipped with a screen (4-12 mesh) at 2300-2500 rpm, blending of the granulation with diluent using a bin type blender such as 2 liter TOTE blender 20 minutes at 19-21 rpm or other appropriate blender, final blending with lubricant using the same bin type blender or other appropriate blender (3 minutes at 19-21 rpm) , and encapsulation using a IIM 2100 equipped with size 4 change parts and 5-12 mm dosing disk (50-90 segments per minute (spm)).

Optionally low shear granulation such as a V-Blender equipped with an intensifier bar, twin screw granulation, may be used instead of the granulation equipment specified above with appropriate adjustment to the milling/screening parameters to manufacture capsules of pimavanserin

Pimavanserin hard shell capsules (34 mg pimavanserin, equivalent to 40 mg pimavanserin tartrate) were manufactured. Table 2 contains an example of a suitable formulation.

As an alternative, the herein disclosed pimavanserin granulation may be compressed as a tablet.

As an alternative, the herein disclosed pimavanserin granulations may be compressed as a tablet without further excipients. Thus the composition disclosed in table 2 in some embodiments is used to form tablets. Said tablets may be formed as an alternative to the filling of a capsule.

US 11,452,721 B2

21

Consequently the obtained pimavansering granulation may be compressed into a tablet of a weight of about 100 mg.

TABLE 2

| Composition of Pimavanserin granulation (34 mg) | | |
|---|---|---|
| Ingredients | Qty (% w/w) | Qty (mg)/dose |
| Pimavanserin Tartrate | 40.0 | 40.0[a] |
| Microcrystalline Cellulose (Avicel PH302, NF, EP) | 59.0 | 59.0 |
| Magnesium Stearate (Vegetable Source, USP, EP) | 1.0 | 1.0 |
| Total | 100.0 | 100.0 |

[a]40 mg pimavanserin tartrate salt is equivalent to 34 mg pimavanserin free base

Table 3 contains the manufacturing process equipment for pimavanserin capsules, 34 mg.

TABLE 3

| Process Step | Equipment class, sub-class | Manufacturer, model, size |
|---|---|---|
| Screening I (API) | Hand screen | 30 Mesh hand screen |
| Granulation | Vertical granulator | Glatt/Powrex VG-50M with 25 L Bowl |
| Fluid Bed Drying | Fluid bed | Glatt GPCG-5 with 25 L bowl |
| Screening II (granulation) | Hand screen | 10 Mesh hand screen |
| Milling | Screening mills, rotating impeller | Comil 197S or U10 with 045R03125 screen |
| Blending I | Diffusion mixers (Tumble), bin blender | TOTE Bin blender, 2 cubic foot |
| Screening III (Magnesium stearate) | Hand screen | 30 Mesh hand screen |
| Final Blending | Diffusion mixers (Tumble), bin blender | TOTE Bin blender, 2 cubic foot |
| Encapsulation | Encapsulator, dosing disk | IIM 2100, Size 4 change parts and 10 mm dosing disk |
| Polishing and weight checking | Not applicable | Bosch KKE 1500 |

Table 4 outlines the process parameters and ranges for pimavanserin capsules, 34 mg manufacture. Bold references are target values with the ranges displayed in parenthesis.

TABLE 4

| Process Step: Equipment | Process Parameter | Ranges |
|---|---|---|
| Screening I (API) 25-40 Mesh hand screen | Screen size | 25-40 Mesh hand screen |
| Granulation Glatt/Powrex VG-50M with 25 L bowl | Spray rate | (10-50) [g/min] |
| | Impeller speed | (200-400) [rpm] |
| | Chopper speed | (1600-2000) [rpm] |
| | Atomization Air Pressure | (3-20) [psig] |
| Fluid Bed Drying Glatt GPCG-5 with 25 L bowl | Process Air Volume | (90-210) [cfm] |
| | Inlet Air Temperature | (40-60) [° C] |
| Screening II (granulation) 4-12 Mesh hand screen | Screen size | 4-12 Mesh hand screen |
| Screening | Screen size | 25-40 mesh |
| Blending I | Diffusion blender | |
| Screening (Magnesium stearate) | Screen size | 25-40 Mesh |
| Blending I | Diffusion blending | |
| Encapsulation dosing disk based encapsulator | Dosing disk | 5-12 mm |

In some embodiments disclosed herein relate to pimavanserin granulation, e.g. composed as in table 2, having a

22

weight of granulation of 100 mg ±7 (average of 20 samples), i.e. the weight relates to the granulation only, i.e. excluding capsule shell weight.

The bulk density of the blended composition is >0.4 g/ml, such as 0.4-0.6 g/ml, such as about 0.5 g/ml determined according to USP <616>, method 1. In some embodiments the bulk density of the composition is >0.4 g/ml, such as about 0.5 g/ml, such as 0.51 g/ml, such as 0.508 g/ml.

The bulk density of pimavanserin granulation is >0.4 g/ml, such as 0.4-0.6 g/ml, such as about 0.5 g/ml, determined according to USP <616>, method 1. In some embodiments the bulk density of the pimavanserin granulation is >0.4 g/ml, such as about 0.5 g/ml, such as 0.51 g/ml, such as 0.508 g/ml.

In addition to the bulk density and Carr's Index obtained according to USP <616>, method 1, FT4 Powder Rheology was obtained for the API (pimavanserin tartrate) and for the compositions disclosed herein using a FT4 Powder Rheometer according to ASTM D7891-15; Standard Test Method for Shear Testing of Powders Using the Freeman Technology FT4 Powder Rheometer Shear Cell.

As discussed herein above the flowability of the composition has been improved compared to the API (pimavanserin tartrate), which for example can be supported by the Specific Energy (SE) obtained from the FT4 measurements. Specific Energy is a measure of the powder's flowability when unconfined, such as during low stress filling, or low shear blending. The average Specific Energy (SE) for the API is about 10.08+/−0.23 mJ/g. The granulated pimavanserin had an average SE of 6.81+/−0.63 mJ/g, and the blended pimavanserin composition an average SE of 3.96+/−0.36 mJ/g. Thus the unconfined flowability was substantially improved compared to the API.

In addition to SE, the Flow Rate Index (FRI) of the composition showed significant improvement compared to the API (pimavanserin tartrate). FRI indicates sensitivity to changing the rate of flow, and the pimavanserin tartrate had an average FRI of 1.90±0.01, the granulated pimavanserin an average FRI of 1.52+/−0.10, and the blended pimavanserin composition had an average FRI of 1.08±0.06, again showing the improved properties for the granulated pimavanserin as well as the blended pimavanserin composition for filling into a capsule of size 3 or 4.

The FT4 Powder Rheometer was also used as yet another means to compare the bulk density between the API, the granulated pimavanserin and the blended pimavanserin compositions disclosed herein and in the accompanying claims. The bulk density is a conditioned bulk density as obtained by the FT4 measurement, in accordance with ASTM D7891-15; Standard Test Method for Shear Testing of Powders Using the Freeman Technology FT4 Powder Rheometer Shear Cell. Pimavanserin tartrate (API) had an average conditioned bulk density (CBD) of 0.336±0.006 g/ml, granulated pimavanserin tartrate had an average conditioned bulk density (CBD) of 0.478±0.028 g/ml, and the blended pimavanserin composition an average CBD of 0.504±0.020 g/ml.

The conditioned bulk density of the blended composition is >0.45 g/ml, such as 0.45-0.6 g/ml, such as 0.47-0.55 g/ml determined according to ASTM D7891-15. In some embodiments the bulk density of the composition >0.45 g/ml, such as an average of about 0.5 g/ml.

The conditioned bulk density of the granulated pimavanserin is >0.42 g/ml, such as 0.42-0.55 g/ml, such as 0.43-0.53 g/ml determined according to ASTM D7891-15. In some embodiments the bulk density of the granulated pimavanserin >0.42 g/ml, such as an average of about 0.48 g/ml.

US 11,452,721 B2

23

The blended pimavanserin composition used in the herein mention FT4 Powder Rheometry measurements comprised 34 mg pimavanserin, 59 mg microcrystalline cellulose and 1 mg magnesium stearate.

The capsules comprising 5-34 mg pimavanserin are stable upon actual or simulated storage under open conditions at 25° C.±2°/60%±5% (RH) relative humidity for at least 1 year, such as at least 1.5 years.

Alternative methods and equipment to be used in connection with the herein disclosed methods, compositions, capsules, tablets and disclosures may be found in SUPAC: manufacturing equipment addendum, an U.S. Department of Health and Human Services, Food and Drug Administration, Center for Drug Evaluation and Research (CDER) issued guidance for industry, e.g. in the December 2014 version, Pharmaceutical Quality/CMC.

The embodiments disclosed herein above meet all specifications outlined relating to the marketing authorization of Nuplazid®, for example:

Assay (90.0-110.0% of Label Claim), i.e. quantify the amount of pimavanserin free base in the drug product, for example using reverse phase HPLC with UV-detection at 210 nm. An example of eluent is a gradient comprised of two mobile phases such as ammonium buffer (pH 9.0), and acetonitrile/methanol (80/20 vol/vol).

Content Uniformity as determined using USP <905>, Uniformity of Dosage Forms and wherein the maximum Acceptance Value (AV) NMT (not more than) 15.0. The AV is calculated for the number of units tested; Level 1=10 units; Level 2=30 units using the following: the mean Assay value for the number of units tested Minus Either 98.5 (when the mean is less than 98.5% of target assay) and 101.5 (when the mean is greater than 101.5% of target assay) times 2.4 (10 units) or 2.0 (30 units) plus the difference between the Mean and the appropriate Upper/Lower % of target assay, using the method for hard capsules.

Dissolution USP <711>:

Stage 1: Q=80% within 30 minutes

Stage 2: Average of 12 units (Stage 1 & Stage 2) is equal to or greater than Q with no unit less than Q-15%

X-ray powder diffraction (XRPD) analyses on a Bruker AXS D8 Advance system with a Bragg-Brentano configuration using CuKα radiation confirmed that all XRPD patterns for the granulations correspond to the XRPD patterns of the currently approved NUPLAZID 17 mg tablet (pimavanserin tartrate form C) , which for example as disclosed in U.S. 7,732, 615.

Long term stability data for capsules containing 34 mg pimavanserin, 59 mg microcrystalline cellulose and 1 mg magnesium stearate at 18 months were determined using standard procedures such as actual or simulated storage under open conditions at 25° C.±2°/60%±5% (RH) relative humidity, e.g. as outlined in WHO Technical Report Series, No. 953, 2009, Annex 2, and the following observations and determinations were made:

Appearance: unchanged at 18 months

Assay (90.0-110.0% of Label Claim): Day 8: 100±2%; 18 months: 100±2%

Total impurities: Day 0: 0.3%; 18 months: 0.3%, determined in line with Assay.

Dissolution (at 18 months): at least 80% of the pimavanserin is released from the composition within 30 minutes upon in vitro dissolution testing according to USP<711> (apparatus 1 (basket apparatus)).

24

Water content (determined in line with USP<921>, method Ia: Day 0: 2.9%; 18 months: 2.9%.

What is claimed is:

1. A pharmaceutically acceptable capsule for orally delivering 34 mg of pimavanserin to a patient, wherein the capsule has a size 3 or 4 capsule shell that contains a blended pimavanserin composition comprising:

granules comprising 40 mg pimavanserin tartrate and optionally one or more pharmaceutically acceptable excipients;

and one or more blending excipients; wherein the bulk density of the granules is >0.4 g/ml as determined by USP<616>, method 1.

2. The pharmaceutically acceptable capsule of claim 1, wherein one of the blending excipients is selected from the group consisting of magnesium stearate, sodium stearyl fumarate, colloidal silicon dioxide, and talc.

3. The pharmaceutically acceptable capsule of claim 1, wherein the blended pimavanserin composition has a D90 particle size distribution of 60-450 μm as measured using laser scattering particle size analysis.

4. A pharmaceutically acceptable capsule for orally delivering 34 mg of pimavanserin to a patient, wherein the capsule has a capsule shell with a capsule shell size 3 or 4, that encapsulates a blended pimavanserin composition comprising:

granules comprising 40 mg pimavanserin tartrate and one or more pharmaceutically acceptable excipients; and wherein the bulk density of the granules is >0.4 g/ml as determined by USP<616>, method 1.

5. The pharmaceutically acceptable capsule of claim 4, wherein the capsule shell is a hard shell size 4 capsule.

6. The pharmaceutically acceptable capsule of claim 1, wherein one of the blending excipients is selected from the group consisting of a cellulose, a polysaccharide, and polyvinylpyrrolidone.

7. The pharmaceutically acceptable capsule of claim 1, wherein one of the blending excipients is selected from the group consisting of microcrystalline cellulose, silicified microcrystalline cellulose, hydroxypropyl cellulose, hydroxypropylmethyl cellulose, hydroxymethyl cellulose, and a lactose cellulose blend.

8. The pharmaceutically acceptable capsule of claim 1, wherein the one of the blending excipients is selected from the group consisting of sucrose, mannitol, sorbitol, pregelatinized starch, and partially pregelatinized starch.

9. The pharmaceutically acceptable capsule of claim 1, wherein the blending excipients comprise microcrystalline cellulose and magnesium stearate.

10. The pharmaceutically acceptable capsule of claim 1, wherein the blending excipients are selected from the group consisting of filler/diluents, lubricants and mixtures thereof.

11. The pharmaceutically acceptable capsule of claim 1, wherein the granules comprise a pharmaceutically acceptable excipient which is a binder.

12. The pharmaceutically acceptable capsule of claim 10, wherein the binder is selected from the group consisting of cellulose, methyl cellulose, polyvinylpyrrolidone and polyethylene glycol.

13. The pharmaceutically acceptable capsule of claim 4 wherein the pharmaceutically acceptable excipients comprise a binder.

* * * * *

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| ACADIA PHARMACEUTICALS INC., | : | |
| | : | |
| | : | C.A. No. 1:22-cv-01387-GBW |
| *Plaintiff,* | : | |
| | : | CONSOLIDATED |
| v. | : | |
| | : | |
| AUROBINDO PHARMA LTD., and | : | |
| AUROBINDO PHARMA USA, INC., | : | |
| | : | **HIGHLY CONFIDENTIAL** |
| *Defendants.* | : | |
| | : | |

**REBUTTAL EXPERT REPORT OF**
**R. CHRISTIAN MORETON, PH.D. ON NONINFRINGEMENT**

# TABLE OF CONTENTS

I.      INTRODUCTION ...............................................................................................1

I.      SUMMARY OF OPINIONS .............................................................................1

II.     QUALIFICATIONS ..........................................................................................4

III.    MATERIALS CONSIDERED ..........................................................................7

IV.     LEGAL STANDARDS .....................................................................................7

V.      TECHNICAL BACKGROUND........................................................................9

     A.     Use of Excipients in Pharmaceutical Applications.................................9

     B.     Powders, Particles, Granules, and Compression...................................11

     C.     Aurobindo's ANDA Product is Made By a Dry Blend Process Without Compression ..........................................................................................15

VI.     LEVEL OF ORDINARY SKILL IN THE ART .............................................22

VII.    THE '721 PATENT ..........................................................................................23

     A.     Claims ....................................................................................................23

     B.     Specification ..........................................................................................24

          i.     The Named Inventors Described Certain Excipients................................25

          ii.    The Named Inventors Described Granules and Granulation ....................26

     C.     File History ............................................................................................27

VIII.   AUROBINDO'S PRODUCTS DO NOT LITERALLY INFRINGE THE ASSERTED CLAIMS OF THE '721 PATENT............................................28

     A.     Aurobindo's ANDA Product Does Not Include the Granules Comprising 40 mg Pimavanserin Tartrate Limitation .........................28

          i.     Aurobindo's ANDA Product Contains No Granules................................29

          ii.    Aurobindo's ANDA Product is Made Via Dry Blending.........................29

          iii.   Aurobindo's ANDA Product Contains No Binder Ingredient .................30

          iv.    Aurobindo's ANDA Product Has No Compression Step .........................30

     B.     The Aurobindo ANDA Use of the Term "granule" Is Imprecise Nomenclature ........................................................................................33

IX.     CONCLUSION.................................................................................................34

## I.    INTRODUCTION

1.      I, R. Christian Moreton, Ph.D., submit this expert report pursuant to Fed. R. Civ. P. 26(a)(2)(B) on behalf of Defendants Aurobindo Pharma Ltd. and Aurobindo Pharma USA, Inc., (hereafter collectively, "Aurobindo" or "Defendant").

2.      I have reviewed the expert report by Dr. Smith dated May 2, 2024, which alleges infringement by Aurobindo, and the materials cited therein.  Dr. Smith provides opinions regarding the alleged infringement of U.S. Patent No. 11,452,721 ("the '721 patent") by Aurobindo.  I have been asked to provide my opinions regarding the alleged infringement of the '721 patent by the Aurobindo ANDA Product and to respond to various opinions that Dr. Smith discloses.

3.      If called to testify, I may testify about my opinions and the bases for those opinions, as discussed in greater detail below.  I may also respond to any opinions or testimony from Dr. Smith regarding issues within my area of expertise.  I reserve the right to supplement or amend this report and offer further testimony in response to any further developments in this litigation, including any new opinions or clarifications Dr. Smith puts forth.

## I.    SUMMARY OF OPINIONS

4.      I understand that Aurobindo has filed an Abbreviated New Drug Application ("ANDA") for **pimavanserin tartrate capsules, 34 mg, ANDA No. 214782**.  My opinions are directed to the composition of Aurobindo's ANDA product.

5.      A POSA would understand that Aurobindo's ANDA product is prepared by a simple, convenient, and economical process to prepare a drug product that is dry blending of powders.  The active pharmaceutical ingredient ("API") is dry blended with non-active ingredients ("excipients") to make Aurobindo's ANDA product.  No liquid is used to make Aurobindo's ANDA product.  The only equipment used to prepare Aurobindo's ANDA product blend is a blender and sieve.  No special equipment, or additional process steps are necessary to make

Aurobindo's ANDA product blend, which is then filled into capsules.  The Aurobindo ANDA Product is made using, essentially, processes and equipment known in the art.  This is compared to the '721 patent, which claims, allegedly a novel, and completely different process for preparing the claimed granules comprising 40 mg pimavanserin tartrate.  The claimed process requires a granulation step and a granulating agent or binder, or a compression/compaction step to form granules.  These items, required to form the claimed granules comprising 40 mg pimavanserin tartrate, are absent form the process used to make the Aurobindo ANDA Product.

6.    It is my opinion that the Aurobindo's ANDA product does not literally infringe any asserted claim of the '721 patent because Aurobindo's ANDA Product contains no granules of pimavanserin tartrate, as required by the asserted claims of the '721 patent.    Therefore, Aurobindo's ANDA product does not literally infringe any asserted claim of the '721 patent.

7.    Dr. Smith opines that Aurobindo's ANDA product infringes one or more claims of the '721 patent under the "doctrine of equivalents" ("DOE").    However, as noted above, Aurobindo's ANDA Product does not contain granules, as defined by the inventors of the '721 patent, and as understood by a POSA.  Moreover, the methods by which Aurobindo's ANDA Product is made do not allow for the formation of aggregates or granules .  In addition, Dr. Smith's experimental data is unreliable and rife with errors, making that analysis essentially useless.  Dr. Smith's experiments do not demonstrate the presence of granules comprising 40 mg pimavanserin tartrate in Aurobindo's ANDA Product, or that Aurobindo's ANDA Product contains an equivalent of granules comprising 40 mg pimavanserin tartrate. Accordingly, the required claim element "granules" or its equivalent is <u>totally missing</u> from Aurobindo's ANDA Product.  Thus, there can be no infringement under the doctrine of equivalents as a matter of law.

8.      In particular, I disagree with Dr. Smith's analysis for several reasons, which I summarize here:

• *First, the Aurobindo ANDA Product is made in a way that does not allow for formation of granules; specifically it does not include any granulation steps, either wet granulation or dry granulation, nor does it include a compression step of sufficient energy to form the claimed granules comprising 40 mg pimavanserin tartrate.*

• *Second, Aurobindo's ANDA Product does not contain a binder. Aurobindo's ANDA Product is produced using a dry blending technique that involves sifting, co-sifting, and dry blending in the absence of any solvents; it is a dry process. The microcrystalline cellulose ("MCC") ingredient in Aurobindo's ANDA Product is not a binder but is a diluent.*

• *Third, the Aurobindo ANDA Product is made in a way that lacks a direct compression step, yet another reason the Aurobindo ANDA Product lacks the claimed granules comprising 40 mg pimavanserin tartrate.*

• *Fourth, there is no question that the Aurobindo ANDA Product is not an equivalent to the claimed granules comprising 40 mg pimavanserin tartrate, not only because the Aurobindo ANDA Product contains no granules meaning it is substantially different. In addition, because the way the Aurobindo ANDA Product is made is essentially the opposite of the purportedly novel (and essential) method of making the claimed granules comprising 40 mg pimavanserin tartrate, meaning that granules could not be made, as they are described and claimed in the '721 patent in claims 1 and 4, by the Aurobindo process.*

• *Fifth, Dr. Smith mistakenly conflates particles that have coalesced through random movement with the specific entity of granules and in doing so overlooks the knowledge of*

3

*a POSA, as well as the named inventor's own disclosure, that granules are formed through specific processes to result in specific entities with specific characteristics.*

• *Sixth, Dr. Smith's experiments and application of Polarized Light Microscopy is insufficient to demonstrate the presence of granules in the Aurobindo ANDA Product relying primarily, as Dr. Smith does, on lighter areas versus darker areas. A POSA would not make the same overly broad conclusions based on Dr. Smith's experiments.*

9.      Plaintiff has taken no positions, and Dr. Smith has articulated no arguments for infringement of the claims of the '721 patent by Aurobindo's ANDA Product under the DOE.  To the extent that Dr. Smith later asserts an infringement argument or position under the DOE, then I reserve the right to respond and assert any argument in response to infringement under the DOE including prosecution history estoppel, disclosure dedication, or any other appropriate response, without limitation.

## II.    QUALIFICATIONS

10.      I am Vice President, Pharmaceutical Sciences for FinnBrit Consulting in Waltham, MA, where I have worked since July, 2007.  My work at FinnBrit is focused on consulting and advisory services to the pharmaceutical industry on chemistry, manufacturing and controls (CMC) issues relating to product formulation for drug development projects, including all aspects of formulation design.

11.      I received a Bachelor of Pharmacy degree from University of Nottingham in the UK in 1971, a Master of Science in Pharmaceutical Analysis from University of Strathclyde in the UK in 1987, and a Doctor of Philosophy (Ph.D.) from the University of Wales in the UK in 1992. Details regarding my background and qualifications can be found in my curriculum vitae, attached as **Exhibit A**.

12.     Before I became Vice President for FinnBrit Consulting, I served as a pre-registration pharmacy graduate at Torbay Hospital in Torquay, South Devon, UK (1971-1972); Preregistration pharmacy graduate, Pharmacist, and Chief Pharmacist at Harker Stagg Ltd., Leyton, London E10, UK (1972-1973); Senior research assistant, staff scientist, and senior scientist for Pfizer Central Research in Sandwich, UK (1973-1980); Department manager with Sterling Winthrop Research Centre in Alnwick, Northumberland, UK (1981-1984); Tablet section manager with ACO Läkemedel AB, Solna, Sweden (1984-1986); Graduate student at Strathclyde University (1986-1987); Graduate research student at Welsh School of Pharmacy, University of Wales in Cardiff, UK (1987-1990), a research associate with Welsh Centre for Postgraduate Pharmacy Education also in Cardiff (1990-1991); Locum Community Pharmacist at various pharmacies in South Wales and Southwest England (1991-1992); Technical Services Manager (Europe) followed by Technical Services Manager (US), Director QA/QC and finally Senior Director Technical Operations all for Penwest Pharmaceuticals Co. (formerly Edward Mendell Co. Inc.) in Patterson, NY (1992-2001); Vice President, R&D for Genpharm Inc., in Etobicoke, Ontario, Canada (2001-2002); worked as a pharmaceutical consultant from March-August 2002; and Vice President, Pharmaceutical Sciences with Idenix Pharmaceuticals, Inc. in Cambridge, MA (2002-2007).

13.     During my time in the pharmaceutical industry, I undertook or supervised the design and development of a number of drug molecules, both new drug molecules for clinical trials and commercial use, as well as generic products. I have formulated tablets, hardgel capsules, softgel capsules, ointments, creams, suppositories, oral solutions, oral suspensions, and parenteral solutions. I have also worked with oral modified release formulations.  I currently consult with clients on the formulation design and development of small-molecule drug candidates, among other things.

14.     I am the recipient of the 2018 United States Pharmacopeia Jacob Bigelow Award for Outstanding Contribution to the Standards by a USP Expert Volunteer.  I have served on USP Expert Committees since 2000 including Excipient Test Methods, Excipient Monograph Content 2, Monographs—Excipients, and Excipient Monographs 1, and am currently chair of the USP Expert Committee on Excipient Test Methods.  I have also been a chair, co-chair or member of USP Advisory Panels or Joint Sub-committees on Good Distribution Practices, Excipient Performance, Use of Enzymes in the Dissolution Testing of Capsules, Lactose, and Reference Standards for Excipients and Food Chemicals.  Further, I am a member of the International Steering Committee for the Handbook of Pharmaceutical Excipients, from the present extending back to 1999.  Since 2011, I have had a visiting tutor/lecturer appointment at the University of Manchester, UK on their Pharmaceutical Industry Advanced Training distance learning program for two Sections covering oral solid dosage forms, and since 2022 a Section on Liquid and Semi-solid Formulations.

15.     I have authored or co-authored more than fifty peer-reviewed papers, articles and web-based publication on topics related to the relationship between the physicochemical characteristics of drugs and their biological effect, with an emphasis on design, development, evaluation, optimization, and scale-up operations of oral dosage forms, including controlled release drug delivery and dispersed systems.  I have also written multiple book chapters, and monographs in the Handbook of Pharmaceutical Excipients, and have been an invited speaker or presenter at numerous professional meetings and events.

16.     My professional memberships include the Royal Pharmaceutical Society of Great Britain, the American Association of Pharmaceutical Scientists, the American Chemical Society, the International Society of Pharmaceutical Engineers, the Academy of Pharmaceutical Sciences of Great Britain, and the Royal Society of Chemistry.

17.    I am being compensated at my customary rate of $600 per hour for my consultation in connection with this litigation.  My compensation is in no way dependent on the outcome of my analysis or opinions rendered in this litigation.

## III.    MATERIALS CONSIDERED

18.    In addition to my experience, education, and training, the materials I considered in forming my opinions are listed in **Exhibit B** and otherwise identified in my report and the attached appendices.

## IV.    LEGAL STANDARDS

19.    I have been instructed by counsel to apply certain legal standards to my analysis. A summary of these legal standards that I have applied is provided below.

20.    I have been informed that Plaintiffs must prove infringement by a "preponderance of the evidence," which means that the fact that is to be proven is more likely true than not.

21.    I have been informed that determining infringement requires performing a two-step analysis.  First, the claims must be construed.  Second, infringement must be proven by showing that each and every claim limitation is found in the accused product or method.  As discussed below, I understand that the parties have agreed or the Court has otherwise ruled on the meaning of certain terms used in the Asserted Claims.  I have reviewed and used those constructions in formulating the opinions set forth in this report.

22.    I have been informed that "literal" infringement requires that every limitation of a claim be embodied in the accused product or method, and that the absence of even one claim limitation avoids literal infringement.

23.    I also have been informed that if an element is not literally found in an accused product or method, infringement may nevertheless be found under the doctrine of equivalents ("DOE") if an "equivalent" of a missing element is found in the accused product or method.  I

7

understand that the DOE does not allow the wholesale redrafting of claims and cannot be used to erase meaningful structural and functional limitations of the claim on which the public is entitled to rely to avoid infringement. I further understand that, in applying the DOE, it is important that some meaning for each limitation in a claim be maintained in order to preserve the boundaries of the invention's patent protection. I understand that the DOE cannot apply so broadly as to effectively eliminate a claim element in its entirety.

24.    I understand that a claim element may be infringed under the DOE when the differences between an element in the accused product and the corresponding element in the asserted claim are insubstantial. For example, if an element in an accused product can be said to be equivalent to a claimed element where it performs substantially the same function, in substantially the same way, to achieve substantially the same result as the corresponding element set forth in the asserted claim.

25.    I further understand that the DOE is applied to individual elements of the claim, not to the invention as a whole. Here, the question of whether Aurobindo's ANDA product infringes the asserted claims of the '721 patent under the DOE requires an element-by-element analysis of the role played by the specific claimed ingredients, particularly the claimed granules comprising 40 mg pimavanserin tartrate, and whether the Aurobindo ANDA Product matches the function, way, and result of the claimed granules comprising 40 mg pimavanserin tartrate.

26.    I understand that an accused feature is not equivalent to a claimed element if the accused feature plays a role substantially different from the claimed element. I also understand that a claim of infringement under the DOE cannot be supported by a conclusory expert opinion unsupported by any explanation or evidence.

8

27.     I understand that when patent applicants narrow claims in response to a rejection, thereby overcoming the rejection, the DOE cannot be used to cover the surrendered subject material. Furthermore, I understand that arguments made by applicants during prosecution to obtain issuance of a patent may also bar application of the DOE.

28.     I further understand that dependent claims contain all of the limitations of the independent claim from which they depend.  Thus, if an independent claim is not infringed, then each of the corresponding dependent claims cannot be infringed.

29.     Finally, I understand that certain claim terms of the '721 patent have been construed by the Court in this matter, but those constructions do not alter my opinions here.  I also understand the terms of the '721 patent are given their plain ordinary meaning to a person of ordinary skill in the art ("POSA") to whom these patents pertain as of the filing of the patents.

## V.     TECHNICAL BACKGROUND

### A.     Use of Excipients in Pharmaceutical Applications

30.     A POSA would have understood that certain, commonly used excipients have multiple functions, but which depend on the specific formulation, or context, in which that excipient is used.  (*See e.g.*, USP <1059> Excipient Performance at 1/59.)  A POSA would further understand that the context in which an excipient is used can significantly affect its properties and role in a given pharmaceutical formulation.  (*Id.*)

31.     A POSA would understand a binder as, "binders or adhesives, which promote adhesion of the particles of the formulation, allowing a granulation to be prepared and maintaining the integrity of the final table."  (Ansel's Pharmaceutical Dosage Forms and Drug Delivery System, 10th Ed. (2014) (hereafter, "Ansel's"); *see also* Aulton's Pharmaceutics, The Design and Manufacture of Medicines, 4th Ed. (2018) (hereafter, "Aulton's") at 516 ("a binder is added to a drug-filler mixture to ensure that granules and tablets can be formed with the required mechanical

9

strength."); *see also* Saharan, Vikas Anand, et al. "Ordered mixing: mechanism, process and applications in pharmaceutical formulations; Asian Journal of Pharmaceutical Sciences; 3(6): 240-259, 243 ("use of binding agents for granulation have been used to prepare ordered units of near identical composition.").)  A POSA would further understand the difference between a diluent and binder when either is used in a dry blend process.  This is because a diluent simply adds bulk density to the formulation.  (Aulton at 513.)  A binder, even when added dry, is adhesive (*i.e.*, sticky) because they are typically water soluble, among other properties, unless they are intended for use in solvent wet granulation.  (*See* Aulton at 516.)  A POSA would understand that a binder can be added as a dry powder which is mixed with the other ingredients before a granulation step, or a compression step, for example slugging or tableting.

32.    A POSA would understand a "diluent" as simply adding bulk to a formulation. (Aulton at 513; *and* Ansel's, at 244.)[1]  A POSA would further understand the difference between a diluent and a binder, especially when either is used in a dry blend process.  This is because binders and diluents have fundamentally different roles in a given formulation as a POSA would readily recognize and agree.  While certain diluents can act (function) as binders, that is not always correct and depends directly on the formulation at issue, including the presence or absence of granulation steps or processes, or compression steps or processes of a sufficient energy to form granules (none of which Aurobindo's ANDA Product use).

33.    The Aurobindo ANDA Product includes as an ingredient microcrystalline cellulose of two different grades.    (AURO_PIMAV00002469-2470  Section  2.3.P.2.1.2, entitled,

---

[1] For example in this case, the bulk density of pimavanserin tartrate capsules are a consideration, such that the smaller size 4 capsule size may be used.  It would therefore be logical to the POSA that in Aurobindo's ANDA Product, which lacks *any* granulation step, that the bulk density of the capsules would be increased by using a diluent in the formulation.  Thus does Aurobindo's ANDA Product achieve a certain bulk density by an entirely different way than the claimed invention.

"Excipients"; and 2458-2462).  I refer to them here collectively as "MCC".  The Aurobindo ANDA characterizes the MCC used in its ANDA Product as a "diluent."   (AURO_PIMAV00002458-2462 Section 2.3.P.1.)

34.      A POSA would further understand the MCC diluent used in Aurobindo's ANDA Product to function as a diluent because the Aurobindo ANDA Product is made by a process that is a dry blending process; one that uses no liquids and involves no dry granulation or compression energy sufficient to result in a granule.

35.     The blending process used in the manufacture of Aurobindo's product is typical of dry blending processes used in the manufacture of powder blends for direct encapsulation.  There is an initial blending step to mix the dry components together.  This is followed by passing the mixed material through a screen using a sifter.  This sifting process serves to break up any coarse powder agglomerates due to the cohesiveness of the powders. Then there is a final blending step to ensure the sifted mixed powder is homogeneous.  (Ansel at 223-225.)

## B.    Powders, Particles, Granules, and Compression

36.     There exist small solid entities (particles) that form components of an immediate release capsule like that at issue here, and with which a POSA would be familiar.  As common examples there are:  powders, particles, and granules.  A powder is an assembly of particles. Particles, as discussed above, are small solid entities. Granules are aggregations of smaller particles that are formed by a granulation process; either wet or dry.  Wet granulation involves the use of an adhesive (binder) in liquid form.  Dry granulation involves the use of high compression force.

37.     A POSA would understand a powder to be a component of a dosage form, or a dosage form itself, composed of very fine particles.  (Ansel at 214-215.)  Powders provide a rapid onset of action because they are readily dispersed, have a large surface area, and usually require only dissolution, not disintegration, before absorption.  (Ansel at 215.)

11

38.    A POSA would understand a particle to be a small piece of a solid material less than ca. 1mm in diameter (if approximately spherical), or per side (if approximately cuboid).  A POSA would also understand that particles can be made of parts of smaller materials that coalesce together and are not necessarily single substance entities.  (Ansel, Ch. 6, at 216.)  A POSA would further understand that a particle is not a granule.

39.    Granulation, a technique of particle enlargement by agglomeration, is one of the most significant unit operations in the production of pharmaceutical dosage forms, mostly tablets and capsules.  During the granulation process, small fine or coarse particles are converted into large agglomerates called granules.  (Shanmugam, "Granulation techniques and technologies: recent progresses; Bioimpacts, 5(1), 55-63, 55 (2015).)  A POSA would understand that a granule is the result of material undergoing a granulation process or method.  (Ansel's, Ch. 6, at pp. 230-231(stating "Granules, which are prepared agglomerates of powdered materials…."; *see* Granulation process transforms fine powders into free-flowing, dust-free granules that are easy to compress; *and see* Shanmugam at 55.)  Granules are specific entities that are prepared by either wet granulation that utilizes a liquid in the process or dry granulation that requires no liquid but does require compression or compaction.  (Shanmugum at 55-56; Ansel at 231; Aulton at 511-512.)  A POSA would understand that granules are specific entities that form as a result of specific actions.  The named inventors of the '721 patent agree with this concept as is evident from the patent's disclosure and as referenced below.  ('721 patent, at 4:43-50.)

40.    The named inventors of the '721 patent continue, stating:

> Generally a granulation process combines one or more particles and forms a granule that will allow tableting or the encapsulation process to be within required limits. The granulation process can be made predictable and repeatable. The granulation is performed in a variety of equipment such as, but not limited to, low shear, high shear granulators, fluid bed granulator, roller compacter, and slugger.

(*Id.* at 4:53-59.)  This passage shows that the named inventors at the time the specification was written also considered granulation to be the result of specific process using specific types of equipment.

41.    A POSA would further understand that to form granules for the purposes of a pharmaceutical formulation, specific processes are required; these processes generally include wet granulation and dry granulation.

42.    Wet granulation is a process whereby powders, consisting of either a single entity or a mixture of entities, are caused to stick together due to a granulation liquid that facilitates the physical connection.  The granulation liquid will contain an adhesive binder substance, or will interact with such a substance that is included in the mixture of materials to be granulated.   (Ansel at 231;  Aulton at 511.)

43.    Dry granulation is a process where the individual component powders of a powder blend to be granulated are caused to adhere to each other under the influence of high pressure.  Under such high pressure, slugs or ribbons are thus formed, then broken down to the required size to form granules.  (Ansel at 231-232; Aulton's at 512.)

44.    There are other granulation methodologies such as hot melt, steam, foam or fluid bed methods; however, even these emerging granulation techniques are specific and specifically designed and developed to form granules.  A POSA would understand further that methodologies such as melt, steam, or foam are really species of wet granulation because the particular processes (*i.e.*, melting, steam, foam) require a liquid phase to promote the formation of mechanical bonds and formation of a granule.  Once again, these are specifically designed processes to result in a specific entity with specific properties:  a granule.  (*See e.g.*, Shanmugam at 55-61 and Table 1.)

45.    None of the granulation methods mentioned here, or as described in the '721 patent, encompass mere associations or random aggregation of particles in the absence of a granulation process or a compression energy sufficient to form the mechanical bonds of a granule,  This is not a granulation method and does not form granules as a POSA would understand it.

46.    A POSA would understand that compression in pharmaceutical formulation typically refers to tablet manufacture. In the context of the '721 patent, compression refers to dry granulation and which a POSA would associate with roller compaction or slugging.  (*See* Ansel at 231-232; Aulton at 512.)

47.    In contrast, a POSA would readily recognize the difference between the light compression of powders, typically used during an encapsulation process, as opposed to the much stronger force need for compression to form tablets and that required in dry granulation.  (*See* Cole et al., at 353; 355-356.)  For example, the force used in the encapsulation process is typically in the 50-100 Pa range, as compared to the compression force required to form tablets is in the 100-200 mPa range.[2]  (*Id*. at 355-357; and Aulton at 590.) Likewise, the compression force required in dry granulation is also in the 100-200 mPa range.  (*Id*. at 355-357; and Aulton at 590.)  A POSA would understand that a standard encapsulation process following dry blending, like that used by Aurobindo, is incapable of forming a granule.

48.    Capsule filling, without a specific compression step, is considered to be just capsule filling, and no POSA would confuse capsule filling with the compression force necessary in dry granulation.  In addition, no POSA would consider capsule filling to be a separate compression step per se because the energy used to simply fill capsules is completely different and far insufficient to form granules.  (Cole et al., at 353.)

---

[2] It should be noted that 1 mPa is equal to 1 million Pa (1 x 10^6 Pa).

49.     It is common for tablets to be made using what is known as direct compression (also known as direct compaction).  This is specific step in forming tablets that involves blending the materials together followed by a specific, high pressure compression step to form tablets. (Aulton at 512-514; and Ansel at 281-282.)  Direct compression of a pharmaceutical formulation to form a tablet requires certain, specific properties of the components of the tablet including the ability of the major part of formulation (but not necessarily all components) to form a tablet in the absence of a granulation step.  Such materials are said to be directly compressible. Excipients which are directly compressible include MCC, coarse grade dibasic calcium phosphate (both the dihydrate and the anhydrous form), certain grades of lactose (but not all), etc.

50.     Dr. Smith appears to conflate basic principles of formulation and the clear differences known to the POSA between common processes like wet or dry granulation, encapsulation, and compression.  In addition, Dr. Smith's analysis and subsequent opinions are based on a misunderstanding of a common excipient like MCC when used in a dry blend process with no compression step.  Given these shortcomings, as well as others identified throughout this report, I disagree[3] with her opinion that the Aurobindo ANDA Product meets the claim limitation "granules comprising 40 mg pimavanserin tartrate …" in either claim 1 or claim 4 of the '721 patent.

**C.      Aurobindo's ANDA Product is Made By a Dry Blend Process Without Compression**

51.     While it is apparent that the asserted claims 1 and 4 are directed to formulations of pimavanserin tartrate, the '721 patent makes clear that the method of producing the claimed granules comprising 40 mg pimavanserin tartrate is novel and critical to the desired product result.  It is also

---

[3] It should be noted that in this report, for assertions, conclusions, and opinions made by Dr. Smith that I do not specifically point out and rebut here, I do necessarily agree with any such assertions, conclusions, or opinions and reserve the right to so state and explain at length based on any replies or supplemental assertions, conclusions, or opinions made by Dr. Smith in the course of this case.

apparent that Aurobindo's ANDA Product is made via completely different method, therefore it does not result in the claimed granules comprising 40 mg of pimavanserin tartrate.  No POSA would consider the steps in the Aurobindo ANDA Product to be of the kind that would produce or result in granules.  Moreover, there does not exist in the Aurobindo ANDA Product process any separate or discrete compression step of the type, or using the force, necessary to form granules.

52.     Dry blending in pharmaceutical formulation is simply mixing of components without transformation of the materials being blended.  More formally, a POSA would consider dry blending to be a means to achieve a sufficiently homogenous mix of the powder components.

53.     Aurobindo's ANDA Product is made using a dry blending process that sifts and co-sifts powder and particulate ingredients.  There are no liquids added, and there are no granulation or compression steps done.  Aurobindo's manufacturing process for preparing Aurobindo's Pimavanserin Product is set forth in Aurobindo's ANDA No. 214782, specifically section 3.2.P.2.3., which includes the following:

**Raw Materials Sifting:**

- Step 1: Co-Sifted Pimavanserin tartrate, half quantity of microcrystalline cellulose (Cellucrest PH-112) & half quantity of microcrystalline cellulose (Cellucrest-113) through 425 μm mesh (ASTM, #40 sieve) and collected separately in the double lined poly bag with proper labeling.

- Step 2: Co-Sifted material from step 1 with remaining half of the quantity of microcrystalline cellulose (Cellucrest PH - 112) and half quantity of microcrystalline cellulose (Cellucrest - 113) along with colloidal silicon dioxide through 425μm mesh (ASTM #40 sieve) and collected separately in the double lined poly bag with proper labeling.

- Step 3: Re-sifted material from step 2 through 425μm Mesh (ASTM #40 sieve) and collected separately in the double lined poly bag with proper labeling.

**Sifting of Lubrication material:**

- Step 4: Sifted Magnesium Stearate USNF through Vibrosifter using ASTM #60 mesh (250 µm sieve) and collected separately in the double lined poly bag with proper labeling.

**Pre-lubrication and Lubrication:**

- Step 5: Loaded the material of step 3 into a blender and blended for 20 minutes with 12 RPM.

- Step 6: Loaded sifted magnesium Stearate USNF from Step 4 to material of step 5 and Lubricated for 5 minutes with 12 RPM.

- Step 7: Unloaded the Lubricated material of step 6 into double lined LDPE bags kept in triple laminated aluminium bags with silica gel desiccant in between the bags followed by Nitrogen purging and sealing at NMT 20% RH condition.

**Blend sample analysis:**

- Step 8: Send the blend sample of pre-lubrication and lubrication for analysis as per the current approved in-process specification.

**Capsule filling:**

- Step 9: The lubricated blend of step 7 was encapsulated into Pimavanserin Capsules 34 mg as per capsule filling plan.

- Step 10: Filled capsules of step 9 were packed into different pack styles as per packaging plan

(*See* AURO_PIMAV00002947 at 2947-2950; *see also* AURO_PIMAV00002944 at 2945-2958, batches: TPIA 019001, 9002, and 9003.)

Aurobindo's manufacturing process is illustrated in the flow chart below.



(AURO_PIMAV00002947 at 2949.)

54.    The equipment utilized in Aurobindo's manufacturing process for preparing Pimavanserin    Capsules,    34    mg    is    presented    below.

| S. No. | Name of the Equipment | Capacity | Make |
|--------|----------------------|----------|------|
| 1. | Vibrosifter (24 Inches) | 100-150 kg | Saan Engg |
| 2. | Octagonal Blender Bin | 30 Liters | Saan Engg |
| 3. | Automatic Capsules Filling Machine (AF-25 T) | 25000 capsules per hour | ACG-PAM Pharma Technologies Pvt Ltd |

(AURO_PIMAV00002945-2958, batches: TPIA 019001, 9002, and 9003.)  A POSA would be very

familiar with the operation and function of this equipment.

55.     A vibrator sifter separates solid particles by causing them to pass through a mesh screen (also known as a sieve).  The energy causing the particles to move and separate is provided by the vibratory action of the sifter unit holding the sieve.  (*See* Ansel at 221 ("Sieving, in which particles are passed by mechanical shaking through a series of sieves…")).

56.     An octagonal blender (also known as an octagonal mixer) is a blending machine for mixing and lubricating dry materials, such as particles,  homogeneously, by tumbling the mix contained inside the blender shell.  (Ansel 6 Chapter at 223-225; *and see* AURO_PIMAV00002944 at 2952-2955.)

57.     A capsule filling machine can fill powders, particles, tablets, pellets or liquids and semisolids into various pharmaceutical capsule sizes by different means.  For the filling of powders into capsules there are two main types of machines: dosator machines and tamping disc machines. They form the powder plug in different ways, but achieve the same result.  (Aulton's, Ch. 33, at pp 589-90, Figs. 33.3 and 33.4)  The force used by a capsule filling machine is much less than that used in tablet compression used in making tablets or the force needed to make granules.  A capsule filling machine undertakes several operations.  These include:  1) the empty capsules are fed into an orientation unit so that they are all the correct way up, 2) the capsule body and cap are separated, and the cap moved to one side, 3) The powder plug is formed either using a dosator or a tamping disc depending on the type of machine, 4) the powder plug is placed in the capsule body, 5) the capsule cap is placed over the capsule body containing the powder plug, 6) the capsule cap and body are closed, and 7) the filled, closed capsule is ejected from the machine and collected prior to *e.g.* testing and final packaging.  (Aulton at 588-590.)

58.    None of the equipment used in Aurobindo's process for preparing Aurobindo's ANDA Product are designed for making granules.  Nor does any of the equipment or steps used in the process to manufacture Aurobindo's ANDA Product magically form the claimed granules as Dr. Smith erroneously concludes.

59.    Notably, the process used to manufacture Aurobindo's ANDA Product is a dry blending process which does not involve any liquids and does not involve a classic wet granulation technique, like the method used to make the granules claimed in the '721 patent.  In addition, the process to manufacture Aurobindo ANDA Product  involves no compression step like the method used to make the granules claimed in the '721 patent.

60.    The equipment used in the process to manufacture Aurobindo's ANDA Product sifts and co-sifts the materials, which are particles, and there is insufficient energy to form specific granule entities.

61.    In addition, Aurobindo's ANDA Product does not include a binder ingredient.  (*See* AURO_PIMAV00002746 at 2747.)  The Aurobindo ANDA identifies the excipient microcrystalline cellulose as a diluent in the Aurobindo ANDA Product formulation.  Dr. Smith mistakenly calls MCC in Aurobindo's ANDA Product a binder.  (*See* Smith at para. 103 pp. 39-40.)  This is incorrect; MCC is not a binder in the Aurobindo ANDA Product formulation and process of manufacture.

62.    Dr. Smith uses the unorthodox verbiage "binder/diluent" to describe the MCC ingredient in the Aurobindo ANDA Product in her effort to find infringement.  (*See* Smith at para. 105 p. 40, (referencing the Handbook of Pharmaceutical Excipients, 5th edition (Exhibit 7)).)  This is clearly erroneous as described in this section.  In addition, the verbiage "binder/diluent: is not

20

applicable to a dry powder composition and no POSA would agree with Dr. Smith on this point or use this unorthodox nomenclature.[4]

63.    As stated above, a POSA would understand that there exists certain, specific excipients that are known to be multi-functional, depending on the context and/or formulation in which they are used.  Dr. Smith is incorrect in her characterization of  MCC in this case, however, because in Aurobindo's dry blended product, MCC is in fact a diluent, not a binder.  This is especially correct in this instance because the Aurobindo ANDA Product process involved neither wet granulation nor direct compression.  That is evident from the formulation itself and the process of making it.

64.    It should also be noted that the contents of Exhibit 7 to Dr. Smith's report, the monograph for MCC from the Handbook of Pharmaceutical Excipients, 5th Ed., contradict her opinions.  There, at part 6 "Functional Category," MCC is described as:  "Absorbent; suspending agent; tablet and capsule diluent; tablet disintegrant."  (*Id.* at 132.)  At part 7 "Applications in Pharmaceutical Formulation Technology," is stated:  "Microcrystalline cellulose is widely used in pharmaceuticals, primarily as a binder/diluent in oral tablets and capsule formulations where it is used in both wet-granulation and direct-compression processes. …."  (*Id.*)  Aurobindo's ANDA Product is made using neither wet granulation nor direct compression.  A POSA would understand

---

[4] As noted in more detail, below, the monograph for MCC from the Handbook of Pharmaceutical Excipients (5th Ed.) relied on by Dr. Smith at Exhibit 7 does use the term "binder/diluent" but does not classify or describe MCC with that term.  The Handbook uses "binder/diluent" verbiage to describe applications of MCC, which is itself a diluent, in certain formulation application contexts limited to wet granulation and direct compression processes, as well as having lubricant and disintegrant properties in tableting).  MCC is not generally referred to as a "binder/diluent" and in my 40-plus years of formulation experience POSAs rarely, if ever, use that terminology when referring to MCC.

that the MCC ingredient in the Aurobindo ANDA is not, in fact, a binder, but is a diluent as stated in the ANDA itself.  Dr. Smith is plainly incorrect when she concludes to the contrary.

## VI.    LEVEL OF ORDINARY SKILL IN THE ART

65.    I have been informed that Dr. Muzzio stated that a POSA to whom the '721 patent is directed would be in the fields of pharmaceutical formulations and ingredients, and the pharmaceutical sciences more broadly.  The POSA would have possessed a relatively high level of skill, such as having at least a Bachelor's degree, and more likely a Master's degree or Doctoral degree, and several years of experience in research and development of pharmaceutically relevant formulations, including, but not limited to, the manufacturing processes of such formulations and the selection and use of ingredients in such formulations. A POSA may be expected to work as part of a team, and is able to draw upon the knowledge and expertise of others on the team. A POSA would have easily understood the prior art references referred to herein and would have had the skill and expertise to draw reasonable inferences from these references.  (Muzzio Opening Report at ¶ 65.)  I agree with Dr. Muzzio's description of a POSA, and as of March 14, 2022, and indeed well before then, I was a person of at least ordinary skill in the art relevant to the '721 patent.

66.    I have reviewed Dr. Smith's Opening Report and nowhere in it does she provide a definition of a POSA as she understands it, nor does she refer to any POSA definition at all.  I understand that the patent infringement inquiry, starting with the meaning of the words of a patent claim, should be considered from the perspective of a POSA.  I find this omission by Dr. Smith casts doubt onto the analysis and opinions appearing in the Opening Report.  For example, I do not agree with her somewhat unusual assertions and opinions concerning the common excipient MCC in the Aurobindo ANDA Product and, in my opinion, a POSA would not either.

67.    Dr. Smith appears to have significant credentials with experience and training in solid state and analytical chemistry.  Dr. Smith, however, appears to lack any real experience or

training in the research and development of pharmaceutical formulations including, but not limited to, the manufacturing processes of such formulations and the selection and use of ingredients in such formulations.  It does not appear that Dr. Smith is, or was in March 2022, a POSA under the definition of Dr. Muzzio.[5]

## VII.    THE '721 PATENT

### A.    Claims

68.    The '721 patent issued with 13 claims, claims 1 and 4 being independent claims.  I understand that Plaintiff has asserted claims 1-7 and 9-13.  These claims are set forth in full, below:

1. A pharmaceutically acceptable capsule for orally delivering 34 mg of pimavanserin to a patient, wherein the capsule has a size 3 or 4 capsule shell that contains a blended pimavanserin composition comprising granules comprising 40 mg pimavanserin tartrate and optionally one or more pharmaceutically acceptable excipients; and one or more blending excipients; wherein the bulk density of the granules is >0.4 g/ml as determined by USP<616>, method 1.

2. The pharmaceutically acceptable capsule of claim 1, wherein one of the blending excipients is selected from the group consisting of magnesium stearate, sodium stearyl fumarate, colloidal silicon dioxide, and talc.

3. The pharmaceutically acceptable capsule of claim 1, wherein the blended pimavanserin composition has a D90 particle size distribution of 60-450 μm as measured using laser scattering particle size analysis.

4. A pharmaceutically acceptable capsule for orally delivering 34 mg of pimavanserin to a patient, wherein the capsule has a capsule shell with a capsule shell size 3 or 4, that encapsulates a blended pimavanserin composition comprising granules comprising 40 mg pimavanserin tartrate and one or more pharmaceutically acceptable excipients; and wherein the bulk density of the granules is >0.4 g/ml as determined by USP<616>, method 1.

5. The pharmaceutically acceptable capsule of claim 4, wherein the capsule shell is a hard shell size 4 capsule.

---

[5] At the time of this report, I am unaware of Dr. Smith's view of the qualifications and level of skill of the person of ordinary skill in the art because these items are not discussed in her Infringement Report dated May 2, 2024.  I reserve the right to supplement any portion of this report as a result and based on any statements by Dr. Smith regarding the level of skill of a POSA.

6. The pharmaceutically acceptable capsule of claim 1, wherein one of the blending excipients is selected from the group consisting of a cellulose, a polysaccharide, and polyvinylpyrrolidone.

7. The pharmaceutically acceptable capsule of claim 1, wherein one of the blending excipients is selected from the group consisting of microcrystalline cellulose, silicified microcrystalline cellulose, hydroxypropyl cellulose, hydroxypropyl methyl cellulose, hydroxymethyl cellulose, and a lactose cellulose blend.

9. The pharmaceutically acceptable capsule of claim 1, wherein the blending excipients comprise microcrystalline cellulose and magnesium stearate.

10. The pharmaceutically acceptable capsule of claim 1, wherein the blending excipients are selected from the group consisting of filler/diluents, lubricants and mixtures thereof.

11. The pharmaceutically acceptable capsule of claim 1, wherein the granules comprise a pharmaceutically acceptable excipient which is a binder.

12. The pharmaceutically acceptable capsule of claim 10, wherein the binder is selected from the group consisting of cellulose, methyl cellulose, polyvinylpyrrolidone and polyethylene glycol.

13. The pharmaceutically acceptable capsule of claim 4 wherein the pharmaceutically acceptable excipients comprise a binder.

('721, 24:4-63.)[6]

## B.    Specification

69.    The '721 patent is titled "Formulations of Pimavanserin" and issued on September 27, 2022 from U.S. Patent Application No. 17/693,830. The '721 patent claims priority from U.S. Provisional Application No. 62/552,300 which was filed on August 30, 2017 ("the '300 provisional"). I make no opinion here whether the '721 patent is entitled to any of its priority claims or parent applications. I have not been asked to consider or opine on the validity of the '721 patent

---

[6] I note that a certificate of correction was submitted regarding claims 12 and 13 of the '721 patent and that Dr. Smith references this in footnotes 2 and 3 of her report. The verbiage at issue referenced in these footnotes for claims 12 and 13 does not affect the substance of my opinions.

and have not done so.

### i.    The Named Inventors Described Certain Excipients

70.    The "Detailed Description" section of the '721 patent starts off with a "Definitions" section.  (*Id.* at 2:31-33.)  The definition section starts out, "Unless defined otherwise, all technical and scientific terms used herein has the same meaning as is commonly understood by one of ordinary skill in the art."  (*Id.* at 2:34-36.)

71.    The '721 patent states, "As used herein, a 'diluent', 'bulking agent' and 'filler' refer to an ingredient (excipient) in a pharmaceutical composition that lacks pharmacological activity but may be necessary or desirable, e.g., to enhance or improve the properties of the pharmaceutical blend for manufacturing or physiological purposes.  For example, a diluent or filler may be used to increase the bulk of a potent drug whose mass is too small for manufacture or administration."  (*Id.* at 3:55-62.)

72.    The '721 patent also describes a binder as; "[a]s used herein, a 'binder' is an excipient holding the ingredients together, and forming granules or tablets with the required mechanical strength, and may give volume to the formulation."  (*Id.* at 3:63-66.)  The description of a binder continues:

> Specific examples of binders are mono-, di- and poly-saccharides and derivatives thereof; sugar alcohols such as xylitol, sorbitol or maltitol; protein, such as; synthetic polymers, such as polyvinylpyrrolidone (PVP), polyethylene glycol (PEG). Binders are classified according to their application, e.g. solution binders are dissolved in a solvent (for example water or alcohol may be used in wet granulation processes). Examples include gelatin, cellulose, cellulose derivatives, polyvinylpyrrolidone, starch, sucrose and polyethylene glycol. Dry binders are added to the powder blend, either after a wet granulation step, or as part of a direct powder compression (DC) formula. Examples include cellulose, methyl cellulose, polyvinylpyrrolidone and polyethylene glycol.

(*Id*. at 3:66-4:13.)

### ii.    The Named Inventors Described Granules and Granulation

73.    The '721 patent provides a specific, quoted meanings for the following term.

> The term "granulation" as used herein, and as conventionally used in the pharmaceutical industry, refers to the act or process in which primary powder particles are made to adhere to form larger, multiparticle entities called granules. *Granules may for example be formed collecting particles together by creating mechanical bonds between them, e.g.by compression or by using a binder. Granulation is extensively used in the manufacturing of tablets and capsules*.

(*Id.* at 4:43-50) (emphasis added).

74.    The '721 patent further discloses what it refers to as, "formulation, granulation, dry milling, blending, and encapsulation of pimavanserin containing novel elements." (*Id.* at 10:39-41) (emphasis added).    The patent continues, stating that, "[s]alient features are that the known granulation technology uses atypical parameters to achieve the desired results.    Spray rate, atomization and quantity of water are examples of atypical parameters used in combination with wet granulation to obtain the targeted properties of pimavanserin formulation disclosed herein." (*Id.* at 10:41-46) (emphasis added).

75.    The patent states, "Prior to the surprising finding that pimavanserin could be successfully wet granulated achieving the targeted improved physical properties (*e.g.* bulk density) without the addition of a binder, and by adding a small, such as 2-15% w/w, *e.g.* 3-10% w/w, 3-8% w/w amount of water to pimavanserin by spraying, many different granulation methods were contemplated and tested…." (*Id.* at 10:54-62.)

76.    The '721 patent goes on to identify experiments, using techniques to achieve the desired pimavanserin compositions, several comparative experiments resulting in unacceptable products were identified.  (*Id.* at 13:33-15:2.)  One of those unacceptable products resulted from twin-screw melt granulation, which does not require the use of organic or aqueous solvents, but does

involve the use of a binder/disintegrant, heat and agitation.  (*Id.* at 14:24-35.)

77.    The '721 patent discloses that the present application "describes processes to manufacture capsules of size 4 comprising 5-34 mg. pimavanserin" and that it was "surprisingly found that a 100% pimavanserin high-shear granulation was possible by using only small quantities of water" and associated techniques.  (*Id.* at 15:3-46.)  The patent notes that the named inventors demonstrated that a wet granulation technique with appropriate water application combined with a chopper/impeller speed, results in granulated pimavanserin having improved bulk density suitable for filling amounts disclosed herein into capsules of size 4.  (*Id.*)

78.    The example(s) given in the '721 patent require, among other things, a high shear granulator and granulation water, *e.g.* 5-8% sprayed at a controlled rate.  (*Id.* at 20:9-57.)

## C.    File History

79.    I have reviewed the file history for the '721 patent, excerpts of which are referenced below.  The application that led to the issuance of the '721 patent was filed on March 12, 2022, Application Number 17/693,830 ("the '830 application"), which claims priority through a chain of continuation patent applications to the provisional patent application number 62/552,300, filed on August 30, 2017.  ('721 patent, at cover page (60, (63).)  For the purposes of this report, I have been instructed to assume that the '721 patent is entitled to the August 30, 2017 priority date.

80.    As originally filed, the '830 application contained 17 claims, of which claims 1, 8, and 14 were independent claims.  A preliminary amendment was filed, amending claims 1, 5, and 14, cancelling claims 2-4, 8-13, and 16-17, and adding new claims 18-25.  In response to a nonstatutory double patenting rejection, the applicants for the '830 application filed a terminal disclaimer with respect to U.S. Patent Nos. 10,449,185; 10,449,480; 10,849,891; and copending U.S. Patent Application No. 17/080,731.  The terminal disclaimer was approved by the Examiner on May 17, 2022.

27

81.     The application received a notice of allowance on June 1, 2022, allowing claim, 5, 7, 14-15, and 18-25, as renumbered containing independent claims 1 and 4.  The '721 patent issued on September 27, 2022.

## VIII.  AUROBINDO'S PRODUCTS DO NOT LITERALLY INFRINGE THE ASSERTED CLAIMS OF THE '721 PATENT

### A.     Aurobindo's ANDA Product Does Not Include the Granules Comprising 40 mg Pimavanserin Tartrate Limitation

82.     Dr. Smith opines that Aurobindo literally infringes asserted claims 1-7 and 9-13 of the '721 patent.  (*See e.g.*, Smith Report at ¶¶ 15, 39, 52-59, 103-06, 108-09, 114, 118-19.)[7]  I disagree.  As described herein, and further detailed below, Aurobindo's ANDA Product would not infringe the "granules comprising 40 mg pimavanserin tartrate… ." claim limitation of either independent claims 1 or 4 because Aurobindo's ANDA Product contains no granules (and it contains no excipient whose function in the Aurobindo ANDA Product is a binder).  The asserted, dependent claims, which depend from either claim 1 or 4, also require this claim limitation and, therefore, Aurobindo's ANDA Product also does not infringe them for all of the same reasons.

83.     For the avoidance of doubt, independent claims 1 and 4 are shown below:

> 1. A pharmaceutically acceptable capsule for orally delivering 34 mg of pimavanserin to a patient, wherein the capsule has a size 3 or 4 capsule shell that contains a blended pimavanserin composition comprising:
> ***granules* comprising 40 mg pimavanserin tartrate and optionally one or more pharmaceutically acceptable excipients**;
> and one or more blending excipients; wherein the bulk density of the granules is >0.4 g/ml as determined by USP<616>, method 1.

---

[7] For the avoidance of doubt, it is my opinion that the Aurobindo ANDA Product contains neither a binder nor "granules comprising 40 mg pimavanserin."  To the extent Dr. Smith makes such allegations in other paragraphs in her report that are not included here, I do not agree and failure to list them here does not mean that I agree with Dr. Smith, whose opinions and analysis are mistaken and flawed as described herein.

> 4. A pharmaceutically acceptable capsule for orally delivering 34 mg of pimavanserin to a patient, wherein the capsule has a capsule shell with a capsule shell size 3 or 4, that encapsulates a blended pimavanserin composition comprising:
> **granules** *comprising 40 mg pimavanserin tartrate and one or more pharmaceutically acceptable excipients*; and
> wherein the bulk density of the granules is >0.4 g/ml as determined by USP<616>, method 1.

(Emphasis added.)

84.     The "granules comprising" claim element bears emphasis in both claims, because this is the claim element missing from Aurobindo's ANDA Product.  As discussed above, the conditions for formation of granules in the Aurobindo ANDA Product process are totally absent.  I recap those reasons, below.

### i.    Aurobindo's ANDA Product Contains No Granules

85.     A required claim limitation of both independent claims 1 and 4 is, "granules comprising 40 mg pimavanserin tartrate."  Because Aurobindo's ANDA Product does not contain granules of anything, much less granules comprising 40 mg pimavanserin tartrate, this element is not met and there is no literal infringement.

86.     Aurobindo's ANDA Product process lacks any steps that a POSA would understand or recognize to form granules comprising 40 mg pimavanserin tartrate, or any granules at all for that matter.  As stated above, the claimed granules comprising 40 mg pimavanserin tartrate are not formed in the Aurobindo ANDA Product process.  To the extent that Dr. Smith argues and concludes to the contrary, I disagree.

### ii.    Aurobindo's ANDA Product is Made Via Dry Blending

87.     As discussed above, the Aurobindo ANDA Product is made using a dry blending process.  Dry blending of powders without a specific compression (or compaction) step and then capsule filling cannot produce or result in granules, or the claimed granules comprising 40 mg

pimavanserin tartrate.  To the extent that Dr. Smith argues and concludes to the contrary, I disagree.

### iii.    Aurobindo's ANDA Product Contains No Binder Ingredient

88.    As discussed above, the Aurobindo ANDA Product contains no binder ingredient and I disagree with Dr. Smith's mistaken assertions and characterizations to the contrary.

89.    As described above, Aurobindo's ANDA Product contains MCC, which in the ANDA Quality Overall Summary is characterized as a "diluent."  As discussed above, MCC is known by the POSA to function as a diluent and, given the need to have a certain bulk density for the Aurobindo ANDA Product, the MCC functions as a diluent.  MCC's role as a diluent in the Aurobindo ANDA Product is made clear because the Product is made via a dry blending process with no specific compression step and in this formulation, MCC has no binder function or character in such a process.

90.    The Aurobindo ANDA Product formulation uses two grades of MCC. (AURO_PIMAV0000245861.)  A POSA would understand this to be further evidence that the MCC, in two grades, functions as a diluent to increase the bulk density of the formulation.  The use of two grades is not uncommon.  The coarser grade promotes flowability of the final blend which is necessary for consistent capsule filling.  The finer grade likely has better disintegrant properties and promotes break up of the capsule plugs (disintegration) and helps with dissolution.  The use of the two grades helps achieve the required blend bulk density, and may also promote better blending and blend stability (reduce tendency for the blend to segregate during filling).  This facilitates encapsulating the powder into the relatively smaller size 4 capsules.

### iv.    Aurobindo's ANDA Product Has No Compression Step

91.    As discussed above, the Aurobindo ANDA Product is made by a dry blending process with no specific compression step.  Because there is no specific compression step, like a

compaction step, using the force required to form tables, and there is neither roller compaction nor slugging, the process is incapable of forming the claimed granules comprising 40 mg pimavanserin tartrate.

92.     Also as discussed above, the Aurobindo ANDA Product is made including an encapsulation step, putting the blended dry powder into size 4 capsules. The force used in the encapsulation step is far short (at least several orders of magnitude) for formation or result in the claimed granules comprising 40 mg pimavanserin tartrate. I completely disagree with Dr. Smith's assertions, conclusions, and opinions to the contrary.

93.     As a result of the foregoing facts, it is my opinion that the marketing, offer for sale, sale, or use of Aurobindo's ANDA Product would not infringe claims 1 or 4 of the '721 patent. And, as a result, would not infringe any of the asserted claims that depend from either claims 1 or 4 of the '721 patent.

94.     In addition, because the Aurobindo ANDA Product process uses a dry blending process of powders, that at best form particles, the Aurobindo ANDA Product is substantially different than the claimed granules comprising 40 mg pimavanserin tartrate. Therefore there can also be no infringement under the doctrine of equivalents.[8]

95.     The Analysis by Dr. Smith is Unreliable, Contains Numerous Errors and Fails to Prove that Aurobindo's ANDA Product Includes the Claimed Granules

---

[8] I do not understand Dr. Smith to have made an argument for infringement under the doctrine of equivalents. Nevertheless, it is my opinion that the Aurobindo ANDA Product is not equivalent to the claimed product because the Aurobindo ANDA Product lacks the claimed granules comprising 40 mg pimvanserin tartrate. Because that claim element is missing from the Aurobindo ANDA Product, it cannot be considered to be equivalent to the claimed subject matter that requires granules comprising 40 mg pimavanserin tartrate, in both claims 1 and 4. In addition, the Aurobindo ANDA Product lacks a binder component, as stated above. To the extent that Dr. Smith later tries to argue infringement under the doctrine of equivalents, I reserve the right to respond in full to such arguments.

96.    Dr. Smith relies on various experiments and observations to support her opinions. I disagree with her opinions that rely on these experiments because the experiments contain numerous, serious flaws, fail to show what Dr. Smith concludes, and fail to support her opinions. Nothing Dr. Smith has purported to demonstrate in her experiments, and conclusions based thereon, change my opinion that Aurobindo's ANDA Product contains no granules.

97.    Polarized light microscopy ("PLM") is a contrast-enhancing technique designed to observe and photograph specimens that are visible primarily due to their optically anisotropic character.  Image contrast arises from the interaction of plane-polarized light with a birefringent (or doubly-refracting) specimen to produce two individual wave components that are each polarized in mutually perpendicular planes.  Dr. Smith's Expert Report states, "The diversity observed within the granules (*e.g.*, lighter areas versus darker areas) is indicative of more than one component being present in the granules." (Smith Report, ¶ 58.)   However, Image 10 which was viewed with plane polarized light has no lighter areas, while Images 11 and 12 which were viewed with crossed polarizers show lighter areas on some of the extreme outer edges. In my opinion, lighter areas v. darker areas in these images is not enough to establish the presence of granules.  Her studies only reveal irregular shaped particles.

98.    Moreover, since MCC is opaque to light. Light and dark areas are irrelevant. As I discussed above, MCC is made from an aqueous suspension of acid-hydrolyzed wood pulp fibers which is reflected in the uneven nature of these cellulose particles.  Accordingly, the diversity observed within the granules, *e.g.*, lighter areas versus darker areas, is more likely the result of the uneven nature of the cellulose fibers in MCC particles..

99.    In her polarized light microscopy studies, Dr. Smith is also confusing the physical structure of granules and the physical structure of powder. The physical structure of granules is

different than the physical structure of powder. In granules, larger particles containing drug product and excipients are rigidly associated. In contrast, in powder formulations, the drug product and excipients are loosely associated. Accordingly, any diversity observed in the Polarized Light Microscopy studies (*e.g.*, lighter areas versus darker areas) of Aurobindo's Pimavanserin Product is more likely to be a result of fine particles of API loosely associated on the surface of MCC rather than being indicative of more than one component being rigidly attached in the particles. This reasoning makes sense of Image 10 which was viewed with plane polarized light and has no lighter areas, while Images 11 and 12 which were viewed with crossed polarizers show lighter areas on some of the extreme outer edges. Thus, lighter areas v. darker areas in these images fail to establish the presence of granules as suggested by Dr. Smith.

100.    In addition, it appears that Dr. Smith did not look at the individual components of the Aurobindo product and compare them. She may not have known the precise grades, but it would have been possible to obtain *e.g.* PH-101, PH-102, PH-301 and PH302 as representative grades. It would have been possible to compare these to the Aurobindo ANDA Product as a control in her microscopy experiments (that would not have made those experiments any more relevant, but perhaps less unreliable).

**B.    The Aurobindo ANDA Use of the Term "granule" Is Imprecise Nomenclature**

101.    Dr. Smith points out in her report a number of places where the Aurobindo ANDA uses the term "granule" or "granulation." (*See e.g.*, Smith Report at ¶ 56.) This in my opinion does not establish, much less prove, that the Aurobindo ANDA Product in this case in fact contains granules or that it is made by what any POSA would recognize as involving a granulation process. As I had described in this report, a POSA would understand that the Aurobindo ANDA Product includes no granulation step or process and, therefore, no granules are produced or formed. To the

extent the Dr. Smith (or Plaintiff Acadia) relies on such errant statements to establish infringement of either claim 1 or 4, I disagree.

102.    In my more than 40 years' experience in the pharmaceutical industry as a formulator, companies often use the term "granule" imprecisely as a sort of shorthand to mean particles or particles more than powder.  It is my opinion that this is no more than imprecise nomenclature, nothing more.

103.    It is my opinion that a POSA would not rely merely on these imprecise, and in this case incorrect, labels, but would look to the actual facts, here, the Aurobindo ANDA Product and how it is made.  No POSA would rely simply on these few statements in the ANDA, when the ANDA itself describes a dry blend process, using no compression (or compaction), no roller compaction or slugging, and applying only sufficient force to the dry blend to form capsule plugs, that could not possibly form the claimed granules comprising 40 mg pimavasnerin tartrate.  A POSA would consider scientific facts and evidence in the ANDA as a whole, not just cherry picking what is clearly imprecise and incorrect nomenclature, as Dr Smith has done.  To the extent Dr. Smith relies on such imprecise and incorrect nomenclature, I disagree.

## IX.    CONCLUSION

104.    For all of the foregoing reasons, it is my opinion that marketing, offering for sale, selling or using the Aurobindo ANDA Product would not infringe any claim of the '721 patent asserted against Aurobindo concerning Aurobindo's ANDA Product.

105.    This Report is based on information known to me as of the date I signed this Report, and I reserve the right to amend or supplement this Report based on additional information uncovered in this action, including my review of any expert statements or reports submitted by or on behalf of any of the Plaintiffs.  I reserve the right to supplement or amend my opinions in response to any opinions expressed by any of the Plaintiffs' experts, or in light of any additional evidence,

testimony, or other information that may be provided to me after the date of this Report, including

at trial. In addition, I expect that I may be asked to testify in response to issues that may be raised

in any reports of any of the Plaintiffs' experts, or to issues that may be raised by fact witnesses and

technical experts at trial. I also reserve the right to develop materials and exhibits as appropriate for

use in helping to demonstrate and explain my opinions if I am asked to testify at trial in the above

matter.

Date: June 6, 2024 _____          _____

R Christian Moreton, Ph.D.

# EXHIBIT 3

```
                          1

        IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF DELAWARE
_____
ACADIA PHARMACEUTICALS INC., )
        Plaintiff,          ) Case No.
v.                          ) 1:22-cv-01387-GBW
AUROBINDO PHARMA LIMITED and ) (Consolidated lead case)
AUROBINDO PHARMA USA, INC., )
        Defendants.         )
_____)
ACADIA PHARMACEUTICALS INC., )
        Plaintiff,          )
v.                          )
MSN LABORATORIES PRIVATE LTD. )
and MSN PHARMACEUTICALS, INC.,)
        Defendants.         )
_____)


              CONFIDENTIAL

          VIDEO DEPOSITION OF
      R. CHRISTIAN MORETON, M.Sc, Ph.D.
          Tuesday, August 20, 2024




_____
          DIGITAL EVIDENCE GROUP
       1730 M Street, NW, Suite 812
          Washington, D.C. 20036
             (202) 232-0646
```

```
                          2

 1                Tuesday, August 20, 2024
 2                     8:57 a.m. EDT
 3
 4
 5
 6
 7        Video Deposition of R. CHRISTIAN MORETON,
 8  M.Sc, Ph.D., appearing at Holland & Knight, 10 St.
 9  James Avenue, #1200, Boston, Massachusetts 02116,
10  held before Dana Welch, a Registered Professional
11  Reporter, Certified Realtime Reporter.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
                          3

 1  APPEARANCES OF COUNSEL:
 2  Attorneys for Aurobindo Pharmaceuticals and the
 3  Witness:
 4        KRATZ & BARRY LLP
 5        By:  Michael P. Hogan, Esq.
 6        325 Chestnut Street, Suite 876, #259
 7        Philadelphia, Pennsylvania 19106
 8        404.341.6600
 9        mhogan@kratzandbarry.com
10
11  On behalf of the Plaintiffs:
12        PAUL HASTINGS LLP
13        By:  Chad J. Peterman, Esq.
14        Peter Edward Conway, Esq.
15        200 Park Avenue
16        New York, New York  10166
17        212.318.6797
18        chadpeterman@paulhastings.com
19        peterconway@paulhastings.com
20
21  Also present:  Gayle Ashton, Videographer
22
23
24
25
```

```
                          4

 1                  I N D E X
 2  WITNESS: R. CHRISTIAN MORETON, M.Sc, Ph.D.
 3  EXAMINATION:                        PAGE:
 4    BY MR. PETERMAN                     6
 5  EXHIBITS MARKED:
 6  NO.  DESCRIPTION                    PAGE:
 7    Moreton Exhibit 1, U.S. Patent 11,452,721    18
 8    Moreton Exhibit 2, Rebuttal Expert Report    52
 9    of R. Christian Moreton, Ph.D. on
10    Noninfringement
11    Moreton Exhibit 3, Exhibit B, Materials     54
12    Considered
13    Moreton Exhibit 4, Document Bates labeled    82
14    AURO_PIMAV00002806 - 2901
15
16  NOTATIONS:
17    Designation of the transcript as          110
18    confidential
19    Transcript order                          110
20
21
22
23
24
25
```

                                    1 (Pages 1 to 4)

5

1           P R O C E E D I N G S
2           THE VIDEOGRAPHER:  Good morning.  We are
3    now on the record.
4           This is the videographer speaking, Gayle
5    Ashton, with the Digital Evidence Group.  Today's
6    date is August 20, 2024, and the time is 8:57 a.m.
7           We are here at Holland & Knight, 10 St.
8    James Avenue, Boston, Massachusetts, to take the
9    video deposition of Dr. R. Christian Moreton in the
10   matter of Acadia Pharmaceuticals Limited versus
11   Aurobindo Pharma Limited, et. al.
12          Would counsel please introduce themselves
13   for the record.
14          MR. PETERMAN:  Good morning.
15          Chad Peterman, along with Peter Conway
16   from Paul Hastings on behalf of the plaintiffs in
17   this case.
18          MR. HOGAN:  Michael Hogan, law firm of
19   Kratz & Barry on behalf of the witness and
20   Aurobindo.
21          THE VIDEOGRAPHER:  Would the court
22   reporter, Dana Welch, please swear in the witness.
23          R. CHRISTIAN MORETON, M.Sc, Ph.D.
24          having provided proper identification, was
25   placed under oath and testified as follows:

6

1               EXAMINATION
2    BY MR. PETERMAN:
3       Q.  Good morning, Dr. Moreton.
4           Would you please state your name and
5    address for the record?
6       A.  Richard Christian Moreton, 29 Shawmut
7    Road, Waltham, Massachusetts.
8       Q.  You understand you're here testifying as
9    an expert in a patent litigation case between
10   Acadia and Aurobindo?
11      A.  Yes, I do.
12      Q.  And you have been retained by Aurobindo in
13   this case?
14      A.  Yes, I have.
15      Q.  And you've been retained to provide
16   opinions regarding infringement in this matter?
17      A.  Yes, I have.
18      Q.  And you understand that this matter
19   involves U.S. Patent 11,452,721?
20      A.  Yes, I do.
21      Q.  And you've been previously deposed in this
22   matter in connection with claim construction,
23   correct?
24      A.  Yes, I believe so.
25      Q.  Okay.  Did you review that testimony in

7

1    preparation for your deposition today?
2       A.  That I'm not sure.  I reviewed a lot of
3    documents.
4       Q.  Do you recall the deposition that you had
5    in connection with claim construction in this case?
6       A.  Some time ago, I don't remember the
7    details.
8       Q.  Do you have any reason to doubt the
9    veracity of your testimony during that earlier
10   testimony?
11      A.  No, I do not.
12      Q.  Now, Dr. Moreton, you've been deposed many
13   times before, correct?
14      A.  I've been deposed, yes.
15      Q.  And just very briefly, just so it's on the
16   record, you understand I'll be asking you a series
17   of questions today?
18      A.  Correct.
19      Q.  If you don't understand my question,
20   please ask me for clarification.
21      A.  Yes,I will.
22      Q.  If you respond, I will assume that you
23   have understood my question; is that fair?
24      A.  That's fair, yes.
25      Q.  If you need a break at any point, please

8

1    let me know, as long as there's not a question
2    pending, then we'll try to take one.
3       A.  Sure.  Thank you.
4       Q.  Otherwise, we'll try to take breaks about
5    every hour or so.
6           And, Dr. Moreton, we'll try to keep this
7    as a question and answer.  If we end up talking
8    over each other, we'll try to correct that for the
9    court reporter's sake.  Is that fair?
10      A.  Sure.  Thank you.
11      Q.  Now, what were you engaged by Aurobindo in
12   this case to do?
13      A.  I was asked to provide expert testimony
14   regarding infringement of the '721 patent.
15      Q.  Just so we're clear on the record, when we
16   refer to the '721 patent, that's U.S. Patent
17   11,452,721; is that fair?
18      A.  That's correct.
19      Q.  And that, as you understand, is the only
20   patent at issue in this case?
21      A.  That's my understanding, yes.
22      Q.  And you're aware that the '721 patent has
23   two independent claims, claims 1 and 4?
24      A.  Yes.  That's correct.
25      Q.  And is it your opinion that Aurobindo's

2  (Pages 5 to 8)

9

1    **ANDA product does not infringe either claim 1 or 4**
2    **of the '721 patent?**
3         A. Yes.
4         **Q. Okay. And in fact it's your opinion that**
5    **it doesn't infringe any claim of the '721 patent.**
6         A. Correct.
7         **Q. And your opinions are set forth in an**
8    **expert report that you prepared for this case,**
9    **correct?**
10        A. Yes.
11        **Q. Are there any corrections or additions**
12   **that you need to make to that report before we go**
13   **on?**
14        A. Yes. There's one -- I think it's on
15   page 3, there's one misspelling. It says "absent
16   form," it should be "absent from." And then on
17   another couple of places, I've referenced force and
18   I've mentioned pascals. Pascals is actually a unit
19   of pressure, so it's the force -- force necessary
20   to generate that pressure. It's, strictly
21   speaking, not correct to say force and pascals.
22        **Q. Other than those two points that you just**
23   **raised, are there any other corrections or**
24   **supplementations that you need to make?**
25        A. There's a couple of instances where

10

1    somehow the superscripts for the footnotes somehow
2    got mangled and they ended up as not superscripts,
3    but I don't understand how that happened.
4         **Q. That's how Microsoft keeps on making**
5    **money, I think.**
6         **Anything else?**
7         A. Not that I recall.
8         **Q. How long did you --**
9         MR. PETERMAN: Strike that.
10        **Q. How did you go about preparing for your**
11   **deposition today?**
12        A. Well, I reviewed my report. We had --
13   counsel and I had different telephone calls over
14   the period of time, and we met yesterday for
15   several hours.
16        **Q. Other than reviewing your report, were**
17   **there any other documents that you reviewed?**
18        A. I reviewed reports of Dr. Smith and some
19   of the references cited by Dr. Smith and some of
20   the references that I cite as well.
21        **Q. Did you review Dr. Smith's deposition**
22   **testimony?**
23        A. Not that I recall.
24        **Q. Do you know whether Dr. Smith has been**
25   **deposed in this case yet?**

11

1         A. No, I do not.
2         **Q. Did you ask your counsel whether Dr. Smith**
3    **had been deposed in this case?**
4         A. No.
5         MR. HOGAN: You can say yes or no.
6         A. No.
7         **Q. Have you ever met Dr. Smith before?**
8         A. Not that I recall.
9         **Q. Were you familiar with Dr. Smith prior to**
10   **this case?**
11        A. Don't believe so.
12        **Q. So other than what's in her report, you**
13   **don't have any familiarity with her qualifications**
14   **in this case?**
15        A. Only what's in her report, yeah.
16        **Q. Have you ever heard of the company**
17   **Improved Pharma based in Indiana?**
18        A. No, not until I read her report, CV.
19        **Q. So you never had occasion to use Improved**
20   **Pharma services?**
21        A. No.
22        **Q. Dr. Moreton, what do you consider to be**
23   **your area of expertise?**
24        A. Generally, formulation science, small
25   molecules.

12

1         **Q. And what is formulation science?**
2         A. It's the science of putting drug products
3    together, formulating drug products or the science
4    behind them as well.
5         **Q. Do you consider yourself an expert in**
6    **analytical chemistry?**
7         A. I'm familiar with analytical chemistry, my
8    master's is in analytical chemistry, but I wouldn't
9    consider myself an expert in analytical chemistry.
10        **Q. Do you consider yourself an expert in**
11   **polarized light microscopy?**
12        A. Again, I'm familiar with it, but I
13   wouldn't consider myself an expert.
14        **Q. Prior to this litigation, have you offered**
15   **opinions regarding polarized light microscopy, as a**
16   **testifying expert?**
17        A. No.
18        **Q. Do you have a polarized light microscopy**
19   **instrument in your current lab?**
20        A. No.
21        **Q. Have you ever had a polarized light**
22   **microscopy instrument in a laboratory that you've**
23   **worked in?**
24        A. Gosh.
25        Possibly, but it's possibly a long time

3  (Pages 9 to 12)

8/20/2024          Acadia Pharmaceuticals, Inc. v. Aurobindo Pharma Limited, et al. R. Christian Moreton, M.Sc, Ph.D.
Confidential

13

1  ago.
2      Q.  Sitting here today, you don't recall any
3  lab that you worked in with a polarized light
4  microscope?
5      A.  Not that I recall, no.
6      Q.  Have you ever operated a polarized light
7  microscope?
8      A.  Not that I recall.
9      Q.  Have you ever interpreted images from a
10  polarized light microscope other than in connection
11  with this litigation?
12      A.  I think possibly a good few years ago.
13      Q.  Can you recall any specifics about your
14  possible interpretation of polarized light
15  microscope images?
16      A.  I can't recall the details.
17      Q.  Was in it connection with a litigation?
18      A.  No.
19      Q.  What kind of project was in it connection
20  with?
21      A.  It was a formulation -- a novel compound
22  formulation project.
23      Q.  What was the purpose of using PLM?
24          And can we agree that polarized light
25  microscopy is PLM?

14

1      A.  Yes.
2      Q.  What was the purpose of using PLM in that
3  exercise?
4      A.  It was a standard test that we ran for
5  certain types of compounds, and it's one of the --
6  like the pre-formulation screening test that we
7  did.
8      Q.  What were you looking for in connection
9  with that standard test?
10      A.  It would give information on the structure
11  of the materials.
12      Q.  Were you using PLM to determine the
13  presence of granules?
14      A.  No.
15      Q.  Outside of this litigation, have you ever
16  used PLM or rendered an opinion of PLM in
17  determining the presence of granules in a
18  formulation?
19      A.  No, I have not.
20      Q.  Can PLM tell you if there's granules in a
21  formulation?
22      A.  No.
23      Q.  Why not?
24      A.  PLM, what I've seen, tells you what the
25  particles look like.  It doesn't tell you much

15

1  about the structure of the particles other than, if
2  you will, it will tell you if they're -- what can I
3  call it -- intact or loose or whatever.
4      Q.  Can PLM tell you how particles are
5  attracted to each other?
6      A.  Not to my knowledge, no.
7      Q.  Does PLM tell you if particles are in
8  contact with each other?
9      A.  If you can determine which of the
10  particles are what, yes.
11      Q.  Did you perform any PLM studies of your
12  own in connection with this litigation?
13      A.  No, I did not.
14      Q.  Other than reviewing PLM images prepared
15  by Dr. Smith, did you perform any other activities
16  with PLM in this litigation?
17      A.  No, I did not.
18      Q.  In connection with the images that you
19  used from Dr. Smith, were they images in her report
20  or did you look at raw images?
21      A.  They were the images in her report.
22      Q.  So you didn't take a look at any raw
23  images that were produced in connection with this
24  litigation?
25      A.  Not that I'm aware of, no.

16

1      Q.  Did you ask counsel for raw images?
2      A.  I did not, no.
3      Q.  So the images that you looked at were the
4  ones that were attached in her opening report, as
5  well as rebuttal report?
6      A.  Yes.
7      Q.  Did you speak with anyone at Aurobindo in
8  connection with any of the work that you've done in
9  this case?
10      A.  No, I have not.
11      Q.  Did you ask any questions to Aurobindo or
12  through counsel in connection with the work that
13  you've done in this case?
14      A.  There may have been one or two.
15      Q.  Do you recall what you asked Aurobindo
16  through counsel?
17          MR. HOGAN:  You can answer if you recall.
18      A.  I don't recall.
19      Q.  Are there any answers that you received
20  from Aurobindo that you're relying upon in
21  connection with the opinions that you're expressing
22  in this case?
23      A.  Not that I'm aware of.
24      Q.  Did you ever review or examine an actual
25  Aurobindo pimavanserin product that's the subject

17

1  of their ANDA?
2      A. No, I did not.
3      Q. So you didn't -- you never received any
4  capsules of Aurobindo's product?
5      A. No, I did not.
6      Q. Did you ask for capsules of Aurobindo's
7  product?
8      A. No, I did not.
9      Q. Other than the materials listed in your
10  expert report, as far as materials considered, did
11  you review any other materials in connection with
12  your opinions?
13      A. Only Dr. Smith's opening report and the
14  attachments.
15      Q. And you reviewed Dr. Smith's rebuttal
16  report?
17      A. Later, yes.
18      Q. Did anything in Dr. Smith's rebuttal
19  report change your opinions in this case?
20      A. No, they did not.
21      Q. Have you formed any additional opinions
22  after reading Dr. Smith's rebuttal report?
23      A. No, I did not.
24      Q. So outside of what's in your expert
25  report, do you intend to testify at trial about any

18

1  other issues?
2      A. Not that I'm aware of.
3      Q. Outside of what's in your expert report,
4  do you intend to offer any other opinions beyond
5  what's in that expert report?
6      A. I don't believe so.
7      Q. You're not offering opinions on validity
8  in connection with this case, correct?
9      A. That's correct.
10      Q. Is there any reason that you can't provide
11  true and complete testimony today?
12      A. No, there isn't.
13      Q. Did you review the '721 patent in
14  connection with preparing your report?
15      A. Yes, I did.
16          MR. PETERMAN: I'm going to mark as
17  Exhibit 1, the '721 patent.
18          (Moreton Exhibit 1, U.S. Patent 11,452,721,
19          marked for identification.)
20      Q. And Dr. Moreton, you're familiar with the
21  '721 patent, correct?
22      A. That's correct.
23      Q. This is the patent that you rendered
24  non-infringement opinions on?
25      A. Yes, that's correct.

19

1      Q. And just to be clear, you understand that
2  the claims are on the last page of the patent?
3      A. Yes, they are.
4      Q. And you've rendered an opinion that claim
5  1 is not infringed?
6      A. Correct.
7      Q. And the reason that claim 1 is not
8  infringed in your opinion is it does not have
9  granules comprising 40 milligrams pimavanserin
10  tartrate?
11      A. That is correct.
12      Q. Is there any other reason that you're
13  offering opinion that claim 1 is not infringed?
14      A. That is the reason.
15      Q. So you're not offering any other -- you're
16  not claiming that any other elements of claim 1 are
17  not met by Aurobindo's product, correct?
18      A. No, I'm not.
19      Q. And then I want to direct your attention
20  to claim 4. With claim 4, you contend that
21  Aurobindo's product does not have granules
22  comprising 40 milligrams pimavanserin tartrate,
23  correct?
24      A. That is correct.
25      Q. Are there any other reasons why you claim

20

1  that Aurobindo's product does not infringe claim 4?
2      A. Not that I'm aware of.
3      Q. Again, to be clear, you didn't do any of
4  your own testing whatsoever on Aurobindo's product,
5  correct?
6      A. That is correct.
7      Q. And your knowledge of Aurobindo's product
8  comes from Aurobindo's ANDA?
9      A. Yes, their ANDA, yes.
10      Q. Other than Aurobindo's ANDA, is there any
11  other source of information that you relied upon
12  for understanding Aurobindo's product?
13      A. My experience.
14      Q. Have you heard of the term, a
15  "product-by-process claim"?
16      A. I've heard of it, yes.
17      Q. Do you know what a product-by-process
18  claim is?
19      A. I think I know, but to offer an opinion,
20  it's a legal term, and I'm not qualified to render
21  that.
22      Q. Okay. Just your expert, you know,
23  non-lawyer opinion as to what you understand a
24  product-by-process to mean?
25      A. I'm not sure I can explain it that well.

5 (Pages 17 to 20)

21

1  I've heard the term and I think it's been mentioned
2  in previous litigation cases, but to me it's a
3  legal term that I encounter from time to time.
4      Q.  Do you know if claim 1 or claim 4 in this
5  '721 patent are product-by-process claims?
6      A.  I would have to take counsel's advice on
7  that.
8      Q.  But in applying your -- or in reaching
9  your opinion on infringement, did you consider
10 whether or not claims 1 and 4 were
11 product-by-process claims?
12     A.  I considered claims 1 and 4 on their merit
13 and I looked at the Aurobindo ANDA and I drew my
14 conclusions on infringement that way.
15     Q.  When you say you considered them on their
16 merit, is that just another way of saying you gave
17 an ordinary reading of the claims?
18     A.  Yes, as a person of skill in the art would
19 understand them.
20     Q.  And in connection with that ordinary
21 reading, did you consider the court's claim
22 constructions in this matter?
23     A.  Yes.  It's in my -- I mentioned that in my
24 declaration report.
25     Q.  And in connection with prepping for the

22

1  deposition, did you review the court's claim
2  construction order?
3      A.  That I don't recall.
4      Q.  Did you look for definitions of terms in
5  the claim within the specification of the '721
6  patent?
7      A.  Yes.  In general, yes.
8      Q.  And is it your understanding that if a
9  patentee defines a term in the specification, that
10 term -- that definition should be used for
11 interpreting the claims?
12     A.  That's what I've been told by counsel.
13     Q.  And did you apply that in connection with
14 your opinions?
15     A.  Yes, I did.
16     Q.  So you understand that the active
17 ingredient at issue in this case is pimavanserin?
18     A.  The active ingredient, yes, is
19 pimavanserin.  It's actually present as the
20 tartrate salt.
21     Q.  And does the difference between
22 pimavanserin and pimavanserin tartrate play any
23 role in your non-infringement opinion?
24     A.  There's a difference between them.  The
25 pimavanserin is freebased, pimavanserin tartrate is

23

1  the salt form.  They have different -- certain
2  different physical properties, so -- but in
3  general, if the formulation contains pimavanserin
4  tartrate, that's what I focused on.
5      Q.  And Aurobindo's proposed ANDA product
6  contains pimavanserin tartrate, correct?
7      A.  That's correct.
8      Q.  And it contains 40 milligrams of
9  pimavanserin tartrate?
10     A.  Yes.  That's what I've been told.
11     Q.  And you confirmed that by looking at the
12 ANDA?
13     A.  Yes.
14     Q.  Now, in claim 1 of the '721 patent, is
15 there a process limitation that's required in order
16 to infringe claim 1?
17     A.  How do you mean, a "process limitation,"
18 sir?
19     Q.  Is there a manufacturing process that's
20 required in claim 1?
21     A.  The only process limitations are that it
22 requires blended and that they require pimavanserin
23 tartrate granules and some excipients that are all
24 blended in.
25     Q.  So you're reading pimavanserin tartrate

24

1  granules as requiring a specific manufacturing
2  process?
3          MR. HOGAN:  Objection to form of the
4  question, no foundation.
5          You can answer.
6      A.  Granules in pharmaceutical terms are made
7  by a granulation process.  But the important part
8  is it's granules that have to be present.
9      Q.  Do the granules have to be present
10 regardless of how they're made?
11     A.  My reading is granules have to be present,
12 period, regardless of how they're made.
13     Q.  So if there's a process that results in
14 granules, it could potentially infringe claim 1?
15     A.  If it results in granules, yes.
16     Q.  So the granules of this invention aren't
17 limited to wet granulation, for instance, correct?
18     A.  That's my understanding, yes.
19     Q.  And the granules aren't limited to dry
20 granulation, correct?
21     A.  They could be either wet granulation or
22 dry granulation, but it has to be a granulation
23 process.
24     Q.  And what do you define as a "granulation
25 process"?

6  (Pages 21 to 24)

8/20/2024          Acadia Pharmaceuticals, Inc. v. Aurobindo Pharma Limited, et al. R. Christian Moreton, M.Sc, Ph.D.
Confidential

25

1    A. Well, you've mentioned the two variants,
2  and there are variants within the variants.  So wet
3  granulation is a process whereby a liquid is added,
4  causes the particles to stick together, then the
5  liquid is dried off and the particles are sized and
6  they form -- sorry -- the granules are sized and
7  they form the final granule.
8      In dry granulation, we use high pressure
9  compaction to create either roller-compacted
10 ribbons or tablet slugs that are then broken down
11 to create the granules.
12     Q. So it's your opinion that dry granulation
13 requires compression?
14     A. Yes.
15     Q. Does the patent require compression as
16 part of a dry granulation process?
17     A. It doesn't require a specific granulation
18 process; it just says granules.
19     Q. So if there was dry granulation without
20 compaction that form granules, that would be within
21 the scope of the claims, correct?
22     MR. HOGAN:  Objection to form of the
23 question.
24     You can answer.
25     A. Yeah, I'm having difficulty working that

26

1  one out because I've always known for 50 years that
2  dry granulation requires pressure.  I can't imagine
3  where a granule would be formed dry without
4  pressure.
5      Q. So based on your experience, granules can
6  only be formed with dry granulation using pressure?
7      A. That's my experience, yes.
8      Q. Did you undertake any review of the
9  literature or any other studies to see if dry
10 granulation could result in granules without
11 compression?
12     A. I have been aware of the literature for
13 many, many years.  I review it periodically.  And I
14 have never seen dry granulation without either
15 roller compaction or tablet slugging.
16     Q. Does the specification of the '721 patent
17 require compression as a part of dry granulation?
18     MR. HOGAN:  Object to the form of the
19 question.
20     You can answer.
21     A. I don't recall the full specification.  It
22 mentions dry granulation, and I believe it mentions
23 roller compaction and slugging as two alternatives.
24     Q. So is it your opinion that the
25 specification requires compression in connection

27

1  with dry granulation?
2      A. Like I said, the specification mentions
3  dry granulation and it mentions the alternatives of
4  roller compaction and slugging.  I wouldn't say
5  that it requires that.  But if you want to have a
6  granule, you have to form them, and these are the
7  ways that are recognized to form granules by dry
8  granulation.
9      Q. So where in claim 1 does it require
10 compression as part of dry granulation?
11     A. It's not --
12     MR. HOGAN:  Sorry.  Object to form of the
13 question.
14     You can answer.
15     A. It's not in claim 1.  It's in the
16 specification.
17     Q. What word within claim 1 do you contend
18 requires compression as part of granulation?
19     MR. HOGAN:  Object to the form of the
20 question.
21     You can answer.
22     A. It requires granules, and there are two
23 main methods of producing granules, one of which is
24 dry granulation, the other one is wet granulation,
25 as we've discussed; whichever way you do it,

28

1  they're granules.
2      Q. And is it your contention that there's no
3  way to produce granules using dry granulation
4  without compression?
5      MR. HOGAN:  Object to the form of the
6  question.
7      A. That's my understanding.
8      Q. And that's based on your 50 years of
9  experience in the area?
10     A. Yeah.
11     MR. HOGAN:  Object to the form of the
12 question.
13     You can answer.
14     A. Yeah.
15     Q. So within claim 1, it's the term
16 "granules" that you believe requires compression as
17 part of dry granulation?
18     MR. HOGAN:  Object to the form of the
19 question.
20     You can answer.
21     A. If you have granules and they're made by
22 dry granulation, then you would require
23 compression.
24     Q. Is there any other word within claim 1
25 that leads you to believe that compression is

7  (Pages 25 to 28)

8/20/2024          Acadia Pharmaceuticals, Inc. v. Aurobindo Pharma Limited, et al. R. Christian Moreton, M.Sc, Ph.D.
Confidential

29

1  required other than "granules"?
2      A. No.
3      Q. So in your opinion, granules formed by dry
4  granulation requires compression?
5      A. Granules formed by dry granulation require
6  compression.
7      Q. And if there's no compression, there
8  cannot be granules?
9      A. That's correct.
10     Q. Regardless of what images show?
11         MR. HOGAN:  Object to the form of the
12  question.
13         You can answer.
14     A. Regardless of what images show, yes.
15     Q. So your opinion that Aurobindo does not
16  have granules is based solely on the fact that
17  there's no compression in its dry mix or dry
18  granulation?
19         MR. HOGAN:  Object to the form of the
20  question.
21         You can answer.
22     A. Aurobindo's process is a simple dry
23  blending process.  There is no compression, there
24  is no wet granulation, so there's no dry
25  granulation, there's no wet granulation, it's just

30

1  simple blending operations.
2      Q. Have you ever studied whether a dry
3  blending process can create granules?
4      A. I have been aware of all those processes
5  over many, many years.  I have never, ever seen a
6  blend produce granules without there being
7  something in there that causes the granules to
8  stick together in such a way that it becomes more
9  than a simple blend.
10     Q. What's the difference between a simple
11  blend and a granule?
12     A. In a simple blend, the particles, the
13  different powders are free to associate,
14  disassociate.  In a granule, particles are locked
15  in, whether it's by wet granulation or dry
16  granulation.  So a dry granulation or wet
17  granulation granule will have multiple particles,
18  but they're locked in as a kind of rigid, more
19  rigid bond, mechanical bond between the different
20  particles.
21     Q. And so when you use the term "locked in,"
22  you mean mechanical bond?
23     A. I mean a rigid bond.  Some people call it
24  mechanical, you know, whatever.  But it's a bond
25  that isn't a loose association.

31

1      Q. Would an electrostatic bond be a rigid
2  bond in your opinion?
3      A. No.
4      Q. So an electrostatic bond is a loose
5  association in your opinion?
6      A. Yes.
7      Q. What's the difference between an
8  electrostatic bond and a mechanical bond?
9      A. Electrostatic bond is produced by
10  particularly small -- sorry -- is associated with
11  particularly small particles, and they get charge
12  on the surface and they -- if other materials have
13  an opposite charge, they will associate together.
14  But it's not a very rigid bond, they can be
15  displaced, and that happens all the time in simple
16  blending.
17         In a rigid bond, and it depends on how
18  it's made, but, you know, in wet granulation, you
19  will have something that's dissolved in a liquid,
20  coated over the materials, and then when it's
21  dried, it will solidify and join and stick the
22  particles together in such a way that they form
23  granules.
24         In dry granulation, you use pressure to
25  force things together in very intimate contact and

32

1  they deform and interlock and that's how you form
2  the granules.
3      Q. Is there a test to determine whether a
4  mechanical bond exists between particles?
5      A. There's not a specific test, but there are
6  tests that you can do.  And you look at things like
7  blend segregation and things like that.  If you do
8  a segregation test on a simple blend, if you use
9  the right conditions, you will segregate out the
10  small particles, but for a -- if you use granules,
11  you will not.
12     Q. Is a blend segregation test like a -- use
13  a sifter?
14     A. A sifter may well be part of it.  But
15  it's -- I mean, there isn't an official test for
16  blend segregation.  The official test is for blend
17  uniformity or content uniformity.
18         But a blend segregation test could be
19  developed whereby you look at the fine fraction
20  that passes through the finest sieve and see how
21  much is drug, how much is excipient, things like
22  that.
23     Q. Have you ever performed a blend
24  segregation test?
25     A. I think we did long time ago.  We ran into

8  (Pages 29 to 32)

33

1  problems and we looked at that, but probably 40
2  years ago.
3      **Q. You didn't perform a blend segregation**
4  **test in this case, correct?**
5      A. No, I did not.
6      **Q. So in those blend segregation tests, would**
7  **the particles be shaken?**
8      A. In one of -- that could be the case.
9  Another way really would be tapped on a tap dance
10  type of apparatus or they could be put onto what
11  they call an air jet sieve and agitated by a jet of
12  air that is under the sieve and blows the particles
13  through.
14      **Q. And if the particles were loosely**
15  **associated, you would expect the particles to**
16  **separate from each other?**
17      A. Yes.
18      **Q. But if the particles stick together after**
19  **being shaken and sieved, are those granules?**
20      A. Not necessarily; depends on the
21  interaction of the -- the electrostatic
22  interaction. But in granules, I would say that you
23  would get far less proportion of the active drug,
24  if that's what you're interested in segregating out
25  through that -- through the segregation test,

34

1  whereas with a loose blend, even with some
2  electrostatic interactions, you would get more of
3  the carrier, what we call the carrier particles,
4  being segregated out, and you could determine that
5  through simple assay.
6      **Q. So being shaken and sieved, one would**
7  **expect an API in a loose blend to separate from the**
8  **rest of the particle?**
9      A. I would expect more of the API to
10  segregate, not all of it, but more of it.
11      **Q. Do you know if Aurobindo has performed any**
12  **blend segregation tests along these lines with its**
13  **product?**
14      A. I don't know about blend segregation. I
15  know they will have conducted content uniformity
16  and blend uniformity, which is part and parcel of
17  the --
18      COURT REPORTER: I'm sorry. You have to
19  say that again, "they conducted"...
20      THE WITNESS: Blend uniformity and content
21  uniformity.
22      **Q. What's the purpose of conducting blend**
23  **uniformity and content uniformity tests?**
24      A. This is a requirement from the FDA and
25  other regulator authorities in order to establish

35

1  that you have a reliable process that will
2  consistently give the correct dose of a drug in the
3  capsules within the batch, the whole batch, and
4  between batches.
5      **Q. When a blend is sifted through a sieve, is**
6  **there a pressure that's applied by the grates of**
7  **the sieve when the blend goes through?**
8      A. Say that again, please.
9      **Q. When a blend is sifted through a sieve, is**
10  **there pressure that gets applied by the grates of**
11  **of the sieve when the blend goes through it?**
12      A. The agitation of the sieve, which is
13  usually the case, or in the case of an air jet
14  sieve, it's the compressed air that agitates the
15  particles. They fall against the sieve, back
16  against the sieve, and that mechanical jarring can
17  separate out materials.
18      **Q. Can that mechanical jarring cause**
19  **materials to combine as well?**
20      A. I've not encountered that.
21      **Q. Is there a minimum pressure that needs to**
22  **be applied to a blend in your opinion in order to**
23  **create a granule?**
24      A. I don't know about a minimum pressure.
25  The typical pressures that we use are in the region

36

1  of 100 to 200 megapascals.
2      **Q. Do you know if granules can form with**
3  **pressures less than 100 to 200 megapascals?**
4      A. I think it would depend on the materials.
5      **Q. Have you studied Aurobindo's materials to**
6  **determine what would be the minimum pressure to**
7  **form granules, in your opinion?**
8      A. I have not. But they have -- the
9  materials are microcrystalline cellulose, magnesium
10  stearate, things like that; these are well known
11  materials. Usually, if you don't have enough
12  pressure, then in terms of tablets, the tablets
13  don't stick together properly.
14      If you have too much pressure, they can
15  split or cap because actually the materials will
16  only accept so much pressure, and then after that,
17  you just elastically compact the tablet, and then
18  when the pressure is released, it relaxes and the
19  tablets split.
20      **Q. And your opinion is that in the Aurobindo**
21  **product, pimavanserin is loosely associated with**
22  **microcrystalline cellulose, correct?**
23      A. That is correct.
24      **Q. Did you perform any tests to determine**
25  **that it was a loose association as opposed to a**

9  (Pages 33 to 36)

37

1  granule?
2     A. No, I did not.
3     Q. Is your opinion that it's a loose
4  association solely based on the lack of a
5  compression step?
6     A. It's based on the process that Aurobindo
7  used and they have blending, co-sifting, blending
8  again, and then filling into capsules.
9     Q. So solely based on that process, you
10 determined that it's a loose association as opposed
11 to a granule?
12    A. Based on my experience and looking at the
13 process that Aurobindo used, it's a simple blend.
14    Q. Were there any tests that you could have
15 performed to --
16    A. Excuse me.
17    Q. I'll give you a second.
18    A. Thank you.
19    Q. Were there any tests that you could have
20 performed on Aurobindo's product to demonstrate
21 that it was a loose association as opposed to a
22 granule?
23    A. Like I mentioned, there could have been a
24 segregation test, but I didn't think it was
25 necessary because all my experience tells me this

38

1  is a very simple dry blending operation or what we
2  call direct encapsulation of a simple blend.
3     Q. Prior to this litigation, did you have
4  experience with pimavanserin?
5     A. That I don't believe so.
6     Q. Have you ever developed any pimavanserin
7  formulations?
8     A. Not that I recall.
9     Q. Have you studied the properties of
10 pimavanserin?
11    A. I did look it up when I first got involved
12 in previous litigation -- prior litigation, but
13 that's all.
14    Q. And when you say in "prior litigation,"
15 prior litigation involving Aurobindo?
16    A. There were a series of other lawsuits
17 earlier and that I was involved in, and I think
18 we -- I looked it up then.
19    Q. And you're correct, there were at one
20 point several other defendants in connection with
21 generic versions of Acadia's Nuplazid product.
22       Prior to your involvement with any of
23 those cases, had you had occasion to study the
24 characteristics of pimavanserin?
25    A. Not that I recall.

39

1     Q. Are you aware of any characteristics of
2  pimavanserin that would cause it to agglomerate
3  more ready with excipients than other APIs?
4     A. Not that I'm aware of, no.
5     Q. And in connection with any of the work
6  you've done in these litigations, did you ever do
7  any testing of pimavanserin?
8     A. No, I did not.
9     Q. Have you ever handled the pimavanserin API
10 itself?
11    A. I don't believe so.
12    Q. Turning to claim 4 of the '721 patent,
13 other than the word "granules" that's used in claim
14 4, is there any other word in that claim that you
15 believe requires compression if it's a dry
16 granulation?
17    A. Just granules.
18    Q. So I want to focus on the word "granules."
19 Is there a definition --
20       MR. PETERMAN: Strike that.
21    Q. What definition of "granules" did you
22 apply in connection with rendering your opinions in
23 this case?
24    A. The definition of granules I applied is
25 one that I was instructed, even back in pharmacy

40

1  school. So a granule is prepared by a granulation
2  process. One or more powders are granulated
3  together. And it's an agglomeration process, so it
4  increases the size of the -- doesn't increase the
5  size of the individual particles, but you increase
6  the size of the resulting clumps of particles
7  because there are advantages for filling of
8  capsules, making tablets.
9        If you have very fine material, they don't
10 flow well. So you use granulation to improve the
11 flow. It also can improve the compaction
12 properties if you want to make tablets, things like
13 that.
14    Q. So the definition that you just gave me is
15 what you applied in determining your opinion that
16 there's no infringement?
17       MR. HOGAN: Object to the form of the
18 question.
19       You can answer.
20    A. Yes.
21    Q. Did the inventors of the '721 patent use
22 the same definition in connection with granules?
23    A. My recollection is that it's pretty much
24 described in the specification, very similar to
25 what I just mentioned.

10  (Pages 37 to 40)

41

1    Q. So let's turn your attention to column 4
2    of the '721 patent. I'll refer you to around line
3    43. You can read that to yourself. I'll ask you
4    some questions about it.
5    A. Okay.
6    Q. So is this --
7        MR. PETERMAN: Strike that.
8    Q. Column 4, line 43 gives a definition of
9    the term "granulation," correct?
10    A. Correct.
11    Q. And granulation is used herein and as
12    conventionally used in the pharmaceutical industry
13    refers to the act or process in which primary
14    powder particles are made to adhere to form larger
15    multiparticle entities called granules, correct?
16    A. Yes.
17    Q. So granules is defined here as larger
18    multiparticle entities, correct?
19    A. Granules are defined as multiparticle
20    entities, which they are called granules.
21    Q. So granules are defined as multiparticle
22    entities in this specification?
23    A. Which are called granules.
24    Q. So when the claim uses the term
25    "granules," the definition is larger multiparticle

42

1    entities?
2    A. Which -- I'm sorry. Which -- which are
3    called granules. Because the particles associate
4    loosely, as I've mentioned, those would be
5    multiparticle entities, but they're not granules.
6    Q. So, again, because I'm just trying to
7    understand the exact definition that you're
8    applying.
9        Are you applying a version of this
10    definition of granules in column 4 or are you
11    applying exactly what's written here in column 4?
12        MR. PETERMAN: Object to the form.
13        You can answer.
14    A. I'm looking at column 4, and it says
15    "which primary particles are made to adhere to form
16    larger multiparticle entities called granules.
17    Granules may, for example, be formed collecting
18    particles together by creating mechanical bonds
19    between them, e.g., by compression or by using a
20    binder."
21        That's the kind of definition of granule
22    and granulation that I'm used to in the
23    pharmaceutical industry and I've been used to for
24    more than 50 years.
25    Q. So claim --

43

1        MR. PETERMAN: Strike that.
2    Q. Column 4 states "Granules may, for
3    example, be formed collecting particles together by
4    creating mechanical bonds between them."
5        Do you see that?
6    A. Yes.
7    Q. It doesn't say granules are exclusively
8    formed collecting particles together by creating
9    mechanical bonds between them, correct?
10    A. That's correct.
11    Q. So this is an example of how granules may
12    be formed, correct?
13        MR. HOGAN: Object to the form of the
14    question.
15        You can answer.
16    A. It's -- on the face of it, it says that
17    there may be other ways to do it. I don't know of
18    any, but on the face of it, it says there may be
19    other ways to do it. But like I said, I don't know
20    of any other ways to create granules.
21    Q. Then it goes on to say, e.g., and "e.g."
22    means example given?
23    A. Correct.
24    Q. "By compression or by using a binder."
25    A. Correct.

44

1    Q. And those are not exclusive ways that the
2    patent describes as creating granules, correct?
3        MR. HOGAN: Object to the form of the
4    question.
5        You can answer.
6    A. The patent is what the patent is written
7    and the patent is what's written in the patent.
8    But in my experience, I don't know of any other way
9    of creating granules other than by wet granulation
10    or dry granulation. Those are the ways.
11        And, you know, wet granulation is -- was
12    very popular at one point. It's not so popular now
13    because of the difficulties of solvents and all the
14    rest of it. But there are only so many ways of
15    making a granule as opposed to a loose association
16    of particles.
17    Q. But you would agree that here in claim
18    4 --
19        MR. PETERMAN: Strike that.
20    Q. You would agree that here in column 4,
21    beginning at line 43, this paragraph does not limit
22    granulation to compression or by using a binder in
23    connection with this patent?
24        MR. HOGAN: Object to the form of the
25    question.

11 (Pages 41 to 44)

45

1    You can answer.
2    A. That's what it says.
3    **Q. It says that it is not limited to**
4    **compression or using a binder, correct?**
5    A. It gives examples, implication of e.g. is
6    that there may be other ways, but as I said
7    earlier, I don't know of them.
8    **Q. The paragraph beginning on column 4, line**
9    **43 does not exclude co-sifting as a potential way**
10   **to create granules, correct?**
11   MR. HOGAN:  Object to form of the
12   question, no foundation.
13   You can answer.
14   A. It doesn't specifically mention co-sifting
15   at all.
16   **Q. So it doesn't exclude co-sifting?**
17   MR. HOGAN:  Object to the form of the
18   question.
19   You can answer.
20   A. While the patent doesn't exclude
21   co-sifting, my experience tells me that you're not
22   going to create granules with co-sifting.
23   **Q. Here in column 4, paragraph or line 43,**
24   **granules are just required to be primary powder**
25   **particles that are adhered to form larger**

46

1    **multiparticle entities, correct?**
2    MR. HOGAN:  Object to the form of the
3    question.
4    You can answer.
5    A. It says adhered to form larger
6    multiparticle entities called granules.  So there's
7    an indication that granule is not just a
8    multiparticle entity; it's a very specific type of
9    multiparticle entity, it's called granules.
10   **Q. It's a process where primary powder**
11   **particles are made to adhere to form larger**
12   **multiparticle entities, correct?**
13   MR. HOGAN:  Object to the form of the
14   question.
15   You can answer.
16   A. Again, it says multiparticle entities
17   called granules.  So the granulation process is
18   used to form granules, and if you don't have a
19   granulation process, you'll not form granules.
20   **Q. So the paragraph on column 4, line 43**
21   **covers any granulation process that forms larger**
22   **multiparticle entities, correct?**
23   MR. HOGAN:  Object to the form of the
24   question.
25   You can answer.

47

1    A. It covers any -- sorry -- it covers
2    processing in which primary powder particles are
3    made to adhere to form larger multiparticle
4    entities called granules.  It's looking at --
5    granulation is used to form granules.
6    **Q. But it's not limited to wet granulation or**
7    **dry granulation, correct?**
8    MR. HOGAN:  Object to the form of the
9    question, asked and answered.
10   You can answer.
11   A. The use of "e.g." suggests that the
12   inventors were leaving it open.  But in my
13   experience, I don't know of any other way other
14   than using a granulation process.
15   **Q. If you continue to the next paragraph,**
16   **column 4, around line 52, it says, "Generally, a**
17   **granulation process combines one or more particles**
18   **and forms a granule that will allow tableting or**
19   **the encapsulation process to be within required**
20   **limits," correct?**
21   A. Yes.
22   **Q. Does that line specify a type of**
23   **granulation process?**
24   A. Doesn't specify a granulation process, it
25   just says that there should be a process for

48

1    granulation.
2    **Q. The next line says, "The granulation**
3    **process can be made more predictable and**
4    **repeatable," and then goes on to say that**
5    **"Granulation can be performed in a variety of**
6    **equipment, such as, but not limited to, low shear,**
7    **high shear granulators, fluid bed granulator,**
8    **roller compactor and slugger," correct?**
9    A. That's correct.
10   **Q. And there in that last sentence that I**
11   **read, the equipment that's described is not the**
12   **full and complete list of potential granulation**
13   **equipment, correct?**
14   MR. HOGAN:  Object to the form of the
15   question.
16   You can answer.
17   A. There are other equipment that have been
18   used and have been published.  Besides fluid bed,
19   there has been infrared assisted drying, assisted
20   vacuum drying, things like that.  But essentially
21   they all use -- if they are wet granulation, they
22   all use some means of mixing the wet, moist powders
23   to form granules and then drying them.  They are
24   alternatives really to the fluid bed granulator.  I
25   don't know of any other things other than roller

12  (Pages 45 to 48)

49

1  compactor or slugging machine that are used in dry
2  granulation.
3      Q. Do you agree that the patentee defines
4  granules in column 4 in the paragraphs going from
5  line 43 down to 58?
6      MR. HOGAN: Object to the form of the
7  question.
8      You can answer.
9      A. They define what the granulation process
10  is and then they go on to say that it forms
11  granules and then they give examples of different
12  granulation processes.
13      Q. You also agree that claim 1 and claim 4
14  don't require a specific granulation process?
15      MR. HOGAN: Object to the form of the
16  question, asked and answered.
17      You can answer.
18      A. They just require granules.
19      MR. PETERMAN: We've been going about an
20  hour. Want to take a break?
21      THE WITNESS: Thank you.
22      THE VIDEOGRAPHER: Time is 9:56. We're
23  going off the record.
24      (Proceedings interrupted at 9:56 a.m. and
25      reconvened at 10:08 a.m.)

50

1      THE VIDEOGRAPHER: We are back on the
2  record. The time is 10:08.
3  BY MR. PETERMAN:
4      Q. So earlier you mentioned the content
5  uniformity and blend uniformity tests.
6      A. Yes.
7      Q. Can you just tell me, what is a content
8  uniformity test?
9      A. A content uniformity test is checking the
10  content of individual capsules so that they comply
11  with the specifications set in the ANDA. So they
12  would take samples from different parts of the
13  batch and just confirm that each individual capsule
14  has 40 milligrams of pimavanserin tartrate plus or
15  minus 5 percent.
16      Q. Other than searching for the presence of
17  the amount of API, does a content uniformity
18  test test for anything else?
19      A. No.
20      Q. And how does that compare to the blend
21  uniformity test?
22      A. Blend uniformity test is done before you
23  get as far as the capsules. This is so that you
24  can confirm that the blend has been executed
25  properly and that you've got a uniform material

51

1  blend of powders to fill into capsules.
2      Q. And did you review the content uniformity
3  test that were included in Aurobindo's ANDA?
4      A. I believe I saw it. I didn't review too
5  much of it, usually prepare the standard tests that
6  the FDA require.
7      Q. The same question with the blend
8  uniformity test, did you review that?
9      A. And, again, I think I saw it. But, again,
10  this is one of the standard tests that the FDA
11  requires. Well, actually, the FDA requires both.
12  The international harmonization efforts, they focus
13  more on uniformity of content.
14      Q. So it's your opinion that a person of
15  skill in the art would understand what a granule
16  means?
17      A. Yes.
18      Q. And it's your opinion that the description
19  given in column 4 of the '721 patent is consistent
20  with the understanding of a granule by a person of
21  skill in the art?
22      A. Yes.
23      Q. Do you consider the formulators at
24  Aurobindo to be persons of skill in the art?
25      A. I would imagine so.

52

1      Q. How familiar are you with the company
2  Aurobindo?
3      A. Other than at this kind of distance, I'm
4  aware of them, but that's all. I have all my
5  contacts through counsel.
6      Q. Have you served as an expert for Aurobindo
7  in any other cases besides this one?
8      A. I may have done.
9      Q. So you're aware that they have made other
10  products other than pimavanserin?
11      A. Yes. They're a well-known generic
12  manufacturer.
13      Q. Does Aurobindo employ formulators?
14      A. I would imagine so.
15      MR. PETERMAN: I'm going to mark as
16  Exhibit 2 your expert report in this case.
17      (Moreton Exhibit 2, Rebuttal Expert Report
18  of R. Christian Moreton, Ph.D. on Noninfringement,
19  marked for identification.)
20      Q. Dr. Moreton, can you confirm that
21  Exhibit 2 is your expert report in this case?
22      A. Yes. It appears to be.
23      Q. Okay. And subject to the corrections that
24  you gave me earlier, this contains all the opinions
25  that you expect to testify about at trial?

53

1    A. Yes, it does.
2    **Q. And did you draft this report?**
3    A. I drafted the scientific bits. The
4    counsel made sure the legal bits were correct.
5    **Q. And approximately how long did you spend**
6    **preparing this report?**
7    A. I just don't recall.
8    **Q. Was it more than 20 hours?**
9    A. Like I said, I don't recall.
10   **Q. And this report was drafted in response to**
11   **Dr. Smith's opening report, correct?**
12   A. That is correct.
13   **Q. And if you look at the last page of**
14   **Exhibit 2, it's dated June 6, 2024.**
15   A. Yes.
16   **Q. And is your signature following that?**
17   A. Yes.
18   **Q. So is June 6, 2024 the time when you**
19   **signed this report?**
20   A. Yes: D-Day.
21   **Q. I'm sorry. I missed that.**
22   A. D-day.
23   **Q. Were you engaged by MSN in connection with**
24   **this case at all?**
25   A. Possibly back in the previous litigation.

54

1    **Q. But in this incarnation you're not**
2    **providing any expert opinion on behalf of MSN?**
3    A. Not that I recall, no.
4    **Q. Did you speak with attorneys from MSN in**
5    **connection with preparing your report in Exhibit 2?**
6    A. No.
7    **Q. Did you speak with Dr. Muzzio in**
8    **connection with preparing your report?**
9    A. No. I have not. I know Dr. Muzzio, but I
10   haven't spoken with him in this report.
11   **Q. And to the extent that you are relying**
12   **upon anything from Dr. Muzzio, that's reflected in**
13   **your report?**
14   A. That is correct, yes.
15   MR. PETERMAN: I just want to hand you and
16   we'll mark as Exhibit 3. This is Exhibit B of your
17   expert report.
18   (Moreton Exhibit 3, Exhibit B, Materials
19   Considered, marked for identification.)
20   **Q. Am I correct that this is the list of**
21   **materials considered in connection with your**
22   **rebuttal infringement report?**
23   A. That is correct.
24   **Q. And as far as you're aware, this is a true**
25   **and correct copy of the materials that you**

55

1    **considered?**
2    A. Yes.
3    **Q. And did you review the entire ANDA from**
4    **Aurobindo?**
5    A. No. I reviewed the formulation section.
6    **Q. Were those sections that you chose or were**
7    **those provided to you by counsel?**
8    A. Those were sections I chose. There may
9    have been some other sections which were referenced
10   in the formulation section.
11   **Q. I'm just going back to your report. Now,**
12   **in paragraph 29 you state that you understand that**
13   **certain claims, the claim terms of the '721 patent,**
14   **have been construed by the court in this matter but**
15   **those constructions do not alter my opinions here.**
16   A. Yes.
17   **Q. So why don't the constructions in the**
18   **court's claim constructions alter the opinions in**
19   **your report?**
20   MR. HOGAN: Object to the form of the
21   question.
22   You can answer.
23   A. Because they were pretty consistent with
24   what I understand.
25   **Q. So did you apply your opinions as to what**

56

1    **claim terms meant or did you apply the court's**
2    **opinion as to what claim terms meant?**
3    MR. HOGAN: Object to the form of the
4    question.
5    You can answer.
6    A. I tried to apply both, made sure that
7    everything was consistent with what I understand.
8    **Q. So you say you tried to apply both. You**
9    **had your own impression of what the terms meant and**
10   **then you also looked at what the court said?**
11   MR. HOGAN: Object to the form of the
12   question.
13   You can answer.
14   A. I looked at what the court said. I
15   examined my understanding of the terms, and if
16   there was anything, I would discuss it with
17   counsel.
18   **Q. Are there any instances that you recall**
19   **where you discussed the meaning of something with**
20   **counsel as there was a difference between what the**
21   **court said and what you were thinking?**
22   MR. HOGAN: You can answer that "yes" or
23   "no."
24   A. Would you repeat the question, please,
25   sir?

14  (Pages 53 to 56)

57

1　　Q. Were there any differences between the
2　court's opinion regarding claim terms and your
3　understanding that you needed to discuss with
4　counsel?
5　　　MR. HOGAN: Same instruction.
6　　A. There may have been some minor things that
7　I wanted clarification on.
8　　Q. And in the situation where there were some
9　conflict or differences between the two, which
10　construction did you apply, yours or the court's?
11　　　MR. HOGAN: Object to the form of the
12　question, no foundation.
13　　　You can answer.
14　　A. I don't think I would classify them as
15　conflicts, but if I just wanted clarification of
16　certain legal issues. And I applied -- you know,
17　if there was any doubt, I applied the court's
18　definition.
19　　Q. And so you did read or you did not read
20　the court's claim construction opinion?
21　　A. I may have seen it. I can't remember.
22　　Q. Looking at Exhibit 3 again, is there any
23　reference to the court's claim construction opinion
24　in the materials that you considered?
25　　A. I don't think so.

58

1　　Q. So is that a "yes" or "no"? Is there a
2　reference to the court's claim construction opinion
3　in the materials that you considered?
4　　　MR. HOGAN: Object to the form of the
5　question.
6　　　You can answer.
7　　A. It says here "Plaintiff's Final
8　Infringement Contentions and Claim Chart Dated
9　April 4th," that's not the same thing that you're
10　asking about, is it, sir?
11　　Q. I don't think it is.
12　　A. Okay.
13　　Q. It's a different document.
14　　A. Okay. I mean, in that case, I don't think
15　I did look at them, but certainly I've discussed
16　with counsel if there was anything in what I was
17　saying that was in contradiction or conflict with
18　the court's definitions.
19　　Q. Okay. So you asked counsel if there was
20　any conflict between your understanding of the
21　terms and what the court determined the terms
22　meant?
23　　A. Yes.
24　　　MR. HOGAN: Object to the form of the
25　question.

59

1　　A. Yes.
2　　Q. And you relied upon counsel saying that
3　there was no difference between the two?
4　　　MR. HOGAN: Object to the form of the
5　question.
6　　　You can answer.
7　　A. If there would have been, we would have
8　discussed it and come to an arrangement -- not an
9　arrangement -- but worked out what I needed to do
10　to continue writing my report.
11　　Q. But you didn't independently verify
12　exactly what the court said for the construction of
13　these terms, correct?
14　　A. No. I worked through counsel.
15　　Q. Do you know what claim terms of the '721
16　patent have been construed by the court?
17　　A. I don't recall.
18　　Q. Do you know if the court construed
19　granules?
20　　A. Again, I don't recall.
21　　Q. And do you know if the court required a
22　process limitation for either claim 1 or claim 4?
23　　　MR. HOGAN: Object to form.
24　　　You can answer.
25　　A. I don't recall.

60

1　　Q. And do you understand that infringement
2　requires the comparison of the accused product with
3　the claims as construed by the court?
4　　A. That's my general understanding, yes.
5　　Q. And yet you didn't seek to see how the
6　court construed the claim terms?
7　　　MR. HOGAN: Object to the form of the
8　question.
9　　　You can answer.
10　　A. I was given the general understanding by
11　counsel and that's how I based my -- the technical
12　part -- my technical part of the report.
13　　Q. And that general understanding was given
14　to you verbally or in a document?
15　　　MR. HOGAN: Object to the form of the
16　question.
17　　　I'm letting him answer these questions.
18　We're not -- we're not waiving, and I think you
19　know that, right, we're not waiving any privilege
20　here.
21　　　MR. PETERMAN: Sure.
22　　　MR. HOGAN: Okay. Go ahead. You can
23　answer the question.
24　　A. I think that we discussed them in
25　conference calls, things like that.

15 (Pages 57 to 60)

8/20/2024          Acadia Pharmaceuticals, Inc. v. Aurobindo Pharma Limited, et al. R. Christian Moreton, M.Sc, Ph.D.
Confidential

61

```
 1        Q. Did the court construe binder in
 2   connection with this litigation?
 3        A. Again, I don't know the specifics.  I
 4   don't recall.
 5        Q. So directing your attention to paragraph
 6   51 of your report, in the first sentence there you
 7   state, "While it is apparent that the asserted
 8   claims 1 and 4 are directed to formulations of
 9   pimavanserin tartrate, the '721 patent makes clear
10   that the method of producing the pim granules
11   comprising 40 milligrams pimavanserin tartrate is
12   novel and critical to the desired product result."
13        Do you see that?
14        A. Yes, I do.
15        Q. What are you referring to in connection
16   with the '721 patent that makes it clear that the
17   method is novel and critical to the desired result?
18        A. Well, the inventors state that it was
19   surprising how they could form the granules with
20   very little water and no excipients.
21        Q. So little water and no excipients.  So is
22   it your opinion that the method is limited to
23   processes involving little water and no excipients?
24        MR. HOGAN:  Object to the form of the
25   question.
```

62

```
 1        You can answer.
 2        A. No.  It says "granules."  And it doesn't
 3   specify a particular method, it just says granules.
 4        Q. Is there a particular section of the
 5   specification that you're referring to when you
 6   state in paragraph 41 regarding the novel and
 7   critical method?
 8        MR. PETERMAN:  Object to form.
 9        51, right?
10        MR. PETERMAN:  51.
11        I can restate the question.
12        Q. Is there a particular section of the
13   specification of the 721 patent that you're
14   referring to when you state in paragraph 51 that
15   there's a novel and critical method to produce the
16   product result?
17        A. I don't -- I remember -- I recall saying
18   the words, you know, "surprisingly found" or
19   whatever.  I don't recall where in the
20   specification it is or if it was in the file
21   history.
22        Q. Okay.  Now, are those statements from the
23   patentees that are either in the prosecution
24   history or the specification critical to your
25   infringement analysis?
```

63

```
 1        MR. HOGAN:  Object to the form of the
 2   question.
 3        You can answer.
 4        A. My analysis is about granules, it's not
 5   about how they were made; it's just about granules.
 6        Q. Continuing in paragraph 51, the sentence
 7   bridging page 15 to 16, you state, "It is also
 8   apparent that Aurobindo's ANDA product is made via
 9   a completely different method, and, therefore, it
10   does not result in the claimed granules comprising
11   40 milligrams of pimavanserin tartrate."
12        Do you see that?
13        A. Yes, I do.
14        Q. So what do you mean "via a completely
15   different method."
16        A. Well, if you compare the process flow
17   chart -- sorry -- in the patent on Figure 2 and
18   then you compare the process flow chart that I
19   included in this one on page 18, you'll see that
20   there are substantial differences.
21        Q. So is it your opinion that Figure 2 of the
22   '721 patent sets forth the process that's required
23   by claims 1 and 4?
24        MR. HOGAN:  Object to the form of the
25   question.
```

64

```
 1        You can answer.
 2        A. Figure 1 -- sorry -- Figure 2 is the
 3   granulation process.  Figure 3 actually is the rest
 4   of it, prior to filling the capsules.  Whereas, the
 5   figure on page 18 of my report is the whole thing
 6   from raw material dispensing all the way through to
 7   finish capsule packing.  So it's a much simpler
 8   process and it does not include granulation or loss
 9   on drying test or that kind of thing.
10        Q. So did you determine that there was no
11   infringement by comparing the process flow chart on
12   page 18 of your report with Figure 2 and Figure 3
13   of the '721 patent?
14        MR. HOGAN:  Object to the form of the
15   question, no foundation.
16        You can answer.
17        A. No, I did not.  I made my -- came to my
18   decision based on the fact that there are no
19   granules in the Aurobindo product.
20        Q. Is it your opinion that claim 1 of the
21   '721 patent is limited to the process shown in
22   Figures 2 and 3?
23        MR. HOGAN:  Object to the form of the
24   question.
25        You can answer.
```

16  (Pages 61 to 64)

8/20/2024    Acadia Pharmaceuticals, Inc. v. Aurobindo Pharma Limited, et al. R. Christian Moreton, M.Sc, Ph.D.
Confidential

65

1    A. Claim 1 is limited to granules. This is
2  just one example of granulation in Figure 2 and
3  Figure 3.
4    Q. So you read that Figure 2 and Figure 3
5  don't provide limiting examples of granulation
6  under the patent, correct?
7    A. That's correct. But they do provide
8  examples of granulation process, wet granulation
9  process. The diagram -- process flow diagram on
10  page 18 in my report doesn't contain any
11  granulation process.
12    Q. Why did you include a flow chart from
13  Aurobindo's ANDA in your report?
14    A. It seemed useful to explain to people who
15  are reading the report what the differences were.
16    Q. And you trust what Aurobindo put in its
17  flow chart that you included in this report?
18    A. Say that again, please?
19    Q. And you trust what Aurobindo included in
20  this flow chart in order to put it in your report,
21  correct?
22    A. That's an interesting question, sir. Yes,
23  I do. Because this is taken from the A-N-D-A or
24  ANDA. This is what they declared to the FDA. The
25  FDA does inspect their plants and will inspect the

66

1  details of the process, and if it's not the same
2  that they observe, then they won't get their ANDA
3  approved.
4    Q. And it's your understanding that generic
5  companies like Aurobindo try to be truthful to the
6  FDA in their ANDAs?
7    A. So say that again, please.
8    Q. It is your understanding that generic
9  companies like Aurobindo try to be truthful to the
10  FDA in their ANDAs?
11    A. Let's put it this way: In the past there
12  have been issues in different places, but a lot of
13  the local regulators have caught up with this. And
14  in India particularly, the local regulators have
15  similar enforcement rules to the FDA. So I would
16  imagine that the Aurobindo, like any other generic
17  manufacturer, if they want to market in the U.S.,
18  they have to comply with U.S. rules, and I'm sure
19  they do.
20    Q. And that would include being truthful in
21  their ANDAs to the FDA?
22    A. Absolutely, yes.
23    Q. Let's go in your report to paragraph 82.
24  So this begins the specific section on your opinion
25  that Aurobindo's products do not literally infringe

67

1  the asserted claims of the '721 patent, correct?
2    A. That's correct, yes.
3    Q. All right. So in that maybe third
4  sentence you say, "As described herein and further
5  detailed below" -- then you have some verbiage
6  after that. You go on to say that "Aurobindo's
7  product will not infringe claim limitation of
8  either independent claims 1 or 4 because
9  Aurobindo's ANDA product contains no granules."
10  And we've discussed that, correct?
11    A. Yes.
12    Q. You also say, "And it contains no
13  excipient whose function in the Aurobindo ANDA
14  product is a binder."
15    Do you see that?
16    A. Yes.
17    Q. What is the import of that statement to
18  your non-infringement position?
19    A. How do you mean "import"?
20    Q. What is the relevance of that statement to
21  your non-infringement position? Is there a binder
22  required in claims 1 or 4?
23    A. Claims 1 and 4 do not require a binder,
24  they require a granule. And granules are even made
25  by one of two general methods, wet granulation,

68

1  some variance on that, and dry granulation.
2    What I'm saying here there is no granule
3  formed because there is no -- nothing causing the
4  drug and the microcrystalline cellulose to be stuck
5  together, to be bound together, which is what a
6  binder does.
7    Q. Do you agree that microcrystalline
8  cellulose can be used as a binder in a formulation?
9    A. This is a limitation of the English
10  language in many respects. And I've been with this
11  for a long time. Microcrystalline cellulose is
12  known as a direct compression binder. You can make
13  tablets of it without every other material being
14  there.
15    But that's -- whether it's a binder or a
16  diluent depends on the context. And binder diluent
17  as Dr. Smith has used is actually a shorthand form
18  to imply that, because many excipients have
19  different functions depending on the context of
20  use. Microcrystalline cellulose in certain
21  instances is a direct compression binder. In other
22  instances, it is just a diluent. And in capsule
23  filling, it is just a diluent unless it is
24  granulated in some way.
25    Q. So is it your opinion that

17 (Pages 65 to 68)

8/20/2024    Acadia Pharmaceuticals, Inc. v. Aurobindo Pharma Limited, et al. R. Christian Moreton, M.Sc, Ph.D. Confidential

69

1  microcrystalline cellulose only functions as a
2  binder if there's direct compression?
3    A. Yes.
4    Q. And there's no other instance where
5  microcrystalline cellulose functions as a binder?
6    A. Well, actually, in dry granulation as
7  well; direct compression and dry granulation
8  because they use similar compressions forces.
9    Q. So your opinion is that absent a
10  compression force, either in wet or dry
11  granulation, MCC is not a binder?
12    MR. HOGAN: Object to the form of the
13  question.
14    You can answer.
15    A. MCC is not a binder in the context of
16  capsule filling because there's no, you know, high
17  compaction force used.
18    MCC is not a binder in and of its own
19  right in wet granulation because it needs something
20  else there to bind it together. It's not water
21  soluble. Although it may contain some water
22  soluble components, they're not sufficient to give
23  a strong binding action.
24    In dry granulation and direct compression,
25  it acts as a binder because it's able to deform

70

1  under high pressure or high force and entrap
2  materials and interlock and hold the -- either the
3  roller-compacted ribbon or the tablet slugs or, you
4  know, the tablets in direct compression together,
5  and that's how it works as a binder. But it
6  doesn't work as this kind of wet granulation
7  adhesive, which is what a wet granulation binder
8  actually is.
9    Q. And what definition are you applying to
10  this case for the term "binder"?
11    A. Just what a POSA would understand.
12    Q. Did you look at how the inventors define
13  binder in the '721 patent?
14    A. I'm sure I did it. I don't recall what
15  the wording was.
16    Q. Now, if you look at column 3 of the '721
17  patent beginning around line 63, can you read that
18  to yourself?
19    A. Line what was it?
20    Q. Beginning around line 63, it says, "As
21  used herein, in a binder."
22    A. Oh, right, yeah. Oh, column 3.
23    Okay.
24    Q. The inventors define "binder" here,
25  correct?

71

1    A. Yes.
2    Q. And does your understanding as a POSA
3  differ from the inventors' definition?
4    A. Well, they've classified them as wet
5  granulation binders and then dry binders, which is
6  the kind of distinction I would make.
7    Q. So is there any part of this paragraph
8  that you disagree with in terms of how a POSA would
9  understand a binder?
10    A. No.
11    Q. So let's turn to paragraph 44 of your
12  report.
13    A. 44.
14    Q. You cite to, quote-unquote, other
15  granulation methodologies.
16    Do you see that?
17    A. On 44? Yes. Sorry. Yes.
18    Q. You refer to hot melt, steam, foam, or
19  fluid bed methods.
20    A. Yes.
21    Q. Are these the only other granulation
22  methodologies that you're aware of beyond what
23  we've already discussed?
24    A. The use of the -- the more common ones,
25  there may be -- no, rephrase that.

72

1    Yes. I think these are the ones I know
2  about, let's put it that way.
3    Q. Now, do you believe that a process has to
4  be specifically designed to form granules for it to
5  be considered a granulation process?
6    A. That's a good question. In my opinion,
7  you have to have the intent of forming granules.
8  You need to have something that will give you
9  granules. Just mixing things together, you know,
10  and the wrong things together will not give you
11  granules, so it would not be a granulation process.
12    Q. But if you don't have the intent to form
13  granules but the process happened to give you
14  granules, would it be a granulation process?
15    MR. HOGAN: Object to the form of the
16  question.
17    You can answer.
18    A. So you're saying that if it wasn't
19  intended to but then actually formed granules would
20  it be a granulation process? In my opinion, yes,
21  because it formed granules.
22    Q. Is there a measure of mechanical strength
23  between particles in a granule?
24    MR. HOGAN: Object to form.
25    You can answer.

18  (Pages 69 to 72)

73

1    A.  That's a very good question, too, because
2    there have been a good number of studies over the
3    years, even Ph.D. theses written on this.  There
4    are -- there are methods that can be used to assess
5    the strength of granules.  There are not methods
6    that can be used just to assess the strength of the
7    bond between two adjacent particles in a granule.
8          But if you look at the force required to
9    fracture a granule, that's certainly a measure of
10   the adhesive nature and the rigid bonding within
11   the granules.  But that's about as far as I can
12   recollect from my review of the literature over the
13   years.
14      Q.  You say there's methods that can be used
15   to assess the strength of the granules.
16      A.  Sorry.  Say that again.
17      Q.  You said that there are methods that can
18   be used to assess the strength of granules?
19      A.  Yes.
20      Q.  And what methods are you aware of to
21   assess the strength of granules?
22      A.  They use something called a -- it's a
23   small tester that uses -- it has a load cell and a
24   platen which comes down against another platen, and
25   you put the granules in there and you slowly move

74

1    the platen down and you get a readout basically of
2    when the granule fails.
3       Q.  Have you performed those tests in the
4    past?
5       A.  No.  I know people who have performed
6    those tests in the past.
7       Q.  And you didn't perform that test in
8    connection with this litigation, correct?
9       A.  No, I didn't.
10      Q.  You understand that Aurobindo does use the
11   term "granule" in its ANDA, correct?
12      A.  Yes.
13      Q.  Okay.  What does Aurobindo mean when it
14   uses the term "granule" in its ANDA?
15      A.  I think it's just a throwback to before
16   direct compression/direct filling came in, when
17   everything was granulated.  And, you know, when I
18   first came into industry, wet granulation was still
19   the most prevalent method of making capsules and
20   tablets.
21          And, you know, my first job, the head of
22   the tablet manufacturing area always used to refer
23   to the final granule blend even when it was direct
24   compression, which is just a powder blend.  It was
25   just a form of terminology.

75

1          The other possibility is that they used
2    some language from a prior ANDA that did use wet
3    granulation or dry granulation process and they
4    just translate or transferred certain sentences
5    over and forgot to change the term from granule to
6    powder.
7       Q.  And who did you speak with at Aurobindo to
8    determine which of these possibilities was the
9    correct one?
10      A.  I haven't spoken with anybody at
11   Aurobindo.
12      Q.  So even after seeing that Dr. Smith
13   pointed out the use of granule in Aurobindo's ANDA,
14   you didn't ascertain or attempt to ascertain from
15   Aurobindo how they meant to use it?
16      A.  I didn't think it was particularly
17   relevant.  I knew what the process would give.  And
18   this is a very standard process that's similar to
19   the ones I've used many times before.
20      Q.  You refer to the use of the term granule
21   by Aurobindo as an errant statement.
22      A.  Yes.
23      Q.  What is the basis for your opinion that
24   it's an errant statement as opposed to something
25   that Aurobindo did intentionally?

76

1       A.  The basis is my reading of the ANDA and
2    the process from the ANDA, which does not form
3    granules.
4       Q.  Have you seen any documents from Aurobindo
5    saying we didn't intend to write "granule" there?
6       A.  I have not.
7       Q.  And you're not aware of any testimony in
8    this case from Aurobindo saying that they didn't
9    mean to put "granule" there?
10      A.  I have not -- I've not been in touch with
11   Aurobindo.  I know nothing about what they will
12   testify about.
13      Q.  So in the ANDA that the FDA has, Aurobindo
14   included the word granule several times, correct?
15      A.  That's my recollection, yes.
16      Q.  And you would tell the FDA that it's an
17   errant statement?
18      A.  If the --
19          MR. HOGAN:  Object to the form of the
20   question.
21          You can answer.
22      A.  If the FDA asked me, I would say that it
23   was an incorrect statement.
24      Q.  You understand that Dr. Smith is not
25   relying just upon the use or the term granule in

19 (Pages 73 to 76)

77

1   Aurobindo's product, correct?
2      A. She relies on other -- the work that she'd
3   done, yeah.
4      Q. Do you know how many times the word
5   granule appears in Aurobindo's ANDA?
6      A. It's several times. I didn't bother
7   counting.
8      Q. Have you asked Aurobindo whether it
9   believes that the product has granules?
10        MR. HOGAN: Object to the form of the
11  question.
12        You can answer.
13     A. I have not been in touch with Aurobindo.
14     Q. Do you know if Aurobindo has done any
15  studies of its product to determine whether or not
16  there are granules present in the final
17  formulation?
18     A. The only information I have from Aurobindo
19  is the ANDA or ANDA.
20     Q. Do you know if Aurobindo sought to design
21  around the '721 patent?
22        MR. HOGAN: Object to the form of the
23  question.
24        You can answer this based on your own
25  information. And we're not waiving any sort of

78

1   privilege here by letting him answer this question.
2   Are we clear on that?
3         MR. PETERMAN: That's fine.
4         MR. HOGAN: Okay. Go ahead. You can
5   answer.
6      A. I haven't been in touch with Aurobindo. I
7   would imagine they were aware of the patent, but I
8   don't know the motivation of their individual
9   formulation guides or whatever. But I would
10  imagine they would have been aware of the '721
11  patent and they would have been desirous not to
12  infringe.
13     Q. But you're not aware of Aurobindo's actual
14  intent with respect to designing its formulation,
15  correct?
16     A. I haven't seen anything either way.
17     Q. Have you identified any other errant
18  statements in Aurobindo's ANDA besides the use of
19  the term granule?
20     A. I haven't. I didn't look specifically for
21  anything else. I just noted when granule was was
22  used, which kind of stuck out at me because there
23  was no granulation process.
24     Q. Do you know if Aurobindo submitted an
25  amendment to the FDA of correcting the use of

79

1   granule in its ANDA?
2      A. I don't know.
3      Q. When you think of the term "adhere" --
4   adhere, a-d-h-e-r-e -- in connection with
5   pharmaceutical formulations, what is your
6   understanding as to what a POSA would understand
7   that to mean?
8      A. Officially -- well, not officially, but in
9   general terms when we talk about adhere, we mean
10  two different materials sticking together. Cohere
11  is when two particles say of the same material
12  stick together.
13     Q. Does pimavanserin cohere?
14     A. I would imagine it does. Many, many
15  powders do cohere.
16     Q. Does pimavanserin adhere to other
17  excipients?
18     A. I would also imagine it does. That's one
19  of the ways we actually formulate blends for
20  tableting and encapsulation. But it's, you know,
21  based on electrostatics and things like that;
22  depends on the particle size as well.
23     Q. Does pimavanserin adhere to
24  microcrystalline cellulose?
25     A. I would imagine it does. It depends, like

80

1   I said, on the particle size.
2      Q. So what's the dividing line between
3   adhering and being a granule?
4         MR. HOGAN: Object to the form of the
5   question.
6         You can answer.
7      A. I'm not sure I can, actually.
8         What's the dividing line between adhering
9   and forming a granule, did you say?
10        MR. PETERMAN: I can break this up into
11  parts.
12     Q. In a granule with two ingredients, an API
13  and excipient, are the API and excipients adhered
14  together?
15     A. Yes.
16     Q. Are there situations where an API and
17  excipient can be adhered but not be in a granule?
18     A. Yes.
19     Q. And what are those situations?
20     A. Dry blends, where you have a small, say,
21  drug particle, which we call the payload particle,
22  and a larger excipient particle, which we call the
23  carrier particle, and the payload particles adhere
24  because of size and electrostatics and things like
25  that to the carrier particles, but it's not a rigid

20  (Pages 77 to 80)

8/20/2024          Acadia Pharmaceuticals, Inc. v. Aurobindo Pharma Limited, et al. R. Christian Moreton, M.Sc, Ph.D.
Confidential

81

1  adherence like in a granule; it's more of a loose
2  adherence because of electrostatics and other
3  associative forces.
4      Q. So does the term "adhere" encompass both
5  rigid adherence and loose adherence?
6      A. Yes.
7      MR. PETERMAN: I want to switch gears. So
8  want to take a 5, 10-minute break?
9      MR. HOGAN: Sure.
10     THE VIDEOGRAPHER: The time is 11:00 a.m.
11  We're going off the record.
12     (Proceedings interrupted at 11:00 a.m. and
13  reconvened at 11:12 a.m.)
14     THE VIDEOGRAPHER: We are back on the
15  record. The time is 11:12.
16  BY MR. PETERMAN:
17     Q. Dr. Moreton, what does the term
18  "hygroscopic" mean?
19     A. Hygroscopic means it absorbs water from
20  the atmosphere.
21     Q. Is pimavanserin hygroscopic?
22     A. That's what I've been told, yes.
23     Q. So in the processing steps of Aurobindo's
24  process, the pimavanserin that's been used is
25  hygroscopic during that process, correct?

82

1      A. Yes. But they will take precautions to
2  avoid too much uptake of moisture. They will use
3  probably low humidity, low-ish humidity in the
4  manufacturing areas. Formulation itself uses
5  excipients which are low moisture content, and
6  that's very often used with hygroscopic materials
7  because they will prevent the drug from becoming
8  too -- containing too much moisture.
9      Q. But in your opinion is it likely that the
10  pimavanserin used in Aurobindo's product has some
11  moisture?
12     A. Everything has moisture associated with it
13  when the relative humidity is above zero percent,
14  so there will be some moisture. I think I looked
15  at a specification for the ANDA and I think there
16  was a moisture content, but it was quite low.
17     MR. PETERMAN: Going to mark as the next
18  Exhibit 4, a document bearing Bates number
19  AURO_PIMAV00002806 through 2901.
20     (Moreton Exhibit 4, Document Bates labeled
21  AURO_PIMAV00002806 - 2901, marked for
22  identification.)
23     Q. I've handed you what has been marked as
24  Exhibit 4, that's a portion of Aurobindo's ANDA
25  3.2.P.2 pharmaceutical development.

83

1      A. Yes.
2      Q. Are you familiar with this document?
3      A. I've seen it, yes.
4      Q. And is this part of what you considered in
5  connection with rendering opinions in this case?
6      A. Yes, that's correct.
7      Q. All right. Generally, what does this
8  document represent?
9      A. This is the pharmaceutical development
10  section of the ANDA or ANDA, so it gives all the
11  different details of how they developed it and what
12  the manufacturing process is and different
13  assessment of the bulk active drug, physical,
14  chemical, and analytical assessment of the bulk
15  active drug.
16     Q. And if we turn to the page ending in Bates
17  number 2855.
18     A. Okay.
19     Q. Do you understand what's been reflected on
20  this page? And of course you can look at earlier
21  pages if you need to.
22     A. What page number, please?
23     Q. It's ending in 2855. It's page 47.
24     A. Oh, 47, yes. It's an explanation of the
25  development of the process that they used to

84

1  manufacture the pimavanserin capsule.
2      Q. Okay. And here on the first part, it's
3  talking about the Sifting Process Development.
4      A. Yes.
5      Q. Do you see that?
6      And on the second line it says, "Moreover,
7  co-sifting of pre-lubrication excipients with API
8  breaks the lumps and brings better homogeneity of
9  API with pre-lubrication materials."
10     A. Yes.
11     Q. What do you understand that sentence to
12  mean?
13     A. It means what they're doing is they're
14  premixing and they're using -- they're premixing
15  the API with the microcrystalline cellulose, and
16  because it's a cohesive material, they're using the
17  sifting to break up the lumps of API and possibly
18  the microcrystalline cellulose to get a more
19  uniform blend.
20     Q. You refer to the API as being a cohesive
21  material?
22     A. Yes. Because it brings better
23  homogenization, intermixing. It says cohesive API
24  on the second line of the paragraph.
25     Q. So what does a "cohesive API" mean?

21 (Pages 81 to 84)

8/20/2024     Acadia Pharmaceuticals, Inc. v. Aurobindo Pharma Limited, et al. R. Christian Moreton, M.Sc, Ph.D.
Confidential

85

1    A. Something that sticks together. I mean,
2  these are not granules, these are loose
3  agglomerates, but they stick together because it's
4  typically with fine particle size.
5    Q. Is there a difference between cohesive and
6  adhesive?
7    A. As we discussed, cohesive is like sticking
8  with like; adhesive is two different things
9  sticking together.
10   Q. Why would microcrystalline cellulose be
11 helpful in the intermixing of cohesive API with the
12 pre-lubrication excipient?
13     MR. HOGAN: Object to the form of the
14 question.
15     You can answer.
16   A. Because microcrystalline cellulose is a
17 useful excipient and it's a diluent and it blends
18 well with many materials. And in this case, it
19 takes the API and helps -- with the co-sifting and
20 blending, helps break up the agglomerates of the
21 cohesive API. And the cohesive API, some of it may
22 adhere to the microcrystalline cellulose, but the
23 microcrystalline cellulose also prevents, after the
24 break up of the cohesive particles -- agglomerates,
25 prevents them reforming, so that you maintain a

86

1  better blend uniformity.
2      And it says here on line 3, "Co-sifting of
3  pre-lubrication excipients with API breaks the
4  lumps and brings better homogeneity of the API with
5  the pre-lubrication materials."
6    Q. What do you understand to be the
7  pre-lubrication materials?
8    A. Microcrystalline cellulose, and,
9  obviously, the API is the API.
10   Q. In the next section, the Pre-lubrication
11 and Lubrication Process Development, it talks about
12 the selection of a blender.
13     Do you see that?
14   A. Yes.
15   Q. In the third bullet point, it says, "The
16 blender provides gentle mixing action thereby
17 reducing agglomeration to a minimum."
18   A. Yes.
19   Q. Is that referring to the agglomeration of
20 MCC and the API?
21   A. It's referring to all agglomeration.
22   Q. So the cohesive agglomeration of the API
23 with itself?
24   A. Yes.
25   Q. As well as the adhesive agglomeration of

87

1  the API with MCC?
2    A. That would also be included, yes.
3    Q. So it doesn't say the mixer eliminates
4  agglomeration, correct?
5    A. That's correct.
6    Q. Just reduces agglomeration?
7    A. It reduces agglomeration to the extent
8  that you can get a uniformed homogeneous blend that
9  meets the requirements for blending uniformity and
10 go on to make capsules that meet the requirements
11 for uniformity of content.
12   Q. Can a blend of granules be a uniform
13 blend?
14   A. Yes, if you know what you're doing.
15   Q. I want to go ahead a few pages to the
16 Bates number 2872, which is page 64 of the report.
17 Obviously, feel free to look at other sections if
18 needed. But do you understand what's happening in
19 the table in part 2 on page 2872?
20   A. Yes. They're looking at, as it says here,
21 the process attributes of the blend stage, so
22 they're looking at all the different materials and
23 how they're -- how the process parameters --
24 sorry -- what the process parameters are, what the
25 proposed range of commercial scale is.

88

1      This is part of the -- demonstrating to
2  the FDA reviewer that they've done the necessary
3  amount of work to anticipate scale-up to commercial
4  scale.
5    Q. In the sifting row, I guess this is
6  referring to the mesh size of the sieves that are
7  used; is that correct?
8    A. Correct, yes.
9    Q. And then it refers to the API, the
10 microcrystalline cellulose and the colloidal
11 silicon dioxide?
12   A. Yes.
13   Q. And the purpose of control, it says "Kept
14 similar across the scale to get similar PSD of the
15 granulates."
16     Does "PSD" mean particle size
17 distribution?
18   A. Correct.
19   Q. And what was kept similar across the
20 scale?
21   A. The size of the mesh. This is another
22 way -- an area where granulates is a misnomer.
23   Q. So you believe this is an errant use of
24 the word "granulate" here on page 2872?
25   A. Yes. It's a simple blend.

22  (Pages 85 to 88)

89

1    Q.  How is the FDA to know that granulates is
2    used incorrectly here?
3    A.  They would know that what the process is,
4    and if the reviewer has got any experience, they
5    would know that it's a blend rather than a
6    granulate.
7    Q.  Do you see in the next row or two rows
8    down, under "Blender Pre-lubrication"?
9    A.  Uh-huh.
10   Q.  It says the "Purpose of Control:  To
11   ensure consistent mixing of API and excipients in
12   the pre-lubricated blend."
13       Do you see that?
14   A.  Yes.
15   Q.  So they use "blend" there, but they use
16   "granules" further up.  How do you account for that
17   difference?
18   A.  Lack of attention to detail maybe.  You'd
19   have to ask Aurobindo.
20   Q.  Let's skip ahead to 2875.  If we look at
21   section 3.2.P.2.7.4, "Control strategy for
22   lubrication process."
23   A.  Yes.
24   Q.  I'm going to focus on the last line, but
25   you can read any portion you need to.

90

1    It says, "Therefore, control strategy for
2    blending the granules with extra-granular material
3    is to lubricate for five minutes."
4    Do you see that?
5    A.  Yes.
6    Q.  So there they actually use "granules" and
7    "extra-granular," correct?
8    A.  Yes.  Again, it's errant.
9    Q.  So you're saying that both granules and
10   extra-granular are errant?
11   A.  Yes.  This is a blend.  There's no
12   granules there.
13   Q.  So in this situation, even though you
14   repeat granules twice or a version of granules
15   twice, you believe both instances are errant?
16   A.  Yes.
17   Q.  What would be the extra-granular materials
18   that are being referred to here in this section?
19   A.  Since there are no extra-granular
20   materials, I really don't know.
21   Q.  So this whole sentence doesn't make sense
22   to you?
23   A.  No, it does not.
24   Q.  So you don't have any opinion as to what
25   Aurobindo meant by extra-granular materials here?

91

1    A.  What they should have referred to was with
2    the pre-lubrication blend and the lubricant,
3    because the lubricant is being added separately,
4    not blended all the way through; that's a common
5    way of adding lubricant to avoid issues with poor
6    dissolution.
7    Q.  And then just to complete this, in this
8    section right above the section we were looking at
9    in 3.2.P.2.7.3, the last line, "Therefore, control
10   strategy for blending the granules with
11   extra-granular materials is to blend for
12   20 minutes."
13       Do you see that?
14   A.  Yes.
15   Q.  And you would have the same opinion, that
16   that is an errant statement?
17   A.  Correct.
18   Q.  So two errant statements on the same page?
19   A.  Yes.  And there are more, as we've
20   discussed.
21   Q.  Turning back to your report -- you can put
22   that Exhibit 4 away -- I want to look at paragraph
23   96 of your report.
24       In paragraph 96, you're referring to
25   experiments done by Dr. Smith, correct?

92

1    A.  Yes.
2    Q.  And in particular, you're referring to
3    polarized light microscopy experiments?
4    A.  Yes.  Those are the ones that I saw, yes.
5    Q.  In paragraph 96 you say, "I disagree with
6    her opinions that rely on these experiments because
7    the experiments contain numerous serious flaws,
8    fail to show what Dr. Smith concludes, and fail to
9    support her opinions."
10       What are the numerous serious flaws that
11   you're referring to here?
12   A.  Well, I don't think the experimental
13   design was that great.  I think there are also
14   artifacts in there that shouldn't be there,
15   possibly contamination of some of the slides.
16   Q.  So where in your report do you refer to
17   the problems with the experimental design?
18   A.  I don't think I specifically refer to
19   that.
20   Q.  So you don't intend to testify regarding
21   any problems with experimental design?
22       MR. HOGAN:  Object to the form of the
23   question.
24       You can answer.
25   A.  Unless it comes up, no.

23  (Pages 89 to 92)

8/20/2024          Acadia Pharmaceuticals, Inc. v. Aurobindo Pharma Limited, et al. R. Christian Moreton, M.Sc, Ph.D. Confidential

93

1    Q.  Well, you understand you're supposed to
2    put your opinions in this report, correct?
3    A.  Sorry.  Say that again.
4    Q.  You understand you're supposed to put your
5    opinions in this report, correct?
6    A.  Yes.
7    Q.  And so if you had any issues with the
8    experimental design, these were opinions that you
9    could have expressed in this report, right?
10   A.  I could have.
11   Q.  But why did you choose not to put the
12   problems with experimental designs?
13   MR. HOGAN:  Object to the form of the
14   question.
15   You can answer.
16   A.  I didn't think it was -- you know, it's
17   just one of several things that are considered
18   serious flaws.
19   Q.  So you considered a serious flaw, but you
20   chose not to actually enumerate or explain what the
21   flaw was?
22   A.  Basically, yes.
23   Q.  What's the serious flaw with the
24   experimental design?
25   A.  Well, there are no controls.

94

1    Q.  What controls?
2    A.  Well, there are photomicrographs of the
3    capsule blend, but there's no photomicrographs of
4    the individual components, for instance the MCC or
5    the pimavanserin tartrate or the lubricant or
6    whatever.  And so it becomes very difficult to
7    interpret the photomicrographs that Dr. Smith has
8    included in her report in any meaningful way.
9    Q.  Other than your allegation of no controls,
10   are there any other flaws with the experimental
11   design?
12   A.  No.  I mean, that was the major flaw.
13   Q.  Are you going to testify about any flaws
14   other than the controls?
15   A.  I don't believe so.
16   Q.  So when you refer to the experiments
17   containing numerous serious flaws, is there
18   anything else besides experimental design?
19   A.  Yes.  Like I mentioned, some of the
20   photomicrographs that are in the report seem to
21   contain anomalies which in my opinion should not
22   have been there, and that says to me that possible
23   contamination or something, I don't know.  But the
24   photomicrographs were not as I would have expected.
25   Q.  Where in your report do you refer to the

95

1    contamination or improper photomicrographs?
2    A.  Well, in paragraph 98 -- sorry -- wrong
3    one.  I'm not sure -- I'm not sure I did include
4    it.  I just focused on interpretation of
5    Dr. Smith's photomicrographs and her comments.
6    Q.  What images from Dr. Smith included
7    contamination?
8    A.  There was one which purported to contain
9    unreacted cellulose and I don't think it was.
10   There were other photomicrographs which looked to
11   include globules of something which was not product
12   related, things like that.
13   Q.  Do you know what numbers you're referring
14   to?
15   A.  I'd have to look at Dr. Smith's report.
16   Q.  But you didn't include those numbers as
17   part of your --
18   A.  No, I did not.
19   Q.  -- report here?
20   A.  Oh, I think the images were probably 10,
21   11, and 12, but I think there were others as well.
22   Q.  Do you intend to testify at any images
23   other than 10, 11, 12?
24   A.  That's not what I said.  I think there
25   were others that contained some anomalous, I'll

96

1    call them structures.
2    Q.  But those images are not specifically
3    referenced in your report?
4    A.  Correct.
5    Q.  So sitting here today, you can't recall
6    what images those were?
7    A.  Can't recall the numbers, no.
8    Q.  You decided not to include those numbers
9    in your report?
10   A.  Yes.
11   Q.  And why didn't you include the numbers of
12   the images with alleged artifacts in your report?
13   A.  I didn't think it was necessary.
14   Q.  Because you don't intend to rely upon it
15   at trial?
16   A.  My focus was on Dr. Smith's interpretation
17   of her photomicrographs, and they weren't relevant
18   to her interpretation.
19   Q.  So the artifacts and the lack of controls
20   weren't relevant to her interpretation?
21   MR. HOGAN:  Object to the form of the
22   question.
23   You can answer.
24   A.  They were just things that could have been
25   done to improve the experiment and they might have

24  (Pages 93 to 96)

8/20/2024        Acadia Pharmaceuticals, Inc. v. Aurobindo Pharma Limited, et al. R. Christian Moreton, M.Sc, Ph.D.
Confidential

97

1  given more reliable experiments, may not have given
2  better information.
3      **Q.  Did the experimental design and the**
4  **artifacts allegedly make her experiment unreliable?**
5      A.  In my opinion, what Dr. Smith has opined
6  is not substantiated, not supported, I should say,
7  by what I saw in the photomicrographs.
8      **Q.  I understand there's -- you disagree with**
9  **her interpretation.  My question is, does the**
10 **experimental design and the artifacts that you**
11 **allege are present make her, you know, reliance**
12 **upon those images reliable from the beginning?**
13     A.  In her mind, no.  In my mind, I think it
14 could have been improved, the experiment could have
15 been improved.
16     **Q.  I understand you believe it could have**
17 **been improved, but are the images reliable as they**
18 **are?**
19     A.  In certain parts, yes.
20     **Q.  Which parts?**
21     A.  Ones that don't contain spurious images.
22     **Q.  And when you say spurious,**
23 **s-p-u-r-r-i-o-u-s?**
24     A.  S-p-u-r-i-o-u-s.
25     **Q.  And what do you mean by "spurious images"?**

98

1      A.  Things that look like globules or the
2  thing that Dr. Smith said was unreacted cellulose,
3  which I don't believe it is, it's not like any
4  other cellulose I've seen.
5      **Q.  What color is the globules that you're**
6  **referring to in these images?**
7      A.  They're dark grayish circular areas, some
8  of them are better defined than others.
9      **Q.  Did any of these appear in images 10, 11,**
10 **or 12?**
11     A.  Possibly.
12     **Q.  Did any of those appear in other images?**
13     A.  Yes.
14     **Q.  But you don't know which other images?**
15     A.  I don't recall.
16     **Q.  Was there anything preventing you from**
17 **listing images you had issues with in your report?**
18     A.  Say that again, please.
19     **Q.  Was there anything that prevented you from**
20 **listing images that you had issues with in your**
21 **report?**
22     A.  No .
23     **Q.  In your report, you don't describe an**
24 **image with these globules, correct?**
25     A.  That's correct, I believe.

99

1      **Q.  In paragraph 97 through 100, are you**
2  **describing any images with these globules?**
3      A.  No.  I just focused on what Dr. Smith was
4  saying was included in those -- what the images
5  showed.
6      **Q.  So what do you think those globules you're**
7  **referring to are?**
8      A.  I have no idea.
9      **Q.  Are Aurobindo's products free from**
10 **contaminants?**
11        MR. HOGAN:  Object to the form of the
12 question.
13        You can answer.
14     A.  If they followed all GMP rules, yes.
15     **Q.  So there should be no contaminants in**
16 **Aurobindo's product at all?**
17     A.  Correct.
18     **Q.  So you don't believe there was unreacted**
19 **cellulose in Aurobindo's product?**
20     A.  If it's unreacted cellulose, it would have
21 had to come from the cellulose that was used in the
22 manufacture of the capsules.  And the way that
23 microcrystalline cellulose is produced, it is
24 produced in, you know, the acid hydrolyzed
25 cellulose in big reactors, and then they pump that

100

1  over, neutralize it, wash it -- sorry -- wash it,
2  neutralize it, and then pump it into a tank prior
3  to, as a slurry for spray drying, or some other
4  form of drying.  And then they take it, the dried
5  material, and pack it into bags.  The particle size
6  is governed by the parameters of the spray drying
7  or the drying process.
8         But from all the MCC manufacturing
9  facilities that I'm aware of -- and I'm not aware
10 of all of them -- they all use roughly similar
11 arrangements.  There are differences in drying and
12 there are differences in some of the reaction
13 size -- reactor sizes.  But it would be very
14 difficult for unreacted cellulose to get through
15 that into the final product.
16     **Q.  So who makes the MCC that Aurobindo uses?**
17     A.  I've seen it somewhere.  I don't recall
18 the name.
19     **Q.  Were you familiar with them?**
20     A.  They're a microcrystalline cellulose
21 manufacturer that I've heard of before.
22     **Q.  So is it your position that it's**
23 **impossible for unreacted cellulose to make it**
24 **through the reaction?**
25     A.  From what I understand of the way

25 (Pages 97 to 100)

101

1  microcrystalline cellulose is made, they would have
2  to follow roughly the same kind of process flow,
3  and that would be very difficult for me to
4  understand how it would get through.
5      Q. So you think it's difficult. Is it
6  possible that unreacted cellulose fiber got
7  through?
8      A. I can't say it's not impossible, but I
9  would find it very difficult to understand how it
10  could happen.
11     Q. And you don't have any opinions as to what
12  the fiber is that Dr. Smith identifies as an
13  unreacted cellulose fiber?
14     A. No, I don't. I mean, it looks to me like
15  half of a stick insect, which it is obviously not.
16  You know, it's a very odd shape. It doesn't bear
17  any relation to any of the other -- the shape of
18  any other particles that are in her
19  photomicrographs.
20     Q. Have you viewed the unreacted
21  microcrystalline cellulose fiber under PLM before?
22     A. No. But I have seen cellulose particles.
23     Q. And are they sticklike?
24     A. They're fibrous, but they're not
25  sticklike.

102

1      Q. In paragraph 97 --
2         MR. PETERMAN: Let me back up for a
3  second.
4      Q. The pimavanserin in Aurobindo's product is
5  amorphous, correct?
6      A. That I don't recall.
7      Q. Microcrystalline cellulose is crystalline?
8      A. Microcrystalline cellulose is mostly
9  crystalline.
10     Q. You say "mostly crystalline," does that
11  mean some of it is amorphous?
12     A. Cellulose under the transmission electron
13  microscope, the fibers appear with light and dark
14  regions. The dark regions have been termed
15  "microcrystallites." The light regions have been
16  termed "hinge regions" or sometimes "amorphous
17  regions." When you acid hydrolyze them, the acid
18  preferentially attacks the hinge regions or the
19  amorphous regions. So it doesn't dissolve all the
20  amorphous region, but it does break up the fibrils.
21  And so you have a certain amount of what might be
22  called looser materials, which is not
23  microcrystallites.
24     Q. How does MCC appear under PLM?
25     A. It should appear as dark particles made up

103

1  of numerous fibrils, microcrystallite fibrils.
2      Q. Did you see MCC in any of the images that
3  Dr. Smith prepared?
4      A. Yes.
5      Q. In image 10, 11, and 12?
6      A. Yes.
7      Q. Prior to reviewing Dr. Smith's PLM images,
8  have you viewed PLM images of MCC before?
9      A. No. But I've reviewed scanning electron
10  microscope images for the most part, yes.
11     Q. And SEM is not -- it's an electronic
12  representation of an object, correct?
13     A. It's the -- yes. It's the image formed
14  when an electron beam bombards the material and
15  reflected electrons are imaged.
16     Q. PLM is a visual analysis, correct?
17     A. Yes. It's an optical method.
18     Q. Does the image of an MCC look different on
19  an SEM versus a PLM?
20     A. I would expect that the image on the SEM
21  would be -- show more fine detail because the
22  wavelength is a lot smaller, shorter. Light is a
23  fixed wavelength, as you know, or at least I hope
24  you know. But the electron beam is analogous a
25  much shorter wavelength.

104

1      Q. Did you review SEMs of MCC in connection
2  with your opinions here?
3      A. Yes. I looked at the SEMs in the
4  monograph in the Handbook of Pharmaceutical
5  Excipients.
6      Q. Are there any monographs with PLM of
7  microcrystalline cellulose?
8      A. Not that I'm aware of.
9      Q. Prior to your analysis of Dr. Smith's
10  report, had you looked at PLM images of
11  pimavanserin?
12     A. No.
13     Q. Had you looked at any type of microscopic
14  images of pimavanserin prior to this report?
15     A. I don't believe so, no.
16     Q. Did you do any testing to ascertain how
17  pimavanserin appears under a PLM?
18     A. No, I did not.
19     Q. What does it mean, "to be opaque to
20  light"?
21     A. It means that light doesn't pass through
22  it.
23     Q. How does that differ from being
24  translucent?
25     A. Well, I'll answer it and I'll go into

26 (Pages 101 to 104)

8/20/2024          Acadia Pharmaceuticals, Inc. v. Aurobindo Pharma Limited, et al. R. Christian Moreton, M.Sc, Ph.D.
Confidential

105

1  transparent first.  Transparent means that light
2  passes through.  It's obviously not -- you don't
3  get the blocking of the light.  Translucent is a
4  little bit in between transparent and opaque, so
5  you have part of the light will pass through, other
6  parts will be blocked.  Typically, translucent
7  materials appear a little bit grayer than
8  transparent, clear transparent materials.
9      Q.  Is MCC transparent or --
10         MR. PETERMAN:  Strike that.
11      Q.  Is MCC translucent or opaque to light?
12      A.  It's my recollection that it's opaque to
13  light, but that under certain circumstances, you
14  can get, you know, it cross polarizes, you get
15  things like birefringence.
16      Q.  In paragraph 98, you state, "Moreover,
17  since MCC is opaque to light, light and dark areas
18  are irrelevant."
19      Do you see that?
20      A.  Yes.
21      Q.  Is there a reference that you're referring
22  to for MCC being opaque to light?
23      A.  My personal knowledge.  I used to work for
24  an MCC company.
25      Q.  In this report, though -- so it's your

106

1  personal knowledge.  You're not referring to a
2  reference?
3      A.  No.
4      Q.  So your opinion is that the lighter and
5  darker areas observed in Dr. Smith's images are the
6  result of the uneven nature of cellulose fibers in
7  MCC particles?
8      A.  Yes.
9      Q.  And does that follow what you and I
10  discussed a few minutes ago as to how MCC is
11  formed?
12      A.  Yes.
13      Q.  You also say Dr. Smith is confusing the
14  physical structure of granules and the physical
15  structure of powder.
16      Do you see that?
17      A.  Yes.
18      Q.  And that's in paragraph 99.
19      What is the difference between the
20  physical structure of granules and the physical
21  structure of powder in a PLM?
22      A.  The powder that I'm referring to is a
23  powder with a single material.  Granules -- the
24  powder consists of individual particles.  Granules
25  I'm referring to particles that are stuck together

107

1  by the granulation process.  So that you have --
2  you can see, if you look at granules under the
3  microscope, particularly the scanning electron
4  microscope, you will see the differences in the
5  different materials, you can pick them up.
6      Q.  So in your opinion, Dr. Smith is observing
7  the API and MCC being loosely associated with each
8  other?
9      A.  Yes.
10      Q.  And your belief is that the loose
11  association is not enough to create granules?
12      A.  Correct.
13      Q.  Would the PLMs look different if the API
14  and the MCC was rigidly associated?
15      A.  I don't believe so, no.
16      Q.  And so your conclusion regarding loose
17  association is based off of them looking at the
18  process by which the product was made?
19      A.  Yes.
20      Q.  So if you had not received information
21  regarding the process for Aurobindo's product,
22  would you be able to make any determination as to
23  whether or not there were granules based on the
24  PLM?
25      A.  No.

108

1      Q.  Is there any testing that could determine
2  whether or not there was granules in Aurobindo's
3  product if one did not have the manufacturing
4  process?
5      A.  There are other tests that could be done.
6  Looking at different types of microscopy, looking
7  at, like I said, segregation tests we discussed
8  earlier, things like that.  It would be a number of
9  tests that you would have to do.
10         MR. PETERMAN:  Let's take five minutes and
11  I'll wrap up when we come back.
12         THE VIDEOGRAPHER:  The time is 11:58.
13  We're going off the record.
14         (Proceedings interrupted at 11:58 p.m. and
15  reconvened at 12:06 p.m.)
16         THE VIDEOGRAPHER:  We are back on the
17  record.  The time is 12:06.
18  BY MR. PETERMAN:
19      Q.  So just turning back to paragraph 99 of
20  your report, looking at a sentence on page 33.  You
21  know the sentence, "Accordingly, any diversity
22  observed in the polarized light microscopy studies,
23  (e.g., lighter areas versus darker areas) of
24  Aurobindo's pimavanserin product is more likely to
25  be a result of fine articles of API loosely

27  (Pages 105 to 108)

109

1  associated on the surface of MCC rather than being
2  indicative of more than one component being rigidly
3  attached to the particles."
4      Do you see that?
5  A.  Yes, I do.
6      Q.  Is that statement still your opinion?
7  A.  Yes, it is.
8      Q.  And is that statement based on reviewing
9  the PLM, or is it based on your understanding of
10 the process for making Aurobindo's product?
11 A.  Both.
12     Q.  What in reviewing the PLM leads you to
13 this conclusion?
14 A.  Well, the particles that Dr. Smith was
15 referring to are on the very edges of the larger
16 particles and that's typically where you would get
17 an adsorption or adherence of the small particles.
18 If you had a granule, you would get the
19 pimavanserin tartrate particles distributed all
20 over the -- and through the granules.  And I didn't
21 see that.
22     Q.  And what would it have looked like, in
23 your opinion, if the pimavanserin tartrate
24 particles were distributed through the granule?
25 A.  It would not have been such a pinpoint

110

1  thing because the pimavanserin is soluble.  It
2  would have been spread uniformly over the surface
3  of all the components of the granule.
4      Q.  And does PLM allow you to see the
5  pimavanserin across the surface of the granule if
6  it existed?
7  A.  I don't believe so.  I think it would just
8  be a particle that would not have any pinpoint like
9  parts.
10     MR. PETERMAN:  I don't have any more
11 questions for you.  Thank you for your time.
12     MR. HOGAN:  No questions from Aurobindo.
13     THE WITNESS:  Thank you.
14     MR. PETERMAN:  Do you want this
15 confidential?
16     MR. HOGAN:  Yes, please, confidential.
17     THE VIDEOGRAPHER:  The time is 12:08.  We
18 are going off the record.  This is the end of
19 today's deposition of Dr. R. Christian Moreton.
20     (Transcript order requested by reporter.)
21     MR. PETERMAN:  Regular delivery.
22     MR. HOGAN:  Regular and rough.
23     MR. PETERMAN:  Rough.
24     (Whereupon, this deposition was concluded
25 at 12:08 p.m. EDT)

111

1              CERTIFICATE
2  Commonwealth of Massachusetts
3  Suffolk, ss.
4      I, Dana Welch, Registered Professional
5  Reporter, Certified Realtime Reporter, do hereby
6  certify that R. CHRISTIAN MORETON, M.Sc, Ph.D., the witness
7  whose deposition is hereinbefore set forth, was duly sworn
8  by me before the commencement of
9  such deposition, and that such deposition was taken
10 before me and is a true record of the testimony
11 given by such witness.
12     I further certify that the adverse party was
13 represented by counsel at the deposition.  I further certify
14 that I have no disqualifying interests, personal or
15 financial, in any party in this action.
16     I further certify that the deposition of R.
17 CHRISTIAN MORETON, M.Sc, Ph.D., occurred IN PERSON on August
18 20, 2024 in Boston, Massachusetts, commencing at 8:57 a.m.
19 and concluding at 12:08 p.m.
20
21
22
23          _____
             Dana Welch, CSR, RPR, CRR
             Notary Public
24           My Commission Expires:
25           September 13, 2024

112

1  R. Christian Moreton, M.Sc, Ph.D., c/o
   KRATZ & BARRY LLP
2  325 Chestnut Street, Suite 876, #259
   Philadelphia, Pennsylvania 19106
3
4  Case: Acadia Pharmaceuticals, Inc. v. Aurobindo Pharma Limited, et al.
   Date of deposition: August 20, 2024
5  Deponent: R. Christian Moreton, M.Sc, Ph.D.
6
7  Please be advised that the transcript in the above
8  referenced matter is now complete and ready for signature.
9  The deponent may come to this office to sign the transcript,
10 a copy may be purchased for the witness to review and sign,
11 or the deponent and/or counsel may waive the option of
12 signing. Please advise us of the option selected.
13 Please forward the errata sheet and the original signed
14 signature page to counsel noticing the deposition, noting the
15 applicable time period allowed for such by the governing
16 Rules of Procedure. If you have any questions, please do
17 not hesitate to call our office at (202)-232-0646.
18
19
20 Sincerely,
   Digital Evidence Group
21 Copyright 2024 Digital Evidence Group
   Copying is forbidden, including electronically, absent
22 express written consent.
23
24
25

28  (Pages 109 to 112)

8/20/2024                     Acadia Pharmaceuticals, Inc. v. Aurobindo Pharma Limited, et al. R. Christian Moreton, M.Sc, Ph.D.
                                                      Confidential

113

1    Digital Evidence Group, L.L.C.
     1730 M Street, NW, Suite 812
2    Washington, D.C. 20036
     (202) 232-0646
3
4    SIGNATURE PAGE
     Case: Acadia Pharmaceuticals, Inc. v. Aurobindo Pharma Limited, et al.
5    Witness Name: R. Christian Moreton, M.Sc, Ph.D.
     Deposition Date: August 20, 2024
6
7    I do hereby acknowledge that I have read
     and examined the foregoing pages
8    of the transcript of my deposition and that:
9
10   (Check appropriate box):
     ( ) The same is a true, correct and
11   complete transcription of the answers given by
     me to the questions therein recorded.
12   ( ) Except for the changes noted in the
     attached Errata Sheet, the same is a true,
13   correct and complete transcription of the
     answers given by me to the questions therein
14   recorded.
15
16   _____
17   DATE          WITNESS SIGNATURE
18
19
20
21   _____
22   DATE          NOTARY
23
24
25

114

1    Digital Evidence Group, LLC
2    1730 M Street, NW, Suite 812
3    Washington, D.C.  20036
4    (202)232-0646
5
6             ERRATA SHEET
7
8    Case: Acadia Pharmaceuticals, Inc. v. Aurobindo Pharma Limited, et al.
9    Witness Name: R. Christian Moreton, M.Sc, Ph.D.
10   Deposition Date: August 20, 2024
11   Page No.    Line No.    Change
12
13
14
15
16
17
18
19
20
21   _____    _____
22   Signature            Date
23
24
25

29  (Pages 113 to 114)