# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ACADIA PHARMACEUTICALS INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 22-1387-GBW |
| | ) | |
| AUROBINDO PHARMA LIMITED *et al*., | ) | CONSOLIDATED |
| | ) | |
| Defendants. | ) | ███████████████ |
| | ) | PUBLIC VERSION FILED |
| | | NOVEMBER 14, 2024 |

## ACADIA'S MOTION *IN LIMINE* TO PRECLUDE
## AUROBINDO FROM REARGUING CLAIM CONSTRUCTION

ACADIA moves to preclude Aurobindo's expert, R. Christian Moreton, from resurrecting Aurobindo's specification disavowal argument, which the Court already rejected during claim construction, or seeking to contravene the Court's finding that the construed terms are not explicitly limited or redefined by the specification. Aurobindo should be precluded from arguing a plain and ordinary meaning of the claims inconsistent with the *Markman* decision.

During *Markman*, Aurobindo argued that ACADIA disavowed formulations where pimavanserin was granulated with other excipients and that Defendants' "proposed constructions … are … fully supported by the consistent description of the claimed invention and its manufacturing process in the '721 patent specification." (D.I. 39 at 17.) Aurobindo asserted that the embodiment "describ[ing] processes to manufacture capsules," (Ex. 1 ('721 patent) at 15:3-5), provides "comparative experiments resulting in *unacceptable* products," and thus, "discloses the invention, which would presumably generate acceptable products, as involving a wet granulation process with 'a small quantity of water' conducted on pimavanserin API alone." (D.I. 39 at 19 (citing Ex. 1 ('721 patent) at cols. 13-15 ("manufacturing embodiment")) (emphasis in original).) In short, Aurobindo argued "that the foundation of the claimed subject matter is 40 mg pimavanserin tartrate granulated alone [and] that foundation is a limitation of all issued claims of the '721 patent." (*Id.* at 42.)

The Court rejected Aurobindo's specification disavowal argument and found that the disputed terms have their "plain and ordinary meaning," "granule" is not limited to pimavanserin granulated alone, and that "blended pimavanserin composition" need not possess an extra-granular component. (D.I. 43 at 3-6.) On specification disavowal, the Court found that "Acadia did not clearly disavow granules containing both pimavanserin and excipients," (*id.* at 9), and that "[w]hile the specification also describes a mixing process that occurs after granulation, nowhere does the

specification explicitly state that extra-granular excipients are mandatory." (*Id.* at 11.)  Dr. Moreton "attempt[s] to resurrect a claim construction that the district court already rejected," however, "[r]estating a previously settled argument does not create an 'actual dispute regarding the proper scope of the claims.'" *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1207 (Fed. Cir. 2010); *TEK Glob., S.R.L. v. Sealant Sys. Int'l, Inc.*, 920 F.3d 777, 787 (Fed. Cir. 2019) (rejecting attempt to "toe[] a fine line" around claim construction by arguing support in 'the *plain language* of [the] claim").

Specifically, Dr. Moreton tries to resuscitate the rejected specification disavowal by arguing that, *inter alia*, "[t]he '721 patent… claims, allegedly a novel… process for preparing the claimed granules comprising 40 mg pimavanserin tartrate.  The claimed process requires a granulation step and a granulating agent or binder, or a compression/compaction step to form granules." (Ex. 2 (Moreton Report) at ¶ 5.)  Dr. Moreton further opines that "[w]hile it is apparent that the asserted claims 1 and 4 are directed to formulations of pimavanserin tartrate, the '721 patent makes clear that the method of producing the claimed granules comprising 40 mg pimavanserin tartrate is novel and critical to the desired product result." (*Id.* at ¶ 51.)  Dr. Moreton then alleges that Aurobindo does not infringe because ████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████ (*Id.* at ¶ 59.)  However, claims 1 and 4 of the '721 patent do not claim a process for preparing granules nor do they contain limitations that require Dr. Moreton's process steps.  Furthermore, when asked during deposition whether he "read the court's claim construction opinion," Dr. Moreton admitted: "I don't think I did look at them, but certainly I've discussed with counsel if there was anything in what I was saying that was in contradiction or conflict with the

court's definitions." (Ex. 3 (Moreton Tr.) at 58:15-18.) Dr. Moreton then proceeded to answer, "I don't recall," when asked a series of questions, including "what claim terms have been construed by the court," ███████████████ " and "if the court required a process limitation for either claim 1 or claim 4." (*Id.* at 59:15-25.) As Dr. Moreton did not read the Court's *Markman* decision or have any knowledge on its findings, it is not surprising that he failed to apply the Court's constructions in his noninfringement analysis.

The Court has already found that the specification "did not clearly disavow granules containing both pimavanserin and excipients." (D.I. 43 at 9.) As a result, Dr. Moreton's opinion that a POSA would understand the '721 patent claims to require the specific processes described in the manufacturing embodiment directly conflicts with the Court's much broader constructions for the claims. *See, e.g.*, *Finjan*, 626 F.3d at 1206-07 ("district court construed [a term] as having 'its plain and ordinary meaning,'" because "the defendant's proposed construction would unjustifiably narrow the term's broad scope, which was not explicitly limited or redefined by the specification," therefore, "the district court [had] rejected Defendants' construction"); *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1325-26 (Fed. Cir. 2012); *TEK Glob.*, 920 F.3d at 787. "Parties, their experts, and their attorneys are not permitted at trial to reargue claim construction or to take positions that are inconsistent with the Court's construction." *See, e.g.*, *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 763 F.Supp.2d 671, 695 (D. Del. 2010). Because the Court expressly rejected Dr. Moreton's purported disclaimer, the Court may prevent Aurobindo's expert from rearguing this previously settled issue under noninfringement contentions to obtain a second stab at reconstruing the terms at trial. *See, e.g.*, *Finjan*, 626 F.3d at 1206-07.

*Of Counsel*:

Chad J. Peterman
Bruce M. Wexler
Scott F. Peachman
Peter E. Conway
PAUL HASTINGS LLP
200 Park Avenue
New York, New York 10166
(212) 318-6000

Felix A. Eyzaguirre
PAUL HASTINGS LLP
600 Travis Street, 58th Floor
Houston, TX 77002
(713) 860-7300


Dated:  October 25, 2024

SAUL EWING LLP

*/s/ Michelle C. Streifthau-Livizos*
_____
James D. Taylor (#4009)
Jessica M. Jones (#6246)
Michelle C. Streifthau-Livizos (#6584)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
james.taylor@saul.com
jessica.jones@saul.com
michelle.streifthau-livizos@saul.com

*Attorneys for Plaintiff*
*ACADIA Pharmaceuticals Inc.*

4

# EXHIBIT 1

US011452721B2

(12) **United States Patent**
Tejwani et al.

(10) Patent No.: **US 11,452,721 B2**
(45) Date of Patent: ***Sep. 27, 2022**

(54) **FORMULATIONS OF PIMAVANSERIN**

(71) Applicant: **ACADIA Pharmaceuticals Inc.**, San Diego, CA (US)

(72) Inventors: **Ravindra Tejwani**, Monmouth Junction, NJ (US); **Stephen Edward Abele**, White Plains, NY (US); **Emanuel Joseph Vizzotti**, Millburn, NJ (US)

(73) Assignee: **ACADIA Pharmaceuticals Inc.**, San Diego, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **17/693,830**

(22) Filed: **Mar. 14, 2022**

(65) **Prior Publication Data**

US 2022/0193057 A1    Jun. 23, 2022

**Related U.S. Application Data**

(63) Continuation of application No. 17/080,731, filed on Oct. 26, 2020, which is a continuation of application No. 16/836,086, filed on Mar. 31, 2020, now Pat. No. 10,849,891, which is a continuation of application No. 16/571,554, filed on Sep. 16, 2019, now Pat. No. 10,646,480, which is a continuation of application No. 16/363,378, filed on Mar. 25, 2019, now Pat. No. 10,449,185, which is a continuation of application No. PCT/US2018/048096, filed on Aug. 27, 2018.

(60) Provisional application No. 62/552,300, filed on Aug. 30, 2017.

(30) **Foreign Application Priority Data**

Sep. 1, 2017    (SE) .................................... 1730232-4

(51) **Int. Cl.**
*A61K 9/48* (2006.01)
*A61K 31/4468* (2006.01)
*A61K 9/16* (2006.01)
*A61K 9/20* (2006.01)
*A61K 47/38* (2006.01)

(52) **U.S. Cl.**
CPC ........ *A61K 31/4468* (2013.01); *A61K 9/1652* (2013.01); *A61K 9/1688* (2013.01); *A61K 9/1694* (2013.01); *A61K 9/2009* (2013.01); *A61K 9/2013* (2013.01); *A61K 9/2054* (2013.01); *A61K 9/485* (2013.01); *A61K 9/4808* (2013.01); *A61K 9/4833* (2013.01); *A61K 9/4858* (2013.01); *A61K 9/4866* (2013.01); *A61K 47/38* (2013.01); *C07B 2200/13* (2013.01)

(58) **Field of Classification Search**
CPC .. A61K 9/4833; A61K 9/4841; A61K 9/4883; A61K 9/4891
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,983,234 A | 9/1976 | Sayers | |
| 4,138,492 A | 2/1979 | Noverola et al. | |
| 4,255,432 A | 3/1981 | Kluge et al. | |
| 4,332,804 A | 6/1982 | Clark | |
| 4,353,900 A | 10/1982 | Clark | |
| 4,353,901 A | 10/1982 | Clark | |
| 4,367,232 A | 1/1983 | Boix-Iglesias et al. | |
| 4,795,646 A | 1/1989 | Schlunken | |
| 4,853,394 A | 8/1989 | King | |
| 5,025,013 A | 6/1991 | Barreau | |
| 5,214,055 A | 5/1993 | Peglion et al. | |
| 5,216,165 A | 6/1993 | Mobilio et al. | |
| 5,461,066 A | 10/1995 | Gericke et al. | |
| 5,595,872 A | 1/1997 | Wetterau, II et al. | |
| 5,621,010 A | 4/1997 | Sueda et al. | |
| 5,707,798 A | 1/1998 | Brann | |
| 5,795,894 A | 8/1998 | Shue | |
| 5,837,730 A | 11/1998 | Javitt | |
| 5,869,488 A | 2/1999 | Shue | |
| 5,877,173 A | 3/1999 | Olney et al. | |
| 5,912,132 A | 6/1999 | Brann | |
| 5,955,281 A | 9/1999 | Brann | |
| 6,107,324 A | 8/2000 | Behan | |
| 6,140,509 A | 10/2000 | Behan | |
| 6,150,393 A | 11/2000 | Behan | |
| 6,358,698 B1 | 3/2002 | Weiner et al. | |
| 6,451,343 B1 | 9/2002 | Glinecke et al. | |
| 6,479,480 B1 | 11/2002 | Moyes | |
| 6,486,153 B1 | 11/2002 | Castro Pineiro | |
| 6,670,137 B2 | 12/2003 | VanMechelen et al. | |
| 6,756,393 B2 | 6/2004 | Andersson et al. | |
| 6,815,458 B2 | 11/2004 | Andersson et al. | |
| 6,911,452 B2 | 6/2005 | Schlienger | |
| 7,022,698 B2 | 4/2006 | Hamied et al. | |
| 7,041,667 B1 | 5/2006 | Armour et al. | |
| 7,087,593 B2 | 8/2006 | Kelly et al. | |
| 7,115,634 B2 | 10/2006 | Thurieau et al. | |
| 7,217,719 B2 | 5/2007 | Schlienger | |
| 7,253,186 B2 | 8/2007 | Andersson et al. | |
| 7,351,707 B2 | 4/2008 | Schlienger | |
| 7,393,861 B2 | 7/2008 | Thurieau et al. | |
| 7,476,682 B2 | 1/2009 | Andersson et al. | |
| 7,538,222 B2 | 5/2009 | Andersson et al. | |
| 7,601,740 B2 | 10/2009 | Weiner et al. | |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| CA | 984843 A | 3/1976 | |
| CN | 104844502 A | 8/2015 | |

(Continued)

OTHER PUBLICATIONS

U.S. Appl. No. 09/800,096, Azacyclic compounds, filed Mar. 6, 2001, U.S. Pat. No. 6,815,458.

(Continued)

*Primary Examiner* — Micah Paul Young

(74) *Attorney, Agent, or Firm* — Goodwin Procter LLP

(57) **ABSTRACT**

Provided herein are capsules containing pimavanserin, processes for manufacturing said capsule, and pharmaceutical compositions containing pimavanserin.

**13 Claims, 4 Drawing Sheets**

## US 11,452,721 B2
Page 2

(56)                    **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 7,659,285 | B2 | 2/2010 | Weiner et al. |
| 7,713,995 | B2 | 5/2010 | Weiner et al. |
| 7,732,462 | B2 | 6/2010 | Weiner et al. |
| 7,732,615 | B2 | 6/2010 | Thygesen et al. |
| 7,790,899 | B2 | 9/2010 | Tolf et al. |
| 7,816,383 | B1 | 10/2010 | Bradford et al. |
| 7,820,695 | B2 | 10/2010 | Weiner et al. |
| 7,858,789 | B2 | 12/2010 | Thurieau et al. |
| 7,863,296 | B2 | 1/2011 | Weiner et al. |
| 7,868,176 | B2 | 1/2011 | Thygesen et al. |
| 7,875,632 | B2 | 1/2011 | Weiner et al. |
| 7,923,564 | B2 | 4/2011 | Thygesen et al. |
| 7,994,193 | B2 | 8/2011 | Weiner et al. |
| 8,008,323 | B2 | 8/2011 | Weiner et al. |
| 8,110,574 | B2 | 2/2012 | Thurieau et al. |
| 8,227,487 | B2 | 7/2012 | Weiner et al. |
| 8,236,960 | B2 | 8/2012 | Thygesen et al. |
| 8,377,959 | B2 | 2/2013 | Weiner et al. |
| 8,618,130 | B2 | 12/2013 | Weiner et al. |
| 8,921,393 | B2 | 12/2014 | Weiner et al. |
| 9,050,343 | B2 | 6/2015 | Peters et al. |
| 9,211,289 | B2 | 12/2015 | Weiner et al. |
| 9,296,694 | B2 | 3/2016 | Andersson et al. |
| 9,446,037 | B2 | 9/2016 | Mills et al. |
| 9,486,453 | B2 | 11/2016 | Javitt |
| 9,566,271 | B2 | 2/2017 | Weiner et al. |
| 9,757,366 | B2 | 9/2017 | Mills et al. |
| 9,765,053 | B2 | 9/2017 | Andersson et al. |
| 10,028,944 | B2 | 7/2018 | Weiner et al. |
| 10,449,185 | B2 * | 10/2019 | Tejwani ............... A61K 9/485 |
| 10,517,860 | B2 | 12/2019 | Parkinson |
| 10,525,046 | B2 | 1/2020 | Weiner et al. |
| 10,597,363 | B2 | 3/2020 | Carlos et al. |
| 10,646,480 | B2 * | 5/2020 | Tejwani ............... A61K 9/4833 |
| 10,849,891 | B2 * | 12/2020 | Tejwani ............... A61K 9/2054 |
| 10,953,000 | B2 | 3/2021 | Parkinson |
| 10,981,870 | B2 | 4/2021 | Carlos et al. |
| 10,981,871 | B2 | 4/2021 | Carlos et al. |
| 11,135,211 | B2 | 10/2021 | Burstein |
| 11,191,757 | B2 | 12/2021 | Parkinson |
| 2002/0004513 | A1 | 1/2002 | Andersson et al. |
| 2002/0156068 | A1 | 10/2002 | Behan |
| 2002/0165225 | A1 | 11/2002 | Kankan et al. |
| 2004/0006081 | A1 | 1/2004 | Burrows |
| 2004/0106600 | A1 | 6/2004 | Andersson et al. |
| 2004/0213816 | A1 | 10/2004 | Weiner et al. |
| 2004/0229908 | A1 | 11/2004 | Nelson |
| 2005/0014757 | A1 | 1/2005 | Andersson et al. |
| 2005/0148018 | A1 | 7/2005 | Weiner et al. |
| 2005/0244862 | A1 | 11/2005 | Brann |
| 2005/0256108 | A1 | 11/2005 | Schlienger |
| 2005/0261278 | A1 | 11/2005 | Weiner et al. |
| 2005/0261340 | A1 | 11/2005 | Weiner et al. |
| 2005/0288328 | A1 | 12/2005 | Weiner et al. |
| 2006/0094758 | A1 | 5/2006 | Andersson et al. |
| 2006/0106063 | A1 | 5/2006 | Thhygesen et al. |
| 2006/0111399 | A1 | 5/2006 | Thhygesen et al. |
| 2006/0194778 | A1 | 8/2006 | Andersson et al. |
| 2006/0194834 | A1 | 8/2006 | Andersson et al. |
| 2006/0199794 | A1 | 9/2006 | Schlienger |
| 2006/0199818 | A1 | 9/2006 | Andersson et al. |
| 2006/0199842 | A1 | 9/2006 | Weiner et al. |
| 2006/0204486 | A1 | 9/2006 | Pyke et al. |
| 2006/0205710 | A1 | 9/2006 | Schlienger |
| 2006/0205722 | A1 | 9/2006 | Andersson et al. |
| 2006/0205780 | A1 | 9/2006 | Thygesen et al. |
| 2006/0205781 | A1 | 9/2006 | Thygesen et al. |
| 2006/0264465 | A1 | 11/2006 | Weiner et al. |
| 2006/0264466 | A1 | 11/2006 | Weiner et al. |
| 2006/0286610 | A1 | 12/2006 | Brann |
| 2006/0292606 | A1 | 12/2006 | Brann |
| 2007/0260064 | A1 | 11/2007 | Tolf et al. |
| 2007/0264330 | A1 * | 11/2007 | Ragnar-Tolf ......... A61K 9/2059 424/464 |
| 2008/0051429 | A1 | 2/2008 | Van Kammen et al. |
| 2008/0280886 | A1 | 11/2008 | Gant et al. |
| 2009/0053329 | A1 | 2/2009 | Peters et al. |
| 2009/0082342 | A1 | 3/2009 | Uldam et al. |
| 2009/0082388 | A1 | 3/2009 | Hacksell |
| 2009/0186921 | A1 | 7/2009 | Andersson et al. |
| 2014/0018348 | A1 | 1/2014 | Javitt |
| 2014/0162942 | A1 | 6/2014 | Ghosal et al. |
| 2014/0221395 | A1 | 8/2014 | Dhanoa |
| 2014/0329903 | A1 | 11/2014 | Burstein et al. |
| 2014/0349976 | A1 | 11/2014 | Hacksell et al. |
| 2015/0231126 | A1 | 8/2015 | Peters |
| 2015/0313888 | A1 | 11/2015 | Mills et al. |
| 2016/0237036 | A1 | 8/2016 | Andersson et al. |
| 2018/0037549 | A1 | 2/2018 | Biljan |
| 2019/0030015 | A1 | 1/2019 | Weiner et al. |
| 2019/0047955 | A1 | 2/2019 | Carlos et al. |
| 2019/0117636 | A1 | 4/2019 | Burstein |
| 2019/0216791 | A1 | 7/2019 | Tejwani et al. |
| 2019/0231767 | A1 | 8/2019 | Parkinson |
| 2019/0240211 | A1 | 8/2019 | Parkinson |
| 2020/0009122 | A1 | 1/2020 | Tejwani et al. |
| 2020/0061045 | A1 | 2/2020 | Burstein |
| 2020/0078346 | A1 | 3/2020 | Parkinson |
| 2020/0165202 | A1 | 5/2020 | Carlos et al. |
| 2020/0181087 | A1 | 6/2020 | Carlos et al. |
| 2020/0222381 | A1 | 7/2020 | Tejwani et al. |
| 2020/0237739 | A1 | 7/2020 | Coate et al. |
| 2020/0323836 | A1 | 10/2020 | Weiner et al. |
| 2021/0077479 | A1 | 3/2021 | Tejwani et al. |
| 2021/0161880 | A1 | 6/2021 | Foff |
| 2021/0283118 | A1 | 9/2021 | Tejwani et al. |
| 2022/0000852 | A1 | 1/2022 | Burstein |
| 2022/0016101 | A1 | 1/2022 | Burstein et al. |
| 2022/0024871 | A1 | 1/2022 | Carlos et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 104961672 A | 10/2015 |
| CN | 105111135 A | 12/2015 |
| CN | 105153016 A | 12/2015 |
| CN | 105418460 A | 3/2016 |
| CN | 105481757 A | 4/2016 |
| CN | 105820110 A | 8/2016 |
| CN | 106543072 A | 3/2017 |
| EP | 0005318 B1 | 11/1979 |
| EP | 0061333 B1 | 9/1982 |
| EP | 0260070 B1 | 3/1988 |
| EP | 0379441 A1 | 7/1990 |
| EP | 0548015 B1 | 6/1993 |
| EP | 0625507 B1 | 11/1994 |
| EP | 1576985 A1 | 9/2005 |
| HU | 157325 | 3/1998 |
| JP | 51052176 | 5/1976 |
| JP | 52085174 A | 7/1977 |
| WO | WO-9427967 A1 | 12/1994 |
| WO | WO-9708166 A1 | 3/1997 |
| WO | WO-9711940 A1 | 4/1997 |
| WO | WO-9738665 A2 | 10/1997 |
| WO | WO-9738984 A1 | 10/1997 |
| WO | WO-9811128 A1 | 3/1998 |
| WO | WO-9817646 A1 | 4/1998 |
| WO | WO-98/44921 A1 | 10/1998 |
| WO | WO-98/50534 A1 | 11/1998 |
| WO | WO-9952927 A1 | 10/1999 |
| WO | WO-2000/020636 A1 | 4/2000 |
| WO | WO-0023076 A1 | 4/2000 |
| WO | WO-0056335 A1 | 9/2000 |
| WO | WO-0059497 A1 | 10/2000 |
| WO | WO-0069810 A1 | 11/2000 |
| WO | WO-2001/029008 A1 | 4/2001 |
| WO | WO-0144191 A1 | 6/2001 |
| WO | WO-0166521 A1 | 9/2001 |
| WO | WO-0187839 A1 | 11/2001 |
| WO | WO-2001089498 A2 | 11/2001 |
| WO | WO-0224649 A1 | 3/2002 |
| WO | WO-2002038142 A2 | 5/2002 |
| WO | WO-02076464 A1 | 10/2002 |
| WO | WO-02079186 A2 | 10/2002 |
| WO | WO-03057698 A2 | 7/2003 |

US 11,452,721 B2

Page 3

## (56) References Cited

### FOREIGN PATENT DOCUMENTS

| WO | WO-03062206 A2 | 7/2003 |
| WO | WO-03070246 A1 | 8/2003 |
| WO | WO-03086400 A1 | 10/2003 |
| WO | WO-04000808 A1 | 12/2003 |
| WO | WO-04039322 A2 | 5/2004 |
| WO | WO-04064753 A2 | 8/2004 |
| WO | WO-2004064738 A2 | 8/2004 |
| WO | WO-05053796 A1 | 6/2005 |
| WO | WO-05063254 A2 | 7/2005 |
| WO | WO-05112927 A1 | 12/2005 |
| WO | WO-2006036874 A1 | 4/2006 |
| WO | WO-2006037043 A1 | 4/2006 |
| WO | WO-06104826 A1 | 10/2006 |
| WO | WO-2007124136 A1 | 11/2007 |
| WO | WO-2007133802 A2 | 11/2007 |
| WO | WO-2008116024 A2 | 9/2008 |
| WO | WO-2008141057 A1 | 11/2008 |
| WO | WO-2008144326 A2 | 11/2008 |
| WO | WO-2008144665 A1 | 11/2008 |
| WO | WO-2009035473 A2 | 3/2009 |
| WO | WO-2009039460 A2 | 3/2009 |
| WO | WO-2009039461 A2 | 3/2009 |
| WO | WO-2010011353 A1 | 9/2010 |
| WO | WO-2011047341 A2 | 4/2011 |
| WO | WO-2011085216 A2 | 7/2011 |
| WO | WO-2014085362 A1 | 6/2014 |
| WO | WO-2015/087283 A1 | 6/2015 |
| WO | WO-2016201373 A1 | 12/2016 |
| WO | WO-2017011767 A2 | 1/2017 |
| WO | WO-2017015272 A1 | 1/2017 |
| WO | WO-2017165635 A1 | 9/2017 |
| WO | WO-2017172757 A1 | 10/2017 |
| WO | WO-2018118626 A1 | 6/2018 |
| WO | WO-2018200977 A1 | 11/2018 |
| WO | WO-2019046167 A1 | 3/2019 |
| WO | WO-2019177973 A1 | 9/2019 |
| WO | WO-2020092618 A1 | 5/2020 |
| WO | WO-2021016369 A1 | 1/2021 |
| WO | WO-2021030607 A1 | 2/2021 |

### OTHER PUBLICATIONS

U.S. Appl. No. 10/409,782, Azacyclic compounds, filed Apr. 7, 2003, U.S. Pat. No. 6,756,393.
U.S. Appl. No. 13/053,079, Methods of treatment using selective 5-HT2A inverse agonists, filed Mar. 21, 2011, U.S. Pat. No. 9,765,053.
U.S. Appl. No. 14/628,156, Azacyclic compounds, filed Feb. 20, 2015, U.S. Pat. No. 9,296,694.
U.S. Appl. No. 10/759,564, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed Jan. 15, 2004, U.S. Pat. No. 7,601,740.
U.S. Appl. No. 11/416,527, Selective Serotonin 2A/2C Receptor Inverse Agonists as Therapeutics for Neurodegenerative Diseases, filed May 3, 2006 2006, U.S. Pat. No. 7,732,462.
U.S. Appl. No. 11/416,855, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed May 3, 2006, U.S. Pat. No. 7,659,285.
U.S. Appl. No. 11/416,594, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed May 3, 2006, U.S. Pat. No. 7,713,995.
U.S. Appl. No. 12/759,662, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed Apr. 13, 2010, U.S. Pat. No. 7,994,193.
U.S. Appl. No. 12/759,664, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed Apr. 13, 2010, U.S. Pat. No. 8,008,323.
U.S. Appl. No. 13/169,893, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed Jun. 27, 2011, U.S. Pat. No. 8,227,487.
U.S. Appl. No. 13/539,011, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed Jun. 29, 2012, U.S. Pat. No. 8,377,959.

U.S. Appl. No. 13/750,778, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed Jan. 25, 2013, U.S. Pat. No. 8,618,130.
U.S. Appl. No. 14/086,838, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed Nov. 21, 2013, U.S. Pat. No. 8,921,393.
U.S. Appl. No. 14/537,793, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed Nov. 10, 2014, U.S. Pat. No. 9,211,289.
U.S. Appl. No. 14/935,246, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed Nov. 6, 2015, U.S. Pat. No. 9,566,271.
U.S. Appl. No. 15/397,582, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed Jan. 3, 2017, U.S. Pat. No. 10,028,944.
U.S. Appl. No. 16/019,485, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed Jun. 26, 2018, U.S. Pat. No. 10,525,046.
U.S. Appl. No. 17/474,816, Selective serotonin 2A/2C receptor inverse agonists as therapeutics for neurodegenerative diseases, filed Sep. 14, 2021, Pending.
U.S. Appl. No. 10/850,819, Selective serotonin receptor inverse agonists as therapeutics for disease, filed May 21, 2004, U.S. Pat. No. 7,820,695.
U.S. Appl. No. 11/134,769, Selective serotonin receptor inverse agonists as therapeutics for disease, filed May 20, 2005, U.S. Pat. No. 7,863,296.
U.S. Appl. No. 12,378,385, Selective serotonin receptor inverse agonists as therapeutics for disease, filed Feb. 11, 2009, U.S. Pat. No. 7,875,632.
U.S. Appl. No. 11/235,558, N-(4-fluorobenzyl)-N-(1-methylpiperidin-4-yl)-N'-(4-(2-methylpropyloxy)phenylmethyl)carbamide and its tartrate salt and crystalline forms, filed Sep. 26, 2005, U.S. Pat. No. 7,732,615.
U.S. Appl. No. 11/235,381, Salts of N-(4-fluorobenzyl)-N-(1-methylpiperidin-4-yl)-N'-(4-(2-methylpropyloxy)phenylmethyl)carbamide and their preparation, filed Sep. 26, 2005, U.S. Pat. No. 7,868,176.
U.S. Appl. No. 12/795,547, Synthesis of N-(4-fluorobenzyl)-N-(1-methylpiperidin-4-yl)-N'-(4-(2-methylpropyloxy)phenylmethyl)carbamide and its tartrate salt and crystalline forms, filed Jun. 7, 2010, U.S. Pat. No. 7,923,564.
U.S. Appl. No. 13/081,427, Synthesis of N-(4-fluorobenzyl)-N-(1-methylpiperidin-4-yl)-N'-(4-(2-methylpropyloxy)phenylmethyl)carbamide and its tartrate salt and crystalline forms, filed Apr. 6, 2011, U.S. Pat. No. 8,236,960.
U.S. Appl. No. Synthesis of N-(4-fluorobenzyl)-N-(1-methylpiperidin-4-yl)-N'-(4-(2-methylpropyloxy)phenylmethyl)carbamide and its tartrate salt and crystalline forms, filed May 15, 2007, U.S. Pat. No. 7,790,899.
U.S. Appl. No. 13/754,769, Combination of pimavanserin and risperidone for the treatment of psychosis, filed Jan. 30, 2013, U.S. Pat. No. 9,050,343.
U.S. Appl. No. 14/647,438, Methods for the treatment of Parkinson's disease psychosis using pimavanserin, filed May 26, 2015, U.S. Pat. No. 9,446,037.
U.S. Appl. No. 15/246,412, Methods for the treatment of Parkinson's disease psychosis using pimavanserin, filed Aug. 24, 2016, U.S. Pat. No. 9,757,366.
U.S. Appl. No. 15/744,636, Methods for preparing N-(4-fluorobenzyl)-N-(1-methylpiperidin-4-yl)-N'-(4-(2-methylpropyloxy)phenylmethyl)carbamide and its tartrate salt and polymorphic form, filed Jan. 12, 2018, U.S. Pat. No. 10,597,363.
U.S. Appl. No. 16/743,607, Methods for preparing N-(4-fluorobenzyl)-N-(1-methylpiperidin-4-yl)-N'-(4-(2-methylpropyloxy)phenylmethyl)carbamide and its tartrate salt and polymorphic form, filed Jan. 15, 2020, U.S. Pat. No. 10,981,870.
U.S. Appl. No. 16/686,809, Methods for preparing N-(4-fluorobenzyl)-N-(1-methylpiperidin-4-yl)-N'-(4-(2-methylpropyloxy)phenylmethyl)carbamide and its tartrate salt and polymorphic form, filed Feb. 10, 2020, U.S. Pat. No. 10,981,871.
U.S. Appl. No. 17/203,266, Methods for preparing N-(4-fluorobenzyl)-N-(1-methylpiperidin-4-yl)-N'-(4-(2-

## US 11,452,721 B2

Page 4

(56)          **References Cited**

OTHER PUBLICATIONS

methylpropyloxy)phenylmethyl)carbamide and its tartrate salt and polymorphic form, filed Mar. 16, 2021, Pending, 20220024871.

U.S. Appl. No. 17/176,723, 5-HT2A serotonin receptor inverse agonists or antagonists for use in reducing amyloid-beta peptides and accumulation of amyloid plaques, filed Feb. 16, 2021, Pending, 20220000852.

U.S. Appl. No. 16/087,604, Combination of pimavanserin and cytochrome p450 modulators, filed Sep. 21, 2018, U.S. Pat. No. 10,953,000.

U.S. Appl. No. 16/379,169, Combination of pimavanserin and cytochrome p450 modulators, filed Apr. 9, 2019, U.S. Pat. No. 10,517,860.

U.S. Appl. No. 16/684,883, Combination of pimavanserin and cytochrome p450 modulators, filed Nov. 19, 2019, U.S. Pat. No. 11,191,757.

U.S. Appl. No. 17/518,776, Combination of pimavanserin and cytochrome p450 modulators, filed Nov. 4, 2021, Pending.

U.S. Appl. No. 16/607,234, Pimavanserin for Treating Impulse Control Disorder, filed Oct. 22, 2019, U.S. Pat. No. 11,135,211.

U.S. Appl. No. 17/412,659, Pimavanserin for Treating Impulse Control Disorder, filed Aug. 26, 2021, Pending.

U.S. Appl. No. 16/471,543, Methods for the Treatment of Alzheimer's Disease Psychosis Using Pimavanserin, filed Jun. 19, 2019, Pending, 20200237739.

U.S. Appl. No. 16/363,378, Formulations of Pimavanserin, filed Mar. 25, 2019, U.S. Pat. No. 10,449,185.

U.S. Appl. No. 16/571,554, Formulations of Pimavanserin, filed Sep. 16, 2019, U.S. Pat. No. 10,646,480.

U.S. Appl. No. 16/836,086, Formulations of Pimavanserin, filed Mar. 31, 2020, U.S. Pat. No. 10,849,891.

U.S. Appl. No. 17/080,731, Formulations of Pimavanserin, filed Oct. 26, 2020, Pending, 20210283118.

U.S. Appl. No. 17/290,479, Methods of Treating Depression, Anxiety and Sexual Dysfunction Using the Compound Primavanserin, filed Apr. 30, 2021, Pending, 20220016101.

U.S. Appl. No. 17/108,623, Methods for Treating Dementia Related Psychosis, filed Dec. 1, 2020, Pending, 20210161880.

U.S. Appl. No. 17/635,459, Pimavanserin for Treating Neurodegenerative Diseases, filed Feb. 15, 2022, Pending.

U.S. Appl. No. 17/629,098, Pimavanserin for Treating Schizophrenia for Treating Psychosis Secondary to Neurodegenerative Disorders or Depressive Disorder, filed Jan. 21, 2022, Pending.

"ACP-103," *Drugs of the Future, Prous Science* (2006) vol. 31, No. 11, pp. 939-943.

"NUPLAZID™ (pimavanserin) Sponsor Background Information for a Meeting of the Psychopharmacologic Drugs Advisory Committee on Mar. 29, 2016," Acadia Pharmaceuticals Inc. 2016. Retrieved from the Internet (URL): <https://www.fda.gov/downloads/advisorycommittees/committeesmeetingmaterials/drugs/psychopharmacologicdrugsadvisorycommittee/ucm492453.pdf> (173 pages).

"Pimavanserin (Nuplazid) for parkinson's disease psychosis," Medical Letter on Drugs and Therapeutics, New Rochelle, NY, US (Jun. 2016) vol. 58, pp. 74-75.

Aarsland et al., "Decreased burden among caregivers of patients with Parkinson's disease psychosis (PDP) treated with pimavanserin, a selective 5-HT2A inverse agonist," (Meeting Abstract) *Neurology* (2015) vol. 84, No. 14, Suppl P6.044.

Abbas et al., "Pimavanserin tartrate: a 5-HT2A inverse agonist with potential for treating various neuropsychiatric disorders," *Expert Opinion on Pharmacotherapy* (2008) vol. 9, No. 18, pp. 3251-3259.

Acadia Pharmaceuticals, "Acadia Pharmaceuticals Announces FDA approval of New Dosing Formulation and Strength for NUPLAZID (Pimavanserin)," Press Release, San Diego (CA) Jun. 29, 2018. Retrieved from the internet (URL): http://ir.acadia-pharm.com/phoenix.zhtml?c=125180&p=irol-newsArticle&ID=2356605 (3 pages).

Adam, et al., "Effects of repeated ritanserin on middle-aged poor sleepers," *Psychopharmacology* (1989) 99:219-221.

Aizenstein et al., "Frequent Amyloid Deposition Without Significant Cognitive Impairment Among the Elderly," Arch. Neurol. 65(11):1509-1517 (2008).

Akin, et al., "Decreased serotonin 5-HT 2A receptor-stimulated phosphoinositide signaling in fibroblasts from melancholic depressed patients," *Neuropsychopharmacology* (2004) 29:2081-2087.

Anonymous, "Use of Liquids and/or Soft Foods as Vehicles for Drug Administration: General Considerations for Selection and In Vitro Methods for Product Quality Assessments Guidance for Industry," Jul. 13, 2018 (Jul. 13, 2018), XP055676101, Retrieved from the Internet: URL:https://www.fda.gov/media/114872/downl <http://www.fda.gov/media/114872/downl> oad [retrieved on Mar. 12, 2020].

Antunes, et al., "The novel object recognition memory: neurobiology, test procedure, and its modifications," *Cogn. Process* (2012) 13:93-110.

Bakshi, et al., "Clozapine antagonizes phencyclidine-induced deficits in sensorimotor gating of the startle response," *The Journal of Pharmacology and Experimental Therapeutics* (1994) 271(2)787-794.

Basha, A., "Synthesis of N, N'-disubstituted Ureas from Carbamates," Tetrahedron Letters 29(21):2525-2526 (1988).

Bekris et al. "Cerebrospinal Fluid Ab42 Levels and APP processing pathway genes in Parkinson's disease," Movement Disorders, 2015, vol. 30, No. 7, pp. 936-944, 2015.

Bennett, et al., "Suppression of dyskinesias in advanced Parkinson's disease. II. Increasing daily clozapine doses suppress dyskinesias and improve parkinsonism symptoms," *Neurology* (1993) 43:1551-1554.

Bhana et al., "A Review of its Use in the Management of the Behavioural and Psychological Symptoms of Dementia," Drugs & Aging 16(6):451-471 (2000).

Biagi, et al., "1,2,3-Triazoles: Structural changes on two effective inhibitors of the prostaglandin synthesis in vitro," *Farmaco Ed. Sci.* (1988) 43:597-611.

Bibbiani, et al., "Serotonin 5-HT1A agonist improves motor complications in rodent and primate parkinsonian models," *Neurology* (2001) 57:1829-1834.

Blakley, et al., "Bidirectional changes in ethanol consumption in rats with site-specific antisense down-regulation of 5-hydroxytryptamine2A receptors in brain," *The Journal of Pharmacology and Experimental Therapeutics* (2001) 299(1):277-289.

Blier, et al., "Potential mechanisms of action of atypical antipsychotic medications in treatment-resistant depression and anxiety," *J. Clin. Psychiatry* (2005) 66(suppl 8):30-40.

Blier, et al., "Putative mechanisms of action of antidepressant drugs in affective and anxiety disorders and pain," *Journal of Psychiatry & Neuroscience* (2001) 26(1):37-43.

Bogolubsky et al., "Bis(2,2,2-trifluoroethyl) carbonate as a condensing agent in one-pot parallel synthesis of unsymmetrical aliphatic ureas," (2014), pages S1-S67. Retrieved from URL: http://pubs.acs.org/doi/suppl/10.102 1/co500025f/supl_file co500025f_si_001.pdf, Table S2, pp. S9, entry 47.

Bogolubsky et al., "Bis(2,2,2-trifluoroethyl) carbonate as a condensing agent in one-pot parallel synthesis of unsymmetrical aliphatic ureas," *ACS Combinatorial Science* (2014) vol. 16, Issue 6, pp. 303-308.

Bond et al., "Physiological effects of inverse agonists in transgenic mice with myocardial overexpression of the beta-adrenoceptor," *Nature* (1995) 374:272-276.

Borman et al., "5-HT2B receptors play a key role in mediating the excitatory effects of 5-HT in human colon in vitro," *Br. J. Pharmacol.* (2002) vol. 135, No. 5, pp. 1144-1151.

Brann, M. R. "Identification of ligands by selective amplification of cells transfected with receptors and marker enzymes," *Chemical Abstracts* (1998) 128 : 111548.

Buddhala et al. "Correlation between decreased CSF a-synuclein and Ab1-42 in Parkinson disease," Neurobiology of Aging, 2015, vol. 36, pp. 476-484, 2015.

Chaturvedi, D., "Perspectives on the Synthesis of Organic Carbamates," Tetrahedron 68:15-45 (2012).

Chaturvedi, D., "Recent Developments on the Carbamation of Amines," Curr. Org. Chem. 15:1593-1624 (2011).

US 11,452,721 B2

Page 5

(56)        **References Cited**

OTHER PUBLICATIONS

Choi et al., "5HT2B receptor-mediated serotonin morphogenic functions in mouse cranial neural crest and myocardiac cells," *Development* (1997) vol. 124, pp. 1745-1755.

Cirrito et al., "Serotonin signaling is associated with lower amyloid-β levels and plaques in transgenic mice and humans," *PNAS* (2011) vol. 108, No. 36, pp. 14968-14973.

Colovic et al., "Acetylcholinesterase Inhibitors: Pharmacology and Toxicology," *Current Neuropharmacology* 11:315-335 (2013).

Cummings et al., "Pimavanserin for patients with Parkinson's disease psychosis: a randomised, placebo-controlled phase 3 trial," *Lancet* (2014) vol. 383, pp. 533-540.

Cummings et al., "Pimavanserin: Potential Treatment for Dementia-Related Psychosis." J. Prev. Alzheimers Dis. 5(4): 253-258 (2018).

Cunningham et al., "Serotonin at the Nexus of Impulsivity and Cue Reactivity in Cocaine Addiction," *Neuropharmacology* 76(0 0): 460-478.

Database CA [online] Chemical Abstracts Service, Columbus, Ohio, US; 2016, Wang et al., "Intermediate of pimavanserin and its analog, preparation method thereof and preparation method of pimavanserin and its analog," XP002761533, retrieved from STN Database accession No. 2016:451070 (reference date: Mar. 23, 2016).

Database CA [online] Chemical Abstracts Service, Columbus, Ohio, US; 2016, Zheng, Xuchun et al: "A process for preparing pimavanserin tartrate," XP002761538, retrieved from STN Database accession No. 2016:1261850 (reference date: Aug. 3, 2016).

Database WPI Week 201622, Derwent Publications Ltd., London, GB; AN 2016-17318M, XP002761536 (reference date: Aug. 19, 2015).

Database WPI Week 201623, Derwent Publications Ltd., London, GB; AN 2015-708058, XP002761532 (reference date: Oct. 7, 2015).

Database WPI Week 201635, Derwent Publications Ltd., London, GB; AN 2016-02257F, XP002761534 (reference date: Dec. 2, 2015).

Database WPI Week 201640, Derwent Publications Ltd., London, GB; AN 2016-01442V, XP002761535 (reference date: Dec. 16, 2015).

Database WPI Week 201641, Derwent Publications Ltd., London, GB; AN 2016-24419S, XP002761537 (reference date: Apr. 13, 2015).

DeClerck, et al., "Increase in slow-wave sleep in humans with the serotonin-S2 antagonist ritanserin," *Current Therapeutic Research* (1987) 41(4):427-432.

Delecluse, et al., "A case of tardive tremor successfully treated with clozapine," *Movement Disorders* (1998) 13(5):846-847.

Dine et al., "One-Pot, Solvent-Free Access to Unsymmetrical Ureas by Palladium-Catalysed Reductive Alkylation Using Molecular Hydrogen," Eur. J. Chem., 5445-5454 (2013).

Dube et al., "Carbonyldiimidazole-Mediated Lossen Rearrangement." Org. Lett. 11(24):5622-5625 (2009).

Dunn, et al., "Analgetic and antiinflammatory 7-aroylbenzofuran-5-ylacetic acids and 7-aroylbenzothiophene-5-ylacetic acids," *J. Med. Chem.* (1986) 29:2326-2329.

Durif, et al., "Low-dose clozapine improves dyskinesias in Parkinson's disease," *Neurology* (1997) 48:658-662.

Eichelbaum, et al., "Influence of pharmacogenetics on drug disposition and response," *Clinical and Experimental Pharmacology and Physiology* (1996) 23:983-985.

Everett, et al., "L-Dopa: Effect on concentrations of dopamine, norepinephrine, and serotonin in brains of mice," *Science* (1970) 168:849-850.

Factor, et al. "Clozapine for the treatment of drug-induced psychosis in Parkinson's disease: Results of the 12 week open label extension in the PSYCLOPS trial," *Movement Disorders* (2001) 16(1):135-139.

Factor, et al., "Clozapine prevents recurrence of psychosis in Parkinson's disease," *Movement Disorders* (1992) 7(2):125-131.

Fava, M. et al. "A Phase 2, Randomized, Double-Blind, Placebo-Controlled Study of Adjunctive Pimavanserin in Patients with Major Depressive Disorder and an Inadequate Response to Therapy (CLARITY)." J Clin Psychiatry. Sep. 24, 2019;80(6) (13 pages).

Fitzgerald et al., "Possible Role of Valvular Serotonin 5-HT2B Receptors in the Cardiopathy Associated with Fenfluramine," *Molecular Pharmacol.* (1999) vol. 57, pp. 75-81.

Friedman et al., "A Multi-Center, Placebo-Controlled, Double-Blind Trial to Examine the Safety and Efficacy of Pimavanserin in the Treatment of Psychosis in Parkinson's Disease," *Neurology* (2010) vol. 74, No. 9, Suppl. 2, pp. A299.

Friedman, et al., "Atypical antipsychotics in the treatment of drug-induced psychosis in Parkinson's disease," *Movement Disorders* (2000) 15(2):201-211.

Friedman, et al., "Low-dose clozapine for the treatment of drug-induced psychosis in Parkinson's disease," N. *Engl. J. Med.* (1999) 340(10):757-763.

Friedman, J. H. "Clozapine treatment of psychosis in patients with tardive dystonia: Report of three cases," *Movement Disorders* (1994) 9(3):321-324.

Gillman, P. K. "Monoamine oxidase inhibitors, opioid analgesics and serotonin toxicity," *British Journal of Anaesthesia* (2005) 95(4):434-441.

Goldman et al., "Genetic counseling and testing for Alzheimer disease: Joint practice guidelines of the American College of Medical Genetics and the National Society of Genetic Counselors," *Genetics in Medicine* (2011) vol. 13, No. 6, pp. 597-605.

Hacksell et al., 2014, "On the Discovery and Development of Pimavanserin: A Novel Drug Candidate for Parkinson's Psychosis," Neurochem. Res., vol. 39, pp. 2008-2017.

Han et al., "Synthesis of Carbamates and Ureas Using Zr(IV)-Catalyzed Exchange Processes," Organic Letters 9(8): 1517-1520 (2007).

Hatoum, H. T. et al., "The Use of the Occupational Disruptiveness Scale of the Neuropsychiatric Inventory-Nusing Home Version to Measure the Impact of Rivastigmine on the Disruptive Behavior of Nursing Home Residents with Alzheimer's Disease," *Journal of the American Medical Directors Association* (2005) vol. 6, No. 4, pp. 238-245.

Highlights of Prescribing Information Nuplazid™ (pimavanserin), Revised Apr. 2016. Retrieved from the Internet (URL): https://www.accessdata.fda.gov/drugsatfda_docs/label/2016/207318lbl.pdf (14 pages).

Highlights of Prescribing Information Nuplazid® (pimavanserin), Revised Jun. 2018. Retrieved from the Internet (URL): https://www.accessdata.fda.gov/drugsatfda_docs/label/2018/207318s005lbl.pdf(15 pages).

Highlights of Prescribing Information Nuplazid® (pimavanserin), Revised Mar. 2018. Retrieved from the Internet (URL): https://www.accessdata.fda.gov/drugsatfda_docs/label/2018/207318s002s004lbl.pdf (15 pages).

Idzikowski, et al. 1991. A dose response study examining the effects of ritanserin on human slow wave sleep. Br. J. Clin. Pharmac., 31:193-196.Idzikowski, et al., "A dose response study examining the effects of ritanserin on human slow wave sleep," *Br. J. Clin. Pharmac.* (1991) 31:193-196.

International Search Report and Written Opinion for International Application No. PCT/US2013/071792, dated, Jan. 1, 2014 (9 pages).

International Search Report and Written Opinion in corresponding PCT Application PCT/US2016/042933 dated Oct. 14, 2016 (13 pages).

International Search Report and Written Opinion in corresponding PCT Patent Application No. PCT/US08/057557 dated Oct. 24, 2008 (10 pages).

International Search Report and Written Opinion in corresponding PCT Patent Application No. PCT/US2017/023795 dated May 29, 2017 (11 pages).

International Search Report and Written Opinion in corresponding PCT Patent Application No. PCT/US2017/024526 dated Jul. 5, 2017 (18 pages).

International Search Report and Written Opinion in corresponding PCT Patent Application No. PCT/US2017/066340 dted Mar. 5, 2018 (13 pages).

## US 11,452,721 B2

Page 6

(56)        **References Cited**

OTHER PUBLICATIONS

International Search Report and Written Opinion in corresponding PCT Patent Application No. PCT/US2018/029831 dated Jul. 11, 2018 (10 pages).

International Search Report and Written Opinion in corresponding PCT Patent Application No. PCT/US2018/048096 dated Oct. 30, 2018 (12 pages).

International Search Report and Written Opinion of the International Searching Authority for International Application No. PCT/US2019/021618 dated Jun. 12, 2019 (10 pages).

International Search Report and Written Opinion of the International Searching Authority for International Application No. PCT/US2019/058927 dated Jan. 23, 2020 (16 pages).

International Search Report and Written Opinion of the International Searching Authority for International Application No. PCT/US2020/043103 dated Dec. 18, 2020 (12 pages).

International Search Report and Written Opinion of the International Searching Authority for International Application No. PCT/US2020/046212 dated Oct. 23, 2020 (10 pages).

International-type Search Report by International Searching Authority for SE1630067-5 dated Sep. 23, 2016 (18 pages).

Ito et al., "Prediction of Human Drug Clearance from in Vitro and Preclinical Data Using Physiologically Based and Empirical Approaches," Pharm. Res., (2005) vol. 22, No. 1, pp. 103-112.

Kalgutkar, et al., "Selective inhibitors of monoamine oxidase (MAO-A and MAO-B) as probes of its catalytic site and mechanism," Medicinal Research Reviews (1995) 15(4)325-388.

Katritzky et al., Chapter V. "Reaction of Amines with Carbamic Acid Esters," Comprehensive Organic Functional Group Transmformations, pp. 501-502 (1995).

Kennedy et al., "The BACE1 inhibitor verubecestat (MK-8931) reduces CNS β-amyloid in animal models and in Alzheimer's disease patients," Sci. Transl. Med. 8, 363ra150 13 pages (2016).

Kondo et al., "Novel Ruthenium-Complex Catalyzed Synthesis of Ureas from Formamides and Amines," Organometallics 16:2562-2570 (1997).

Kotachi et al., "Ruthenium catalysed N.N'-Diarylurea Synthesis from N-Aryl Substituted Formamides and Aminoarenes," J. Chem. Soc., Chem. Comm., 7:549-550 (1990).

Lane et al., "Alzheimer's Disease," Eur. J. Neurol. 25:59-70 (2018).

Lashley et al. "Cortical a-synuclein load is associated with amyloid-b plaque burden in subset of Parkinson disease patients," Acta Neuropathol. 2008, 115, 417-425.

Leysen, et al. "Serotonergic component of neuroleptic receptors," Nature (1978) 272:168-171.

Liechti, et al., "Effects of MDMA (ecstasy) on prepulse inhibition and habituation of startle in humans after pretreatment with Citalopram, Haloperidol, or Ketanserin," Neuropsychopharmacology (2001) 24(3):240-252.

Linder, et al. "Pharmacogenetics: A laboratory tool for optimizing therapeutic efficiency," Clinical Chemistry (1997) 43(2):254-266.

Loudon et al., "Conversion of Aliphatic Amides into Amines with [I,I-Bis(trifluoroacetoxy)iodo]benzene. 1. Scope of Reaction," J. Org. Chem. 49:4272-4276 (1984).

Marek et al., "The Selective 5-HT2A receptor Antagonist MI00907 Enhances Antidepressant-Like Behavioral Effects of the SSRI Fluoxetine," Neuropsychopharmacology (2005) vol. 30, No. 12, pp. 2205-2215.

Marek, et al., "Synergistic action of 5-HT2A antagonists and selective serotonin reuptake inhibitors in neuropsychiatric disorders," Neuropsychopharmacology (2003) 28:402-412.

Matsumura et al., "A New Method for Synthesis of Unsymmetrical Ureas Using Electochemically Prepared Trifluoroethyl Carbamates," J. Org. Chem. 65:1549-1551 (2000).

Medical Review(s), Application No. 207318Orig1s000, Center for Drug Evaluation and Research, Submission Date Sep. 1, 2015 [available online Jun. 3, 2016]. Retrieved from the Internet (URL): <https://www.accessdata.fda.gov/drugsatfda_docs/nda/2016/207318Oriq1s000MedR.pdf> (173 pages).

Meltzer et al., "Co-therapy with pimavanserin and risperidone 2 mg provides an improved clinical profile," Schizophrenia Research (2008) vol. 98, pp. 16.

Meltzer et al., "Pimavanserin, a Serotonin(2A) Receptor Inverse Agonist, for the Treatment of Parkinson's Disease Psychosis," Neuropsychopharmacology (2010) vol. 35, No. 4, pp. 881-892.

Meltzer et al., "Serotonin Receptors: Their Key Role in Drugs to Treat Schizophrenia," Progress in Neuro-Pyschopharmacology & Biol. Psych. (2003) vol. 27, pp. 1159-1172.

Meltzer, et al., "Plasma clozapine levels and the treatment of L-DOPA-induced psychosis in Parkinson's disease," Neuropsychopharmacology (1995) 12(1):39-45.

Meltzer, H. Y. "The role of serotonin in antipsychotic drug action," Neuropsychopharmacology (1999) 21(2S): 106S-115S.

Morley et al., "Antibody to Amyloid p Protein Alleviates Imparied Acquisition, Retention, and Memory Processing in SAMP8 Mice," Neurobiology of Learning and Memory (2002), 78(1):125-138.

Naritomi et al., "Prediction of human hepatic clearance from in vivo animal experiments and in vitro metabolic studies with liver microsomes from animals and humans," Drug Metab. Dispos. (2001) vol. 29, No. 10, pp. 1316-1324.

NDA Approval/Supplement Approval, NDA 210793 NDA 207318/S-003, Letter Signed Jun. 28, 2018. Retrieved from the Internet (URL): https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2018/210793Orig1s000,207318Orig1s003ltr.pdf (5 pages).

Nebigil et al., "Serotonin is a novel survival factor of cardiomyocytes: mitochondria as a tarqet of 5-HT2B-receptor signaling," FASEB J. (2003) vol. 27, No. 10, pp. 1373-1375.

Ng, et al., "L-dopa-induced release of cerebral monoamines," Science (1970) 170:76-77.

Nordstrom, et al., "High 5-HT2 receptor occupancy in clozapine treated patients demonstrated by PET," Psychopharmacology (1993) 110:365-367.

Norton et al., "Caregivers of PDP patients have an increased risk of developing emotional and social distress that is decreased when PDP is treated with pimavanserin," (Meeting Abstract) Journal of Parkinson's Disease (Sep. 2016) vol. 6, No. S1, pp. 257, Abstract No. P42.11.

Norton et al., "Decreased burden among caregivers of patients with Parkinson's disease psychosis (PDP) treated with pimavanserin, a selective 5-HT2A inverse agonist," (Meeting Abstract) Journal of Parkinson's Disease (Sep. 2016) vol. 6, No. S1, pp. 88, Abstract No. P12.08.

Obach et al., "The Prediction of Human Pharmacokinetic Parameters from Preclinical and In Vitro Metabolism Data," J. Pharm. Exp. Therap. (1997) vol. 283, No. 1, pp. 46-58.

Ogawa, et al., "Effects of R-102444 and its active metabolite R-96544, selective 5-HT2A receptor antagonists, on experimental acute and chronic pancreatitis: Additional evidence for possible involvement of 5-HT2A receptors in the development of experimental pancreatitis," European Journal of Pharmacology (2005) 521:156-163.

Paiva, et al., "Effects of ritanserin on sleep disturbances of dysthymic patients," Psychopharmacology (1988) 96:395-399.

Patel, et al., "The highly selective 5-hydroxytryptamine (5-HT)2A receptor antagonist, EMO 281014, significantly increases swimming and decreases immobility in male congenital learned helpless rats in the forced swim test," Synapse (2004) 52:73-75.

Pierce, et al., "5-hydroxytryptamine-induced synovial plasma extravasation is mediated via 5-hydroxytryptamine2A receptors on sympathetic efferent terminals," The Journal of Pharmacology and Experimental Therapeutics (1995) 275(1):502-508.

Poewe, W. "Psychosis in Parkinson's disease," Movement Disorders (2006) vol. 18, Suppl. 6, pp. S80-S87.

Pollak, et al., "Clozapine in drug-induced psychosis in Parkinson's disease," Lancet (1999) 353:2041-2042.

Price et al., "Pimavanserin, a 5-HT2A receptor inverse agonist, reverses psychosis-like behaviors in a rodent model of Alzheimer's disease," Behavioural Pharmacology (2002), 23:426-433.

R&D Focus Drug News (Jan. 24, 2000). Pimvaserin ACADIA lead compounds identified.

R&D Focus Drug News (Nov. 12, 2001). Pimavserin ACADIA preclinical data.

**US 11,452,721 B2**

Page 7

(56)            **References Cited**

OTHER PUBLICATIONS

Sadzot, et al., "Hallucinogenic drug interactions at human brain 5-HT2 receptors: Implications for treating LSD-induced hallucinogenesis," *Psychopharmacology* (1989) 98:495-499.

Saltzman, et al., "Cloning of the human serotonin 5-HT2 and 5-HT1C receptor subtypes," *Biochemical and Biophysical Research Communications* (1991) 181(3):1469-1478.

Sandler and Karo, Chapter E., "Reaction of Amines with Urethanes and Carbamates," Organic Functional Group Preparations, Academic Press pp. 161-162 (1986).

Satori and Maggi, "Acyclic and Cyclic Ureas," Science of Synthesis 18: 695-699 (2005).

Saxena, et al., "Cardiovascular effects of serotonin agonists and antagonists," *Journal of Cardiovascular Pharmacology* (1990) 15(Supp. 7):S17-S34.

Shanmugam, S. "Granulation Techniques and Technologies: Recent Progresses," *BioImpacts* (2015) vol. 5, No. 1, pp. 55-63.

Shigemori et al., "The factorial structure of the mini mental state examination (MMSE) in Japanese dementia patients," BMC Geriatrics 10(36): 7 pages (2010).

Stoner et al., "Integrated oral bioavailability projection using in vitro screening data as a selection tool in drug discovery," *Int. J. Pharm.* (2004) vol. 269, No. 1, pp. 241-249.

Swedish Search Report for Patent Application No. 1730232-4 dated Mar. 28, 2018 (10 pages).

Thavonekham, "A Practical Synthesis of Ureas from Phenyl Carbamates," Synthesis 11:1189-1194 (1997).

Vanover et al., "Pharmacological Characterization of AC-90179 [2-(4-Methoxy-phenyl)-N-(4-methyl-benzyl)-N-(1-methyl-piperidiny-4-yl)-acetamide Hydrochloride]: A Selective Serotonin 2A Receptor Inverse Agonist," *J. Pharmacology & Experimental Therapeutics* (2004) vol. 310, No. 3, pp. 943-951.

Vanover, Kimberly E. et al., "Pharmacokinetics, tolerability, and safety of ACP-103 following single or multiple oral dose administration in healthy volunteers," *Journal of Clinical Phamacol.* (2007) vol. 47, No. 6, pp. 704-714.

Vanover, Kimberly E. et al., "Pharmacological and Behavioral Profile of N-(4-Fluorophenylmethyl)-N-(1-methylpiperidin-4-yl)-N'-(4-(2-methylpropyloxy)phenylmethyl) Carbamide (2R,3R)-Dihydroxybutanedioate (2:1) (ACP-103), a Novel 5-Hydroxytryptamine$_{2A}$ Receptor Inverse Agonist," *The Journal of Pharmacology and Experimental Therapeutics* (2006) 317(2):910-918.

Vinogradova et al., Palladium Catalyzed Cross-Coupling of Aryl Chlorides and Triflates with Sodium Cyanate: A Practical Synthesis of Unsymmetrical Ureas, J. Am. Chem. Soc. 134:11132-11135 (2012).

Volk et al., "Synthesis of methyl ethyl and phenyl 4 2 methylpropoxy benzyl carbamates," The IP.com Prior Art Database, Disclosure No. IPCOM000244271D, (Nov. 27, 2015).

Weintraub et al., "Association of Dopamine Agonist Use With Impulse Control Disorders in Parkinson Disease," *Arch Neurol.* 2006 63(7):969-973.

Weintraub et al., "Clinical Spectrum of Impulse Control Disorders in Parkinson's Disease," *Movement Disorders 2015* 30(2):121-127.

Wood et al., "The Use of the Neuropsychiatric Inventory in Nursing Home Residents: Characterization and Measurement," Am. J. Geriatr. Psychiatr. 8(1):75-83 (2000).

Ye et al. "Improving response inhibition in Parkinson's disease with Atomoxetine." Biological Psychiatry, Apr. 15, 2015, 77, 740-748.

Yoshimura et al., "Hypervalent Iodine Catalyzed Hofmann Rearrangement of Carboxamides Using Oxone as Terminal Oxidant," JOC 77:11399-11404 (2012).

Yoshimura et al., (Tosylimino)phenyl-λ3-iodane as a Reagent for the Synthesis of Metyl Carbamates via Hofmann Rearrangement of Aromatic and Aliphatic Carboxamides, Journal of Organic Chemistry 77:2087-2091 (2012).

*Acadia Pharmaceuticals Inc. v. Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Declaration of R. Christian Moreton, Ph.D in Support of Defendants' Reply Claim Construction Brief, dated Jan. 19, 2022 (11 pages).

*Acadia Pharmaceuticals Inc. v. Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Defendants' Sur-Reply Claim Construction Brief, dated Jan. 21, 2022 (23 pages).

*Acadia Pharmaceuticals Inc. v. Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Acadia's Opening Claim Construction Brief, dated Oct. 8, 2021 (24 pages).

Acadia's NUPLAZID® product information, Retrieved from the Internet (URL): https://www.acadia-pharm.com/product/ (dated Oct. 4, 2021, 2 pages) (Exhibit 1 of *Acadia Pharmaceuticals Inc. v. Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Acadia's Opening Claim Construction Brief, dated Oct. 8, 2021).

Highlights of Prescribing Information NUPLAZID™ (pimavanserin), Revised Apr. 2016. Retrieved from the Internet (URL): https://www.accessdata.fda.gov/drugsatfda_docs/label/2016/207318lbl.pdf) (14 pages) (Exhibit 2 of *Acadia Pharmaceuticals Inc. v. Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Acadia's Opening Claim Construction Brief, dated Oct. 8, 2021).

Highlights of Prescribing Information NUPLAZID® (pimavanserin), Revised Jun. 2018. Retrieved from the Internet (URL): https://www.accessdata.fda.gov/drugsatfda_docs/label/2018/207318s005lbl.pdf) (15 pages) (Exhibit 3 of *Acadia Pharmaceuticals Inc. v. Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Acadia's Opening Claim Construction Brief, dated Oct. 8, 2021).

2017 U.S. Pharmacopeia National Formulary, vol. 1 (7 pages) (Exhibit 4 of *Acadia Pharmaceuticals Inc. v. Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Acadia's Opening Claim Construction Brief, dated Oct. 8, 2021).

*Acadia Pharmaceuticals Inc. v. Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Declaration of R. Christian Moreton, Ph.D in Support of Defendants' Answering Claim Construction Brief, dated Nov. 12, 2021 (28 pages).

*Acadia Pharmaceuticals Inc. v. Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Declaration of R. Christian Moreton, Ph.D in Support of Defendants' Answering Claim Construction Brief, dated Nov. 12, 2021 (64 pages).

*Acadia Pharmaceuticals Inc. v. Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Defendants' Responsive Claim Construction Brief, dated Nov. 12, 2021 (30 pages).

USP 40 Phase-solubility analysis-general information, Retrieved from the Internet (URL): www.getintopharma.com <http://www.getintopharma.com> (5 pages) (Exhibit 1 of *Acadia Pharmaceuticals Inc. v. Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Declaration of R. Christian Moreton, Ph.D in Support of Defendants' Answering Claim Construction Brief, dated Nov. 12, 2021).

Curriculum Vitae of Richard Christian Moreton (29 pages) (Exhibit A of *Acadia Pharmaceuticals Inc. v. Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Declaration of R. Christian Moreton, Ph.D in Support of Defendants' Answering Claim Construction Brief, dated Nov. 12, 2021).

*Acadia Pharmaceuticals Inc. v. Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Acadia's Reply Claim Construction Brief, dated Dec. 17, 2021 (28 pages).

*Acadia Pharmaceuticals Inc. v. Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Declaration of Alexander M. Klibanov, Ph.D., in Support of Plaintiff's Reply Claim Construction Brief, dated Dec. 16, 2021 (61 pages).

Curriculum vitae of Alexander M. Klibanov (43 pages) (Exhibit A of *Acadia Pharmaceuticals Inc. v. Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Declaration of Alexander M. Klibanov, Ph.D., in Support of Plaintiff's Reply Claim Construction Brief, dated Dec. 16, 2021).

Notice Letter of Paragraph IV Certification Regarding U.S. Pat. Nos. 10,449,185 and 10,646,480 from Aurobindo Pharma Ltd. to Acadia Pharmaceuticals, Inc. dated Jun. 10, 2020 (179 pages).

Notice Letter of Paragraph IV Certification Regarding U.S. Pat. No. 10,449,185 from Teva Pharmaceuticals USA, Inc. to Acadia Pharmaceuticals, Inc. dated Jun. 10, 2020 (83 pages).

**US 11,452,721 B2**

Page 8

(56)        **References Cited**

OTHER PUBLICATIONS

Notice Letter of Paragraph IV Certification Regarding U.S. Pat. Nos. 7,732,615; 7,923,564; and 10,449,185 from MSN Laboratories Private Ltd. to Acadia Pharmaceuticals, Inc. dated Jun. 15, 2020 (18 pages).

Notice Letter of Paragraph IV Certification Regarding U.S. Pat. No. 10,646,480 from MSN Laboratories Private Ltd. to Acadia Pharmaceuticals, Inc. dated Jun. 18, 2020 (28 pages).

Notice Letter of Paragraph IV Certification Regarding U.S. Pat. Nos. 10,449,185, and 10,646,480 from Zydus Pharmaceuticals (USA) Inc. to Acadia Pharmaceuticals, Inc. dated Jun. 22, 2020 (67 pages).

Notice Letter of Paragraph IV Certification Regarding U.S. Pat. No. 10,646,480 from Teva Pharmaceuticals USA, Inc. to Acadia Pharmaceuticals, Inc. dated Jun. 23, 2020 (18 pages).

Notice Letter of Paragraph IV Certification Regarding U.S. Pat. No. 10,849,891 from Teva Pharmaceuticals USA, Inc. to Acadia Pharmaceuticals, Inc. received Dec. 23, 2020 (16 pages).

Notice Letter of Paragraph IV Certification Regarding U.S. Pat. No. 10,849,891 from Aurobindo Pharma Ltd. to Acadia Pharmaceuticals, Inc. dated Jan. 13, 2021 (26 pages).

Notice Letter of Paragraph IV Certification Regarding U.S. Pat. No. 10,849,891 from Zydus Pharmaceuticals (USA) Inc. to Acadia Pharmaceuticals, Inc. received Feb. 17, 2021 (22 pages).

Notice Letter of Paragraph IV Certification Regarding U.S. Pat. No. 10,849,891 from MSN Laboratories Private Ltd. to Acadia Pharmaceuticals, Inc. received Apr. 16, 2021 (38 pages).

*Acadia Pharmaceuticals Inc.* v. *Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Defendants' Initial Invalidity Contentions, dated Apr. 26, 2021 (241 pages) (redacted).

*Acadia Pharmaceuticals Inc.* v. *Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Joint Claim Construction Brief, filed Jan. 28, 2022 (93 pages).

*Acadia Pharmaceuticals Inc.* v. *Aurobindo Pharma Ltd., et al.* Civil Action No. 1:20-cv-00985-RGA, Joint Claim Construction Appendix, filed Jan. 28, 2022 (225 pages).

*Acadia Pharmaceuticals Inc.* v. *Aurobindo Pharma Ltd., et al.* Civil Action No. 20-985-RGA, Memorandum Opinion, filed Apr. 6, 2022 (13 pages).

*Acadia Pharmaceuticals Inc.* v. *Aurobindo Pharma Limited and Aurobindo Pharma USA, Inc.*, D.Del. Civil Action No. 1-20-cv-00985: Complaint against Aurobindo Pharma Limited and Aurobindo Pharma USA, Inc. filed by Acadia Pharmaceuticals Inc., Jul. 24, 2020 (127 pages).

*Acadia Pharmaceuticals Inc.* v. *Hetero Labs Limited, Hetero Labs Limited Unit-V, and Hetero USA Inc.*, D.Del. Civil Action No. 1-20-cv-01022: Complaint against Hetero Labs Limited, Hetero Labs Limited Unit-V, and Hetero USA Inc. filed by Acadia Pharmaceuticals Inc., Jul. 30, 2020 (90 pages).

*Acadia Pharmaceuticals Inc.* v. *MSN Laboratories Private Ltd. and MSN Pharmaceuticals, Inc.*, D.Del. Civil Action No. 1-20-cv-01029: Complaint against MSN Laboratories Private Ltd. and MSN Pharmaceuticals, Inc. filed by Acadia Pharmaceuticals Inc., Jul. 30, 2020 (71 pages).

*Acadia Pharmaceuticals Inc.* v. *Teva Pharmaceuticals USA, Inc. and Teva Pharmaceutical Industries Ltd.*, D.Del. Civil Action No. 1-20-cv-00986: Complaint against Teva Pharmaceuticals USA, Inc. and Teva Pharmaceutical Industries Ltd. filed by Acadia Pharmaceuticals Inc., Jul. 24, 2020(126 pages).

*Acadia Pharmaceuticals Inc.* v. *Zydus Pharmaceuticals (USA) Inc. and Cadila Healthcare Limited*, D.Del. Civil Action No. 1-20-cv-01021: Complaint against Zydus Pharmaceuticals (USA) Inc. and Cadila Healthcare Limited filed by Acadia Pharmaceuticals Inc., Jul. 30, 2020 (153 pages).

\* cited by examiner

U.S. Patent

Sep. 27, 2022

Sheet 1 of 4

US 11,452,721 B2

| EMPTY HARD CAPSULE SPECIFICATIONS | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| APPROXIMATE COMPARATIVE SIZE | CAPSULE SIZE | CONVENTIONAL FILL WEIGHT (mg) | | | VOLUME (Theoretical) | LENGTH | EXTERNAL DIAMETER | WEIGHT |
| | | TYPICAL POWDER DENSITY | | | (ml) | ±0.8(mm) | (mm) | ±10% |
| | | 0.45 (light) | 0.7 (standard) | 1.0 (heavy) | | | | |
| | 000 | 615 | 960 | 1370 | 1.37 | 26.1 | 9.9 | 163 |
| | 00 | 430 | 665 | 950 | 0.95 | 23.3 | 8.5 | 118 |
| | 0 | 305 | 475 | 680 | 0.68 | 21.7 | 7.65 | 96 |
| | 1 | 225 | 350 | 500 | 0.5 | 19.4 | 6.91 | 76 |
| | 2 | 165 | 260 | 370 | 0.37 | 18.0 | 6.35 | 61 |
| | 3 | 135 | 210 | 300 | 0.3 | 15.9 | 5.82 | 48 |
| | 4 | 95 | 145 | 210 | 0.21 | 14.3 | 5.31 | 38 |
| | 5 | 60 | 90 | 130 | 0.13 | 11.1 | 4.91 | 28 |

FIG. 1

U.S. Patent    Sep. 27, 2022    Sheet 2 of 4    US 11,452,721 B2



FIG. 2

**U.S. Patent**     Sep. 27, 2022     Sheet 3 of 4     US 11,452,721 B2



FIG. 3



FIG. 4



FIG. 5

US 11,452,721 B2

1

# FORMULATIONS OF PIMAVANSERIN

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 17/080,731, filed on Oct. 26, 2020, which is a continuation of U.S. patent application Ser. No. 16/836,086, filed on Mar. 31, 2020, which is a continuation of U.S. patent application Ser. No. 16/571,554, filed on Sep. 16, 2019, which is a continuation of U.S. patent application Ser. No. 16/363,378, filed on Mar. 25, 2019, which is a continuation of International Patent Application No. PCT/US2018/048096, filed on Aug. 27, 2018, which claims priority to and the benefit of U.S. Provisional Patent Application No. 62/552,300, filed Aug. 30, 2017, and Swedish Patent Application No. 1730232-4, filed Sep. 1, 2017.

## BACKGROUND

Pimavanserin, the active component in Nuplazid®, is approved for treatment of hallucinations and delusions associated with Parkinson's disease psychosis at a dose of 34 mg, taken as two 17 mg tablets once a day. The tablets are immediate release, film-coated tablet containing 20 mg of pimavanserin tartrate, which is equivalent to 17 mg of pimavanserin free base. Inactive ingredients include pregelatinized starch, magnesium stearate, and microcrystalline cellulose. Additionally, the following inactive ingredients are present as components of the film coat: hypromellose, talc, titanium dioxide, polyethylene glycol, and saccharin sodium.

Patients suffering from neurodegenerative diseases, such as Parkinson's disease are at a risk of non-compliance when administered a drug of too large size, or if taken as more than one tablet per day as said patients often have difficulty swallowing. Formulations of pimavanserin are described in WO 2007/133802. Pimavanserin is currently approved and administered as tablets containing 20 mg pimavanserin tartrate (equivalent to 17 mg pimavanserin), taken as two tablets once a day. Each with a total 150 mg tablet weight before film coating, i.e. total weight per dose is 300 mg (equivalent to 34 mg pimavanserin). In order to simplify administration and patient compliance of pimavanserin it would be advantageous to administer pimavanserin as a single dose.

Improved manufacturing processes for single unit dose forms, particularly for smaller sized single unit dosage forms, for oral administration of a therapeutic quantity of pimavanserin are critical. The physical properties of pimavanserin, e.g. bulk density and flow, when prepared in a tablet form requires, e.g. binders and other agents that increase the finished dosage size. Pimavanserin manufactured following conventional techniques has low bulk density and poor flowability and a tendency to clump, which will adversely impact reproducibility and quantitative accurate filling of capsules during the manufacturing process.

Consequently there is a need to improve the properties of pimavanserin allowing dosing of the daily therapeutic dose as a single administration.

## SUMMARY

Provided herein are capsules comprising 5-34 mg pimavanserin (equivalent to 6-40 mg pimavanserin tartrate), or a pharmaceutically acceptable salt thereof

2

Provided herein are also pharmaceutical compositions consisting of 5-34 mg pimavanserin or a pharmaceutically acceptable salt thereof, a filler and a lubricant .

Provided herein are also processes for manufacturing a capsule comprising 5-34 mg pimavanserin or a pharmaceutically acceptable salt thereof comprising: adding water to pimavanserin or a pharmaceutically acceptable salt thereof, and granulating pimavanserin or a pharmaceutically acceptable salt thereof with the water; controlling the impeller speed and/or amperage; drying the granulated pimavanserin or a pharmaceutically acceptable salt thereof; sizing the dried granulated pimavanserin or a pharmaceutically acceptable salt thereof; blending the dried and granulated pimavanserin or a pharmaceutically acceptable salt thereof and one or more filler; encapsulating the blended pimavanserin composition in a capsule of size 3 or 4.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 shows a table disclosing specifications of capsule sizes, commercially available.

FIG. 2 schematically discloses a process flow chart for pimavanserin granulation.

FIG. 3 schematically discloses a process flow chart for encapsulating pimavanserin granulation

FIG. 4 shows a particle size distribution diagram of pimavanserin tartrate.

FIG. 5 shows a particle size distribution diagram of granulated pimavanserin.

## DETAILED DESCRIPTION

Definitions

Unless defined otherwise, all technical and scientific terms used herein have the same meaning as is commonly understood by one of ordinary skill in the art. All patents, applications, published applications and other publications referenced herein are incorporated by reference in their entirety. In the event that there are a plurality of definitions for a term herein, those in this section prevail unless stated otherwise.

As used herein, "pharmaceutical composition" refers to a composition of one or more active pharmaceutical ingredient(s) alone, or administered with other chemical components, such as diluents, binders, lubricants, pharmaceutical flow agents, and/or other excipients, e.g. for forming a unit dose, such as a tablet, a capsule etc.

As used herein, "physiologically acceptable" defines a diluent, binder, or excipient that does not abrogate the biological activity and properties of the pharmaceutically active compound.

As used herein, "pharmaceutically acceptable salt" refers to a salt of a compound that does not abrogate the biological activity and properties of the compound. Pharmaceutical salts can be obtained by reaction of a compound disclosed herein with an acid or base. Base-formed salts include, without limitation, ammonium salt ($NH_4^+$); alkali metal, such as, without limitation, sodium or potassium, salts; alkaline earth, such as, without limitation, calcium or magnesium, salts; salts of organic bases such as, without limitation, dicyclohexylamine, piperidine, piperazine, methylpiperazine, N-methyl-D-glucamine, diethylamine, ethylenediamine, tris(hydroxymethyl)methylamine; and salts with the amino group of amino acids such as, without limitation, arginine and lysine. Useful acid-based salts include, without limitation, acetates, adipates, aspartates, ascorbates, benzoates, butyrates, caparate, caproate, capry-

US 11,452,721 B2

**3**

late, camsylates, citrates, decanoates, formates, fumarates, gluconates, glutarate, glycolates, hexanoates, laurates, lactates, maleates, nitrates, oleates, oxalates, octanoates, propanoates, palmitates, phosphates, sebacates, succinates, stearates, sulfates, sulfonates, such as methanesulfonates, ethanesulfonates, p-toluenesulfonates, salicylates, tartrates, and tosylates.

Pharmaceutically acceptable solvates and hydrates are complexes of a compound with one or more solvent of water molecules, or 0.5 to about 100, or 1 to about 100, or 1 to about 10, or one to about 2, 3 or 4, solvent or water molecules.

As used herein, to "modulate" the activity of a receptor means either to activate it, i.e., to increase its cellular function over the base level measured in the particular environment in which it is found, or deactivate it, i.e., decrease its cellular function to less than the measured base level in the environment in which it is found and/or render it unable to perform its cellular function at all, even in the presence of a natural binding partner. A natural binding partner is an endogenous molecule that is an agonist for the receptor.

An "agonist" is defined as a compound that increases the basal activity of a receptor (e.g. signal transduction mediated by the receptor).

As used herein, "partial agonist" refers to a compound that has an affinity for a receptor but, unlike an agonist, when bound to the receptor it elicits only a fractional degree of the pharmacological response normally associated with the receptor even if a large number of receptors are occupied by the compound.

An "inverse agonist" is defined as a compound, which reduces, or suppresses the basal activity of a receptor, such that the compound is not technically an antagonist but, rather, is an agonist with negative intrinsic activity.

As used herein, "antagonist" refers to a compound that binds to a receptor to form a complex that does not give rise to any response, as if the receptor was unoccupied. An antagonist attenuates the action of an agonist on a receptor. An antagonist may bind reversibly or irreversibly, effectively eliminating the activity of the receptor permanently or at least until the antagonist is metabolized or dissociates or is otherwise removed by a physical or biological process.

As used herein, a "subject" refers to an animal that is the object of treatment, observation or experiment. "Animal" includes cold- and warm-blooded vertebrates and invertebrates such as birds, fish, shellfish, reptiles and, in particular, mammals. "Mammal" includes, without limitation, mice; rats; rabbits; guinea pigs; dogs; cats; sheep; goats; cows; horses; primates, such as monkeys, chimpanzees, and apes, and, in particular, humans.

As used herein, an "excipient" refers to an inactive ingredient that is added to a pharmaceutical composition to provide, without limitation, bulk, consistency, stability, binding ability, lubrication, disintegrating ability, etc., to the composition. A "diluent" is a type of excipient.

As used herein, a "diluent", "bulking agent" and "filler" refer to an ingredient (excipient) in a pharmaceutical composition that lacks pharmacological activity but may be pharmaceutically necessary or desirable, e.g. to enhance or improve the properties of the pharmaceutical blend for manufacturing or physiological purposes. For example, a diluent or filler may be used to increase the bulk of a potent drug whose mass is too small for manufacture or administration.

As used herein, a "binder" is an excipient holding the ingredients together, and forming granules or tablets with required mechanical strength, and may give volume to the formulation. Specific examples of binders are mono-, di-, and poly-saccharides and derivatives thereof; sugar alcohols

**4**

such as xylitol, sorbitol or maltitol; protein, such as; synthetic polymers, such as polyvinylpyrrolidone (PVP), polyethylene glycol (PEG). Binders are classified according to their application, e.g. solution binders are dissolved in a solvent (for example water or alcohol may be used in wet granulation processes). Examples include gelatin, cellulose, cellulose derivatives, polyvinylpyrrolidone, starch, sucrose and polyethylene glycol. Dry binders are added to the powder blend, either after a wet granulation step, or as part of a direct powder compression (DC) formula. Examples include cellulose, methyl cellulose, polyvinylpyrrolidone and polyethylene glycol.

As used herein a "lubricant" refers to an excipient which for example prevents ingredients and excipients to lump together, and/or sticking to the capsule filling machine. A lubricant may also ensure that the formation, filing and ejection of the capsule can occur, for example by lowering friction. Examples of lubricants are talc, silicon dioxide (silica), fatty acids or fatty acid salts, such as magnesium stearate, sodium stearate fumarate, stearic acid, etc.

As used herein a "disintegrant" refers to an excipient which disintegrate a pharmaceutical preparation on contact with an aqueous fluid.

As used herein, "coadministration" of pharmacologically active compounds refers to the delivery of two or more separate chemical entities, whether in vitro or in vivo. Coadministration means the simultaneous delivery of separate agents; the simultaneous delivery of a mixture of agents; as well as the delivery of one agent followed by delivery of a second agent or additional agents. Agents that are coadministered are typically intended to work in conjunction with each other.

The term "an effective amount" as used herein means an amount of active compound or pharmaceutical agent that elicits the biological or medicinal response in a tissue, system, animal or human that is being sought by a researcher, veterinarian, medical doctor or other clinician, which includes alleviation or palliation of the symptoms of the disease being treated.

The terms screen, screening, delump, delumping, dry milling, and sizing are used interchangeably herein. These terms refer to separation according to size.

The term "granulation" as used herein, and as conventionally used in the pharmaceutical industry, refers to the act or process in which primary powder particles are made to adhere to form larger, multiparticle entities called granules. Granules may for example be formed collecting particles together by creating mechanical bonds between them, e.g. by compression or by using a binder. Granulation is extensively used in the manufacturing of tablets and capsules.

The terms "granulated pimavanserin" and "pimavanserin granulation" are used interchangeably herein.

Generally a granulation process combines one or more particles and forms a granule that will allow tableting or the encapsulation process to be within required limits. The granulation process can be made predictable and repeatable. The granulation can be performed in a variety of equipment such as, but not limited to, low shear, high shear granulators, fluid bed granulator, roller compactor, and slugger.

The term "blending" refers to the mixing of pharmaceutical ingredients to form a mixture of the ingredients, e.g. active pharmaceutical ingredient (API) and diluent, as defined by pharmaceutical specifications in the compendial references using a variety of equipment such as, but not limited to, "V"-blenders, bin-blenders, cone-blenders.

The term "encapsulation" refers to a range of techniques used to enclose medicines in a shell, e.g. a two-piece capsule, such as a two-piece hard shell capsule. The capsule

US 11,452,721 B2

**5**

referred to herein may be taken orally. Capsules may be designed with a telescoping cap and body manufactured from e.g. gelatin or cellulose.

Compounds

Pimavanserin, which is also known as N-(1-methylpip-eridin-4-yl)-N-(4-fluorophenylmethyl)-N'-(4-(2-methylpro-

**6**

pyloxy)phenylmethyl)carbamide,    N-[(4-fluorophenyl) methyl]-N-(1-methyl-4-piperidinyl)-N'-[4-(2-methylpropoxy)phenyl]methyl -urea, 1-(4-fluorobenzyl)-1-(1-methylpiperidin-4-yl)-3-[4-(2-methylpropoxy)benzyl] urea, or ACP-103. Pimavanserin commonly is administered as pimavanserin tartrate and has the structure of Formula (I):

(I)



Pimavanserin has previously been synthesized according to the method disclosed in Scheme 1.

SCHEME I: SYNTHESIS OF PIMAVANSERIN

US 11,452,721 B2

7                                                                8

-continued

Step 6 | COCl$_2$, HCl, toluene

Step 7 | 1) THF
         2) EtOH

30

Alternative methods for preparing pimavanserin are disclosed in WO2017/015272, which is incorporated herein by reference in its entirety.

Pimavanserin and methods for its use are described in U.S. Pat. Nos. 7,601,740; 7,659,285; 7,713,995; 7,732,462; 7,994,193 and 8,008,323, the entirety of each of which is hereby incorporated by reference. Pimavanserin can be obtained in a number of salt and crystalline forms. Exemplary pharmaceutically acceptable salts include the tartrate, hemi-tartrate, citrate, fumarate, maleate, malate, phosphate, succinate, sulphate, and edisylate (ethanedisulfonate) salts. Pimavanserin salts including the aforementioned ions, among others, are described in U.S. Patent Publication No. 2006-0111399, filed Sep. 26, 2005, the entirety of which is incorporated herein by reference. In an embodiment provided herein, pimavanserin is the tartrate salt of pimavanserin. Several crystalline forms of the tartrate salt of pimavanserin have been described in U.S. Patent Publication No. 2006-0106063, filed Sep. 26, 2006, the entirety of which is incorporated herein by reference. See also U.S. Pat. Nos. 7,732,615; 7,795,547; 7,790,899; 7,868,176, the entirety of each of which is incorporated herein by reference. In an embodiment provided herein, pimavanserin is the crystalline form of the tartrate salt of pimavanserin Form A. In another embodiment, pimavanserin is the crystalline form of the tartrate salt of pimavanserin Form C. Pimavanserin (including, for example, the tartrate salt) may be formulated into tablets, such as is described in U.S. Patent Publication Nos. 2007-0260064, filed May 15, 2007 and 2007-0264330, filed May 15, 2007, each of which are incorporated herein by reference in their entireties.

The pharmacological activity of pimavanserin has been previously reported. See U.S. Patent Publication Nos. 2004/0213816 and 2009/0053329, the entirety of each of which is hereby incorporated by reference. Pimavanserin is active in a number of models thought to be predictive of antipsychotic activity such as DOI ((±)-2,5-dimethoxy-4-iodoamphetamine, a serotonin agonist) induced head twitches in the rat and attenuation of hyperactivity in mice induced by the N-methyl-D-aspartate antagonist MK-801. The compound was effective in these models at oral doses of 3 and 10 mg/kg.

Suitable routes of administration of pimavanserin may, for example, include oral, rectal, transmucosal, topical, or intestinal administration; parenteral delivery, including intramuscular, subcutaneous, intravenous, intramedullary injections, as well as intrathecal, direct intraventricular, intraperitoneal, intranasal, or intraocular injections. The compounds can also be administered in sustained or controlled release dosage forms, including depot injections, osmotic pumps, pills, transdermal (including electrotransport) patches, and the like, for prolonged and/or timed, pulsed administration at a predetermined rate. Embodiments provided herein relate to oral administration of a capsule comprising pimavanserin granulation.

The pharmaceutical compositions described herein comprised in a capsule refer to compositions prepared by methodologies not conventionally used in granulation, such as high and low shear granulation, e.g. using low amounts of water.

For oral administration, the compositions can be formulated readily by combining the active pharmaceutical ingredient (API) (e.g., pimavanserin or pimavanserin tartrate) with pharmaceutically acceptable binders or diluents well known in the art. Such binders or diluents enable the API disclosed herein to be formulated as tablets, pills, dragees, capsules, liquids, gels, syrups, slurries, suspensions and the like, for oral ingestion by a patient to be treated.

Provided herein is pimavanserin and pharmaceutically acceptable salts thereof having altered properties, such as increased bulk density, improved flow, and compressibility allowing the pharmaceutical manufacturing of a capsule

US 11,452,721 B2

9

comprising about 5-34 mg pimavanserin, such as about 34 mg, which for example may be filled in a size 3 or 4 capsule, such as a capsule of size 4.

It has herein been demonstrated that altering the flow and bulk density of pimavanserin, and compositions comprising pimavanserin using methods described herein results in a reproducible and quantitatively accurate filling of small sized capsules (e.g. size 3 or 4 capsules) in a scaled up pharmaceutical manufacturing processes, e.g. for manufacturing of about 1,000,000 capsules or more, for example at a speed of 40-90,000 capsules per hour.

Pharmaceutical manufacturing as used herein implies certain requirement being met such as manufacturing efficiency and economical requirements. Although also product quality and performance are ensured through the design of effective and efficient manufacturing processes, product and process specifications are based on a mechanistic understanding of how formulation and process factors affect product performance, e.g. variability between batches, assuring continuous real-time quality of the product and the materials, e.g. excipients. Additionally, regulatory policies and procedures used to meet official requirements such as those set out by health authorities, such as EMA (European Medicine agency) and FDA (U.S. Food and Drug Administration) and similar agencies in order to obtain the required quality of a drug product has an impact on the pharmaceutical manufacturing. For example, risk-based regulatory approaches recognize the level of scientific understanding of how formulation and manufacturing process factors affect product quality and performance and the capability of process control strategies to prevent or mitigate the risk of producing a poor quality product. For example, manual filling of capsules would not be considered relevant by those skilled in the art as manual filling of capsules cannot provide high reproducibility at the filling speed required to manufacture batches containing more than 100,000 capsules. Consequently those skilled in the art setting out to improve the formulation of an existing active pharmaceutical ingredient (API) for example to improve patient compliance, are working with tools used within the field of pharmaceutical manufacturing of small molecules.

Generally when improving the flow of an API (active pharmaceutical ingredient) the fill weight is increased. Increasing the fill weight is counterproductive to filling a small volume, such as a size 3 or even a size 4 capsule, at the production speeds required, such as 40-90,000 capsules per hour.

Disclosed herein are pharmaceutical manufacturing processes for obtaining suitable strength capsules of pimavanserin or a pharmaceutically acceptable salt thereof, said process comprises spraying water to pimavanserin, followed by a granulation process, wherein pimavanserin is granulated without addition of a binder, and blending followed by encapsulation. The particle size distribution, and/or bulk density of the granulated pimavanserin is controlled and matched to other excipient(s) to improve flow of the composition and assure content uniformity and low variability of the product. Additionally matching of excipient(s) allows reproducibility during encapsulation of pimavanserin. The matching of physical properties of API and other excipients used herein enables pharmaceutical manufacturing, in particular capsule filling (encapsulating the dried pimavanserin granulation in capsules of size 3 or 4) at sufficient speed such as more than 40,000 capsules per hour. Matching of API may for example be done by matching the particle size distribu-

10

tion of the API and one or more excipient. The bulk density of the API and the one or more excipients may also be matched.

For example, as shown in table 1, pimavanserin granulation, as obtained by the pharmaceutical manufacturing described herein vs the native API (active pharmaceutical ingredient (e.g., pimavanserin tartrate), obtained for example as decribed in W02017/015272), the bulk density and the Carr's Index (Carr's Compressibility Index) have been substantially altered which enables the filling of the above mentioned small capsule. Carr's Index compares the difference between the bulk density and tapped density of a substance to determine its compressibility. The bulk density and the Carr's Index may be determined in accordance with USP<616> (method for performing Bulk and Tapped Densities, method 1) and USP<1174> (definition of powder flow) respectively.

TABLE 1

|  | Pimavanserin granulation* | Native API |
|---|---|---|
| Bulk density (g/ml) according to USP <616> | 0.508  (n = 4) | 0.294  (n = 2) |
| Carr's Index | 24  (n = 4) | 36  (n = 2) |

*final blend as disclosed in the example herein below and in table 2

Table 1 visualizes that filling of a capsule, in particular a capsule of size 3 or 4 (capsule volumes of 0.30 and 0.21 ml respectively, approximately 120 mg and 85 mg respectively at a bulk density of 0.5 g/ml). As evident from Table 1, native pimavanserin (API) would be challenging for a size 3 capsule and not possible for a capsule of size 4 without improving the bulk density (as comparison 85 mg of pimavanserin granulation would require about 0.17 ml compared to 0.29 ml for the native API) and flowability (Carr index is frequently used in pharmaceutical manufacturing as an indication of the flowability of a powder, e.g. 2016 U.S. Pharmacopoeias-National Formulary [USP 35 NF 30]).

In particular, disclosed herein are formulation, granulation, dry milling, blending, and encapsulation of pimavanserin containing novel elements. Salient features are that the known granulation technology uses atypical parameters to achieve the desired results. Spray rate, atomization and quantity of water are examples of atypical parameters used in combination with wet granulation to obtain the targeted properties of pimavanserin formulation disclosed herein. For example, pimavanserin has been successfully granulated without the use of binder by spraying, at a controlled rate and under controlled atomization conditions, a controlled amount of water to pimavanserin during the wet granulation to provide granulated pimavanserin suitable for further processing (e.g. drying, blending, etc.) in the pharmaceutical manufacturing of capsules containing 5-34 mg pimavanserin, such as 10-34 mg capsules of size 3 or 4. Prior to the surprising finding that pimavanserin could be successfully wet granulated achieving the targeted improved physical properties (e.g. bulk density) without the addition of a binder, and by adding a small, such as 2-15% w/w, e.g. 3-10% w/w, 3-8% w/w amount of water to pimavanserin by spraying, many different granulation methods were contemplated and tested, and some discussed more in detail hereinbelow.

In one embodiment, High Shear Granulation (HSG) utilizing a small quantity of water, such as approximately 3-8% w/w of the dry ingredients, under appropriate HSG parameters for atomization, spray rate, impeller speed, and chopper speed was found to provide the required improvements

US 11,452,721 B2

11

to the pimavanserin (API) physical properties, such as increased bulk density, improved flow, and compressibility. The small quantity of water, its application using appropriate water atomization and/or water application rate are important reasons for the improved properties of pimavanserin. It has herein been demonstrated that the atomized spraying of a small amount of water during the granulation of pimavanserin achieves a wetting of pimavanserin that provides a granulated pimavanserin suitable for pharmaceutical manufacturing of a capsule, such as a capsule of size 4 comprising 10-34 mg pimavanserin. The actual amount of water to be sprayed at the granulation of pimavanserin may vary from batch to batch (depending on surrounding factors such as humidity, temperature, exact properties of the API batch, etc) but is still consider to be a small amount, e.g. 3-10% w/w based on the dry ingredients. The amount of water and the granulation process disclosed herein is controlled by controlling the impeller energy to achieve the targeted impeller speed. The appropriate impeller speed ensures sufficient mixing and controls the growth of granules. The specific small amount of water needed for each batch is controlled by the power consumption (amperage) of the granulator, i.e., if the amperage is too high, additional amounts of water could be sprayed to the granulate in order to obtain pimavanserin having the properties desired in order to pharmaceutically manufacture capsules comprising 5-34 mg pimavanserin. Adding too much water may alter other properties of the API, such as its crystallinity. The properties are achieved via a manufacturing process that includes granulation, using a suitable granulator, e.g. a high shear granulator, simultaneously spraying the adequate amount of water while mixing, followed by screening, and blending appropriate quantities of excipients. In some embodiments the lack of a binder, and using pimavanserin, properly wetted and not over-wetted are believed to be reasons for the fill uniformity observed using the herein described manufacturing process. Over-wetted granulation could seriously affect the further processing. In some embodiments particle size distribution of the granulated pimavanserin is controlled and matched to the particle size distribution of the diluents and other excipients to minimize segregation and improve flow and capsule filling reproducibility. The particle size distribution is also considered a factor involved in the successful filing of capsules of size 3 or 4, as a too aggressive milling would cause a wider particle size distribution and hamper the encapsulation. Examples of suitable particles size distribution of the granulated pimavanserin is a particle size distribution (D90) of 60-450 μm, such as 100-420 μm, such as above 250 μm. Particle size distribution referred to herein is obtained using Laser light scattering particle size (LLS PS) analyses of granulated pimavanserin conducted on a Malvern Mastersizer 2000 LLS PS system using a Scirocco 2000 dry dispersion unit using standard non-GMP conditions, and in a sample size of about 2 -10 g. Suitable diluents such as microcrystalline cellulose, silicified microcrystalline cellulose, low substituted hydroxylpropyl cellulose or similar materials to a concentration approximately one-half of the granulation and lubricated with magnesium stearate, sodium stearyl fumarate or other suitable lubricants to prevent sticking to the encapsulation tooling. In some embodiments the particle size distribution of the diluent is matched to the above mentioned particle size distribution of granulated pimavanserin, for example microcrystalline cellulose having a particle size distribution (D90) is 180-420 μm, such as above 250 μm. In some embodiments the lubricant, such as magnesium stearate is also matched to the API. In some embodiments the matching

12

of the particle size distribution of the lubricant, compared to the diluent, is less important in view of the lower amounts used in some embodiments. Optionally suitable binders and/or disintegrants may be included in the blending of the pimavanserin granulation. In some embodiments pimavanserin is blended with a diluent, e.g. microcrystalline cellulose and lubricant, magnesium stearate only, whereas amounts of water were added by spraying during the granulation process

In some embodiments the particle size distribution (D90) of the composition is 60-380 μm, such as 75-350 μm, such as 100-300 μm.

FIG. 4 discloses the particle size distribution of pimavanserin tartrate, prior to the herein disclosed granulation process.

FIG. 5 discloses the particle size distribution of the granulated pimavanserin. The arrow in FIG. 5 indicates the area of particles size distribution of the API. A substantial change in the particle size distribution can be seen, e.g. the D90 has increased from about 30 μm for the API to above 279 μm.

The matching of particles size distribution of the API and diluent is considered one factor influencing the herein disclosed robust process and reproducible encapsulation of pimavanserin, e.g. 10-34 mg pimavanserin in size 4 capsules, e.g. two-piece capsules.

In some embodiment bulk density between the API and the diluent and optionally the lubricant are matched, for example granulated pimavanserin having a bulk density above >0.40 g/ml, such as about 0.5 g/ml, and the diluent 0.35-0.46 g/ml.

In some embodiments both the bulk density and the particle size distribution is used in combination in order to adequately match at least the pimavanserin granulate and the diluent in order to obtain capsules of size 4 comprising 10-34 mg pimavanserin.

In some particular embodiments the granulation of pimavanserin may be completed and the obtained pimavanserin granulation having suitable properties for the herein disclosed manufacturing process, in the absence of a binder. It is however possible to include a binder in the granulation but for various reasons not necessarily preferred.

In some embodiments disclosed herein the blended pimavanserin composition, as described herein, comprised in a capsule (e.g a size 4 capsule) have an average Specific Energy (SE) of less than 5 mJ/g, such as less than 4.5 mJ/g, such as less than 4 mJ/g, as obtained by FT4 measurement.

In some embodiments disclosed herein the blended pimavanserin composition, as described herein, comprised in a capsule (e.g a size 4 capsule) have an average Flow Rate Index (FRI) of 0.9-1.2, such as 1.0-1.1, as obtained by FT4 measurement.

In some embodiments disclosed herein the blended pimavanserin composition, as described herein, comprised in a capsule (e.g a size 4 capsule) have an average Specific Energy (SE) of less than 4.5 mJ/g, and an average Flow Rate Index (FRI) of 0.9-1.2.

Pharmaceutical Formulations

Some embodiments include a pharmaceutical composition comprising granulated pimavanserin tartrate, Form C which may include a small percentage of Form A, including a pharmaceutically acceptable diluent, binder or excipient, or combination thereof.

The pharmaceutical compositions disclosed herein, are in some embodiments, provided as a two-piece hard shell capsules made of gelatin (fish, mammalian, or vegetable sourced) or other combinations. The two-piece hard shell

US 11,452,721 B2

13

capsules may contain the pimavanserin granules with a filler/diluent and/or lubricants.

The finished dosage forms may be presented in packaging containing metal or plastic foil such as a blister pack. The pack may also be accompanied with a notice associated with the container in form prescribed by a governmental agency regulating the manufacture, use, or sale of pharmaceuticals, which notice is reflective of approval by the agency of the form of the drug for human or veterinary administration. Such notice, for example, may be the labeling approved by the U.S. Food and Drug Administration for prescription of drugs, or the approved package insert.

WO 2007/133802 discloses that only certain components are compatible with pimavanserin, and although certain components are compatible their use in the herein disclosed capsule may not be preferred. A particular example is lactose as it may have implications to the administration to subject being lactose intolerant.

Some requirements of the pharmaceutical manufacturing for pimavanserin are commercial operational speed, as well as stringent regulatory requirements. For example, the encapsulation equipment used is capable of ~100,000 capsules per hour, such as 40,000-90,000 capsules per hour, such as 60,000-86,000 capsules per hour, such as 60,000-70,000 capsules per hour. The manufacturing must be reproducible and robust to be capable of this output while producing quality product.

Prior to the surprising finding, i.e. the herein disclosed processes and compositions resulting in a robust and reliable filling of 5-34 mg pimavanserin in capsules of size 3 or 4, such as size 4 capsules, many experiments were done.

Comparative experiments resulting in unacceptable products

For example, the pharmaceutical industry has used fluid-bed layering extensively for several decades to produce small spherical particles with improved properties (e.g. flowability and compressibility) for further downstream processing, such as capsule filling. During this two-phase process that includes simultaneous spraying and drying, the addition of a binder causes primary particles to increase the diameter of the substrate by the addition of a dense layer of the drug and a binder, one such technique evaluated was top spray layering (use of conventional top-spray fluidized bed granulation equipment to apply the drug layer to a small substrate particle), e.g. using the following compostion about 63% w/w microcrystalline cellulose (the spherical particle (bead) around which the API is layered or applied), about 28% w/w of pimavanserin tartrate (API), about 6% w/w povidone (binder), such as povidone K30, and about 2% w/w HPMC E5 (Methocel™ E5) (hydroxypropylmethyl cellulose). The top spray fluid-bed layering resulted in particles having an acceptable flow and bulk density but unacceptable stability and particle size distribution as well an unacceptable amount of impurities. These unacceptable disadvantages, such as unacceptable stability, less favourable dissolution, resulted in deeming this process option unsuitable for the current purpose.

Wurster Layering (a similar and more common process to the Top Spray Layering described above) was tested and found to produce particles having an acceptable flow and bulk density but unacceptable stability and particle size distribution as well an unacceptable amount of impurities. These unacceptable disadvantages, such as unacceptable stability, less favourable dissolution, resulted in deeming this process option unsuitable for the current purpose. One compostion tested was the same as in the top spray layering.

14

Extrusion/spheronization is especially useful in producing semi-spherical, dense granules. The physical advantages of extrusion/spheronization vs. other multiparticulate approaches can include relatively high drug loading, improved flow properties, narrow particle size distribution, smooth and a coatable surface, low friability, and uniform packing characteristics. The process consists of five operations, i.e. wet granulating the formulation, followed by screening to form cylindrical extrudates, adding the extrudate to a spheronizer forming spheres from the extrudate, and drying the spheres. Optionally coatings may be applied to the spheres. A composition containing about 27% w/w pimavanserin tartrate as a 32% w/w slurry in water, about 68% w/w microcrystalline cellulose (e.g. Avicel PH 101), about 4% hydroxypropylmethyl cellulose (e.g. Methocel™ A15LV), and about 1% w/w povidone (e.g. povidone K30) resulted in particles having an acceptable flow and bulk density but unacceptable stability and particle size distribution as well an unacceptable amount of impurities. The particles were milled in order to achieve a uniform particle size, yet the amount of impurities and stability were found to be unacceptable.

Twin-Screw Melt Granulation has increased in popularity in pharmaceutical manufacturing due to the numerous advantages of this continuous manufacturing technique over traditional batch wet granulation. Twin-Screw Melt Granulation does not require the use of organic or aqueous solvents, making the entire process less consuming in terms of time and energy as compared to wet granulation, and in view of other tests disclosed hereinabove the use of solvent was deemed as a potential source for the impurities and may have been a factor for the stability issues observed. Consequently Twin-Screw Melt Granulation was evaluated using a binder/disintegrant, heat and agitation. As binder/disintegrant a low substituted hydroxypropyl cellulose (e.g. LH-B1 marketed by Shin Etsu), and Kollidon® VA64 marketed by BASF were used in separate compositions using about 50% w/w pimavanserin tartrate and LH-B1 and Kollidon VA64 respectively. In either case the resulting particles were screened and evaluated resulting in particles having an acceptable flow and bulk density but unacceptable finding of impurities as well as unacceptable dissolution.

Conventionally wet granulation (both high shear and low shear) have been used for a long time in pharmaceutical manufacturing, an example of a conventional wet granulation process is described in WO2009/061909 wherein table 7 discloses 40-50% w/w of water being used in the wet granulation, i.e. conventionally a wet granulation uses a liquid, e.g. water in order to prepare a wet mass with sufficient plasticity which can be subsequently wet-milled and dried produce granules with improved flow and density properties. High shear granulation was chosen for evaluation due to the higher energy it is capable of imparting to the particles, which was known to improve the particle density, spherocity, and consequently the capsule filling capability and particle flow, respectively. The quantity of water used in conventional or traditional wet granulation proved to be problematic resulting in very large, wet, adhesive pimavanserin granules that would not be easily dried in a fluid bed dryer. Additionally, large quantity of water would also result in high impurities and changes in the crystallinity of pimavanserin.

Several embodiments were evaluated using excipients commonly used to mitigate the impact of high water content while providing excellent granule properties. These did not improve the resulting over-wetting of the pimavanserin

US 11,452,721 B2

15

blend and resulted in an adhesive wet mass that would not would not be easily dried in a fluid bed dryer.

Contrary to the above disclosed comparative experiments the present application describes processes to manufacture capsules of size 4 comprising 5-34 mg pimavanserin. As additionally disclosed above it was surprisingly found that a 100% pimavanserin high-shear granulation was possible by using only small water quantities, often large quantities of water and a binder conventionally used in high-shear granulation. In order for a small quantity of water to be effective, the distribution of the water should be finely divided providing small points of localized wetting of pimavanserin. Localized wetting is considered wetting of an immediate area around the water droplets. Examples of suitable size of the water droplets to be sprayed are about 0.05-0.15 mm The granulation of pimavanserin, for example without the presence of a binder, was achieved using a small amount of water and a nozzle, such as an atomizing nozzle, capable of producing a spray pattern that covered a large area of pimavanserin and preventing over-wetting of large areas of the batch. Suitable nozzles are commercially available, e.g. from Spraying Systems Co. Spraying of low amounts of water and appropriate impeller speed and chopper speed of the high shear granulator achieved pimavanserin granulation having altered properties and improved the flow, e.g. bulk density compared to the native API. The total quantity of water added to the pimavanserin granulation should be limited to a global value the would not result in a global state of over-wetting (global refers to a large area of the batch being over-wetted), which as described above would occur during conventional wet granulation of pimavanserin, causing an adhesive wet mass that would not be easily dried in a fluid bed dryer, i.e. not resulting in a sufficiently dried product, or too long drying times, and increasing the risk of changing the crystalline form of pimavanserin (e.g. changing pimavanserin into amorphous forms), which could result in slow dissolution when administered to a patient. As disclosed above conventionally high shear granulation utilizes amounts of water that would lead to over wetting of an API, such as pimavanserin, and the present inventors have demonstrated that an appropriate water application, e.g. using a nozzle, capable of spraying water over a large area of the API, combined with a chopper/impeller speed (e.g. by controlling amperage), results in granulated pimavanserin having improved bulk density suitable for filling amounts disclosed herein into capsules of size 4.

In addition to the global, or batch, over-wetting a local over-wetting may also impair the properties of the API. One solution presented herein relates to applying a spray of water having a droplet size such as 0.05-0.15 mm, e.g. using a nozzle spraying the water and resulting in adequate wetting, locally and globally.

Suitable drying times of the wet granulation described herein is 120 min, such as 100 min, such as 80 min, such as 60 min. A drying time of 60 min is preferred, e.g. in view of process efficiency etc. The global quantity of water will vary depending on many factors such as the capacity of the high shear granulator, loading of the high shear granulator, the batch of pimavanserin to be granulated, surrounding environment, and may be controlled by impeller speed and chopper speed as well as the spray rate and spray pattern parameters (e.g. using a atomization nozzle), and the amperage (energy consumption) of the granulator. As the high shear granulator is an "open" system and energy from the impeller actually incorporates into the product causing the product temperature to increase favorably limiting the global impact of the added water when applied at a low rate.

16

However, the range of water was found to be approximately 3-15% w/w, such as 3-10% w/w, such as 3-8% w/w (based on the mass of the pimavanserin in the granulator at the start of the granulation process). As disclosed herein it has been demonstrated that pimavanserin can be granulated without the use of a binder, i.e. utilizing water only. It is however contemplated that in some embodiments suitable binders, such as cellulose, methyl cellulose, polyvinylpyrrolidone and polyethylene glycol may be used, although not a necessity. The present high shear granulation of pimavanserin utilizing e.g. 3-8% w/w water, applied by an nozzle, which can generate an atomized spray pattern, provides benefits.

Embodiments disclosed herein relate to pimavanserin tartrate as crystalline Form C, Form A or a combination thereof.

The doses referred to herein, i.e. 5-34 mg refers to pimavanserin free base (equivalent to about 6 mg-40 mg pimavanserin tartrate).

Some embodiments relates to pimavanserin tartrate Form C (40 mg of pimavanserin tartrate, equivalent to 34 mg pimavanserin free base) being encapsulated in capsules of size 3 or 4, such as capsules of size 4.

One embodiment of the compositions described herein includes pimavanserin tartrate granulation without binder, dried, and thereafter blended with less than 60% w/w microcrystalline cellulose such as Avicel PH302 or equivalent microcrystalline cellulose, and about 1% w/w magnesium stearate.

In some embodiments the compositions described herein comprises granulated pimavanserin and microcrystalline cellulose is at least 20% w/w microcrystalline cellulose, such as 30% w/w microcrystalline cellulose, such as 40% w/w microcrystalline cellulose, such as 50% w/w microcrystalline cellulose, such as 50-89% w/w microcrystalline cellulose, such as 20-94% w/w, such as 50-94% w/w, such as 57-94% w/w, such as 57-89% w/w microcrystalline cellulose, such as 57-79% w/w microcrystalline cellulose, or 57-60% w/w microcrystalline cellulose, or 57-59.5% w/w microcrystalline cellulose, or 58.5-59.5% w/w microcrystalline cellulose, or 59% w/w microcrystalline cellulose.

In some embodiments the compositions described herein comprises granulated pimavanserin and microcrystalline cellulose and magnesium stearate, such as 0.1-3% w/w, such as 0.5-2% w/w magnesium stearate, or 0.5-1.5% w/w magnesium stearate, or 1% w/w magnesium stearate.

In some embodiments the compositions described herein comprises granulated pimavanserin (5, 10, 20 or 34 mg) and microcrystalline cellulose is at least 20% w/w microcrystalline cellulose, such as 30% w/w microcrystalline cellulose, such as 40% w/w microcrystalline cellulose, such as 50% w/w microcrystalline cellulose, such as 50-89% w/w microcrystalline cellulose, such as 20-94% w/w, such as 50-94% w/w, such as 57-94% w/w, such as 57-89% w/w microcrystalline cellulose, such as 57-79% w/w microcrystalline cellulose, or 57-60% w/w microcrystalline cellulose, or 57-59.5% w/w microcrystalline cellulose, or 58.5-59.5% w/w microcrystalline cellulose, or 59% w/w microcrystalline cellulose and magnesium stearate, such as 0.1-3% w/w, such as 0.5-2% w/w magnesium stearate, or 0.5-1.5% w/w magnesium stearate, or 1% w/w magnesium stearate.

The compositions disclosed herein comprise pimavanserin and additional compatible excipients, e.g. sugars, sucrose, mannitol, sorbitol, polysaccharides (e.g. from corn, wheat, rice, potato), as well as pregelatinized or partially pregelatinized starches (e.g. STARCH 1500®), cellulose preparations such as microcrystalline cellulose (MCC) (e.g. AVICEL® PH 302, AVICEL® PH 102, VIVAPUR® 302,

US 11,452,721 B2

17

VIVAPUR® 102, EMCOCEL® HD 90), silicified microc-
rystalline cellulose (e.g. PROSOLV® 50, PROSOLV® HD,
PROSOLV® HD90), lactose cellulose blends (e.g. CELLA-
TOSE® 80, CELLATOSE® 90, PROSOLV® EASYtab
SP), hydroxypropylmethyl cellulose, hydroxymethyl cellu-
lose, polyvinylpyrrolidone, lubricants such as magnesium
stearate, sodium stearyl fumarate, colloidal silicon dioxide,
and talc.

Several tests attempting to mitigate the impact of the high
water quantity used in high-shear granulation by the use of
excipients generally capable of absorption of the water were
made. However, these proved to be unsuccessful.

One embodiment of the compositions described herein
includes pimavanserin tartrate granulation without binder,
drying, and blending said granulation with microcrystalline
cellulose having a bulk density of 0.35-0.46 g/ml, and
wherein the bulk density of the blended composition is >0.4
g/ml, such as >0.5 g/ml.

In some embodiments the composition comprises micro-
crystalline cellulose (MCC) having a bulk density of about
0.40 g/ml, such as 0.3-0.5 g/ml, such as 0.35-0.46 g/ml. In
some embodiment the API having a bulk density of >0.40
g/ml and MCC having a bulk density of 0.30-0.50 g/ml and
is blended with magnesium stearate in order to make up a
composition having a bulk density of 0.40-0.55 g/ml.

One embodiment of the compositions described herein
includes pimavanserin tartrate granulation with spraying
water and without any binder, followed by, drying, and
blending said granulation with less than 50% w/w microc-
rystalline cellulose such as Avicel PH302 or equivalent
microcrystalline cellulose, and about 1% w/w magnesium
stearate. The spraying of water to pimavanserin tartrate is
done while mixing in an appropriate granulator.

Another embodiment of the composition described above
includes pimavanserin tartrate granulation containing less
than 10% w/w Avicel PH302 and colloidal silicon dioxide,
e.g. Aerosil Pharma 200 manufactured by Evonik, with a
specific surface area from about 175 to about 225 m²/g
blended with less than 60% w/w microcrystalline cellu-
lose, such as Avicel PH302 or equivalent microcrystalline cellu-
lose, and about 1% w/w magnesium stearate.

Another embodiment of the composition described above
includes pimavanserin tartrate granulation containing less
than 10% w/w Avicel PH101 and colloidal silicon dioxide
with a specific surface area from about 175 to about 225
m²/g, e.g. Aerosil Pharma 200 manufactured by Evonik,
blended with less than 60% w/w microcrystalline cellulose,
such as Avicel PH302 or equivalent thereof, and about 1%
w/w magnesium stearate.

As used herein, whenever a USP is referred to it is the
current official version at the time of filing of the application,
i.e 40-NF 35, released Nov. 1, 2016 and official May 1, 2017.

Provided herein are embodiment for manufacturing pima-
vanserin granulation comprising: providing pimavanserin
and adding water while mixing in an appropriate granulator,
such as a high shear granulator; granulating and; drying the
wet pimavanserin granulation, sizing the pimavanserin
granulation, e.g. through a screen, such as a 10-20 mesh
screen; and obtaining pimavanserin granulation. Said pima-
vanserin granulation being suitable for encapsulation in size
4 capsules, for example by blending with a diluent before
capsule filling (encapsulation).

Provided herein are embodiment for manufacturing pima-
vanserin granulation by: providing pimavanserin (weighed
and the loss-on-drying (LOD) moisture content determined)
to a high shear granulator; pre-blending (optional); provid-
ing granulation water, e.g. 3-8% w/w, e.g. by spraying at a

18

controlled rate and/or a controlled pattern (e.g. using an
atomization nozzle) while monitoring the impeller speed
and/or amperage, and granulating; stopping the provision of
granulation water, e.g. when the impeller amperage
increases; wet massing, e.g. without changing the impeller
speed; drying the wet granulation, e.g. in a fluid bed dryer
until the LOD moisture is at or below the LOD moisture of
the pimavanserin as provided; and sizing, e.g. through a
10-mesh screen; and obtaining pimavanserin granulation.
Said pimavanserin granulation being suitable for encapsu-
lation in size 3 or 4 capsules, for example by providing
additional excipients during the screening, followed by
filling of the capsule.

It is important to control the amount of water, the water
application rate and/or water application method thereof
(e.g. using an atomization nozzle, or another suitable spray-
ing device) as too much water may have a negative impact,
e.g. change its properties, such as its crystallinity, of pima-
vanserin. Adding too much water, e.g. 25% w/w, would have
undesired effects on properties of pimavanserin, which
would cause issues with the continued pharmaceutical
manufacturing of capsules. In some embodiments water is
sprayed (e.g. using an atomization nozzle) to pimavanserin
while mixing. Addition of water without mixing may lead to
localized over-wetting. Provided herein are embodiments
wherein pimavanserin, for example pimavanserin tartrate,
such as pimavanserin tartrate Form C, is granulated with
water using high shear granulation. In some embodiments
the amount of water is 1-10% w/w (water based on dry
ingredient content), such as 3-8% w/w. In some embodi-
ments the impeller speed and/or chopper speed of the high
shear granulator is controlled in order to obtain a granulation
of sufficient quality for further processing. The wet granu-
lation is then dried, e.g. in fluid bed dryers or tray dryers at
controlled conditions of temperature and drying air flow.
The dried granulation is then sized using a screening mill or
other appropriate milling (delumping), and blended with
appropriate pharmaceutical diluents and/or binders, such as
microcrystalline cellulose, enabling the filling of 5-34 mg
granulated pimavanserin (equivalent to about 6 mg-40 mg
pimavanserin tartrate) in a size 3 (0.30 ml volume) or 4 (0.21
ml volume) capsule. Some embodiments relates to the
capsule being a capsule of size 4, and a two-piece capsule.

Provided herein is a process for manufacturing capsules
containing 5-34 mg pimavanserin; by providing pimavan-
serin, for example pimavanserin tartrate, such as pimavan-
serin tartrate Form C and water, e.g. 1-10% w/w, such as
2-9% w/w, such as 3-8% w/w, such as 4-8% w/w, such as
5-8% w/w, such as 5-7% w/w to a high shear granulator,
granulating pimavanserin and the water, drying the pima-
vanserin granulation, sizing (or screening, may also be
referred to as delumping) the dried pimavanserin granula-
tion, e.g. using a screening mill, blending with one or more
pharmaceutical excipients, such as one or more filler (di-
luent) filling a size 3 or 4 capsule, e.g. a two-piece capsule,
with pimavanserin granulation . Provided herein is a process
for manufacturing capsules containing 5-34 mg pimavan-
serin, wherein the process comprises the following (e.g. in
said order): providing pimavanserin, for example pimavan-
serin tartrate, such as pimavanserin tartrate Form C to a high
shear granulator, granulating pimavanserin together with
water (e.g. 1-10% w/w, such as 2-9% w/w, such as 3-8%
w/w, such as 4-8% w/w, such as 5-8% w/w, such as 5-7%
w/w) while controlling the water application rate, and/or
atomization parameters (e.g. by using an appropriate nozzle
such as an externally mixed, two-fluid, air-atomizing spray
nozzle), impeller speed (e.g. by monitoring amperage),

US 11,452,721 B2

19

and/or chopper speed (e.g. by monitoring amperage), drying the granulated pimavanserin, e.g. using fluid bed drying, sizing the dried pimavanserin granulation, e.g. using a screening mill or other appropriate milling device (such as oscillating mills, impact mills), blending the sized pimavanserin granulation with one or more filler/diluent (optionally including a lubricant), and final blending with a lubricant (unless the filler/diluent includes a lubricant), filling a size 3 or 4 two-piece capsule with the blended pimavanserin composition. In some embodiments the capsule is a capsule of size 4 and the amount of pimavanserin is 34 mg. As specified herein, such as hereinbelow, excipients such as diluents, binders, lubricants, pharmaceutical flow agents, and/or other excipients compatible with pimavanserin may be included. Some embodiments provide pimavanserin, microcrystalline cellulose and magnesium stearate only. Some embodiements relate to the microcrystalline cellulose having a particle size distribution (D90) of 180-340 μm. Some embodiments relate to microcrystalline cellulose having a bulk density above >0.40 g/ml. Some embodiments relate to the microcrystalline cellulose having a particle size distribution (D90) of 180-340 μm and a bulk density above >0.40 g/ml.

Provided herein are embodiments wherein the capsule is a capsule of size 4, e.g. a two-piece capsule, such as a two-piece hard shell capsule, e.g. a two-piece capsule of gelatin or hydroxypropyl methylcellulose (HPMC). Some commercial examples are VCaps®, VCaps® Plus, Coni-Snap® marketed by Capsugel.

Provided are also embodiments wherein pimavanserin (granulated), microcrystalline cellulose, for example Avicel PH302 or an equivalent microcrystalline cellulose, and/or magnesium stearate, for example vegetable grade are encapsulated in a capsule of size 4, for example a two-piece capsule.

Provided are also embodiments wherein 34 mg pimavanserin (granulated) (equivalent to 40 mg pimavanserin tartrate), microcrystalline cellulose, such as microcrystalline cellulose having a particle size distribution (D90) of 180-340 μm, for example Avicel PH302 or an equivalent microcrystalline cellulose, and/or magnesium stearate, for example vegetable grade are encapsulated in a capsule of size 4, for example a two-piece capsule.

Provided are also embodiments wherein 10 or 20 mg pimavanserin (granulated), microcrystalline cellulose, for example Avicel PH302 or an equivalent microcrystalline cellulose, and/or magnesium stearate, for example vegetable grade are encapsulated in a capsule of size 4, for example a two-piece capsule.

Provided are also embodiments wherein 34 mg pimavanserin (granulated), 59 mg microcrystalline cellulose, for example Avicel PH302 or an equivalent microcrystalline cellulose, and/or 1 mg magnesium stearate, for example vegetable grade are encapsulated in a capsule of size 4, for example a two-piece capsule. No other excipients were added.

Also provided is a pharmaceutical composition, comprising a capsule of pimavanserin and one or more pharmaceutically acceptable excipient(s) as provided herein, wherein the composition is formulated such that at least 80% of pimavanserin is released in 30 minutes upon administration to a subject.

Also provided is a pharmaceutical composition, comprising a capsule of pimavanserin and one or more pharmaceutically acceptable excipient(s) as provided herein, wherein the composition is formulated such that at least 80% of the pimavanserin is released from the composition within 30

20

minutes upon in vitro dissolution testing according to USP<711> (apparatus 1 (basket apparatus)).

The final moisture content of the pimavanserin granulation is equivalent to the starting moisture content of the pimavanserin.

Another requirement achieved by the pimavanserin capsules disclosed herein can be a long shelf-life, i.e., a shelf-life of at least 1 year is obtained, such as 2 years of shelf-life.

Examples

Manufacturing of a capsule, size 4 two-piece capsule, comprising 34 mg pimavanserin equivalent to 40 mg pimavanserin tartrate

Pimavanserin 34 mg capsules may be prepared as outline herein below.

Granulation: The required ingredients for all operations of the entire process are weighed. The loss-on-drying (LOD) moisture content of the pimavanserin is determined, for example using an appropriate LOD instrument such as those manufacture by Mettler, Ariz. Instruments, Ohaus or Denver Instruments. Drying end point may be determined using temperature, time or weight loss. Pimavanserin is charged through a screen (25-40 mesh) into a high shear granulator, for example a Glatt Powerex 50 liter high shear granulator equipped with a 25 liter bowl. Following a pre-blend in the high shear granulator (200-400 rpm), granulation water, e.g. 5-8% w/w is sprayed at a controlled rate ((18.5-26.5 g/min) at 15 psi (10.0-20.0) atomization air pressure while monitoring the impeller speed ((200-400 rpm)) and amperage, chopper speed (1600-2000 rpm). When the impeller amperage increases (such as 13-18%,), the spray of water is stopped and the mixture wet massing for 5 minutes without changing the impeller or chopper speeds. Following the 5-minute wet massing, the wet granulation is discharged and placed in a fluid bed dryer (100-140 cfm; 45-55° C.); dew point 10° C.; filter shaking 15 sec/5 sec (interval/duration) until the LOD moisture is at or below the LOD moisture of the pimavanserin at dispensing. The dried granulation is discharged from the fluid bed dryer, screened through a screen (4-12 mesh), and packaged until diluent blending and encapsulation.

Diluent Blending: The screened, dried pimavanserin granulation is dispensed (weighed) for blending/encapsulation unit operations. The required diluent and lubricant quantities are also dispensed. The dispensing is followed by delumping of pimavanserin granulation with a screening mill such as 197S or U10 Comil equipped with a screen (4-12 mesh) at 2300-2500 rpm, blending of the granulation with diluent using a bin type blender such as 2 liter TOTE blender 20 minutes at 19-21 rpm or other appropriate blender, final blending with lubricant using the same bin type blender or other appropriate blender (3 minutes at 19-21 rpm) , and encapsulation using a IIM 2100 equipped with size 4 change parts and 5-12 mm dosing disk (50-90 segments per minute (spm)).

Optionally low shear granulation such as a V-Blender equipped with an intensifier bar, twin screw granulation, may be instead of the granulation equipment specified above with appropriate adjustment to the milling/screening parameters to manufacture capsules of pimavanserin

Pimavanserin hard shell capsules (34 mg pimavanserin, equivalent to 40 mg pimavanserin tartrate) were manufactured. Table 2 contains an example of a suitable formulation.

As an alternative, the herein disclosed pimavanserin granulation may be compressed as a tablet.

As an alternative, the herein disclosed pimavanserin granulations may be compressed as a tablet without further excipients. Thus the composition disclosed in table 2 in some embodiments is used to form tablets. Said tablets may be formed as an alternative to the filling of a capsule.

US 11,452,721 B2

21

Consequently the obtained pimavansering granulation may be compressed into a tablet of a weight of about 100 mg.

TABLE 2

| Composition of Pimavanserin granulation (34 mg) | | |
|---|---|---|
| Ingredients | Qty (% w/w) | Qty (mg)/dose |
| Pimavanserin Tartrate | 40.0 | 40.0[a] |
| Microcrystalline Cellulose (Avicel PH302, NF, EP) | 59.0 | 59.0 |
| Magnesium Stearate (Vegetable Source, USP, EP) | 1.0 | 1.0 |
| Total | 100.0 | 100.0 |

[a]40 mg pimavanserin tartrate salt is equivalent to 34 mg pimavanserin free base

Table 3 contains the manufacturing process equipment for pimavanserin capsules, 34 mg.

TABLE 3

| Process Step | Equipment class, sub-class | Manufacturer, model, size |
|---|---|---|
| Screening I (API) | Hand screen | 30 Mesh hand screen |
| Granulation | Vertical granulator | Glatt/Powrex VG-50M with 25 L Bowl |
| Fluid Bed Drying | Fluid bed | Glatt GPCG-5 with 25 L bowl |
| Screening II (granulation) | Hand screen | 10 Mesh hand screen |
| Milling | Screening mills, rotating impeller | Comil 197S or U10 with 045R03125 screen |
| Blending I | Diffusion mixers (Tumble), bin blender | TOTE Bin blender, 2 cubic foot |
| Screening III (Magnesium stearate) | Hand screen | 30 Mesh hand screen |
| Final Blending | Diffusion mixers (Tumble), bin blender | TOTE Bin blender, 2 cubic foot |
| Encapsulation | Encapsulator, dosing disk | IIM 2100, Size 4 change parts and 10 mm dosing disk |
| Polishing and weight checking | Not applicable | Bosch KKE 1500 |

Table 4 outlines the process parameters and ranges for pimavanserin capsules, 34 mg manufacture. Bold references are target values with the ranges displayed in parenthesis.

TABLE 4

| Process Step: Equipment | Process Parameter | Ranges |
|---|---|---|
| Screening I (API) 25-40 Mesh hand screen | Screen size | 25-40 Mesh hand screen |
| Granulation Glatt/Powrex VG-50M with 25 L bowl | Spray rate | (10-50) [g/min] |
| | Impeller speed | (200-400) [rpm] |
| | Chopper speed | (1600-2000) [rpm] |
| | Atomization Air Pressure | (3-20) [psig] |
| Fluid Bed Drying Glatt GPCG-5 with 25 L bowl | Process Air Volume | (90-210) [cfm] |
| | Inlet Air Temperature | (40-60) [° C] |
| Screening II (granulation) 4-12 Mesh hand screen | Screen size | 4-12 Mesh hand screen |
| Screening | Screen size | 25-40 mesh |
| Blending I | Diffusion blender | |
| Screening (Magnesium stearate) | Screen size | 25-40 Mesh |
| Blending I | Diffusion blending | |
| Encapsulation dosing disk based encapsulator | Dosing disk | 5-12 mm |

In some embodiments disclosed herein relate to pimavanserin granulation, e.g. composed as in table 2, having a

22

weight of granulation of 100 mg ±7 (average of 20 samples), i.e. the weight relates to the granulation only, i.e. excluding capsule shell weight.

The bulk density of the blended composition is >0.4 g/ml, such as 0.4-0.6 g/ml, such as about 0.5 g/ml determined according to USP <616>, method 1. In some embodiments the bulk density of the composition is >0.4 g/ml, such as about 0.5 g/ml, such as 0.51 g/ml, such as 0.508 g/ml.

The bulk density of pimavanserin granulation is >0.4 g/ml, such as 0.4-0.6 g/ml, such as about 0.5 g/ml, determined according to USP <616>, method 1. In some embodiments the bulk density of the pimavanserin granulation is >0.4 g/ml, such as about 0.5 g/ml, such as 0.51 g/ml, such as 0.508 g/ml.

In addition to the bulk density and Carr's Index obtained according to USP <616>, method 1, FT4 Powder Rheology was obtained for the API (pimavanserin tartrate) and for the compositions disclosed herein using a FT4 Powder Rheometer according to ASTM D7891-15; Standard Test Method for Shear Testing of Powders Using the Freeman Technology FT4 Powder Rheometer Shear Cell.

As discussed herein above the flowability of the composition has been improved compared to the API (pimavanserin tartrate), which for example can be supported by the Specific Energy (SE) obtained from the FT4 measurements. Specific Energy is a measure of the powder's flowability when unconfined, such as during low stress filling, or low shear blending. The average Specific Energy (SE) for the API is about 10.08+/−0.23 mJ/g. The granulated pimavanserin had an average SE of 6.81+/−0.63 mJ/g, and the blended pimavanserin composition an average SE of 3.96+/−0.36 mJ/g. Thus the unconfined flowability was substantially improved compared to the API.

In addition to SE, the Flow Rate Index (FRI) of the composition showed significant improvement compared to the API (pimavanserin tartrate). FRI indicates sensitivity to changing the rate of flow, and the pimavanserin tartrate had an average FRI of 1.90±0.01, the granulated pimavanserin an average FRI of 1.52+/−0.10, and the blended pimavanserin composition had an average FRI of 1.08±0.06, again showing the improved properties for the granulated pimavanserin as well as the blended pimavanserin composition for filling into a capsule of size 3 or 4.

The FT4 Powder Rheometer was also used as yet another means to compare the bulk density between the API, the granulated pimavanserin and the blended pimavanserin compositions disclosed herein and in the accompanying claims. The bulk density is a conditioned bulk density as obtained by the FT4 measurement, in accordance with ASTM D7891-15; Standard Test Method for Shear Testing of Powders Using the Freeman Technology FT4 Powder Rheometer Shear Cell. Pimavanserin tartrate (API) had an average conditioned bulk density (CBD) of 0.336±0.006 g/ml, granulated pimavanserin tartrate had an average conditioned bulk density (CBD) of 0.478±0.028 g/ml, and the blended pimavanserin composition an average CBD of 0.504±0.020 g/ml.

The conditioned bulk density of the blended composition is >0.45 g/ml, such as 0.45-0.6 g/ml, such as 0.47-0.55 g/ml determined according to ASTM D7891-15. In some embodiments the bulk density of the composition >0.45 g/ml, such as an average of about 0.5 g/ml.

The conditioned bulk density of the granulated pimavanserin is >0.42 g/ml, such as 0.42-0.55 g/ml, such as 0.43-0.53 g/ml determined according to ASTM D7891-15. In some embodiments the bulk density of the granulated pimavanserin >0.42 g/ml, such as an average of about 0.48 g/ml.

US 11,452,721 B2

23

The blended pimavanserin composition used in the herein mention FT4 Powder Rheometry measurements comprised 34 mg pimavanserin, 59 mg microcrystalline cellulose and 1 mg magnesium stearate.

The capsules comprising 5-34 mg pimavanserin are stable upon actual or simulated storage under open conditions at 25° C.±2°/60%±5% (RH) relative humidity for at least 1 year, such as at least 1.5 years.

Alternative methods and equipment to be used in connection with the herein disclosed methods, compositions, capsules, tablets and disclosures may be found in SUPAC: manufacturing equipment addendum, an U.S. Department of Health and Human Services, Food and Drug Administration, Center for Drug Evaluation and Research (CDER) issued guidance for industry, e.g. in the December 2014 version, Pharmaceutical Quality/CMC.

The embodiments disclosed herein above meet all specifications outlined relating to the marketing authorization of Nuplazid®, for example:

Assay (90.0-110.0% of Label Claim), i.e. quantify the amount of pimavanserin free base in the drug product, for example using reverse phase HPLC with UV-detection at 210 nm. An example of eluent is a gradient comprised of two mobile phases such as ammonium buffer (pH 9.0), and acetonitrile/methanol (80/20 vol/vol).

Content Uniformity as determined using USP <905>, Uniformity of Dosage Forms and wherein the maximum Acceptance Value (AV) NMT (not more than) 15.0. The AV is calculated for the number of units tested; Level 1=10 units; Level 2=30 units using the following: the mean Assay value for the number of units tested Minus Either 98.5 (when the mean is less than 98.5% of target assay) and 101.5 (when the mean is greater than 101.5% of target assay) times 2.4 (10 units) or 2.0 (30 units) plus the difference between the Mean and the appropriate Upper/Lower % of target assay, using the method for hard capsules.

Dissolution USP <711>:

Stage 1: Q=80% within 30 minutes

Stage 2: Average of 12 units (Stage 1 & Stage 2) is equal to or greater than Q with no unit less than Q-15%

X-ray powder diffraction (XRPD) analyses on a Bruker AXS D8 Advance system with a Bragg-Brentano configuration using CuKα radiation confirmed that all XRPD patterns for the granulations correspond to the XRPD patterns of the currently approved NUPLAZID 17 mg tablet (pimavanserin tartrate form C), which for example as disclosed in U.S. 7,732, 615.

Long term stability data for capsules containing 34 mg pimavanserin, 59 mg microcrystalline cellulose and 1 mg magnesium stearate at 18 months were determined using standard procedures such as actual or simulated storage under open conditions at 25° C.±2°/60%±5% (RH) relative humidity, e.g. as outlined in WHO Technical Report Series, No. 953, 2009, Annex 2, and the following observations and determinations were made:

Appearance: unchanged at 18 months

Assay (90.0-110.0% of Label Claim): Day 8: 100±2%; 18 months: 100±2%

Total impurities: Day 0: 0.3%; 18 months: 0.3%, determined in line with Assay.

Dissolution (at 18 months): at least 80% of the pimavanserin is released from the composition within 30 minutes upon in vitro dissolution testing according to USP<711> (apparatus 1 (basket apparatus)).

24

Water content (determined in line with USP<921>, method Ia: Day 0: 2.9%; 18 months: 2.9%.

What is claimed is:

1. A pharmaceutically acceptable capsule for orally delivering 34 mg of pimavanserin to a patient, wherein the capsule has a size 3 or 4 capsule shell that contains a blended pimavanserin composition comprising:

granules comprising 40 mg pimavanserin tartrate and optionally one or more pharmaceutically acceptable excipients;

and one or more blending excipients; wherein the bulk density of the granules is >0.4 g/ml as determined by USP<616>, method 1.

2. The pharmaceutically acceptable capsule of claim 1, wherein one of the blending excipients is selected from the group consisting of magnesium stearate, sodium stearyl fumarate, colloidal silicon dioxide, and talc.

3. The pharmaceutically acceptable capsule of claim 1, wherein the blended pimavanserin composition has a D90 particle size distribution of 60-450 μm as measured using laser scattering particle size analysis.

4. A pharmaceutically acceptable capsule for orally delivering 34 mg of pimavanserin to a patient, wherein the capsule has a capsule shell with a capsule shell size 3 or 4, that encapsulates a blended pimavanserin composition comprising:

granules comprising 40 mg pimavanserin tartrate and one or more pharmaceutically acceptable excipients; and wherein the bulk density of the granules is >0.4 g/ml as determined by USP<616>, method 1.

5. The pharmaceutically acceptable capsule of claim 4, wherein the capsule shell is a hard shell size 4 capsule.

6. The pharmaceutically acceptable capsule of claim 1, wherein one of the blending excipients is selected from the group consisting of a cellulose, a polysaccharide, and polyvinylpyrrolidone.

7. The pharmaceutically acceptable capsule of claim 1, wherein one of the blending excipients is selected from the group consisting of microcrystalline cellulose, silicified microcrystalline cellulose, hydroxypropyl cellulose, hydroxypropylmethyl cellulose, hydroxymethyl cellulose, and a lactose cellulose blend.

8. The pharmaceutically acceptable capsule of claim 1, wherein the one of the blending excipients is selected from the group consisting of sucrose, mannitol, sorbitol, pregelatinized starch, and partially pregelatinized starch.

9. The pharmaceutically acceptable capsule of claim 1, wherein the blending excipients comprise microcrystalline cellulose and magnesium stearate.

10. The pharmaceutically acceptable capsule of claim 1, wherein the blending excipients are selected from the group consisting of filler/diluents, lubricants and mixtures thereof.

11. The pharmaceutically acceptable capsule of claim 1, wherein the granules comprise a pharmaceutically acceptable excipient which is a binder.

12. The pharmaceutically acceptable capsule of claim 10, wherein the binder is selected from the group consisting of cellulose, methyl cellulose, polyvinylpyrrolidone and polyethylene glycol.

13. The pharmaceutically acceptable capsule of claim 4 wherein the pharmaceutically acceptable excipients comprise a binder.

* * * * *

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

———————————————————————  :
ACADIA PHARMACEUTICALS INC.,          :
                                       :     C.A. No. 1:22-cv-01387-GBW
            *Plaintiff,*                :
                                       :     CONSOLIDATED
      v.                               :
                                       :
AUROBINDO PHARMA LTD., and             :
AUROBINDO PHARMA USA, INC.,            :
                                       :     **HIGHLY CONFIDENTIAL**
            *Defendants*.              :
———————————————————————  :

**REBUTTAL EXPERT REPORT OF**
**R. CHRISTIAN MORETON, PH.D. ON NONINFRINGEMENT**

# TABLE OF CONTENTS

I.      INTRODUCTION ....................................................................................................1

I.      SUMMARY OF OPINIONS .................................................................................1

II.     QUALIFICATIONS ..............................................................................................4

III.    MATERIALS CONSIDERED ..............................................................................7

IV.     LEGAL STANDARDS .........................................................................................7

V.      TECHNICAL BACKGROUND...........................................................................9

     A.      Use of Excipients in Pharmaceutical Applications.................................9

     B.      Powders, Particles, Granules, and Compression....................................11

     C.      Aurobindo's ANDA Product is Made By a Dry Blend Process Without
          Compression ...........................................................................................15

VI.     LEVEL OF ORDINARY SKILL IN THE ART ...............................................22

VII.    THE '721 PATENT .............................................................................................23

     A.      Claims ....................................................................................................23

     B.      Specification ...........................................................................................24

          i.      The Named Inventors Described Certain Excipients.................................25

          ii.     The Named Inventors Described Granules and Granulation ....................26

     C.      File History ............................................................................................27

VIII.   AUROBINDO'S PRODUCTS DO NOT LITERALLY INFRINGE THE
       ASSERTED CLAIMS OF THE '721 PATENT.................................................28

     A.      Aurobindo's ANDA Product Does Not Include the Granules
          Comprising 40 mg Pimavanserin Tartrate Limitation............................28

          i.      Aurobindo's ANDA Product Contains No Granules...............................29

          ii.     Aurobindo's ANDA Product is Made Via Dry Blending.........................29

          iii.    Aurobindo's ANDA Product Contains No Binder Ingredient .................30

          iv.     Aurobindo's ANDA Product Has No Compression Step .........................30

     B.      The Aurobindo ANDA Use of the Term "granule" Is Imprecise
          Nomenclature .........................................................................................33

IX.     CONCLUSION....................................................................................................34

## I.    INTRODUCTION

1.       I, R. Christian Moreton, Ph.D., submit this expert report pursuant to Fed. R. Civ. P. 26(a)(2)(B) on behalf of Defendants Aurobindo Pharma Ltd. and Aurobindo Pharma USA, Inc., (hereafter collectively, "Aurobindo" or "Defendant").

2.       I have reviewed the expert report by Dr. Smith dated May 2, 2024, which alleges infringement by Aurobindo, and the materials cited therein.  Dr. Smith provides opinions regarding the alleged infringement of U.S. Patent No. 11,452,721 ("the '721 patent") by Aurobindo.  I have been asked to provide my opinions regarding the alleged infringement of the '721 patent by the Aurobindo ANDA Product and to respond to various opinions that Dr. Smith discloses.

3.       If called to testify, I may testify about my opinions and the bases for those opinions, as discussed in greater detail below.  I may also respond to any opinions or testimony from Dr. Smith regarding issues within my area of expertise.  I reserve the right to supplement or amend this report and offer further testimony in response to any further developments in this litigation, including any new opinions or clarifications Dr. Smith puts forth.

## I.    SUMMARY OF OPINIONS

4.       I understand that Aurobindo has filed an Abbreviated New Drug Application ("ANDA") for **pimavanserin tartrate capsules, 34 mg, ANDA No. 214782**.  My opinions are directed to the composition of Aurobindo's ANDA product.

5.       A POSA would understand that Aurobindo's ANDA product ▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

████████████████████████████████████████████ The Aurobindo ANDA Product is made using, essentially, processes and equipment known in the art. This is compared to the '721 patent, which claims, allegedly a novel, and completely different process for preparing the claimed granules comprising 40 mg pimavanserin tartrate. The claimed process requires a granulation step and a granulating agent or binder, or a compression/compaction step to form granules. These items, required to form the claimed granules comprising 40 mg pimavanserin tartrate, are absent form the process used to make the Aurobindo ANDA Product.

6.      It is my opinion that the Aurobindo's ANDA product does not literally infringe any asserted claim of the '721 patent because Aurobindo's ANDA Product ████████████ ████████████ as required by the asserted claims of the '721 patent. Therefore, Aurobindo's ANDA product does not literally infringe any asserted claim of the '721 patent.

7.      Dr. Smith opines that Aurobindo's ANDA product infringes one or more claims of the '721 patent under the "doctrine of equivalents" ("DOE"). However, as noted above, Aurobindo's ANDA Product ████████████ as defined by the inventors of the '721 patent, and as understood by a POSA. Moreover, the methods by which Aurobindo's ANDA Product is made ████████████████████ In addition, Dr. Smith's experimental data is unreliable and rife with errors, making that analysis essentially useless. Dr. Smith's experiments do not demonstrate ████████████████████ ████████████████ or that Aurobindo's ANDA Product contains an equivalent of ████████████████ Accordingly, the required claim element ████████████████ Aurobindo's ANDA Product. Thus, there can be no infringement under the doctrine of equivalents as a matter of law.

2

8.      In particular, I disagree with Dr. Smith's analysis for several reasons, which I summarize here:

• *First, the Aurobindo ANDA Product is made in a way that* ██████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████

• *Second, Aurobindo's ANDA Product does not contain a binder. Aurobindo's ANDA Product* ██████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████

• *Third, the Aurobindo ANDA Product* ██████████████████████

████████████████████████████████████████████████████

████████████████████████████

• *Fourth, there is no question that the Aurobindo ANDA Product is not an equivalent to the claimed granules comprising 40 mg pimavanserin tartrate, not only because the Aurobindo ANDA Product* ██████████████████████████ *In addition, because the way the Aurobindo ANDA Product is made* ██████████████

████████████████████████████████████████████████████

██████████████████████████████████ *as they are described and claimed in the '721 patent in claims 1 and 4,* ████████████████.

• *Fifth, Dr. Smith mistakenly conflates particles that have coalesced through random movement with the specific entity of granules and in doing so overlooks the knowledge of*

3

*a POSA, as well as the named inventor's own disclosure,* ███████████████

███████████████████████████████

•     *Sixth, Dr. Smith's experiments and application of Polarized Light Microscopy is insufficient to demonstrate* ███████████████████ *relying primarily, as Dr. Smith does, on lighter areas versus darker areas. A POSA would not make the same overly broad conclusions based on Dr. Smith's experiments.*

9.     Plaintiff has taken no positions, and Dr. Smith has articulated no arguments for infringement of the claims of the '721 patent by Aurobindo's ANDA Product under the DOE. To the extent that Dr. Smith later asserts an infringement argument or position under the DOE, then I reserve the right to respond and assert any argument in response to infringement under the DOE including prosecution history estoppel, disclosure dedication, or any other appropriate response, without limitation.

## II.   QUALIFICATIONS

10.     I am Vice President, Pharmaceutical Sciences for FinnBrit Consulting in Waltham, MA, where I have worked since July, 2007. My work at FinnBrit is focused on consulting and advisory services to the pharmaceutical industry on chemistry, manufacturing and controls (CMC) issues relating to product formulation for drug development projects, including all aspects of formulation design.

11.     I received a Bachelor of Pharmacy degree from University of Nottingham in the UK in 1971, a Master of Science in Pharmaceutical Analysis from University of Strathclyde in the UK in 1987, and a Doctor of Philosophy (Ph.D.) from the University of Wales in the UK in 1992. Details regarding my background and qualifications can be found in my curriculum vitae, attached as **Exhibit A**.

12.    Before I became Vice President for FinnBrit Consulting, I served as a pre-registration pharmacy graduate at Torbay Hospital in Torquay, South Devon, UK (1971-1972); Preregistration pharmacy graduate, Pharmacist, and Chief Pharmacist at Harker Stagg Ltd., Leyton, London E10, UK (1972-1973); Senior research assistant, staff scientist, and senior scientist for Pfizer Central Research in Sandwich, UK (1973-1980); Department manager with Sterling Winthrop Research Centre in Alnwick, Northumberland, UK (1981-1984); Tablet section manager with ACO Läkemedel AB, Solna, Sweden (1984-1986); Graduate student at Strathclyde University (1986-1987); Graduate research student at Welsh School of Pharmacy, University of Wales in Cardiff, UK (1987-1990), a research associate with Welsh Centre for Postgraduate Pharmacy Education also in Cardiff (1990-1991); Locum Community Pharmacist at various pharmacies in South Wales and Southwest England (1991-1992); Technical Services Manager (Europe) followed by Technical Services Manager (US), Director QA/QC and finally Senior Director Technical Operations all for Penwest Pharmaceuticals Co. (formerly Edward Mendell Co. Inc.) in Patterson, NY (1992-2001); Vice President, R&D for Genpharm Inc., in Etobicoke, Ontario, Canada (2001-2002); worked as a pharmaceutical consultant from March-August 2002; and Vice President, Pharmaceutical Sciences with Idenix Pharmaceuticals, Inc. in Cambridge, MA (2002-2007).

13.    During my time in the pharmaceutical industry, I undertook or supervised the design and development of a number of drug molecules, both new drug molecules for clinical trials and commercial use, as well as generic products. I have formulated tablets, hardgel capsules, softgel capsules, ointments, creams, suppositories, oral solutions, oral suspensions, and parenteral solutions. I have also worked with oral modified release formulations.  I currently consult with clients on the formulation design and development of small-molecule drug candidates, among other things.

14.     I am the recipient of the 2018 United States Pharmacopeia Jacob Bigelow Award for Outstanding Contribution to the Standards by a USP Expert Volunteer.  I have served on USP Expert Committees since 2000 including Excipient Test Methods, Excipient Monograph Content 2, Monographs—Excipients, and Excipient Monographs 1, and am currently chair of the USP Expert Committee on Excipient Test Methods.  I have also been a chair, co-chair or member of USP Advisory Panels or Joint Sub-committees on Good Distribution Practices, Excipient Performance, Use of Enzymes in the Dissolution Testing of Capsules, Lactose, and Reference Standards for Excipients and Food Chemicals.  Further, I am a member of the International Steering Committee for the Handbook of Pharmaceutical Excipients, from the present extending back to 1999.  Since 2011, I have had a visiting tutor/lecturer appointment at the University of Manchester, UK on their Pharmaceutical Industry Advanced Training distance learning program for two Sections covering oral solid dosage forms, and since 2022 a Section on Liquid and Semi-solid Formulations.

15.     I have authored or co-authored more than fifty peer-reviewed papers, articles and web-based publication on topics related to the relationship between the physicochemical characteristics of drugs and their biological effect, with an emphasis on design, development, evaluation, optimization, and scale-up operations of oral dosage forms, including controlled release drug delivery and dispersed systems.  I have also written multiple book chapters, and monographs in the Handbook of Pharmaceutical Excipients, and have been an invited speaker or presenter at numerous professional meetings and events.

16.     My professional memberships include the Royal Pharmaceutical Society of Great Britain, the American Association of Pharmaceutical Scientists, the American Chemical Society, the International Society of Pharmaceutical Engineers, the Academy of Pharmaceutical Sciences of Great Britain, and the Royal Society of Chemistry.

6

17.     I am being compensated at my customary rate of $600 per hour for my consultation in connection with this litigation.  My compensation is in no way dependent on the outcome of my analysis or opinions rendered in this litigation.

## III.    MATERIALS CONSIDERED

18.     In addition to my experience, education, and training, the materials I considered in forming my opinions are listed in **Exhibit B** and otherwise identified in my report and the attached appendices.

## IV.    LEGAL STANDARDS

19.     I have been instructed by counsel to apply certain legal standards to my analysis. A summary of these legal standards that I have applied is provided below.

20.     I have been informed that Plaintiffs must prove infringement by a "preponderance of the evidence," which means that the fact that is to be proven is more likely true than not.

21.     I have been informed that determining infringement requires performing a two-step analysis.  First, the claims must be construed.  Second, infringement must be proven by showing that each and every claim limitation is found in the accused product or method.  As discussed below, I understand that the parties have agreed or the Court has otherwise ruled on the meaning of certain terms used in the Asserted Claims.  I have reviewed and used those constructions in formulating the opinions set forth in this report.

22.     I have been informed that "literal" infringement requires that every limitation of a claim be embodied in the accused product or method, and that the absence of even one claim limitation avoids literal infringement.

23.     I also have been informed that if an element is not literally found in an accused product or method, infringement may nevertheless be found under the doctrine of equivalents ("DOE") if an "equivalent" of a missing element is found in the accused product or method.  I

7

understand that the DOE does not allow the wholesale redrafting of claims and cannot be used to erase meaningful structural and functional limitations of the claim on which the public is entitled to rely to avoid infringement. I further understand that, in applying the DOE, it is important that some meaning for each limitation in a claim be maintained in order to preserve the boundaries of the invention's patent protection. I understand that the DOE cannot apply so broadly as to effectively eliminate a claim element in its entirety.

24.    I understand that a claim element may be infringed under the DOE when the differences between an element in the accused product and the corresponding element in the asserted claim are insubstantial. For example, if an element in an accused product can be said to be equivalent to a claimed element where it performs substantially the same function, in substantially the same way, to achieve substantially the same result as the corresponding element set forth in the asserted claim.

25.    I further understand that the DOE is applied to individual elements of the claim, not to the invention as a whole. Here, the question of whether Aurobindo's ANDA product infringes the asserted claims of the '721 patent under the DOE requires an element-by-element analysis of the role played by the specific claimed ingredients, particularly the claimed granules comprising 40 mg pimavanserin tartrate, and whether the Aurobindo ANDA Product matches the function, way, and result of the claimed granules comprising 40 mg pimavanserin tartrate.

26.    I understand that an accused feature is not equivalent to a claimed element if the accused feature plays a role substantially different from the claimed element. I also understand that a claim of infringement under the DOE cannot be supported by a conclusory expert opinion unsupported by any explanation or evidence.

27.     I understand that when patent applicants narrow claims in response to a rejection, thereby overcoming the rejection, the DOE cannot be used to cover the surrendered subject material. Furthermore, I understand that arguments made by applicants during prosecution to obtain issuance of a patent may also bar application of the DOE.

28.     I further understand that dependent claims contain all of the limitations of the independent claim from which they depend.  Thus, if an independent claim is not infringed, then each of the corresponding dependent claims cannot be infringed.

29.     Finally, I understand that certain claim terms of the '721 patent have been construed by the Court in this matter, but those constructions do not alter my opinions here.  I also understand the terms of the '721 patent are given their plain ordinary meaning to a person of ordinary skill in the art ("POSA") to whom these patents pertain as of the filing of the patents.

## V.     TECHNICAL BACKGROUND

### A.     Use of Excipients in Pharmaceutical Applications

30.     A POSA would have understood that certain, commonly used excipients have multiple functions, but which depend on the specific formulation, or context, in which that excipient is used.  (*See e.g.*, USP <1059> Excipient Performance at 1/59.)  A POSA would further understand that the context in which an excipient is used can significantly affect its properties and role in a given pharmaceutical formulation.  (*Id.*)

31.     A POSA would understand a binder as, "binders or adhesives, which promote adhesion of the particles of the formulation, allowing a granulation to be prepared and maintaining the integrity of the final table."  (Ansel's Pharmaceutical Dosage Forms and Drug Delivery System, 10th Ed. (2014) (hereafter, "Ansel's"); *see also* Aulton's Pharmaceutics, The Design and Manufacture of Medicines, 4th Ed. (2018) (hereafter, "Aulton's") at 516 ("a binder is added to a drug-filler mixture to ensure that granules and tablets can be formed with the required mechanical

9

strength."); *see also* Saharan, Vikas Anand, et al. "Ordered mixing: mechanism, process and applications in pharmaceutical formulations; Asian Journal of Pharmaceutical Sciences; 3(6): 240-259, 243 ("use of binding agents for granulation have been used to prepare ordered units of near identical composition.").)  A POSA would further understand the difference between a diluent and binder when either is used in a dry blend process.  This is because a diluent simply adds bulk density to the formulation.  (Aulton at 513.)  A binder, even when added dry, is adhesive (*i.e.*, sticky) because they are typically water soluble, among other properties, unless they are intended for use in solvent wet granulation.  (*See* Aulton at 516.)  A POSA would understand that a binder can be added as a dry powder which is mixed with the other ingredients before a granulation step, or a compression step, for example slugging or tableting.

32.    A POSA would understand a "diluent" as simply adding bulk to a formulation. (Aulton at 513; *and* Ansel's, at 244.)[1]  A POSA would further understand the difference between a diluent and a binder, especially when either is used in a dry blend process.  This is because binders and diluents have fundamentally different roles in a given formulation as a POSA would readily recognize and agree.  While certain diluents can act (function) as binders, that is not always correct and depends directly on the formulation at issue, including the presence or absence of granulation steps or processes, or compression steps or processes of a sufficient energy to form granules (none of which Aurobindo's ANDA Product use).

33.    The Aurobindo ANDA Product includes ███████████████████████ ███████████████s.  (AURO_PIMAV00002469-2470  Section  , entitled,

---

[1] For example in this case, the bulk density of pimavanserin tartrate capsules are a consideration, such that the smaller size 4 capsule size may be used.  It would therefore be logical to the POSA that in Aurobindo's ANDA Product ███████████████████, that the bulk density of the capsules would be increased by using a diluent in the formulation.  Thus does Aurobindo's ANDA Product ████████████████████████████████████

"Excipients"; and 2458-2462). I refer to them here collectively as ██████. The Aurobindo ANDA characterizes ████████████████████████ (AURO_PIMAV00002458-2462 Section 2.3.P.1.)

34.     A POSA would further understand ████████ used in Aurobindo's ANDA Product to function as a diluent because the Aurobindo ANDA Product is ████████████

████████████████████████████████████████████

████████████████████

35.     The blending process used in the manufacture of Aurobindo's product ████████

████████████████████████████████████  ████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████ Then there is a ████████████

████████████████ (Ansel at 223-225.)

**B.     Powders, Particles, Granules, and Compression**

36.     ████████████████████████████████

████████████████████████████████████████

██████████  ████████████████  ████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

37.     ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████

38.   ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████

39.   ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████    ██████████████████████████

████████████████████████████████████████████████

██████████████████████████████████    ███████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████

40.   The named inventors of the '721 patent continue, stating:

Generally a granulation process combines one or more particles and forms a granule that will allow tableting or the encapsulation process to be within required limits. The granulation process can be made predictable and repeatable. The granulation is performed in a variety of equipment such as, but not limited to, low shear, high shear granulators, fluid bed granulator, roller compacter, and slugger.

(*Id.* at 4:53-59.)  This passage shows that the named inventors at the time the specification was written also considered granulation to be the result of specific process using specific types of equipment.

41.  ███████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████

42.     Wet granulation is a process whereby powders, consisting of either a single entity or a mixture of entities, are caused to stick together due to a granulation liquid that facilitates the physical connection.  The granulation liquid will contain an adhesive binder substance, or will interact with such a substance that is included in the mixture of materials to be granulated.   (Ansel at 231;  Aulton at 511.)

43.     Dry granulation is a process where the individual component powders of a powder blend to be granulated are caused to adhere to each other under the influence of high pressure.  Under such high pressure, slugs or ribbons are thus formed, then broken down to the required size to form granules.  (Ansel at 231-232; Aulton's at 512.)

44.     There are other granulation methodologies such as hot melt, steam, foam or fluid bed methods; however, even these emerging granulation techniques are specific and specifically designed and developed to form granules.  A POSA would understand further that methodologies such as melt, steam, or foam are really species of wet granulation because the particular processes (*i.e.*, melting, steam, foam) require a liquid phase to promote the formation of mechanical bonds and formation of a granule.  Once again, these are specifically designed processes to result in a specific entity with specific properties:  a granule.  (*See e.g.*, Shanmugam at 55-61 and Table 1.)

45.  ███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████

46.    A POSA would understand that compression in pharmaceutical formulation typically refers to tablet manufacture. In the context of the '721 patent, compression refers to dry granulation and which a POSA would associate with roller compaction or slugging.  (*See* Ansel at 231-232; Aulton at 512.)

47.  ███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████    ████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████

48.  ███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████

---
2 ████████████████████████████████████████████████

49.     It is common for tablets to be made using what is known as direct compression (also known as direct compaction).  This is specific step in forming tablets that involves blending the materials together followed by a specific, high pressure compression step to form tablets. (Aulton at 512-514; and Ansel at 281-282.)  Direct compression of a pharmaceutical formulation to form a tablet requires certain, specific properties of the components of the tablet including the ability of the major part of formulation (but not necessarily all components) to form a tablet in the absence of a granulation step.  Such materials are said to be directly compressible. Excipients which are directly compressible include MCC, coarse grade dibasic calcium phosphate (both the dihydrate and the anhydrous form), certain grades of lactose (but not all), etc.

50.     Dr. Smith appears to conflate basic principles of formulation and the clear differences known to the POSA between common processes like wet or dry granulation, encapsulation, and compression.  In addition, Dr. Smith's analysis and subsequent opinions are based on a misunderstanding of a common excipient like MCC when used in a dry blend process with no compression step.  Given these shortcomings, as well as others identified throughout this report, I disagree[3] with her opinion that the Aurobindo ANDA Product meets the claim limitation "granules comprising 40 mg pimavanserin tartrate …" in either claim 1 or claim 4 of the '721 patent.

C.     Aurobindo's ANDA Product ████████████████████
████████████

51.     ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

---

[3] It should be noted that in this report, for assertions, conclusions, and opinions made by Dr. Smith that I do not specifically point out and rebut here, I do necessarily agree with any such assertions, conclusions, or opinions and reserve the right to so state and explain at length based on any replies or supplemental assertions, conclusions, or opinions made by Dr. Smith in the course of this case.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████

52.    ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

53.    Aurobindo's ANDA Product is made ████████████████████████████

████████████████████████████████████████████████

██████████████████████    Aurobindo's manufacturing process for preparing Aurobindo's

Pimavanserin Product is set forth in Aurobindo's ANDA No. 214782, specifically section 3.2.P.2.3.,

which includes the following:

██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████



(*See* AURO_PIMAV00002947 at 2947-2950; *see also* AURO_PIMAV00002944 at 2945-2958, batches: ██████████████████)

Aurobindo's manufacturing process is illustrated in the flow chart below.



familiar with the operation and function of this equipment.

55. ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████

56. ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████

57. ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████  ███████████  ███████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████

58. █████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████

59. ████████████████████████████████████ ███

████████ ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████

60. █████████████████████████████████████████

████████████████████████████████████████████████

█████████████

61. ████████████████████████████████████. (*See*

AURO_PIMAV00002746 at 2747.) ██████████████████████

█████████████████████████████ Dr. Smith mistakenly calls

████ ██████████████████ (*See* Smith at para. 103 pp. 39-40.) This is incorrect;

████ ██████████████████████████████████████

62. ████████████████████████████████████ █████

█████████████████████████ █████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████



64.    It should also be noted that the contents of Exhibit 7 to Dr. Smith's report, the monograph for MCC from the Handbook of Pharmaceutical Excipients, 5th Ed., contradict her opinions.  There, at part 6 "Functional Category," MCC is described as:  "Absorbent; suspending agent; tablet and capsule diluent; tablet disintegrant."  (*Id.* at 132.)  At part 7 "Applications in Pharmaceutical Formulation Technology," is stated:  "Microcrystalline cellulose is widely used in pharmaceuticals, primarily as a binder/diluent in oral tablets and capsule formulations where it is used in both wet-granulation and direct-compression processes. …."  (*Id.*)  Aurobindo's ANDA Product is made using neither wet granulation nor direct compression.  A POSA would understand

---

[4] As noted in more detail, below, the monograph for MCC from the Handbook of Pharmaceutical Excipients (5th Ed.) relied on by Dr. Smith at Exhibit 7 does use the term "binder/diluent" but does not classify or describe MCC with that term.  ████████████████████████████████

████████████████████████████████████████████  MCC is not generally referred to as a "binder/diluent" and in my 40-plus years of formulation experience POSAs rarely, if ever, use that terminology when referring to MCC.

that the MCC ingredient in the Aurobindo ANDA is not, in fact, a binder, but is a diluent as stated in the ANDA itself.  Dr. Smith is plainly incorrect when she concludes to the contrary.

## VI.    LEVEL OF ORDINARY SKILL IN THE ART

65.    I have been informed that Dr. Muzzio stated that a POSA to whom the '721 patent is directed would be in the fields of pharmaceutical formulations and ingredients, and the pharmaceutical sciences more broadly.  The POSA would have possessed a relatively high level of skill, such as having at least a Bachelor's degree, and more likely a Master's degree or Doctoral degree, and several years of experience in research and development of pharmaceutically relevant formulations, including, but not limited to, the manufacturing processes of such formulations and the selection and use of ingredients in such formulations. A POSA may be expected to work as part of a team, and is able to draw upon the knowledge and expertise of others on the team. A POSA would have easily understood the prior art references referred to herein and would have had the skill and expertise to draw reasonable inferences from these references.  (Muzzio Opening Report at ¶ 65.)  I agree with Dr. Muzzio's description of a POSA, and as of March 14, 2022, and indeed well before then, I was a person of at least ordinary skill in the art relevant to the '721 patent.

66.    I have reviewed Dr. Smith's Opening Report and nowhere in it does she provide a definition of a POSA as she understands it, nor does she refer to any POSA definition at all.  I understand that the patent infringement inquiry, starting with the meaning of the words of a patent claim, should be considered from the perspective of a POSA.  I find this omission by Dr. Smith casts doubt onto the analysis and opinions appearing in the Opening Report.  For example, I do not agree with her somewhat unusual assertions and opinions concerning the common excipient MCC in the Aurobindo ANDA Product and, in my opinion, a POSA would not either.

67.    Dr. Smith appears to have significant credentials with experience and training in solid state and analytical chemistry.  Dr. Smith, however, appears to lack any real experience or

training in the research and development of pharmaceutical formulations including, but not limited to, the manufacturing processes of such formulations and the selection and use of ingredients in such formulations.  It does not appear that Dr. Smith is, or was in March 2022, a POSA under the definition of Dr. Muzzio.[5]

## VII.    THE '721 PATENT

### A.    Claims

68.    The '721 patent issued with 13 claims, claims 1 and 4 being independent claims.  I understand that Plaintiff has asserted claims 1-7 and 9-13.  These claims are set forth in full, below:

> 1. A pharmaceutically acceptable capsule for orally delivering 34 mg of pimavanserin to a patient, wherein the capsule has a size 3 or 4 capsule shell that contains a blended pimavanserin composition comprising granules comprising 40 mg pimavanserin tartrate and optionally one or more pharmaceutically acceptable excipients; and one or more blending excipients; wherein the bulk density of the granules is >0.4 g/ml as determined by USP<616>, method 1.

> 2. The pharmaceutically acceptable capsule of claim 1, wherein one of the blending excipients is selected from the group consisting of magnesium stearate, sodium stearyl fumarate, colloidal silicon dioxide, and talc.

> 3. The pharmaceutically acceptable capsule of claim 1, wherein the blended pimavanserin composition has a D90 particle size distribution of 60-450 μm as measured using laser scattering particle size analysis.

> 4. A pharmaceutically acceptable capsule for orally delivering 34 mg of pimavanserin to a patient, wherein the capsule has a capsule shell with a capsule shell size 3 or 4, that encapsulates a blended pimavanserin composition comprising granules comprising 40 mg pimavanserin tartrate and one or more pharmaceutically acceptable excipients; and wherein the bulk density of the granules is >0.4 g/ml as determined by USP<616>, method 1.

> 5. The pharmaceutically acceptable capsule of claim 4, wherein the capsule shell is a hard shell size 4 capsule.

---

[5] At the time of this report, I am unaware of Dr. Smith's view of the qualifications and level of skill of the person of ordinary skill in the art because these items are not discussed in her Infringement Report dated May 2, 2024. I reserve the right to supplement any portion of this report as a result and based on any statements by Dr. Smith regarding the level of skill of a POSA.

6. The pharmaceutically acceptable capsule of claim 1, wherein one of the blending excipients is selected from the group consisting of a cellulose, a polysaccharide, and polyvinylpyrrolidone.

7. The pharmaceutically acceptable capsule of claim 1, wherein one of the blending excipients is selected from the group consisting of microcrystalline cellulose, silicified microcrystalline cellulose, hydroxypropyl cellulose, hydroxypropyl methyl cellulose, hydroxymethyl cellulose, and a lactose cellulose blend.

9. The pharmaceutically acceptable capsule of claim 1, wherein the blending excipients comprise microcrystalline cellulose and magnesium stearate.

10. The pharmaceutically acceptable capsule of claim 1, wherein the blending excipients are selected from the group consisting of filler/diluents, lubricants and mixtures thereof.

11. The pharmaceutically acceptable capsule of claim 1, wherein the granules comprise a pharmaceutically acceptable excipient which is a binder.

12. The pharmaceutically acceptable capsule of claim 10, wherein the binder is selected from the group consisting of cellulose, methyl cellulose, polyvinylpyrrolidone and polyethylene glycol.

13. The pharmaceutically acceptable capsule of claim 4 wherein the pharmaceutically acceptable excipients comprise a binder.

('721, 24:4-63.)[6]

## B.    Specification

69.    The '721 patent is titled "Formulations of Pimavanserin" and issued on September 27, 2022 from U.S. Patent Application No. 17/693,830. The '721 patent claims priority from U.S. Provisional Application No. 62/552,300 which was filed on August 30, 2017 ("the '300 provisional"). I make no opinion here whether the '721 patent is entitled to any of its priority claims or parent applications.  I have not been asked to consider or opine on the validity of the '721 patent

---

[6] I note that a certificate of correction was submitted regarding claims 12 and 13 of the '721 patent and that Dr. Smith references this in footnotes 2 and 3 of her report.  The verbiage at issue referenced in these footnotes for claims 12 and 13 does not affect the substance of my opinions.

and have not done so.

### i.    The Named Inventors Described Certain Excipients

70.    The "Detailed Description" section of the '721 patent starts off with a "Definitions" section.  (*Id.* at 2:31-33.)  The definition section starts out, "Unless defined otherwise, all technical and scientific terms used herein has the same meaning as is commonly understood by one of ordinary skill in the art."  (*Id.* at 2:34-36.)

71.    The '721 patent states, "As used herein, a 'diluent', 'bulking agent' and 'filler' refer to an ingredient (excipient) in a pharmaceutical composition that lacks pharmacological activity but may be necessary or desirable, e.g., to enhance or improve the properties of the pharmaceutical blend for manufacturing or physiological purposes.  For example, a diluent or filler may be used to increase the bulk of a potent drug whose mass is too small for manufacture or administration."  (*Id.* at 3:55-62.)

72.    The '721 patent also describes a binder as; "[a]s used herein, a 'binder' is an excipient holding the ingredients together, and forming granules or tablets with the required mechanical strength, and may give volume to the formulation."  (*Id.* at 3:63-66.)  The description of a binder continues:

> Specific examples of binders are mono-, di- and poly-saccharides and derivatives thereof; sugar alcohols such as xylitol, sorbitol or maltitol; protein, such as; synthetic polymers, such as polyvinylpyrrolidone (PVP), polyethylene glycol (PEG). Binders are classified according to their application, e.g. solution binders are dissolved in a solvent (for example water or alcohol may be used in wet granulation processes). Examples include gelatin, cellulose, cellulose derivatives, polyvinylpyrrolidone, starch, sucrose and polyethylene glycol. Dry binders are added to the powder blend, either after a wet granulation step, or as part of a direct powder compression (DC) formula. Examples include cellulose, methyl cellulose, polyvinylpyrrolidone and polyethylene glycol.

(*Id*. at 3:66-4:13.)

ii.    **The Named Inventors Described Granules and Granulation**

73.    The '721 patent provides a specific, quoted meanings for the following term.

> The term "granulation" as used herein, and as conventionally used in the pharmaceutical industry, refers to the act or process in which primary powder particles are made to adhere to form larger, multiparticle entities called granules. *Granules may for example be formed collecting particles together by creating mechanical bonds between them, e.g. by compression or by using a binder. Granulation is extensively used in the manufacturing of tablets and capsules.*

(*Id.* at 4:43-50) (emphasis added).

74.    The '721 patent further discloses what it refers to as, "formulation, granulation, dry milling, blending, and encapsulation of pimavanserin containing novel elements." (*Id.* at 10:39-41) (emphasis added).    The patent continues, stating that, "[s]alient features are that the known granulation technology uses atypical parameters to achieve the desired results.    Spray rate, atomization and quantity of water are examples of atypical parameters used in combination with wet granulation to obtain the targeted properties of pimavanserin formulation disclosed herein." (*Id.* at 10:41-46) (emphasis added).

75.    The patent states, "Prior to the surprising finding that pimavanserin could be successfully wet granulated achieving the targeted improved physical properties (*e.g.* bulk density) without the addition of a binder, and by adding a small, such as 2-15% w/w, *e.g.* 3-10% w/w, 3-8% w/w amount of water to pimavanserin by spraying, many different granulation methods were contemplated and tested…." (*Id.* at 10:54-62.)

76.    The '721 patent goes on to identify experiments, using techniques to achieve the desired pimavanserin compositions, several comparative experiments resulting in unacceptable products were identified.    (*Id.* at 13:33-15:2.)    One of those unacceptable products resulted from twin-screw melt granulation, which does not require the use of organic or aqueous solvents, but does

involve the use of a binder/disintegrant, heat and agitation. (*Id.* at 14:24-35.)

77.    The '721 patent discloses that the present application "describes processes to manufacture capsules of size 4 comprising 5-34 mg. pimavanserin" and that it was "surprisingly found that a 100% pimavanserin high-shear granulation was possible by using only small quantities of water" and associated techniques. (*Id.* at 15:3-46.)  The patent notes that the named inventors demonstrated that a wet granulation technique with appropriate water application combined with a chopper/impeller speed, results in granulated pimavanserin having improved bulk density suitable for filling amounts disclosed herein into capsules of size 4. (*Id.*)

78.    The example(s) given in the '721 patent require, among other things, a high shear granulator and granulation water, *e.g.* 5-8% sprayed at a controlled rate. (*Id.* at 20:9-57.)

   **C.**    **File History**

79.    I have reviewed the file history for the '721 patent, excerpts of which are referenced below.  The application that led to the issuance of the '721 patent was filed on March 12, 2022, Application Number 17/693,830 ("the '830 application"), which claims priority through a chain of continuation patent applications to the provisional patent application number 62/552,300, filed on August 30, 2017. ('721 patent, at cover page (60, (63).)  For the purposes of this report, I have been instructed to assume that the '721 patent is entitled to the August 30, 2017 priority date.

80.    As originally filed, the '830 application contained 17 claims, of which claims 1, 8, and 14 were independent claims.  A preliminary amendment was filed, amending claims 1, 5, and 14, cancelling claims 2-4, 8-13, and 16-17, and adding new claims 18-25.  In response to a nonstatutory double patenting rejection, the applicants for the '830 application filed a terminal disclaimer with respect to U.S. Patent Nos. 10,449,185; 10,449,480; 10,849,891; and copending U.S. Patent Application No. 17/080,731.  The terminal disclaimer was approved by the Examiner on May 17, 2022.

81.     The application received a notice of allowance on June 1, 2022, allowing claim, 5, 7, 14-15, and 18-25, as renumbered containing independent claims 1 and 4.  The '721 patent issued on September 27, 2022.

## VIII.  AUROBINDO'S PRODUCTS DO NOT LITERALLY INFRINGE THE ASSERTED CLAIMS OF THE '721 PATENT

A.     ████████████████████████████████████████████
████████████████████████████████

82.     Dr. Smith opines that Aurobindo literally infringes asserted claims 1-7 and 9-13 of the '721 patent.  (*See e.g.*, Smith Report at ¶¶ 15, 39, 52-59, 103-06, 108-09, 114, 118-19.)[7]  I disagree.  █████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████  The asserted, dependent claims, which depend from either claim 1 or 4, also require this claim limitation and, therefore, Aurobindo's ANDA Product also does not infringe them for all of the same reasons.

83.     For the avoidance of doubt, independent claims 1 and 4 are shown below:

> 1. A pharmaceutically acceptable capsule for orally delivering 34 mg of pimavanserin to a patient, wherein the capsule has a size 3 or 4 capsule shell that contains a blended pimavanserin composition comprising:
> **granules** comprising 40 mg pimavanserin tartrate and optionally one or more pharmaceutically acceptable excipients;
> and one or more blending excipients; wherein the bulk density of the granules is >0.4 g/ml as determined by USP<616>, method 1.

---

[7] ████████████████████████████████████████████
████████████████████████████████████  To the extent Dr. Smith makes such allegations in other paragraphs in her report that are not included here, I do not agree and failure to list them here does not mean that I agree with Dr. Smith, whose opinions and analysis are mistaken and flawed as described herein.

4. A pharmaceutically acceptable capsule for orally delivering 34 mg of pimavanserin to a patient, wherein the capsule has a capsule shell with a capsule shell size 3 or 4, that encapsulates a blended pimavanserin composition comprising:

*granules* comprising 40 mg pimavanserin tartrate and one or more *pharmaceutically acceptable excipients*; and

wherein the bulk density of the granules is >0.4 g/ml as determined by USP<616>, method 1.

(Emphasis added.)

84. ███████████████████████████████████████████

███████████████████████████████████    █████████████████

███████████████████████████████████████████████

████████████████████

    i.    ██████████████████████████████

85. ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████

86. ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████

    ii.    ████████████████████████████████

87. ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████



**iii.** ███████████████████████

88.    ███████████████████████████

███████████████████████████

89.    █████████████████████  █████████████

██████████████████████  ████████████  ████  █

███████████████████████████████

█████████████████  ████  ██████████████  █████  ███████████

███████████████████████████████

████████████████████████  ████  ███████████████

████████████

90.    The  Aurobindo  ANDA  Product  formulation  ████████████████████

███████████████████████████████

███████████████████████████████  The use of two

grades is not uncommon.  The coarser grade promotes flowability of the final blend which is

necessary for consistent capsule filling.  The finer grade likely has better disintegrant properties and

promotes break up of the capsule plugs (disintegration) and helps with dissolution.  The use of the

two grades helps achieve the required blend bulk density, and may also promote better blending and

blend  stability  (reduce  tendency  for  the  blend  to  segregate  during  filling).  This  facilitates

encapsulating the powder into the relatively smaller size 4 capsules.

**iv.** █████████████████████████

91.    ███████████████████████████

███████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████

92.    ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

93.    As a result of the foregoing facts, it is my opinion that the marketing, offer for sale, sale, or use of Aurobindo's ANDA Product would not infringe claims 1 or 4 of the '721 patent.  And, as a result, would not infringe any of the asserted claims that depend from either claims 1 or 4 of the '721 patent.

94.    ███████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████  there can also be no infringement under the doctrine of equivalents.8

95.    The Analysis by Dr. Smith is Unreliable, Contains Numerous Errors and Fails to Prove that Aurobindo's ANDA Product Includes the Claimed Granules

---

8 I do not understand Dr. Smith to have made an argument for infringement under the doctrine of equivalents.  ██████████████████████████████████ ████████████████████████████  Because that claim element is missing from the Aurobindo ANDA Product, it cannot be considered to be equivalent to the claimed subject matter that requires granules comprising 40 mg pimavanserin tartrate, in both claims 1 and 4.  ███████████████ █████████████████████████████████████████████  To the extent that Dr. Smith later tries to argue infringement under the doctrine of equivalents, I reserve the right to respond in full to such arguments.

96.     Dr. Smith relies on various experiments and observations to support her opinions. I disagree with her opinions that rely on these experiments because the experiments contain numerous, serious flaws, fail to show what Dr. Smith concludes, and fail to support her opinions. Nothing Dr. Smith has purported to demonstrate in her experiments, and conclusions based thereon, change my opinion that Aurobindo's ANDA Product contains no granules.

97.     Polarized light microscopy ("PLM") is a contrast-enhancing technique designed to observe and photograph specimens that are visible primarily due to their optically anisotropic character.  Image contrast arises from the interaction of plane-polarized light with a birefringent (or doubly-refracting) specimen to produce two individual wave components that are each polarized in mutually perpendicular planes. ███████████████████████████ ████████████████████████████████████████████████ █████████████████████ (Smith Report, ¶ 58.)   However, Image 10 which was viewed with plane polarized light has no lighter areas, while Images 11 and 12 which were viewed with crossed polarizers show lighter areas on some of the extreme outer edges. ████████████████ ███████████████████████████████████████ Her studies only reveal irregular shaped particles.

98.     Moreover, since ██████ is opaque to light. Light and dark areas are irrelevant. As I discussed above, █████ is made from an aqueous suspension of acid-hydrolyzed wood pulp fibers which is reflected in the uneven nature of these cellulose particles. █████████████ ████████████████████████████████████████ ████████████████████ ████ █████████

99.     ███████████████████████████████████████ ███████████████████████████████████████



100.    In addition, it appears that Dr. Smith did not look at the individual components of the Aurobindo product and compare them. She may not have known the precise grades, but it would have been possible to obtain ███████████████████████ as representative grades. It would have been possible to compare these to the Aurobindo ANDA Product as a control in her microscopy experiments (that would not have made those experiments any more relevant, but perhaps less unreliable).

**B.** ████████████████████████████
████████████

101.    ██████████████████████████████

33



102.

103.

. A POSA

would consider scientific facts and evidence in the ANDA as a whole, not just cherry picking what is clearly imprecise and incorrect nomenclature, as Dr Smith has done. To the extent Dr. Smith relies on such imprecise and incorrect nomenclature, I disagree.

## IX.    CONCLUSION

104.    For all of the foregoing reasons, it is my opinion that marketing, offering for sale, selling or using the Aurobindo ANDA Product would not infringe any claim of the '721 patent asserted against Aurobindo concerning Aurobindo's ANDA Product.

105.    This Report is based on information known to me as of the date I signed this Report, and I reserve the right to amend or supplement this Report based on additional information uncovered in this action, including my review of any expert statements or reports submitted by or on behalf of any of the Plaintiffs. I reserve the right to supplement or amend my opinions in response to any opinions expressed by any of the Plaintiffs' experts, or in light of any additional evidence,

testimony, or other information that may be provided to me after the date of this Report, including at trial. In addition, I expect that I may be asked to testify in response to issues that may be raised in any reports of any of the Plaintiffs' experts, or to issues that may be raised by fact witnesses and technical experts at trial. I also reserve the right to develop materials and exhibits as appropriate for use in helping to demonstrate and explain my opinions if I am asked to testify at trial in the above matter.

Date: June 6, 2024

R Christian Moreton, Ph.D.

# EXHIBIT 3

Case 1:22-cv-01387-GBW    Document 103-18    Filed 11/14/24    Page 70 of 74 PageID #: 2716

8/20/2024    Acadia Pharmaceuticals, Inc. v. Aurobindo Pharma Limited, et al. R. Christian Moreton, M.Sc, Ph.D.
Confidential

**1**

```
          IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF DELAWARE
_____
ACADIA PHARMACEUTICALS INC., )
          Plaintiff,        ) Case No.
v.                          ) 1:22-cv-01387-GBW
AUROBINDO PHARMA LIMITED and ) (Consolidated lead case)
AUROBINDO PHARMA USA, INC., )
          Defendants.        )
_____)
ACADIA PHARMACEUTICALS INC., )
          Plaintiff,        )
v.                          )
MSN LABORATORIES PRIVATE LTD. )
and MSN PHARMACEUTICALS, INC.,)
          Defendants.        )
_____)


                 CONFIDENTIAL

            VIDEO DEPOSITION OF
        R. CHRISTIAN MORETON, M.Sc, Ph.D.
           Tuesday, August 20, 2024




         _____
               DIGITAL EVIDENCE GROUP
            1730 M Street, NW, Suite 812
                Washington, D.C. 20036
                  (202) 232-0646
```

**2**

```
 1              Tuesday, August 20, 2024
 2                   8:57 a.m. EDT
 3
 4
 5
 6
 7      Video Deposition of R. CHRISTIAN MORETON,
 8 M.Sc, Ph.D., appearing at Holland & Knight, 10 St.
 9 James Avenue, #1200, Boston, Massachusetts 02116,
10 held before Dana Welch, a Registered Professional
11 Reporter, Certified Realtime Reporter.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**3**

```
 1 APPEARANCES OF COUNSEL:
 2 Attorneys for Aurobindo Pharmaceuticals and the
 3 Witness:
 4      KRATZ & BARRY LLP
 5      By:  Michael P. Hogan, Esq.
 6      325 Chestnut Street, Suite 876, #259
 7      Philadelphia, Pennsylvania 19106
 8      404.341.6600
 9      mhogan@kratzandbarry.com
10
11 On behalf of the Plaintiffs:
12      PAUL HASTINGS LLP
13      By:  Chad J. Peterman, Esq.
14      Peter Edward Conway, Esq.
15      200 Park Avenue
16      New York, New York  10166
17      212.318.6797
18      chadpeterman@paulhastings.com
19      peterconway@paulhastings.com
20
21 Also present:  Gayle Ashton, Videographer
22
23
24
25
```

**4**

```
 1              I N D E X
 2 WITNESS: R. CHRISTIAN MORETON, M.Sc, Ph.D.
 3 EXAMINATION:                    PAGE:
 4   BY MR. PETERMAN                 6
 5 EXHIBITS MARKED:
 6 NO.  DESCRIPTION                PAGE:
 7 Moreton Exhibit 1, U.S. Patent 11,452,721   18
 8 Moreton Exhibit 2, Rebuttal Expert Report   52
 9 of R. Christian Moreton, Ph.D. on
10 Noninfringement
11 Moreton Exhibit 3, Exhibit B, Materials   54
12 Considered
13 Moreton Exhibit 4, Document Bates labeled   82
14 AURO_PIMAV00002806 - 2901
15
16 NOTATIONS:
17 Designation of the transcript as       110
18 confidential
19 Transcript order               110
20
21
22
23
24
25
```

1 (Pages 1 to 4)

21

1  I've heard the term and I think it's been mentioned
2  in previous litigation cases, but to me it's a
3  legal term that I encounter from time to time.
4      Q.  Do you know if claim 1 or claim 4 in this
5  '721 patent are product-by-process claims?
6      A.  I would have to take counsel's advice on
7  that.



25      Q.  And in connection with prepping for the

22

1  deposition, did you review the court's claim
2  construction order?
3      A.  That I don't recall.
4      Q.  Did you look for definitions of terms in
5  the claim within the specification of the '721
6  patent?
7      A.  Yes.  In general, yes.
8      Q.  And is it your understanding that if a
9  patentee defines a term in the specification, that
10 term -- that definition should be used for
11 interpreting the claims?
12     A.  That's what I've been told by counsel.
13     Q.  And did you apply that in connection with
14 your opinions?
15     A.  Yes, I did.
16     Q.  So you understand that the active
17 ingredient at issue in this case is pimavanserin?
18     A.  The active ingredient, yes, is
19 pimavanserin.  It's actually present as the
20 tartrate salt.
21     Q.  And does the difference between
22 pimavanserin and pimavanserin tartrate play any
23 role in your non-infringement opinion?
24     A.  There's a difference between them.  The
25 pimavanserin is freebased, pimavanserin tartrate is

23

1  the salt form.  They have different -- certain
2  different physical properties, so -- but in
3  general, if the formulation contains pimavanserin
4  tartrate, that's what I focused on.
5      Q.  And Aurobindo's proposed ANDA product
6  contains pimavanserin tartrate, correct?
7      A.  That's correct.
8      Q.  And it contains 40 milligrams of
9  pimavanserin tartrate?
10     A.  Yes.  That's what I've been told.
11     Q.  And you confirmed that by looking at the
12 ANDA?
13     A.  Yes.
14     Q.  Now, in claim 1 of the '721 patent, is
15 there a process limitation that's required in order
16 to infringe claim 1?
17     A.  How do you mean, a "process limitation,"
18 sir?
19     Q.  Is there a manufacturing process that's
20 required in claim 1?
21     A.  The only process limitations are that it
22 requires blended and that they require pimavanserin
23 tartrate granules and some excipients that are all
24 blended in.
25     Q.  So you're reading pimavanserin tartrate

24

1  granules as requiring a specific manufacturing
2  process?
3      MR. HOGAN:  Objection to form of the
4  question, no foundation.
5      You can answer.



8/20/2024                    Acadia Pharmaceuticals, Inc. v. Aurobindo Pharma Limited, et al. R. Christian Moreton, M.Sc, Ph.D.
Confidential

53

1    A. Yes, it does.
2    Q. And did you draft this report?
3    A. I drafted the scientific bits. The
4  counsel made sure the legal bits were correct.
5    Q. And approximately how long did you spend
6  preparing this report?
7    A. I just don't recall.
8    Q. Was it more than 20 hours?
9    A. Like I said, I don't recall.
10   Q. And this report was drafted in response to
11 Dr. Smith's opening report, correct?
12   A. That is correct.
13   Q. And if you look at the last page of
14 Exhibit 2, it's dated June 6, 2024.
15   A. Yes.
16   Q. And is your signature following that?
17   A. Yes.
18   Q. So is June 6, 2024 the time when you
19 signed this report?
20   A. Yes: D-Day.
21   Q. I'm sorry. I missed that.
22   A. D-day.
23   Q. Were you engaged by MSN in connection with
24 this case at all?
25   A. Possibly back in the previous litigation.

54

1    Q. But in this incarnation you're not
2  providing any expert opinion on behalf of MSN?
3    A. Not that I recall, no.
4    Q. Did you speak with attorneys from MSN in
5  connection with preparing your report in Exhibit 2?
6    A. No.
7    Q. Did you speak with Dr. Muzzio in
8  connection with preparing your report?
9    A. No. I have not. I know Dr. Muzzio, but I
10 haven't spoken with him in this report.
11   Q. And to the extent that you are relying
12 upon anything from Dr. Muzzio, that's reflected in
13 your report?
14   A. That is correct, yes.
15   MR. PETERMAN: I just want to hand you and
16 we'll mark as Exhibit 3. This is Exhibit B of your
17 expert report.
18   (Moreton Exhibit 3, Exhibit B, Materials
19 Considered, marked for identification.)
20   Q. Am I correct that this is the list of
21 materials considered in connection with your
22 rebuttal infringement report?
23   A. That is correct.
24   Q. And as far as you're aware, this is a true
25 and correct copy of the materials that you

55

1  considered?
2    A. Yes.
3    Q. And did you review the entire ANDA from
4  Aurobindo?
5    A. No. I reviewed the formulation section.
6    Q. Were those sections that you chose or were
7  those provided to you by counsel?
8    A. Those were sections I chose. There may
9  have been some other sections which were referenced
10 in the formulation section.
11   Q. I'm just going back to your report. Now,
12 in paragraph 29 you state that you understand that
13 certain claims, the claim terms of the '721 patent,
14 have been construed by the court in this matter but
15 those constructions do not alter my opinions here.
16   A. Yes.
17   Q. So why don't the constructions in the
18 court's claim constructions alter the opinions in
19 your report?
20   MR. HOGAN: Object to the form of the
21 question.
22   You can answer.
23   A. Because they were pretty consistent with
24 what I understand.
25   Q. So did you apply your opinions as to what

56

1  claim terms meant or did you apply the court's
2  opinion as to what claim terms meant?
3    MR. HOGAN: Object to the form of the
4  question.
5    You can answer.
6    A. I tried to apply both, made sure that
7  everything was consistent with what I understand.
8    Q. So you say you tried to apply both. You
9  had your own impression of what the terms meant and
10 then you also looked at what the court said?
11   MR. HOGAN: Object to the form of the
12 question.
13   You can answer.
14   A. I looked at what the court said. I
15 examined my understanding of the terms, and if
16 there was anything, I would discuss it with
17 counsel.
18   Q. Are there any instances that you recall
19 where you discussed the meaning of something with
20 counsel as there was a difference between what the
21 court said and what you were thinking?
22   MR. HOGAN: You can answer that "yes" or
23 "no."
24   A. Would you repeat the question, please,
25 sir?

14  (Pages 53 to 56)

57



58

1    Q.  So is that a "yes" or "no"?  Is there a
2  reference to the court's claim construction opinion
3  in the materials that you considered?
4        MR. HOGAN:  Object to the form of the
5  question.
6        You can answer.
7     A.  It says here "Plaintiff's Final
8  Infringement Contentions and Claim Chart Dated
9  April 4th,"  that's not the same thing that you're
10  asking about, is it, sir?
11    Q.  I don't think it is.
12    A.  Okay.
13    Q.  It's a different document.
14    A.  Okay.  I mean, in that case, I don't think
15  I did look at them, but certainly I've discussed
16  with counsel if there was anything in what I was
17  saying that was in contradiction or conflict with
18  the court's definitions.
19    Q.  Okay.  So you asked counsel if there was
20  any conflict between your understanding of the
21  terms and what the court determined the terms
22  meant?
23    A.  Yes.
24        MR. HOGAN:  Object to the form of the
25  question.

59

1    A.  Yes.
2    Q.  And you relied upon counsel saying that
3  there was no difference between the two?
4        MR. HOGAN:  Object to the form of the
5  question.
6        You can answer.
7     A.  If there would have been, we would have
8  discussed it and come to an arrangement -- not an
9  arrangement -- but worked out what I needed to do
10  to continue writing my report.
11    Q.  But you didn't independently verify
12  exactly what the court said for the construction of
13  these terms, correct?
14    A.  No.  I worked through counsel.
15    Q.  Do you know what claim terms of the '721
16  patent have been construed by the court?
17    A.  I don't recall.
18    Q.  Do you know if the court construed
19  granules?
20    A.  Again, I don't recall.
21    Q.  And do you know if the court required a
22  process limitation for either claim 1 or claim 4?
23        MR. HOGAN:  Object to form.
24        You can answer.
25    A.  I don't recall.

60



8/20/2024                    Acadia Pharmaceuticals, Inc. v. Aurobindo Pharma Limited, et al. R. Christian Moreton, M.Sc, Ph.D.
Confidential



61

1    Q. Did the court construe binder in
2  connection with this litigation?
3    A. Again, I don't know the specifics. I
4  don't recall.
5    Q. So directing your attention to paragraph
6  51 of your report, in the first sentence there you
7  state, "While it is apparent that the asserted
8  claims 1 and 4 are directed to formulations of
9  pimavanserin tartrate, the '721 patent makes clear
10  that the method of producing the pim granules
11  comprising 40 milligrams pimavanserin tartrate is
12  novel and critical to the desired product result."
13    Do you see that?
14    A. Yes, I do.

62

4    Q. Is there a particular section of the
5  specification that you're referring to when you
6  state in paragraph 41 regarding the novel and
7  critical method?
8    MR. PETERMAN: Object to form.
9    51, right?
10    MR. PETERMAN: 51.
11    I can restate the question.

63

21    Q. So is it your opinion that Figure 2 of the
22  '721 patent sets forth the process that's required
23  by claims 1 and 4?
24    MR. HOGAN: Object to the form of the
25  question.

64

1    You can answer.

14    MR. HOGAN: Object to the form of the
15  question, no foundation.
16    You can answer.

20    Q. Is it your opinion that claim 1 of the
21  '721 patent is limited to the process shown in
22  Figures 2 and 3?
23    MR. HOGAN: Object to the form of the
24  question.
25    You can answer.

16 (Pages 61 to 64)