## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ACADIA PHARMACEUTICALS INC., | |
| Plaintiff, | |
| v. | C.A. No. 22-1387-GBW |
| AUROBINDO PHARMA LIMITED, et al., | CONSOLIDATED |
| Defendants. | ▆▆▆▆▆▆▆▆▆▆ |
| | **PUBLIC VERSION FILED** |
| | **DECEMBER** 20, 2024 |

James S. Green, Jr., SEITZ, VAN OGTROP & GREEN, P.A., Wilmington, DE; Richard J. Berman, Janine A. Carlan, Bradford C. Frese, Michael Baldwin, ARENTFOX SCHIFF LLP, Washington, DC; Julie A. Vernon, ARENTFOX SCHIFF LLP, Chicago, IL.

*Counsel for Plaintiff*

James D. Taylor, Jr., Jessica M. Jones, Michelle C. Streifthau-Livizos, SAUL EWING LLP, Wilmington, DE; Chad J. Peterman, Bruce M. Wexler, Scott F. Peachman, Peter E. Conway, PAUL HASTINGS LLP, New York, NY; Felix A. Eyzaguirre, PAUL HASTINGS LLP, Houston, TX.

*Counsel for Defendants*

## MEMORANDUM OPINION

November 25, 2024
Wilmington, Delaware

GREGORY B. WILLIAMS
UNITED STATES DISTRICT JUDGE

Pending before the Court is (1) Defendant MSN Laboratories Private Ltd. and Defendant

MSN Pharmaceuticals, Inc.'s (the "MSN Defendants") sealed *Daubert* Motion Regarding Certain

Opinions of Dr. Pamela Smith ("*Daubert* Motion") (D.I. 94), which has been fully briefed (D.I.

D.I. 97; D.I. 98; D.I. 100; D.I. 107[1]); (2) Plaintiff Acadia Pharmaceuticals Inc.'s ("Plaintiff" or

"Acadia") sealed Motion *In Limine* to Preclude Defendants from Rearguing Claim Construction

("MIL #1") (D.I. 101-15), which the Defendants have collectively opposed (D.I. 101-16); and (3)

Acadia's sealed Motion *In Limine* to Preclude Aurobindo from Rearguing Claim Construction

("MIL #2") (D.I. 101-17), which Defendant Aurobindo Pharma Ltd. and Defendant Aurobindo

Pharma USA, Inc. (the "Aurobindo Defendants") have opposed (D.I. 101-18). For the following

reasons, the Court DENIES the MSN Defendants' *Daubert* Motion, DENIES Acadia's MIL #1,

and GRANTS Acadia's MIL #2.

## I.    LEGAL STANDARDS

### A.    *Daubert* Motion

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the U.S. Supreme Court held that Federal

Rule of Evidence 702 creates "a gatekeeping role for the [trial] judge" in order to "ensur[e] that an

---

[1] On September 12, 2024, the MSN Defendants attempted to file their sealed opening brief (and various additional documents) in support of their *Daubert* Motion. However, the opening brief and two of the additional documents only included cover pages. On November 20, 2024, the Court ordered Defendants to refile under seal, and hand deliver to chambers, the opening brief and all supporting documents. D.I. 106. Shortly after on the same day, the MSN Defendants refiled under seal (D.I. 107) and hand delivered. The MSN Defendants had the same issue with their reply brief in support of their *Daubert* Motion (D.I. 98). However, the public version (D.I. 100) contained no redactions, and the Court relies on that version in this Memorandum Opinion.

2

expert's testimony both rests on a reliable foundation and is relevant to the task at hand." 509 U.S.

579, 597 (1993). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. As the Third Circuit has explained:

> Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit. Qualification refers to the requirement that the witness possess specialized expertise. We have . . . [held] that a broad range of knowledge, skills, and training qualify an expert. Secondly, the testimony must be reliable; it must be based on the methods and procedures of science rather than on subjective belief or unsupported speculation; the expert must have good grounds for his o[r] her belief. In sum, Daubert holds that an inquiry into the reliability of scientific evidence under Rule 702 requires a determination as to its scientific validity. Finally, Rule 702 requires that the expert testimony . . . must be relevant for the purposes of the case and must assist the trier of fact.

*Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003) (cleaned up); *Kuhar*

*v. Petzl Co.*, No. 19-cv-3900, 2022 WL 1101580, at *7 (3d Cir. Apr. 13, 2022) (acknowledging the

same trilogy).

Rule 702 "has a liberal policy of admissibility," *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243

(3d Cir. 2008) (citation omitted); *see also United States v. Scripps*, 599 F. App'x 443, 447 (3d Cir.

2015) (same), as "the question of whether the expert is credible or the opinion is correct is generally a

question for the fact finder, not the court," *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1296

(Fed. Cir. 2015). "Vigorous cross-examination, presentation of contrary evidence, and careful

instruction on the burden of proof are the traditional and appropriate means of attacking shaky but

admissible evidence." *Daubert*, 509 U.S. at 596; *see Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d

61, 83 (3d Cir. 2017) (quoting *Daubert*, 509 U.S. at 596). "*Daubert* considerations are less pressing

in the context of a bench trial." *LG Display Co. v. AU Optronics Corp.*, 265 F.R.D. 199, 202 (D. Del. 2010).

"As recognized by the United States Court of Appeals for the Third Circuit, while an expert's methodology is required to pass muster under Rule 702, the data underlying the expert's opinion must pass muster under Rules 104 and 703." *ZF Meritor LLC v. Eaton Corp.*, 646 F. Supp. 2d 663, 666 (D. Del. 2009). Rule 104 provides in part: "The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible." Fed. R. Evid. 104(a). Rule 703 provides:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Fed. R. Evid. 703.

## B.    Motion *in Limine*

A motion *in limine* is designed to "narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions." *Bradley v. Pittsburgh Bd. of Educ.*, 913 F.2d 1064, 1069 (3d Cir. 1990). Motions *in limine* allow the court "to exclude anticipated prejudicial evidence before the evidence is actually offered." *Luce v. United States*, 469 U.S. 38, 40 n.2 (1984). "A motion in limine is appropriate for 'evidentiary submissions that clearly ought not be presented . . . because they clearly would be inadmissible for any purpose.'" *Evolved Wireless, LLC v. Apple Inc.*, No. 15-cv-542-JFB-SRF, 2019 WL 1100471, at *1 (D. Del. Mar. 7, 2019) (citation omitted).

## II.   DISCUSSION

This Discussion has the following Subsections: (1) discussion of the MSN Defendants' *Daubert* Motion; (2) discussion of Acadia's MIL #1; and (3) discussion of Acadia's MIL #2. Each Subsection regards asserted claims of U.S. Patent No. 11,452,721 (the "'721 patent").

### A.   The Court Denies the MSN Defendants' *Daubert* Motion

The MSN Defendants seek to exclude the portions of the expert opinions of Dr. Pamela Smith ("Dr. Smith") "regarding the D90 particle size distribution limitation of claim 3 of [the '721 patent] and associated experiments." D.I. 107 at 1. For the following reasons, the Court denies the MSN Defendants' *Daubert* Motion.

Claim 3 of the '721 patent depends on claim 1 and recites: "The pharmaceutically acceptable capsule of claim 1, wherein the blended pimavanserin composition has a D90 particle size distribution of 60-450 μm as measured using laser scattering particle size analysis." '721 patent, claim 3. This means that the 90th percentile of particle size is between 60 and 450 micrometers. *See* D.I. 107 at 1. To support their assertion of infringement of claim 3, Acadia relies on its expert Dr. Smith and her Expert Report Regarding MSN's Infringement of U.S. Patent No. 11,452,721 ("Dr. Smith's Opening Report") dated May 2, 2024. In particular, Acadia relies on Dr. Smith to contend that the 90th percentile of the accused product's particle size is between 60 and 450 micrometers. D.I. 107-3 Ex. B. Dr. Smith asserts:

> 81.   Improved Pharma also conducted particle size distribution testing on MSN's ANDA Product on September 29, 2021. The contents from 21 capsules . . . [were] hand-carried to Purdue University for testing. The analysis was conducted at Purdue University's Particle, Powder and Compact Characterization Lab, located in the Center for Particulate Products and Processes ("CP3"). Particle size distribution was measured using laser scattering particle size analysis. A Malvern Mastersizer 3000 particle size analyzer was used for the analysis. A solvent-free air dispersion unit Aero S was used to introduce the sample to the analyzer. The analysis was conducted by a CP3 particle size expert and was witnessed by Dr. Stephen Byrn, representing Improved Pharma.

5

82. The contents of the [capsules] were analyzed over two runs: therefore, the results from the two runs were averaged to represent the entire sample. Specifically, the D90 particle size distribution following the average of two runs of the blended pimavanserin composition was determined to be ▮▮▮▮. . . .

83. For the first run, the D90 result of product tested following particle size distribution testing by laser light scattering technology was ▮▮▮▮▮. . . .

84. For the second run, the D90 result of product tested following particle size distribution testing by laser light scattering technology was ▮▮▮▮▮. . . .

85. The average D90 particle size across these two tests performed was ▮▮▮▮ . . .

86. Thus, it is my opinion that this claim limitation is met.

D.I. 107-3 Ex. B ¶¶ 81-86 (citations omitted).

In their *Daubert* Motion, the MSN Defendants contend (1) "Dr. Smith is not qualified to opine on Dr. Byrn's laser light scattering particle size distribution analysis," (2) "Dr. Smith's Opinion is inadmissible because she is relying on impermissible hearsay not reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject," and (3) "Dr. Smith's Opinion and testimony does not fit this case." D.I. 107 at 4-8. Each of these contentions, however, fail.

## 1. That Dr. Smith May Not Be Independently Qualified to Measure Particle Size Distribution is Not Dispositive Here

The MSN Defendants contend that Dr. Smith (1) is "not an expert in particle size analysis," (2) lacks extensive "experience with particle size analysis," (3) did not "know how to properly do the analysis," (4) relied on her colleague, Dr. Stephen Byrn ("Dr. Byrn")[2], to conduct the analysis, (5) did not rely on any literature to ensure the testing was performed correctly, and (6) instead relied on her "trust" of Dr. Byrn and his colleague. D.I. 107 at 4-5 (citations omitted). That Dr.

---

[2] Dr. Byrn is the Chief Science Officer of Improved Pharma and also a Professor of Medicinal Chemistry at Purdue University. *See* D.I. 97 at 1.

Smith may lack sufficient expertise to independently measure particle size distribution, however, is not dispositive if Dr. Smith is entitled to rely on the measurements performed by her colleague, Dr. Byrn.[3]  For the reasons discussed in the next subsubsection of this Memorandum Opinion, Dr. Smith is entitled to rely on the measurements performed by Dr. Byrn.[4]

2.    **The Portions of Dr. Smith's Expert Reports Regarding Particle Size Distribution Are Permissible Because Dr. Smith is Relying on Permissible Hearsay that is Reasonably Relied Upon by Experts in Her Field**

The MSN Defendants contend and, Acadia does not contest, that the statements of Dr. Byrn are hearsay, i.e., statements not made "while testifying at the current trial or hearing" uttered "to prove the truth of the matter asserted" (Fed. R. Evid. 801(c)).  *See* D.I. 107 at 5; D.I. 97.  The dispositive issue before the Court, therefore, is whether Dr. Smith may rely on Dr. Byrn's out of court statements.  The answer is yes.

"Unlike an ordinary witness, *see* Rule 701, an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Daubert*, 509

---

[3] The MSN Defendants admit that "Dr. Smith may be a talented analytical chemist." D.I. 107 at 4.  Indeed, Dr. Smith is the Vice President and Chief Operating Officer of Improved Pharma, a research, consulting, and information company in the pharmaceutical field.  D.I. 97-3 Ex. 2 ¶ 2. In that role, Dr. Smith "lead[s] pharmaceutical solid-state research projects" and "supervise[s] work in Improved Pharma's chemistry research laboratory on analytical methods including microspectroscopy (infrared microspectroscopy, Raman microscopy), polarized light microscopy, hot stage optical microscopy, high-performance liquid chromatography (HPLC), dissolution, differential scanning calorimetry (DSC), and ultraviolet-visible (UV-Vis) spectrophotometry." D.I. 97-3 Ex. 2 ¶ 2.  In the last five years, Dr. Smith has "provided consulting and analytical services to over fifty pharmaceutical companies on a variety of solid-state chemistry and analytical projects." D.I. 97-3 Ex. 2 ¶ 4.  Prior to 2018, she "led over 100 pharmaceutical research projects." D.I. 97-3 Ex. 2 ¶ 5.  Hence, it is unsurprising that the MSN Defendants are "not attacking Dr. Smith's qualifications to testify as an expert in this case in general." D.I. 100 at 1.  Instead, the MSN Defendants protest her reliance on the measurements performed by Dr. Byrn.

[4] In their first argument, the MSN Defendants cite case law interpreting and applying Federal Rule of Evidence 702.  *See* D.I. 107 at 4.  "While Rule 702 focuses on an expert's methodology, Rule 703 focuses on the data underlying the expert's opinion." *In re Paoli R.R. Yard Pcb Litig.*, 35 F.3d at 747.  Since the Court resolves that Dr. Smith may rely on the underlying data under Federal Rule of Evidence 703, the Court limits analysis under Federal Rule of Evidence 702.

U.S. at 592 (citing Fed. R. Evid. 702; Fed. R. Evid. 703).  Again, Federal Rule of Evidence 703 provides:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Fed. R. Evid. 703.

"To determine whether 'an expert's data is of a type reasonably relied on by experts in the field,' the court must 'assess whether there are good grounds to rely on this data to draw the conclusion reached by the expert.'" *Shire ViroPharma Inc.*, 2021 U.S. Dist. LEXIS 61551, at *30 (citing *Montgomery Cnty. v. Microvote Corp.*, 320 F.3d 440, 448 (3d Cir. 2003)).  "Whether experts in the field rely on this type of data" is "part" of the court's analysis. *In re Paoli R.R. Yard Pcb Litig.*, 35 F.3d at 749.  If "the data underlying the expert's opinion are so unreliable that no reasonable expert could base an opinion on them, the opinion resting on that data must be excluded." *Shire ViroPharma Inc.*, 2021 U.S. Dist. LEXIS 61551, at *30.

"Numerous courts have held that reliance on scientific test results prepared by others may constitute the type of evidence that is reasonably relied upon by experts for purposes of Rule of Evidence 703." *Monsanto Co. v. David*, 516 F.3d 1009, 1015 (Fed. Cir. 2008); *see* 4 Weinstein's Federal Evidence § 703.04 (2024) (likewise explaining that courts have consistently held that "[s]cientific theories and test results" are the kinds of facts or data upon which experts in a particular field would reasonably rely).

In *Monsanto*, the expert relied on "seed report tests" (i.e., tests examining what types of seeds were planted in a particular agricultural season) that were "conducted by" the plaintiffs'

8

scientific team, "but not by [the expert] personally." *Monsanto Co.*, 516 F.3d at 1015. The Federal Circuit held that the expert's "reliance on the scientific reports prepared by his team" was "the type of reliance that is reasonable for expert witnesses." *Id.* The expert's "testimony was therefore admissible." *Id.* at 1016.

Here, there are likewise "good grounds to rely on" the data collected by Dr. Byrn and his colleague. *See Shire ViroPharma Inc.*, 2021 U.S. Dist. LEXIS 61551, at *30. Like the expert in *Monsanto*, Dr. Smith relied on "tests" that were "conducted by" Dr. Byrn and his colleague. *See Monsanto Co.*, 516 F.3d at 1015; *see also* D.I. 107-3 Ex. B ¶ 81 ("The analysis was conducted by a CP3 particle size expert and was witnessed by Dr. Stephen Byrn, representing Improved Pharma."). Like the expert's reliance in *Monsanto*, Dr. Smith's "reliance on the scientific [data] prepared by [her] team" is "the type of reliance that is reasonable for expert witnesses." *See Monsanto Co.*, 516 F.3d at 1015. Indeed, "test results" (like the particle size distribution test results here) are the kinds of facts or data upon which experts in a particular field would reasonably rely. *See* 4 Weinstein's Federal Evidence § 703.04 (2024).

Dr. Smith's assertion that her reliance is conventional for a person of ordinary skill in the art corroborates the reasonability of her reliance. *See In re Paoli R.R. Yard Pcb Litig.*, 35 F.3d at 747, 749 ("We have held that . . . if an expert avers that his testimony is based on a type of data on which experts reasonably rely, that is generally enough to survive the Rule 703 inquiry. . . . Whether experts in the field rely on this type of data will simply continue to be a part of the judge's analysis."); *see also* D.I. 97-4 Ex. 3 ¶ 5 (asserting in her reply expert report that a person of ordinary skill in the art "would also have experience working as part of a multi-disciplinary team and would have access to, and draw upon the knowledge of, individuals with comparable levels of education and experience in relevant disciplines that lie outside his or her primary training").

9

The MSN Defendants' contentions against the reasonableness of Dr. Smith's reliance are unavailing. *First*, the MSN Defendants contend that Dr. Smith's reliance "is not 'of a type reasonably relied upon by experts in the particular field' because she is merely acting as a mouthpiece for Dr. Byrn's opinions." D.I. 107 at 5 (emphasis removed). However, the MSN Defendants' contention is circular and not probative.

*Second*, the MSN Defendants quote an out-of-circuit decision to similarly contend: "The *Daubert* test must be applied with due regard for the specialization of modern science. A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty." D.I. 107 at 6 (citing *Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002)). In *Dura*, the Seventh Circuit held:

> An expert witness is permitted to use assistants in formulating his expert opinion, and normally they need not themselves testify. . . .
>
> Analysis becomes more complicated if the assistants aren't merely gofers or data gatherers but exercise professional judgment that is beyond the expert's ken. . . . Now it is common in technical fields for an expert to base an opinion in part on what a different expert believes on the basis of expert knowledge not possessed by the first expert; and it is apparent from the wording of Rule 703 that there is no general requirement that the other expert testify as well. The Committee Notes to the 1972 Proposed Rule 703 give the example of a physician who, though not an expert in radiology, relies for a diagnosis on an x-ray. We too do not "believe that the leader of a clinical medical team must be qualified as an expert in every individual discipline encompassed by the team in order to testify as to the team's conclusions." . . . .
>
> The *Daubert* test must be applied with due regard for the specialization of modern science. A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty. That would not be responsible science. A theoretical economist, however able, would not be allowed to testify to the findings of an econometric study conducted by another economist if he lacked expertise in econometrics and the study raised questions that only an econometrician could answer. If it were apparent that the study was not cut and dried, the author would have to testify; he could not hide behind the theoretician. . . .

> It is apparent from these affidavits that Valkenburg's assistants did not merely collect data for him to massage or apply concededly appropriate techniques in a concededly appropriate manner, or otherwise perform routine procedures, and that he himself lacks the necessary expertise to determine whether the techniques were appropriately chosen and applied.

*Dura Auto. Sys. of Ind., Inc.*, 285 F.3d at 612-15.

The present case is distinguishable from *Dura*. Unlike the expert in *Dura*, who relied on mathematical models, that were in turn based on underlying data, Dr. Smith directly relied on data collected by Dr. Byrn and his colleague. The MSN Defendants contend that Dr. Byrn and his colleague "exercised 'professional judgment' beyond Dr. Smith's knowledge, such as setting up and validating the testing equipment." D.I. 107 at 6-7. But the same contention could be asserted with respect to any method of collecting scientific data and, as discussed above, experts can and regularly rely on scientific data collected by other individuals when preparing their analyses. In particular, that the preparation of Dr. Byrn and his colleague to collect the data here involved the use of a microscope and "a short series of trial runs" (*see* D.I. 107 at 7) does not divest Dr. Smith of the propriety of her Rule 703 reliance. *Cf. Dura Auto. Sys. of Ind., Inc.*, 285 F.3d at 613 ("The Committee Notes to the 1972 Proposed Rule 703 give the example of a physician who, though not an expert in radiology, relies for a diagnosis on an x-ray.").

Moreover, the method of data collection here (laser light scattering) involves a "short" analysis time, "robust methods," "a minimum amount of material," "reproducible" results, and no "calibration." D.I. 107-3 Ex. 9 at 274. As Acadia observes, the MSN Defendants have not adequately "pointed to any references or testimony to support the notion that laser light scattering analysis would be as subjective or complicated as the type of expert opinion provided in *Dura Auto Systems*." *See* D.I. 97 at 9-10; *see* D.I. 100 at 4-5 (acknowledging but pivoting from Acadia's observation).

11

*Third*, the MSN Defendants repeatedly trumpet that Dr. Smith did not "know how to properly do the analysis." *See, e.g.*, D.I. 100 at 3-5; *see also* D.I. 107 at 5-6 (similarly contending that "Dr. Smith's lack of expertise robs her of any basis to opine on what a qualified expert in laser light scattering particle size analysis would consider appropriate to rely on in forming their opinion, including Dr. Byrn's experiments"). However, that Dr. Byrn is better suited for performing the measurements is precisely why Dr. Smith relied on Dr. Byrn. *See* D.I. 97 at 2-3. Endorsing the MSN Defendants' contention wholesale would improvidently preclude any expert from relying on data collected by another individual when the expert does not understand the underlying method of data collection. *See, e.g.*, *Monsanto Co.*, 516 F.3d at 1015.

*Fourth*, the MSN Defendants raise concern with Dr. Smith's reliance on Dr. Byrn's averaging of the two particle size distribution measurements (

). *See* D.I. 107 at 2. However, "the use of averages to evaluate . . . data [] go[es] to the weight given [to] the [data], not its admissibility." *Macdougall v. Am. Honda Motor Co.*, No. 20-cv-56060, 2021 U.S. App. LEXIS 37780, at *3 (9th Cir. Dec. 21, 2021) (nonprecedential).

*Fifth*, the MSN Defendants cite *Allscripts Healthcare, LLC v. Andor Health, LLC* for the proposition that "more specific knowledge is required to support more specific opinions." D.I. 100 at 1 (quoting 21-cv-704-MAK, 2022 WL 3021560, at *23 (D. Del. July 29, 2022)). *Allscripts*, however, is inapposite because the decision did not involve Rule 703. *See* 2022 WL 3021560, at *22-24.

Moreover, since Dr. Smith can rely on the data collected by Dr. Byrn and his colleague on the basis of Rule 703, *Daubert* and its progeny, it is of no concern that "Dr. Byrn had not been disclosed to MSN as a potential expert in this case, has not submitted a report in this case, and is not testifying as to the contents of his opinion, his chosen methodology of averaging the two runs,

12

or his expertise in particle size analysis." *See* D.I. 107 at 2; *see also* Fed. R. Evid. 703 ("If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.").

For the foregoing reasons, Dr. Byrn is hardly "the proverbial man behind the curtain" (*see* D.I. 107 at 2), and Dr. Smith permissibly relied on Dr. Byrn's data in her expert reports.

**3.   The Portions of Dr. Smith's Expert Reports Regarding Particle Size Distribution Fit this Case**

As described above, claim 3 of the '721 patent recites that the particle size distribution of the blended pimavanserin composition is "measured using laser scattering particle size analysis." '721 patent, claim 3.  The specification of the '721 patent explains that particle size distributions referred to in the '721 patent were measured using a "Malvern Mastersizer 2000 LLS PS system using a Scirocco 2000 dry dispersion unit using standard non-GMP conditions, and in a sample size of about 2 -10 g." '721 Patent, 11:49-54.

The MSN Defendants contend that the laser scattering particle size analysis "*should be* 'conducted on [the same] Malvern Mastersizer 2000 LLS PS system using [the same] Scirocco 2000 dry dispersion unit using standard non-GMP conditions, and in [the same] sample size of about 2 -10 g.'" D.I. 107 at 8 (emphasis added).[5]  Since this exact equipment "was not used in testing" the accused product (D.I. 107 at 8 (emphasis removed)), the MSN Defendants contend that Dr. Smith's "testimony on this point cannot be of use to the Court" and does not "fit" the case. D.I. 107 at 8.  The MSN Defendants are wrong.

---

[5] The MSN Defendants do not contend that Dr. Byrn and his colleague did not measure the particle size distribution "using laser scattering  particle size analysis." D.I. 107; *see* D.I. 107-3 Ex. B ¶ 81 (explaining that the D90 measurements were taken "using laser scattering particle size analysis").

Federal Rule of Evidence 702(a) provides that expert testimony must "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Fit "goes primarily to relevance as the testimony must assist the trier of fact to understand the evidence or to determine a fact in issue and have a valid connection to the pertinent inquiry as a precondition to admissibility." *Shure Inc. v. Clearone, Inc.*, No. 19-cv-1343, 2021 WL 7209740, at *1 (D. Del. Oct. 5, 2021). "The standard for fit . . . is 'not high; it is met when there is a clear "fit" connecting the issue in the case with the expert's opinion that will aid the jury in determining an issue in the case.'" *Id.* (citation omitted).

Here, Dr. Smith's testimony regarding particle size distribution will "help the trier of fact to understand the evidence or to determine a fact in issue" (*see* Fed. R. Evid. 702(a)) because particle size distribution between 60 and 450 micrometers is a limitation of claim 3 of the '721 patent. Likewise, Dr. Smith's testimony "fits" the case because it will "assist the trier of fact to . . . determine a fact in issue." *Shure Inc.*, 2021 WL 7209740, at *1. The Court's conclusion comports with the low bar for establishing fit. *See id.*

While the MSN Defendants contend that the particle size distribution measurements *should* have been "conducted on a Malvern Mastersizer 2000 LLS PS system using a Scirocco 2000 dry dispersion unit using standard non-GMP conditions" (D.I. 107 at 8), the '721 patent does not require measurement with such equipment or conditions. As described above, the patent merely explains that the measurements referenced therein were conducted with such equipment and conditions. '721 Patent, 11:49-54.

The MSN Defendants similarly contend: "Dr. Smith offers no basis as to why the laser-light scattering measurement equipment and air dispersion unit that Dr. Byrn used in his particle size distribution analysis would be expected to generate the same results as the equipment specified

in the patent, nor does she have the expertise to do so." D.I. 107 at 8. However, Dr. Smith was not required to do so and, as described above, the '721 patent does not require measurement with the older system.

In conclusion, the Court will not exclude the portions of Dr. Smith's expert reports regarding particle size distribution because her team employed an updated version of the equipment that was referenced but not required by the '721 patent. Any concern about the credibility of the data collected by the equipment used by Dr. Byrn and his colleague or the weight that should be afforded it are issues of credibility and weight to be determined by the fact-finder as opposed to issues of admissibility. *Compare In re Paoli R.R. Yard Pcb Litig.*, 35 F.3d at 748 ("We now make clear that it is the judge who makes the determination of reasonable reliance . . . .") *with PNC Fin. Servs. Grp., Inc. v. Plaid Inc.*, No. 20-cv-1977, 2024 U.S. Dist. LEXIS 140018, at *37, *40 (W.D. Pa. Aug. 7, 2024) (recognizing another court's conclusion "that the plaintiffs' contention that the survey data were unreliable was a credibility determination best reserved for cross examination at trial" and likewise holding that "criticisms about Dr. Chakraborty's inexperience with survey design are best reserved for cross examination at trial"). Moreover, the MSN Defendants or their non-infringement expert could have collected and produced their own competing particle size distribution measurements and they could have collected these measurements with the Malvern Mastersizer 2000 or other equipment of their choosing. They have apparently elected not to do so. *See* D.I. 97 at 7 n.4.

## B.    The Court Denies Acadia's MIL #1

Acadia's MIL #1 seeks to preclude Defendants' expert, Dr. Fernando J. Muzzio ("Dr. Muzzio") from "rearguing claim construction." D.I. 101-15. For the following reasons, the Court denies MIL #1.

Claims 1 and 4 of the '721 patent" are at issue. Claim 1 recites:

15

1. A pharmaceutically acceptable capsule for orally delivering 34 mg of pimavanserin to a patient, wherein the capsule has a size 3 or 4 capsule shell that contains *a blended pimavanserin composition comprising:*

> *__granules comprising 40 mg pimavanserin tartrate__ and optionally one or more pharmaceutically acceptable excipients;*
>
> *and one or more blending excipients*; wherein the bulk density of the granules is >0.4 g/ml as determined by USP<616>, method 1.

'721 patent, claim 1 (emphases added to show the phrases disputed in the parties' Joint Claim Construction Brief (D.I. 39), wherein the parties disputed not only relatively smaller phrases within relatively larger phrases, but also those relatively larger phrases). Claim 4 recites:

4. A pharmaceutically acceptable capsule for orally delivering 34 mg of pimavanserin to a patient, wherein the capsule has a capsule shell with a capsule shell size 3 or 4, that encapsulates *a blended pimavanserin composition comprising:*

> *__granules comprising 40 mg pimavanserin tartrate__ and one or more pharmaceutically acceptable excipients*; and
>
> wherein the bulk density of the granules is >0.4 g/ml as determined by USP<616>, method 1.

'721 patent, claim 4 (emphases added to show the phrases disputed in the parties' Joint Claim Construction Brief (D.I. 39), wherein the parties disputed not only relatively smaller phrases within relatively larger phrases, but also those relatively larger phrases).

The specification describes "[c]omparative experiments resulting in unacceptable products." '721 patent, 13:33-34. The specification explains that contrary to these "comparative experiments the present application describes processes to manufacture capsules of size 4 comprising 5-34 mg pimavanserin." '721 patent, 15:3-5.

In the Join Claim Construction Brief, Defendants contended:

> The specification . . . discloses comparative experiments resulting in *unacceptable* products. In contrast to such "unacceptable products," the specification again discloses the invention, which would presumably generate acceptable products, as

16

involving a wet granulation process with "a small quantity of water" conducted on pimavanserin API alone. (Ex. 9, '721 patent at cols. 13-15).

. . .

[T]he foundation of the claimed subject matter is 40 mg pimavanserin tartrate granulated *alone*; that foundation is a limitation of all issued claims of the '721 patent.

D.I. 39 at 18-19, 42 (second emphasis added).  The Court, however, held that "Acadia did not clearly disavow granules containing both pimavanserin and excipients." *Acadia Pharms. Inc. v. Aurobindo Pharma Ltd.*, No. 22-cv-1387-GBW, 2023 U.S. Dist. LEXIS 221662, at *11 (D. Del. Dec. 13, 2023).  The Court's claim constructions are reproduced below.

| Term No. | Claim Term | Court's Construction |
|---|---|---|
| 1 | "A blended pimavanserin composition comprising: granules comprising 40 mg pimavanserin tartrate and optionally one or more pharmaceutically acceptable excipients; and one or more blending excipients"  '721 patent, claim 1 | Plain and ordinary meaning; an extra-granular component is not required |
| 2 | "A blended pimavanserin composition comprising: granules comprising 40 mg pimavanserin tartrate and one or more pharmaceutically acceptable excipients"  '721 patent, claim 4 | Plain and ordinary meaning; an extra-granular component is not required |
| 3 | "Granules comprising 40 mg pimavanserin tartrate"  '721 patent, claims 1 and 4  "Granules comprising 40 mg pimavanserin tartrate and optionally one or more pharmaceutically acceptable excipients" | Plain and ordinary meaning; the scope of the term granule includes granules granulated with pimavanserin and excipients |

| | '721 patent, claim 1 | |
| | | |
| | "Granules comprising 40 mg pimavanserin tartrate and one or more pharmaceutically acceptable excipients" | |
| | | |
| | '721 patent, claim 4 | |

*Id.* at *5-6.

On May 2, 2024, Dr. Muzzio submitted his Opening Expert Report Regarding U.S. Patent No. 11,452,721 ("Dr. Muzzio Opening Report"). D.I. 101-16 Ex. A. On June 7, 2024, Dr. Steven R. Little ("Dr. Little") submitted his Responsive Expert Report Concerning U.S. Patent No. 11,452,721 ("Dr. Little Responsive Report"). D.I. 101-15 Ex. 2 at 1. On June 27, 2024, Dr. Muzzio submitted his Reply Expert Report Regarding U.S. Patent No. 11,452,721 ("Dr. Muzzio Reply Report"). D.I. 101-15 Ex. 2. Dr. Muzzio asserted in his Reply Report:

101. In paragraph 211, Dr. Little states "[t]he original claims of the application leading to the '721 Patent would have further confirmed a POSA's reading of these disclosures, and consequently, a POSA's understanding of what 'the joint inventors regarded as their invention.'" He further states, "[t]he first four original claims broadly recite '[a] capsule comprising 5-34 mg pimavanserin, or a pharmaceutically acceptable salt thereof ... wherein the capsule is of size 3 or 4 ... wherein the capsule is a two-piece capsule,' and 'further comprising one or more pharmaceutically acceptable excipient(s) selected from the group consisting of a filler, a binder, and a lubricant.' (WO2019/046167 at Claims 1-4 (Mar. 7, 2019).)" But Dr. Little's assertion is beside the point, as the original claims do not recite granules, and could read on dry powder blends of pimavanserin, or even crystalline pimavanserin tartrate by itself, that was hand-filled into capsules. **Rather, as addressed above in paragraphs 91-94, the issued claims recite granules, granules must be made by granulation processes, and the comparative experiments define granulation processes that resulted in unacceptable products, i.e., unacceptable granules, and thus would be unacceptable for use in a "pharmaceutically acceptable capsule" that is to contain granules.**

102. In other words, my opinion is not that **the claims encompass subject matter the inventors expressly disclaimed** simply because the granules recited in the claims can encompass pimavanserin tartrate and one or more pharmaceutically acceptable excipients. My opinion is that, unless the "pharmaceutically acceptable capsule" language operates to somehow exclude the unacceptable granulations

18

from the scope of claims 1 and 4 (and thus the remaining claims), then claims 1 and 4 read on the unacceptable granules as well as the **acceptable granules of pimavanserin alone**. And thus, while prior patent claims within the same patent family distinguished the recited pimavanserin granules from the comparative examples on the basis that they were granulations of pimavanserin alone, without excipients, the '721 patent claims offer no basis to distinguish the granules comprising pimavanserin recited in the claims from the comparative experiments. And Dr. Little provides no opinion to the contrary, except with respect to claim 3.

D.I. 101-15 Ex. 2. ¶¶ 101-02 (emphases added to show the statements from Dr. Muzzio's Reply Report that Acadia flags).

In MIL #1, Acadia contends that Dr. Muzzio, by and through the language in his Reply Report that is reproduced above, is inappropriately "resurrecting Defendants' specification disavowal argument" and "seeking to contravene the Court's finding that the construed terms are not explicitly limited or redefined by the specification." D.I. 101-15 at 1. In response, Defendants contend that Dr. Muzzio is not attempting to resurrect Defendants' specification disavowal argument and contravene the Court's claim construction. D.I. 101-16 at 1. Rather, "Dr. Muzzio [is relying] on the construction for his opinion that the asserted claims of the '721 patent are invalid under 35 U.S.C. § 112(b)." D.I. 101-16 at 1.

In other words, it does not appear that Dr. Muzzio is attempting to re-litigate the same claim constructions issues that were before this Court last year. Instead, Dr. Muzzio is contending that claims 1 and 4 of the '721 patent cover products that the specification has described as "unacceptable." As such, Dr. Muzzio contends that claims 1 and 4 of the '721 patent are invalid. D.I. 101-15 Ex. 2. ¶¶ 101-02; *also* D.I. 101-16 at 2 ("Dr. Muzzio also opines that if the claims do not exclude the specification's 'unacceptable products' from the scope of the claims, the claims are invalid for encompassing these 'unacceptable products.'" (citation omitted)).

Dr. Muzzio admits, however, that his invalidity contention is not feasible if "the 'pharmaceutically acceptable capsule' language operates to somehow exclude the unacceptable

granulations from the scope of claims 1 and 4." D.I. 101-15 Ex. 2. ¶ 102. In other words, Dr. Muzzio contends that his invalidity contention relies upon his implicit construction that "pharmaceutically acceptable capsule" does not "exclude the unacceptable granulations from the scope of claims 1 and 4." *See* D.I. 101-15 Ex. 2. ¶ 102. The Court notes that Dr. Muzzio's invalidity contention appears to rest upon the broader finding that the "unacceptable" products are encompassed by claims 1 and 4 of the '721 patent.

As Defendants observe, the Court was not asked to resolve this underlying claim construction issue. D.I. 101-16 at 3 ("Further, the Court has not ruled on whether the 'comparative experiments' were disclaimed."). Insofar as such construction becomes necessary (*e.g.*, if the Court were to credit Defendants' invalidity contention), the Court will order the parties in post-trial briefing to set forth their proposed constructions regarding whether claims 1 and 4 of the '721 patent encompass the "unacceptable" products discussed in the specification. *See Cambridge Mobile Telematics, Inc. v. Zendrive, Inc.*, No. 22-cv-1260-RGA, 2023 U.S. Dist. LEXIS 132093, at *20 (D. Del. July 28, 2023) (explaining that "a more fulsome construction of the terms [was] unnecessary as the proposed constructions [did] not change" the "analysis").

For the foregoing reasons, the Court denies Acadia's MIL #1.

## C.    The Court Grants Acadia's MIL #2

Acadia's MIL #2 seeks to preclude Defendant Aurobindo's expert Dr. R. Christian Moreton ("Dr. Moreton") from "rearguing claim construction." D.I. 101-17. For the following reasons, the Court grants Acadia's MIL #2.

Claims 1 and 4 of the '721 patent are again at issue. Plaintiff's expert Dr. Smith prepared an expert report dated May 2, 2024 ("Dr. Smith's Opening Report") regarding infringement. D.I. 101-17 Ex. 2 at 1. Dr. Moreton prepared a non-infringement rebuttal report dated June 6, 2024 ("Dr. Moreton's Rebuttal Report"). D.I. 101-17 Ex 2.

In his Rebuttal Report, Dr. Moreton contended:

███████████████████████████████████████████████████████████
██████████████ This is compared to the '721 patent, which claims, allegedly a
novel, and completely different process for preparing the claimed granules
comprising 40 mg pimavanserin tartrate. ████████████████████████
███████████████████████████████████████████████████████████
██████████████████████████████████████
███████████████████████████████████████

. . .

While it is apparent that the asserted claims 1 and 4 are directed to formulations of
pimavanserin tartrate, the '721 patent makes clear that the method of producing the
claimed granules comprising 40 mg pimavanserin tartrate is novel and critical to
the desired product result. . . .

Notably, ██████████████████████████████████████████████████
███████████████████████████████████████████████████████████
██████████████████, like the method used to make the granules claimed in
the '721 patent. In addition, ████████████████████████████████████
██████████████████ like the method used to make the granules claimed in
the '721 patent.

D.I. 101-17 Ex. 2 ¶¶ 5, 51, 59.

Acadia seeks to preclude Dr. Moreton from raising these contentions during trial. D.I. 101-

17. As Acadia observes, "claims 1 and 4 of the '721 patent ████████████████████

███████████████████ ██████████████████████████████ D.I. 101-17 at

2. Indeed, Dr. Moreton explained during his deposition that his infringement "████████████

███████████████████████████████████████████████" D.I. 101-17 Ex. 3 at 63:4-

5.

Since the asserted claims are not product-by-process claims and do not otherwise involve

any process limitations, and since Dr. Moreton admits ████████████████████████

████████████████████" any testimony or contention from Dr. Moreton or Defendants during

the upcoming trial in this case concerning the process language quoted above would be an

21

"unnecessary trial interruption[]." *Bradley*, 913 F.2d at 1069.  For these reasons, the Court will grant Acadia's MIL #2 and preclude Dr. Moreton from rearguing claim construction during his testimony.

## III.   CONCLUSION

For the foregoing reasons, the Court DENIES the MSN Defendants' *Daubert* Motion, DENIES Acadia's MIL #1, and GRANTS Acadia's MIL #2.

22