**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| ACADIA PHARMACEUTICALS INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 1:22-cv-01387-GBW |
| | ) | (Consolidated; Lead Case) |
| AUROBINDO PHARMA LIMITED, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

**DEFENDANTS' OPENING POST-TRIAL BRIEF**

## <u>TABLE OF CONTENTS</u>

I.   INTRODUCTION ............................................................................................. 1

II.  THE ASSERTED CLAIMS ARE OBVIOUS OVER "NUPLAZID TABLETS" IN
     VIEW OF RAGNAR-TOLF ............................................................................ 1

     A.   Wet granulation with excipients is a very common and long-known
          technique. ............................................................................................. 1

     B.   Acadia's Nuplazid tablets were on the market first. ............................... 2

     C.   Acadia recognized the problems with the pimavanserin tablets. ............ 3

     D.   Nuplazid Tablets discloses administering 34 mg/day of pimavanserin to
          treat Parkinson's disease psychosis. ..................................................... 3

     E.   A POSA would have been motivated to modify Nuplazid Tablets to
          achieve the Asserted Claims with a reasonable expectation of success. ... 3

          1.   There is no dispute that a POSA would have motivation to modify
               Nuplazid Tablets to boost swallowability and decrease the number of pills. ........ 3

          2.   A POSA would have been motivated to use a size 3 or 4 capsule. ............. 4

          3.   A POSA would have looked to Ragnar-Tolf to design a small capsule
               containing the full daily dose of pimavanserin, with a reasonable expectation of
               success. ......................................................................................... 5

     F.   Dr. Little failed to rebut the *prima facie* obviousness of the Asserted
          Claims. ................................................................................................ 6

III. THE ASSERTED CLAIMS ARE INVALID UNDER 35 U.S.C. § 112. ............. 9

     A.   The Asserted Claims are invalid under 35 U.S.C. § 112(b) as indefinite, or
          for claiming that which the inventors did not regard as their invention. ............ 9

          1.   The term "pharmaceutically acceptable capsule" is indefinite because the
               specification does not provide a POSA with reasonable certainty regarding what
               goes into making a capsule "pharmaceutically acceptable." ................... 9

          2.   If the term "pharmaceutically acceptable capsule" has the plain and
               ordinary meaning that Dr. Little proposed, the Asserted Claims read on the
               comparative examples and are invalid for claiming that which the patentees did
               not regard as their invention. .........................................................11

     B.   The Asserted Claims are invalid under 35 U.S.C. § 112(a) as lacking
          written description and enablement. ................................................... 12

          1.   The specification does not describe granules including the full scope of
               "pharmaceutically acceptable excipients." .......................................... 12

2.    The specification fails to describe or enable pimavanserin granules having the full scope of bulk densities greater than 0.4 g/ml, which causes invalidity under both written description and enablement requirements. ............................ 14

IV.  CONCLUSION ................................................................................................................ 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen Eng'g Corp. v. Bartell Indus., Inc.*,
  299 F.3d 1336 (Fed. Cir. 2002).................................................................................9, 11

*Ariad Pharms., Inc. v. Eli Lilly & Co.*,
  598 F.3d 1336 (Fed. Cir. 2010)......................................................................................14

*Datamize, LLC v. Plumtree Software, Inc.*,
  417 F.3d 1342 (Fed. Cir. 2005)......................................................................................10

*Graham v. John Deere Co.*,
  383 U.S. 1 (1966).............................................................................................................8

*Intellectual Ventures I v. T-Mobile USA*,
  902 F.3d 1372 (Fed. Cir. 2018)......................................................................................10

*Janssen Pharms., Inc. v. Teva Pharms. USA, Inc.*,
  97 F.4th 915 (Fed. Cir. 2024)...........................................................................................8

*Juxtacomm-Texas Software, LLC v. Axway, Inc.*,
  No. 6:10CV011, 2012 WL 7637197 (E.D. Tex. July 5, 2012)................................................12

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
  572 U.S. 898 (2014).........................................................................................................9

*Purdue Pharma L.P. v. Accord Healthcare, Inc.*,
  No. 2023-1953, 2024 WL 5244764, at *6 (Fed. Cir., Dec. 30, 2024).......................................8

*Tronzo v. Biomet, Inc.*,
  156 F.3d 1154 (Fed. Cir. 1998)......................................................................................13

**Statutes**

35 U.S.C. §103.....................................................................................................................1

35 U.S.C. §112......................................................................................................... *passim*

## TABLE OF ABBREVIATIONS

Unless otherwise stated, the abbreviations below have the meanings ascribed to them in the right-hand column throughout this and MSN's post-trial brief.

| ABBREVIATION | MEANING |
|---|---|
| The '721 patent | U.S. Patent No. 11,452,721 (JTX9) |
| The '480 patent | U.S. Patent No. 10,646,480 (DTX-215) |
| The '891 patent | U.S. Patent No. 10,849,891 (DTX-216) |
| API | Active pharmaceutical ingredient |
| FOF | Defendants' Post-Trial Findings of Fact (being filed with this brief). |
| POSA | Person of ordinary skill in the art |
| Nuplazid Tablets | Prescribing Information for Nuplazid Tablets (Apr. 29, 2016) (JTX12) |
| Ragnar-Tolf | U.S. Pre-Grant Publication No. 2007/0264330 to Ragnar-Tolf, et al. (November 15, 2007) (JTX11) |
| Tr. | Trial Transcript |

## I.    **INTRODUCTION**

This case is about Acadia taking the patent system too far. In its effort to foreclose generic competition for its Nuplazid pimavanserin capsule product, Acadia obtained the '721 patent. But this attempt to cover MSN's and Aurobindo's proposed generic versions of pimavanserin capsules overshoots; the patent is grossly overbroad and therefore invalid. Acadia has some earlier patents covering its pimavanserin capsule product, the '480 and '891 patents, and those patents required granulations of pimavanserin alone—that is, granulating pimavanserin *without* any additional inactive ingredients known as excipients. FOF, ¶ 2. MSN and Aurobindo each developed their own innovative pimavanserin formulations that *included* excipients in the granules, and therefore did not infringe these first patents. FOF, ¶ 3. So Acadia sought and obtained broader claims in the '721 patent, which cover granules of pimavanserin *with* excipients. FOF, ¶ 4. But the Asserted Claims are so broad that they are invalid under 35 U.S.C. §103 over the prior art; and under 35 U.S.C. §112 for lack of written description, lack of enablement and for failing to claim what the inventors stated was their actual invention—pimavanserin granulated alone, without any other ingredients.

The Asserted Claims are invalid; the Court should issue judgment in Defendant's favor.

## II.    **THE ASSERTED CLAIMS ARE OBVIOUS OVER "NUPLAZID TABLETS" IN VIEW OF RAGNAR-TOLF**

The Asserted Claims cover a pharmaceutically acceptable capsule, having a size 3 or 4 capsule shell, that holds granules comprising 40 mg pimavanserin tartrate and one or more pharmaceutically acceptable excipients, where the bulk density of the granules is greater than 0.4 g/ml. FOF, ¶ 6. This alleged invention was obvious in light of what was known, as discussed below.

### A.    **Wet granulation with excipients is a very common and long-known technique.**

Generally, granules are made by a process known as granulation, in which smaller particles stick together into larger particles. FOF, ¶ 8. The most common granulation process is wet

granulation, which involves combining the active ingredient with a liquid, like water or alcohol, and also powder excipients (such as "binders") in order to build the larger particles. *Id*. The resulting granules are used to make final dosage forms like capsules or tablets. *Id.*

A POSA knew that granulation is useful to improve the flow of the starting material, which helps when filling the material into capsules or compressing the material into tablets. FOF, ¶ 9. A POSA also knew that granulation is useful to increase the bulk density of the starting material, which allows more material to fit into a smaller space. *Id*. In fact, based on the known bulk density of a material, a POSA knew exactly how much material could fit into certain capsule sizes. *Id.*. So measuring the initial bulk density of the material and altering the bulk density to fit within a certain capsule size was routine practice in pharmaceutical development. FOF, ¶ 10.

Raw pimavanserin API was known to be a "bad behaving material," with a low bulk density, poor flowability and a tendency to clump. FOF, ¶ 17. In light of those characteristics, the prior art explained how to wet granulate pimavanserin with binder excipients to increase the bulk density and flowability of the material. FOF, ¶ 27. Indeed, a POSA knew from the prior art that the bulk density of the pimavanserin API could be increased from 0.294 g/ml to about 0.6 g/ml by wet granulating pimavanserin API with ethanol and binder excipients. *Id*.

**B.     Acadia's Nuplazid tablets were on the market first.**

Acadia's initial pimavanserin product, also called Nuplazid and approved in 2016, was a tablet made with pimavanserin and well-known binder excipients. FOF, ¶ 11. The package insert for the product, "Nuplazid Tablets," provided a lot of detail about pimavanserin and its use, for example:  the tablets each contained 20 mg of pimavanserin tartrate, which is equivalent to 17 mg of pimavanserin; patients were instructed to take two tablets together, once per day, for a daily dose of 40 mg pimavanserin tartrate (34 mg of pimavanserin); and the tablets were used to treat Parkinson's disease psychosis, a condition that mainly affects elderly patients. FOF, ¶¶ 12–13.

2

C.    **Acadia recognized the problems with the pimavanserin tablets.**

Elderly patients in general, and Parkinson's disease patients in particular, have a high "pill burden" (the daily number of pills the patient has to take) and a tendency to fail to comply with their dosing regimen. FOF, ¶ 16. In addition, elderly and particularly Parkinson's disease patients have difficulty swallowing their medicines, which also leads to non-compliance. *Id.* Unfortunately, the Nuplazid tablets required taking two tablets at a time, so a POSA would have been motivated to reduce the pill burden and enhance swallowability to increase compliance. FOF, ¶ 17. Indeed, Acadia's expert, Dr. Little, admitted that a POSA would have understood this advantage of administering the full daily dose of pimavanserin as a single pill. Tr., 572:12-22.

Recognizing these issues, Acadia hired Catalent, a third party pharmaceutical development company, to develop pimavanserin capsules, with the goal to produce small sized capsules, each containing the full daily dose of pimavanserin. FOF, ¶ 15. Catalent proposed wet granulating the pimavanserin API to increase the bulk density high enough to fill size 3 or 4 capsules with the full daily dose of pimavanserin. *Id.* Catalent's work is reflected in the '721 patent. *Id.*

D.    **Nuplazid Tablets discloses administering 34 mg/day of pimavanserin to treat Parkinson's disease psychosis.**

The Nuplazid Tablets package insert was published in April 2016. FOF, ¶ 12. Nuplazid Tablets discloses white, rounded tablets containing 20 mg of pimavanserin tartrate (17 mg of pimavanserin). FOF, ¶ 13. The recommended dose is 34 mg pimavanserin (two tablets once per day), for treatment of Parkinson's disease psychosis. *Id.*

E.    **A POSA would have been motivated to modify Nuplazid Tablets to achieve the Asserted Claims with a reasonable expectation of success.**

1.    There is no dispute that a POSA would have motivation to modify Nuplazid Tablets to boost swallowability and decrease the number of pills.

Both Defendants' expert, Dr. Muzzio, and Plaintiff's expert, Dr. Little, agreed that a POSA

knew that Parkinson's disease patients often have difficulty swallowing and, due to "pill burden," are at risk of noncompliance. FOF, ¶ 16. So a POSA, in general, would have been motivated to enhance swallowability and decrease the number of pills the patient has to take. FOF, ¶ 17. And both experts agreed that a POSA would have recognized that a single pill containing the full daily dose of pimavanserin would be advantageous to increase patient compliance. *Id*. Thus, there is no dispute on this point—there was motivation to modify Nuplazid Tablets to decrease the two-tablet-per-day regimen to a single pill that was easy to swallow. FOF, ¶ 18.

2.    A POSA would have been motivated to use a size 3 or 4 capsule.

A POSA knew that small capsules are preferred by patients as easy to swallow, and that capsules can provide for better taste-masking than film-coated tablets. FOF, ¶¶ 19–20. A POSA further knew that multi-colored capsules can help elderly patients more-easily differentiate them from ubiquitous white rounded tablets, which helps with compliance. FOF, ¶ 21. These factors would have motivated a POSA to go from the round white tablets disclosed in Nuplazid Tablets to a capsule as the new pimavanserin dosage form. FOF, ¶ 22. A POSA would have concluded that a size 4 capsule shell (which is smaller than a size 3) was a particularly good choice because the dimensions of this capsule shell are small and known to be easier to swallow. FOF, ¶ 23.

A POSA would have appreciated that other oral dosage forms, such as effervescent tablets, orally disintegrating formulations, chewable tablets, films and jellies, also would be relatively easy to swallow; however, these uncommon dosage forms are more expensive to make, require more complicated taste-masking, require more work on the part of caregivers, and must be stored more carefully than capsules. Thus, a POSA would only employ such formulations if the more common solution of using a capsule would not work. FOF, ¶ 24.

3.    A POSA would have looked to Ragnar-Tolf to design a small capsule containing the full daily dose of pimavanserin, with a reasonable expectation of success.

A POSA seeking to develop a new, small capsule dosage form of pimavanserin would have immediately found Ragnar-Tolf. FOF, ¶ 25. Ragnar-Tolf, published in 2007, has a wealth of information about making pimavanserin dosage forms. Ragnar-Tolf discloses dosage forms containing 1 to 80 mg of pimavanserin tartrate, such as the target dose of 40 mg. FOF, ¶ 26. Ragnar-Tolf also discloses experiments showing that pimavanserin is compatible with two common capsule shells, and that capsules are an alternative to film-coated tablets for masking the bitter taste of pimavanserin. FOF, ¶ 27. Further, Ragnar-Tolf discloses that pimavanserin tends to form clumps and has poor flow properties when subjected to dry blending, and discloses, as an alternative, actual examples of wet granulation with binder excipients and a small amount of water, to produce granules containing 1 mg, 5 mg or 20 mg pimavanserin tartrate. *Id*. Both experts agreed that Ragnar-Tolf's pimavanserin granules had consistent bulk densities around 0.6 g/ml, despite having up to 20-fold difference in pimavanserin concentration in the granules. *Id*.

Based on Ragnar-Tolf, a POSA would have known that, in order to fit the full 40 mg daily dose of pimavanserin tartrate in a size 4 capsule, he or she would have to slightly increase the pimavanserin tartrate concentration (by about 12%),[1] and this easily could be done by decreasing the concentration of the inactive mannitol diluent[2] by the same amount. *Id*. Based on the consistent 0.6 g/ml bulk densities shown for the pimavanserin granules in Ragnar-Tolf, a POSA would have expected the bulk density of the 40 mg strength to remain roughly the same 0.6 g/ml when the concentration of the drug was increased. FOF, ¶ 30. Thus, a POSA would have reasonably expected

---

[1] The concentration would increase from 20 percent (for the 20 mg dose disclosed in Ragnar-Tolf) to about 32.4 percent (for a 40 mg dose). Tr., 334:10–12.

[2] A diluent is a material that provides bulk or volume to dilute a small amount of drug substance into a larger volume, which provides ease of handling. Tr., 253:2–8.

that 40 mg of pimavanserin tartrate granules could fit within a size 4 capsule, and would have been able to achieve the result within one or two routine experiments. FOF, ¶ 30.

So, in summary, a POSA would have been motivated to consolidate the full 40 mg dose of pimavanserin tartrate (34 mg pimavanserin) into a single dosage form to reduce pill burden. The POSA would have been motivated to put the pimavanserin granules in a size 4 capsule to make it easy to swallow, provide effective taste-masking and make the medication easy to identify. The POSA would have looked to Ragnar-Tolf for information on granulating pimavanserin, and easily would have determined the small concentration increase needed to fit inside a size 4 capsule, with a reasonable expectation of success. FOF, ¶ 30. The Asserted Claims are thus obvious.[3]

### F.    Dr. Little failed to rebut the *prima facie* obviousness of the Asserted Claims.

Dr. Little never challenged Dr. Muzzio's testimony that a POSA would have been motivated to combine Ragnar-Tolf and Nuplazid Tablets. And while Dr. Little testified to a lot of things, he failed to provide back-up evidence to his statements, and thus failed to rebut the *prima facie* case of obviousness.

Dr. Little admitted to some things. He admitted that a POSA would have been motivated to consolidate the daily dose of pimavanserin described in Nuplazid Tablets into a single dosage form. Tr., 512:20-513:1, 572:1–11. But while Dr. Little tried to downplay that clear motivation by telling the Court that combining two pills into one dosage form is somehow hard to do (Tr., 508:5–17), Dr. Little did not actually present any evidence as to why that is so.[4] That's because it is not.

Dr. Little also admitted that a POSA would have expected 40 mg of pimavanserin tartrate

---

[3] Neither Plaintiff nor Dr. Little relied on any objective indicia of non-obviousness. Tr., 543:24-544:3.

[4] Instead, Dr. Little merely listed hypothetical "risks involved in reformulating a dosage form just to pursue general improvements" (Tr., 507:6-508:4) and said it was *possible* that increasing the pimavanserin concentration could have unintended consequences. Tr., 538:6-539:14.

granules having bulk density of 0.4-0.6 g/ml to fit into a size 3 or 4 capsule. Tr., 484:11-485:2. And Dr. Little admitted that Ragnar-Tolf discloses pimavanserin tartrate granules having a bulk density of about 0.6 g/ml, the only difference being the *amount* of pimavanserin tartrate in the granules (20 mg vs. 40 mg). Tr., 534:8-535:9, 538:6–10. Perhaps because of those admissions that Dr. Little could not dispute, Dr. Little speculated, without evidence, that including "double the amount" of pimavanserin *could* cause problems (Tr., 542:19–25), while he ignored Dr. Muzzio's testimony that the *concentration* of pimavanserin tartrate in the Ragnar-Tolf granules would increase by only about 12% with a 40 mg strength. FOF, ¶ 45. And Dr. Little never provided any rationale, other than speculation, as to why a POSA would not have expected the modified Ragnar-Tolf granulation to fit into a size 3 or 4 capsule.[5]

Moreover, Dr. Little's testimony shows that the Asserted Claims are overbroad. For instance, Dr. Little pointed to the patent examiner's allowance over Ragnar-Tolf to show the claims were non-obvious. *See* Tr. 490:23–492:9. But the examiner allowed the application because "[t]he instantly granulated pimavanserin allows for *minimal excipients* in smaller dosages that are easier to swallow," while, as Dr. Little admitted, the claims are not limited to formulations with "minimal" excipients. Tr., 573:15–574:3.

In an effort to throw this Court off the scent, Dr. Little paraded through a list of alternative pimavanserin formulations a POSA *might have tried* instead of capsules to make an easy-to-swallow dosage form, testifying, incredibly, that Dr. Muzzio never discussed why a POSA would not pursue these alternatives.[6] Tr., 516:24-522:11. Even so, Dr. Little's analysis is legally flawed

---

[5] Dr. Little incorrectly testified that Example 8 taught away from increasing the pimavanserin concentration because it allegedly showed an increase in clumping with increasing pimavanserin concentrations Tr., 534:8–21, 536:7–14. The example says no such thing.
[6] Dr. Muzzio, in fact, addressed each of these alternatives, stating that a POSA would only employ such formulations if using a capsule would not work. Tr., 322:7-326:22.

in that it attempts to "abstract back out to the larger problem . . . and ask how many ways that could be done . . . completely disconnected from where the prior art would have already led a person of ordinary skill in the art"—namely, tablets and capsules of pimavanserin. *See Purdue Pharma L.P. v. Accord Healthcare, Inc.*, No. 2023-1953, 2024 WL 5244764, at *6 (Fed. Cir., Dec. 30, 2024); *see also* Tr., 306:1–14 and JTX11-0011 (Ragnar-Tolf at [0063]). Showing how far he would reach, Dr. Little even attempted to recast one of Dr. Muzzio's prior art references as disclosing a patient preference of tablets over capsules. Tr., 524:8-527:4 But Dr. Little misrepresented the common-sense point of the reference—*smaller* dosage forms are easier to swallow than larger ones. Tr. 329:18-24 (Muzzio); *see also* DTX-007.0006 (Schiele).

Finally, Dr. Little attempted to criticize Dr. Muzzio's obviousness analysis in which he compared the prior art to the claims, pointed out the differences between them, and explained how the prior art showed those differences. Tr. 492:20–493:10, 499:4-11, 515:2-9, 530:15-22. But this is exactly how obviousness is analyzed. See *Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966). Further still, Dr. Little criticized Dr. Muzzio's analysis for relying on "general motivations that someone would have to make improvements" that would not "justify a reformulation campaign," (Tr. 502:20–503:21) and that "Nuplazid [Tablets] doesn't specifically say that you would want to change things in the formulation . . . on the label." Tr. 498:10–15. But the prior art does "not need to hold itself out as flawed for a POSA to alter it." *Janssen Pharms., Inc. v. Teva Pharms. USA, Inc.*, 97 F.4th 915, 929 (Fed. Cir. 2024). Rather, motivation to modify the prior art "may be found explicitly or implicitly in . . . any need or problem known in the field of endeavor at the time of invention and addressed by the patent; and the background knowledge, creativity, and common sense of the person of ordinary skill." *Id.* at 929-930. Dr. Muzzio's analysis follows the proper obviousness analysis; Dr. Little's did not.

8

Examining all the admissions that Dr. Little had to make, and analyzing the statements Dr. Little made with nothing to rely on, it is evident that Dr. Little failed to rebut the *prima facie* obviousness of the Asserted Claims.

## III.    THE ASSERTED CLAIMS ARE INVALID UNDER 35 U.S.C. § 112.

The Asserted Claims are invalid under 35 U.S.C. § 112 as well, due to their overbreadth. By broadening the claims of their first patents, Acadia rendered their claims indefinite, extended them to compositions the inventors did not regard as their invention, and expanded them beyond the patent's written description and ability to enable their full scope.

### A.    The Asserted Claims are invalid under 35 U.S.C. § 112(b) as indefinite, or for claiming that which the inventors did not regard as their invention.

The term "pharmaceutically acceptable capsule," recited in each of the Asserted Claims, is either indefinite, or causes the claims to extend to subject matter the inventors told the world was not their invention. 35 U.S.C. § 112(b) requires that the claims "particularly point[] out and distinctly claim[] the subject matter which the inventor or a joint inventor regards as the invention." Claims may be invalid under 35 U.S.C. § 112(b) if they fail to inform a POSA about the scope of the invention with reasonable certainty. *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). Claims also may be invalid under 35 U.S.C. § 112(b) "[w]here it would be apparent to one of skill in the art, based on the specification, that the invention set forth in a claim is not what the patentee regarded as his invention." *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1349 (Fed. Cir. 2002). The Asserted Claims fail one requirement or the other.

      1.    The term "pharmaceutically acceptable capsule" is indefinite because the specification does not provide a POSA with reasonable certainty regarding what goes into making a capsule "pharmaceutically acceptable."

Both experts agreed that the term "pharmaceutically acceptable" typically has a plain and ordinary meaning that is well-understood in the art. Tr. 257:14–19; 450:9–19. And both experts

agreed that, here, the '721 patent specification distinguishes between products of the invention and comparative "unacceptable products" that are not part of the invention.[7] FOF, ¶ 48. However, they disagreed on whether the specification provides a POSA with reasonable certainty regarding what differentiates "acceptable" products of the invention and "unacceptable products" that are not part of the invention, *i.e.*, what goes into making the claimed capsule "pharmaceutically acceptable." Tr., 257:14–258:2. Dr. Little's opinion on this is unsupported, while Dr. Muzzio explained exactly why the specification's reference to "unacceptable products" causes confusion.

The specification contains five comparative examples of granulations that lead to "unacceptable products," which were contrasted with granulations of the invention. FOF, ¶ 34. Each of these five comparative products had "acceptable" bulk density, meaning the granules had sufficient bulk density to fill the full daily dose of pimavanserin into a size 3 or 4 capsule in accordance with the patent. *Id*. However, the inventors stated that *other* attributes of those examples, such as stability, particle size, impurity levels, or dissolution were subjectively considered "unacceptable," without further explanation as to why. *Id*. Both experts agreed that the specification only uses *subjective* language to distinguish the "acceptable" products from "unacceptable" products, and provides no *objective* standards by which a POSA could determine whether a particular attribute (stability, particle size, impurity levels or dissolution) resulted in an "acceptable" product. FOF, ¶ 32. This violates the definiteness requirement of 35 U.S.C. § 112(b). Some objective standard must be provided in order to allow the public to determine the scope of the claimed invention; a claim term, to be definite, requires an objective anchor. *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1350 (Fed. Cir. 2005); *see also Intellectual Ventures I v.*

---

[7] Dr. Little initially testified that the comparative examples relate to manufacturing processes, and "whether those processes were suitable or not," (Tr., 464:9-465:12) but on cross-examination he admitted that the comparative examples relate to "unacceptable products." Tr., 555:25-556:18.

*T-Mobile USA*, 902 F.3d 1372, 1381 (Fed. Cir. 2018). But here, there is none.

For example, the comparative example 4 granules had "acceptable flow and bulk density," but were deemed unacceptable because of an "unacceptable finding of impurities as well as unacceptable dissolution," thus indicating that the product was intended to be *outside* the boundary of the invention, *i.e.*, it was not "pharmaceutically acceptable." FOF, ¶ 31. As Dr. Muzzio testified, a POSA who replicated that example and was satisfied with the granulation (*i.e.*, the POSA considered the product to be "pharmaceutically acceptable") would have no way to determine if he or she infringed the claims, because the boundary between the "acceptable" and "unacceptable" attributes of impurities and dissolution is undefined. Tr., 270:6-271:5. Since the specification does not provide a POSA with reasonable certainty regarding what goes into making a capsule product "pharmaceutically acceptable," and a POSA would not be able to determine what products fall inside or outside the boundaries of the claims, the Asserted Claims are indefinite. FOF, ¶ 33.

2.    If the term "pharmaceutically acceptable capsule" has the plain and ordinary meaning that Dr. Little proposed, the Asserted Claims read on the comparative examples and are invalid for claiming that which the patentees did not regard as their invention.

Dr. Little testified that the term "pharmaceutically acceptable capsule" has its plain and ordinary meaning here, and should *not* be interpreted in light of the comparative examples that resulted in "unacceptable products." Tr., 450:9–19; 465:13–19. But if the term "pharmaceutically acceptable capsule" does not exclude the comparative "unacceptable products," as Dr. Little proposed, the Asserted Claims are invalid for claiming something the inventors did not regard as their invention. *See Allen Eng'g*, 299 F.3d at 1349. Here, both experts agreed that a POSA would understand that the comparative experiments are *not* part of the invention.[8] FOF, ¶¶ 31, 34. Yet, unless they are excluded, the "unacceptable" granules produced in these comparative experiments

---

[8] See footnote 7, *supra*.

fulfill the broad claim limitations, including "pharmaceutically acceptable capsule." FOF, ¶ 34. Other courts have found that such a logical inconsistency or contradiction between the claims and the specification renders the claims invalid. *See, e.g.*, *Juxtacomm-Texas Software, LLC v. Axway, Inc.*, No. 6:10CV011, 2012 WL 7637197, at *4 (E.D. Tex. July 5, 2012). Such is the case here. If Dr. Little's proposed meaning of "pharmaceutically acceptable capsule" is adopted, and the term does not exclude the comparative examples, the Asserted Claims are invalid.

**B.    The Asserted Claims are invalid under 35 U.S.C. § 112(a) as lacking written description and enablement.**

The Asserted Claims are also invalid as lacking written description and enablement. The specification does not describe granules including the full scope of pharmaceutically acceptable excipients. Nor does the specification describe or enable granules having the full scope of bulk densities greater than 0.4 g/ml. The claims are thus invalid under 35 U.S.C. § 112(a).

1.    The specification does not describe granules including the full scope of "pharmaceutically acceptable excipients."

The Asserted Claims cover granules containing "pharmaceutically acceptable excipients." As written, this is so broad that the claims read on conceivably *any* granulation of pimavanserin. Tr., 354:11–13. Both experts agreed that, according to the claims, there is *no limit* on the number, type, or function of "pharmaceutically acceptable excipients" that can go into the granules. FOF, ¶ 35. Indeed, Dr. Little admitted that the claim language is even broad enough to encompass excipients that change the timing of the release of the pimavanserin in the body, a concept that is not described (or even suggested) in the '721 patent. Tr., 575:7–17. The specification, in contrast, is far more circumscribed: it only describes granules containing pimavanserin alone, or with a specific type of excipient (a binder), or with a combination of colloidal silicon dioxide and an excipient known as Avicel. FOF, ¶ 36. It does not describe granules with *any* excipient.

Focusing on what the inventors disclosed, the specification shows the inventors were not

in possession of the full scope of "pharmaceutically acceptable excipients" in the Asserted Claims, which is a legal concept that is different from whether or not something was obvious. Here, the specification describes that pimavanserin granules with a specific type of excipient (a binder), or the combination of colloidal silicon dioxide and Avicel, are intended to be within the scope of the invention; however, the comparative experiments that resulted in "unacceptable products" describe pimavanserin granules with *other* excipients, and tell a POSA "don't do this." *Id*. While disclosure of a species within a claim can provide support for a generic claim, it does not do so where the specification distinguishes the species from others within the same genus. *See, e.g.*, *Tronzo v. Biomet, Inc.*, 156 F.3d 1154, 1158–9 (Fed. Cir. 1998) (disclosure of conical cup as advantageous over other cup shapes could not support a claim that was generic as to the cup shape). Here, a POSA would not recognize the inventors had invented granules with absolutely *any* excipient, but instead had invented something far more limited: granules containing pimavanserin alone, or with a binder, or with a combination of colloidal silicon dioxide and Avicel. FOF, ¶ 37.

The specification portions Dr. Little identifies as allegedly providing support for the broad genus of "pharmaceutically acceptable excipients" fail to do so. For instance, Dr. Little pointed to a certain section as disclosing granules including two excipients (microcrystalline cellulose and magnesium stearate), but he failed to identify where it discloses putting those excipients *in the* granules as the claim requires (because it does not).[9] Tr., 475:18–476:13; JTX0009 at 16:23–28; *see also* JTX9-0023 (claim 4). Rather, the specification identifies the "pimavanserin granulation" as "pimavanserin tartrate granulation without binder," which is *thereafter* "blended with . . . microcrystalline cellulose, and … magnesium stearate," which is a completely different thing.

_____

[9] Even if Dr. Little was correct (and he is not), at best this disclosure merely supports including two "pharmaceutically acceptable excipients" in the granules – but as Dr. Muzzio testified, the claim covers *any* number: "I can use one or 20." Tr., 346:6–10. Dr. Little agreed. Tr., 574:16–18.

Similarly, although Dr. Little pointed to Table 2 of the patent as describing pimavanserin with intragranular excipients, he admitted on cross examination that this example does not disclose the identity of any excipients being added to the pimavanserin during granulation. Tr., 473:9–12, 579:11-16. Dr. Little's unsupported testimony does not save the Asserted Claims; they are invalid as lacking written description for the full scope of "pharmaceutically acceptable excipients."

2. The specification fails to describe or enable pimavanserin granules having the full scope of bulk densities greater than 0.4 g/ml, which causes invalidity under both written description and enablement requirements.

The inventors claimed a product with a bulk density greater than 0.4 g/ml, with no upper limit specified. Both experts agreed that the plain and ordinary meaning of the claim term ">0.4 g/ml" has no explicit upper limit.[10] Tr. 355:1–13 (Muzzio); 581:23-582:24 (Little). The patent specification fails to show the inventors were in possession of pimavanserin tartrate granules having the *full scope* of bulk densities greater than 0.4 g/ml. Both experts agreed that the single example in the specification is to a bulk density of 0.508 g/ml, and the specification only discloses a narrow range of 0.4 to 0.6 g/ml, which means that the specification doesn't support a claimed range above 0.6 g/ml. *See* FOF ¶ 39. And Dr. Little admitted that the specification fails to teach a POSA how to make granules having a higher bulk density than 0.6 g/ml. Tr., 581:9–22.

To get around this issue, Dr. Little testified, again with nothing to point to that he is relying on, that the claims have an *implicit* upper limit, and that pimavanserin's "bad behavior" would lead a POSA not to "expect it to have the full range of what you would expect for a common material." Tr. 481:5–11 (Little). Dr. Little fails to point to *any* description supporting even this "implicit" upper limit. "Requiring a written description of the invention plays a vital role in curtailing claims . . . that have not been invented, and thus cannot be described." *Ariad Pharms., Inc. v. Eli Lilly &*

---

[10] It is further undisputed that a POSA would recognize that granules of bulk densities of 0.4 to 1 g/ml were generally known to be achievable in the art. FOF ¶ 63.

*Co.*, 598 F.3d 1336, 1352 (Fed. Cir. 2010). Here, Dr. Little admitted that nothing in the specification taught a POSA the inventors had achieved bulk densities of even 0.7 g/ml, which he said was "the upper limit for standard materials." FOF, ¶ 39. Thus, the Asserted Claims lack written description for the full scope of bulk densities greater than 0.4 g/ml.

There is also an enablement problem. Dr. Little's testimony further confirms the patent fails to enable the full scope of the claims. In his testimony, Dr. Little relied on the background section of the specification to argue that it would have been difficult to achieve bulk densities of pimavanserin granules above 0.6 g/ml, which, for purposes of enablement, shows that the claim is not enabled for bulk densities higher than 0.6 g/ml. FOF, ¶ 40; *see also* Tr. 482:1–22. Dr. Little also noted that adding excipients was known to "cover up the bad behavior" of drugs like pimavanserin. *Id.* But, as Dr. Muzzio explained, the specification fails to provide guidance on *which* excipients could increase the bulk density above 0.6 g/ml, or how to modify any of the parameters to achieve such bulk densities. FOF, ¶ 40. Rather, to achieve higher bulk densities, the POSA would need to engage in an extensive trial-and-error research program "equivalent to a Ph.D. dissertation," which would constitute undue experimentation--testimony that Dr. Little did not rebut. *Id*. Thus, the Asserted Claims are also invalid as lacking enablement.

## IV.  **CONCLUSION**

For the foregoing reasons, the Court should hold claims 4 and 5 of the '721 patent invalid.

DATED: January 13, 2025

*Of Counsel:*

Richard J. Berman
Janine A. Carlan
Bradford C. Frese
Michael Baldwin
ARENTFOX SCHIFF LLP
1717 K Street, NW
Washington, DC 20006
(202) 857-6000
richard.berman@afslaw.com
janine.carlan@afslaw.com
bradford.frese@afslaw.com
michael.baldwin@afslaw.com

*Of Counsel:*

Timothy H. Kratz *(Pro Hac Vice)*
George J. Barry III *(Pro Hac Vice)*
John Thallemer *(Pro Hac Vice)*
KRATZ & BARRY LLP
1050 Crown Pointe Parkway, Suite 500
Atlanta, GA 30338
(404) 431-6600
tkratz@kratzandbarry.com
gbarry@kratzandbarry.com
jthallemer@kratzandbarry.com

Michael P. Hogan *(Pro Hac Vice)*
KRATZ & BARRY LLP
622 South 4th Street
P.O. Box 63765
Philadelphia, PA 19147
(917) 216-8585
mhogan@kratzandbarry.com

**SEITZ, VAN OGTROP & GREEN. P.A.**

/s/ *James S. Green, Jr.*
James S. Green, Jr. (#4406)
222 Delaware Avenue, Suite 1500
Wilmington, Delaware 19801
(302) 888-7607
jsgreen@svglaw.com

*Counsel for Defendants,*
*MSN Laboratories Private. Ltd. and*
*MSN Pharmaceuticals, Inc.*

**KRATZ & BARRY LLP**

/s/ *R. Touhey Myer*
R Touhey Myer (#5939)
800 N. West Street
Wilmington, DE 19801
(302) 527-9378
tmyer@kratzandbarry.com

*Attorneys for Defendants,*
*Aurobindo Pharma Ltd. and*
*Aurobindo Pharma USA, Inc.*