# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ACADIA PHARMACEUTICALS INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) Tr., |
| v. | ) C.A. No. 1:22-cv-01387-GBW |
| | ) (Consolidated; Lead Case) |
| AUROBINDO PHARMA LIMITED, et al. | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

## DEFENDANTS' POST-TRIAL FINDINGS OF FACT

# **TABLE OF CONTENTS**

I. BACKGROUND ........................................................................................................... 1

    A. U.S. Patent No. 11,452,721 ("the '721 patent") ................................................ 1

    B. State of the Art .................................................................................................... 1

        1. Level of Ordinary Skill in the Art .......................................................... 1

        2. Granulation, Bulk Density, and Encapsulation ..................................... 2

        3. Nuplazid (pimavanserin) tablets ............................................................ 3

    C. Development of Pimavanserin Capsules ............................................................ 3

II. THE ASSERTED CLAIMS ARE INVALID AS OBVIOUS OVER NUPLAZID TABLETS IN VIEW OF RAGNAR-TOLF ........................................................................ 4

    A. A POSA would have been motivated to consolidate the full 34 mg pimavanserin dose of Nuplazid Tablets into a single dosage form. ...................... 4

    B. A POSA would have been motivated to use a size 4 capsule shell. ................... 5

    C. A POSA would have looked to Ragnar-Tolf to design a small capsule containing the full daily dose of pimavanserin, with a reasonable expectation of success. ......................................................................................... 6

III. THE ASSERTED CLAIMS ARE INVALID UNDER 35 U.S.C. § 112(b) ............................. 7

    A. The Asserted Claims are Indefinite. .................................................................... 7

    B. The Asserted Claims Cover Subject Matter the Inventors or Joint Inventors Did Not Regard as Their Invention. ................................................... 8

IV. THE ASSERTED CLAIMS ARE INVALID UNDER 35 U.S.C. § 112(a) AS LACKING WRITTEN DESCRIPTION AND ENABLEMENT. ..................................... 9

    A. The specification does not describe granules including the full scope of pharmaceutically acceptable excipients. .............................................................. 9

    B. The specification fails to describe or enable pimavanserin granules having the full scope of bulk densities greater than 0.4 g/ml. ........................................ 10

## TABLE OF ABBREVIATIONS

Unless otherwise stated, the abbreviations below have the meanings ascribed to them in the right-hand column throughout this and MSN's post-trial brief.

| ABBREVIATION | MEANING |
| --- | --- |
| The '721 patent | U.S. Patent No. 11,452,721 (JTX9) |
| The '480 patent | U.S. Patent No. 10,646,480 (DTX-215) |
| The '891 patent | U.S. Patent No. 10,849,891 (DTX-216) |
| API | Active pharmaceutical ingredient |
| POSA | Person of ordinary skill in the art |
| Nuplazid Tablets | Prescribing Information for Nuplazid Tablets (Apr. 29, 2016) (JTX12) |
| Ragnar-Tolf | U.S. Pre-Grant Publication No. 2007/0264330 to Ragnar-Tolf, et al. (November 15, 2007) (JTX11) |
| Tr. | Trial Transcript |

## I.  BACKGROUND

### A.  U.S. Patent No. 11,452,721 ("the '721 patent")

1. The '721 patent relates to capsules containing pimavanserin, processes for making those capsules, and pharmaceutical compositions containing pimavanserin. Its earliest effective priority date is August 30, 2017. Tr., 236:3–10 (Muzzio); JTX9-0001.

2. Acadia has some earlier patents covering its pimavanserin capsule product, the '480 and '891 patents, and those patents required granulations of pimavanserin alone—that is, granulating pimavanserin *without* any additional inactive ingredients known as excipients. Tr., 271:6-273:2 (Muzzio); DTX-0215_0021; DTX-0216_0021.

3. MSN and Aurobindo had developed alternative formulations of pimavanserin formulations that *included* excipients in the granules, and therefore did not infringe these first patents. DTX-0215_0021; DTX-0216_0021.

4. Acadia sought and obtained broader claims in the '721 patent, which cover granules of pimavanserin *with* excipients. JTX9-0025.

5. Acadia is now asserting claims 4 and 5 (the "Asserted Claims") of the '721 patent against MSN and Aurobindo. Tr., 18:19-24.

6. The Asserted Claims are directed to a capsule, having a size 3 or 4 capsule shell, that encapsulates granules comprising 40 mg pimavanserin tartrate and one or more pharmaceutically acceptable excipients, wherein the bulk density of the granules is greater than 0.4 g/ml. JTX9-0025 ('721 patent, claims 4 and 5).

### B.  State of the Art

#### 1.  Level of Ordinary Skill in the Art

7. A POSA of the '721 patent would have at least a Bachelor's degree, and more likely a Master's degree or Doctoral degree in a relevant field, including pharmaceutical sciences,

1

chemistry, chemical engineering, or materials science, and several years of experience in research and development of pharmaceutically relevant solid dose formulations, including, but not limited to, the manufacturing processes of such formulations and the selection and use of ingredients in such formulations. A POSA would work as part of a team, and is able to draw upon the knowledge and expertise of others on the team, such as analytical chemists experienced in characterization of drug substance and drug product, doctors with relevant knowledge of the conditions to be treated and the patient population, and others. Tr., 237:16–238:11 (Muzzio)

### 2. Granulation, Bulk Density, and Encapsulation

8. Generally, granules are made by a process known as granulation, in which smaller particles stick together into larger particles. Tr., 240:24–241:5 (Muzzio). The most common granulation process is wet granulation, which involves combining the active ingredient with a liquid, like water or alcohol, and also powder excipients ("binders") in order to build the larger particles. Tr., 241:10-21 (Muzzio). The resulting granules are used to make final dosage forms like capsules or tablets. Tr., 241:22-25, 245:14-24 (Muzzio); JTX9-0015 ('721 patent at 4:49–50)

9. A POSA knew, in general, that granulation is useful to improve the flow of the starting material, which helps when filling the material into capsules or compressing the material into tablets. Tr., 242:1–243:5 A POSA also knew that granulation is useful to increase the bulk density of the starting material, which allows more material to fit into a smaller volume, e.g., a smaller capsule. Tr., 243:14-23, 246:7-247:24 (Muzzio); DTX-0005_0010, 0012 (Stegemann 2002).

10. Based on the bulk density of the material, a POSA knew exactly how much material could fit into certain capsule sizes. Tr., 247:25–248:15 (Muzzio); DTX-0005_0005 (Stegeman 2002). Measuring the initial bulk density of the material and altering the bulk density to fit within a certain capsule size was routine practice in pharmaceutical development. Tr., 249:4-250:19,

2

249:17–250:17 (Muzzio).

### 3. Nuplazid (pimavanserin) tablets

11. Acadia's initial pimavanserin product, also called Nuplazid and approved in 2016, was a tablet made with pimavanserin and well-known binder excipients. Tr., 290:1–19; 292:4–20 (Muzzio); 496:10–497:5 (Little); JTX12-0001, 0007-8 (Nuplazid Tablets).

12. The Nuplazid Tablets package insert was published in April 2016, and Nuplazid Tablets were commercially available more than one year prior to the earliest effective filing date of the '721 patent. JTX12-0001 (Nuplazid Tablets); Tr., 290:1–9 (Muzzio)

13. The package insert for the product, "Nuplazid Tablets," disclosed that the tablets were white, film-coated tablets that each contained 20 mg of pimavanserin tartrate, which is equivalent to 17 mg of pimavanserin; patients were instructed to take two tablets together, once per day, for a daily dose of 40 mg pimavanserin tartrate (34 mg of pimavanserin); and the tablets were used to treat Parkinson's disease psychosis, a condition that mainly affects elderly patients. Tr., 290:1–19; 292:4–20 (Muzzio); 293:2–20 (Muzzio); 495:–497:5 (Little); JTX12-0001–2, 0007-8 (Nuplazid Tablets). A POSA knew from Nuplazid Tablets, that 40 mg pimavanserin tartrate is equivalent to 34 mg pimavanserin. Tr., 292:4–14 (Muzzio); JTX12-0007–8 (Nuplazid Tablets).

### C. Development of Pimavanserin Capsules

14. Raw pimavanserin API was known to be a "bad behaving material," with a low bulk density, poor flowability and a tendency to clump. Tr., 481:17-483:4, 533:17–24, 545:10–546:12 (Little); JTX9-0014 ('721 patent, 1:48–58).

15. Acadia hired Catalent, a third party pharmaceutical development company, to develop pimavanserin capsules, with the goal to produce small sized (size "3" or "4") capsules, each containing the full daily dose of 34 mg pimavanserin. Tr., 337:22-339:4 (Muzzio), JTX13-0002. Catalent proposed wet granulating the pimavanserin API to increase the bulk density high

3

enough to fill the size 3 or 4 capsules with the full daily dose of pimavanserin. Tr., 339:18–341:1 (Muzzio); JTX13-0003–4. Catalent's work is reflected in the '721 patent. Tr., 425:5–426:11 (Muzzio); JTX13-0001 (identifying Steven Abele as the author); JTX9-0001.

## II. THE ASSERTED CLAIMS ARE INVALID AS OBVIOUS OVER NUPLAZID TABLETS IN VIEW OF RAGNAR-TOLF

### A. A POSA would have been motivated to consolidate the full 34 mg pimavanserin dose of Nuplazid Tablets into a single dosage form.

16. Elderly patients in general, and Parkinson's disease patients in particular, have a high "pill burden" (the daily number of pills the patient has to take) and a tendency to fail to comply with their dosing regimen. Tr., 307:23–311:18 (Muzzio); 512:20–513:18, 516:5–20, 570:21–572:22 (Little); DTX-011.0002 (Kumar); DTX-010.0005 (Hattori); DTX-009.0004, right column (Chapman). In addition, elderly and particularly Parkinson's disease patients have difficulty swallowing their medicines, which also leads to non-compliance. Tr., 313:1–314:24 (Muzzio), 570:19–572:11 (Little); DTX-013_0003 (Liu).

17. Patients taking Nuplazid tablets were required to take two tablets at a time, so a POSA would have been motivated to reduce the pill burden and enhance swallowability to increase compliance. Tr., 312:10–15; 315:6–12 (Muzzio); 569:21–572:22 (Little); JTX12-0001–2 (Nuplazid Tablets).

18. A POSA, in general, would have been motivated to enhance swallowability and decrease the number of pills the patient has to take. Tr., 312:10–15, 315:6–12 (Muzzio); 569:21–572:22 (Little); DTX-011.0002 (Kumar); DTX-010.0005 (Hattori); DTX-009.0004, right column (Chapman); DTX-013_0003 (Liu). This would be advantageous and increase patient compliance. Tr., 312:10–15 (Muzzio); 569:21–572:22 (Little). A POSA thus would have been motivated to modify Nuplazid Tablets to decrease the two-tablet-per-day regimen to a single pill that was easy to swallow. Tr., 309:25–312:15 (Muzzio); DTX-009_0004 (Chapman, right column); DTX-

4

011.0002 (Kumar); DTX-010.0005 (Hattori).

### B. A POSA would have been motivated to use a size 4 capsule shell.

19. A POSA would have known that small capsules are preferred by patients as being easy to swallow. Tr., 315:13–316:17 (Muzzio); DTX-005_0012 (Stegemann 2002).

20. It was also known that capsules can provide for better taste-masking than film-coated tablets, and that pimavanserin tartrate had a pronounced bitter taste. Tr., 319:17–321:22 (Muzzio); DTX-005_0012 (Stegemann 2002); JTX-0011.0020 (Ragnar-Tolf).

21. A POSA further would have known that multi-colored capsules can help elderly patients identify dosage forms and differentiate them from other medications (especially white, rounded tablets), and that differentiation helps with patient compliance. Tr., 317:3-319:16 (Muzzio); DTX-006_0005 (Stegemann 2005).

22. These factors would have motivated a POSA to go from the round, white film-coated tablets disclosed in Nuplazid Tablets to a capsule as a new pimavanserin dosage form. Tr., 326:9-327:25 (Muzzio); DTX-005_0012, left column (Stegemann 2002); DTX-006_0005 (Stegemann 2002); JTX11-0020 (Ragnar-Tolf).

23. A POSA would have concluded that a size 4 capsule shell (which is smaller than a size 3) was a good choice because the dimensions of this capsule shell are known to be easy to swallow. Tr., 329:8–330:20 (Muzzio); DTX-007.0006 (Schiele); JTX9-0010, Fig. 1 (the '721 patent).

24. A POSA would have appreciated that other oral dosage forms, such as effervescent tablets, orally disintegrating formulations, chewable tablets, films and jellies, also would be relatively easy to swallow; however, these uncommon dosage forms are more expensive to make, require more complicated taste-masking, require more work on the part of caregivers, and must be stored more carefully than capsules; thus, a POSA would only employ such formulations if the

5

more common solution of using a capsule would not work. Tr., 322:7-326:22 (Muzzio); DTX013_0011, 0013 (Liu).

### C. A POSA would have looked to Ragnar-Tolf to design a small capsule containing the full daily dose of pimavanserin, with a reasonable expectation of success.

25. A POSA seeking to develop a new, small capsule dosage form of pimavanserin would have looked to Ragnar-Tolf. Tr., 293:22–294:23, 295:24–296:5 (Muzzio); JTX11-0001 (Ragnar-Tolf). Ragnar-Tolf was published in 2007, almost ten years before the earliest effective filing date of the '721 patent. Tr., 296:7–12; JTX11-0001 (Ragnar-Tolf).

26. Ragnar-Tolf discloses dosage forms containing 1 to 80 mg of pimavanserin tartrate, and specifically the target dose of 40 mg. 296:17–25 (Muzzio); JTX11-0012 (Ragnar-Tolf at [0067]). Ragnar-Tolf also discloses pre-formulation experiments showing that pimavanserin is compatible with two common capsule shells. Tr., 297:1–298:19, 305:25–306:14 (Muzzio); JTX11-0016–0019 (Ragnar-Tolf, [0063] and [0102], [0123], Table 4).

27. Further, Ragnar-Tolf discloses that pimavanserin tends to form clumps and has poor flow properties when subjected to dry blending, and discloses, as an alternative, actual examples of wet granulation with binder excipients and a small amount of water, to produce granules containing 1 mg, 5 mg or 20 mg pimavanserin tartrate. Tr., 298:21-302:3, 303:8–22, 306:1–307:16 (Muzzio); 568:11–569:16 (Little); JTX11-0019–20 (Ragnar-Tolf at [0124]–[0128] and [0129]–[0131]). Ragnar-Tolf also taught a POSA how to increase the bulk density and flowability of the pimavanserin API through wet granulation. Tr., 299:18–301:20; JTX11-0019–20 (Ragnar-Tolf). A POSA would have known from Ragnar-Tolf that the bulk density of the pimavanserin API could be increased from 0.294 g/ml to about 0.6 g/ml by wet granulating pimavanserin API with ethanol and binder excipients. Tr., 303:8–22 (Muzzio), 544:20-545:4 (Little); JTX11-0020 (Ragnar-Tolf). In addition, a POSA would have recognized that Ragnar-Tolf's pimavanserin granules had

6

consistent bulk densities around 0.6 g/ml, despite having up to 20-fold difference in pimavanserin concentration in the granules. Tr., 303:8–304:13, 334:13–23, 336:7–15 (Muzzio); 538:2–10 (Little); JTX11-0020 (Ragnar-Tolf, Table 8).

28. Ragnar-Tolf also discloses that the wet granulated formulations could be compressed into tablets and film-coated, or filled into capsules. Tr., 305:25–306:14 (Muzzio); JTX11-0011 (Ragnar-Tolf at [0063]).

29. From Ragnar-Tolf, a POSA would have known that, in order to fit the full 40 mg daily dose of pimavanserin tartrate in a size 4 capsule, he or she would have to slightly increase the pimavanserin tartrate concentration (by about 12%) and this easily could be done by simply decreasing the concentration of mannitol by the same amount. Tr., 332:21–335:1 (Muzzio); JTX11-0020 (Ragnar-Tolf at [0129]–[0131]). The concentration of pimavanserin would then be increase from about 20% to about 32.4% for a 40 mg dose. Tr., 334:10–12 (Muzzio).

30. Based on the consistent 0.6 g/ml bulk densities shown for the pimavanserin granules in Ragnar-Tolf, a POSA would have expected the bulk density of the 40 mg strength to remain roughly the same 0.6 g/ml when the concentration of the drug was increased. Tr., 335:15–336:15 (Muzzio); JTX11-0020 (Ragnar-Tolf at [0129]–[0131]). A POSA would have reasonably expected that 40 mg of pimavanserin tartrate granules could fit within a size 4 capsule, and would have been able to achieve the result within one or two routine experiments. Tr., 335:3–24 (Muzzio); JTX11-0020 (Ragnar-Tolf at [0129]–[0131]).

### III.     THE ASSERTED CLAIMS ARE INVALID UNDER 35 U.S.C. § 112(b)

#### A.     The Asserted Claims are Indefinite.

31. The '721 patent specification distinguishes between products of the invention and five comparative examples of granulations that lead to "unacceptable products," that are not part of the invention. Tr., 257:14–258:2; 261:10-271:5; 283:5–284:17 (Muzzio); 464:9–468:20 (Little);

JTX9-0018, 0020-21 ('721 patent at 10:39–41, 10:54–62; 13:33–15:2, 15:3–10; 15:37-46). Each of these five comparative products had "acceptable" bulk density, meaning the granules had sufficient bulk density to fill the full daily dose of pimavanserin into a size 3 or 4 capsule in accordance with the patent. Tr., 260:24-261:9, 265:13–19, 285:25–287:15 (Muzzio); JTX9-0020-1 ('721 patent at 13:33–15:2). However, the inventors stated that *other* attributes of those examples, such as stability, particle size, impurity levels, or dissolution were subjectively considered "unacceptable," without further explanation as to why. 261:10-264:2 (Muzzio); JTX9-0020-1 ('721 patent at 13:33–15:2). For example, the granules made according to comparative example 4 had "acceptable flow and bulk density," but were deemed unacceptable because of an "unacceptable finding of impurities as well as unacceptable dissolution." Tr., 258:22–260:23; 267:2-268:3 (Muzzio); JTX9-0020 ('721 patent at 14:41–43).

32. The specification only uses *subjective* language to distinguish the "acceptable" products from "unacceptable" products, and provides no *objective* standards by which a POSA could determine whether a particular attribute (stability, particle size, impurity levels or dissolution) resulted in an "acceptable" product. Tr., 267:21–268:3 (Muzzio); 556:24–564:25 (Little); JTX9-0020-1 ('721 patent at 13:33–15:2).

33. The specification does not provide a POSA with reasonable certainty regarding what goes into making a capsule "pharmaceutically acceptable," and a POSA would not be able to determine what products fall inside or outside the boundaries of the claims. Tr., 274:9–24 (Muzzio).

**B.    The Asserted Claims Cover Subject Matter the Inventors or Joint Inventors Did Not Regard as Their Invention.**

34. A POSA would understand from the specification that the comparative experiments are *not* part of what the inventors considered the invention. Tr., 257:14–258:21, 283:5-284:17

8

(Muzzio); JTX9-0018, 0021 ('721 patent at 10:39-41; 10:54-62; 15:3-10; 15:37-46). However, the "unacceptable" granules produced in the comparative experiments would otherwise meet the claim limitations if the term "pharmaceutically acceptable capsule" did not exclude them. Tr., 285:25-287:22 (Muzzio); JTX9-0020-1 ('721 patent at 13:33–15:2).

### IV. THE ASSERTED CLAIMS ARE INVALID UNDER 35 U.S.C. § 112(a) AS LACKING WRITTEN DESCRIPTION AND ENABLEMENT.

#### A. The specification does not describe granules including the full scope of pharmaceutically acceptable excipients.

35. There is no limit on the number, type, or function of "pharmaceutically acceptable excipients" that can go into the granules recited in the claims. Tr., 345:25–346:17 (Muzzio), 574:16–575:17 (Little).

36. The specification only describes granules containing pimavanserin alone, or with a specific type of excipient (a binder), or with less than 10% of a combination of colloidal silicon dioxide and an excipient known as Avicel. Tr., 346:19–348:2 (Muzzio); JTX9-0019, 0021–22 ('721 patent at 12:37-42; 16:4–10; and 17:26-49). The comparative experiments that resulted in "unacceptable products," however, describe pimavanserin granules with *other* excipients, and tell a POSA "don't do this." Tr., 346:19–348:2, 349:17–351:18 (Muzzio); JTX9-0019, 0021–23 ('721 patent at 12:37-42; 16:4–10; and 17:26-49 and 20:15-40).

37. A POSA would not recognize the inventors had invented granules with absolutely *any* excipient, but instead granules containing pimavanserin alone, or with a binder, or with a combination of colloidal silicon dioxide and Avicel. Tr., 346:19–348:12 (Muzzio); JTX9-0019, 0021–23 ('721 patent at 12:37-42; 16:4–10; and 17:26-49).

38. Although Table 2 of the '721 patent describes a "pimavanserin granulation," the example preceding it does not disclose any excipients being added to the pimavanserin during granulation. 349:17–353:10 (Muzzio); 473:17–22, 579:14 (Little); JTX9-0023–24 ('721 patent at

9

20:9–15).

### B. The specification fails to describe or enable pimavanserin granules having the full scope of bulk densities greater than 0.4 g/ml.

39. A POSA would recognize that granules of bulk densities of 0.4 to 1 g/ml were generally known to be achievable in the art. Tr., 355:1–7 (Muzzio); 583:20–584:2 (Little). The single example of a pimavanserin granulation in the specification has a bulk density of 0.508 g/ml, and the specification only discloses a narrow range of 0.4 to 0.6 g/ml. 355:14–356:8; 582:23–583:8; JTX9-0018, 0024 ('721 patent at Table 1, 22:9–14). The specification fails to teach a POSA how to make granules of pimavanserin having a bulk density greater than 0.6 g/ml. Tr., 354:23–355:13 (Muzzio); 581:9–22 (Little). Nothing in the specification taught a POSA the inventors had achieved bulk densities of even 0.7 g/ml, which is the upper limit for standard materials. Tr., 354:23–358:10 (Muzzio); 581:9-584:10 (Little); JTX9-0018 ('721 patent, Table 1).

40. The specification also fails to show the inventors were in possession of pimavanserin tartrate granules having the full scope of bulk densities greater than 0.4 g/ml. Tr., 354:23–358:10 (Muzzio); JTX9-0018 ('721 patent, Table 1). Rather, the background section of the '721 patent specification would have shown a POSA that it would have been difficult to make pimavanserin granules with bulk densities above 0.6 g/ml. 481:17–482:22 (Little); JTX9-0014 ('721 patent at 1:48-58). While it was known that adding excipients could cover up the bad behavior of drugs like pimavanserin, the specification fails to provide guidance on *which* excipients could increase the granules' bulk density above 0.6 g/ml, or how to modify any of the granulation parameters to achieve such bulk densities. Tr., 358:12-362:23 (Muzzio); 482:7–14 (Little). To achieve such higher bulk densities, the POSA would need to engage in an extensive trial-and-error research program, "equivalent to a Ph.D. dissertation," which would constitute undue experimentation. Tr., 364:7–365:6 (Muzzio).

| | |
|---|---|
| DATED: January 13, 2025 | **SEITZ, VAN OGTROP & GREEN. P.A.** |
| *Of Counsel:* | /s/ *James S. Green, Jr.* |
| | James S. Green, Jr. (#4406) |
| Richard J. Berman | 222 Delaware Avenue, Suite 1500 |
| Janine A. Carlan | Wilmington, Delaware 19801 |
| Bradford C. Frese | (302) 888-7607 |
| Michael Baldwin | jsgreen@svglaw.com |
| ARENTFOX SCHIFF LLP | |
| 1717 K Street, NW | *Counsel for Defendants,* |
| Washington, DC 20006 | *MSN Laboratories Private. Ltd. and* |
| (202) 857-6000 | *MSN Pharmaceuticals, Inc.* |
| richard.berman@afslaw.com | |
| janine.carlan@afslaw.com | |
| bradford.frese@afslaw.com | |
| michael.baldwin@afslaw.com | |
| | **KRATZ & BARRY LLP** |
| *Of Counsel:* | /s/ *R. Touhey Myer* |
| | R Touhey Myer (#5939) |
| Timothy H. Kratz *(Pro Hac Vice)* | 800 N. West Street |
| George J. Barry III *(Pro Hac Vice)* | Wilmington, DE 19801 |
| John Thallemer *(Pro Hac Vice)* | (302) 527-9378 |
| KRATZ & BARRY LLP | tmyer@kratzandbarry.com |
| 1050 Crown Pointe Parkway, Suite 500 | |
| Atlanta, GA 30338 | *Attorneys for Defendants,* |
| (404) 431-6600 | *Aurobindo Pharma Ltd. and* |
| tkratz@kratzandbarry.com | *Aurobindo Pharma USA, Inc.* |
| gbarry@kratzandbarry.com | |
| jthallemer@kratzandbarry.com | |
| | |
| Michael P. Hogan *(Pro Hac Vice)* | |
| KRATZ & BARRY LLP | |
| 622 South 4th Street | |
| P.O. Box 63765 | |
| Philadelphia, PA 19147 | |
| (917) 216-8585 | |
| mhogan@kratzandbarry.com | |

11