# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

ACADIA PHARMACEUTICALS INC.,

Plaintiff,

v.

AUROBINDO PHARMA LIMITED, *et al.*,

Defendants.

C.A. No. 1:22-cv-01387-GBW
(Consolidated; Lead Case)



**PUBLIC VERSION FILED
JANUARY 21, 2025**

## PLAINTIFF ACADIA PHARMACEUTICALS INC.'S
## OPENING POST-TRIAL BRIEF ON INFRINGEMENT

## TABLE OF CONTENTS

Page

I. INTRODUCTION ........................................................................................................... 1

II. STATEMENT OF THE CASE ....................................................................................... 2

III. LEGAL STANDARDS FOR INFRINGEMENT............................................................ 2

IV. AUROBINDO'S ANDA PRODUCT INFRINGES THE ASSERTED CLAIMS............ 4

    A. Claim 4 ................................................................................................................ 4

        1. Element [a]: "A pharmaceutically acceptable capsule for orally delivering 34 mg of pimavanserin to a patient" ......................................... 4

        2. Element [b]: "wherein the capsule has a capsule shell with a capsule shell size 3 or 4" ............................................................................ 5

        3. Element [c]: "that encapsulates a blended pimavanserin composition comprising: granules comprising 40 mg pimavanserin tartrate and one or more pharmaceutically acceptable excipients" ............ 5

        4. Element [d]: "wherein the bulk density of the granules is >0.4 g/ml as determined by USP<616>, method 1" .................................................. 15

    B. Claim 5 .............................................................................................................. 15

V. CONCLUSION.............................................................................................................. 15

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Acorda Therapeutics Inc. v. Mylan Pharms. Inc.*,
   817 F.3d 755 (Fed. Cir. 2016) .................................................................................................3

*Adams Respiratory Therapeutics, Inc. v. Perrigo Co.*,
   616 F.3d 1283 (Fed. Cir. 2010) ...............................................................................................2

*In re Brimonidine Pat. Litig.*,
   643 F.3d 1366 (Fed. Cir. 2011) ...............................................................................................3

*Global-Tech Appliances, Inc. v. SEB S.A.*,
   563 U.S. 754 .........................................................................................................................4,9

*Markman v. Westview Instruments, Inc.*,
   52 F.3d 967 (Fed. Cir. 1995) ...................................................................................................2

*Par Pharm., Inc. v. Eagle Pharms., Inc.*,
   44 F.4th 1379 (Fed. Cir. 2022) ............................................................................................3, 9

*Sunovion Pharms., Inc. v. Teva Pharms. USA, Inc.*,
   731 F.3d 1271 (Fed. Cir. 2013) .......................................................................................2,3,10

ii

## TABLE OF ABBREVIATIONS

| Abbreviation | Meaning |
|---|---|
| ███ | ████████████ |
| PDR | Pharmaceutical Development Report |
| PF | Proposed Findings of Fact and Conclusions of Law |
| PLM | Polarized Light Microscopy |
| '721 patent | U.S. Patent No. 11,452,721 |

I.  **INTRODUCTION**

ACADIA has established, by a preponderance of the evidence, that Aurobindo's ANDA Product infringes claims 4 and 5 of the '721 patent. Aurobindo's ANDA expressly discloses all elements of the asserted claims within Aurobindo's ANDA Product, including the only element that Aurobindo appears to dispute—███████████████████████████████████████ ███████████████████████████████ Indeed, ███████████████████████ ████████████████████████████████████████████████████████, ██████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ████████████████

The numerous disclosures in Aurobindo's ANDA carry ACADIA's burden of proof on infringement. ACADIA, however, went even further with its proofs at trial and presented microscopy imaging by Dr. Pamela Smith, confirming Aurobindo's representations to the FDA about the presence of granules in Aurobindo's product.

Despite its representations to the FDA concerning ███████, ███████████████ ███████████████████████████████████████████████████████████████████ ██████████████████████████████ This convenient attempt to avoid infringement lacks merit. Aurobindo presented no evidence that it tried to correct these alleged mistakes, and Aurobindo's disclosures of ████████████████████████████████. Aurobindo's sole witness on these alleged "mistakes" (senior product developer, Mr. Saravanan Kannusamy) lacks credibility, as exemplified by his refusal to even acknowledge the incontrovertible fact that Aurobindo's draft documents used the word ████████ in describing its product. (Proposed Findings of Fact and Conclusions of Law ("PF") ¶ 25.)

Aurobindo's infringement expert, Dr. Christian Moreton, did not testify about

1

Aurobindo's repeated disclosures of ▮▮▮▮▮▮▮▮▮. (PF ¶ 44.) He acknowledged that the asserted claims just require granules, and no specific granulation process. (PF ¶ 41.) He did not perform any testing of Aurobindo's ANDA Product nor handle any of it himself. (PF ¶ 40.) He admitted that he lacks expertise in the imaging work that Dr. Smith performed. (PF ¶ 39.) His "criticisms" of Dr. Smith's testing are insufficient to overcome ACADIA's proof of infringement.

## II. STATEMENT OF THE CASE

Aurobindo seeks approval to market a generic version of ACADIA's 34 mg Nuplazid® capsule product. (PF ¶ 2.) Nuplazid®, which has pimavanserin as its active ingredient, is approved by the FDA for treatment of hallucinations and delusions associated with Parkinson's disease psychosis. (PF ¶ 6.) Asserted claims 4 and 5 of the '721 patent are directed to a pimavanserin capsule with a size 3 or 4 capsule shell and granules containing 40 mg of pimavanserin tartrate and one or more pharmaceutically acceptable excipients. (PF ¶¶ 4-5.)

The Court held a bench trial on December 3, 4, and 6 and heard testimony from two experts called by ACADIA, Drs. Smith (infringement) and Little (validity), and two experts and one fact witness called by Aurobindo, Drs. Moreton (infringement) and Muzzio (validity), and Mr. Kannusamy (fact).

## III. LEGAL STANDARDS FOR INFRINGEMENT

Infringement is a question of fact. *Sunovion Pharms., Inc. v. Teva Pharms. USA, Inc.*, 731 F.3d 1271, 1275 (Fed. Cir. 2013). In deciding infringement, the Court first construes the claims, and then the fact-finder compares the construed claims against the accused infringing product. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995). Infringement must be proven by a preponderance of the evidence, meaning that infringement is "more likely than not." *Adams Respiratory Therapeutics, Inc. v. Perrigo Co.*, 616 F.3d 1283,

1287 (Fed. Cir. 2010).

In the Hatch-Waxman context, the filing of an ANDA containing a paragraph IV certification for patents listed in the Orange Book is an "artificial" act of infringement for which the inquiry is "whether, if a particular drug were put on the market, it would infringe the relevant patent in the usual, non-artificial sense." *Acorda Therapeutics Inc. v. Mylan Pharms. Inc.*, 817 F.3d 755, 760 (Fed. Cir. 2016) (citation omitted). Infringement "is controlled by the ANDA specification itself." *Par Pharm., Inc. v. Eagle Pharms., Inc.*, 44 F.4th 1379, 1383-84 (Fed. Cir. 2022) ("If the ANDA defines a proposed generic drug in a manner that directly addresses the issue of infringement, it controls the infringement inquiry."). The ANDA directly resolves the infringement question if it defines a proposed generic product in a manner that either meets the limitations of an asserted patent claim or is outside the scope of such a claim. *Id.* (citing *Ferring B.V. v. Watson Lab'ys, Inc.-Fla.*, 764 F.3d 1401, 1408-09 (Fed. Cir. 2014)).

An ANDA applicant cannot describe its product one way to the FDA for approval and then a different way to the court to avoid infringement:

> What [the generic applicant] has asked the FDA to approve as a regulatory matter is the subject matter that determines whether infringement will occur, and the fact that [the generic applicant] either tells the court that its manufacturing guidelines will keep it outside the scope of the claims or has even filed a declaration in the court stating that it will stay outside the scope of the claims does not overcome the basic fact that it has asked the FDA to approve, and hopes to receive from the FDA, approval to market a product within the scope of the issued claims . . .
>
> What a generic applicant asks for and receives approval to market, if within the scope of a valid claim, is an infringement. If it had no intent to infringe, [the generic applicant] should not have requested, or should not accept, approval to market a product within the scope of the claim.

*Sunovion*, 731 F.3d at 1278-79; *see In re Brimonidine Pat. Litig.*, 643 F.3d 1366, 1378 (Fed. Cir. 2011), *as corrected* (Aug. 8, 2011) (noting that generic applicant "was bound by the representations in its ANDA").

3

Intent to infringe is not necessary for direct infringement; it is sufficient that the product infringes regardless of intent. *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 761 n.2 ("It is not necessary that Hospira intended the citric acid to function as a chelating agent if, as the district court could readily find, the citric acid actually does so.").

### IV. AUROBINDO'S ANDA PRODUCT INFRINGES THE ASSERTED CLAIMS

Aurobindo's ANDA Product infringes asserted claims 4 and 5 of the '721 patent, which read as follows (with elements bracketed for identification):

> **4.** [a] A pharmaceutically acceptable capsule for orally delivering 34 mg of pimavanserin to a patient, [b] wherein the capsule has a capsule shell with a capsule shell size 3 or 4, [c] that encapsulates a blended pimavanserin composition comprising:
>   granules comprising 40 mg pimavanserin tartrate and one or more pharmaceutically acceptable excipients; and
> [d] wherein the bulk density of the granules is >0.4 g/ml as determined by USP<616>, method 1.
>
> **5.** The pharmaceutically acceptable capsule of claim 4, wherein the capsule shell is a hard shell size 4 capsule.

At trial, Aurobindo's only meaningful dispute on infringement was ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ For the following reasons, Aurobindo's product infringes of each and every element of claims 4 and 5.

#### A. Claim 4

##### 1. Element [a]: "A pharmaceutically acceptable capsule for orally delivering 34 mg of pimavanserin to a patient"

Element [a] is the preamble. To the extent it is a limitation, it is met. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (PF ¶ 16.) 34 mg pimavanserin is equivalent to 40 mg pimavanserin tartrate, ▮▮▮

4

███████████████████████████████████████ (PF ¶ 17.)

### 2. Element [b]: "wherein the capsule has a capsule shell with a capsule shell size 3 or 4"

Aurobindo's ANDA Product ██████████████, and thus Element [b] is met. Numerous documents from Aurobindo's ANDA disclose ████████ and Dr. Smith testified to the same based on those documents. (PF ¶ 16.)

### 3. Element [c]: "that encapsulates a blended pimavanserin composition comprising: granules comprising 40 mg pimavanserin tartrate and one or more pharmaceutically acceptable excipients"

Aurobindo's ANDA Product meets Element [c]. At trial, ACADIA offered evidence from Aurobindo's ANDA ████████████████████████████████████ ████████████████ and Dr. Smith's microscopy images providing confirmation. In response, Aurobindo merely alleged that its ANDA statements describing its product as containing ██████████████████████████████████████ and that Dr. Smith's testing did not support her conclusions. Aurobindo's arguments are insufficient to overcome ACADIA's evidence of infringement.

#### a. "Granules" Do Not Require a Specific Process

The term "granules" is central to the dispute. ██████████████ ██████████████████████████ However, nothing in the patent specification, nor any of the evidence presented at trial, supports this argument. Indeed, the evidence shows that Aurobindo's process ████████████████████████████

At Markman, the Court construed several terms relating to "granules." (PF ¶¶ 8-10.) The Court found that "granules comprising 40 mg pimavanserin tartrate" and "granules comprising 40 mg pimavanserin tartrate and one or more pharmaceutically acceptable excipients" have their "plain and ordinary meaning," and that "the scope of the term granules

includes granules granulated with pimavanserin and excipients." (*Id.*) The Court further found that "[a] blended pimavanserin composition comprising . . ." has its "plain and ordinary meaning," and that "an extra-granular component is not required." (*Id.*) The Court did not limit "granules" by any particular process. (PF ¶¶ 8-11.)

The Court then denied Aurobindo's attempt to reargue claim construction, explaining that the claims are not product-by process claims. (PF ¶ 11.) At trial, the Court explained that the claimed granules are not limited by any particular type of "intentional process of granulation." (PF ¶ 11.) The Court's rulings align with the '721 patent specification, which describes granules as "[p]rimary powder particles . . . made to adhere to form larger, multiparticle entities." (PF ¶ 12.) The specification mentions no restriction on the process or type of adherence or bonds between the particles. (PF ¶ 13, 41.) Even Dr. Moreton agreed that a POSA would understand that the use of "adhere" in the specification means particles of different types sticking together, and that adherence "in simple terms" could encompass both a rigid adherence and a looser adherence. (PF ¶ 41.) Dr. Moreton further agreed that the "definition of granules" in the patent "just uses the term 'adhere,' without any qualification." (PF ¶ 41.) Thus, as described in the patent, "granules" do not require the particles to be permanently bonded together.

The specification also provides various non-limiting examples of granules and how they might be formed. (PF ¶ 14 ("Granules may *for example* be formed collecting particles together by creating mechanical bonds between them, e.g. by compression or by using a binder.") (emphasis added).) "Compression" and use of a binder are merely provided as examples in the specification but are not required to form granules, even in situations where the manufacturing process is a dry process. (*Id.*) The specification describes granulation generally without requiring a specific process: "[g]enerally a granulation process combines one or more particles

and forms a granule that will allow tableting or the encapsulation process to be within required limits." (*Id*.) The specification further describes non-limiting examples of equipment that can be used for granulation: "granulation can be performed in a variety of equipment *such as, but not limited to,* low shear, high shear granulators, fluid bed granulator, roller compactor, and slugger." (*Id*.) Nowhere in the specification is there any process requirement or teaching that a compression step is required.

███████████████████████████████████

██████████████████████ as the term is commonly understood and used in the '721 patent.

### b. Aurobindo's ANDA Proves Infringement of Element [c]

#### (1) Aurobindo's ANDA Discloses ███████████

As detailed at trial, Aurobindo's ANDA describes ████████████████████████

████████████████████████████████████████████████████████

██████████████████ Section 3.2.P.3.3 in Aurobindo's ANDA, Description of Manufacturing Process and Process Controls, ██████████████████████████████

████████████████████████ (PF ¶ 18.) Section 3.2.P.2 in Aurobindo's ANDA, the Pharmaceutical Development report ("PDR"), ██████████████████████

███████████████████████████████████████. (PF ¶ 19-21.) The PDR in particular ████████████████████████████████████████████████

████████████████████████████████████████ (PF ¶ 19.)

Section 3.2.P.3.3 lists a series of several steps in the manufacture of Aurobindo's product.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

7

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████

████████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████

The PDR expressly describes ████████████████████████████ (PF ¶ 19-21.) Specifically, in subsection 3.2.P.2.3, "Manufacturing Process Development," Aurobindo included ██████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████. (PF ¶ 20.) ████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████ further supports a finding of infringement. ██████████████████████████████████████████

██████████████████████████████████████████████████████

8



▇▇▇▇▇▇▇▇▇▇ (PF ¶ 21.) ▇▇▇▇▇▇▇▇▇▇

In sum, Aurobindo stated to the FDA ▇▇▇▇▇▇▇▇▇▇

▇▇▇ As Dr. Smith testified, these disclosures inform a POSA that Aurobindo's product ▇▇▇▇▇▇ (72:5-76:20)[1], and provide conclusive proof of infringement.  *See Par Pharm.*, 44 F.4th at 1383-84.  Aurobindo cannot legitimately describe its product one way to the FDA for approval and a different way to the Court to avoid infringement.

In addition to the ANDA, evidence presented at trial shows that Aurobindo consistently described the result of ▇▇▇▇▇▇▇▇▇▇.  These representations can be found in ▇▇▇▇▇▇▇▇▇▇ (PF ¶ 22.)  These documents further support ▇▇▇▇▇▇▇▇▇▇.  (PF ¶ 23.)

Moreover, while there is no intent requirement for infringement here (*see Global-Tech Appliances,* 563 U.S. at 761 n.2), to the extent that Aurobindo attempts to argue that there is one,

---

[1] References to ([page]:[line]) refer to the trial transcript.

9

Aurobindo's intent is clear, given the repeated ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See Sunovion*, 731 F.3d at 1278-79; (PF ¶ 23.)

### (2) Aurobindo's "Mistake" Argument Lacks Credibility

In the face of overwhelming evidence from its own ANDA (and draft MFCs), Aurobindo now claims that its repeated disclosures of ▮▮▮▮▮▮ was a mistake. This argument lacks credibility.

First, Aurobindo described its product as containing ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮



These disclosures lead to the conclusion that Aurobindo was not mistaken in its representations to the FDA.

Second, Aurobindo has made no attempt to present evidence that it tried to correct these "mistakes" with the FDA. Indeed, the PDR is still the operative document being considered as part of Aurobindo's application. (PF ¶ 24.) Mr. Kannusamy agreed on cross-examination that "[i]f Aurobindo believed that something was incorrect in its ANDA, it would take steps to correct it with the FDA." (*Id.*) As there is no evidence that Aurobindo tried to correct the alleged mistakes with the FDA, it is proper to conclude that the repeated disclosures of ▮▮▮▮▮ are not mistakes.

Third, Mr. Kannusamy lacks credibility as a witness. He was so focused on repeating Aurobindo's litigation mantra—that its product ▮▮▮▮▮▮▮▮▮▮▮▮▮▮—that he refused to even acknowledge the fact that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ used the word ▮▮▮▮▮ in describing its products. (PF ¶ 25-26.) His refusal to acknowledge such incontrovertible facts casts serious

10

doubt on the veracity of his testimony overall.

### c. Dr. Smith's Testing Confirms the Presence of ▮

In addition to reviewing Aurobindo's documents, Dr. Smith used polarized light microscopy ("PLM") and stereomicroscopy to see the granules Aurobindo's product. (PF ¶ 27-29.) Dr. Smith recorded the results of her testing in laboratory notebooks. (PF ¶ 32-33.) Dr. Smith is a recognized expert in both techniques, having analyzed solid dosage forms using such techniques hundreds of times. (PF ¶ 27.) Dr. Smith's analysis showed that in Aurobindo's product, consistent with Aurobindo's ANDA, ▮ ▮ (PF ¶ 35.)

Stereomicroscopy provides a magnified image of the ▮ using reflected light. (PF ¶ 31.) Dr. Stereomicroscopy imaging helps to see whether or not ▮ are present (PF ¶ 30-32.) Dr. Smith testified about a representative image, which revealed a ▮ ▮ (PF ¶ 32.) She testified about additional stereomicroscopy images showing ▮ as well. (*Id.*)

Dr. Smith also testified regarding her PLM studies. She used PLM to look more closely inside the contents of Aurobindo's product and to see their structure. (PF ¶ 33-35.) PLM involves transmitting light through a sample instead of reflecting it off the surface as in stereomicroscopy. (PF ¶ 34.) Dr. Smith used three different types of PLM techniques to view Aurobindo's ANDA Product, explaining their purpose at trial. (PF ¶ 33-35.) Importantly, Dr. Smith testified that she could clearly distinguish between ▮ ▮. (PF ¶ 33-35.) This allowed her to confirm the presence of ▮ in Aurobindo's product. (PF ¶ 33-37.)

Dr. Smith included many PLM images in her laboratory notebook and also testified

11

regarding the observations that she made while performing her testing, including those that she did not capture images of. (PF ¶ 33-37.) She testified that not once did she see pimavanserin tartrate particles alone—meaning that she always saw pimavanserin tartrate in a ▇ adhered to an excipient, ▇ (PF ¶ 35.) Notably, Aurobindo has presented no evidence to the contrary.

Dr. Smith testified that there is no practical way to test every single solid in Aurobindo's product to confirm that it is in a ▇, but that the numerous images and observations that she did make (including of the materials in the bottom collection pan of her experimental set up) provided her with complete confidence that all 40 mg of the pimavanserin tartrate in Aurobindo's product was ▇. (PF ¶ 37.) If any of the pimavanserin tartrate was not in a ▇, ▇ in the images and observations that she made. But not once did she observe ▇. (PF ¶ 33-37.)

Furthermore, Dr. Smith testified that her sample preparation, which involved sieving the contents of Aurobindo's product to break up any agglomerates and preparing slides with mineral oil, would have dispersed any pimavanserin that was not part of a ▇, and that she would have observed such pimavanserin had it existed. (PF ¶ 36.) Dr. Smith's findings are consistent with Aurobindo's ANDA as described above.

### d. Aurobindo's Other Non-Infringement Arguments Fail

In addition to arguing "mistake" through Mr. Kannusamy, Aurobindo offered non-infringement testimony through Dr. Moreton. His testimony fails to overcome ACADIA's substantial evidence of infringement. Dr. Moreton's primary argument is that ▇ ▇. Dr. Moreton's argument is easily dismissed given the evidence to the contrary.

As explained, nothing in the '721 patent or claim construction requires a compression

12

step in a dry process. If the pimavanserin tartrate particles are made to adhere with other particles, granules are formed. Dr. Moreton agrees that (1) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"[2] and (2) that no specific process is required under the '721 patent to form granules. (PF ¶ 41.) Yet he still testified that compression is needed for a dry process to form granules. It appears that Dr. Moreton is trying to surreptitiously import a process limitation. Moreover, Dr. Smith testified that, while a specific compression step might be the most typical way of forming granules in a dry process, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (131:16-23.)

Further, the manufacturing process as described in Aurobindo's own ANDA contradicts Dr. Moreton's opinion that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (PF ¶ 15-21.) Dr. Moreton testified that there were "clumps" in Aurobindo's product, ▮▮▮▮▮▮. (197:25-198:2.) But this is based on his theory—unsupported by the '721 patent—that a "compression step" is required. Notably, Dr. Moreton never addressed Aurobindo's repeated disclosures of ▮▮▮▮▮ in its documents at trial.

In contrast, and consistent with Aurobindo's ANDA, Dr. Smith's testing shows ▮▮▮▮. While Dr. Moreton criticized Dr. Smith's testing at trial, he failed to establish that her testing was unreliable. Dr. Moreton even admitted at trial that *he is not an expert in PLM and has never operated a polarized light microscope.* (PF ¶ 39-40.) Thus, Dr. Moreton is not even remotely as qualified as Dr. Smith to testify regarding PLM, and his criticisms of her PLM testing should carry little weight. Moreover, Dr. Moreton (1) did not conduct *any* of his own testing on

---

[2] This important admission by Dr. Moreton is consistent with references introduced by Aurobindo, which characterize MCC as a filler/binder that can be used to form granules. (PF ¶ 38.) This is also consistent with testimony from ACADIA's validity expert, Dr. Little, who agrees that MCC can serve a dual role of filler and binder forming granules, as here. (*Id.* ("MCC is what we call a filler/binder, so it's -- I think it's like the prototypical filler/binder.").)

13

Aurobindo's product, (2) did not try to replicate *any* of Dr. Smith's tests, and (iii) never even handled *any* of Aurobindo's product. (PF ¶ 39-45.) At best, Dr. Moreton merely speculated about alleged issues with Dr. Smith's testing. Such "armchair quarterbacking" must be viewed in a circumspect manner.

Dr. Moreton admitted that "a lot of what Dr. Smith explained [about her testing] may be valid." (PF ¶ 41.) However, he opines that her testing could not inform a POSA as to how particles are structured or what they contain. (210:3-215:5.) This is a fundamental dispute between the two experts, which pits Dr. Smith's decades of expertise using PLM and stereomicroscopy against Dr. Moreton's admitted lack of expertise. Dr. Smith offered detailed and persuasive testimony on the ▓▓▓▓ she observed and the conclusions she drew from them (which matched Aurobindo's own ANDA disclosures). (PF ¶¶ 27-37.) Conversely, Dr. Moreton offered no testing of his own and merely speculated over purported issues with Dr. Smith's testing. (PF ¶¶ 39-45.)

Dr. Moreton criticized Dr. Smith for not imaging ▓▓▓▓▓▓▓▓▓▓ used as an excipient in Aurobindo's product as a control for her testing. (209:6-210:2.) Dr. Smith testified that she has looked at the excipients "hundreds, if not thousands of times" in her career and knows what they look like. (PF ¶ 27.) Dr. Moreton offered no evidence that ▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓ impacted Dr. Smith's analysis. (PF ¶ 43.)

Dr. Moreton alleges that humidity "*may* well have affected the results" of Dr. Smith's testing and caused the nature of the pimavanserin to change (218:3-10; 215:22-216:11), but admitted on cross-examination that he did not perform any studies on the effect of humidity, nor was he "saying definitely" or "with any certainty" that humidity changed Dr. Smith's results. (PF ¶ 42.) Dr. Smith testified that nothing she did in terms of her sample preparation created

14

granules in Aurobindo's product that were not already there. (131:8-10.)

Dr. Moreton's string of unsupported criticisms fails to overcome Dr. Smith's testing and Aurobindo's admissions concerning ▬▬. ACADIA has shown that all limitations of Element [c] are met.

    **4.    Element [d]: "wherein the bulk density of the granules is >0.4 g/ml as determined by USP<616>, method 1"**

Aurobindo's ANDA Product meets this claim element. Bulk density is the ratio of the mass of an untapped sample over its volume, expressed in grams/milliliter. (PF ¶ 46.) Claim 4 requires measuring bulk density according to USP<616>, method 1. Dr. Smith conducted bulk density testing of Aurobindo's ANDA Product according to USP<616>, method 1, and recorded the results of her testing in her lab notebook. (PF ¶ 47-48.) She ran two tests —the first resulted in a bulk density reading of ▬▬ and the second in ▬▬. (*Id.*)

The results of Dr. Smith's testing are consistent with the results that appear in Aurobindo's ANDA. (PF ¶ 49.) ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ (JTX-0106-AURO-013.) (*Id.*) Dr. Moreton did not offer testimony refuting this limitation nor Dr. Smith's bulk density testing. (PF ¶ 50.)

    **B.    Claim 5**

Claim 5 is dependent on claim 4 and further requires a "hard shell" size 4 capsule. Aurobindo's product meets this claim, ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. (PF ¶ 16.) Dr. Moreton did not offer testimony refuting infringement of this limitation.

**V.    <u>CONCLUSION</u>**

For these reasons, Aurobindo's product infringes claims 4 and 5 of the '721 patent.

<table>
<tr><td>

*Of Counsel*:

Chad J. Peterman
Bruce M. Wexler
Scott F. Peachman
Peter E. Conway
PAUL HASTINGS LLP
200 Park Avenue
New York, New York 10166
(212) 318-6000

Felix A. Eyzaguirre
PAUL HASTINGS LLP
600 Travis Street, 58th Floor
Houston, TX 77002
(713) 860-7300

Dated: January 13, 2025

</td><td>

**SAUL EWING LLP**

*/s/ Michelle C. Streifthau-Livizos*
James D. Taylor, Jr. (#4009)
Jessica M. Jones (#6246)
Michelle C. Streifthau-Livizos (#6584)
1201 N. Market Street, Suite 2300
P.O. Box 1266
Wilmington, Delaware 19899
(302) 421-6800
james.taylor@saul.com
jessica.jones@saul.com
michelle.streifthau-livizos@saul.com

*Attorneys for Plaintiff ACADIA Pharmaceuticals Inc.*

</td></tr>
</table>