**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

ACADIA PHARMACEUTICALS INC.,

       Plaintiff,

  v.

AUROBINDO PHARMA LIMITED, *et al.*,

       Defendants.

C.A. No. 1:22-01387-GBW
(Consolidated; Lead Case)

**PUBLIC VERSION FILED**
**JANUARY 21, 2025**

**PLAINTIFF ACADIA PHARMACEUTICALS INC.'S**
**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

## TABLE OF CONTENTS

**Page**

I.  THE PARTIES..................................................................................................... 1

II.  THE '721 PATENT ............................................................................................ 1

III.  NUPLAZID® ..................................................................................................... 2

IV.  CLAIM CONSTRUCTION................................................................................. 2

V.  AUROBINDO'S ANDA AND MASTER FORMULA CARDS.................................... 3

VI.  TESTING OF AUROBINDO'S PRODUCT................................................................ 7

## I.    THE PARTIES

1.    Plaintiff ACADIA Pharmaceuticals Inc. ("ACADIA") is a corporation organized and existing under the laws of the State of Delaware.  (D.I. 101, Ex. 1, Joint Statement of Uncontested Facts ("JSUF") at ¶ 1.)

2.    Defendant Aurobindo Pharma Limited ("Aurobindo Limited") is an entity organized and existing under the laws of India and Defendant Aurobindo Pharma USA, Inc. ("Aurobindo USA") is a corporation organized and existing under the laws of the State of Delaware.  Aurobindo Limited and Aurobindo USA (collectively, "Aurobindo") work in concert regarding regulatory approval, manufacturing, and commercialization of products in the U.S. (*Id*. at 6-7.)

## II.    THE '721 PATENT

3.    U.S. Patent No. 11,452,721 ("the '721 patent") titled "FORMULATIONS OF PIMAVANSERIN" was issued on September 27, 2022, from U.S. Application No. 17/693,830, which was filed on March 14, 2022 and claims priority to U.S. Provisional Patent Application No. 62/552,300, which was filed on August 30, 2017.  (JTX-0009-02.)  The '721 patent expires August 27, 2038.  (JSUF at ¶ 14.)

4.    Claim 4 of the '721 patent recites:

> 4. A pharmaceutically acceptable capsule for orally delivering 34 mg of pimavanserin to a patient, wherein the capsule has a capsule shell with a capsule shell size 3 or 4, that encapsulates a blended pimavanserin composition comprising: granules comprising 40 mg pimavanserin tartrate and one or more pharmaceutically acceptable excipients; and wherein the bulk density of the granules is >0.4 g/ml as determined by USP<616>, method 1.

> (JTX-0009-0025.)

5.    Claim 5 of the '721 patent recites: "The pharmaceutically acceptable capsule of claim 4, wherein the capsule shell is a hard shell size 4 capsule."  (*Id.*)

-1-

III.  **NUPLAZID®**

6.      ACADIA is the holder of approved New Drug Application ("NDA") No. 210793

for Nuplazid® (pimavanserin) immediate-release, oral capsules of 34 mg, which is indicated for

the treatment of hallucinations and delusions associated with Parkinson's disease psychosis.

(JSUF at ¶¶ 9-10; 24:24–25:14.)[1]

7.      The '721 patent is listed in the U.S. Food and Drug Administration's ("FDA")

publication titled *Approved Drug Products with Therapeutic Equivalence Evaluations* (also

known as the "Orange Book") in conjunction with Nuplazid®.  (JSUF at ¶ 14.)

IV.  **CLAIM CONSTRUCTION**

8.      The Court construed  "[a] blended pimavanserin comprising: granules comprising

40 mg pimavanserin tartrate and one or more pharmaceutically acceptable excipients" of claim 4

of the '721 patent as follows: "Plain and ordinary meaning; an extra-granular component is not

required."  (D.I. 44 at 1.)

9.      The Court construed "[g]ranules comprising 40 mg pimavanserin tartrate" of

claim 4 of the '721 patent as follows: "Plain and ordinary meaning; the scope of the term granule

includes granules granulated with pimavanserin and excipients."  (*Id.* at 1-2.)

10.     The Court construed "[g]ranules comprising 40 mg pimavanserin tartrate and one

or more pharmaceutically acceptable excipients" of claim 4 of the '721 patent as follows:  "Plain

and ordinary meaning; the scope of the term granule includes granules granulated with

pimavanserin and excipients."  (*Id.*)

11.     Claims 4 and 5 of the '721 patent are not product-by-process claims and "do not

otherwise involve any process limitations."  (D.I. 112 at 20-22; 137:23-138-5.)

_____

[1] References to ([page]:[line]) refer to the trial transcript.

12.    "Granules" appears within the phrases the Court has construed as having their plain and ordinary meanings.  The plain and ordinary meaning of granules is provided in the '721 patent specification: "[p]rimary powder particles . . . made to adhere to form larger, multiparticle entities."  (JTX-09-0015 at 4:46-47; D.I. 43 at 9.)

13.    "Adhere" in the specification means particles of different types sticking together, and adherence encompasses both a rigid adherence and a looser adherence.  (225:14-25.) The '721 patent specification places no restriction on the type of adherence between the particles and uses "adhere" "without any qualification."  (226:1-4.)

14.    The specification provides non-limiting examples of granules and how they might be formed.  "Granules may for example be formed collecting particles together by creating mechanical bonds between them, e.g. by compression or by using a binder."  (JTX-0009 at 4:49–50; D.I. 43 at 9.)  The specification describes granulation generally without requiring a specific process: "[g]enerally a granulation process combines one or more particles and forms a granule that will allow tableting or the encapsulation process to be within required limits."  (JTX-0009 at 4:53–55.)   The specification further describes non-limiting examples of equipment that can be used for granulation: "granulation can be performed in a variety of equipment *such as, but not limited to,* low shear, high shear granulators, fluid bed granulator, roller compactor, and slugger."  (*Id.* at 4:56-58.)   Neither the specification nor the claims require a compression step in a dry process.

V.    **AUROBINDO'S ANDA AND** ███████████████

15.    Aurobindo submitted ANDA No. 214782 ("Aurobindo's ANDA") to the FDA under § 505(j)(2) of the Federal Food, Drug, and Cosmetic Act seeking approval to engage in the manufacture, use, sale, or offer for sale of pimavanserin 34 mg capsules ("Aurobindo's Product") prior to the expiration of the '721 patent.  (JSUF at ¶ 25.)

16. Aurobindo's Product is ████████████████████████ ████████████████████████████████████████. (JTX-0103-AURO0002; JTX-0105-AURO0002, -0003, -0010; 59:8-20, 63:16-64:15, 112:9-113:16.)

17. Aurobindo's Product contains ████████████████ ███████████████████████████████████. (*See* PTX-1213 at Section 11, Description; 61:1-12.)

18. Aurobindo's ANDA contains Section 3.2.P.3.3 that provides a description of the manufacturing process for Aurobindo's Product. (*See* JTX-0106-AURO.)



19. Aurobindo's ANDA contains Section 3.2.P.2 which includes a "Pharmaceutical development report [that] summarizes the development" of Aurobindo's Product. (JTX-0125-AURO0007.) This report, which was submitted to the FDA, ████████████████████

███████████████████████████████████████████████

████████ (*Id*. at AURO0004; 154:8-19; 162:1-25.)

      20. ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████ Thus, Aurobindo discloses ████████████████

████████████████████████████████ in its product.

      21.   Aurobindo disclosed the presence of ████████████████████

████████████████████ in two additional places in the pharmaceutical development

report. ████████████████████████████████

████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████

██████████████████████████████████████████

████████████████████████████████



████████████████████████████████ Thus, in JTX-0125-AURO, Aurobindo

discloses the presence of ████████████████████████████

████████ in its product.  (66:25-67:7, 68:24-69:4.)

22.    ██████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████

23.    The disclosures of granules in JTX-125-AURO, as supported by the disclosures

████████ in JTX-0134-AURO, JTX-0108-AURO, JTX-0109-AURO, demonstrates that

Aurobindo makes ████████████████ and intended to do so.

24.    Mr. Saravanan Kannusamy, Aurobindo's Associate Vice President in Formulation

R&D Center, agreed that "[i]f  Aurobindo believed that something was incorrect in its ANDA, it

would take steps to correct it with the FDA."  (149:12–19.)  Aurobindo introduced no evidence

that it made any attempt to correct the allegedly erroneous disclosures of ████████ in JTX-125-

AURO.  JTX-125-AURO is still included in Aurobindo's ANDA, and thus Aurobindo is

continuing to represent to the FDA that its product contains ███████████

██████████████████████████. (167:7-10.)

25.    Mr. Kannusamy refused to acknowledge the incontrovertible fact that JTX-0134-

AURO states ████████████████████████████" (167:19-169:20.)

26.    Aurobindo's contention that the repeated references to ████████ in its ANDA at

JTX-125-AURO are just "mistakes" lacks credibility.

## VI.    TESTING OF AUROBINDO'S PRODUCT

27.    ACADIA's infringement expert Dr. Pamela Smith has a Ph.D. in Analytical

Chemistry from Miami University and an undergraduate degree (B.A.) in Chemistry from

Illinois Wesleyan University.  Her expertise lies in microscopy techniques, including

stereomicroscopy and polarized light microscopy ("PLM"), which she has used to analyze solid

dosage forms hundreds of times.  (51:11-17, 52:2-7, 12-14, 16-21, 102:5-13; 91:8-16.)

28.    Dr. Smith was admitted in this case as an expert in pharmaceutical science,

including formulation and characterization of pharmaceutical dosage forms, such as solid dosage

forms and development of such formulations.  (53:6-13.)

29.    Dr. Smith's testing confirmed the disclosures in Aurobindo's ANDA that its

product contains granules comprising 40 mg pimavanserin tartrate and one or more

pharmaceutically acceptable excipients and meets the remaining elements of claims 4 and 5.

30.    Dr. Smith examined the contents of Aurobindo's Product using stereomicroscopy

and PLM.  (82:8-15.)

31.    Stereomicroscopy provides a magnified image of the ██████ using reflected

light and helps to determine whether granules are present.  (82:23-83:5.)

32.    Dr. Smith recorded her stereomicroscopy imaging in JTX-0062, which includes

(1) image 12-38-1-1-1 of a ████████████████████████████

████, (83:9-11; 83:18-84:5), and an image labeled Sieve Number 200-75 micro-2, which

shows ██████████████████████████████████████. (84:19-85:3).

33.    Dr. Smith conducted PLM testing of Aurobindo's product to look more closely at

████████████████████████████████████ and recorded images from that analysis

in JTX-0061.  (85:1-6; 88:12-19.)

34.    PLM involves transmitting light through a sample instead of reflecting it off the

surface as in stereomicroscopy.  (85:7-88:13.)  Dr. Smith used three different types of PLM

techniques to view Aurobindo's ANDA Product.  (86:14-87:12.)

35.    The images at JTX-0061, 15-17 are PLM images of Aurobindo's product showing

█████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████    Dr. Smith has looked at the excipients in Aurobindo's product

"hundreds, if not thousands of times" in her career and knows what they look like.  (102:5-13;

91:8-16.)

36.    Dr. Smith prepared samples of Aurobindo's Product for imaging by sieving the

product to break up any agglomerates and added mineral oil to the slides containing the contents

of the capsules of Aurobindo's product.  (96:3-97:24; 116:16-21.)  The preparation work would

have dispersed any pimavanserin that was not part of the ██████. (97:6-18.)  Aurobindo's

product withstood Dr. Smith's sample prep, further conforming that 

█████. (97:13-18; 121:7-14.)

37.    There is no practical way to test every single solid in Aurobindo's product to confirm that it is in a ████, but Dr. Smith's numerous images and observations satisfy ACADIA's burden of proving infringement. (133:5-15.) Aurobindo's Product contains ████ ██████████████████████████████.

38.    ████ can serve a dual role of filler/binder to form granules. (180:14-18, 186:6-10, 584:16-22.)

39.    Dr. Moreton, Aurobindo's expert, was proffered as an expert in "pharmaceutical formulation." (177:13-14.) Dr. Moreton is not an expert in polarized light microscopy and has never operated a polarized light microscope. (227:16-228:2.)

40.    Dr. Moreton never handled Aurobindo's Product nor performed any testing of Aurobindo's Product. He did not conduct PLM imaging or stereomicroscopy imaging on Aurobindo's Product. (220:18-221:10.)

41.    Dr. Moreton admitted that "a lot of what Dr. Smith explained [about her testing] may be valid." (213:9-20.) He agreed that the asserted claims just require granules and that "adhere" is used "in simple terms," without qualification. (131:16-23 132:8-17, 187:3-12, 210:3-215:5, 223:25-224:7, 225:14-25, 226:1-4.) He also agreed that "pimavanserin can adhere to ████████████████, depending on the particle size" and agrees that no specific process is required under the '721 patent to form granules. (226:9-12; 226:17-227:1)

42.    Dr. Moreton did not conduct any studies to determine whether humidity impacted the results of Dr. Smith's testing and cannot say "with any certainty" or "definitely" that humidity changed Dr. Smith's results. (222:1-24.)

43.     Dr. Moreton offered no evidence that using a different type of ███ as a control impacted Dr. Smith's analysis.

44.     Dr. Moreton did not provide any testimony at trial regarding the alleged errors or mistakes disclosing granules in Aurobindo's ANDA and ████████████████.

45.     Dr. Moreton's testimony is insufficient to overcome the infringement evidence from Aurobindo's ANDA and Dr. Smith's testing introduced by ACADIA.

46.     Bulk density is the ratio of the mass of an untapped sample over volume and is expressed as grams per milliliter.  (106:2-6.)  Aurobindo disclosed the bulk density results of its three exhibit batches ████████████████ in JTX-0106-AURO-013.  The reported bulk densities were ████████████████, respectively.  (JTX-0106-AURO-013.)

47.     Dr. Smith measured bulk density according to Claim 4 and recorded the results in her lab notebook at JTX-0063.  (103:24-104:7.)  Dr. Smith's testing confirmed Aurobindo's testing and showed that ████████████████████████ ████████████ according to USP<616>, method 1.  (104:14-16.)

48.     Dr. Smith validated the bulk density testing process under USP<616>, method 1 and conducted two bulk density tests on Aurobindo's Product with the first resulting in ██████ ████████████████████████ ███ (104:17-24; 106:15-111:6; JTX-0057; JTX-0060.)

49.     The results of Dr. Smith's testing were consistent with the results that appear in Aurobindo's ANDA at JTX-0106-AURO-013.  (104:25-105:5.)

50.     Dr. Moreton offered no testimony refuting this limitation nor Dr. Smith's bulk density testing.

51.     Aurobindo's ANDA Product infringes claims 4 and 5 of the '721 patent.

Dated: January 13, 2025

OF COUNSEL:

Chad J. Peterman
Bruce M. Wexler
Scott F. Peachman
Peter E. Conway
PAUL HASTINGS LLP
200 Park Avenue
New York, New York 10166
(212) 318-6000

Felix A. Eyzaguirre
PAUL HASTINGS LLP
600 Travis Street, 58th Floor
Houston, TX 77002
(713) 860-7300

**SAUL EWING LLP**

*/s/ Michelle C. Streifthau-Livizos*
James D. Taylor, Jr. (#4009)
Jessica M. Jones (#6246)
Michelle C. Streifthau-Livizos (#6584)
1201 N. Market Street, Suite 2300
P.O. Box 1266
Wilmington, Delaware 19899
(302) 421-6800
james.taylor@saul.com
jessica.jones@saul.com
michelle.streifthau-livizos@saul.com

*Attorneys for Plaintiff ACADIA
Pharmaceuticals Inc.*