**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ACADIA PHARMACEUTICALS INC.,<br><br>    Plaintiff,<br><br>v.<br><br>AUROBINDO PHARMA LIMITED, *et al.*,<br><br>    Defendants. | C.A. No. 1:22-cv-01387-GBW<br>(Consolidated; Lead Case)<br><br>**HIGHLY CONFIDENTIAL** |

**PLAINTIFF ACADIA PHARMACEUTICALS INC.'S
<u>RESPONSIVE POST-TRIAL BRIEF ON INVALIDITY</u>**

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ........................................................................................................... 1

II. DEFENDANTS FAILED TO PROVE  OBVIOUSNESS BY CLEAR AND CONVINCING EVIDENCE ................................................................................................ 1

    A. Defendants Have Not Alleged a Cognizable Legal Theory of Obviousness ......... 1

    B. Defendants Failed to Prove Motivation to Modify Nuplazid Tablets  to Achieve the Asserted Claims by Clear and Convincing Evidence ....................... 2

        1. Defendants Have Not Shown  Motivation to Reformulate Nuplazid Tablets ................................................................................................... 3

        2. Defendants Have Not Shown Motivation  to Use Capsules Over Other Dosage Forms,  or Size 3 or 4 Capsules if Capsules Were Used ......................................................................................................... 4

    C. Defendants Failed To Show a Reasonable Expectation of Success in Modifying Nuplazid Tablets to Achieve the Claimed Invention .......................... 7

III. DEFENDANTS HAVE FAILED TO PROVE THAT  "PHARMACEUTICALLY ACCEPTABLE CAPSULE"  RENDERS THE ASSERTED CLAIMS INVALID UNDER 35 U.S.C. 112(B) ................................................................................................ 10

IV. DEFENDANTS FAILED TO PROVE THAT THE ASSERTED  CLAIMS LACK WRITTEN DESCRIPTION OR ARE NOT ENABLED .................................... 12

    A. "Granules Comprising 40 mg Pimavanserin Tartrate and One or More Pharmaceutically Acceptable Excipients" Does Not Lack Written Description .................................................................................................... 12

    B. "Wherein the Bulk Density of the Granules Is >0.4 g/ml as Determined by USP<616>, Method 1" Is Not Invalid For Written Description or Enablement ....................................................................................................... 14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
694 F.3d 1312 (Fed. Cir. 2012)....................................................................................4

*Allen Engineering Corp. v. Bartell Industries*,
299 F.3d 1336 (Fed. Cir. 2002)..................................................................................12

*Allergan, Inc. v. Sandoz Inc.*,
796 F.3d 1293 (Fed. Cir. 2015)................................................................................4, 9

*Alza Corp. v. Andrx Pharms., LLC*,
607 F. Supp. 2d 614 (D. Del. 2009)..............................................................................7

*Ancora Techs., Inc. v. Apple, Inc.*,
744 F.3d 732 (Fed. Cir. 2014)...............................................................................11, 12

*Arctic Cat Inc. v. GEP Power Prods., Inc.*,
919 F.3d 1320 (Fed. Cir. 2019)..................................................................................10

*Aventis Pharma S.A. v. Hospira, Inc.*,
675 F.3d 1324 (Fed. Cir. 2012)..................................................................................10

*BASF Corp. v. Johnson Matthey Inc.*,
875 F.3d 1360 (Fed. Cir. 2017)..................................................................................11

*Baxalta Inc. v. Bayer Healthcare LLC*,
513 F. Supp. 3d 426 (D. Del. Jan. 19, 2021) ............................................................14

*Cont'l Cirs. LLC v. Intel Corp.*,
915 F.3d 788 (Fed. Cir. 2019)....................................................................................11

*Eli Lilly & Co. v. Teva Pharms. Int'l GmbH*,
8 F.4th 1331 (Fed. Cir. 2021) ...................................................................................1, 7

*Fs.Com Inc. v. Int'l Trade Comm'n*,
65 F.4th 1373 (Fed. Cir. 2023) ..................................................................................15

*Impax Labs., Inc. v. Aventis Pharms., Inc.*,
545 F.3d 1312 (Fed. Cir. 2008)................................................................................1, 2

*Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*,
821 F.3d 1359 (Fed. Cir. 2016)....................................................................................7

*Lampi Corp. v. American Power Prods., Inc.*,
   228 F.3d 1365 (Fed. Cir. 2000)............................................................................12

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
   358 F.3d 898 (Fed. Cir. 2004)..............................................................................10

*Life Techs., Inc. v. Clontech Labs., Inc.*,
   224 F.3d 1320 (Fed. Cir. 2000)..............................................................................3

*Medichem, S.A. v. Rolabo, S.L.*,
   437 F.3d 1157 (Fed. Cir. 2006)..............................................................................3

*Otsuka Pharm. Co. v. Sandoz, Inc.*,
   678 F.3d 1280 (Fed. Cir. 2012)..............................................................................1

*PAR Pharm., Inc. v. TWI Pharms., Inc.*,
   773 F.3d 1186 (Fed. Cir. 2014)..............................................................................1

*Polaris Indus., Inc. v. Arctic Cat, Inc.*,
   882 F.3d 1056 (Fed. Cir. 2018)..............................................................................6

*Purdue Pharma L.P. v. Depomed, Inc.*,
   643 F. App'x 960 (Fed. Cir. 2016)........................................................................10

*Seagen Inc. v. Daiichi Sankyo Co.*,
   No. 2:20-CV-00337-JRG, 2022 WL 2789901, at *8 (E.D. Tex. July 15, 2022)...................12

*Shire LLC v. Amneal Pharms., LLC*,
   802 F.3d 1301 (Fed. Cir. 2015)..............................................................................1

*TQ Delta, LLC v. CISCO Sys., Inc.*,
   942 F.3d 1352 (Fed. Cir. 2019)......................................................................5, 6, 7

*Univ. of Strathclyde v. Clear-Vu Lighting LLC*,
   17 F.4th 155 (Fed. Cir. 2021) ...............................................................................2

*Vanda Pharm., Inc. v. West-Ward Pharms. Int'l Ltd.*,
   887 F.3d 1117 (Fed. Cir. 2018)............................................................................12

*In re Wands*,
   858 F.2d 731 (Fed. Cir. 1988)..............................................................................12

*Zoltek Corp. v. United States*,
   815 F.3d 1302 (Fed. Cir. 2016)..............................................................................3

**Statutes**

35 U.S.C. 112(B) ...............................................................................................10

## TABLE OF ABBREVIATIONS

| Abbreviation | Meaning |
|---|---|
| BD | Bulk Density |
| FOF | Defendants' Proposed Findings of Fact (D.I. 126-1) |
| MCC | Microcrystalline Cellulose |
| Op. | Defendants' Opening Post-Trial Brief (D.I. 126) |
| PF | Plaintiff's Proposed Findings of Fact and Conclusions of Law |
| '721 patent | U.S. Patent No. 11,452,721 |

I.    **INTRODUCTION**

Defendants failed to meet their burden of proving by clear and convincing evidence that the Asserted Claims are invalid.  Tellingly, Defendants never reference this exacting burden, instead resorting to *ad hominem* attacks, mischaracterizations of Dr. Little's expert testimony, and offer conflicting assertions which demonstrate their claims are meritless.

II.    **DEFENDANTS FAILED TO PROVE OBVIOUSNESS BY CLEAR AND CONVINCING EVIDENCE**

"A party seeking to invalidate a patent based on obviousness must demonstrate by clear and convincing evidence that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so." *Eli Lilly & Co. v. Teva Pharms. Int'l GmbH*, 8 F.4th 1331, 1344 (Fed. Cir. 2021).  Where, as here, the patent examiner has considered the "basis for the validity challenge during patent prosecution," the burden "becomes particularly heavy." *Impax Labs., Inc. v. Aventis Pharms., Inc.*, 545 F.3d 1312, 1314 (Fed. Cir. 2008); *Shire LLC v. Amneal Pharms., LLC*, 802 F.3d 1301, 1307 (Fed. Cir. 2015). "The inventor's own path itself never leads to a conclusion of obviousness; that is hindsight. What matters is the path that the [POSA] would have followed, as evidenced by the pertinent prior art." *Otsuka Pharm. Co. v. Sandoz, Inc.*, 678 F.3d 1280, 1296 (Fed. Cir. 2012).

A.    **Defendants Have Not Alleged a Cognizable Legal Theory of Obviousness**

Defendants' stated theory is that a "POSA would have been motivated to modify Nuplazid Tablets to achieve the Asserted Claims with a reasonable expectation of success." (D.I. 126 ("Op.") at 3-6).  The Court "first must determine whether [Defendants] carried [their] burden to prove that all claimed limitations are disclosed in the prior art" *before* even "consider[ing] motivation to combine and reasonable expectation of success." *PAR Pharm., Inc.*

1

*v. TWI Pharms., Inc.*, 773 F.3d 1186, 1194 (Fed. Cir. 2014); *Univ. of Strathclyde v. Clear-Vu Lighting LLC*, 17 F.4th 155, 160 (Fed. Cir. 2021).  Defendants' theory fails this threshold step.

The Asserted Claims are, *inter alia*, drawn to (i) a size 3 or 4 capsule formulation comprising granules that contain 40 mg of pimavanserin tartrate and one or more pharmaceutically acceptable excipients, and (ii) where said granules with 40 mg of pimavanserin tartrate and one or more excipients have a bulk density ("BD") of greater than 0.4 g/ml. (Proposed Findings ("PF") ¶ 7.)  Defendants cannot show that each of the aforementioned elements is disclosed in the prior art.  (*Id.*)

Defendants' primary references, the Nuplazid Tablet Label and Ragnar-Tolf, are listed on the face of the '721 patent and were considered by the examiner during patent prosecution, (PF ¶ 9), which makes Defendants' burden "particularly heavy."  *Impax*, 545 F.3d at 1314.  None of Defendants' references disclose (i) a formulation that fits in a size 4 capsule and comprises granules containing 40 mg of pimavanserin tartrate and one or more pharmaceutically acceptable excipients, or (ii) granules with 40 mg of pimavanserin tartrate and one or more pharmaceutically acceptable excipients having a BD of greater than 0.4 g/ml.  (PF ¶ 8.)  Drs. Muzzio and Little agreed that the prior art does not disclose either element, but instead it discloses (i) formulations that do not fit in a size 4 capsule and consist of magnesium stearate and granules containing 1-20 mg of pimavanserin tartrate and excipients, and (ii) lubricated blends that have a BD of 0.56-0.61 g/ml and consist of magnesium stearate and granules containing 1-20 mg of pimavanserin tartrate and excipients.  (PF ¶ 8.)  As the required elements are missing, Defendants failed to meet their burden on this threshold inquiry.

### B. Defendants Failed to Prove Motivation to Modify Nuplazid Tablets to Achieve the Asserted Claims by Clear and Convincing Evidence

Even if motivation to combine and reasonable expectation of success were considered,

Defendants failed to meet their burden.  "[M]otivation to combine references serves to prevent hindsight bias," and Defendants' analysis here was improperly distorted by hindsight. *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1164-65 (Fed. Cir. 2006).  Indeed, Dr. Muzzio improperly "started [his analysis] by looking at the ['721 patent]," and once armed with the patent's disclosures, he then erroneously read the motivations and teachings of the inventors into the very same prior art references previously reviewed by the examiner.  (PF ¶ 10).  By starting with the patent, Dr. Muzzio's "[h]indsight reconstruction for litigation ends is not of probative value." *Zoltek Corp. v. United States*, 815 F.3d 1302, 1313 (Fed. Cir. 2016).

### 1.    Defendants Have Not Shown Motivation to Reformulate Nuplazid Tablets

Defendants assert a variety of vague considerations to modify Nuplazid Tablets to achieve the claimed capsule, including swallowability, pill burden, taste-masking, and pill identification.  (PF ¶ 11.)  There is no evidence that any of these considerations were recognized problems in the prior art for Nuplazid Tablets.  (*Id*.)  To the contrary, the evidence shows that Defendants used the '721 patent and ACADIA's own development efforts as a roadmap to cherry-pick disclosures, ignore contrary teachings, and simply retrace the path to the invention. (*Id*.)  Indeed, Defendants concede that Acadia "recognized the problems with the pimavanserin tablets," and developed "small sized capsules, each containing the full daily dose of pimavanserin."  (Op. 3.)  Acadia's actions are of no moment in this analysis though, as the "path that leads an inventor to the invention is expressly made irrelevant to patentability by statute." *Life Techs., Inc. v. Clontech Labs., Inc.*, 224 F.3d 1320, 1325 (Fed. Cir. 2000).

Unable to identify a problem in the actual Nuplazid Tablet prior art recognized by someone other than ACADIA, Defendants rely on the universal problem that elderly patients are at a risk of noncompliance because, in general, they have a high pill burden and difficulty swallowing.  (Op.

3

3; D.I. 126-1 ("FOF") ¶ 16.)  Such a "generic" reliance "bear[ing] no relation to any specific combination of prior art elements" cannot establish motivation.  *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1328 (Fed. Cir. 2012).[1]

### 2.    Defendants Have Not Shown Motivation to Use Capsules Over Other Dosage Forms, or Size 3 or 4 Capsules if Capsules Were Used

Even assuming that a POSA would initially be motivated to reformulate Nuplazid Tablets, the prior art teaches away from using a capsule to address swallowability and pill burden.  Dr. Muzzio opined that a POSA would have been motivated "to formulate pimavanserin into a dosage form that is ***as easy to swallow as possible***" and "***to minimize the number of tablets or capsules administered*** to a patient."  (315:6-12, 311:1-2.)  The prior art teaches that noncompliance due to swallowing difficulties and pill burden are caused by *any* solid oral dosage forms, *e.g.*, tablets or capsules, and teaches that other dosage forms, such as liquids and flexible oral solids, alleviate these problems.  (PF ¶ 12.)  For instance, the Liu reference relied upon by Dr. Muzzio, discloses that "***safe swallowing is the key formulation factor*** in designing medicines for older patients" and that liquid and flexible solid dosage forms should be used to treat patients with swallowing difficulties, and discouraged the use of capsules unless other dosage forms were not acceptable.  (PF ¶ 12); *Allergan, Inc. v. Sandoz Inc.*, 796 F.3d 1293, 1306 (Fed. Cir. 2015) ("An inference of nonobviousness is especially strong where the prior art's teachings undermine the very reason being proffered as to why a [POSA] would have combined the known elements.").  Using hindsight, Dr. Muzzio ignores Liu and concludes the exact

---

[1] Contrary to Defendants' mischaracterization, Dr. Little did not admit that a POSA would have understood administering pimavanserin as a single pill to be an advantage worth pursuing at the time of invention, but instead a single dosage form in view of the patent's disclosures.  (*Compare* Op. 3, *with* 569:21-572:22 (discussing disclosures in the patent)).

opposite, that "you don't do these [liquid and flexible solid dosages] unless and until the simpler, more common solution of a capsule or a tablet has failed,"—ironically requiring patients to swallow capsules, despite testifying that the dosage form should be "as easy to swallow as possible" and "eliminating even one pill would give benefits for patient adherence." (322:12-326:22, 315:6-12, 311:1-2.)

Dr. Muzzio further opined that a POSA would not be motivated to pursue these better-suited dosage forms over a capsule because they are less common, more expensive to make, need taste-masking, require more caregiver work, and must be stored more carefully.  (PF ¶ 13.)  This and Dr. Muzzio's other "conclusory and unsupported expert testimony" should be rejected because "crediting such testimony risks allowing the challenger to use the challenged patent as a roadmap to reconstruct the claimed invention using disparate elements from the prior art—*i.e.*, the impermissible *ex post* reasoning and hindsight bias that *KSR* warned against."  *TQ Delta, LLC v. CISCO Sys., Inc.*, 942 F.3d 1352, 1361 (Fed. Cir. 2019).  Similarly, Dr. Muzzio admitted that Ragnar-Tolf discloses pimavanserin could be formulated into liquids, gels, syrups, slurries, and suspensions, but again opines that a POSA would interpret the reference as limiting the options to either tablets or capsules without further explanation.  (PF ¶ 13.)  Dr. Little on the other hand, recognized the extensive disclosures in the prior art teaching away from using capsules for someone motivated to modify Nuplazid Tablets.  (*Id.*)

The Schiele reference cited by Dr. Muzzio teaches that capsules cause swallowing problems almost twice as often as tablets with irregular shapes and nearly 1.6 times more frequently than round tablets.  (PF ¶ 14.)  Despite this, Dr. Muzzio opines that a POSA would have still been motivated to pursue a capsule based on a single sentence in a publication *authored by a capsule manufacturer* which merely states that patients **perceive** capsules as being

easier to swallow.  (PF ¶ 14.)[2]

Nevertheless, even under Defendants' selective interpretation, a POSA still would have been motivated to pursue either (i) tablets, which are compressed and thus comparably smaller than capsules, or (ii) size 5 capsules, which are the smallest and thus the easiest to swallow, but not a size 3 or 4 capsule.  (PF ¶ 15.)  Defendants provide no explanation as to why a POSA would be motivated to choose a size 3 or 4 capsule over a smaller size 5 capsule.

Ragnar-Tolf teaches coated tablet formulations, which can be used for identification and taste masking (PF ¶ 16), yet Dr. Muzzio ignores these teachings to opine that a POSA would have been motivated to pursue a capsule over a tablet due to ease of identification and better taste-masking.  (*Id*.)  In his own patent, Dr. Muzzio does admit that "[t]he tablet, the most frequently prescribed commercial dosage form, is stable, elegant and effective" and "provides the patient with a convenient product for handling, identification and administration."  (PF ¶ 17.) Tablets can be different shapes and coated for taste-masking and coloring.  (*Id*.)

Additionally, the Nuplazid Tablets and Ragnar-Tolf teach towards direct compression tablet formulations, not capsules.  (PF ¶ 18.)  Ragnar-Tolf taught that "[r]aw pimavanserin API was known to be a bad behaving material" and "blending the pimavanserin mixture [as needed for encapsulation] tended to form aggregates" (PF ¶ 19; DTX-005_0010 ("The tendency towards adhesion of many drug actives or excipients ***might lead to difficulties during capsule filling***"

---

[2] Unlike Stegemann, Schiele provides an in-depth factual analysis on swallowability and even distinguishes between patients with and without swallowing difficulties.  (PF ¶ 15.)  Defendants incorrectly argue that "Dr. Little misrepresented the common-sense point of [Schiele]—smaller dosage forms are easier to swallow than larger ones," but Schiele expressly teaches both larger dosage forms and capsules cause more swallowing difficulties.  (*Id*.); *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1069 (Fed. Cir. 2018) ("[A] reference must be considered for all it taught, disclosures that diverged and taught away from the invention at hand as well as disclosures that pointed towards and taught the invention at hand.").

because "the fill substance breaks up, which leads to unacceptable fill variations.") (emphases added)).  Dr. Muzzio testified that the disclosed RSD values[3] in Ragnar-Tolf indicated to a POSA that these API aggregates had a high risk of content uniformity failure which would likely result in a failed product, so they are better off not blending.  (PF ¶ 19.)  Similarly, Ragnar-Tolf taught that pimavanserin is very hygroscopic and formulating with some capsules may be problematic for both dry and wet samples.  (PF ¶ 20.)

In sum, Defendants selectively read the prior art to reach their intended goal.  The prior art repeatedly identifies problems with capsules in general and for pimavanserin specifically.  As a result, a POSA would not have been motivated to use a capsule to modify Nuplazid Tablets because capsules "would have been expected to perform inefficiently in that role."  *Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1368-69 (Fed. Cir. 2016).

### C.    Defendants Failed To Show a Reasonable Expectation of Success in Modifying Nuplazid Tablets to Achieve the Claimed Invention

Defendants failed to meet their "burden [of] demonstrat[ing] that despite any unpredictability in the literature, a skilled artisan nevertheless would have had a reasonable expectation of success" in achieving the claimed capsule formulation.  *Eli Lilly & Co. v. Teva Pharms. Int'l GmbH*, 8 F.4th 1331, 1349 (Fed. Cir. 2021).  Pharmaceutical formulation is unpredictable, especially here, where Ragnar-Tolf (as noted by Dr. Muzzio) described numerous undesirable manufacturing qualities of pimavanserin.  Section I.C.2 *supra*; *see, e.g.*, *Alza Corp. v. Andrx Pharms., LLC*, 607 F. Supp. 2d 614, 656 (D. Del. 2009) ("expert witness testimony indicates a significant level of unpredictability in the field of pharmaceutical product design").

Defendants admit that their references do not disclose (i) capsule formulations for 40 mg

---

[3] RSD is short for "relative standard deviation" and values greater than 6% indicate a high risk of content uniformity failure.  (300:4-15 (Muzzio).)

of pimavanserin tartrate, (ii) granules containing 40 mg of pimavanserin tartrate, (iii) RSD values for wet granulated formulations, or (iv) a known relationship between the amount of pimavanserin tartrate and the BD of the granules.  (PF ¶ 21.)  Due to this lack of information, Defendants' argument that a POSA would have had a reasonable expectation of success hinges solely on Dr. Muzzio's speculative extrapolation of the same data over which the examiner already found the claims to be nonobvious.[4]  In fact, Dr. Muzzio's extrapolation relies on multiple unsupported assumptions, such as (1) BD of the blend and the granules being about equal, (2) increasing pimavanserin concentration will not decrease BD, (3) decreasing mannitol concentration will not decrease BD[5], and (4) changing these concentrations will not affect other desirable properties that Dr. Muzzio opined to be important to a POSA's reformulation decisions, *e.g.*, content uniformity, flowability, stability, etc.  (PF ¶ 22.)  Despite testifying about its poor properties, Dr. Muzzio failed to identify why, in the specific context of pimavanserin, a POSA would expect BD values (let alone other desired properties) to stay at 0.6 g/ml when increasing the amount of pimavanserin by 20 mg, *i.e.*, increasing concentration by 62% (from 20% to 32.4%).  *CBP*, 676 F.3d at 1071-72; (PF ¶ 22); (DTX-005_0010 ("For doses … in the smallest suitable capsule size, the ***properties of the active are of key importance***").

Moreover, Dr. Muzzio testified that "the POSA would say, okay, if I ***assume*** that a density is going to stay at 0.6 … then I can prepare a blend at least 32.4 percent… by taking

---

[4] Defendants mischaracterize both the examiner's allowance and Dr. Little's testimony to argue that "the claims are not limited to formulations with 'minimal' excipients."  *Compare* (Op. 7), *with* (PF ¶ 19; DTX-005_0010 ("For doses … in the ***smallest suitable capsule size***, the properties of the active are of key importance, as the ***quantities of excipients are minimal***.")).

[5] Dr. Muzzio also did not address that pimavanserin is hygroscopic and should be combined with the diluent mannitol for capsule dosage forms.  (*See* DTX-005_0010 ("Hygroscopic compounds can have a negative influence on the formulation of hard gelatin capsules," and "should be combined with the diluent mannitol.").)

some of the mannitol out." (PF ¶ 8.) "A plain reading of the testimony, however, indicates that Dr. [Muzzio] never expressed even an expectation of success." *CBP*, 676 F.3d at 1073-74. Instead, he merely testified that, whether the granules' BD would be similar to those produced by the Asserted Claims, "depended on the relationship between [the concentration of pimavanserin tartrate in the granules] and [their BD]—a relationship that all concede was unknown." *Id.* This is especially speculative here, where pimavanserin was known to be a bad behaving material, and "the record shows that the claimed amount[] of [pimavanserin tartrate] could and did materially and unpredictably alter the property of the claimed formulation," *i.e.*, the BD of the granules. *Allergan, Inc. v. Sandoz Inc.*, 796 F.3d 1293, 1305 (Fed. Cir. 2015). For example, the inventors obtained a BD of 0.508 g/ml through high-shear granulation, which is much lower than Dr. Muzzio's assumption of 0.6-0.8 g/ml for that same process. (PF ¶ 22.)

Furthermore, Ragnar-Tolf was an inventor associated with ACADIA (405:1-5) and as Dr. Muzzio admitted, the Nuplazid Tablet label told a "POSA that there was a reason to subdivide the dose into smaller portions" because otherwise there would be no reason to "give the patient two tablets at the same time as opposed to just one bigger tablet," (411:10-18). If a POSA would have been motivated to consolidate Nuplazid Tablets into a single size 4 capsule and could achieve the result within one or two routine experiments based on the disclosures of ACADIA's work, then Nuplazid would have come to market as a single size 4 capsule. (FOF ¶ 30.) Indeed, "[ACADIA's] failure to develop a [single size 4 capsule] formulation suggests that skilled artisans would not have reasonably expected to succeed in developing the claimed formulation." *CBP*, 676 F.3d at 1083. Likewise, "[t]he long delay between the marketing of [the two tablet] formulation and [the one capsule formulation] … supports the inference that it was difficult for researchers to create a [single size 4 capsule] product." *Id.* Assuming "a desire existed for such

a product" and the references teach a POSA that it would have only taken one or two routine experiments to achieve, "researchers, presumably, would have created one if they were able to do so." *Id.* Similarly, the fact that Dr. Muzzio did not perform those "one or two routine experiments" to clearly and convincingly demonstrate that his opinion is not mere speculation undercuts the veracity of his assertion.

Moreover, Defendants did not address whether adding the claimed features to the tablet formulation "would have been reasonably expected to lead to a dosage form that satisfies the other" properties that Defendants allege to motivate a POSA in reaching "the challenged claims." *Purdue Pharma L.P. v. Depomed, Inc.*, 643 F. App'x 960, 965-66 (Fed. Cir. 2016).

## III.  DEFENDANTS HAVE FAILED TO PROVE THAT "PHARMACEUTICALLY ACCEPTABLE CAPSULE" RENDERS THE ASSERTED CLAIMS INVALID UNDER 35 U.S.C. 112(b)

Defendants contend that "pharmaceutically acceptable capsule" is indefinite, or if the plain and ordinary meaning is adopted and does not exclude the so-called comparative examples, the Asserted Claims are invalid.  (Op. 9-11.)  Both arguments lack merit.

As an initial matter, "pharmaceutically acceptable capsule," which appears in the preamble ("A pharmaceutically acceptable capsule for orally delivering 34 mg of pimavanserin to a patient") is not a claim limitation and therefore Defendants' arguments fail.  "[The] preamble is not limiting where" as here, the "patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention," here, orally delivering 34 mg of pimavanserin to a patient.  *Arctic Cat Inc. v. GEP Power Prods., Inc.*, 919 F.3d 1320, 1327-28 (Fed. Cir. 2019).[6]  The rest of the claim provides

---

[6] *See Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1330 (Fed. Cir. 2012) (declining to require "efficacy, safety, and stability limitations"); *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 908 (Fed. Cir. 2004) (declining to require "the claims be construed as limited to

complete structure (*i.e.*, capsule shell, blended pimavanserin composition, granules comprising 40 mg of pimavanserin tartrate with required bulk density).  (PF ¶ 23.)

　If the preamble is limiting, then the "claim term should be given its ordinary meaning in the pertinent context, unless the patentee has made clear its adoption of a different definition or otherwise disclaimed that meaning." *Ancora Techs., Inc. v. Apple, Inc.*, 744 F.3d 732, 734 (Fed. Cir. 2014).[7]  Neither exception applies here.  (PF ¶¶ 3, 4, 6.)  Both experts agree that "pharmaceutically acceptable capsule" as used in the Asserted Claims has a well-understood, plain and ordinary meaning in the art, *i.e.*, "a capsule generally suitable for use in pharmaceutical compositions."  (PF ¶ 6.)  The '721 patent does not expressly or implicitly redefine or disclaim "pharmaceutically acceptable capsule."  (*Id*.)

　Defendants "infer[] that this patent requires, but fails to specify, a distinctive, patent-specific set of criteria for what constitutes" a pharmaceutically acceptable capsule, but "ha[ve] read too much into the specification." *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1367 (Fed. Cir. 2017).  The specification section Defendants rely on simply compares various high speed manufacturing processes with a preferred manufacturing process embodiment disclosed in the patent.  (PF ¶¶ 4-5.)  Nowhere in the specification does ACADIA state that certain processes will not lead to "pharmaceutically acceptable capsules."  (PF ¶ 5.)  Defendants misleadingly argue that "both experts agreed … that the comparative experiments are not part of the invention," (Op. 11), despite Dr. Little clearly testifying that the comparative examples are merely *a screening of high-speed, large-scale manufacturing processes*, which compare various

---

structures that are capable of achieving all of the objectives").

[7] *See Cont'l Cirs. LLC v. Intel Corp.*, 915 F.3d 788, 796-97 (Fed. Cir. 2019) (lexicography: "a patentee must clearly set forth a definition of the disputed claim term," and disavowal: "specification must contain expressions of manifest exclusion or restriction").

processes with a preferred process embodiment, (555:25-564:25). The Asserted Claims do not claim a manufacturing process, they claim capsules with certain characteristics, and therefore cannot be limited by these comparisons.

Defendants' reliance on *Allen Engineering Corp. v. Bartell Industries,* 299 F.3d 1336 (Fed. Cir. 2002) is misplaced. "[T]his case is unlike *Allen,* where the patentee agreed that the claim language did not match what he regarded as his invention, as the intrinsic record unambiguously showed." *Ancora*, 744 F.3d at 739. "Here, [ACADIA] embraces the claim language's clear, ordinary meaning, and … the specification and prosecution history [do not] establish that the applicants regarded their invention as something contrary." *Id.*; (PF ¶ 6).[8]

## IV.    DEFENDANTS FAILED TO PROVE THAT THE ASSERTED CLAIMS LACK WRITTEN DESCRIPTION OR ARE NOT ENABLED

Defendants have not proven by clear and convincing evidence that the specification lacks written description by failing to "reasonably convey[] to those skilled in the art that the inventor had possession of ***the claimed subject matter*** as of the filing date." *Vanda Pharm., Inc. v. West-Ward Pharms. Int'l Ltd.*, 887 F.3d 1117, 1136 (Fed. Cir. 2018) (emphasis added). A patent claim "need not provide *in haec verba* support for the claimed subject matter at issue" to satisfy the written description requirement. *Lampi Corp. v. American Power Prods., Inc.*, 228 F.3d 1365, 1378 (Fed. Cir. 2000). Nor have Defendants proved by clear and convincing evidence, that the Asserted Claims are not enabled. *In re Wands*, 858 F.2d 731, 735-37 (Fed. Cir. 1988).

### A.    "Granules Comprising 40 mg Pimavanserin

---

[8] *See also Seagen Inc. v. Daiichi Sankyo Co.*, No. 2:20-CV-00337-JRG, 2022 WL 2789901, at *8 (E.D. Tex. July 15, 2022) ("*Allen* is distinguishable from the present case" because "the claimed invention is [not] clearly contrary to the specification such as 'parallel' verses 'perpendicular.' … At its core, DSC's § 112(b) defense requires the Court to conclude that the specification is limited to dolastatin/auristatin compounds," and "is an attempt to take at least a third bite at the same apple" because it "rejected DSC's attempts to narrow the patent at *Markman* … [and] DSC has not offered any additional evidence … that warrants a deviation.").

Tartrate and One or More Pharmaceutically
Acceptable Excipients" Does Not Lack Written Description

The '721 patent specification reasonably conveys to a POSA that the inventors had possession of the full scope of "granules comprising pimavanserin tartrate and one or more pharmaceutically acceptable excipients." The specification shows possession through numerous descriptions of formulations of granules comprising pimavanserin tartrate and one or more pharmaceutically acceptable excipients. (PF ¶¶ 24-25.) Specifically, Dr. Little identified numerous examples within the specification describing granules with pimavanserin and one or more excipients *within* the granules and, contrary to Defendants' claim, defended his position on cross-examination. (*Id*.) Moreover, the specification includes express disclosures for manufacturing processes for granules, which notes that "excipients such as diluents, binders, lubricants, pharmaceutical flow agents, and/or other excipients compatible with pimavanserin may be included." (JTX09 at 19:12-15.)

Defendants agree that "one or more pharmaceutically acceptable excipients" has a plain and ordinary meaning, and that a POSA would have tried to understand the term in the context of the patent as a whole. (PF ¶ 26.) Yet Defendants do not apply a plain and ordinary reading to the claim term in their analysis. Rather, Dr. Muzzio, contends that the claims "claim[] *any* excipient, *any* number of excipients in *any* amount having *any* function, so *the entire universe* of excipients in principle is now a claim here."[9] (PF ¶ 27.) A POSA reading the specification would not have read the claims so. Instead, a POSA, for instance would have understood the

---

[9] Dr. Muzzio's broad read here is at odds with his read of the same term for purposes of indefiniteness. There, Dr. Muzzio admitted that a "pharmaceutically acceptable excipient" would be generally suitable for use in a pharmaceutical composition, "[w]hen used the right way and in the correct amount… the material itself being … nontoxic, … not affect adversely the drug substance, and … be used in amounts and in ways that would not cause problems to the patient." (376:19-378:14.)

13

objective of preparing granules suitable for encapsulation in size 3 or 4 capsules, not bigger or smaller sizes, and the functions served by including excipients in granules. Thus, a POSA would understand that there are not unlimited options, and that the disclosures in the specification are sufficient for written description. (PF ¶¶ 24-27); *Baxalta Inc. v. Bayer Healthcare LLC*, 513 F. Supp. 3d 426, 453 (D. Del. Jan. 19, 2021) ("Every species in a genus need not be described in order that a genus meet the written description requirement."). Defendants either ignore or misinterpret these disclosures, and thus arrive at the wrong conclusion.

### B. "Wherein the Bulk Density of the Granules Is >0.4 g/ml" Is Not Invalid For Lack of Written Description or Enablement

Defendants fail to show by clear and convincing evidence that "[w]herein the bulk density of the granules is >0.4 g/ml" lacks written description support or is not enabled. The specification expressly discloses bulk densities ranging from 0.4 g/ml to 0.6 g/ml, including disclosures of "such as about 0.5 g/ml, such as 0.51 g/ml, such as 0.508 g/ml." (PF ¶¶ 28-30.) Thus, there is no dispute regarding written description and enablement for 0.4 g/ml to 0.6 g/ml.

A POSA reading the specification would have understood the claim term >0.4 g/ml as not being unbounded, but inherently limited to the range of 0.4 to 0.6 g/ml. (PF ¶ 33.) From the prior art, a POSA first would have understood the upper limit for a "typical" bulk density to be 0.7 g/ml. (PF ¶¶ 32-33.) And a POSA would have further understood, that pimavanserin was not a "typical" material as it was bad behaving. (PF ¶¶ 31-32.) Therefore, a POSA would have understood that bulk densities for pimavanserin tartrate would be less than the inherent limit for "standard" materials of 0.7 g/ml. (485:18-486:11; PF ¶¶ 32-33.) Contrary to Defendants' contention, in practice, bulk densities are not unbounded and are not intended to go as high as, *e.g.*, 1.2 g/ml. (PF ¶¶ 32-33.)

Defendants apply the same strategy here as they did with "and one or more

pharmaceutically acceptable excipients," namely, they do not apply a plain and ordinary meaning to the BD limitation. Indeed, Dr. Muzzio does not provide any basis for how or why he reads the BD limitation as reaching every imaginable BD above 0.4 g/ml. (355:23-355:13).[10] As Dr. Little testified, "[f]or any material, there's going to be an upper limit . . . . I don't mean to be silly about this, but this claim doesn't talk about black holes." (582:2-12.)

The Federal Circuit acknowledges that open-ended claims, such as ">0.4 g/ml" can be proper "if there is an inherent, albeit not precisely known, upper limit and the specification enables one of skill in the art to approach that limit." *Fs.Com Inc. v. Int'l Trade Comm'n*, 65 F.4th 1373, 1376 (Fed. Cir. 2023) (quoting *Andersen Corp. v. Fiber Composites*, LLC, 474 F.3d 1361 (Fed. Cir. 2007).

As discussed above, a POSA would have understood there to be an inherent, albeit not precisely known, upper limit of 0.6 g/ml for granules comprising bad-behaving material like pimavanserin tartrate. (PF ¶¶ 32-33.) Dr. Little explained his rationale for this inherent limit at trial. (PF ¶¶ 31-33.) Defendants, however, provide no basis for going beyond 0.6 g/ml, even acknowledging that the specification does not contemplate bulk densities of greater than 0.6 g/ml. (D.I. 126 at 15; 354:23-358:10.).[11] For these reasons, Defendants fail to show by clear and convincing evidence that the asserted claims lack written description and enablement.

---

[10] Table 1 does not provide support because a POSA would have read this chart as disclosing capsules generally available. A POSA would not have read Table 1 as specific to pimavanserin. Dr. Muzzio agreed Table 1 is not specific to pimavanserin. (400:11-401:13 (Muzzio).)

[11] If anything, Dr. Muzzio said a POSA would understand there to be an upper limit for ***all materials generally.*** (582:2-12 ("There's an upper limit for all materials, as I described earlier, that upper limit for standard materials is typically 0.7 or something like that . . . . For any material, there's going to be an upper limit.").) And as Dr. Little explained, knowing that pimavanserin has "bad behavior," "you're not thinking of the top of the range." (584:3-5)

SAUL EWING LLP

*Of Counsel*:

/s/ Michelle C. Streifthau-Livizos

Chad J. Peterman
Bruce M. Wexler
Scott F. Peachman
Peter E. Conway
PAUL HASTINGS LLP
200 Park Avenue
New York, New York 10166
(212) 318-6000

James D. Taylor, Jr. (#4009)
Jessica M. Jones (#6246)
Michelle C. Streifthau-Livizos (#6584)
1201 N. Market Street, Suite 2300
P.O. Box 1266
Wilmington, Delaware 19899
(302) 421-6800
james.taylor@saul.com
jessica.jones@saul.com
michelle.streifthau-livizos@saul.com

Felix A. Eyzaguirre
PAUL HASTINGS LLP
600 Travis Street, 58th Floor
Houston, TX 77002
(713) 860-7300

*Attorneys for Plaintiff ACADIA Pharmaceuticals Inc.*

Dated:  February 12, 2025

16