## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ACADIA PHARMACEUTICALS INC., <br><br> Plaintiff, <br><br> v. <br><br> AUROBINDO PHARMA LIMITED, *et al.*, <br><br> Defendants. | C.A. No. 1:22-01387-GBW <br> (Consolidated; Lead Case) |

## PLAINTIFF ACADIA PHARMACEUTICALS INC.'S
## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

## TABLE OF CONTENTS

Page

I. U.S. PATENT NO. 11,452,721 ("THE '721 PATENT")...................................................... 1

II. CLAIM CONSTRUCTION............................................................................................... 1

III. OBVIOUSNESS................................................................................................................. 2

    A. Defendants Failed to Prove Motivation to Modify Nuplazid Tablets to Achieve the Asserted Claims by Clear and Convincing Evidence ........................ 4

    B. Defendants Failed To Show a Reasonable Expectation of Success in Modifying Nuplazid Tablets to Achieve the Claimed Invention........................... 7

IV. INDEFINITENESS............................................................................................................ 8

V. WRITTEN DESCRIPTION............................................................................................... 8

    A. The specification describes the full scope of "granules comprising pimavanserin tartrate and one or more pharmaceutically acceptable excipients"......................................................................................................... 8

    B. The specification describes and enables pimavanserin granules "wherein the bulk density of the granules is >0.4 g/ml" ......................................................... 9

**TABLE OF CONTENTS**
(continued)

**Page**

**TABLE OF ABBREVIATIONS**

| Abbreviation | Meaning |
|---|---|
| '721 patent | U.S. Patent No. 11,452,721 (JTX09) |
| '300 provisional app | U.S. Provisional Patent Application No. 62/552,300 |
| Op. | Defendants' Opening Post-Trial Brief (D.I. 126) |
| FOF | Defendants' Post-Trial Findings of Fact (D.I. 126-1) |
| Asserted Claims | Claims 4 and 5 of the '721 patent (JTX09-0025) |
| POSA | Person of ordinary skill in the art |
| BD | Bulk density |
| MCC | Microcrystalline cellulose |
| CSD | Colloidal silicon dioxide |
| HSG | High shear granulation |

I. **U.S. Patent No. 11,452,721 ("the '721 patent")**

1. The '721 patent is titled "FORMULATIONS OF PIMAVANSERIN" and claims priority to the '300 provisional app, which was filed on Aug. 30, 2017. (JTX09-0002.)

2. The term "pharmaceutically acceptable capsule" is recited in the preamble of the Asserted Claims. (JTX9-0025 at claims 4 and 5; 367:3-15 (Muzzio).)

II. **CLAIM CONSTRUCTION**

3. During *Markman*, Defendants contended that because the specification discloses comparative experiments resulting in "unacceptable products," the invention is limited to the wet granulation process that presumably produces "acceptable products," *i.e.*, granules containing 40 mg of pimavanserin tartrate alone. (D.I. 112 at 16-17.) "The Court, however, held that 'Acadia did not clearly disavow granules containing both pimavanserin and excipients.'" (*Id.*; D.I. 43 at 9, 11; *see, e.g.*, JTX09 at 1:65-2:3, 2:42-47, 3:50-4:23, 4:43-5:3, 8:48-50, 8:56-63, 12:3-9, 12:58-13:2, 13:14-19, 16:6-10, 16:19-22, 16:29-17:8, 17:34-49, 19:11-16, 19:57-20:2, 20:60-21:15, 21:66-22:3; 396:3-397:6, 397:7-17, 398:17-22, (Muzzio); 470:13-471:2, 471:16-473:12, 474:17-475:15, 475:18-476:5 (Little).) The specification discloses that the "comparative experiments" are embodiments. (JTX09 at 14:64-15:2.)

4. A POSA would understand that the "comparative experiments resulting in unacceptable products" section is describing the inventors' evaluation of manufacturing processes, *e.g.*, granulation methods, to determine whether they produced granules or particles with "unacceptable disadvantages" as compared to the "novel" granulation method using "atypical parameters" for the purpose of the pharmaceutical manufacturing of capsules. (JTX09 at 8:64-9:11, 9:12-66, 13:39-44, 13:59-61, 14:7-12, 14:24-29, 14:34, 14:40-41, 14:44-47, 14:53, 14:64-65; 258:3-12, 259:5-260:2, 264:14-17, (Muzzio); 464:9-465:12, 555:25-556:18 (Little).) A POSA would understand that the "novel" HSG method using "atypical parameters" is merely

"one embodiment… that provides a granulated pimavanserin suitable for pharmaceutical manufacturing of a capsule." (JTX09 at 10:63-11:33, 11:33-67.) A POSA would understand that the specification describes the "comparative experiments" as embodiments of the inventions. (JTX09 at 14:64-15:2).)

5. The "comparative experiments resulting in unacceptable products" do not use the term "pharmaceutically acceptable capsule," or "pharmaceutically acceptable." (JTX09-0020-21; 380:19-24 (Muzzio); 463:17-469:18 (Little).) They do not specify whether a size 3 or 4 capsule was used, (JTX09-0020-21; 389:22-390:2 (Muzzio); 463:17-469:18 (Little)), or whether they used 34 mgs of pimavanserin, (JTX09-0020-21; 390:3-11 (Muzzio); 463:17-469:18 (Little)).

6. The definition section states that "[u]nless defined otherwise, all technical and scientific terms used herein have the same meaning as is commonly understood by one of ordinary skill in the art." (JTX09 at 2:33-41.) The specification does not redefine the term "pharmaceutically acceptable" nor "pharmaceutically acceptable capsule." (JTX09; 394:10-15, 395:25-396:2 (Muzzio); 449:13-23 (Little).) Both experts and Defendants agree that the term "pharmaceutically acceptable" has a plain and ordinary meaning well-understood in the art of "generally suitable for use in pharmaceutical compositions." (376:19-378:14 (Muzzio); PTX-0021 at claim 8 ("pharmaceutically acceptable material"); 450:13-23 (Little).) Similarly, both experts and Defendants agree that a POSA would understand the term "pharmaceutically acceptable capsule" to have a plain and ordinary meaning of "a capsule generally suitable for use in pharmaceutical compositions." (257:14-19, 427:3-13 (Muzzio); 449:7-451:9 (Little); Op. 9.)

III. **OBVIOUSNESS**

7. The Asserted Claims are, *inter alia*, drawn to (i) a size 3 or 4 capsule formulation comprising granules that contain 40 mg of pimavanserin tartrate and one or more

pharmaceutically acceptable excipients, and (ii) where the granules with 40 mg of pimavanserin tartrate and one or more pharmaceutically acceptable excipients have a BD of greater than 0.4 g/ml.  (JTX09 at claims 4 and 5; JTX10-2404; FOF ¶ 6; 448:18-449:6.)  Defendants did not show that either of the aforementioned elements is disclosed in the prior art, and Dr. Muzzio admitted they are not.  (341:16-343:3.)

8. For element (i), Dr. Muzzio asserted that "the POSA would have been motivated to select a size 4 capsule shell," (342:5-9), but admitted that "Ragnar-Tolf … does not explicitly talk about any one size other than size 0," (416:23-417:6), and does not teach a formulation that fits in a size 4 capsule and comprises granules with 40 mg of pimavanserin tartrate and one or more excipients, (333:1-7).  For element (ii), Dr. Muzzio also admitted that Ragnar-Tolf only discloses lubricated blends that have a BD of 0.56-0.61 g/ml and consist of magnesium stearate and granules containing 1-20 mg of pimavanserin tartrate and excipients.  (304:14-305:14, 342:23-343:3.)  Dr. Muzzio admitted that a POSA would need to assume that both (1) the BD of the lubricated blend and the granules is "very similar," (305:2-14), and (2) the BD of the granules is going to stay at 0.6 g/ml, despite changing the pimavanserin and mannitol concentrations, (333:17-334:20 ("So the POSA would say, okay, if I *assume* that a density is going to stay at 0.6 …, then I can prepare a blend at least 32.4 percent")).  Dr. Muzzio admitted that a POSA would need to modify Ragnar-Tolf's 20 mg tablet formulation to increase pimavanserin concentration by 62%, from 20% to 32.4%,[1] decrease mannitol concentration from 71% to 58.6%, and change the dosage form to a size 4 capsule.  (342:5-22, 333:17-334:20.)

9. Nuplazid Tablet Label and Ragnar-Tolf are listed on the face of the '721 patent. (JTX09-0008; JTX09-0003 ("2007/0264330 A1 … Ragnar-Tolf")).  The patent examiner already

---

[1] 32.4-20 = 12.4% change → (12.4/20)*100 = 62% increase from 20% to 32.4%.

-3-

considered Defendants' basis for the validity challenge during patent prosecution and in the Reasons for Allowance he determined that the Asserted Claims were not obvious over the closest prior art, Ragnar-Tolf, because "the density of [its] granulation would not allow for the same amount of the drug to be present in the capsule." (JTX10-2404.) Dr. Little testified that while the Asserted Claims do not recite a "minimal excipients" limitation verbatim, they do restrict the claims to "minimal excipients" via the "size 3 or 4 capsule" and "40 mg of pimavanserin tartrate" limitations. (574:1-15; DTX-005_0010.)

### A. Defendants Failed to Prove Motivation to Modify Nuplazid Tablets to Achieve the Asserted Claims by Clear and Convincing Evidence

10. Dr. Muzzio assumes that "a POSA [would be] seeking to develop a new version of [Nuplazid Tablets]," (293:2-294:7), but the prior art does not disclose a specific problem with the tablet formulation, (409:1-412:7 (Muzzio); 502:13-504:7 (Little)). Dr. Muzzio "started [his analysis] by looking at the ['721] patent," (235:4-20), and opined that "the POSA would know just after reading the label of the prior art tablets" that the "elderly patients… are known to have a high pill burden and difficulty swallowing," (293:22-295:23; Op. 3-4), which is the same problem disclosed by the inventors in the specification, (JTX09 at 1:34-47).

11. There is no evidence that swallowability, pill burden, taste-masking, pill identification, or other problems were recognized in the prior art for Nuplazid Tablets. (326:9-22, 409:1-412:7 (Muzzio); 502:13-504:7 (Little).) Defendants used the '721 patent and ACADIA's own development efforts as a roadmap to cherry-pick disclosures, ignore contrary teachings, and simply retrace the path to the invention. (509:6-515:25.)

12. The Liu reference teaches away from solid oral dosage forms, such as tablets and capsules, because "**safe swallowing is the key formulation factor** in designing medicines for older patients," (DTX-013_1), and "[i]n older patients, age- or disease-related swallowing

difficulties affect their ability to take *solid oral* medicines," (DTX-013_4, _2 ("ability to swallow determines the acceptability of … *tablets and capsules*")).  (516:4-523:9.)  Liu also teaches a POSA that liquid and "flexible oral solid medicines [] are convenient to use by patients who cannot swallow tablets and capsules," and "[a]lternatives … are often sought where liquid medicines are *not acceptable* to patients," in which case "*more sophisticated formulation* approaches such as *encapsulation* of drug particles *may be required*," *i.e.*, capsules.  (DTX-013_11; 516:4-523:9.)

13. Dr. Muzzio provided conclusory and unsupported "reasons" not to pursue liquid and flexible solid dosage forms, including they "are not very common compared to capsules," "more expensive to make," "require effective taste-masking," "require more effort by the caregiver," and "require more … protection from exposure to moisture."  (*Compare Id.*, Op. 4, FOF ¶ 24, *with* 516:4-523:9, 527:24-529:3.)  Dr. Muzzio admitted that Ragnar-Tolf discloses pimavanserin could be formulated as "liquids, gels, syrups, slurries, and suspensions."  (417:18-24; JTX-11 at [0049].)  Dr. Little recognized the extensive disclosures in the prior art that teach away from using capsules if modifying Nuplazid Tablets per Dr. Muzzio's alleged motivations.  (516:4-523:9, 527:24-529:3.)

14. Schiele teaches that capsules cause more swallowing problems than tablets, and that patients with swallowing difficulties preferred to take round tablets.  (DTX-7 at 5; 523:13-527:23.)  Dr. Muzzio's opinion that a POSA would still pursue a capsule is based on a single sentence in a publication authored by a capsule manufacturer which merely states that patients perceive capsules as being easier to swallow.  (414:10-415:10; DTX-005_0012 (Stegemann 2002).)

15. Unlike Stegemann, Schiele provides an in-depth factual analysis on swallowability and even distinguishes between patients with and without swallowing difficulties. (DTX-7 at 5; 523:13-527:23.) Schiele expressly teaches both larger dosage forms and capsules cause more swallowing difficulties, (DTX-7 at 5; 523:13-527:23). A POSA still would have been motivated to pursue either (i) tablets, which are compressed and thus comparably smaller than capsules, (509:6-515:9; 523:13-527:23), or (ii) size 5 capsules, which are the smallest and thus the easiest to swallow, but not a size 3 or 4 capsule. (483:15-485:2.)

16. The Nuplazid Tablet Label and Ragnar-Tolf teach coated tablet formulations, which can be used for identification and taste masking. (JTX11 at [0019], [0021], [0050], [0063] and Example 10; 527:24-530:22.) Dr. Muzzio ignores these teachings to opine that a POSA would still pursue a capsule over a tablet due to ease of identification and better taste-masking. (317:22-318:14.) Dr. Muzzio's opinion that a POSA would have read ¶ 63 of Ragnar-Tolf as "saying that you have to use taste-masking" because pimavanserin tartrate has a "pronounced bitter taste," (305:18-306:14), is merely hindsight, (527:24-530:22).

17. Dr. Muzzio admitted that "[t]he tablet, the most frequently prescribed commercial dosage form, is stable, elegant and effective" and "provides the patient with a convenient product for handling, identification and administration." (413:21-414:2.) Tablets can be different shapes and coated for both taste-masking and vibrant coloring. (JTX91; 530:23-531:24.)

18. The Nuplazid Tablets and Ragnar-Tolf teach towards direct compression tablet formulations, not capsules. (509:6-515:9; 523:13-527:23, 535:11-537:23.)

19. Ragnar-Tolf taught that "[r]aw pimavanserin API was known to be a bad behaving material," and "blending the pimavanserin mixture [as needed for encapsulation] tended to form aggregates." (Op. 2; FOF ¶ 14; 533:7-534:21; JTX11 at [0125]; 535:11-536:3;

DTX-005_0010.)  Dr. Muzzio admitted that the disclosed RSD values in Ragnar-Tolf would have indicated to a POSA that these API aggregates had a high risk of content uniformity failure and would likely result in a failed product, so they are better off not blending.  (300:4-15, 419:8-422:21).

20. Ragnar-Tolf taught that pimavanserin is very hygroscopic and formulating with a gelatin or HPMC capsule may be problematic for both dry and wet samples.  (417:18-418:14 (Muzzio); JTX11 at [0120-21]; 222:1-21 (Moreton)).

### B. Defendants Failed To Show a Reasonable Expectation of Success in Modifying Nuplazid Tablets to Achieve the Claimed Invention

21. Defendants admit that their references do not disclose (i) size 3 or 4 capsule formulations for 40 mg of pimavanserin tartrate, (ii) granules containing 40 mg of pimavanserin tartrate, (iii) RSD values for wet granulated formulations, or (iv) a known relationship between the amount of pimavanserin tartrate and the BD of the granules.  (341:16-343:3; 416:23-417:6; 333:1-334:20; 304:14-305:14; 300:4-15, 419:8-422:21.)

22. Dr. Muzzio's extrapolation relies on multiple unsupported and unexplained assumptions, such as (1) BD of the blend and the granules being about equal, (2) increasing pimavanserin concentration will not decrease BD, (3) decreasing mannitol concentration will not decrease BD, and (4) changing these concentrations will not affect other desirable properties that Dr. Muzzio opined to be important to a POSA's reformulation decisions.  (305:2-14, 333:17-334:20.)  The inventors obtained a BD of 0.508 g/ml through high-shear granulation, which is much lower than Dr. Muzzio's assumption of 0.6-0.8 g/ml for that same process.  (*Compare* JTX09 at Table 1 and 22:9-14, *with* 340:11-341:1.)

## IV. <u>INDEFINITENESS</u>

23. The preamble is not limiting here because the Asserted Claims define a structurally complete invention in the claim body (*i.e.*, capsule shell, blended pimavanserin composition, granules comprising 40 mg of pimavanserin tartrate with required bulk density) and use the preamble only to state a purpose or intended use for the invention. (JTX09 at claim 4 and 5; 58:6-13 (Smith); 257:3-19, 367:3-18; 376:8-18 (Muzzio).)

## V. <u>WRITTEN DESCRIPTION</u>

### A. **The specification describes the full scope of "granules comprising pimavanserin tartrate and one or more pharmaceutically acceptable excipients"**

24. The specification provides adequate written description support for "one or more pharmaceutically acceptable excipients." The specification provides numerous disclosures that would have told a POSA that the inventors were in possession of the full scope of this claim term. (*See, e.g.*, JTX09 at 16:4-10, 16:19-45, 17:34-49, 19:12-15, 21:3-15; 396:3-397:6, 397:7-17, 398:17-22, (Muzzio); 470:13-471:2, 471:16-473:12, 474:17-475:15,475:18-476:5 (Little).)

25. A POSA would have read Table 2 as describing a pimavanserin granulation with intragranular excipients. (473:9-12, 577:24-579:14 (Little).) A POSA would have known that binders and lubricants (like MCC and magnesium stearate, respectively) can be intragranular. (472:5-473:7 (Little); 399:23-400:10 (Muzzio).)

26. The Court construed "granules comprising 40 mg pimavanserin tartrate and one or more pharmaceutically acceptable excipients" as having "plain and ordinary meaning; the scope of the term includes granules granulated with pimavanserin and excipients," (D.I. 43 at 5). Drs. Muzzio and Little agree that a plain and ordinary meaning applies. (376:22-377:3, 377:4-20, 377:25-378:14 (Muzzio); 457:3-6 (Little)). A POSA would have read this term in the context of the entire patent specification to understand its scope, and would have referred to the examples

-8-

and disclosures contained therein. (380:10-381:4 (Muzzio)). A POSA would not have considered the comparative experiments to understand the scope of the Asserted Claims. (473:23-474:1 (Little).)

27. Dr. Muzzio does not apply a plain and ordinary meaning to the claim term "one or more pharmaceutically acceptable excipients," even though he agrees a plain and ordinary meaning should apply. Instead, Dr. Muzzio applies an overly broad read of the claim term, as claiming any excipient in any amount without limitation. (252:15-254:15, 345:3-24, 346:4-17, 353:11-354:13, 353:11-23 ("places no limits"), 357:17-358:1 (Muzzio).)

**B. The specification describes and enables pimavanserin granules "wherein the bulk density of the granules is >0.4 g/ml"**

28. The specification provides adequate written description support for "wherein the bulk density of the granules is >0.4 g/ml." The specification provides several examples and disclosures that would have told a POSA that the inventors were in possession of the full scope of this claim term. (JTX9 at 24:4-14, Table 1; 478:24-479:21).

29. A POSA reading the specification would have understood the claim term as not being unbounded, but as being limited to the range of 0.4 to 0.6 g/ml, *i.e.*, bulk densities would be sufficient for fitting 40 mg pimavanserin tartrate (granulated) inside a size 3 or 4 capsule. (JTX09 at 22:4-14; 478:8-23, 478:24-479:21, 480:17-481:11, 481:22-482:22, 482:23-483:11, 483:12-485:2, 485:3-17, 485:18-486:11, 486:22-487:5, 487:6-24, 487:25-488:5 (Little).)

30. A POSA would have read Table 1 generally, and would not have applied the "typical" bulk densities listed therein to the claimed BD for pimavanserin granules. (JTX9 at Figure 1 (listing "conventional fill weight" for "typical powder density"); 400:11-25; 401:1-13 (Muzzio).)

31. A POSA reading the claimed size 3 or 4 capsules are thus requiring a certain bulk density. (370:12-15, 370:19-20, 400:11-401:18 (Muzzio); 478:24-479:21, 482:23-483:11, 483:12-485:2, 486:22-487:5 (Little).)

32. A POSA would have understood the plain and ordinary meaning of this claim term based on a POSA's general knowledge and from reading the specification as a whole. (401:14-18.) The specification and the plain language of the claims would have told a POSA that capsule sizes other than 3 or 4 are excluded from the scope of the Asserted Claims. (483:12-485:2 (Little).) The specification would have told a POSA that pimavanserin is a material that is "bad behaving material" that is difficult to work with. (JTX9 at 1:48-58; 481:17-483:11, 533:17-24, 545:10-14 (Little).)

33. A POSA would have understood that generally the upper limit for bulk density for "standard" materials is 0.7 g/ml. (478:9-23, 480:13-481:11, 485:24-486:11, 582:2-12 (Little)). A POSA would have understood that achieving a bulk density of 0.7 g/ml as outside the claimed range of bulk densities, and therefore would not have needed to engage in any "extensive trial-and-error research program" to achieve bulk densities greater than 0.6 g/ml. (*Id.*) A POSA would have understood the objective of preparing a formulation comprising granules of pimavanserin tartrate and minimal excipients. (JTX-10 at 2404; 490:19-491:13.)