IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ACADIA PHARMACEUTICALS INC.,

    Plaintiff,

v.

AUROBINDO PHARMA LIMITED et al.,

    Defendants.

C.A. No. 22-1387-GBW
(CONSOLIDATED)

**PLAINTIFF ACADIA PHARMACEUTICALS INC.'S OPPOSITION
TO DEFENDANTS' MOTION FOR LEAVE TO FILE POST-TRIAL REPLY**

Plaintiff ACADIA Pharmaceuticals Inc. ("ACADIA") respectfully requests that the Court deny Defendants MSN Laboratories Private Ltd., and MSN Pharmaceuticals Inc.'s (collectively, "MSN") Motion for Leave to File a Post-Trial Reply (D.I. 137, "Mot."). As MSN admits, the Supplemental Scheduling Order (D.I. 120) does not permit the filing of reply briefs. Mot. at 1. Yet in spite of this knowledge, MSN still chose not to address ACADIA's well-established validity arguments in either its opening brief (D.I. 126, "Op.") or its findings of fact (D.I. 126-1, "FOF"). In a misguided attempt to retroactively rectify its strategic decision, MSN disingenuously alleges that ACADIA's responsive post-trial brief (D.I. 134, "Rp.") "raises several new points," but merely lists these "points" without explaining how any are "new" or compel granting its motion. Mot. at 1-2. Indeed, as detailed below, ACADIA solely relies on evidence and facts in the record and raises no "new" arguments. *See* D.I. 134; D.I. 134-1 ("PF"). Therefore, ACADIA's brief "does not open the door to" MSN's "additional briefing that unnecessarily taxes the resources of both the parties and the court." *Cephea Valve Techs., Inc. v. Abbott Lab'ys*, C.A. No. 23-691-

1

GBW-SRF, 2024 WL 1932830, at *9 (D. Del. Mar. 26, 2024), *report and recommendation adopted*, 2024 WL 3291632 (D. Del. Apr. 19, 2024).[1]

"Generally, [additional] briefs are disfavored," but the Court "may grant leave to file a []reply if the []reply responds to new evidence, facts, or arguments raised for the first time in a [responsive] brief." *Versar Env't Servs., LLC v. Black & Veatch Special Projects Corp.*, C.A. No. 23-1450-RGA, 2024 WL 5090804, at *6 (D. Del. Dec. 12, 2024). Rather than trying to demonstrate that ACADIA introduced new evidence, facts, and/or arguments, MSN just provides a nondescriptive list of "points" and a conclusory assertion that "*[m]ost* of these allegations"[2] "were not *affirmatively* argued at trial,"[3] and "any alleged 'facts'" are not "supported by the *actual* evidence of record."[4] Mot. at 1-2. But "[d]etermining the weight and credibility of the evidence" and whether "the burden of proof has been met" "is the special province of the trier of fact," therefore what MSN considers to be "actual evidence" is of no moment. *Velander v. Garner*, 348 F.3d 1359, 1371 (Fed. Cir. 2003); Mot. at 2.

Compounding upon its errors while implicitly admitting that it seeks the last word on factual disputes, MSN misrepresents *Choma v. Blue Cross Blue Shield of Del.*, C.A. No. 06-486-JJF, 2008 WL 4276546, *15 (D. Del. Sep. 18, 2008) as "granting sur-reply to correct 'demonstrable factual inaccuracies.'" Mot. at 2. However, the court was merely quoting Choma's alleged reason for her motion, and granted her motion, despite finding no such inaccuracy, because

---

[1] Unless otherwise noted, all citations have been omitted and all emphasis has been added.

[2] Despite qualifying with "most," MSN does not clarify which "allegations" were purportedly "never raised," apparently leaving that mystery for both ACADIA and the Court to try to unravel.

[3] It is unclear what "not *affirmatively* argued at trial" means, (Mot. at 1), but MSN does not contend that ACADIA's arguments were not relevant to "indefiniteness, obviousness, lack of written description, and lack of enablement," (D.I. 120).

[4] MSN appears to imply that any "evidence of record" unfavorable to it is somehow fake.

it did not alter the court's analysis. *Id.* at \*15 ("Choma filed a Motion for Leave to File a Sur-Reply . . . to 'correct a demonstrable inaccuracy in Defendant's Reply.' (D.I. 70.)"[5]), n.12 ("the Court reads the email . . . as regarding Choma's earlier filed charges . . . not her [later] filed charges").

Contrary to MSN's contentions, a parsing of its eight purportedly "new points" illustrates that each of ACADIA's assertions is well-founded, and that MSN had a full and fair opportunity to address them in its opening brief, but simply did not do so. D. Del. LR 7.1.3(c)(2) ("opening brief shall not reserve material"); *Cephea*, 2024 WL 1932830, at \*9 (arguments are "not 'new'" if "responsive" and "Defendants could have anticipated" them). For Point One, Liu (DTX-013) teaches that: (i) dysphagia is difficulty in swallowing;[6] (ii) the ability to swallow determines the acceptability of solid oral dosage forms, *e.g.*, capsules;[7] (iii) dysphagia hinders an older patient's ability to take capsules;[8] (iv) liquid dosage forms should be used to treat older patients with dysphagia;[9] (v) alternatives are often sought where liquid medicines are not acceptable;[10] (vi) these

---

[5] MSN misquotes this language as "demonstrable factual inaccuracies." Mot. at 2.

[6] "Dysphagia is defined as difficulty in swallowing." DTX-013_3; *see* Tr. 517:14-16.

[7] "The ability to swallow determines the acceptability of . . . capsules." DTX-013_2; *see* DTX-013_1; Tr. 516:17-20 ("safe swallowing is the key formulation factor . . . for older patients").

[8] "In older patients . . . swallowing difficulties affect their ability to take solid oral medicines. In a survey … 60% of [older] patients . . . experienced difficulties in swallowing … capsules." DTX-013_4; Tr. 523:2-9 ("the reference . . . provides . . . a whole range of dosage forms that are . . . easier to swallow for various reasons . . . described by the reference than a capsule").

[9] "**Alternatives to liquid medicines are often sought where liquid medicines are not acceptable to patients**; for example, where taste **issues cannot be overcome**, **more sophisticated formulation approaches** such as **encapsulation** of drug particles **may be required**. Many disadvantages associated with taking oral liquids can be avoided by the use of **flexible oral solid medicines** that are **convenient to use by patients who cannot swallow** tablets and **capsules**." DTX-013_11; Tr. 518:9-19 ("for . . . these patients where it's difficult to swallow, what you want is a liquid medicine"), 513:19-515:9 ("the references that Dr. Muzzio put forth actually say that there are other options that you would go to instead [of a capsule]").

[10] *Id.* (same as n.10).

3

alternatives include flexible oral solid dosage forms and capsules, but patients with dysphagia prefer the former;[11] (vii) capsules are a more sophisticated formulation approach than liquid dosage forms.[12] DTX-013_1-3, _10-13; Rp. 4-5; PF ¶¶ 12-13; Tr. 513:19-523:9. In other words, Liu discourages using capsules unless liquid and flexible oral solid dosage forms are unacceptable. MSN was aware of ACADIA's position. Op. 4; FOF ¶ 24.

For Point Two, Schiele teaches that: (i) dosage forms cause swallowing difficulties for reasons other than size;[13] (ii) capsules cause more swallowing problems than irregular/round tablets;[14] and (iii) patients with swallowing difficulties prefer round tablets.[15] DTX-007_4-5, _8; Rp. 5-6; PF ¶¶ 14-15; Tr. 523:13-527:23. Again, MSN was aware of ACADIA's position. *See* Op. at 8 (disputing whether Schiele "disclos[es] a patient preference of tablets over capsules").

For Point Three, Ragnar-Tolf teaches towards compressed tablets because: (i) all working examples are compressed tablets;[16] (ii) blending pimavanserin tends to form agglomerates, *i.e.*, clumps, that affect RSD values and content uniformity;[17] (iii) Example 9 lacks the RSD values

---

[11] *Id.* (same as n.10); DTX-013_10-13; Tr. 517:19-518:4 ("many disclosures in this reference that talk about alternatives to solid oral dosage forms and the[ir] acceptability and that patients prefer them"), 519:2-6 ("flexible oral solid medicines . . . have advantages over . . . a capsule").

[12] DTX-013_11 (same language as n.10).

[13] "Reasons given for [swallowing] difficulties related to the dosage form were size (74.6%), surface (70.5%), shape (43.5%), and flavor (22.1%)." DTX-007_4.

[14] "Hard . . . [and] soft gelatin capsules . . . caused [swallowing] problems almost twice as often as tablets with irregular shapes, nearly 1.6 times more frequently than round tablets . . . (Fig. 3)." DTX-007_5; Tr. 525:2-526:6 ("capsules . . . caused more difficulties than any of the tablets").

[15] "[M]any patients with swallowing difficulties preferred to take round tablets (34.1 %) (Fig. 6)." DTX-007_5, _8; Tr. 524:8-22 ("a [POSA] would choose a tablet over a capsule" because "patients with swallowing difficulty specifically prefer to take the tablets").

[16] JTX-011 at Examples 8-10 (all compressed tablets); Tr. 532:13-21 (Little) ("it talks about taking 17 mgs [pimavanserin] and putting into a tablet"); Tr. 298:21-25 (Muzzio) (Example 8 is "a compression tablet"), 303:8-304:17 (Example 9 is compressed tablets), 416:23-417:17 (only discloses compatibility testing for "HPMC and gelatin capsules" of "size 0").

[17] FOF ¶ 14; JTX-011 at [0125]; Tr. 533:17-24 (Little); Tr. 299:9-300:1 (Muzzio) ("during

4

needed to show "acceptable" content uniformity;[18] and (iv) capsule formulations may be problematic.[19]  JTX-011 at [0120-27]; Rp. 6-7; PF ¶¶ 16-20.  Again, MSN was aware of ACADIA's position.  FOF ¶ 28; Tr. 336:17-336:22 (Frese) ("[E]xample 9 . . . says . . . making tablets. Would that have dissuaded a [POSA] from using the granulation to fill a capsule?").

For Points Four and Five, as explained in ACADIA's briefings, Dr. Muzzio makes several assumptions to allege an expectation of success, including that changing pimavanserin and mannitol concentrations in the Ragnar-Tolf granulation would not inhibit production of his desired granules or a formulation with his desired properties.  Rp. 8-9; PF ¶¶8, 21-22; Tr. 334:13-23 (Muzzio); Tr. 533:7-543:23 (Little).  Also, the claimed formulation comprises granules containing 40 mg pimavanserin (claimed amount) with a bulk density ("BD") range of 0.4-0.6 g/ml (claimed property).  *Id.*  Dr. Muzzio testified that Ragnar-Tolf only taught granules containing 20 mg pimavanserin (not the claimed amount) with a ~0.6 g/ml BD.  *Id.*  So, the only evidence for granules containing 40 mg (claimed amount) is that the inventors obtained a 0.508 g/ml BD, which is less than 0.6 g/ml, and shows that the claimed amount could and did materially and unpredictably alter the property of BD for the claimed formulation.  *Id.*  The Federal Circuit previously found similar expert testimony to not be an expressed expectation of success.  *In re Cyclobenzaprine Hydrochloride Extended–Release Capsule Patent Litig.*, 676 F.3d 1063, 1073-74 (Fed. Cir. 2012).  Put another way, just because Dr. Muzzio parroted the magic words—"expectation of success"—

---

blending, the mixture tended to form aggregates, which would potentially affect content uniformity" and a "POSA . . . would learn that this drug substance tends to form clumps").

[18] Tr. 419:8-422:21 (RSD values greater than 6 % told POSA not to do Example 8), 423:20-424:9 (admitting Example 9 has no RSD values but he relied on it anyway); JTX-011 at Tables 6 & 8.

[19] JTX-011 at [0120] (dry sample results indicated gelatin and HPMC capsules "have potential for interaction"), [0121] (wet sample results show "gelatin capsule, and HPMC capsule may be problematic"); *compare id.* at [0123] (capsule "materials **could be** suitable candidates"), *with* [0127] (Table 6 content uniformity results "indicated acceptable tableting parameters").

does not mean MSN proved by clear and convincing evidence that a POSA would have had one. *Id.* at 1069-70. Again, MSN was aware of ACADIA's position. Op. 6-7 ("20 mg vs. 40 mg. . . of pimavanserin *could* cause problems").

For Points Six and Seven, Dr. Muzzio admitted that (i) Ragnar-Tolf describes the 17 mg Nuplazid tablets,[20] (ii) its formulations cannot fit 40 mg pimavanserin into a size 4 capsule,[21] and (iii) the Nuplazid label told a POSA that there was a reason the dose was two small tablets instead of one bigger tablet.[22] Rp. 9-10. Dr. Little testified that if Dr. Muzzio's target product profile is accurate, then ACADIA "failed to achieve the target product profile that they would have made when they made the Nuplazid tablets . . . because of things like densification of the material, [or] it was difficult to do." Tr. 498:3-499:11. The FDA approved two tablet Nuplazid® in April 2016, and one capsule Nuplazid® in June 2018, *i.e.*, about a two-year delay. JTX09-06 ("Nuplazid™ . . . Apr. 2016" and "Nuplazid® . . . Jun. 2018"). Similarly, Ragnar-Tolf published in November 2007 and the '721 patent's provisional was filed in August 2017, *i.e.*, about a ten-year delay. FOF ¶ 25; JTX09-02. Rationally, either two or ten years is a "long delay" when MSN and Dr. Muzzio contend that the result could obviously be achieved "within one or two routine experiments." FOF ¶ 30; Tr. 335:3-24. MSN was aware of ACADIA's positions. Op. 3 & FOF ¶ 15 (misrelying on inventors' recognition / achievement of invention for obviousness).

For Point Eight, the specification is intrinsic evidence and unambiguously discloses that "excipients such as diluents, binders, lubricants, pharmaceutical flow agents, and/or other

---

[20] Tr. 404:23-405:5 (answering "yes" to "Ragnar-Tolf describes the 17 mg [Nuplazid] tablets?").

[21] Tr. 332:21-333:11; FOF ¶ 29.

[22] Tr. 411:10-18 ("[W]hy do you give the patient two tablets at the same time as opposed to just one bigger tablet? So yeah, the [Nuplazid] label is telling the POSA that there was a reason to subdivide the dose into smaller portions.").

excipients compatible with pimavanserin may be included," either inside or outside the granules. JTX09 at 19:12-15. As such, the Court is fully capable of determining whether this disclosure provides § 112 support without specific testimony on the passage. Contrary to MSN's assertion, while the Court may rely on expert testimony when evaluating written description, the proper inquiry is into the specification first and then guided by expert testimony as needed. *See Allergan USA, Inc. v. MSN Labs. Priv. Ltd.*, 111 F.4th 1358, 1376 (Fed. Cir. 2024). Again, MSN was aware of this because ACADIA disclosed "18:14-19:23" of the '721 patent as § 112 support, *inter alia*, in its Responses to Defendant's Interrogatories No. 7 at 24 (attached as Ex. B).

ACADIA seeks to note three additional issues in case the Court considers MSN's proposed reply brief (D.I. 137, Ex. A) when deciding whether to grant MSN's motion. First, despite promising that its reply "is strictly limited to responding to these new arguments," MSN immediately reneges on this pledge by rearguing a factual dispute that it certainly raised in its opening. Mot. at 2; *see Siemens Med. Sols. USA, Inc. v. Humedica, Inc.*, C.A. No. 14-880-LPS-CJB, 2015 WL 1738186, at *1 n.1 (D. Del. Apr. 8, 2015) ("[ACADIA] did not raise 'new arguments' . . . instead, the complained-of material was responsive to theories and arguments raised in [MSN's] brief."). In the reply's second paragraph, MSN repeats the exact same gross mischaracterization of Dr. Little's testimony that it already alleged, in essentially the same manner, three separate times in its opening brief. *Compare* Ex. A at 1, *with* Op. 3-4, 6 & Rp. 4 n.1. However, Dr. Little's testimony is clearly limited to a POSA's understanding of the inventor's statements in the '721 patent (Tr. 572:12-573:7)[23], and MSN is merely making one last "blatant

---

[23] 572:12-22 ("Q. Starting on line 44, **the patent says**, '[statement].' In your opinion, a POSA would agree with that statement, correct?"), 572:23-573:7 ("Q. … [patent] says, 'There is a need to improve … dosing of the daily therapeutic dose as a single administration.' … A. … That **need was not disclosed in prior art**, but that's the need that the[ inventors] saw to pursue.").

attempt" to "mislead the Court as to the contents of the record" by misrepresenting it as an admission for the fourth time, (Ex. A at 1).  Second, MSN's proposed reply brief relies heavily on attorney argument in an attempt to rebut the facts in the record, therefore only serving to affirm that Dr. Muzzio's obviousness analysis was impermissibly tainted by hindsight.  Lastly, if the Court decides to consider the merits of MSN's reply brief when deciding this Motion, or grants MSN's Motion, ACADIA respectfully requests that the Court allow it to respond in kind.

MSN's mischaracterization of known "points" as "new" provides no basis for allowing its reply brief and its Motion should be denied.  *See, e.g.*, *Cephea*, 2024 WL 1932830, at *9.

| OF COUNSEL: | SAUL EWING LLP |
|---|---|
| Chad J. Peterman<br>Bruce M. Wexler<br>Scott F. Peachman<br>Peter E. Conway<br>PAUL HASTINGS LLP<br>200 Park Avenue<br>New York, New York 10166<br>(212) 318-6000<br><br>Felix A. Eyzaguirre<br>PAUL HASTINGS LLP<br>600 Travis Street, 58th Floor<br>Houston, TX 77002<br>(713) 860-7300 | */s/ Michelle C. Streifthau-Livizos*<br>James D. Taylor (#4009)<br>Jessica M. Jones (#6246)<br>Michelle C. Streifthau-Livizos (#6584)<br>1201 N. Market Street<br>P.O. Box 1347<br>Wilmington, DE 19899<br>(302) 658-9200<br>james.taylor@saul.com<br>jessica.jones@saul.com<br>michelle.streifthau-livizos@saul.com<br><br>*Attorneys for Plaintiff*<br>*ACADIA Pharmaceuticals Inc.* |

Dated:  April 1, 2025