# EXHIBIT B

**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ACADIA PHARMACEUTICALS INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 22-1387-GBW |
| | ) |
| AUROBINDO PHARMA LIMITED, *et al.*, | ) **CONSOLIDATED** |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

**ACADIA'S SUPPLEMENTAL OBJECTIONS AND RESPONSES TO**
**DEFENDANT'S FIRST SET OF INTERROGATORIES (NO. 7)**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, and the applicable Local Civil Rules of the United States District Court for the District of Delaware, Plaintiff ACADIA Pharmaceuticals Inc. ("ACADIA" or "Plaintiff"), by and through its undersigned attorneys, hereby makes the following responses and objections to Defendant MSN Laboratories Private Ltd. and MSN Pharmaceuticals, Inc. (collectively "MSN" or "Defendant") First Set of Interrogatories (Nos. 1-8) (hereinafter "Interrogatories").

Pursuant to Federal Rule of Civil Procedure 26(e), Plaintiff reserves the right to amend or supplement its responses as the case progresses or should it learn or become aware of additional responsive information.

**GENERAL OBJECTIONS**

Plaintiff makes the following General Objections to Defendant's Interrogatories, which are made part of and incorporated by reference in Plaintiff's response to each Interrogatory:

Plaintiff incorporates by reference the General Objections set forth in its October 30, 2021 Objections and Responses to Defendant's First Set of Requests to Plaintiff for the Production of Documents and Things (Nos. 1-66).

1.      Plaintiff objects to Defendant's Interrogatories, including the "Definitions and Instructions," to the extent they seek to impose requirements or obligations on Plaintiff in addition to or different from those imposed by the Federal Rules of Civil Procedure, the District of Delaware Local Rules of Civil Practice and Procedure (the "Local Rules"), and the Orders of the Court. Plaintiff further objects to these "Definitions and Instructions" to the extent that they purport to alter the plain meaning or scope of any Interrogatory on the ground that such alteration renders the Interrogatory vague, ambiguous, overly broad, or unduly burdensome.

2.      Plaintiff objects to each Interrogatory to the extent it seeks information, documents, or things protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or immunity. Nothing contained in Plaintiff's responses is intended to be, or in any way shall be deemed to be, a waiver of any such applicable privilege or immunity. In responding to each Interrogatory, Plaintiff will not provide privileged or otherwise protected information, documents, or things. Any inadvertent production shall not be deemed a waiver of any privilege or immunity with respect to the information, documents, or things produced.

3.      Plaintiff objects to each Interrogatory to the extent it calls for the disclosure of confidential and/or private information, documents, or things of any third party or individual that is in the possession of Plaintiff pursuant to confidentiality and nondisclosure restrictions imposed by contract or applicable law.

2

4.      Plaintiff objects to each Interrogatory to the extent it calls for information, documents, or things relating to products offered for sale or sold outside of the United States or products not at issue in this lawsuit.

5.      Plaintiff objects to each Interrogatory to the extent it seeks information, documents, or things that are not within the possession, custody, or control of Plaintiff.

6.      Plaintiff objects to each Interrogatory to the extent it seeks information, documents, or things that are publicly available and therefore of no greater burden for Defendant to obtain than for Plaintiff to obtain and produce. In responding to the Interrogatories, Plaintiff will not conduct searches of publicly accessible databases, publicly available literature, or publicly accessible libraries, or collect or organize information, documents, or things that are as accessible to Defendant as they are to Plaintiff.

7.      Plaintiff objects to each Interrogatory to the extent it seeks information, documents, or things that are not relevant to any claim or defense and not proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, documents, or things, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

8.      Plaintiff objects to each Interrogatory to the extent that it seeks information, documents, or things that are more properly addressed by other forms of discovery. Plaintiff also objects to each Interrogatory to the extent it seeks expert testimony.

3

9.      Any response herein provided by Plaintiff shall in no way constitute or be construed as a waiver of any objection contained herein. For any and all information, documents, or things provided in response to each Interrogatory, Plaintiff reserves all objections or other questions regarding the authenticity, competency, relevance, privilege, or admissibility of such information, document, or thing as evidence in this suit or any other proceeding, action, or trial.

10.     Plaintiff objects to each Interrogatory to the extent it mischaracterizes facts or documents. Plaintiff's response to any Interrogatory is not meant to be, and should not be construed as, an acknowledgement by Plaintiff that such facts or documents exist or are accurately characterized.

11.     Plaintiff responds to each Interrogatory based on present knowledge, information, and belief. Plaintiff objects to each Interrogatory to the extent that a complete answer may be impractical or infeasible because this lawsuit is still in a preliminary stage. These responses and the objections and limitations contained herein are subject to and without waiver of (a) the right to make additional or supplemental objections to these or other Interrogatories and (b) the right to revise, correct, amend, or modify these responses upon, among other things, the discovery of additional facts and materials, further investigation, and other developments in this proceeding.

## **INTERROGATORIES**

## **INTERROGATORY NO. 7**

For each asserted claim of the Patent-in-Suit, describe in detail the complete factual and legal bases for Plaintiff's contention(s) that the Patent-in-Suit are not invalid under 35 U.S.C. §§ 101, 102, 103, and 112, and the judicially-created doctrine of obviousness-type double patenting, including by specifically responding to each ground of invalidity in any invalidity contentions served by Defendants; identify by Bates number all documents concerning the foregoing; and

identify the three individuals (at or employed by Plaintiff or under Plaintiff's control) most knowledgeable about the foregoing.

**ACADIA'S RESPONSE TO INTERROGATORY NO. 7:**
**(SERVED OCTOBER 20, 2023)**

In addition to its General Objections, Plaintiff objects to this Interrogatory as improper under Federal Rule of Civil Procedure 33(a) because it purports to be a single interrogatory but contains multiple subparts. Plaintiff further objects to this Interrogatory as vague, ambiguous, overly broad, and unduly burdensome, and seeking information, documents, or things that are neither relevant to any party's claim or defense and proportional to the needs of the case.

Plaintiff further objects to this Interrogatory to the extent that it seeks information, documents, or things that are protected by the attorney-client privilege, attorney work product doctrine, or any other applicable privilege or immunity. Plaintiff further objects to this Interrogatory as premature as this case is still in its initial stages. Under the current case schedule, fact discovery does not conclude until February 8, 2024, and expert discovery does not conclude until August 2, 2024.

Subject to the foregoing objections and General Objections, Plaintiff states as follows: Defendants have the burden of proof with respect to the alleged invalidity of the Patent-in-Suit. Defendants provided their 71-page initial invalidity contentions regarding any alleged invalidity of the Patent-in-Suit on July 13, 2023, which Plaintiff is currently reviewing. Plaintiff further objects to this Interrogatory as premature in that it seeks fact and expert discovery prior to the time set for fact and expert discovery by the Court. Under the current case schedule, fact discovery does not conclude until February 8, 2024, and expert discovery does not conclude until

5

August 2, 2024. Plaintiff further objects to this Interrogatory to the extent it requires Plaintiff to disprove any elements of invalidity for which Defendants have the burden of proof by clear and convincing evidence. Moreover, despite its length, Defendant's Initial Invalidity Contentions includes vague and general statements which are unsupported at this time, *e.g.*, "Defendants explicitly reserve the right to amend, revise, correct, supplement, or clarify any of these contentions at any time," "Defendants reserve the right to supplement, revise, or amend these contentions, including by way of illustration but not limitation, after receiving any validity positions from Plaintiff, after exchanges of claim construction positions or a claim construction opinion, after the completion of document production, and as depositions occur," "Defendants therefore reserve the right to further supplement or alter the positions taken and information disclosed in these Joint Initial Invalidity Contentions including, without limitation, the prior art and grounds of invalidity set forth herein, to take into account information or defenses that may come to light as a result of these continuing efforts." *See, e.g.*, Defendant's Initial Invalidity Contentions at 1, 2, 3, 69-70.

As this case is still in the initial stages of discovery, Plaintiff reserves the right to modify or further supplement this response upon, among other things, discovery of additional facts, information, and materials, expert discovery, and other relevant developments in this proceeding, and following the Court's issuance of a claim construction order in this case.

**ACADIA'S FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 7[1]:**
**(SERVED MARCH 11, 2024)**

In addition to its General Objections, Plaintiff objects to this Interrogatory as improper under Federal Rule of Civil Procedure 33(a) because it purports to be a single interrogatory but contains multiple subparts. Plaintiff further objects to this Interrogatory as vague, ambiguous, overly broad, and unduly burdensome, and seeking information, documents, or things that are neither relevant to any party's claim or defense and proportional to the needs of the case.

Plaintiff further objects to this Interrogatory to the extent that it seeks information, documents, or things that are protected by the attorney-client privilege, attorney work product doctrine, or any other applicable privilege or immunity. Plaintiff further objects to this Interrogatory as premature as this case is still in discovery. Under the current case schedule, fact discovery does not conclude until March 21, 2024, and expert discovery does not conclude until August 29, 2024.

Subject to the foregoing objections and General Objections, Plaintiff states as follows:

The Patent-in-Suit is presumed valid and it is Defendants that have the burden of proving invalidity by clear and convincing evidence. Defendants' interrogatory improperly attempts to shift the burden to ACADIA to disprove invalidity of the asserted claims. *See* 35 U.S.C. § 282

---

[1] This response addresses certain allegations made in Defendants' First Supplemental and Amended Joint Initial Invalidity Contentions, to the extent that it is appropriate to address them in the context of responding to Defendant's Interrogatory No. 7 at this time. ACADIA does not necessarily agree with (and reserves its right to respond in due course to) any of the allegations from Defendants' First Supplemental and Amended Joint Initial Invalidity Contentions that are not addressed herein, and ACADIA's silence as to any of those allegations at this time does not constitute agreement by ACADIA to any such allegation. Consistent with Federal Rule 26, ACADIA may, as a matter of right, supplement and amend its response as discovery progresses. In addition, ACADIA reserves the right to rely on any art cited or referenced in Defendants' First Supplemental and Amended Joint Initial Invalidity Contentions.

("The burden of establishing invalidity . . . shall rest on the party asserting such invalidity.").

For example, Defendants' Interrogatory No. 7 asks for "the complete factual and legal bases for"

why each asserted claim is "not invalid under 35 U.S.C. §§ 101, 102, 103, and 112, and the

judicially-created doctrine of obviousness-type double patenting."  Notwithstanding those

inquiries, the patent challenger's burden "is constant" and "never shifts" to the patentee.  *Am.*

*Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1359, 1360 (Fed. Cir. 1984),

*abrogated on other grounds by Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276

(Fed. Cir. 2011).

     In any event, the asserted claims are not invalid as anticipated or obvious in view of the

prior art identified by Defendants under 35 U.S.C. §§ 102, 103, or obviousness-type double

patenting.  Nor do they fail to comply with the requirements of 35 U.S.C. § 112.  Defendants'

assertions to the contrary are both incomplete and baseless.[2]

### A.    <u>Defendants Have Not Demonstrated that the '721 Patent Is Invalid</u>

    1.    The '300 Provisional Application Provides
        <u>Adequate Written Description Support for the Asserted Claims</u>

     The '300 provisional application provides adequate written description support to support

a priority claim for the asserted claims of the '721 patent.

     Defendants contend that "[t]he '300 provisional contains no disclosure that would

indicate to a POSA that the parties applying for the patent had actually invented size 3 or 4

---

[2] In responding to Defendants' First Supplemental and Amended Joint Initial Initial Invalidity Contentions, ACADIA cites a number of references that are exemplary and/or otherwise supportive of points made herein. ACADIA reserves its right to cite additional references and/or otherwise supplement its evidence as fact and expert discovery progress.

capsules containing "a blended pimavanserin composition comprising: granules comprising 40 mg pimavanserin tartrate and optional one or more pharmaceutically acceptable excipients" as recited in claims 1 and 4." (Defs' Invalidity Contentions at 29.) Contrary to Defendants' contention, the '300 Provisional Application provides sufficient disclosures. (*See, e.g.*, '300 Provisional Application at [0024], [0025], [0026], [0031], [0032], [0040]-[0045], [0050]-[0052], [0054], [0056], [0069], [0071]-[0072], [0084-0085], [0097]-[0098].) Thus, a POSA would understand that the claimed granules need not be limited to pimavanserin granulated alone, and Defendants' contention that "[n]othing in the '300 publication discloses, so broadly, that the granules may contain 'optionally one or more pharmaceutically acceptable excipients'" (Defs' Invalidity Contentions at 29) is incorrect.

2.    Defendants' Characterization of
the '721 Patent's Prosecution History Is Incorrect

Defendants provide purported summaries of the prosecution histories for each of the '721, '185, and '480 patents. (Def. Invalidity Contentions at 31-37.) ACADIA disagrees with Defendants' characterizations of the prosecution histories of the '721, '185, and '480 patents and reserves the right to respond to specific arguments contained therein. By way of example, Defendants incorrectly seems to suggest that the '721 patent evinces that its scope is equivalent to that of the predecessor patents. (*See, e.g.*, *id.* at 32 ("All submitted claims [of the '721 patent] were rejected on the ground of non-statutory double patenting as being unpatentable over claims 1-9 and 12-20 of the '480 patent (*Id.*). The Examiner stated that the claims were not patentably distinct over the claims of the '185 patent because they differed only in that they 'do not disclose the particle size of the excipients; however, the instant claims are written with open claim

9

language and do not foreclose these features.'; *see also id.* at 32-33.)  Defendants are incorrect,

as pointed out by the Court in its Claim Construction Memorandum Opinion.  (*See* D.I. 43 at 9-

10 ("[T]he claims of the '721 patent make clear that the 'claimed granules' differ in scope from

that of the predecessor patent because the '721 claims either allow (claim 1) or require (claim 4)

the granulation of pimavanserin with a separate ingredient.").)  ACADIA further incorporates by

reference in their entirety the Court's Claim Construction Order (D.I. 44), the Court's Claim

Construction Memorandum Opinion (D.I. 43), and the parties' claim construction briefing

materials concerning the '721 patent, including the Joint Claim Construction Brief (D.I. 39)[3], the

Declarations of R. Christian Moreton, Ph.D., the Deposition of R. Christian Moreton, Ph.D., the

Declaration of Christian Schöneich, Ph.D., the Deposition of Christian Schöneich, Ph.D., and

any exhibits cited in any of the aforementioned materials.  Defendants' characterizations of the

prosecution histories of the '185, '480, and '721 patents are incorrect for at least the reasons

provided by ACADIA during claim construction briefing.

> 3.    Defendants' "Background on the Prior Art and
>        Knowledge of a POSA" Contains Inaccuracies and Misrepresentation

Defendants make various allegations as to the purported state of the art as it would have

been understood by a POSA.  ACADIA addresses particular misrepresentations and inaccuracies

contained therein.  ACADIA's silence as to any particular statement does not reflect agreement.

---

[3] In its Memorandum Opinion, the Court explained that it is "unconvinced by Defendants' argument that the prosecution history of the '721 patent evinces that its scope is equivalent to that of the predecessor patents."  (D.I. 43 at 9.)  Defendants' characterizations of the prosecution histories of the patents are therefore incorrect for at least the reasons previously provided or relied upon by the Court.

Defendants allege that "in 2016 the FDA approved NUPLAZID® for the treatment of hallucinations and delusions associated with Parkinson's disease psychosis at a dose of 34 mg pimavanserin (40 mg pimavanserin tartrate), taken as two 17 mg tablets once a day. (NUPLAZID LABEL at 7–8; '185 Patent at 1:21–30; Ragnar at [0178]–[0128].) The desired dosage could be delivered by capsule. (Ragnar at [0049]; Glinecke at Ex. 2.)." (Defs' Invalidity Contentions at 37.) Defendants' contention is baseless. Nuplazid® was initially approved only in 17 mg tablet form (not capsules), and to achieve the 34 mg dose, two tablets needed to be administered once per day. Ragnar provides no descriptions or examples or suggestions as to how 34 mg of pimavanserin could be encapsulated within a single size 3 or 4 capsule. Defendants' citation to Glinecke at Ex. 2 is unavailing as it describes a particular capsule with active ingredient of "Compound X" – which has no relation to pimavanserin – and in an exceedingly low amount of 0.4 % w/w and 0.10 mg/capsule. Neither Ragnar nor Glinecke, alone or in combination, provide any suggestion that the 34 mg dose of pimavanserin "could be delivered by capsule." Furthermore, Defendants' reliance on these references reveals engagement in hindsight bias, as none of the references relate to pimavanserin or make any attempt to address any of the challenges faced by the named inventors of the '721 patent.

Defendants' additional citations to Ragnar are also misleading. (Defs' Invalidity Contentions at 38.) For instance, Defendants allege that Ragnar at [0062] and claims 45 and 52 "taught that pimavanserin formulations could be produced via a wet granulation method, including binderless wet granulation." (*Id.*) But Ragnar at [0062] describes that in some embodiments tablets are made using a "wet formulation method" with particular excipients, and

11

with significant amounts of either mannitol or lactose.  Ragnar in no way states that this method is "binderless."  Furthermore, nothing in claims 45 and 52 of Ragnar teach binderless wet granulation.

Defendants also allege that "[f]or certain wet granulation formulations, the bulk density of the granulation ranged from 0.56-0.61 g/ml and the D90 particle size (where about 90% of particles are smaller than the claimed range) is within the range of 90-250 microns.  (Ragnar at Table 8)."  (Defs' Invalidity Contentions at 38.)  Yet Defendants fail to mention that these certain wet granulation formulations are ~100 mg tablets containing 1 mg, 5 mg, or 20 mg of pimavanserin tartrate.  (*See, e.g.*, Ragnar at Example 9, Table 8.)  Ragnar does not describe the alleged bulk density and D90 particle size ranges values with respect to 34 mg of pimavanserin (*i.e.*, 40 mg of pimavanserin tartrate) and a size 3 or 4 capsule dosage form.  A POSA would thus have appreciated that such a teaching is neither described nor exemplified in Ragnar.

Defendants allege that "a POSA would have known about the prevalence of dysphagia in patients with neurodegenerative diseases and the benefits of smaller capsules for dysphagic patients," and further contend that "[t]he prior art disclosed that capsules possessed properties which made them easy to swallow and more tolerable to the patient.  Capsules could be easily administered because they were tasteless, smooth, and slippery.  (Lachman at 374; *see also* Remington at 1642.)."  (Defs' Invalidity Contentions at 38-39.)  However, the alleged prior art references upon which Defendants rely also disclosed that tablets possessed properties which made them preferable over capsules.  (*See, e.g.*, Lachman at 293-294 (explaining that tablets "may provide the greatest ease of swallowing with the least tendency for 'hang-up' above the

12

stomach, especially when coated . . . ."; *see also* Remington at 1615 ("Tablets remain popular as

a dosage form because of advantages afforded both to the manufacturer . . . and the patient (eg,

accuracy of dosage, compactness, portability, blandness of taste and ease of administration.")

Furthermore, and as Defendants appear to recognize, pimavanserin tablets could be crushed (like

opening capsules) to aid in the administration of the drug to patients with difficulty swallowing.

(*See, e.g.*, Defs' Invalidity Contentions at 39.)  Thus, Defendants fail to show that a POSA would

have viewed capsules as preferable over tablets.  Plaintiff further notes that Defendants' reliance

on these references reveals engagement in hindsight bias, as none relate to pimavanserin or make

any attempt to address any of the challenges faced by the named inventors of the '721 patent.

Defendants further contend that "[t]he option to mix the contents of capsules with food

distinguished capsules as a preferred dosage form for patients with difficulty swallowing," and

"[b]y contrast, the prior art taught that crushing tablets in order to mix medicine with water or

food resulted in drug loss from spilled powder or powder being left in the vessel, and could

further lead to altering the pharmacokinetic properties, therapeutic efficacy, and safety of the

medication (Thong at 1-2, 6-7, 10; *see also* Mc Gillicuddy at Abstract, 142, 147-48)."  (Defs'

Invalidity Contentions at 40.)  But Defendants do not disagree that tablet crushing was a type of

modification of oral medicines that would aid in administration to patients with difficulty

swallowing.  (*See, e.g.*, *id.* at 39 ("Due to difficulty swallowing, the prior art disclosed that

administration to older patients commonly required modification of oral medicines, such as

tablet crushing and capsule opening.").)  Defendants also fail to mention that their alleged prior

art reference does not suggest a preference for capsules over tablets.  (*See, e.g.*, Mc Guillicuddy

13

at 149 ("The majority (69%) of patients with difficulty swallowing solid [oral dosage forms] in a general population admitted to not taking a tablet *or capsule* due to difficulty swallowing the dosage form.") (emphasis added).  Thus, Defendants fail to demonstrate that capsules would have been preferred over tablets.

Defendants allege that "a POSA would have been motivated to double the amount of API in the prior art NUPLAZID because of the known advantages of administering fewer capsules. However, a POSA would have understood that it was undesirable to increase the size of the dosage form because of the known advantages of administering smaller capsules, and the disadvantages reported with larger dosage forms."  (Defs' Invalidity Contentions at 41.)  As explained *supra*, none of the references upon with Defendants rely would have motivated or taught a POSA how to arrive at the claimed inventions of the '721 patent.  Neither do any of Defendants' alleged prior art references indicate a preference for capsules over tablets as the dosage form.  In addition, Defendants' reliance on these references reveals engagement in hindsight bias, as none of the references relate to pimavanserin or make any attempt to address any of the challenges faced by the named inventors of the '721 patent.

Defendants next allege that "a POSA would have known about the advantages of densifying voluminous drug substances to reduce the size of the oral dosage form were well known in the art."  (Defs' Contentions at 41.)  Specifically, Defendants contend that "[a]s of the priority date, it was well known that the densification of drug substances was a desirable way to incorporate drugs into smaller capsules that could be more easily swallowed by the patient (Ribeiro at 4:5–10)," that "[a] POSA would have understood that one way to modify bulk density

of a drug substance was to alter the particle size of the drug powder," and that "[i]t was also known that the particle size distribution of the API itself can significantly impact both manufacturability (e.g., flowability, packing properties, and mixing) and quality attributes of a drug product (e.g., dissolution rate, bioavailability, and content uniformity), and a POSA would know how to modulate particle size distribution to address these properties (Adamson at 1; Wöstheinrich at 483, 485; Remington at 1609)." (Defs' Invalidity Contentions at 41-42.) None of the references to which Defendants cite, however, contain an API that resembles pimavanserin. To the contrary, Ribeiro teaches that "[a]s every API has its own physical, chemical and pharmacological characteristics, a suitable pharmaceutical composition and dosage form has to be individually designed for every new API." (Ribeiro at 2:1-3.) Defendants make no attempt to explain how the teachings in these references would apply to pimavanserin. In addition, Defendants' reliance on these references reveals engagement in hindsight bias, as none of the references relate to pimavanserin or make any attempt to address any of the challenges faced by the named inventors of the '721 patent.

Defendants allege that "a POSA would have routinely used granulation to densify voluminous drug substances" with citation to Ribeiro. (Defs' Invalidity Contentions at 42.) In particular, Defendants allege that "the prior art taught that wet granulation was a particularly desirable method for densifying drug substances because it provides blends with good flow properties and low risk of cohesiveness." (*Id.*) Again, Defendants have cited a single reference containing an API that does not resemble pimavanserin. (*See* Ribeiro at 1:15-19.) This citation does not support what methods POSAs "routinely" employ. To the contrary, Ribeiro teaches that

15

"[a]s every API has its own physical, chemical and pharmacological characteristics, a suitable pharmaceutical composition and dosage form has to be individually designed for every new API." (*Id.* at 2:1-3.) Defendants make no attempt to characterize the physiochemical properties of the active ingredient in Ribeiro's formulations or how Ribeiro's teachings would apply to pimavanserin. Defendants also rely on Ribeiro to allege that "[b]y using densification techniques, a capsule of size 4 could comprise up to 50 mg or 40% by weight of the API." (Defs' Invalidity Contentions at 42.) However, even if a POSA would have looked to Ribeiro, Ribeiro prefers that "a capsule of size 3 or 4 is used for dosage strength of 25 mg." (*See, e.g.*, Ribeiro at 7:27-29.)

Defendants allege that "a POSA would have known that wet granulation of drug and one or more binders could be used to achieve a bulk density of at least 0.4 g/mL, including preferably up to at least 0.5 g/mL, at least 0.6 g/mL, or at least 0.7 g/mL. (*Id.* at 8:32-9:5; Ragnar at Table 8.) This approach was also known to yield a particle size distribution wherein approximately 90% particles (measured either by weight or by volume) fell below the range of 90–250 microns. (*E.g.*, Ragnar at Table 8.)" (Defs' Invalidity Contentions at 42.) As described above, Defendants' citation to Ragnar is inapposite. Ragnar does not describe the above bulk densities or particle size distribution values with respect to a composition containing 40 mg of pimavanserin tartrate in a size 3 or 4 capsule shell dosage form. Defendants' citation to Ribeiro at 8:32-9:5 is also flawed as it describes a general wish-list of bulk densities between 0.4 g/ml to 1.2 g/ml for a different drug without providing any guidance to a POSA, or relevant example, of how such densities would be obtained with 34 mg of pimavanserin in a size 3 or 4 capsule shell.

16

Moreover, Defendants' allegation that "[g]iven that pimavanserin is soluble in water, it would have been an obvious candidate for binder-free granulation" (Defs' Invalidity Contentions at 43) is belied by at least the early development of dosage forms for pimavanserin, including as documented in the Ragnar reference cited by Defendants, which does not utilize binder-free granulation.

Defendants allege that "[t]he prior art reported that granulated API generated via binderless wet granulation methods can have bulk densities in the range of 0.397 to 0.459 g/mL. (Wöstheinrich at 483.)" (Defs' Invalidity Contentions at 43.) Defendants' citation to Wöstheinrich is inapposite. Wöstheinrich reports a study of polymorphic changes of thiamine hydrochloride during granulation and tableting. (*See* Wöstheinrich at 481.) Granulating liquid of 200-400 g is employed, and after granulation, tablets are formed by compression. (*See id.* at 483-84.) Defendants have not articulated how Wöstheinrich provides guidance to a POSA seeking to fit 34 mg of pimavanserin into a size 3 or 4 capsule shell.

Defendants allege that "API particles formed via granulation (with and without binders) were known to provide excellent free-flowing properties, increased stability, and eliminate potential unwanted influence of binders on the granulation (Schlunken at 4:26; Wöstheinrich at 482, 488; Al-Zahrani at 10-11)." (Defs' Invalidity Contentions at 43.) Defendants have not articulated how these alleged prior art references would provide guidance to a POSA seeking to fit 34 mg of pimavanserin into a size 3 or 4 capsule shell, nor do Defendants explain their position regarding "potential unwanted influence of binders on the granulation." (*Id.*) In addition, Defendants' reliance on these references reveals engagement in hindsight bias, as none

17

of the references relate to pimavanserin or make any attempt to address any of the challenges faced by the named inventors of the '721 patent.

Defendants allege that "[g]ranulation also provided an alternative to dry roller compaction that could be implemented without major process changes (Shen at 9–10)." (*Id.* at 43.) However, the alleged prior art reference upon which Defendants rely describes dry roller compaction as a form of granulation. (*See, e.g.*, Shen at 9 ("In this industrial case study, an undisclosed [API] used in inhalation therapy, is typically granulated using roller compaction.").) Defendants' reliance on Shen is further misplaced because Shen is not generally applicable to any API or pharmaceutical composition, but rather is particularized for a specific API with specific properties. (*See, e.g.*, Shen at 9 ("The aim of this study is to devise a humidification treatment prior fluidization to shift cohesive fine powder from Geldart Type C to coarser Type A by utilizing the very hygroscopic nature of the API concerned.").) Defendants have not shown that Shen is applicable outside the context of a "cohesive hygroscopic inhalant API" (*see, e.g.*, Shen at 15), and therefore fail to demonstrate that a POSA would have understood Shen's particularized teachings to apply to formulations containing pimavanserin.[4]

Defendants further allege that "[a] POSA would also know that densification of the API via wet granulation techniques would result in a bulk density of between 0.4 and 0.6 g/mL (*E.g.*, Wöstheinrich at 483)." (Defs' Invalidity Contentions at 44 (citing Wöstheinrich at 483.) As

---

[4]      In addition, Defendants' reliance on Shen reveals engagement in hindsight bias, as Shen does not relate to pimavanserin or make any attempt to address any of the challenges faced by the named inventors of the '721 patent.

explained *supra*, Defendants fail to describe how the disclosures of Wöstheinrich would apply to fitting 34 mg of pimavanserin into a size 3 or 4 capsule shell.

Defendants' citation to Ragnar as supporting "the prior art teaches that the bulk density of the formulation should be between 0.56 and 0.61 g/ml" (Defs' Invalidity Contentions at 44) is flawed for the reasons described above, *e.g.*, that such densities are taught for low dose tablets of pimavanserin. Accordingly, contrary to Defendants' allegation, a bulk density within the claimed range would not have been "the natural and inevitable result of a POSA's pursuit of a dosage form that combines the dose of both prior art NUPLAZID tablets into a single, small capsule." (Defs' Invalidity Contentions at 44.) Defendants further allegation that "the prior art teaches that the bulk density of particles generated through wet granulation can be prepared at such bulk densities" (*id.*) is inapposite as none of Defendants' three cited references (Wöstheinrich, Ribeiro, or Ragnar) describe how such bulk densities can be prepared in the context of 34 mg pimavanserin in a size 3 or 4 capsule. Indeed, Defendants have not and cannot cite any reference in which 34 mg pimavanserin (or 40 mg pimavanserin tartrate) was encapsulated into a size 3 or 4 capsule.

Defendants make various claims about the benefits of optimizing particle size distribution. (*Id.* at 44-46.) Defendants do not cite or relate any of their cited references to the facts of 34 mg pimavanserin in a size 3 or 4 capsule. Defendants' sole cited examples of particle size between ~125 and ~355 μm are found in Al-Zahrani (a master's thesis discussing general powder characteristics) and Hart (an article discussing testing on a detergent powder.) (*Id.*) Contrary to Defendants' allegation, a particle size within the claimed range would not have been

19

"the natural and inevitable result of a POSA's pursuit of a dosage form that combines the dose of both prior art NUPLAZID tablets into a single, small capsule." (*Id.*)  Defendants do not explain this assertion, and in any event, Defendants' references are inapposite.

Defendants' allegation that "it was both known and desirable to use wet granulation using a small amount of water to achieve a particle size distribution and bulk density within the claimed range, including with respect to pimavanserin" falls flat. (*Id.*)  Defendants' only references with pimavanserin are Ragnar and NUPLAZID Clinical Pharm. & Biopharmaceutics Review, and its teachings are inapposite, as discussed above.  In addition, Defendants' reliance on these references reveals engagement in hindsight bias, as none of the references make any attempt to address any of the challenges faced by the named inventors of the '721 patent.

        4.    A POSA Would Not Have Had a Motivation to Combine
                Prior Art Teachings with a Reasonable Expectation of Success

Defendants recite various factors to consider in order to show motivation to combine and allege that "a POSA would have been motivated to combine the teachings of these prior art references with the reasonable expectation of success, in that smaller dosage forms of the NUPLAZID formulations already on the market could be achieved via densification." (Defs' Invalidity Contentions at 46-48.)  Contrary to Defendants' contentions, and for the reasons provided in Section A.3 *supra*, Defendants fail to show that a POSA would have had motivation to combine the alleged prior art teachings with a reasonable expectation of success to achieve the claimed invention.  ACADIA reserves the right to supplement if Defendants later provide specific reasons as to why particular references would have supplied a motivation to combine with a reasonable expectation of success.

20

Defendants also claim to provide exemplary combinations of references. (*See, e.g.*, Defs'

Invalidity Contentions at 47-48.) ACADIA reserves the right to respond to any combination not

expressly presented in Defendants' First Supplemental and Amended Joint Invalidity

Contentions.

5.      Defendants Have Not Demonstrated that the Asserted<br>Claims of the '721 Patent Are Obvious under 35 U.S.C. § 103

Defendants' obviousness rationale for claim 1 of the '721 patent is flawed for at least the

reasons presented above in ACADIA's responses to the "Background on the Prior Art and

Knowledge of a POSA" (Section A.3 *supra*), which are incorporated by reference. ACADIA

below points out further reasons why Defendants' alleged ground of invalidity is erroneous. If

ACADIA does not address any particular point, this does not indicate agreement.

As described above, Ragnar at [0049] contemplates that its compositions could be

formulated in pharmaceutically acceptable carriers including, *inter alia*, capsules, but provides

no descriptions or examples as to how 34 mg of pimavanserin could be encapsulated within a

single size 3 or 4 capsule. Ragnar's specific tablet formulations are 1 mg, 5 mg, or 20 mg of

pimavanserin. (Ragnar at Table 8.) A POSA would not have understood Ragnar to support

Defendants' twisted read of the disclosure. As argued above, Defendants' select citations to

Ribeiro, Wöstheinrich, and Ragnar, among others, to allegedly support that densification

methods were well known is erroneous. (Defs' Invalidity Contentions at 48-54.) Among other

things, Ribeiro and Wöstheinrich do not provide relevant teachings as to pimavanserin, nor how

to densify 34 mg pimavanserin into a size 3 or 4 size capsule shell. Defendants' fail to explain

21

why a POSA would have sought to modify Ragnar with either Ribeiro or Wöstheinrich, or why such references are compatible for combination. Defendants further allegation that "[a] POSA would have been aware that densification of the API via wet granulation techniques would have resulted in a bulk density of more than 0.4 g/mL" is erroneous. (*Id.* at 51.) To the extent Defendants are implying 34 mg pimavanserin would reach such a range, none of Defendants' cited references alone or in combination provides this teaching.

Defendants allege that "the prior art teaches how to achieve a bulk density of a pimavanserin formulation between 0.56 and 0.61 g/mL (Ragnar at Table 8) . . . . If a POSA would have wanted to granulate using fewer excipients, it would have been obvious to a POSA to apply this target bulk density to the API alone." (Defs' Invalidity Contentions at 52-53.) Defendants' allegation must fail. Ragnar at Table 8 discloses tablet formulations of 1 mg, 5, mg, or 20 mg, and a POSA would not have extrapolated from Ragnar that such bulk densities should immediately become a target for API alone granulation in a small size 3 or 4 capsule shell. Defendants fail to explain why and how they make this leap, and likely are relying on their incorrect read of Ragnar, as noted above.

Further, Defendants do not explain why a POSA would want to granulate pimavanserin alone, or why wet granulation (with or without excipients) would enable 34 mg of pimavanserin to fit inside of a small size 3 or 4 capsule shell. This is compounded by the fact that Defendants have not explained why a POSA would have modified Ragnar with Defendants' other cited references with a reasonable expectation of success.

Defendants posit three different putative groups of prior art references. (Defs' Invalidity Contentions at 53-56.) Defendants allege that claim 1 of the '721 patent is obvious over the "Group 1 references" either "alone or further in view of" the Group 2 references, and that "[i]t would also be obvious based on those combinations in view of" the "Group 3 references." (*Id.*) Defendants then provide over a dozen additional references as reflecting "the knowledge of a POSA" which are the "Group 4 references." (*Id.* at 54.) ACADIA submits that Defendants' descriptions of these prior art references are unclear, including the fact that Defendants' entire obviousness rationale relies on references which Defendants do not even view as essential to their purported obviousness combinations.

Defendants provide a long bullet point list of potential obviousness combinations that allegedly render claim 1 of the '721 patent obvious. ACADIA cannot decipher what particular grounds Defendants' wish to allege for purposes of obviousness of claim 1 of the '721 patent. ACADIA reserves the right to supplement when definitive combinations are proposed.

Defendants' obviousness arguments for claims 2-7, and 9-13 of the '721 patent are largely duplicative of their arguments for claim 1 of the '721 patent. Claims 1-13 of the '721 patent are not invalid for obviousness for at least the reasons presented above.

### B. Defendants Have Not Demonstrated that the Asserted Claims of the '721 Patent Are Invalid under 35 U.S.C. § 112

Defendants' First Supplemental and Amended Joint Initial Invalidity Contentions for the '721 patent set forth written description theories under 35 U.S.C. § 112. For at least the

following reasons, Defendants' contentions are without merit.[5]

1.  Defendants Have Not Demonstrated that the Asserted Claims
of the '721 Patent Are Invalid for Lack of Written Description

Defendants allege that "[t]he specification only discloses granulated forms of pimavanserin where the API is granulated by itself, without any excipients, or with less than 10% w/w of Avicel PH302 or Avicel PH101 and colloidal silicon dioxide."  (Defs' Invalidity Contentions at 71.)[6] Contrary to Defendants' contention, the '721 patent specification contains sufficient disclosures such that adequate written description support for the claimed inventions of the asserted claims would have been provided to a POSA. (*See, e.g.*, '721 patent at 1:65-2:16, 8:64-9:3, 10:39-12:9, 13:29-32, 15:3-16:18, 18:14-19:23, and 23:5-8.)  Indeed, and as Defendants appear to recognize, "including a binder in the granulation is possible." (Defs' Invalidity Contentions at 72 (citing '721 patent at 12:40-42).)  Thus, the disclosures in the '721 patent provide adequate written description support for the claimed inventions.

Defendants further allege that "the Applicants represented to the Patent Office that the novelty of these claims rested on the increase in bulk density offered by granulating the drug alone, without any excipients permits a larger dose of the API to be formulated into a smaller capsule . . . . The purported novel increase in bulk density is the direct result of the pimavanserin-only granulation method disclosed in the specification." (Defs' Invalidity

---

[5]    Plaintiff does not agree with Defendants' characterizations of the specification of the '721 patent throughout Defendants' First Supplemental and Amended Joint Initial Invalidity Contentions for the '721 patent, and reserve the right to rebut any point not addressed in this supplemental response to Defendant's Interrogatory No. 7.
[6]    Defendants further allege that "[t]o the extent that intra-granular excipients are discussed, the specification limits the presence of excipients in granules to 'less than 10% w/w' and only specifically with either Avicel PH302 or Avicel PH101 and colloidal silicon dioxide."  (Defs' Invalidity Contentions at 71-72.)

Contentions at 71.)   Defendants not only mischaracterize the file history of the '721 patent but also ignore the Court's Markman opinion.  (*See, e.g.*, D.I. 43 at 9 ("The Court is further unconvinced by Defendants' argument that the prosecution history of the '721 patent evinces that its scope is equivalent to that of the predecessor patents . . . .  [T]he claims of the '721 patent make clear that the 'claimed granules' differ in scope from that of the predecessor patent because the '721 claims either allow (claim 1) or require (claim 4) the granulation of pimavanserin with a separate ingredient.").)  Thus, Defendants' argument here falls flat.

Defendants therefore fail to show that the specification of the '721 patent does not sufficiently describe the inventions recited in Asserted Claims in such detail that a POSA would not have reasonably concluded that the inventors had in their possession the claimed subject matter. The disclosures in the '721 patent provide adequate written description support for "granules comprising 40 mg pimavanserin tartrate and optionally one or more pharmaceutically acceptable excipients."

2.      Defendants Have Not Demonstrated that the Asserted
Claims of the '721 Patent Are Invalid for Lack of Enablement

Defendants allege that "[t]he specification only discloses granulated forms of pimavanserin where the API is granulated by itself, without any excipients, or with less than 10% w/w of excipients."  (Defs' Invalidity Contentions at 73.)[7]  Contrary to Defendants' contention, the '721 patent specification contains sufficient disclosures such that a POSA would have understood the claimed inventions of the asserted claims to be enabled.  (*See, e.g.*, '721

---

[7]      Defendants further allege that "[t]o the extent that intra-granular excipients are discussed, the specification limits the presence of excipients in granules to 'less than 10% w/w' and only specifically with either Avicel PH302 or Avicel PH101 and colloidal silicon dioxide."  (Defs' Invalidity Contentions at 71-72.)

patent at 1:65-2:16, 8:64-9:3, 10:39-12:9, 13:29-32, 15:3-16:18, ==18:14-19:23,== and 23:5-8.)

Defendants further allege that "the Applicants represented to the Patent Office that the novelty of these claims rested on the increase in bulk density offered by granulating the drug alone, without any excipients permits a larger dose of the API to be formulated into a smaller capsule . . . . The purported novel increase in bulk density is the direct result of the pimavanserin-only granulation method disclosed in the specification." (Defs' Invalidity Contentions at 73.) As explained in Section B.1. *supra*, Defendants' argument here falls flat.

Defendants further allege that "since the specification makes clear that one of the purportedly novel elements is the elimination of excipients in granulating pimavanserin, the specification specifically does not establish a functional range of intra-granular excipients which would be effective in making a 34 mg blended pimavanserin composition which is dense enough to fit into a size 3 or 4 capsule." (Defs' Invalidity Contentions at 73.) Defendants' allegations must fail. Among other things, the specification demonstrates to a POSA that the inventors were in possession of a pimavanserin composition comprising granules comprising 40 mg pimavanserin tartrate and excipients and furthermore provides guidance on how to prepare such dosage forms that a POSA would have been able to formulate without undue experimentation. (*See, e.g.*, '721 patent at 1:65-2:16, 8:64-9:3, 10:39-12:9, 13:29-32, 15:3-16:18, 18:14-19:23, and 23:5-8.)

3.   Defendants Have Not Demonstrated that the
     Claims 12 and 13 of the '721 Patent Are Invalid as Indefinite

Defendants allege that "[a] POSA, reading claim 12, would not know whether the claim required a binder." (Defs' Invalidity Contentions at 74.) Defendants further allege that "that it

26

would be unclear whether the claim encompassed compositions that did not include a binder (given claim 1's statement that the one or more pharmaceutically acceptable excipients are optional), or whether the claim required the presence of a binder. Nothing in the specification or file history would further answer this question to a POSA." (Defs' Invalidity Contentions at 75.)

Defendants further allege that "[c]laim 13 is also invalid as indefinite," and that "[t]he use of the term 'pharmaceutically acceptable excipients' in claim 13 would generally be understood by a POSA to restrict the composition of claim 4 to require more than one pharmaceutically acceptable excipient, as the claim does not recite the specific language of claim 4 ('one or more pharmaceutically acceptable excipients') and uses the plural term 'pharmaceutically acceptable excipients.' In addition, the claim says the 'pharmaceutically acceptable excipients comprise a binder,' which indicates additional components are present." (Defs' Invalidity Contentions at 75.)

Plaintiff submits that a request for Certificate of Correction has been submitted in connection with claims 12 and 13 of the '721 patent, and that such request is a part of the file history. (*See* '721 Patent File History, Request for Certificate of Correction dated March 1, 2024.) Thus, in view of Plaintiff's request for a Certificate of Correction, Defendants' arguments of indefiniteness are rendered moot. Plaintiff reserves the right to further respond to Defendants' allegations of indefiniteness in view of further developments at the Patent Office.

C.   **Defendants Have Not Demonstrated that the
     '721 Patent Is Unenforceable Due to Unclean Hands**

Defendants allege that "[k]nowing that it had made the statements regarding the invention involving pimavanserin granulated alone during prosecution, and with knowledge of MSN's confidential formulation, [ACADIA] filed a new patent application with the same disclosure as the '480 and '891 patents on March 14, 2022 but with new claims." (Defs' Invalidity Contentions at 67.) Defendants further allege that "[k]nowing that it had made the statements regarding the invention involving pimavanserin granulated alone during prosecution, and with knowledge of MSN's confidential formulation, [ACADIA] filed a new patent application with the same disclosure as the '480 and '891 patents on March 14, 2022 but with new claims." (*Id.* at .) Defendants conclude that "Plaintiff's actions surrounding its patent prosecution activities that led to the issuance of the patent-in-suit are unconscionable," and therefore "MSN (and others) are entitled to a declaration that the manufacture, use, offer for sale, and sale of the MSN ANDA Product . . . does not and will not infringe any claim of the '721 patent." (*Id.* at 69; *see generally id* at 76-80.) Defendants, however, have offered nothing but conjecture in support of its claims and has not identified any actual evidence of conduct supporting unclean hands.

As this case is still in discovery, Plaintiff reserves the right to modify or further supplement this response upon, among other things, discovery of additional facts, information, and materials, expert discovery, and other relevant developments in this proceeding.

OF COUNSEL:

Chad J. Peterman
Bruce M. Wexler
Scott F. Peachman
Peter E. Conway
PAUL HASTINGS LLP
200 Park Avenue
New York, New York 10166
(212) 318-6000
chadpeterman@paulhastings.com
brucewexler@paulhastings.com
scottpeachman@paulhastings.com
peterconway@paulhastings.com

Felix A. Eyzaguirre
PAUL HASTINGS LLP
600 Travis Street, 58th Floor
Houston, TX 77002
(713) 860-7300
felixeyzaguirre@paulhastings.com

*Attorneys for Plaintiff ACADIA Pharmaceuticals Inc.*

March 11, 2024

SAUL EWING LLP

/s/ *James D. Taylor Jr.*
James D. Taylor, Jr. (#4009)
Jessica M. Jones (#6246)
Michelle C. Streifthau-Livizos (#6584)
1201 N. Market Street, Suite 2300
P.O. Box 1266
Wilmington, Delaware 19899
(302) 421-6800
james.taylor@saul.com
jessica.jones@saul.com
michelle.streifthau-livizos@saul.com

*Attorneys for Plaintiff*

29