**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

ACADIA PHARMACEUTICALS INC.,

Plaintiff,

v.

AUROBINDO PHARMA LIMITED, et al.,

Defendants.

Civil Action No. 22-1387-GBW

CONSOLIDATED

**REDACTED PUBLIC VERSION**

---

James D. Taylor, Jr., Jessica M. Jones, Michelle C. Streifthau-Livizos, SAUL EWING LLP, Wilmington, DE; Chad J. Peterman, Bruce M. Wexler, Scott F. Peachman, Peter E. Conway, PAUL HASTINGS LLP, New York, NY; Felix A. Eyzaguirre, PAUL HASTINGS LLP, Houston, TX.

*Counsel for Plaintiff*

R Touhey Myer, KRATZ & BARRY LLP, Wilmington, DE; Timothy H. Kratz, George J. Barry III, John Thallemer, KRATZ & BARRY LLP, Atlanta, GA; Michael P. Hogan, KRATZ & BARRY LLP, Philadelphia, PA.

*Counsel for Defendants Aurobindo Pharma Limited and Aurobindo Pharma USA, Inc.*

James S. Green, Jr., SEITZ, VAN OGTROP & GREEN, P.A., Wilmington, DE; Richard J. Berman, Janine A. Carlan, Bradford C. Frese, Michael Baldwin, ARENTFOX SCHIFF LLP, Washington, DC.

*Counsel for Defendants MSN Laboratories Private Ltd. and MSN Pharmaceuticals Inc.*

# OPINION

May 16, 2025
Wilmington, Delaware

GREGORY B. WILLIAMS
UNITED STATES DISTRICT JUDGE

This Hatch-Waxman action[1] arises from Aurobindo's and MSN's Abbreviated New Drug Applications ("ANDA") to the Food and Drug Administration ("FDA") to market a generic version of Acadia's 34 mg Nuplazid® pharmaceutical capsule. Following these applications, Acadia filed separate actions against Aurobindo and MSN, each alleging infringement of U.S. Patent No. 11,452,721 ("the '721 patent"). On May 19, 2023, the Court consolidated the two actions. On December 3, 4, and 6, 2024, the Court presided over a three-day bench trial, during which the parties disputed whether Aurobindo infringes claims 4 and 5 of the '721 patent and whether claims 4 and 5 of the '721 patent are invalid. MSN stipulated to infringement on the eve of trial.

The parties submitted post-trial briefs (D.I. 126; D.I. 127; D.I. 131; D.I. 134) and proposed findings of fact and conclusions of law (D.I. 126-1; D.I. 128; D.I. 132; D.I. 134-1). Upon review of these documents, along with consideration of the trial record, the exhibits introduced into evidence, and the stipulations of fact by the parties (*see* D.I. 101-1), the Court concludes that Aurobindo infringes claims 4 and 5 of the '721 patent and that claims 4 and 5 of the '721 patent are not invalid. Below, the Court separately sets forth its findings of fact and conclusions of law as required by Rule 52(a)(1) of the Federal Rules of Civil Procedure.

Also pending before the Court is MSN's Motion for Leave to File Post-Trial Reply Brief ("Motion for Leave") (D.I. 137), which has been fully briefed (D.I. 138; D.I. 139). For the reasons

[1] "Hatch-Waxman" refers to the Patent Term Restoration Act of 1984. In this action, the Plaintiff is Acadia Pharmaceuticals Inc. ("Acadia" or "Plaintiff"). The Defendants are Aurobindo Pharma Limited and Aurobindo Pharma USA, Inc. (together, "Aurobindo") and MSN Laboratories Private Ltd. and MSN Pharmaceuticals Inc. (together, "MSN") (together with Aurobindo, "Defendants").

set forth in the penultimate Section of this Opinion, the Court denies MSN's Motion for Leave. The Court also denies-as-moot Acadia's contingent request for leave to file a sur-reply brief in support of its opposition to Defendants' post-trial brief (D.I. 138 at 8).

## I. FINDINGS OF FACT

The Court divides its Findings of Fact into the following Sections: (A) Background, (B) Infringement, (C) Obviousness, (D) Indefiniteness, and (E) Written Description / Enablement.

### A. Background

The Court divides its Background Findings of Fact into the following Sections: (1) the Parties, (2) the Experts, (3) Nuplazid®, (4) the Asserted Patent, (5) Defendants' ANDAs, and (6) the Court's Claim Constructions.

#### 1. The Parties

1. Acadia is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 12830 El Camino Real, Suite 400, San Diego, California 92130. D.I. 101-1 ¶ 1.

2. MSN Laboratories Private Limited is an entity organized and existing under the laws of India, having a principal place of business at MSN House, Plot No. C-24, Industrial Estate, Sanathnagar, Hyderabad, Telangana, 500018 India. D.I. 101-1 ¶ 2.

3. MSN Pharmaceuticals, Inc. is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 20 Duke Road, Piscataway, New Jersey 08854. D.I. 101-1 ¶ 3.

4. Aurobindo Pharma Limited is an entity organized and existing under the laws of India, having a principal place of business at Plot No. 2, Maitrivihar, Ameerpet, Hyderabad-500038, Telangana, India. D.I. 101-1 ¶ 5.

5. Aurobindo Pharma USA, Inc. is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 279 Princeton-Hightstown Road, East Windsor, New Jersey, 08520. D.I. 101-1 ¶ 6.

6. Aurobindo Pharma Limited and Aurobindo Pharma USA, Inc. work in concert, either directly or indirectly, with respect to the regulatory approval, manufacturing, marketing, sale, and distribution of generic pharmaceutical products throughout the United States, including in the State of Delaware. D.I. 101-1 ¶ 7.

**2. The Experts**

7. Dr. Pamela Smith ("Dr. Smith"), Acadia's infringement expert, has a Bachelor of Arts in Chemistry from Illinois Wesleyan University and a PhD in Analytical Chemistry from Miami University. Tr. 51:11-17.

8. Dr. Smith was admitted in this case as an expert in pharmaceutical science. Tr. 53:6-13.

9. Dr. Christian Moreton ("Dr. Moreton"), Aurobindo's non-infringement expert, has a Bachelor of Pharmacy from the University of Nottingham, a Master of Science in Pharmaceutical Analysis from the University of Strathclyde, and a PhD in Pharmaceuticals from the University of Wales, Cardiff. Tr. 173:5-12.

10. Dr. Moreton was admitted in this case as an expert in pharmaceutical formulation. Tr. 177:13-19.

11. Dr. Fernando Muzzio ("Dr. Muzzio"), Defendants' invalidity expert, has a Bachelor of Science in Chemical Engineering from the University of Mar del Plata in Argentina, and a PhD in Chemical Engineering from University of Massachusetts at Amherst. DTX-81 at 0001.

12. Dr. Muzzio was admitted in this case as an expert in pharmaceutical formulation. Tr. 234:18–235:2.

13. Dr. Steven Little ("Dr. Little"), Acadia's validity expert, has a Bachelor of Science in Chemical Engineering from Youngstown State University, and a PhD in Chemical Engineering from Massachusetts Institute of Technology. Tr. 436:7-11; PTX-0119 at 1.

14. Dr. Little was admitted in this case as an expert in pharmaceutical science. Tr. 440:15-21.

**3. NUPLAZID®**

15. Acadia holds FDA-approved New Drug Application ("NDA") No. 210793, which provides for the use of Nuplazid® (pimavanserin) immediate-release, oral capsules of 34 mg ("Nuplazid capsules"). D.I. 101-1 ¶ 9.

16. Nuplazid capsules are indicated for the treatment of hallucinations and delusions associated with Parkinson's disease psychosis. D.I. 101-1 ¶ 10.

17. Acadia's earlier pimavanserin product is a pimavanserin tablet made with excipients ("Nuplazid tablets"). JTX-12 at 0007-0008 ("NUPLAZID tablets are intended for oral administration only. Each round, white to off-white, immediate-release, film-coated tablet contains 20 mg of pimavanserin tartrate, which is equivalent to 17 mg of pimavanserin free base. Inactive ingredients include pregelatinized starch, magnesium stearate, and microcrystalline cellulose. Additionally, the following inactive ingredients are present as components of the film coat: hypromellose, talc, titanium dioxide, polyethylene glycol, and saccharin sodium."); Tr. 496:15-21 (Dr. Little confirming the ingredients in Nuplazid tablets); *see* FoF ¶¶ 38, 40, 42 (finding that microcrystalline cellulose, colloidal silicon dioxide, and magnesium stearate are excipients).

18. The Nuplazid tablets, like the Nuplazid capsules, are "indicated for the treatment of hallucinations and delusions associated with Parkinson's disease psychosis." JTX-12 at 0001.

**4. The Asserted Patent**

19. On September 27, 2022, the United States Patent and Trademark Office issued the '721 patent. D.I. 101-1 ¶ 11; JTX-09 at 0002.

20. The '721 patent is titled "FORMULATIONS OF PIMAVANSERIN." JTX-09 at 0002.

21. The application for the '721 patent, filed on March 14, 2022, is U.S. Application No. 17/693,830 ("the '830 application"). D.I. 101-1 ¶ 11.

22. The '830 application claims priority to U.S. Provisional Patent Application No. 62/552,300, which was filed on August 30, 2017. D.I. 101-1 ¶ 11.

23. The '721 patent names Ravindra Tejwani, Stephen Edward Abele, and Emanuel Joseph Vizzotti as inventors, and lists Acadia as assignee. D.I. 101-1 ¶ 12.

24. Acadia owns the '721 patent. D.I. 101-1 ¶ 13.

25. The '721 patent is listed in Approved Drug Products with Therapeutic Equivalence Evaluations (i.e., the "Orange Book")[2] in conjunction with the Nuplazid capsules. D.I. 101-1 ¶ 14.

26. The Orange Book provides an expiration date for the '721 patent of August 27, 2038. D.I. 101-1 ¶ 15.

27. Claims 4 and 5 of the '721 patent (i.e., the only claims asserted at the December 2024 bench trial) recite:

> 4. A pharmaceutically acceptable capsule for orally delivering 34 mg of pimavanserin to a patient, wherein [1] the capsule has a capsule shell with a capsule shell size 3 or 4, [2] that encapsulates a blended pimavanserin composition comprising: granules comprising 40 mg pimavanserin tartrate

---

[2] "The 'Orange Book' is an FDA database 'that contains summary information about active drug patents submitted by patentholders.'" *Jazz Pharms., Inc. v. Avadel CNS Pharms., LLC*, 641 F. Supp. 3d 85, 89 (D. Del. 2022) (citation omitted).

> and one or more pharmaceutically acceptable excipients; and [3] wherein the bulk density of the granules is >0.4 g/ml as determined by USP, method 1.
>
> 5. The pharmaceutically acceptable capsule of claim 4, wherein the capsule shell is a hard shell size 4 capsule.

JTX-09 at 0025 (brackets added to separate limitations).

**5. Defendants' ANDAs**

28. MSN submitted ANDA No. 214925 pursuant to § 505(j)(2) of the Federal Food, Drug, and Cosmetic Act seeking FDA approval to engage in the commercial manufacture, use, sale, or offer for sale of pimavanserin 34 mg capsules (the "MSN's Product") prior to the expiration of the '721 patent. D.I. 101-1 ¶ 23.

29. If approved by the FDA, MSN's Product will be indicated for the treatment of hallucinations and delusions associated with Parkinson's disease psychosis. D.I. 101-1 ¶ 24.

30. Aurobindo submitted ANDA No. 214782 pursuant to § 505(j)(2) of the Federal Food, Drug, and Cosmetic Act seeking FDA approval to engage in the commercial manufacture, use, sale, or offer for sale of pimavanserin 34 mg capsules ("Aurobindo's Product" or "Aurobindo's Capsule") prior to the expiration of the '721 patent. D.I. 101-1 ¶ 25.

31. If approved by the FDA, Aurobindo's Product will be indicated for the treatment of hallucinations and delusions associated with Parkinson's disease psychosis. D.I. 101-1 ¶ 26.

**6. The Court's Claim Constructions**

32. This Court construed "[a] blended pimavanserin comprising: granules comprising 40 mg pimavanserin tartrate and one or more pharmaceutically acceptable excipients" of claim 4

of the ’721 patent as: “Plain and ordinary meaning; an extra-granular component is not required.” D.I. 44 at 1.

33. This Court construed “[g]ranules comprising 40 mg pimavanserin tartrate” of claim 4 of the ’721 patent as: “Plain and ordinary meaning; the scope of the term granule includes granules granulated with pimavanserin and excipients.” D.I. 44 at 1-2.

34. This Court construed “[g]ranules comprising 40 mg pimavanserin tartrate and one or more pharmaceutically acceptable excipients” of claim 4 of the ’721 patent as: “Plain and ordinary meaning; the scope of the term granule includes granules granulated with pimavanserin and excipients.” D.I. 44 at 2.

**B. Infringement**

The Court divides its Infringement Findings of Fact into the following Sections: (1) Dosage Form, (2) Pharmaceutical Composition, and (3) Bulk Density. These Sections reflect the three overarching limitations in claim 4 of the ’721 patent.

**1. Dosage Form**

35. The dosage form of Aurobindo’s Product is an orally-administered hard shell size 4 capsule. JTX-0103 at AURO0002; JTX-0105 at AURO0002-AURO0003.

**2. Pharmaceutical Composition**

The Court divides its Pharmaceutical Composition Findings of Fact into the following Sections: (a) Materials in Aurobindo’s Product, (b) Granules, (c) Aurobindo’s Manufacturing Process, (d) Aurobindo’s Documents, (e) Dr. Smith’s Examinations, and (f) General Findings.

**a. Materials in Aurobindo’s Product**

36. Pimavanserin is a pharmaceutical ingredient and pimavanserin tartrate is the salt form of pimavanserin. Tr. 56:17-22 (Dr. Smith testifying as such).

37. Aurobindo's Product [redacted]. PTX-1213 at Section 11 [redacted]."); Tr. 59:24–61:12 (Dr. Smith testifying that Aurobindo's Product contains "[redacted]").

38. [redacted] Tr. 170:4-5 (Mr. Saravanan Kannusamy ("Mr. Kannusamy"), Aurobindo's Associate Vice President in Formulation Research and Development Center, testifying that "[redacted]"); *see* Tr. 139:16-17 (Mr. Kannusamy confirming his title); Tr. 584:16-22 (Dr. Little testifying *inter alia*: "[redacted].").

39. Aurobindo's Product [redacted]. PTX-1213 at Section 11 ("[redacted]."); JTX-0106 at AURO0004-0005 (describing Aurobindo's manufacturing process).

40. [redacted]. Tr. 170:4-6 (Mr. Kannusamy testifying that "[redacted]").

41. [redacted]. PTX-1213 at Section 11 ("[redacted]"); JTX-0106 at AURO0004-0005 (describing Aurobindo's manufacturing process).

42. [redacted]. Tr. 476:20-23 (Dr. Smith testifying: "[redacted].").

43. Aurobindo's Product [redacted]. PTX-1213 at Section 11 ("[redacted]"); JTX-0106 at AURO0004-0005 (describing Aurobindo's manufacturing process).

44. Aurobindo's Product [redacted] FoF ¶¶ 36-43.

**b. Granules**

45. Granules are "[p]rimary powder particles . . . made to adhere to form larger, multiparticle entities." JTX-09 at 4:45-47.

46. "Adhere" in this context means "particles of different types sticking together." Tr. 225:14-25 (Dr. Moreton confirming).

47. The '721 patent specification does not qualify the term "adhere" in its description of granules. JTX-09; Tr. 226:1-4 (Dr. Moreton testifying as such).

48. A person of ordinary skill in the art ("POSA") would have understood that "one reason to granulate is because you want to make larger particles because the smaller particles can be problematic" in that they might, for example, "not flow well, they might be cohesive, they might stick to equipment, they might form clumps that you want to prevent so you would granulate to avoid that." Tr. 242:3-9 (Dr. Muzzio testimony).

49. Granulation, as used in the specification of the '721 patent "and as conventionally used in the pharmaceutical industry, refers to the act or process in which primary powder particles are made to adhere to form larger, multiparticle entities called granules." JTX-09 at 4:43-50; Tr. 240:24–241:5 (Dr. Muzzio testifying: "Generally, granules are made by running a process called granulation that makes the particles stick together so that the smaller particles are now permanently bond to each other in a way that doesn't really change the

state of aggregation, the face of the particles themselves, but rather bonds them together into a composite particle, a larger particle.").

50. Granules may "be formed collecting particles together by creating mechanical bonds between them, e.g. by compression or by using a binder," and granulation "is extensively used in the manufacturing of tablets and capsules." JTX-09 at 4:47-50; Tr. 241:24-25 (Dr. Muzzio testifying: "Typically granulations are used to make either capsules or tablets."); Tr. 226:17–227:1 (Dr. Moreton agreeing that the specification of the '721 patent teaches that granules may "be formed by collecting particles together by creating mechanical bonds between them, e.g. by compression or using a binder" and that this is "a nonlimiting example of how granules may be formed").

51. The specification of the '721 patent describes granulation generally without requiring a specific process: "[g]enerally a granulation process combines one or more particles and forms a granule that will allow tableting or the encapsulation process to be within required limits." JTX-09 at 4:53-55; Tr. 226:17–227:1 (Dr. Moreton testifying that the examples of granulation from the specification of the '721 patent are "nonlimiting").

52. The specification describes non-limiting examples of equipment that can be used for granulation: "granulation can be performed in a variety of equipment such as, but not limited to, low shear, high shear granulators, fluid bed granulator, roller compactor, and slugger." JTX-09 at 4:56-58.

53. [redacted] FoF ¶¶ 51-52; Tr. 131:16-23 (Dr. Smith testifying [redacted]"); Tr.

584:14–585:4 (Dr. Little testifying [redacted]).

c. **Aurobindo's Manufacturing Process**

54. [redacted] Aurobindo's manufacturing process are as follows (JTX-0106 at AURO0004-AURO0005):

[redacted]

55. The conditions of Aurobindo's manufacturing process involved [redacted] AURO-DTX-320 at 0005.

56. Aurobindo's Capsule [redacted]. FoF ¶ 54; DTX-347 at 0003-0004 (describing the process); DTX-320 at 0004-0005 (describing the process); Tr. 141:18-25 (Mr. Kannusamy explaining that Aurobindo's Product [redacted]

[redacted] Tr. 77:1-3 (Dr. Smith testifying [redacted]).

**d. Aurobindo's Documents**

57. Aurobindo describes [redacted]:

a. **Manufacturing Process Map**: Aurobindo's ANDA contains Section "3.2.P.2 Pharmaceutical Development," which is a "[p]harmaceutical development report [that] summarizes the development" of Aurobindo's Product ("Aurobindo's Pharmaceutical Development Report"). JTX-0125 at AURO0001, AURO0007.

b. On April 15, 2020, three Aurobindo employees (including Mr. Kannusamy) signed Aurobindo's Pharmaceutical Development Report; Mr. Kannusamy also approved Aurobindo's Pharmaceutical Development Report. JTX-0125 at AURO0004; Tr. 154:8-19 (Mr. Kannusamy confirming that he signed and approved the report); Tr. 162:1-25 (Mr. Kannusamy confirming that two others also signed the report).

c. Subsection 3.2. P.2.3 of Aurobindo's Pharmaceutical Development Report is titled "Manufacturing Process Development" and includes a manufacturing process map for Aurobindo's Product. JTX-0125 at AURO0046-AURO0047; Tr. 73:5-25 (Dr. Smith confirming).

d. The manufacturing process map identifies "Process parameters," "Material attributes of input materials," "Manufacturing process steps," and "Quality attributes of output materials" for Aurobindo's Product. JTX-0125 at AURO0047.

e. In the manufacturing process map, Aurobindo describes [redacted]

[redacted] JTX-0125 at AURO0047; Tr. 74:4–77:3 (Dr. Smith testifying *inter alia*: "This [the manufacturing process map] tells me that [redacted]).

i. Mr. Kannusamy agreed that, "[i]f Aurobindo believed that something was incorrect in its ANDA, it would take steps to correct it with the FDA." Tr. 149:12-19.

ii. As found above, Aurobindo's Pharmaceutical Development Report is part of Aurobindo's ANDA and, thus, [redacted] FoF ¶ 57(a); Tr. 167:7-10 (Mr. Kannusamy confirming that JTX-0125 "is part of the ANDA dossier").

iii. Aurobindo introduced no evidence that it corrected, or attempted to correct, [redacted] in its Pharmaceutical Development Report.

f. **Control Strategy**: Section 3.2. P.2.7 of Aurobindo's Pharmaceutical Development Report is titled "Control Strategy." JTX-0125 at AURO0065.

g. Control strategy "is important in pharmaceutical development to make sure that throughout your process you're making what you intend to make, and so typically there will be some tests that are done at various points throughout the process to ensure that it's okay to move forward with the next step." Tr. 71:13-25 (Dr. Smith testifying as such).

h. Section 3.2. P.2.7.3 of Aurobindo's Pharmaceutical Development Report is titled "[redacted]" JTX-0125 at AURO0070.

i. This Section conveys that [redacted]. JTX-0125 at AURO0070 ("[redacted]"); Tr. 72:4-18 (Dr. Smith confirming).

j. Section 3.2. P.2.7.4 of Aurobindo's Pharmaceutical Development Report is titled "[redacted]" JTX-0125 at AURO0070.

k. This Section conveys that [redacted]. JTX-0125 at AURO0070 ("[redacted]

[redacted]);

Tr. 72:19–73:4 (Dr. Smith confirming).

l. **Draft Master Formula Cards:** Three of Aurobindo's draft "Master Formula Cards" describe [redacted]. JTX-0134 at AURO0004 [redacted]"), JTX-0108 at AURO0003 [redacted]"), JTX-0109 at AURO0004 ("[redacted]"); Tr. 77:8–81:10 (Dr. Smith testifying *inter alia* that JTX-0134, JTX-0108 and JTX-0109 are drafts of Aurobindo's Master Formula cards); Tr. 82:2-7 (Dr. Smith testifying: "Since these [Aurobindo's draft Master Formula Cards] were documents that were throughout the process of it, the development, this told me that throughout the process, it suggested to me [redacted]").

i. Mr. Kannusamy refused to answer whether the draft Master Formula Cards [redacted], even though he was asked about it at least six times during trial. Tr. 167:19–169:20 (Mr. Kannusamy refusing to answer whether the draft Master Formula Cards describe [redacted]).

ii. Aurobindo's final signed Master Formula Cards for its ANDA capsule [redacted] AURO-DTX-347; AURO-DTX-348; AURO-DTX-349.

58. Aurobindo's description, in its own documents, of the [redacted]. FoF ¶ 57.

### e. Dr. Smith's Examinations

59. Dr. Smith examined the contents of Aurobindo's Product sample using stereomicroscopy. Tr. 82:8-15 (Dr. Smith confirming that she "did stereo microscopy . . . on Aurobindo's products").

a. Stereomicroscopy provides a magnified image of materials using reflected light and helps to determine [redacted]. Tr. 82:23–83:5 (Dr. Smith explaining the "stereo microscopy imaging technique," which involves "looking at something with a naked eye but zoomed in, so it's a magnified image, looking at it in a reflected light," and that this technique helped her "[redacted]" in Aurobindo's Product sample).

b. To conduct her experiment, Dr. Smith opened Aurobindo's Capsule sample and subjected the material therein to a sieving process. JTX-62 at 003.

c. Sieving served to break up any agglomerates, which would allow for improved sample viewing. Tr. 128:7-12 (Dr. Smith confirming).

d. Dr. Smith used a total of eight sieves, with increasingly smaller mesh sizes, such that the contents of Aurobindo's Capsule sample would pass through or be captured by the sieves from top to bottom. Tr. 116:13–117:1 (Dr. Smith testifying *inter alia* that "the contents of Aurobindo's pill" passed through "1-8 sieves of -- of increasingly smaller meshes").

e. Dr. Smith reported her data as follows:

[redacted]

JTX-0062 at 003; JTX-0061 at 003; Tr. 116:13-21 (Dr. Smith confirming that this data is from her "notebook").

f. The right hand column of the table from FoF ¶ 59(e) represents the percentage by weight retained by each sieve, as well as the percentage by weight which passed through all 8 sieves and onto the collection pan. JTX-0062 at 003; JTX-0061 at 003; Tr. 117:2-17 (Dr. Smith confirming *inter alia* that "the right-hand column of this table is the fraction retained by each of those sieves and then a fraction that went into a collection pan to come up with the total weight as a percentage of the starting contents of the pill").

g. After sieving, Dr. Smith viewed portions of Aurobindo's Capsule sample from the sieves on a slide under a microscope. Tr. 96:3–97:24 (Dr. Smith explaining as such).

h. Before viewing, Dr. Smith added mineral oil to the slides containing the contents of Aurobindo's Product sample. Tr. 96:3–97:24 (Dr. Smith testifying that she "put a drop of mineral oil" on the "cover slip" of the "microscope slide[s]").

i. Dr. Smith's deposit of mineral oil on the sample slides [redacted]. Tr. 96:15–97:12 (Dr. Smith testifying: "Now, the mineral oil, through capillary action, will get drawn under the coverslip, and it will pass through all those particles, whatever sample you have there, flow over it. And you can actually watch it under the microscope like a -- like a wave coming through, and as it passes through the material, [redacted] so this would -- this is a proper preparation.").

j. Dr. Smith's deposit of mineral oil on the sample slides [redacted]. Tr. 97:13-18 ("And what I noted was that every single preparation we did of the Aurobindo materials, this didn't happen. That meant that how [redacted]").

k. As explained above, Dr. Smith recorded her stereomicroscopy imaging of Aurobindo's Product sample in JTX-0062. FoF ¶ 59(e); JTX-0062.

l. The image labeled "12-38-1-1-1" [redacted]. JTX-0062 at 0005; Tr. 83:18–84:5 (Dr. Smith confirming that the "image that has a legend 12-38-1-1-1" "is an

image of [redacted]" and that the "[redacted]").

m. The image labeled "Sieve Number 200-75 micro-2" depicts [redacted]. JTX-0062 at 0007; Tr. 84:19–85:3 (Dr. Smith confirming that the image labeled "Sieve Number 200-75 micro-2" [redacted] just to show what it would look like with the naked eye . . . under stereomicroscope under reflective light").

n. [redacted] of the total weight of the contents of Aurobindo's Capsule sample was collected by the smallest mesh sieve. FoF ¶ 59(e).

o. [redacted] of the total weight of the contents of Aurobindo's Capsule sample was collected in the pan at the bottom. FoF ¶ 59(e); Tr. 119:4-8 (Dr. Smith confirming that "[redacted] percent by weight of the pill just scooted all the way through to -- no matter what the mesh was, it went to the bottom").

p. [redacted] of the total weight of the contents of Aurobindo's Capsule sample was unaccounted for. FoF ¶ 59(e); Tr. 119:9-16 (Dr. Smith confirming that "[redacted] percent just didn't get measured"); JTX-0062 at 003 (Dr. Smith writing in her notebook that "not all the materials were recovered from the sieves due to the . . . caking").

q. Aurobindo proposes the fact that Dr. Smith did not provide images for the material that was collected by the smallest sieve or the collection pan, or the material that was unaccounted for, all of which amount to [redacted] of the total weight of the contents of Aurobindo's Capsule sample. D.I. 132 ¶ 30 (citing JTX-0062 at 003; JTX-0061 at 003).

r. Dr. Smith observed material from the smallest sieve and her observation of the material from the smallest sieve was consistent with her other observations. Tr. 130:8-12 (Dr. Smith testifying: "I looked at every single sieve. I looked at every single thing that passed . . . through those sieves and then -- that was in the capsule."); Tr. 117:18-25 (Dr. Smith confirming that everything she "[redacted]").

s. Dr. Smith observed material from the collection pan and her observation of the material from the collection pan was consistent with her other observations. Tr. 117:18–118:1 (Dr. Smith confirming that everything she "[redacted], whether I was looking at sieve fraction one or the collection pan"); Tr. 130:7-8 (Dr. Smith testifying: "I looked at the collection pan; I just didn't collect any images of it.").

t. There is no practical way to examine [redacted] Aurobindo's Capsule sample to confirm that [redacted]. Tr. 133:5-15 (Dr. Smith confirming that she was "not aware of a quantitative test in order to say that every single -- every [redacted], which is why [she] looked at every -- every sample").

u. Dr. Smith's conclusion, on the basis of her stereomicroscopy examination of the contents of Aurobindo's Capsule sample, that Aurobindo's Capsule sample contains [redacted]. FoF ¶ 59(a)-(t); *see* FoF ¶¶ 61-62; *see also* FoF ¶¶ 7-8.

60. Dr. Smith also examined the contents of Aurobindo's Product using "polarized light microscopy." Tr. 82:8-15 (Dr. Smith confirming).

a. Polarized light microscopy transmits light through a sample. Tr. 85:7-18 (Dr. Smith testifying *inter alia*: "So in this case [i.e., polarized light microscopy], we're transmitting light through the sample instead of reflecting it from the top like in stereo microscopy, we're transferring light through the sample.").

b. Dr. Smith employed three techniques of polarized light microscopy to view Aurobindo's Product. Tr. 86:14–87:12 (Dr. Smith testifying: "So when I walk through the images, I'm going to show you them in groups of three. And the first image is always going to be the image with a single polarizer in place, so it would be the equivalent to looking at an image like this, a clear image. . . . The second type of image is called crossed polars. So that means I have two polarizers in place. . . . [I]f the sample [redacted]).

c. Dr. Smith recorded her polarized light microscopy images of material from Aurobindo's Product sample in JTX-0061. Tr. 88:12-19 (Dr. Smith confirming).

d. The three polarized light microscopy images (one for each technique) at JTX-0061 at 0015-0017 are titled "12-38-1-4- 10," "12-38-1-4- 11," and "12-38-1-4- 1" and [redacted] JTX-0061 at 0015-0017; Tr. 89:1–92:5 (Dr. Smith testifying *inter alia*: [redacted]).

e. The three polarized light microscopy images (one for each technique) at JTX-0061 at 0039-0041 are titled "12-38-1-6- 4," "12-38-1-6- 5," and "12-38-1-6- 6" and [redacted]

[redacted]. JTX-0061 at 0039-0041; Tr. 92:6–94:15 (Dr. Smith testifying *inter alia* that image 12-38-1-6- 6 is [redacted] that have [redacted]).

f. Dr. Smith observed [redacted] in every observation of Aurobindo's Product (including materials in the bottom collection pan); not once did Dr. Smith observe [redacted]. Tr. 94:16–95:19 (Dr. Smith confirming that she "[redacted]"); Tr. 116:7-12 (Dr. Smith confirming that she "[redacted]"); Tr. 117:18–118:1 (Dr. Smith confirming that everything she "[redacted]"); Tr. 119:21-24 (Dr. Smith testifying that while she did not observe all of the material from Aurobindo's Capsule, that she thinks her conclusion is "fair" because she "consistently saw the same thing over and over and over again"); Tr. 131:11-14 (Dr. Smith confirming that "everything [she] saw, including in the collection pan, [redacted]").

g. [redacted]. Tr. 180:14-18 (Dr. Moreton testifying *inter alia* that [p]harmaceutical excipients can have more than one function"), Tr. 186:6-10 (Dr. Moreton confirming that "the

function [redacted]"), Tr. 584:16-22 (Dr. Little testifying *inter alia*: "Yeah, so [redacted]."); Tr. 584:14–585:4 (Dr. Little testifying that pimavanserin is a "sticky drug" and that mixing pimavanserin and [redacted]"); Tr. 226:9-12 (Dr. Moreton agreeing that "pimavanserin can adhere to [redacted]").

h. Dr. Smith's conclusion, on the basis of her polarized light microscopy examination of the contents of Aurobindo's Capsule sample, that Aurobindo's Capsule sample contains [redacted]. FoF ¶ 60(a)-(g); *see* FoF ¶¶ 61-62; *see also* FoF ¶¶ 7-8.

61. Dr. Smith's expertise lies in microscopy techniques, including stereomicroscopy and polarized light microscopy, which she has used to analyze solid dosage forms "hundreds of times." Tr. 52:2-21 (Dr. Smith confirming).

62. As a microscopist, Dr. Smith has "been trained to recognize" the ingredients in Aurobindo's Capsule sample "after looking at hundreds and thousands of images over [her] lifetime" and, thus, the images are "easily recognizable " to her. Tr. 87:22-25 (Dr. Smith testifying as such).

63. Dr. Moreton is not an expert in polarized light microscopy and has never "operated" a polarized light microscope, but has "used microscopy and polarized light microscopy in the past." Tr. 227:16–228:2 (Dr. Moreton testifying as such).

64. Dr. Moreton "never handled" Aurobindo's pimavanserin product nor "perform[ed] any testing of Aurobindo's pimavanserin product." Tr. 220:24–221:10 (Dr. Moreton confirming).

65. Dr. Smith did not control for humidity in her experiments. Tr. 124:13–125:8 (Dr. Smith stating that "there's no humidity reading noted on [her] notebook page").

66. Humidity could cause pimavanserin to clump. Tr. 216:4-21 (Dr. Moreton testifying *inter alia* that certain humidity thresholds could cause pimavanserin to "absorb water"); Tr. 222:4-15 (Dr. Moreton testifying that: "[Pimavanserin is] recognized as a hygroscopic . . . . I do understand that with very hygroscopic materials, because I've handled them, that very often only an exposure of an hour can change the whole characteristic of the powder."); FoF ¶ 123.

67. Dr. Moreton did not perform any studies to determine whether humidity impacted the results of Dr. Smith's testing and could not "definitely" attest that humidity changed Dr. Smith's results. Tr. 222:1-24 (Dr. Moreton testifying as such).

**f. General Findings**

68. On the basis of Findings of Fact ¶¶ 36-67, the Court finds that Aurobindo's Product encapsulates [redacted].

69. The Court also finds that Aurobindo's Product encapsulates [redacted], on the basis of the same Findings of Fact (i.e., Findings of Fact ¶¶ 36-67), but excluding either Findings of Fact ¶¶ 57-58 (i.e., the facts regarding Aurobindo's description of [redacted]), Findings of Fact ¶ 59 (i.e., facts regarding Dr. Smith's conclusion, on the basis of her

stereomicroscopy examination of the contents of Aurobindo's Capsule sample, that Aurobindo's Capsule [redacted]), or Finding of Fact ¶ 60 (i.e., facts regarding Dr. Smith's conclusion, on the basis of her polarized light microscopy examination of the contents of Aurobindo's capsule, that Aurobindo's Capsule [redacted]).

70. The Court also finds that Aurobindo's Product encapsulates [redacted], on the basis of the same Findings of Fact described in Finding of Fact ¶ 68, but excluding all of the facts regarding Dr. Smith's examinations of Aurobindo's Capsule sample (i.e., Findings of Fact ¶¶ 59-67).

71. The Court also finds, on the basis of Findings of Fact ¶¶ 36-67, that Aurobindo's [redacted]

**3. Bulk Density**

72. Bulk density is the ratio of mass over volume and is expressed as grams per milliliter (i.e., g/ml). Tr. 106:2-6 (Dr. Smith confirming as such).

73. A POSA would have understood that [redacted] can increase the bulk density of a pharmaceutical composition. DTX-005 at 0010 ("Doses over 600 mg in powder form are virtually impossible to put into capsules of acceptable size. It has, though, been possible to produce such doses in hard gelatin capsule form by increasing the density of the formulation; for instance, [redacted]."); Tr. 246:22–247:2 (Dr. Muzzio confirming).

74. Aurobindo produced three exhibit batches of its Product titled "TPIA019001," "TPIA019002," and "TPIA019003." JTX-0106 at AURO-0013.

75. In its ANDA, Aurobindo reported the bulk density of its Product from the exhibit batches, in Finding of Fact ¶ 74, as 0.413, 0.407, and [redacted] respectively. JTX-0106 at AURO-0013.

76. Dr. Smith conducted two bulk density tests on Aurobindo's Product: the first test produced a bulk density reading of [redacted] and the second test produced a bulk density reading of [redacted] Tr. 104:14-24 (Dr. Smith confirming).

77. Dr. Smith's results are consistent with the results that appear in Aurobindo's ANDA. Tr. 104:25–105:5 (Dr. Smith confirming); JTX-0106 at AURO-0013.

78. On the basis of Findings of Fact ¶¶ 72-77, the Court finds that Aurobindo's Product contains a bulk density between 0.4 g/ml and 0.6 g/ml.

**C. Obviousness**

The Court divides its Obviousness Findings of Fact into the following Sections: (1) A POSA Would Not Have Been Motivated to Formulate a Capsule Dosage of Pimavanserin, and (2) A POSA Would Not Have Been Motivated to Achieve the Bulk Density in Claim 4 of the '721 Patent with a Reasonable Expectation Of Success.

**1. A POSA Would Not Have Been Motivated to Formulate a Capsule Dosage of Pimavanserin**

The Court divides its Findings of Fact regarding whether a POSA would have been motivated to formulate a capsule dosage of pimavanserin into the following Sections: (a) Pill Burden, (b), Swallowability, (c) Taste-Masking, (d) Color Coating and Pill Identification, and (e) General Findings.

**a. Pill Burden**

79. Generally, a POSA could be motivated to minimize the number of tablets or capsules administered to patients to decrease the pill burden. Tr. 312:10-15 (Dr. Muzzio testifying:

"It [i.e., pill burden] would motivate a person of ordinary skill in the art to try to formulate it in such a way where you can put all 40 mgs of pimavanserin tartrate in a single dosage form.").

80. The prescribing information for the Nuplazid tablets recommended that patients take two tablets at a time. JTX-12 at 0002 ("The recommended dose of NUPLAZID is 34 mg, taken orally as two 17 mg strength tablets once daily, without titration.").

81. The prior art does not disclose a pill burden problem for the Nuplazid tablets. Tr. 409:1–412:7 (Dr. Muzzio testifying that the prior art does not disclose a pill burden problem for the tablet formulation of pimavanserin); Tr. 502:14-19 (Dr. Little responding "[no]" to the question of whether "the prior art expressly disclose[s] any of Dr. Muzzio's alleged problems with respect to the 17 mg Nuplazid tablets"); Tr. 513:1-12 (Dr. Little confirming that none of "the references provided by Dr. Muzzio suggest to a POSA that patients taking Nuplazid tablets were at an increased risk of pill burden or noncompliance due to its two-tablet dosage form"); Tr. 515:5-9 (Dr. Little confirming that he was not "aware of any prior art reference teaching that a single capsule dosage form of Nuplazid would be preferable for alleviating pill burden or noncompliance").

82. A POSA would not have been motivated to formulate a capsule dosage of pimavanserin over a tablet dosage of pimavanserin on the basis of pill burden. FoF ¶¶ 79-81; *see* Tr. 512:14-25 (Dr. Little testifying: "So, again, this is one of those general motivations. So it's not like pill burden couldn't provide motivation in some context. It could be part of something. It's generally known, okay. But if you're talking about pill burden, in this particular instance, what you're saying is what kind of change would I make. So if I am going to pill burden, okay, it's my opinion that you wouldn't be doing a capsule. And

there's reasons why I will describe to you."); Tr. 527:3-10 (Dr. Little's testimony: "Q. If pill burden was a motivation for a POSA to reformulate, would a POSA have selected a single capsule dosage form based on the Schiele reference? A. No. If you're just looking at the Schiele reference and now you're limited to only a capsule or a tablet and that you're not going to consider the other dosage forms that we looked at in the last reference that talks about those, you're going to pick a tablet over a capsule.").

**b. Swallowability**

83. Generally, a POSA could be motivated to minimize the difficulty of swallowing medications. Tr. 315:6-12 (Dr. Muzzio testifying that difficulty swallowing "would motivate a person of ordinary skill in the art to formulate pimavanserin into a dosage form that is as easy to swallow as possible").

84. Dr. Muzzio opined that the patients taking the Nuplazid tablets were "known to have a high . . . difficulty swallowing because they're older patients with Parkinson's disease." Tr. 295:11-17.

85. The Schiele reference[3] teaches that capsules cause more swallowing problems than tablets. DTX-007 at 0005 ("Hard gelatin capsules, soft gelatin capsules and oblong tablets caused problems almost twice as often as tablets with irregular shapes, nearly 1.6 times more frequently than round tablets, and about 1.2 times more often than oval tablets."); *id.* at Figure 3 (depicting that hard gelatin and soft gelatin capsules cause swallowing difficulties in 21.4% and 21.2% of patients, respectively, while round tablets, oval tablets, oblong

[3] Julia T. Schiele, *Difficulties swallowing solid oral dosage forms in a general practice population: prevalence, causes, and relationship to dosage forms*, Pharmacoepidemiology and Prescription (Sept. 29, 2012).

tablets, and irregularly shaped tablets cause swallowing difficulties in 13.4%, 17.3%, 19.8%, and 11% of patients, respectively):




Fig. 3 Proportion of different kinds of tablets and capsules that caused swallowing difficulties in a general practice population of 1,051 consecutive patients

86. The Schiele reference teaches that patients with swallowing difficulty are more likely to prefer tablets compared to capsules. DTX-007 at Figure 6 (




**Fig. 6** Preferred types of dosage forms and tablet shapes in a general practice population with (37.4 %) and without (62.6 %) swallowing difficulties ($N$=1,051 consecutive patients)

); *see* Tr. 523:4–527:10 (Dr. Little testifying *inter alia* that the Schiele reference teaches that "every type of tablet was preferred over the capsule" among patients with swallowing difficulties and that if "you're just looking at the Schiele reference and now you're limited to only a capsule or a tablet and that you're not going to consider the other dosage forms that we looked at in the last reference that talks about those, you're going to pick a tablet over a capsule").

87. The Liu reference[4] teaches that "safe swallowing is the key formulation factor in designing medicines for older patients" and "[i]n older patients, age- or disease-related swallowing difficulties affect their ability to take solid oral medicines." DTX-013 at 0001, 0002, 0004.

[4] Fang Liu et al., *Patient-Centered Pharmaceutical Design to Improve Acceptability of Medicine: Similarities and Differences in Paediatric and Geriatric Populations* (October 2, 2014).

88. The Liu reference teaches that liquid and "flexible oral solid medicines [] are convenient to use by patients who cannot swallow tablets and capsules." DTX-013 at 0011.

89. The Liu reference teaches that orally disintegrating tablets (otherwise known as orally dispersible tablets) "and film formulations have been developed for the treatment of diseases that are common in the older population such as . . . Parkinson's disease." DTX-013 at 0013.

90. The Liu reference teaches that orally dispersible tablets are considered advantageous with respect to administration for patients with Parkinson's disease and dysphagia. DTX-013 at Table 5.

91. The Liu reference teaches that more than twice as many older patients with Parkinson's disease prefer orally dispersible tablets "compared with conventional tablets." DTX-013 at Table 5.

92. The Liu reference teaches that a "film formulation provides easy swallow through the application of a dry film that turns into a jelly instantaneously in the mouth" and that such a formulation improves "swallowing for older patients." DTX-013 at 0013.

93. The Liu reference teaches that "effervescent tablets are solid dosage forms that can be dispersed or dissolved in a liquid to form a solution or suspension" and "are beneficial in the delivery of large doses of active drug substances as they are easier to swallow than large tablets" and otherwise "[m]ay be a useful technology to promote safe swallowing in older patients." DTX-0013 at 0011.

94. Dr. Little opined on the swallowability benefits of "dispersible and effervescent tablets" in the context of the Liu reference (i.e., in the context of prior art). Tr. 516:2–523:3.

95. The Ragnar-Tolf reference[5] discloses that pimavanserin can be formulated "to form tablets, pills, dragees, capsules, liquids, gels, syrups, slurries, suspensions, and the like, for oral ingestion by a patient to be treated." JTX-11 at 0049; Tr. 417:18-23 (Dr. Muzzio confirming that Ragnar-Tolf discloses "different types of ways to formulate [pimavanserin], including tablets, pills, liquids, gels, syrups, slurries, [and] suspensions").

96. Sven Stegemann ("Mr. Stegemann") is an employee of Capsugel, a capsule manufacturing company, and authored an article published by Capsugel titled "Hard gelatin capsules today – and tomorrow" (the "Stegemann reference"). DTX-005.

97. In the Stegemann reference, Mr. Stegemann reported on a study concluding that "66 % of the patients choses capsules, 19 % chose coated tablets and only 4 % uncoated tablets as easy to swallow." DTX-005 at 13.

98. In light of the conflict of interest arising from Mr. Stegemann's employment at a capsule manufacturer, the Stegemann reference has diminished credibility.

99. A POSA would not have been motivated to formulate a capsule dosage of pimavanserin over a tablet dosage of pimavanserin on the basis of swallowability. FoF ¶¶ 83-98; *see* Tr. 527:11-17 (Dr. Little answering "[n]o" to the question: "And if size of a dosage form was a motivation for a POSA to reformulate, would a POSA have selected a single capsule dosage form here?").

**c. Taste-Masking**

100. Generally, a POSA could be motivated to formulate a medication on the basis of taste. Tr. 527:23-25 (Dr. Little testifying that "taste is something that you would definitely consider as a general motivation").

---

[5] U.S. Patent Application Publication, 2007/0264330 A1 (November 15, 2017).

101. Pimavanserin "has a pronounced bitter taste." JTX-11 at 0132.

102. Ragnar-Tolf discloses that "a taste-masking coating was applied to" the pimavanserin tablets" that "was water based and selected to minimize wetting of the tablet cores." JTX-11 at 0132.

103. A POSA would not have been motivated to develop a capsule for pimavanserin on the basis of paragraph 63 of Ragnar-Tolf, which states that in "some embodiments, tablets . . . are coated . . . with a taste masking film" and that in "some embodiments, instead of compression into tablets, a dry or wet blend . . . is placed in a gelatin capsule or HPMC capsule." JTX-11 at 0063; Tr. 530:9-16 (Dr. Little testifying: "But I don't take issue with the fact that you can taste-coat with gelatin capsules. I don't think that's what this is saying, but you can, okay. But what I cannot understand is how somebody would read paragraph 63 as put up here on the screen and say that it would teach you to move away from a tablet taste-masking film to a capsule. The only way you would read that into this paragraph is if you're looking at it through the lens of the invention.").

104. The Nuplazid tablets have a film-coating that masks the taste of pimavanserin, negating the motivation for a POSA to develop other dosage forms. Tr. 527:23–528:2 (Dr. Little testifying: "I would say that taste is something that you would definitely consider as a general motivation, but as we saw, the Nuplazid cap- -- tablets had a film-coating on them that allowed you to taste-mask, so that's something that you could do.").

105. A POSA would have understood that capsule dosage forms may provide better taste masking than tablet dosage forms. Tr. 320:5-24 (Dr. Muzzio testifying: "But if you're coating the tablet also to mask taste, then you would be very concerned with something called film failure. . . . So as a result of all of this, some tablets would be taste-masked, but

there would be some that are not properly taste-masked and so, once in a while, the patient would actually experience a bitter taste of the medicine. That doesn't happen with capsules because the power doesn't leak out of the capsule.").

106. A POSA would not have been motivated to formulate a capsule dosage of pimavanserin over a tablet dosage of pimavanserin on the basis of taste. FoF ¶¶ 100-05.

**d. Color Coating and Pill Identification**

107. A POSA would have understood that color coating dosage forms may facilitate medication identification and patient compliance. Tr. 317:3-21 (Dr. Muzzio testifying *inter alia*: "So this passage talks about something that is also mentioned in some of the other references that we have been talking about, which is basically that -- it says for elder patients who take a number of medications every day, they need to identify those medications, right. Some are to be taken in the morning, some are to be taken in the evening, etc. And so it says that to help the patients automatically process, distinguish, you know, figure out how to take the medication, the dosage form should be easy for the person to identify.").

108. Film-coated tablets can be distinctively color coated. Tr. 530:20-22 (Dr. Little confirming that "film-coated tablets" can "be distinctively color coated"); JTX-91 at 0001 ("Opadry fx systems are formulated by incorporating pearlescent pigments into high gloss, clear polymer systems from Colorcon. The results are film coated tablets that exhibit stimulating colors and lustrous effects.").

109. A POSA would have understood that there may be difficulties in color coating. Tr. 320:1-7 (Dr Muzzio testifying: "The person of ordinary skill in the art would know that film coating a tablet is a complex process, it's also an expensive process, it's a time-consuming process, and it's also a process that can have failures. If you're just coating the tablet to make it pretty, it's one thing.").

110. Capsules, like tablets, can be distinctively color coated. Tr. 318:14-17 (Dr. Muzzio confirming).

111. A POSA would not have been motivated to formulate a capsule dosage of pimavanserin over a tablet dosage of pimavanserin on the basis of color coating. FoF ¶¶ 107-10; *see* Tr. 531:10-13 (Dr. Little responding "[no]" to the question of whether "a POSA have been motivated to make a capsule dosage form over a tablet due to the cost to film coat and print on tablets").

**e. General Findings**

112. Dr. Muzzio was not aware of "any complaints" from "doctors or patients or any other healthcare professional or anyone regarding the two . . . 17 mg tablets for pimavanserin." Tr. 414:4-9.

113. Dr. Muzzio admitted that "[t]he tablet, the most frequently prescribed commercial dosage form, is stable, elegant and effective" and "provides the patient with a convenient product for handling, identification and administration." Tr. 413:21–414:2.

114. Tablet dosages of pimavanserin already existed. JTX-12 at 0007-0008.

115. A POSA would have been aware of various difficulties associated with the formulation of dosage forms other than tablets or capsules, such as effervescent tablets, orally disintegrating formulations, chewable tablets, films and jellies. Tr. 322:7–326:8 (Dr. Muzzio testifying *inter alia*: "Effervescent tablets . . . require effective taste-masking . . . [and] also require more effort by the caregiver. They're also more expensive to make. . . . Orally disintegrating formulations . . . are more expensive to make . . . [and] require more . . . protection from exposure to moisture. . . . Chewable tablets . . . are also, generally speaking, more expensive to make. . . . Films . . . [are] also more expensive to make. . . .

Jellies . . . would disperse in the mouth. . . . [C]hewable tablets . . . [are] not very common.").

116. A POSA would not have been motivated to formulate a capsule dosage of pimavanserin over a tablet dosage of pimavanserin on the basis of the following non-exhaustive list of factors: pill burden, swallowability, taste-masking, color coating and pill identification, commonality of dosage forms, effort by the caregiver, protection from moisture, dispersion in the mouth, and costs associated with formulation. FoF ¶¶ 79-115.

**2. A POSA Would Not Have Been Motivated to Achieve the Bulk Density in Claim 4 of the '721 Patent with a Reasonable Expectation Of Success**

117. A POSA seeking to develop a new dosage form of pimavanserin would have looked to the Ragnar-Tolf reference. Tr. 293:22–296:6 (Dr Muzzio testifying: "So a person of ordinary skill in the art seeking to develop a new version of this product would start by a literature search looking for information about preformulation or formulation studies that have been performed for this particular drug substance. . . . [T]he POSA would have found Ragnar-Tolf immediately."); JTX-11.

118. The Ragnar-Tolf reference was published on November 15, 2007, almost ten years before the earliest effective filing date of the '721 patent. JTX-11 at 0001; Tr. 296:7-12 (Dr. Muzzio testifying: "This [i.e., the Ragnar-Tolf patent application] was published in November 2007, almost -- almost ten years before the '721 patent.").

119. The Ragnar-Tolf reference, as well as the Nuplazid Tablet Label, are listed on the face of the '721 patent. JTX-09 at 0003, 0008.

120. The Ragnar-Tolf reference "does not explicitly talk about any one [capsule] size other than size 0." Tr. at 416:23–417:6 (Dr. Muzzio stating as such).

121. The Ragnar-Tolf reference discloses that pimavanserin tends to aggregate when subjected to dry blending, and also discloses, as an alternative to dry blending, examples of wet granulation to produce granules containing 1 mg, 5 mg or 20 mg of pimavanserin tartrate. JTX-11 at 0125 ("It was discovered that during blending, the mixture tended to form aggregates, potentially affecting content uniformity. Accordingly, pimavanserin tartrate Form A was blended with spray-dried lactose prior to sieving at 0.5 mm for 1 mg and 5 mg formulations and at 0.7 mm for 20 mg formulations. It was found that the stepwise blending/sieving procedure ensured that a homogenous blend was maintained."); *see* Tr. 300:19–301:3 (Dr. Muzzio testifying: "So when a POSA would see that the drug has a tendency to form clumps and that those clumps can lead to these problems for what's relatively a low-dose product, the most common approach to solve this problem is to wet granulate. . . . Right, so right on cue, the very next thing in Ragnar-Tolf after example 8 is example 9 where they do what is the most common solution to the problem. They go ahead and they wet granulate.").

122. A POSA would have understood that pimavanserin is a "bad-behaving" material — in that pimavanserin has a low bulk density and tends to clump up — and requires a lot of excipients to allay its bad behavior. FoF ¶ 157; Tr. 533:16-18 (Dr. Little testifying: "That it's [i.e., pimavanserin] a bad-behaving material. It is a low bulk density. It needs a lot of excipients in order to cover up its bad behavior and has a tendency to clump.").

123. A POSA would have understood that Pimavanserin is hygroscopic, meaning that pimavanserin tends to absorb moisture and, thus, that formulating dosages of pimavanserin could be difficult. Tr. 222:5-15 (Dr. Moreton testifying that: "[Pimavanserin is] recognized as a hygroscopic material, and in the manufacturing instructions, the manufacturing area is

-- is conditioned below 20 percent relative humidity, which tells me that it's a very hygroscopic material. . . . I do understand that with very hygroscopic materials, because I've handled them, that very often only an exposure of an hour can change the whole characteristic of the powder.").

124. The Ragnar-Tolf reference discloses that the wet granulated formulations could be compressed into not only tablets with film coating, but also into capsules. JTX-11 at 0063 ("In some embodiments, tablets produced by any of the methods described above are coated such as with a taste masking film (e.g., an OPADRYR film). In some embodiments, instead of compression into tablets, a dry or wet blend, such as those described above, is placed in a gelatin capsule or HPMC capsule.").

125. With respect to tablets, the Ragnar-Tolf reference discloses embodiments of 1 to 80 mg tablets of pimavanserin tartrate, including 40 mg tablets. JTX-11 at 0067 ("Various embodiments include tablets as described above containing 1 mg, 2 mg, 5 mg, 10 mg, 20 mg, 40 mg, 60 mg, or 80 mg of pimavanserin tartrate."); Tr. 296:17-25 (Dr. Muzzio testifying: "So reading this paragraph, the person of ordinary skill in the art would immediately learn that Ragnar-Tolf has concerned itself with dosages containing anywhere from 1 mg to maybe up to 80 mg.").

126. The Ragnar-Tolf reference has the following tables (Table 7 and Table 8):

TABLE 7

Ingredient amounts (%) for wet granulation formulations.

| | Tablet strength | | |
|---|---|---|---|
| | 1 mg | 5 mg | 20 mg |
| Drug | 1.03 | 5.13 | 20.5 |
| Mannitol | 91.3 | 87.2 | 71.1 |
| Pregelatinized Starch | 5.00 | 5.00 | 5.00 |
| Povidone | 1.15 | 1.15 | 1.15 |
| Magnesium stearate | 1.5 | 1.5 | 2.0 |
| Ethanol 99.5%** | 19.8 | 16.5 | 16 |

**Evaporates during manufacturing process

TABLE 8

Physical and analytical characteristics of wet granulation formulations.

| Tablet strength | 1 mg | 5 mg | 20 mg | 5 mg | 20 mg |
|---|---|---|---|---|---|
| LOD (%) | 1.5% | 0.8% | 2.3% | 0.9% | 1.6% |
| Sieving analysis (%) | | | | | |
| >710 | 0 | 0 | 0 | 0 | 0 |
| 500-710 | 0 | 0 | 1 | 0 | 1 |
| 250-500 | 8 | 5 | 7 | 4 | 6 |
| 125-250 | 69 | 69 | 69 | 71 | 72 |
| 90-125 | 19 | 21 | 18 | 21 | 18 |
| <90 | 5 | 4 | 6 | 5 | 4 |
| Bulk/Tapped density g/ml | 0.57/0.60 | 0.58/0.64 | 0.61/0.63 | 0.5610.60 | 0.56/0.61 |
| Tablet weight | 100 mg | 100 mg | 100 mg | 101 mg | 99.7 mg |
| Crushing strength | 61N | 51N | 58N | 61N | 44N |
| Tablet height | 3.7 mm | 3.8 mm | 3.8 mm | 3.7 mm | 3.8 mm |
| Friability, 100 rot. (%) | 0.1 | 0.1 | 0 | — | — |
| Friability, 200 rot. (%) | — | — | — | 0.1 | 0.1 |
| Disintegration time | 6 min | 6 min | 5 min | 6 min | 5 min |
| Content uniformity, mg/tabl | 1.0 mg | 5.4 mg | 20.5 mg | — | 20.1 mg |
| Released amount %, 30 min | 98% | 117% | 102% | — | — |

JTX-11 at Tables 7, 8.

127. As depicted in Table 8, the Ragnar-Tolf reference discloses examples of pimavanserin tablets that were formulated, including in 1 mg, 5 mg, and 20 mg dosages, that ranged in

bulk-density between 0.56 g/ml and 0.61 g/ml. JTX-11 at Table 8; Tr. 342:25–343:3 (Dr. Muzzio testifying: "Ragnar-Tolf is already disclosing granules that have a bulk density somewhere between 0.56 and 0.61 for a wide range of drug concentrations from 1 percent to 20 percent."); Tr. 538:1-5 (Dr. Little testifying that Table 8 "taught a POSA, in terms of bulk densities you can see that you are around 0.6 for the amount of pimavanserin that was used here. But what you see is it stops at 20 mg.").

128. A POSA would have understood, including on the basis of the Ragnar-Tolf reference, that, in order to fit 40 mg of pimavanserin tartrate in a size 4 capsule, he or she would have had to increase the pimavanserin tartrate concentration in the 20 mg formulation identified in Finding of Fact ¶ 127 from approximately 20% to 32.4% (i.e., by over 60%) and such an increase could potentially be accomplished by also decreasing the concentration of mannitol. Tr. 332:21–335:1 (Dr. Muzzio testifying *inter alia*: "So the next obvious thing to try is to do this calculation, right; is to say, okay, if the 40 mgs of pimavanserin tartrate need to be contained in 126 mgs of final blend, that means that the concentration of pimavanserin tartrate in the final blend is going to be 31.7 percent. And because 2 percent of that blend is magnesium stearate, it would say that the granules themselves need to have a little higher concentration, about 32.4 percent.").

129. If possible, a POSA would have understood that increasing the concentration of pimavanserin tartrate, and likewise decreasing the inactive mannitol diluent, in the blended pimavanserin in the manner described in Finding of Fact ¶ 128 could have increased or decreased the bulk density of the granules. Tr. 538:21–539:8 (Dr. Little testifying: "So as I was describing to Your Honor before, when you change something, it is possible you can change any number of parameters. So in the case Dr. Muzzio looks at the claim and he says

pharmaceutically acceptable would be known to have all of these other parameters that would be in them, it is possible that changing the pimavanserin concentration in this in order to get it up to the point where you can fit it into a size 3 and 4 capsule, which by the way, if you're going to change one thing, the pimavanserin concentration is going to be the one thing that has the highest likelihood of changing the bulk density. It's the thing that has the worst behavior in the formulation."); Tr. 333:23–335:13 (Dr. Muzzio testifying: "So the POSA looks at this data and says, okay, I need to put more drug in the blend. I need to increase the concentration of drug in the blend so that I can put my 40 mgs within the 126 mgs of total blend that I can put inside that capsule. . . . And I can do that just by taking some of the mannitol out. . . . And when you granulate that way, if your density comes out at 0.6, as would be the expectation, problem solved. Now, you put 126 mgs of that final blend into the capsule and you have your 40 mgs of pimavanserin . . . Let's say that the density . . . comes up 0.62, then you will want to put a little bit less than 12 -- than, you know, 32.4 percent, so you would then run one more experiment and you would go down to maybe 34 percent. Conversely, if the density comes out, let's say, 0.57, now you're off by about three percentage points. So you could say, oh, maybe I need to run one more experiment; instead of 32.4 percent, I need to go to maybe 34 percent, right.").

130. A POSA would have not been motivated to formulate the recited capsule dosage of pimavanserin with the claimed bulk density with a reasonable expectation of success in doing so. FoF ¶¶ 117-29.

131. The patent examiner already considered Defendants' basis for the validity challenge during patent prosecution and, in the Reasons for Allowance, he determined that the Asserted Claims were not obvious over the closest prior art, the Ragnar-Tolf reference, because "the

density of [its] granulation would not allow for the same amount of the drug to be present in the capsule." JTX-10 at 2404.

132. A diluent is a material that provides bulk or volume to dilute a drug substance, which can provide ease of handling. Tr. 253:2-8 (Dr. Muzzio testifying: "So diluents are materials that are used to -- as it says here, to provide bulk, to provide volume to a mixture. And this is particularly important when, for example, I'm handling very small doses of the drug substance and I need to dilute that small amount of drug substance into a larger volume so I can more easily and more accurately handle that.").

**D. Indefiniteness**

133. A POSA would have understood that the '721 patent specification discloses "comparative experiments" of various manufacturing processes that resulted in products with "unacceptable" characteristics. JTX-09 at 13:33–15:2 ("The top spray fluid-bed layering resulted in particles having . . . unacceptable stability and particle size distribution as well an unacceptable amount of impurities. . . . Wurster Layering (a similar and more common process to the Top Spray Layering described above) was tested and found to produce particles having an . . . unacceptable stability and particle size distribution as well an unacceptable amount of impurities. . . . Extrusion/spheronization is especially useful in producing semi-spherical, dense granules . . . [but] resulted in particles having an acceptable flow and bulk density but unacceptable stability and particle size distribution as well an unacceptable amount of impurities. . . . Twin-Screw Melt Granulation . . . result[ed] in particles having . . . unacceptable finding of impurities as well as unacceptable dissolution. . . . Conventionally wet granulation . . . proved to be problematic resulting in very large, wet, adhesive pimavanserin granules that would not be easily dried in a fluid bed dryer."); *see* Tr. 261:10–271:5 (Dr. Muzzio discussing the comparative experiments);

Tr. 283:5–284:17 (same); Tr. 464:15–466:3 (Dr. Little explaining *inter alia*: "I think a person of ordinary skill in the art would first understand that what we're talking about in these comparative experiments, as I will show you, that the inventors were going through their process in order to determine or deem whether those processes were suitable or not. That's why the word is being used here. They would not be seeing the word and then trying to find a claim term in order to exclude things from a claim that is about compositions and not about pharmaceutical manufacturing processes.").

134. A POSA would have understood that the unacceptable characteristics of the comparative experiments included, for example, "stability, particle size, impurity levels, or dissolution." JTX-09 at 13:33–15:2; *see, e.g.*, JTX-09 at 13:52-55 ("The top spray fluid-bed layering resulted in particles having . . . unacceptable stability and particle size distribution as well an unacceptable amount of impurities."); Tr. 261:17-22 (Dr. Muzzio testifying: "So the first comparative experiment uses a technique called top spray layering, uses excipients, it has acceptable density and flow, but it says to have – it's said to have an unacceptable stability, unacceptable limits of impurity, unacceptable particle size distribution, less favorable dissolution, so those attributes are mentioned.").

135. A POSA would have understood that the '721 patent does not describe the comparative experiments as "embodiments," but rather that the '721 patent describes how various embodiments were evaluated when subjected to the manufacturing processes discussed in the comparative experiments. JTX-09 at 14:64–15:2 ("Several embodiments were evaluated using excipients commonly used to mitigate the impact of high water content while providing excellent granule properties. These did not improve the resulting over-

wetting of the pimavanserin blend and resulted in an adhesive wet mass that would not would not be easily dried in a fluid bed dryer.").

136. A POSA would have understood that "[c]ontrary to the disclosed comparative experiments," the '721 patent also "describes [acceptable] processes to manufacture capsules of size 4 comprising 5-34 mg pimavanserin." JTX-09 at 15:3-5.

137. The section of the '721 patent discussing the comparative experiments does not utilize the term "pharmaceutically acceptable capsule" or "pharmaceutically acceptable." *See* JTX-09 at 13:33–15:2; *see also, e.g.*, Tr. 380:19-24 (Dr. Muzzio stating that "'pharmaceutically acceptable' doesn't appear" in the section of the '721 patent discussing the comparative experiments).

138. During the *Markman* stage of this proceeding, Defendants contended:

> The specification . . . discloses comparative experiments resulting in unacceptable products. In contrast to such "unacceptable products," the specification again discloses the invention, which would presumably generate acceptable products, as involving a wet granulation process with "a small quantity of water" conducted on pimavanserin API alone. . . . The specification has more, and consistent, disclosures on granulating pimavanserin or pimavanserin tartrate API alone to form granules, followed by a mixing process involving the API granules and extra-granular excipients to form the blended composition, which is then filled into capsules. . . . To summarize, the '721 patent specification is very consistent on the points that (1) the pimavanserin tartrate API in the claimed compositions is to be granulated alone (i.e. with water in a wet granulation process), and (2) the granules are then mixed with excipients by blending.

D.I. 39 at 18-19.

139. "The Court, however, held that 'Acadia did not clearly disavow granules containing both pimavanserin and excipients.'" D.I. 112 at 17 (quotation omitted).

140. The specification does not define the term "pharmaceutically acceptable" or the term "pharmaceutically acceptable capsule." JTX-09; Tr. 395:25–396:2 (Dr. Muzzio confirming); Tr. 449:1–450:6 (Dr. Little confirming).

141. The specification of the '721 patent states that, "[u]nless defined otherwise, all technical and scientific terms used herein have the same meaning as is commonly understood by one of ordinary skill in the art." JTX-09 at 2:34-36.

142. Dr. Little states that the phrase "pharmaceutically acceptable" is used "in thousands of patents" and "just means generally suitable for use in pharmaceutical compositions." Tr. at 450:9-13. Dr. Little testifies that the phrase does not mean "something different for capsules as opposed to excipients." Tr. 449:23–450:2; Tr. 450:24–451:3 (Dr. Little stating: "So it would be applied, as I said, the plain and ordinary meaning, which is generally suitable for use in pharmaceutical compositions. And since it's seen twice in this claim, it would be applied the same in both instances that it's used.").

143. Dr. Muzzio states that "pharmaceutically acceptable excipient" means "an excipient that has been proved to be pharmaceutically acceptable by a regulatory authority" or means "generally suitable for use in a pharmaceutical composition" at least "[w]hen used the right way and in the correct amount." Tr. 377:17–378:3. Dr. Muzzio avers that he does not "know" the meaning of the phrase "pharmaceutically acceptable capsule" and that neither would a "POSA" in light of, at least, the comparative experiments in the '721 specification. Tr. 382:4-9; Tr. 377:13-16 (Dr. Muzzio stating: "So, indeed, there are different ways in which you need to look at the words 'pharmaceutically acceptable' and see what it is that they are modifying to understand what that means.").

**E. Written Description / Enablement**

144. The '721 patent does not limit the number of "pharmaceutically acceptable excipients." JTX-09.

145. The specification discloses various embodiments of "pharmaceutically acceptable excipients." *See, e.g.*, JTX-09 at 16:4-10 ("As disclosed herein it has been demonstrated that pimavanserin can be granulated without the use of a binder, i.e. utilizing water only. It is however contemplated that in some embodiments suitable binders, such as cellulose, methyl cellulose, polyvinylpyrrolidone and polyethylene glycol may be used, although not a necessity."); Tr. 474:17–475:8 (Dr. Little confirming that the list of excipients from JTX-09 at 16:4-10 "is the first of a number of disclosures" in the specification of the '721 patent "that demonstrate to a person of ordinary skill in the art that the inventors were envisioning adding excipients to the granules"); Tr. 396:3–397:6 (Dr. Muzzio testifying that JTX-09 at 16:4-10 discloses "four" binders and that "binders" are "excipients"); JTX-09 at 17:34-41 ("Another embodiment of the composition described above includes pimavanserin tartrate granulation containing less than 10% w/w Avicel PH302 and colloidal silicon dioxide, e.g. Aerosil Pharma 200 manufactured by Evonik, with a specific surface area from about 175 to about 225 $m^2/g$ blended with less than 60% w/w microcrystalline cellulose, such as Avicel PH302 or equivalent microcrystalline cellulose, and about 1% w/w magnesium stearate."); JTX-09 at 17:42-49 ("Another embodiment of the composition described above includes pimavanserin tartrate granulation containing less than 10% w/w Avicel PH101 and colloidal silicon dioxide with a specific surface area from about 175 to about 225 $m^2/g$, e.g. Aerosil Pharma 200 manufactured by Evonik, blended with less than 60% w/w microcrystalline cellulose, such as Avicel PH302 or equivalent thereof, and about 1% w/w magnesium stearate."); Tr. 397:7-17 (Dr. Muzzio admitting that these two disclosures from

column 17 of the '721 patent disclose compositions with "Avicel PH302," "Avicel PH101" and "silicon dioxide").

146. A POSA would have understood that excipients can be intragranular. Tr. 472:6-12 (Dr. Little explaining: "On the left-hand side, you will then see as part of the pimavanserin granulation, you have 40 mgs of pimavanserin tartrate in the pimavanserin granulation, you have 59 mgs of microcrystalline cellulose in the pimavanserin granulation, and you have 1 mg of magnesium stearate in the pimavanserin granulation, leading to a total of 100 mgs."); Tr. 399:23–400:10 (Dr. Muzzio explaining *inter alia* that colloidal silicon dioxide "can be put inside granules").

147. As stated above, the Court construed "[g]ranules comprising 40 mg pimavanserin tartrate and one or more pharmaceutically acceptable excipients" as having "plain and ordinary meaning; the scope of the term includes granules granulated with pimavanserin and excipients." FoF ¶ 34.

148. A POSA would have understood that the '721 patent discloses excipients that may "provide, without limitation, bulk, consistency, stability, binding ability, lubrication, disintegrating ability." JTX-09 at 3:50-53.

149. The comparative experiments that resulted in "unacceptable products" describe the manufacturing process for pimavanserin granules with certain excipients. JTX-09 at 13:33–15:2.

150. A POSA would not have considered the comparative experiments to understand the Asserted Claims. Tr. 469:7-12 (Dr. Little testifying that a POSA would not "place any limitation on the asserted claims" based on "the comparative experiments" from "columns 13-15 of the '721 patent specification"); Tr. 474:8-10 (Dr. Little reiterating that he does

not "think that you should be reading what [Dr. Muzzio] believes to be restrictions in the comparative [experiments] on to the claims").

151. The '721 patent discloses the following table (Table 2):

TABLE 2

Composition of Pimavanserin granulation (34 mg)

| Ingredients | Qty (% w/w) | Qty (mg)/dose |
|---|---|---|
| Pimavanserin Tartrate | 40.0 | 40.0[a] |
| Microcrystalline Cellulose (Avicel PH302, NF, EP) | 59.0 | 59.0 |
| Magnesium Stearate (Vegetable Source, USP, EP) | 1.0 | 1.0 |
| Total | 100.0 | 100.0 |

[a]40 mg pimavanserin tartrate salt is equivalent to 34 mg pimavanserin free base

152. A POSA would have understood that Table 2 of the specification describes a pimavanserin granulation with intragranular excipients. Tr. 471:14-24 (Dr. Little explaining: "So we've got pimavanserin granulation, and this is the composition of the pimavanserin granulation. So what you see in the left-hand column is the ingredients of the pimavanserin granulation, and then you see a column that says 'quantity, percent weight by weight, and you see a column that says quantity mg/dose.'").

153. The '721 patent specification discloses a bulk density range of pimavanserin granulation between 0.4 to 0.6 g/ml and one embodiment within that range of 0.508 g/ml. JTX-09 at 22:9-14 ("The bulk density of pimavanserin granulation is >0.4 g/ml, such as 0.4-0.6 g/ml, such as about 0.5 g/ml, determined according to USP <616>, method 1. In some embodiments the bulk density of the pimavanserin granulation is >0.4 g/ml, such as about 0.5 g/ml, such as 0.51 g/ml, such as 0.508 g/ml."); Tr. 582:17–583:2 (Dr. Little stating that

"[t]here's an example plan of 0.508" in response to the question of whether .508 g/ml was "the only actual example" of a bulk density between 0.4 g/ml and 0.6 g/ml).

154. The specification of the '721 patent does not teach a POSA how to make granules of pimavanserin having a bulk density greater than 0.6 g/ml. Tr. 581:11–582:16 (Dr. Little explaining that the '721 patent does not "teach[] how to select excipients to use to make pimavanserin granules with a bulk density in the range of 0.6 to 0.8 g/ml" and that "once you go above 0.8, you know, there's no disclosures in [the '721 patent] of that because a person of ordinary skill in the art is not thinking whether a difficult material like this is going up above for what you would expect for even an average material").

155. A POSA would not have applied the "typical" bulk densities from Figure 1 of the '721 patent to the claimed bulk density for pimavanserin granules. JTX-09 at Figure 1 (listing the "conventional fill weight" for "typical powder density"); Tr. 400:11–401:13 (Dr. Muzzio confirming that the "conventional fill weight" in Figure 1 is "not specific to pimavanserin").

156. A POSA would have understood that generally the upper limit of bulk density for "standard" materials is 0.7 g/ml. Tr. at 480:15-20 (Dr. Little testifying: "And you have sort of your standard materials that you're used to working with. And I would actually agree with him on this, that for a standard material you could see [a bulk density of] 0.4, 0.5, 0.6 and 0.7."); Tr. 583:10-13 (Dr. Little testifying: "So you've got your conventional materials that you would use, and I agree with Dr. Muzzio on that, those are the ranges you'd see up to like 0.7, you know?"); Tr. 583:14-16 (Dr. Little agreeing that for "a common material, the upper limit would be 0.7"); Tr. 582:1-6 (Dr. Little testifying that

"[f]or any material, there's going to be an upper limit . . . . I don't mean to be silly about this, but this claim doesn't talk about black holes").

157. A POSA would have understood, including on the basis of the teachings of the '721 patent, that pimavanserin is a "bad behaving material." JTX-09 at 1:54-58 ("Pimavanserin manufactured following conventional techniques has low bulk density and poor flowability and a tendency to clump, which will adversely impact reproducibility and quantitative accurate filling of capsules during the manufacturing process."); Tr. 583:3-8 (Dr. Little explaining that pimavanserin "has bad behavior"); Tr. 583:22 (Dr. Little explaining: "In this case, you have bad behaving materials."); *see* FoF ¶ 122.

158. A POSA would have understood that granules of pimavanserin, as "bad-behaving," will have a bulk density upper limit that is lower than the bulk density upper limit for standard materials, and that this lower bulk density limit for granules of pimavanserin would be 0.6 g/ml. Tr. 533:16-18 (Dr. Little explaining that a "bad-behaving material" will have a "low[er] bulk density"); Tr. 583:3-8 (Dr. Little agreeing that a POSA would know that granules of pimavanserin cannot have a bulk density above "0.6 because" "pimavanserin is . . . a 'bad material'"); Tr. 583:22-23 (Dr. Little explaining: "In this case, you have bad behaving materials. You're not thinking of the top of the [normal] range [that goes up to 0.7].").

159. A POSA would have understood that the bulk density of the granules of pimavanserin are limited to the range of 0.4 g/ml to 0.6 g/ml. FoF ¶¶ 153-58.

## II. LEGAL STANDARD

Rule 52(a)(1) of the Federal Rules of Civil Procedure provides: "In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its

conclusions of law separately." Fed. R. Civ. P. 52(a)(1). "The classical statement of the burden of proof in an ordinary civil case such as this is that the facts must be proved by a 'preponderance of the evidence.'" *Burch v. Reading Co.*, 240 F.2d 574, 578 (3d Cir. 1957); *see E.M.D. Sales, Inc. v. Carrera*, 604 U.S. 45, 50 (2025) (confirming that "the preponderance-of-the-evidence standard has remained the default standard of proof in American civil litigation"). It is within the province of the district court as the finder of fact to "make subjective credibility determinations about the witnesses who testified." *Bayer AG v. Housey Pharms., Inc.*, 386 F. Supp. 2d 578, 580 (D. Del. 2005), *aff'd*, 189 F. App'x 969 (Fed. Cir. 2006).

## III. DISCUSSION: INFRINGEMENT AND INVALIDITY

This Discussion has four Sections: (A) Acadia Demonstrates Infringement by a Preponderance of the Evidence, (B) Defendants Fail to Demonstrate Obviousness by Clear and Convincing Evidence, (C) Defendants Fail to Demonstrate Indefiniteness by Clear and Convincing Evidence, and (D) Defendants Fail to Demonstrate a Lack of Written Description by Clear and Convincing Evidence; Defendants Fail to Demonstrate a Lack of Enablement by Clear and Convincing Evidence.

### A. Acadia Demonstrates Infringement by a Preponderance of the Evidence

"A patent owner has the burden of proving infringement by a preponderance of the evidence." *H. Lundbeck A/S v. Lupin Ltd. ("Lundbeck")*, No. 18-88-LPS, 2021 U.S. Dist. LEXIS 204535, at *234-35 (D. Del. Sep. 30, 2021) (citing *SmithKline Diagnostics, Inc. v. Helena Lab. Corp.*, 859 F.2d 878, 889 (Fed. Cir. 1988)). A patent is infringed when a person "without authority makes, uses, offers to sell, or sells any patented invention, within the United States . . . during the term of the patent." 35 U.S.C. § 271(a). Literal infringement, which is the only type of infringement asserted here, generally "occurs when each element of at least one claim of the patent

is found in the alleged infringer's product." *Alza Corp. v. Andrx Pharms., LLC*, 607 F. Supp. 2d 614, 623 (citing *Panduit Corp. v. Dennison Mfg. Co., Inc.*, 836 F.2d 1329, 1330 (Fed. Cir. 1987)).

Courts employ a two-step analysis in making a literal infringement determination. *Lundbeck*, 2021 U.S. Dist. LEXIS 204535, at *235 (citing *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995)). "First, a court must construe the asserted claims." *Id.* "Next, the trier of fact must compare the properly-construed claims to the accused infringing product." *Id.* "If an accused product does not infringe an independent claim, it also does not infringe any claim depending from that independent claim." *Id.* (citing *Wahpeton Canvas Co. v. Frontier, Inc.*, 870 F.2d 1546, 1553 (Fed. Cir. 1989)). "However, one may infringe an independent claim and not infringe a claim dependent on that claim." *Id.* (cleaned up).

In cases arising under 35 U.S.C. § 271(e)(2)(A) (like the present case), the infringement inquiry concerns "whether, if a particular drug *were* put on the market, it *would* infringe the relevant patent." *Acorda Therapeutics, Inc. v. Mylan Pharms., Inc.*, 817 F.3d 755, 760 (Fed. Cir. 2016) (emphases added); *accord Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1365 (Fed. Cir. 2003) ("Once jurisdiction is established, however, the substantive determination whether actual infringement or inducement will take place is determined by traditional patent infringement analysis, just the same as it is in other infringement suits, including those in a non-ANDA context, the only difference being that the inquiries now are hypothetical because the allegedly infringing product has not yet been marketed.").

"If the ANDA defines a proposed generic drug in a manner that directly addresses the issue of infringement, [the ANDA] controls the infringement inquiry." *Par Pharm., Inc. v. Eagle Pharms., Inc.*, 44 F.4th 1379, 1383 (Fed. Cir. 2022) (cleaned up). In such instances, that a generic manufacturer "tells the court that its manufacturing guidelines will keep [its product] outside the

scope of the claims or has even filed a declaration in the court stating that [its product] will stay outside the scope of the claims [cannot] overcome the basic fact that it has asked the FDA to approve, and hopes to receive from the FDA, approval to market a product within the scope of the issued claims." *Sunovion Pharms., Inc. v. Teva Pharms. USA, Inc.*, 731 F.3d 1271, 1278 (Fed. Cir. 2013). However, if "the ANDA specification does not speak clearly and directly to the question of infringement, courts may look to other relevant evidence, such as data or samples the ANDA filer has submitted to the FDA, to assess whether a proposed product will infringe." *Par Pharm.*, 44 F.4th 1379, 1384 (citations omitted).

In this action, Acadia alleges that Aurobindo infringes claims 4 and 5 of the '721 patent, the former of which recites (alterations added):

> 4. A pharmaceutically acceptable capsule for orally delivering 34 mg of pimavanserin to a patient, wherein [1] the capsule has a capsule shell with a capsule shell size 3 or 4, [2] that encapsulates a blended pimavanserin composition comprising: granules comprising 40 mg pimavanserin tartrate and one or more pharmaceutically acceptable excipients; and [3] wherein the bulk density of the granules is >0.4 g/ml as determined by USP, method 1.

The Court construed claim 4 of the '721 patent such that "an extra-granular component is not required" and that "the scope of the term granule includes granules granulated with pimavanserin and excipients." FoF ¶¶ 32-34.

After comparing the properly-construed claims to the Court's Findings of Fact regarding the accused infringing product (*see Lundbeck*, 2021 U.S. Dist. LEXIS 204535, at *235), the Court holds that Acadia demonstrates by a preponderance of the evidence that Aurobindo's Product practices every limitation of claim 4 of the '721 patent. The following Findings of Fact show that each claim limitation is met:

> A pharmaceutically acceptable capsule for orally delivering 34 mg of pimavanserin to a patient, wherein the capsule has a capsule shell with a capsule shell size 3 or 4 [FoF ¶ 35], that encapsulates a blended pimavanserin composition comprising:

> granules comprising 40 mg pimavanserin tartrate and one or more pharmaceutically acceptable excipients [FoF ¶¶ 68-71]; and wherein the bulk density of the granules is >0.4 g/ml as determined by USP, method 1 [FoF ¶¶ 78].

The only limitation from claim 4 of the '721 patent that Aurobindo disputes is the presence of granules. However, similar to the ANDA from the generic manufacturer in *Sunvion*, Aurobindo's "ANDA specification clearly describes a product that" includes granules. *See Sunovion Pharms., Inc.*, 731 F.3d 1271, 1280; FoF ¶¶ 57-58.[6] Any argument from Aurobindo that the disclosures of [redacted] in its ANDA were inadvertent (*see* D.I. 131 at 10) or that Aurobindo's actual product does not infringe (*see* D.I. 131) "cannot override" that Aurobindo sought "FDA approval to market a generic compound within the scope of" the '721 patent and, thus, infringed the '721 patent. *See Sunovion Pharms., Inc.*, 731 F.3d 1271, 1280; *see also id.* ("Simply saying 'But I won't do it' is not enough to avoid infringement."). If the disclosures of [redacted] in Aurobindo's specification were inadvertent, Aurobindo could have taken steps to amend its ANDA. However, Aurobindo neglected to do so (FoF ¶ 57(e)(ii)-(iii)), notwithstanding that Mr. Kannusamy acknowledged that "[i]f Aurobindo believed that something was incorrect in its ANDA, it would take steps to correct it with the FDA" (FoF ¶ 57(e)(i)). Furthermore, several other Findings of Fact also supported (and in fact independently served as a basis for) the conclusion that Aurobindo's Product [redacted], including Dr. Smith's stereomicroscopy and polarized light microscopy examinations of Aurobindo's Product sample. *See* FoF ¶¶ 59-67.

---

[6] The Court acknowledges that not every section of Aurobindo's specification references [redacted] and, indeed, the lack of uniform reference to [redacted] support Aurobindo's argument that the specification does not "clearly describe[]" a product that [redacted]. *See* D.I. 132 ¶ 22. The Court also acknowledges Aurobindo's argument that its ANDA does not expressly state that its "finished" product [redacted]. *See* D.I. 131 at 9. Ultimately, however, the Court found these arguments unconvincing in light of the repeated references to [redacted] in Aurobindo's documents.

Separately, the Court holds that the preamble to claim 4 of the '721 patent is not a limitation. "What is required to meet the written description requirement 'varies with the nature and scope of the invention at issue, and with the scientific and technologic knowledge already in existence.'" *Juno Therapeutics, Inc. v. Kite Pharma, Inc.*, 10 F.4th 1330, 1335 (Fed. Cir. 2021) (quoting *Capon v. Eshhar*, 418 F.3d 1349, 1357 (Fed. Cir. 2005)). "Whether to treat a preamble as a limitation is a determination resolved only on review of the entire patent to gain an understanding of what the inventors actually invented and intended to encompass by the claim." *In re Xencor, Inc.*, 130 F.4th 1350, 1356-57 (Fed. Cir. 2025) (cleaned up). "The mere fact that a structural term in the preamble is part of the claim does not mean that the preamble's statement of purpose or other description is also part of the claim." *Id.* at 1357 (cleaned up). "That is, where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention, the preamble is not a claim limitation." *Id.* (cleaned up). However, courts do read the preamble as limiting "if the claim preamble, when read in the context of the entire claim, recites limitations of the claim, or, if the claim preamble is necessary to give life, meaning, and vitality to the claim." *Id.* (cleaned up).

Here, Acadia "defines a structurally complete invention in the claim body" of claim 4 "and uses the preamble only to state a purpose or intended use for the invention" and, thus, the preamble is not a claim limitation." *See id.* Even were the Court to determine that the preamble is a limitation, however, the Court would have still found that Aurobindo infringed. *Compare* claim 4 of the '721 patent, preamble ("A pharmaceutically acceptable capsule for orally delivering 34 mg of pimavanserin to a patient"), *with* FoF ¶¶ 35, 68-71.

In addition to claim 4, the Court, after comparing the properly-construed claims to the accused infringing product (*see Lundbeck*, 2021 U.S. Dist. LEXIS 204535, at *235), holds that

Acadia demonstrates by a preponderance of the evidence that Aurobindo's Product practices every limitation of claim 5 of the '721 patent. *Compare* claim 5 of the '721 patent (reciting: "The pharmaceutically acceptable capsule of claim 4, wherein the capsule shell is a hard shell size 4 capsule."); *with* FoF ¶ 35 ("The dosage form of Aurobindo's Product is an orally-administered hard shell size 4 capsule.").

The Court does not adopt several of Aurobindo's proposed findings of fact, which generally contest that Aurobindo's Product [redacted], or, to the extent that Court does adopt some of Aurobindo's proposed findings of fact, the Court nonetheless maintains that Acadia demonstrates infringement by a preponderance of the evidence. Aurobindo's proposed findings of fact (and corresponding legal arguments) broadly fit into two categories, including Aurobindo's manufacturing process and Dr. Smith's examinations, categories of which the Court will address in turn.

Regarding the former category, Aurobindo proposes that its manufacturing process [redacted] In particular, Aurobindo proposes that no [redacted] D.I. 132 ¶ 14. Aurobindo also proposes that a "POSA would understand that a [redacted] is distinct from the various processes that result [redacted]." D.I. 132 ¶ 15. Accordingly, Aurobindo proposes that "Aurobindo's ANDA capsule contains pimavanserin tartrate [redacted]" and likewise that a "POSA would understand Aurobindo's ANDA to be describing a capsule formulation that [redacted]" D.I. 132 ¶¶ 14, 15; *see* D.I. 131 at 8-9. Having weighed the evidence, having assessed the credibility of the expert witnesses, and having reviewed the entire trial record, however, the Court found that Aurobindo's Product [redacted]. The Court also found that

Aurobindo's [redacted]. FoF ¶ 71.[7]

Regarding the latter category, Aurobindo proposes several facts challenging the propriety of Dr. Smith's examinations of Aurobindo's Product.[8] Aurobindo proposes, for example, that there "is no record of any observation (microscopic or otherwise), data or pictures from the material collected by the smallest sieve, the material that passed through all of the sieves, or was lost and unaccounted for" and that "the total amount of material with no record of any observation of any kind was [redacted] of the total capsule." D.I. 132 ¶ 30; *see* D.I. 132 ¶ 35 (similar); D.I. 131 at 14. Aurobindo somewhat similarly proposes that, even [redacted]" D.I. 132 ¶ 34; D.I. 131 at 14. For these reasons, Aurobindo contends that Acadia cannot demonstrate infringement by a preponderance of the evidence. D.I. 131 at 14-15.

However, as found above:

- "Dr. Smith observed material from the smallest sieve and her observation of the material from the smallest sieve was consistent with her other observations." FoF ¶ 59(r).

[7] Aurobindo similarly proposes that Dr. Smith agrees that Aurobindo's [redacted] D.I. 132 ¶ 18 (emphasis added). However, Dr. Smith did not so agree. Rather, while Dr. Smith acknowledged that "when people think about [redacted] FoF ¶ 53. Dr. Smith also testified that [redacted] FoF ¶ 53. Aurobindo similarly proposes that [redacted] in Aurobindo's Product. D.I. 132 ¶ 19. However, as found above, Aurobindo's manufacturing process [redacted] (FoF ¶ 71).

[8] Aurobindo also contends that Dr. Smith's examinations [redacted]. D.I. 131 at 11. The Court, however, found otherwise.

- "Dr. Smith observed material from the collection pan and her observation of the material from the collection pan was consistent with her other observations." FoF ¶ 59(s).
- "There is no practical way to test every single solid in Aurobindo's capsule [redacted]" FoF ¶ 59(t).

These Findings of Fact, in concert with various other Findings of Fact, in totality, show that Aurobindo infringes the '721 patent by a preponderance of the evidence [redacted]), notwithstanding that Dr. Smith [redacted] in Aurobindo's Product sample. FoF ¶¶ 36-71.

Aurobindo also flags Dr. Smith's admission that humidity was not controlled in her experiments. D.I. 132 ¶ 31; *see* FoF ¶ 65. However, as found above, "Dr. Moreton did not perform any studies to determine whether humidity impacted the results of Dr. Smith's testing and could not 'definitely' attest that humidity changed Dr. Smith's results." FoF ¶ 67. Considering the totality of the evidence, the Court maintains that Aurobindo infringes the '721 patent. *See Galderma Labs., L.P. v. Sun Pharm. Indus.*, 411 F. Supp. 3d 271, 312 (D. Del. 2019) (recognizing that the preponderance of the evidence standard "does not require proof to a level of scientific certainty" (cleaned up)).

In sum, the Court weighed the evidence from the parties and the credibility of the parties' experts and concludes that Acadia demonstrates that Aurobindo infringes claims 4 and 5 of the '721 patent by a preponderance of the evidence.

### B. Defendants Fail to Demonstrate Obviousness by Clear and Convincing Evidence

Under the Patent Act, an invention cannot be patented "if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill

in the art to which the claimed invention pertains." 35 U.S.C. § 103. "Patents are presumed to be valid." *P&G v. Teva Pharms. USA, Inc.*, 566 F.3d 989, 994 (Fed. Cir. 2009). Thus, any "party seeking to invalidate a patent based on obviousness must demonstrate by clear and convincing evidence that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so." *Eli Lilly & Co. v. Teva Pharms. Int'l GmbH*, 8 F.4th 1331, 1344 (Fed. Cir. 2021). "Clear and convincing evidence places in the fact finder 'an abiding conviction that the truth of [the] factual contentions are highly probable.'" *P&G*, 566 F.3d 989, 994 (quoting *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984)). "The obviousness determination turns on underlying factual inquiries involving: (1) the scope and content of prior art, (2) differences between claims and prior art, (3) the level of ordinary skill in pertinent art, and (4) secondary considerations such as commercial success and satisfaction of a long-felt need." *Id.* (citing *Graham v. John Deere Co.*, 383 U.S. 1 (1966)). The "motivation to combine references[] serves to prevent hindsight bias." *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1164-65 (Fed. Cir. 2006).

As stated above, claims 4 and 5 of the '721 patent recite:

> 4. A pharmaceutically acceptable capsule for orally delivering 34 mg of pimavanserin to a patient, wherein the capsule has a capsule shell with a capsule shell size 3 or 4, that encapsulates a blended pimavanserin composition comprising: granules comprising 40 mg pimavanserin tartrate and one or more pharmaceutically acceptable excipients; and wherein the bulk density of the granules is >0.4 g/ml as determined by USP, method 1.
>
> 5. The pharmaceutically acceptable capsule of claim 4, wherein the capsule shell is a hard shell size 4 capsule.

FoF ¶ 27.

The Court divides its obviousness discussion into the following Sections: (1) Plaintiff is Wrong as a Matter of Law That Only the Combination of Prior Art May Render an Invention Obvious; Modification of the Prior Art May Also Render an Invention Obvious; (2) Defendants Fail to Demonstrate by Clear and Convincing Evidence That a POSA Would Have Been Motivated to Formulate a Capsule Dosage of Pimavanserin, and (3) Defendants Fail to Demonstrate by Clear and Convincing Evidence That a POSA Would Have Been Motivated to Achieve the Bulk Density of the Claimed Invention With a Reasonable Expectation of Success in Doing So.[9]

**1. Plaintiff is Wrong as a Matter of Law that Only the Combination of Prior Art May Render an Invention Obvious; Modification of the Prior Art May Also Render an Invention Obvious**

Plaintiff suggests that only the *combination* of prior art references can render an invention obvious. D.I. 134 at 1-2 ("Defendants' stated theory is that a 'POSA would have been motivated to modify Nuplazid Tablets to achieve the Asserted Claims with a reasonable expectation of success.' The Court 'first must determine whether [Defendants] carried [their] burden to prove that all claimed limitations are disclosed in the prior art' before even 'consider[ing] motivation to combine and reasonable expectation of success.' . . . None of Defendants' references disclose [the claim limitations]. . . . As the required elements are missing, Defendants failed to meet their burden on this threshold inquiry.").

Plaintiff is, however, incorrect since the *modification* of prior art references may also render an invention obvious. *See In re Gorris*, 847 F. App'x 889, 891 (Fed. Cir. 2021) ("Obviousness is a question of law based on underlying factual findings. Such factual findings include determinations as to: (1) the scope and content of the prior art; and (2) whether a person of ordinary skill in the art would have been motivated to combine or *modify* prior art

[9] In light of the holdings herein, the Court does not address every argument raised by the parties.

references with a reasonable expectation of success." (emphasis added) (citation omitted)); *Unification Techs. LLC v. Micron Tech. Inc.*, No. 2023-1348, 2024 U.S. App. LEXIS 20014, at *14 (Fed. Cir. Aug. 9, 2024) ("And 'in appropriate circumstances, a patent can be obvious in light of a single prior art reference if it would have been obvious to *modify* that reference to arrive at the patented invention.'" (emphasis added) (quoting *Arendi S.A.R.L. v. Apple Inc.*, 832 F.3d 1355, 1361 (Fed. Cir. 2016)); Matthews, *Annotated Patent Digest* § 18:43.50 ("It can be error to assume that to show obviousness based on a combination of prior art references, the combination must actually disclose each and every claim limitation. The proper focus of the analysis looks to see if the combination of the prior art provides enough information such that a person applying routine skill would find the claimed invention obvious from the prior art, rather than whether each limitation is literally disclosed somewhere in the prior art."). Therefore, the Court rejects, as a matter of law, Plaintiff's contention that the invention was not obvious because the prior art did not include all of the claim limitations.

**2. Defendants Fail to Demonstrate by Clear and Convincing Evidence that a POSA Would Have Been Motivated to Formulate a Capsule Dosage of Pimavanserin**

Defendants contend that claims 4 and 5 of the '721 patent are obvious, including because a "POSA would have been motivated to use a . . . capsule" as the formulated dosage form of pimavanserin. D.I. 126 at 4. However, as the Court found above on the basis of the trial record, a "POSA would not have been motivated to formulate a capsule dosage of pimavanserin." FoF ¶ 116. The following predicate findings support the finding:

- "The tablet, the most frequently prescribed commercial dosage form, is stable, elegant and effective and provides the patient with a convenient product for handling, identification and administration." FoF ¶ 113 (cleaned up).
- "Tablet dosages of pimavanserin already existed." FoF ¶ 114.

- "Dr. Muzzio was not aware of any complaints from doctors or patients or any other healthcare professional or anyone regarding the two 17 mg tablets for pimavanserin." FoF ¶ 112 (cleaned up).
- "A POSA would not have been motivated to formulate a capsule dosage of pimavanserin over a tablet dosage of pimavanserin on the basis of pill burden." FoF ¶ 82.
- "A POSA would not have been motivated to formulate a capsule dosage of pimavanserin over a tablet dosage of pimavanserin on the basis of swallowability." FoF ¶ 99.
- "A POSA would not have been motivated to formulate a capsule dosage of pimavanserin over a tablet dosage of pimavanserin on the basis of taste." FoF ¶ 106.
- "A POSA would not have been motivated to formulate a capsule dosage of pimavanserin over a tablet dosage of pimavanserin on the basis of color coating." FoF ¶ 111.
- "A POSA would not have been motivated to formulate a capsule dosage of pimavanserin over a tablet dosage of pimavanserin on the basis of . . . commonality of dosage forms, effort by the caregiver, protection from moisture, dispersion in the mouth, and costs associated with formulation." FoF ¶ 116.

Since Defendants fail to demonstrate the motivation of a POSA to formulate a capsule dosage of pimavanserin by clear and convincing evidence, Defendants fail to meet their burden of demonstrating obviousness. *Eli Lilly & Co.*, 8 F.4th 1331, 1344 ("[A]ny party seeking to invalidate a patent based on obviousness must demonstrate by clear and convincing evidence that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so.").

The Court does not adopt several of Defendants' proposed findings of fact, or, to the extent that Court does adopt some of Defendants' proposed findings of fact, the Court nonetheless maintains that Defendants fail to demonstrate, by clear and convincing evidence, that a POSA would have been motivated to pursue a capsule formulation of pimavanserin. For example, the Court does not adopt Defendants' proposed fact that a POSA "would have been motivated to modify Nuplazid Tablets to decrease the two-tablet-per-day regimen to a single pill that was easy to swallow." D.I. 126-1 ¶ 18; *see* D.I. 126 at 4. While the Court found that in general "a POSA could be motivated to minimize the number of tablets or capsules administered to patients to decrease the pill burden" (FoF ¶ 79), the Court found that here a "POSA would not have been motivated to formulate a capsule dosage of pimavanserin over a tablet dosage of pimavanserin on the basis of pill burden" (FoF ¶ 82 ).

Defendants also raise various legal contentions that are without merit. For example, Defendants contend that Dr. Little's recital of various alternatives to a capsule formulation improperly "abstract[s] back out to the larger problem . . . and ask[s] how many ways that could be done . . . completely disconnected from where the prior art would have already led a person of ordinary skill in the art." D.I. 126 at 7-8 (quoting *Purdue Pharma L.P. v. Accord Healthcare, Inc.*, No. 2023-1953, 2024 WL 5244764, at *6 (Fed. Cir. Dec. 30, 2024)). Defendants are wrong. Dr. Little's discussion of various alternatives to a capsule formulation was not abstract and not disconnected from the prior art. For example, "Dr. Little opined on the swallowability benefits of 'dispersible and effervescent tablets' in the context of the Liu reference (i.e., in the context of prior art)." FoF ¶ 94.

Defendants correctly observe that the prior art does "not need to hold itself out as flawed for a POSA to alter it." D.I. 126 at 8 (quoting *Janssen Pharms., Inc. v. Teva Pharms. USA, Inc.*,

97 F.4th 915, 929 (Fed. Cir. 2024)). Defendants could have, for example, demonstrated obviousness by "demonstrating a different motivation based on publicly available information." *Janssen Pharms., Inc.*, 97 F.4th 915, 929. However, Defendants fail to demonstrate obviousness based on publicly available information.

For the foregoing reasons, Defendants fail to demonstrate by clear and convincing evidence that a POSA would have been motivated to formulate a capsule dosage of pimavanserin.

**3. Defendants Fail to Demonstrate by Clear and Convincing Evidence that a POSA Would Have Been Motivated to Achieve the Bulk Density of the Claimed Invention With a Reasonable Expectation of Success in Doing So**

With respect to bulk density (one of the limitations of claim 4 of the '721 patent), Defendants contend:

> Based on Ragnar-Tolf, a POSA would have known that, in order to fit the full 40 mg daily dose of pimavanserin tartrate in a size 4 capsule, he or she would have to slightly increase the pimavanserin tartrate concentration (by about 12%),[[10]] and this easily could be done by decreasing the concentration of the inactive mannitol diluent by the same amount. Based on the consistent 0.6 g/ml bulk densities shown for the pimavanserin granules in Ragnar-Tolf, a POSA would have expected the bulk density of the 40 mg strength to remain roughly the same 0.6 g/ml when the concentration of the drug was increased. Thus, a POSA would have reasonably expected that 40 mg of pimavanserin tartrate granules could fit within a size 4 capsule, and would have been able to achieve the result within one or two routine experiments.

D.I. 126 at 5-6 (citations omitted).

However, the patent examiner for the '721 patent already examined Ragnar-Tolf and explained that Ragnar-Tolf, the "closet prior art" to the Asserted Claims, does not render the Asserted Claims obvious because "the density of the granulation" in Ragnar-Tolf "would not allow for the same amount of the drug to be present in the capsule" in the Asserted Claims. FoF ¶ 131.

[10] Defendants explain in a footnote that the "concentration would increase from 20 percent (for the 20 mg dose disclosed in Ragnar-Tolf) to about 32.4 percent (for a 40 mg dose)" (D.I. 126 at 5 n.1 (citation omitted)) which is more accurately characterized as an increase of more than 60%.

To overcome the patent examiner's conclusion, Defendants bear a "particularly heavy" burden. *Impax Labs., Inc. v. Aventis Pharms., Inc.*, 545 F.3d 1312, 1314 (Fed. Cir. 2008); *see Shire LLC v. Amneal Pharms., LLC*, 802 F.3d 1301, 1307 (Fed. Cir. 2015). Defendants fail to meet this burden.

As found above, a "POSA would have not been motivated to formulate the recited capsule dosage of pimavanserin with the claimed bulk density with a reasonable expectation of success in doing so." FoF ¶ 130. The following Findings of Fact evince the foregoing:

- "A POSA seeking to develop a new dosage form of pimavanserin would have looked to the Ragnar-Tolf reference." FoF ¶ 117.
- A "POSA would have understood that pimavanserin is a 'bad-behaving' material — in that pimavanserin has a low bulk density and tends to clump up — and requires a lot of excipients to allay its bad behavior." FoF ¶ 122.
- "A POSA would have understood that Pimavanserin is hygroscopic, meaning that pimavanserin tends to absorb moisture and, thus, that formulating dosages of pimavanserin could be difficult." FoF ¶ 123.
- The "Ragnar-Tolf reference discloses examples of pimavanserin tablets that were formulated, including in 1 mg, 5 mg, and 20 mg dosages, that ranged in bulk-density between 0.56 g/ml and 0.61 g/ml." FoF ¶ 127.
- "A POSA would have understood, including on the basis of the Ragnar-Tolf reference, that, in order to fit 40 mg of pimavanserin tartrate in a size 4 capsule, he or she would have had to increase the pimavanserin tartrate concentration in the 20 mg formulation identified in Finding of Fact ¶ 127 from approximately 20% to 32.4% (i.e., by over 60%) and such

an increase could potentially be accomplished by also decreasing the concentration of mannitol." FoF ¶ 128.

- If possible, "a POSA would have understood that increasing the concentration of pimavanserin tartrate, and likewise decreasing the inactive mannitol diluent, in the blended pimavanserin in the manner described in Finding of Fact ¶ 128 could have increased or decreased the bulk density of the granules." FoF ¶ 129.

In particular, the increase of concentration of pimavanserin by more than 60%, while maintaining the appropriate bulk density, militates against a POSA's reasonable expectation of success here, notwithstanding that the Ragnar-Tolf reference discloses consistent bulk densities for pimavanserin in 1 mg, 5 mg, and 20 mg dosages. *See Allergan, Inc. v. Sandoz Inc.*, 796 F.3d 1293, 1305 (Fed. Cir. 2015) ("Here in this case, the prior art ranges are broader than the range in *Galderma*, and the record shows that the claimed amounts of the two different ingredients could and did materially and unpredictably alter the property of the claimed formulation. Thus, *Galderma* does not compel a conclusion of obviousness in this case."); *see also Alza Corp. v. Andrx Pharms.*, LLC, 607 F. Supp. 2d 614, 656 (D. Del. 2009) (acknowledging "expert witness testimony" that indicated "a significant level of unpredictability in the field of pharmaceutical product design").

In addition, "[t]he long delay between [the Ragnar-Tolf reference] and [the one capsule formulation] . . . supports the inference that it was difficult for researchers to create [the capsule formulation] product." *See Eurand, Inc. v. Mylan Pharms., Inc.*, 676 F.3d 1063, 1083 (Fed. Cir. 2012); FoF ¶ 118 ("The Ragnar-Tolf reference was published on November 15, 2007, almost ten years before the earliest effective filing date of the '721 patent."). Assuming that "a desire existed

for such a product, researchers, presumably, would have created one if they were able to do so." *See Eurand*, 676 F.3d 1063, 1083.

Since Defendants fail to demonstrate by clear and convincing evidence that a POSA would have been motivated to achieve the bulk density in the claimed invention with a reasonable expectation of success in doing so, Defendants fail to meet their burden of demonstrating obviousness. *Eli Lilly & Co.*, 8 F.4th 1331, 1344.[11]

**C. Defendants Fail to Demonstrate Indefiniteness by Clear and Convincing Evidence**

Section 112 of the Patent Act requires that the claims of a patent "particularly point[] out and distinctly claim[] the subject matter which the inventor . . . regards as the invention." 35 U.S.C. § 112(b). The "primary purpose of the definiteness requirement" that § 112(b) contains "is to ensure that the claims are written in such a way that they give notice to the public of the extent of the legal protection afforded by the patent, so that interested members of the public, e.g., competitors of the patent owner, can determine whether or not they infringe." *All Dental Prodx, LLC v. Advantage Dental Prods., Inc.*, 309 F.3d 774, 779-80 (Fed. Cir. 2002) (citation omitted).

"[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). While a "potential infringer" need not "be able to determine *ex ante* if a particular act infringes the claims," the patentee must "apprise the public 'of what is still open to them[]'" such that "a person of ordinary skill in the art could determine whether or not an accused

[11] The Court does not adopt several of Defendants' proposed findings of fact, or, to the extent that Court does adopt some of Defendants' proposed findings of fact, the Court nonetheless concludes that Defendants fail to demonstrate, by clear and convincing evidence, that a POSA would have been motivated to pursue a capsule formulation of pimavanserin with the claimed bulk density with a reasonable likelihood of success.

product or method infringes the claim." *Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*, 30 F.4th 1339, 1346-47 (Fed. Cir. 2022) (citations omitted).

Like claim construction, definiteness is a question of law, but the Court must sometimes render factual findings based on extrinsic evidence to resolve the ultimate issue of definiteness. *See Sonix Tech. Co. v. Publications Int'l, Ltd.*, 844 F.3d 1370, 1376 (Fed. Cir. 2017). "Patent claims are presumed to be valid and definite." *B.E. Tech., LLC v. Twitter Inc.*, No. CV 20-621-GBW, 2024 WL 579076, at *1 (D. Del. Feb. 13, 2024) (citing 35 U.S.C. § 282). Thus, the challenger must prove indefiniteness by clear and convincing evidence. *See Nippon Shinyaku Co. v. Sarepta Therapeutics, Inc.*, No. CV 21-1015-GBW, 2023 WL 4314485, at *6 (D. Del. July 3, 2023).

Here, Defendants contend that the term "pharmaceutically acceptable capsule" from the preamble of claim 4 of the '721 patent is indefinite because the specification does not provide a POSA with reasonable certainty regarding what goes into making a capsule "pharmaceutically acceptable." D.I. 126 at 9; D.I. 126-1 ¶ 33. In particular, Defendants contend that the specification discloses "comparative examples"[12] of granulations that are "unacceptable" in light of various "subjective" standards, such as "stability." D.I. 126 at 10. Defendants contend further that, without "an objective anchor," a POSA would not be able to determine the meaning of these subjective standards and thus the meaning of "pharmaceutically acceptable capsule" from the preamble of claim 4. D.I. 126 at 10. Without being able to determine the meaning of "pharmaceutically acceptable capsule" from the preamble of claim 4, Defendants theorize that a POSA would not be able to determine "the scope of the claimed invention." D.I. 126 at 10.

[12] The specification of the '721 patent uses the term "comparative experiments" and not the term "comparative examples." JTX-09 at 13:33-34.

Defendants' theory, however, dissolves upon scrutiny. Critically, the term "pharmaceutically acceptable capsule" appears in the preamble and the Court already determined above that the preamble to claim 4 of the '721 patent is not a limitation. *See supra* § III(A). Since the preamble is not limiting, it cannot be indefinite. *See Sunoco Partners Mktg. & Terminals L.P. v. Powder Springs Logistics, LLC*, Civil Action No. 17-1390-LPS-CJB, 2019 U.S. Dist. LEXIS 146831, at *27 (D. Del. Aug. 28, 2019) ("In light of the Court's conclusion that these preamble terms are not limiting, no further construction (or consideration of Defendants' indefiniteness argument) is required." (collecting cases)).

Moreover, Defendants omit that the specification discloses that certain attributes of the products from the comparative experiments were unacceptable as a result of various *manufacturing processes*. *See* FoF ¶ 133 ("A POSA would have understood that the '721 patent specification discloses 'comparative experiments' of various manufacturing processes that resulted in products with 'unacceptable' characteristics'"). That the specification discloses unacceptable attributes of products that resulted from manufacturing *processes* does not render the *apparatus* claims here indefinite. *See 10Tales, Inc. v. Tiktok Inc.*, No. 21-cv-03868-VKD, 2023 U.S. Dist. LEXIS 141602, at *16 (N.D. Cal. Aug. 14, 2023) (holding that the apparatus claim was not indefinite where the specification described a process); *see also* (claim 4 of the '721 patent (reciting a capsule that encapsulates a blended pimavanserin composition)).[13] In addition, while a "patent claim is indefinite if it combines two different statutory classes of invention—such as combining a 'machine' with a 'process'" (*Smart Denture Conversions, LLC v. Straumann USA,*

[13] The Court notes that a "POSA would have understood that, '[c]ontrary to the disclosed comparative experiments,' the '721 patent also 'describes [acceptable] processes to manufacture capsules of size 4 comprising 5-34 mg pimavanserin.'" FoF ¶ 136.

*LLC*, 759 F. Supp. 3d 555, 555 (D. Del. 2024)), claims 4 and 5 of the '721 patent do not combine apparatus and process elements (*see* FoF ¶ 27).

As a contingency, Defendants assert that the Asserted Claims otherwise "read on the comparative [experiments] and are invalid for claiming that which the patentees did not regard as their invention." D.I. 126 at 11; D.I. 126-1 ¶ 34. However, this contingency theory also fails since, as discussed above, the specification of the '721 patent discloses that the unacceptable attributes of the invention arose from *processes*, not different formulations of the *apparatus* itself. *See 10Tales*, 2023 U.S. Dist. LEXIS 141602, at *16. At bottom, Defendants fail to demonstrate that claim 4, when "read in light of the specification delineating the" '721 patent (including the portion of the '721 patent discussing the comparative experiments) "and the prosecution history, fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *See Nautilus*, 572 U.S. 898, 901.

Defendants' reliance (*see* D.I. 126 at 9, 11) on *Allen Engineering Corp. v. Bartell Industries*, 299 F.3d 1336 (Fed. Cir. 2002) is misplaced. "[T]his case is unlike *Allen*, where the patentee agreed that the claim language did not match what he regarded as his invention, as the intrinsic record unambiguously showed." *Ancora Techs. v. Apple, Inc.*, 744 F.3d 732, 739 (Fed. Cir. 2014). "Here, [Acadia] embraces the claim language's clear, ordinary meaning, and . . . the specification and prosecution history [do not] establish that the applicants regarded their invention as something contrary." *Id.*[14]

---

[14] Aurobindo also cites *Juxtacomm-Texas Software, LLC v. Axway, Inc.*, No. 6:10CV011, 2012 WL 7637197, at *4 (E.D. Tex. July 5, 2012). D.I. 126 at 12. However, the Court need not follow this case. *Daubert v. NRA Grp., LLC*, 861 F.3d 382, 395 (3d Cir. 2017) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same [district] judge in a different case." (alteration in original) (quoting *Camreta v. Greene*, 563 U.S. 692 (2011)); *Wahl Clipper Corp. v. Conair Corp. & Conair*

For the foregoing reasons, the Court holds that Defendants have failed to demonstrate indefiniteness by clear and convincing evidence.[15]

**D. Defendants Fail to Demonstrate a Lack of Written Description by Clear and Convincing Evidence; Defendants Fail to Demonstrate a Lack of Enablement by Clear and Convincing Evidence**

35 U.S.C. § 112(a) contains both the written description and enablement requirements under the Patent Act. In particular, § 112(a) provides that the "specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor or joint inventor of carrying out the invention." 35 U.S.C. § 112(a).

The "written description requirement is satisfied if the specification conveys with reasonable clarity to those skilled in the art that the inventor was in possession of the claimed invention." *Pharmacyclics LLC v. Alvogen, Inc.*, No. 2021-2270, 2022 U.S. App. LEXIS 31479, at *18 (Fed. Cir. Nov. 15, 2022) (citing *Biogen Int'l GmbH v. Mylan Pharms., Inc.*, 18 F.4th 1333, 1341-42 (Fed. Cir. 2021)). A patent claim "need not provide *in haec verba* support for the claimed subject matter at issue" to satisfy the written description requirement. *Lampi Corp. v. American Power Prods., Inc.*, 228 F.3d 1365, 1378 (Fed. Cir. 2000). To satisfy the separate requirement of enablement, "the specification must enable the full scope of the invention *as defined by its claims*." *Amgen Inc. v. Sanofi*, 598 U.S. 594, 610 (2023) (emphasis added). Defendants bear the

---

*LLC*, No. 23-cv-00114-JCG-LDH, 2024 U.S. Dist. LEXIS 23526, at *2 (D. Del. Jan. 16, 2024) (confirming that out-of-circuit cases "are not binding on this Court").

[15] The Court notes that Defendants also invoked the comparative experiments during the *Markman* stage of the proceeding to promote a construction of claim 4 requiring that the excipients were extra-granular. FoF ¶ 138. Defendants' argument now, like Defendants' arguments then, lacks merit.

burden of demonstrating a lack of written description and enablement by clear and convincing evidence. *Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1072 (Fed. Cir. 2005).

Defendants challenge whether the specification of the '721 patent (1) describes the full scope of "pharmaceutically acceptable excipients" and (2) describes and enables pimavanserin granules having the full scope of bulk densities greater than 0.4 g/ml. D.I. 126 at 12-15. As discussed sequentially below, both of Defendants' challenges fail.

**1. Defendants Fail to Demonstrate by Clear and Convincing Evidence that the '721 Patent Does Not Describe the Full Scope of "Pharmaceutically Acceptable Excipients"**

Defendants fail to demonstrate by clear and convincing evidence that the '721 patent does not describe the full scope of "pharmaceutically acceptable excipients." In other words, Defendants fail to demonstrate by clear and convincing evidence that the '721 patent does not "convey[] with reasonable clarity to those skilled in the art that [Acadia] was in possession of" "pharmaceutically acceptable excipients." *See Pharmacyclics*, 2022 U.S. App. LEXIS 31479, at *18. The Court will address each of Defendants' arguments in turn.

*First*, Defendants contend that claim 4 broadly encompasses virtually any excipient, whereas the specification only exemplifies some excipients and, accordingly, that the '721 patent does not describe the full scope of pharmaceutically acceptable excipients. D.I. 126 at 12-14; *see* Tr. 345:12-17 (Dr. Muzzio testifying that the asserted claims are directed to "any excipient, any number of excipients in any amount having any function, so the entire universe of excipients in principle is now a claim here"). However, that the '721 patent does not disclose every potential excipient does not foreclose adequate written description. *See Baxalta Inc. v. Bayer Healthcare LLC*, 513 F. Supp. 3d 426, 453 (D. Del. Jan. 19, 2021) ("Every species in a genus need not be described in order that a genus meet the written description requirement."); *Lochner Techs., LLC v. Vizio, Inc.*, 567 F. App'x 931, 940 (Fed. Cir. 2014) (explaining that courts should consider that

"a patentee cannot be required to disclose every possible embodiment" when addressing "written description issue[s]").

Instead, the '721 patent only need describe "a representative number of [particular excipients] falling within the scope of [excipients] or structural features common to the members of the [excipients] so that one of skill in the art can visualize or recognize the members of the [excipients]." *See Baxalta*, 513 F. Supp. 3d 426, 453 (cleaned up); *see also* D.I. 126 at 13 (Defendants admitting that "disclosure of a species within a claim can provide support for a generic claim"). Here, the '721 patent describes "a representative number of [particular excipients] falling within the scope of [excipients]." *See Baxalta*, 513 F. Supp. 3d 426, 453; *see also* FoF ¶ 145 ("The specification discloses various embodiments of 'pharmaceutically acceptable excipients.'"); D.I. 126 at 13 (Defendants admitting that the specification describes "granules containing pimavanserin alone, or with a binder, or with a combination of colloidal silicon dioxide and Avicel"). The '721 patent also describes certain "features . . . of the [excipients]," including that the excipients may "provide, without limitation, bulk, consistency, stability, binding ability, lubrication, disintegrating ability." *See Baxalta*, 513 F. Supp. 3d 426, 453 (first set of quotations); FoF ¶ 148 (second set of quotations).

*Second*, Defendants contend that the comparative experiments from the '721 specification foreclose adequate written description. D.I. 126 at 13. However, similar to the Court's discussion *supra* § III(D), that the specification discloses unacceptable attributes of the invention that arose from certain manufacturing *processes* does not foreclose the sufficiency of Acadia's written description in connection with its *apparatus* claims. *See EVM Sys., LLC v. Rex Med., L.P.*, No. 6:13-CV-184, 2015 U.S. Dist. LEXIS 107736, at *17 (E.D. Tex. Aug. 17, 2015) ("Here, the Court previously construed that the term 'retrieval basket' is an apparatus, which is defined by its claimed

structural elements and does not refer to a specific medical device. Imposing a standard for the written description requirement as it applies to method claims would be improper for apparatus claims, such as those disclosed in the '670 Patent." (citation omitted)).[16] Defendants here simply "read too much into the specification." *See BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1367 (Fed. Cir. 2017).

*Third*, Defendants posit that, "although Dr. Little pointed to Table 2 of the patent as describing pimavanserin with intragranular excipients, [Dr. Little] admitted on cross examination that this example does not disclose the identity of any excipients being added to the pimavanserin during granulation." D.I. 126 at 14. Defendants reach too far. Table 2 (reproduced below) supports the adequacy of the '721 patent's written description of "pharmaceutically acceptable excipients" because Table 2 exemplifies "pharmaceutically acceptable excipients" composing the "the Pimavanserin granulation."

TABLE 2

Composition of Pimavanserin granulation (34 mg)

| Ingredients | Qty (% w/w) | Qty (mg)/dose |
|---|---|---|
| Pimavanserin Tartrate | 40.0 | 40.0[a] |
| Microcrystalline Cellulose (Avicel PH302, NF, EP) | 59.0 | 59.0 |
| Magnesium Stearate (Vegetable Source, USP, EP) | 1.0 | 1.0 |
| Total | 100.0 | 100.0 |

[a]40 mg pimavanserin tartrate salt is equivalent to 34 mg pimavanserin free base

[16] The Court notes again that a "POSA would have understood that '[c]ontrary to the disclosed comparative experiments,' the '721 patent also 'describes [acceptable] processes to manufacture capsules of size 4 comprising 5-34 mg pimavanserin.'" FoF ¶ 136.

FoF ¶ 151. Moreover, as discussed above, "a representative number of [particular excipients] falling within the scope of [excipients]," like those from Table 2, may satisfy the written description requirement. *See Baxalta Inc.*, 513 F. Supp. 3d 426, 453.

For the foregoing reasons, Defendants fail to demonstrate by clear and convincing evidence that the '721 patent fails to describe "pharmaceutically acceptable excipients."

**2. Defendants Fail to Show by Clear and Convincing Evidence that the '721 Patent Does Not Describe or Enable the Limitation of Claim 4 of "[W]herein the Bulk Density of the Granules is >0.4 g/ml"**

Defendants contend that the '721 patent does not describe or enable a bulk density of granules above 0.6 g/ml. D.I. 126 at 14-15. To achieve a bulk density above 0.6 g/ml, Defendants propose that a "POSA would need to engage in an extensive trial-and-error research program, 'equivalent to a Ph.D. dissertation,' which would constitute undue experimentation." D.I. 126-1 ¶ 40 (citation omitted). Defendants are wrong.

The Federal Circuit has explained that open-ended claims, like the bulk density limitation of claim 4 of the '721 patent, can be proper "if there is an inherent, albeit not precisely known, upper limit." *Fs.Com Inc. v. Int'l Trade Comm'n*, 65 F.4th 1373, 1376 (Fed. Cir. 2023) (considering rule in the context of enablement) (quoting *Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361 (Fed. Cir. 2007)); *First Quality Tissue, LLC v. Irving Consumer Prods. Ltd.*, Civil Action No. 19-428-RGA, 2022 U.S. Dist. LEXIS 58289, at *26 (D. Del. Mar. 30, 2022) (considering rule in the context of written description).

Here, the claim limitation ">0.4 g/ml" includes such "an inherent, albeit [perhaps] not precisely known, upper limit." *See Fs.Com Inc.*, 65 F.4th 1373, 1376. As found above, "[t]he '721 patent specification discloses a bulk density range of pimavanserin granulation between 0.4 to 0.6 g/ml and one embodiment within that range of 0.508 g/ml." FoF ¶ 153. Similarly, the "specification of the '721 patent does not teach a POSA how to make granules of pimavanserin

having a bulk density greater than 0.6 g/ml." FoF ¶ 154. "A POSA would have understood that generally the upper limit of bulk density for 'standard' materials is 0.7 g/ml." FoF ¶ 156. In addition, a "POSA would have understood, including on the basis of the teachings of the '721 patent, that pimavanserin is a 'bad behaving material.'" FoF ¶ 157. As such, a "POSA would have understood that granules of pimavanserin, as 'bad behaving,' will have a bulk density upper limit that is lower than the bulk density upper limit for standard materials, and that this lower bulk density limit for granules of pimavanserin would be 0.6 g/ml." FoF ¶ 158. Therefore, a POSA would have understood that the bulk density requirement of claim 4 of the '721 patent includes "an inherent, albeit [perhaps] not precisely known, upper limit" of 0.6 g/ml. *See Fs.Com Inc.*, 65 F.4th 1373, 1376; FoF ¶ 159.

Defendants' arguments to the contrary are without merit. Defendants contend that Acadia and Dr. Little fail to point to anywhere in the specification that supports an implicit upper limit of 0.6 g/ml. D.I. 126 at 14. However, the specification does support an implicit upper limit of 0.6 g/ml for the reasons discussed in the preceding paragraph. Defendants also somewhat contradict themselves by asserting that "Dr. Little relied on the background section of the specification to argue that it would have been difficult to achieve bulk densities of pimavanserin granules above 0.6 g/ml." D.I. 126 at 15.

Defendants contend that it "is undisputed that a POSA would recognize that granules of bulk densities of 0.4 to 1 g/ml were generally known to be achievable in the art." D.I. 126 at 14 n.10. However, insofar that a POSA would have recognized that *some* granule compositions may have been able to achieve a bulk density above 0.6 g/ml does not mean that a POSA would have recognized that granule compositions *of pimavanserin* would have been able to achieve a bulk density above 0.6 g/ml.

For the above reasons, Defendants fail to show by clear and convincing evidence that the specification of the '721 patent does not sufficiently describe or enable the bulk density limitation of claim 4.

## IV. DISCUSSION: MSN's MOTION FOR LEAVE

On March 18, 2025, MSN filed its motion (D.I. 137) for leave to file a reply brief in further support of its post-trial brief on invalidity (D.I. 126), along with a draft of the proposed reply brief (D.I. 137-1 Ex. A). For the reasons discussed below, the Court denies MSN's Motion.

Motions for leave to file reply briefs are highly disfavored where the reply brief is prohibited by a rule or the operative scheduling order. *See Atkinson v. Veolia N. Am.*, No. 5:19-CV-526-BO, 2021 U.S. Dist. LEXIS 22157, at *9 (E.D.N.C. Feb. 5, 2021) ("Furthermore, since reply briefs are not permitted under the rules of this Court, defendant's motion for leave to file a reply memorandum is highly disfavored."); *Harpo v. Intermark Mgmt. Co.*, No. 1:21-cv-87, 2022 U.S. Dist. LEXIS 245058, at *3 (S.D. Ga. July 11, 2022) ("Additionally, Plaintiff has no right to file a Reply, and reply briefs are generally disfavored."); *Atencio v. TuneCore, Inc.*, No. CV 16-1925-DMG (MRWx), 2018 U.S. Dist. LEXIS 223997, at *29 n.9 (C.D. Cal. Nov. 13, 2018) (acknowledging that "the Court generally disfavors reply briefing in support of motions in *limine*"); *Regions Bank v. Hyman*, No. 8:09-cv-1841-T-17MAP, 2013 U.S. Dist. LEXIS 199553, at *5 (M.D. Fla. Aug. 26, 2013) ("Contrary to the Plaintiff's comment that such motions are commonly allowed, motions for leave to file a reply are not typically granted. Indeed, replies or any other pleading directed to the motion are disfavored (*see* Local Rule 3.01(c), which requires leave of court before filing a reply; hence, the rule infers the practice should be sparingly considered).").

Few grounds overcome this disfavor. For example, courts may grant motions for leave to file a reply brief where the proposed reply "brief responds to new evidence, facts, or arguments raised for the first time in the" opposition brief. *See Versar Env't Servs., LLC v. Black & Veatch Special Projects Corp.*, C.A. No. 23-1450-RGA, 2024 WL 5090804, at *6 (D. Del. Dec. 12, 2024) (ruling on a motion for leave to file a sur-reply); *see also St. Clair Intellectual Prop. Consultants, Inc. v. Samsung Elecs. Co. Ltd.*, 291 F.R.D. 75, 80 (D. Del. 2013) (same). Critically, content from an opposition brief is not "new" if it "is directly responsive to arguments made in" the opening brief. *See Cephea Valve Techs., Inc. Equityholders' Representative v. Abbott Labs.*, Civil Action No. 23-691-GBW-SRF, 2024 U.S. Dist. LEXIS 83381, at *22 (D. Del. Mar. 18, 2024) (ruling on a motion for leave to file a sur-reply).

Courts may, but need not, grant motions for leave to file a reply brief where the opposition brief contains a "court opinion" that "did not appear in" the opening brief, even where the opposition brief relies on the court opinion in response to arguments made in the opening brief. *Cf. Empower Brands LLC v. Tristar Prods., Inc.*, Civil Action No. 23-01225-RGA, 2024 U.S. Dist. LEXIS 225561, at *5 (D. Del. Dec. 12, 2024) (ruling on a motion for leave to file a sur-reply brief where the reply brief included a decision that "did not appear in" the opening memorandum); *see Int'l Bus. Machines Corp. v. The Priceline Grp. Inc.*, No. CV 15-137-LPS-CJB, 2016 WL 626495, at *1 (D. Del. Feb. 16, 2016) (contemplating the "the need to respond to judicial opinions cited in" a reply brief), *report and recommendation adopted*, No. CV 15-137-LPS-CJB, 2016 WL 1253472 (D. Del. Mar. 30, 2016).

When the evidence, facts and arguments in the opposition brief are not "new," they do "not open the door to an expansion of briefing." *See Cephea Valve Techs.*, 2024 U.S. Dist. LEXIS 83381, at *22. Similarly, courts may deny motions for leave to file a reply brief where the

proposed reply brief raises an issue that "could have been raised" in the opening brief. *See Bishop v. JPMorgan Chase & Co.*, No. CA 13-1-RGA-MPT, 2013 WL 3177826, at *6 (D. Del. June 21, 2013) (ruling on a motion for leave to file a sur-reply brief), *report and recommendation adopted*, No. CV 13-1- RGA, 2013 WL 4007508 (D. Del. Aug. 5, 2013); *Jazayeri v. Avaya, Inc.*, No. 2:19-CV-06003-JDW, 2021 WL 2186367, at *6 (E.D. Pa. May 28, 2021) (same).

Courts may also grant motions for leave to file a reply brief where the reply brief seeks to "correct a demonstrable inaccuracy." *Choma v. Blue Cross Blue Shield of Delaware*, No. CIV.A. 06-486-JJF, 2008 WL 4276546, at *15 (D. Del. Sept. 18, 2008) (ruling on a motion for leave to file a sur-reply brief).

Although there may be occasion where the most expedient resolution of the matters underlying the briefing would be to consider "the additional briefing," the better approach is often "to encourage the parties to follow the rules." *See Waters Techs. Corp. v. Aurora SFC Sys. Inc.*, C.A. No. 11-708-RGA, 2012 WL 13167829, at *1 (D. Del. Apr. 20, 2012) (ruling on motion for leave to file a sur-reply). The decision on whether to grant leave to file a reply is ultimately one of "discretion" for the district court. *See Levey v. Brownstone Inv. Grp., LLC*, 590 F. App'x 132, 137 (3d Cir. 2014) (confirming that "permission for leave to file a sur-reply is a matter committed to the District Court's sound discretion" (cleaned up)).

As an initial matter, the operative Scheduling Order in this action instructs that "[t]here shall be no reply trial briefs filed." D.I. 120 ¶ 1; *see* D.I. 121-1 (modifying other portions of the D.I. 120 Scheduling Order). Therefore, MSN's motion requesting leave to file a reply brief is highly disfavored. The grounds that MSN sets forth in its Motion for Leave fail to overcome such disfavor. In particular, MSN identifies eight arguments from Acadia's opposition brief that purportedly merit a reply from MSN. D.I. 137 at 1-2. The Court discusses each below. Since the

Court declines MSN's request for leave to file a reply, the Court also declines-as-moot Acadia's contingent request for leave to file a sur-reply (D.I. 138 at 8).

**A. The Liu reference (DTX-013) "discouraged the use of capsules unless other dosage forms were not acceptable." (Resp. Br. at 4.)**

Defendants rely on the Liu reference in their opening brief to opine on the difficulty that elderly patients have in swallowing their medications. D.I. 126 at 3 (citing D.I. 126-1 ¶ 16 (relying on the Liu reference)). Acadia likewise relies on the Liu reference in its opposition brief to opine on the difficulty that elderly patients have in swallowing their medications, particularly as it pertains to capsules. D.I. 134 at 4 (citing D.I. 134-1 ¶ 12). Therefore, the referenced argument in Acadia's opposition brief "is directly responsive to arguments made in" Defendants' opening brief and not "new." *See Cephea Valve Techs.*, 2024 U.S. Dist. LEXIS 83381, at *22. Since the argument in Acadia's opposition brief is not "new," the argument does "not open the door to an expansion of briefing." *See id.* Even were the Court to consider the arguments in MSN's proposed reply brief, they "would not change the outcome" of the Court's decision on invalidity. *See Del. Life Ins. Co. v. Short*, No. 20-996-LPS, 2021 U.S. Dist. LEXIS 50053, at *1 n.1 (D. Del. Mar. 17, 2021).

For the foregoing reasons, the Court denies MSN's Motion for Leave with respect to argument (A).

**B. The Schiele reference (DTX-007) "explicitly teaches both larger dosage forms and capsules cause more swallowing difficulties." (Resp. Br. at 6.)**

Defendants rely on the Schiele reference in their opening brief to opine on the swallowability of dosage forms. D.I. 126 at 8. Acadia likewise relies on the Schiele reference in its opposition brief to opine on the swallowability of dosage forms, again, particularly as it pertains to capsules. D.I. 134 at 6. Therefore, the referenced argument in Acadia's opposition brief "is directly responsive to arguments made in" Defendants' opening brief and not "new." *See Cephea*

*Valve Techs.*, 2024 U.S. Dist. LEXIS 83381, at *22. Since the argument in Acadia's opposition brief is not "new," the argument does "not open the door to an expansion of briefing." *See id.* Even were the Court to consider the arguments in MSN's proposed reply brief, they "would not change the outcome" of the Court's decision on obviousness. *See Del. Life Ins. Co.*, 2021 U.S. Dist. LEXIS 50053, at *1 n.1.

For the foregoing reasons, the Court denies MSN's Motion for Leave with respect to argument (B).

**C. Ragnar-Tolf (JTX-011) teaches a POSA towards "direct compression tablet formulations, not capsules." (Resp. Br. at 6.)**

Defendants rely on the Ragnar-Tolf reference in their opening brief to opine on a POSA's motivation to formulate capsule dosages of pimavanserin. D.I. 126 at 5-6. Acadia likewise relies on the Ragnar-Tolf reference in its opposition brief to opine on a POSA's motivation (or lack thereof) to formulate capsule dosages of pimavanserin. D.I. 134 at 6. Therefore, the referenced argument in Acadia's opposition brief "is directly responsive to arguments made in" Defendants' opening brief and not "new." *See Cephea Valve Techs.*, 2024 U.S. Dist. LEXIS 83381, at *22. Since the argument in Acadia's opposition brief is not "new," the argument does "not open the door to an expansion of briefing." *See id.* Even were the Court to consider the arguments in MSN's proposed reply brief, they "would not change the outcome" of the Court's decision on obviousness. *See Del. Life Ins. Co.*, 2021 U.S. Dist. LEXIS 50053, at *1 n.1.

For the foregoing reasons, the Court denies MSN's Motion for Leave with respect to argument (C).

**D. That a "plain reading of the testimony, however, indicates that Dr. [Muzzio] never expressed even an expectation of success[.]" (Resp. Br. at 9.)**

MSN is correct that "Dr. Muzzio explicitly testified that a POSA would have had such an expectation [of success]" regarding the bulk density limitation of claim 4 of the '721 patent. D.I.

137 Ex. A at 3; *see* Tr. 335:15–336:15 (Dr. Muzzio testifying *inter alia* that a "POSA would expect the density to remain roughly there when the concentration is increased from 20 to 32 percent"). Accordingly, Acadia's argument is a "demonstrable inaccuracy" that MSN seeks to "correct." *See Choma*, 2008 WL 4276546, at *15.

However, the Court does not rely on argument (D) in its Opinion and, thus, the arguments in MSN's proposed reply brief would "not change the outcome" of the Court's decision. *See Del. Life Ins. Co.*, 2021 U.S. Dist. LEXIS 50053, at *1 n.1. For this reason, the Court denies MSN's Motion for Leave with respect to argument (D).

**E. That "the record shows that the claimed amount[] of [pimavanserin tartrate] could and did materially and unpredictably alter the property of the claimed formulation[.]" (Resp. Br. at 9.)**

This argument pertains to bulk density. The full quote from Plaintiffs' opposition brief is: "This is especially speculative here, where pimavanserin was known to be a bad behaving material, and the record shows that the claimed amount of pimavanserin tartrate could and did materially and unpredictably alter the property of the claimed formulation, i.e., the BD of the granules." D.I. 134 at 9 (cleaned up). Defendants rely on prior art (in particular, the Ragnar-Tolf reference) in their opening brief to opine on a POSA's motivation and reasonable expectation of success in formulating a pimavanserin capsule with a bulk density above 0.4 g/ml. D.I. 126 at 5-6. Acadia similarly relies on prior art (in particular, the Catalent reference (JTX-13)) in its opposition brief to opine on a POSA's motivation and reasonable expectation of success (or lack thereof) in formulating a pimavanserin capsule with a bulk density above 0.4 g/ml. D.I. 134 at 9 (citing D.I. 134-1 ¶ 22 (citing Tr. 340:11-341:1 (Dr. Muzzio discussing the Catalent reference))). Therefore, the referenced argument in Acadia's opposition brief "is directly responsive to arguments made in" Defendants' opening brief and not "new." *See Cephea Valve Techs.*, 2024 U.S. Dist. LEXIS

83381, at *22. Since the argument in Acadia's opposition brief is not "new," the argument does "not open the door to an expansion of briefing." *See id.*

Unlike argument (D), argument (E) is not a "demonstrable inaccuracy." *See Choma*, 2008 WL 4276546, at *15. Rather, the parties rely on different references to contend whether a POSA would have had a reasonable expectation of success in obtaining a bulk density of the pimavanserin composition above 0.4 g/ml. Defendants rely on the Ragnar-Tolf reference, which "discloses examples of pimavanserin tablets that were formulated, including in 1 mg, 5 mg, and 20 mg dosages, that ranged in bulk-density between 0.56 and 0.61." FoF ¶ 127 (citing the record). Acadia relies on the Catalent reference, which teaches that high shear "granulations are known to be capable of [bulk density] in the 0.6 – 0.8 g/ml range." JTX-13 at 0004. That the parties disagree on whether these references would have motivated a POSA to formulate the claimed invention with a reasonable likelihood of success is hardly surprising.

The Court does not necessarily agree with Acadia's characterization that the record shows that the claimed amount of pimavanserin tartrate materially and unpredictably changed the bulk density of the claimed invention. However, the Court found that a POSA would not have had a reasonable expectation of success in formulating a bulk density greater than 0.4 g/ml on other grounds. In addition, the arguments in MSN's proposed reply brief are essentially identical to the arguments from Defendants' opening brief. *Compare* D.I. 137 at 3, *with* D.I. 126 at 5. Thus, the arguments in MSN's proposed reply brief do "not change the outcome" of the Court's decision. *See Del. Life Ins. Co.*, 2021 U.S. Dist. LEXIS 50053, at *1 n.1.

For the foregoing reasons, the Court denies MSN's Motion for Leave with respect to argument (E).

**F. That "[ACADIA's] failure to develop a single size 4 capsule formulation suggests that skilled artisans would not have reasonably expected to succeed[.]" (Resp. Br. at 9.)**

The Court does not rely on argument (F) in its Opinion and, thus, the arguments in MSN's proposed reply brief would "not change the outcome" of the Court's decision. *See Del. Life Ins. Co.*, 2021 U.S. Dist. LEXIS 50053, at *1 n.1. For this reason, the Court denies MSN's Motion for Leave with respect to argument (F).

**G. That "'the long delay between the marketing of the [two tablet] formulation and [the one capsule formulation] . . . supports the inference that it was difficult for researchers to create a [single size 4 capsule] product.'" (Resp. Br. at 9.)**

The Court does not rely on argument (G) in its Opinion on obviousness and, thus, the arguments in MSN's proposed reply brief would "not change the outcome" of the Court's decision. *See Del. Life Ins. Co.*, 2021 U.S. Dist. LEXIS 50053, at *1 n.1. Though, the Court does rely on the underlying case upon which Acadia relies to reason that "the long delay between the Ragnar-Tolf reference and the one capsule formulation supports the inference that it was difficult for researchers to create the capsule formulation product." *Supra* § III(B)(3) (cleaned up). The facts undergirding the Court's reasoning are in the trial record. FoF ¶ 118 ("The Ragnar-Tolf reference was published on November 15, 2007, almost ten years before the earliest effective filing date of the '721 patent." (citing JTX-011 at 0001; Tr. 296:7-12)). Since MSN does not take issue with the underlying court decision, and since the Court relies on facts in the record and not new evidence introduced by Acadia, there is no basis for MSN's proposed reply brief.

For the foregoing reasons, the Court denies MSN's Motion for Leave with respect to argument (G).

**H. That column 19 of the '721 patent provides "express disclosures for manufacturing processes for granules" including various excipients may be included. (See Resp. Br. at 13 (citing JTX09 at 19:12–15))**

The Court does not rely on argument (H) in forming its Opinion and, thus, the arguments in MSN's proposed reply brief would "not change the outcome" of the Court's decision. *See Del. Life Ins. Co.*, 2021 U.S. Dist. LEXIS 50053, at *1 n.1. For this reason, the Court denies MSN's Motion for Leave with respect to argument (H).

## V. CONCLUSION

For the reasons discussed above, the Court concludes that Aurobindo infringes claims 4 and 5 of the '721 patent and that claims 4 and 5 of the '721 patent are not invalid. The Court also, for the reasons discussed above, denies MSN's Motion for Leave to File Post-Trial Reply Brief (D.I. 137) and denies-as-moot Acadia's contingent request for leave to file a sur-reply (D.I. 138 at 8). The Court will enter an Order consistent with this Opinion.